1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                   Plaintiff,       )
                                     )
5     v.                             )   6:10-cr-60066-HO-1-2
                                     )
6   STEVEN DWIGHT HAMMOND,           )
    DWIGHT LINCOLN HAMMOND, JR.,     )
7                                    )
                    Defendants.      )
8

9            TRANSCRIPT OF TRIAL PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11   UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12              WEDNESDAY, JUNE 13, 2012

13                 PENDLETON, OREGON

14        DAY 2 A.M. SESSION - PAGES 200 - 340

15                       -:-

16

17

18

19

20

21

22

23           Deborah Wilhelm, CSR, RPR
                  Court Reporter
24               P.O. Box 1504
              Eugene, OR  97440
25               (541) 431-4113

```
 1                  APPEARANCES OF COUNSEL

 2   FOR THE PLAINTIFF:      FRANK R. PAPAGNI, JR.
                            ANNEMARIE SGARLATA
 3                          United States Attorney's Office
                            405 E. 8th Avenue
 4                          Suite 2400
                            Eugene, OR  97401
 5                          (541) 465-6771

 6   FOR THE DEFENDANT:     LAWRENCE H. MATASAR
     (Steven D. Hammond)    Lawrence Matasar, P.C.
 7                          621 S.W. Morrison Street
                            Suite 1025
 8                          Portland, OR  97205
                            (503) 222-9830
 9
                            W. ALAN SCHROEDER
10                          Schroeder & Lezamiz Law Offices
                            447 West Myrtle Street
11                          Boise, ID  83701-0267
                            (208) 384-1627
12

13   (Dwight L. Hammond)    MARC D. BLACKMAN
                            Ransom Blackman LLP
14                          1001 SW Fifth Avenue, Suite 1400
                            Portland, OR  97204
15                          (503) 228-0487

16

17

18

19

20

21

22

23

24

25
```

INDEX OF EXAMINATIONS

| FOR THE PLAINTIFF: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| DENNIS NELSON | | | | |
| By Mr. Papagni | 214 | -- | 238, 241 | -- |
| By Mr. Schroeder | -- | 233 | -- | -- |
| By Mr. Blackman | -- | 236 | -- | 240 |
| | | | | |
| DUSTIN NELSON | | | | |
| By Mr. Papagni | 242 | -- | 249 | -- |
| By Mr. Schroeder | -- | 247 | -- | -- |
| DUSTY HAMMOND | | | | |
| By Mr. Papagni | 251 | -- | 300 | -- |
| By Mr. Matasar | -- | 286 | -- | -- |
| By Mr. Blackman | -- | 294 | -- | 302 |
| | | | | |
| TAMMARA RENFRO | | | | |
| By Mr. Papagni | 303 | -- | -- | -- |
| By Mr. Blackman | -- | 308 | -- | -- |
| ROD SPANNAUS | | | | |
| By Mr. Papagni | 310 | -- | 335 | -- |
| By Mr. Blackman | -- | 323 | -- | -- |
| By Mr. Schroeder | -- | 333 | -- | -- |

1        (Wednesday, June 13, 2012; 8:46 a.m.)

2        (The jury is absent from the courtroom.)

3                    P R O C E E D I N G S

4        MR. BLACKMAN:  Your Honor, we didn't realize

5   that you were taking the bench right now.  I'll go get

6   the Hammonds.

7        (Brief pause.)

8        THE CLERK:  This is the time set for Criminal

9   Case 10-60066, *United States of America versus Steven*

10  *Dwight Hammond and Dwight Lincoln Hammond, Junior*, time

11  set for jury trial, day two.

12       THE COURT:  Thank you.  I understand you have

13  some evidentiary matters.  I'll -- you can make your

14  record.  I'll tell you if I need argument, but I don't

15  want to hold you back from --

16       MR. PAPAGNI:  I just wanted to -- the day the

17  court had asked that we be efficient, first of all, I

18  want to make sure everyone knows, CR 160, our filing

19  lists the witnesses plus the exhibits we intend to use

20  for those witnesses.  Some of those exhibits are going

21  to change today, Judge, because we got some exhibits on

22  Monday from the defense.  We'll probably use those

23  today.

24       Number two, is that last night you mentioned

25  that I usually cut away a witness.  Well, I got rid of

```
 1    one last night named Taci Weil.  She won't testify.

 2    Apparently all the parties agree to the timing of this

 3    particular audio recordings.

 4         But I also -- that brings into the issue that

 5    I'd like some guidance on.  On page 41 or 40 of the

 6    transcript last week at our hearing, Judge, we were

 7    pretty careful about the audio recording of Mr. Gordon

 8    Choate.  And yesterday I brought it up a couple of times

 9    but I backed off because I didn't want to play it

10    because I know the defense had some objection to one of

11    the lines at the very end of the recording.  And you

12    told me to be careful.  It might be rebuttal or it might

13    be impeach -- you know, rehabilitation.

14         My intent today is when Tammi Renfro takes the

15    stand, you might recall she is the one who took the call

16    from Steve Hammond, that my intent is to play his call

17    first, because it was the first call.  And then play

18    Mr. Choate's call next.  Those are Exhibits 19 and 20.

19         Now, I want to make sure everyone got advance

20    notice of that.  I feel like I can offer it to

21    rehabilitate Mr. Choate.  But I wanted the court to know

22    that was my intent.  I know the court prefers to know

23    ahead of time.

24         The comments that you made about that, like I

25    said, were on page 40, 41 of the transcript.
```

 1          THE COURT:  They were shown to me this morning.

 2    I don't have that transcript in front of me, but I don't

 3    need it.  It's all right.

 4          MR. PAPAGNI:  The next issue is pretty simple

 5    is that Mr. Glascock's personnel file, as sometimes

 6    happens with the government, it was sent to Eugene and

 7    not here.  I spoke to my secretary -- I didn't speak to

 8    her, but I had a message to my secretary Roxie and told

 9    her to make sure it would be sent to Pendleton.  As soon

10    as it gets here, we'll provide it to the court.

11          That was what I represented to the court and I

12    want to make sure I get that done.

13          Number three issue, again, it's on an issue

14    from last week, on page 46 of the transcript, and that

15    was the Trooper Rod Spannaus.  I don't expect

16    Mr. Spannaus to testify until late this morning or early

17    this afternoon.  But basically in addition to his doing

18    the look for the deer that you know about, we discussed

19    two issues.

20          One, was -- excuse me, one issue, it was the

21    Oregon Hunter's Association meeting.  I confirmed this

22    morning that Mr. Hammond at that meeting a year before

23    the incident that we're concerned about, Mr. Steve

24    Hammond did speak and did ask the hunters to pay his

25    ranch, not other landowners, his ranch fees for the deer

1   on -- being fed by him, apparently.

2           You had mentioned at the time you thought that

3   was a skinny, but I still think it goes to his motive

4   because Mr. Jantze will probably be testifying on Friday

5   morning about the $5,000 requested fee.

6           So I need some guidance if you think that's too

7   skinny to offer or the not.  It would take about three

8   minutes of the court's time.

9           The last issue of some concern is that based

10  upon the questions by one of the defense lawyers

11  yesterday, we have checked, and we do have the BLM

12  permit for Mr. Jantze for this particular hunt.

13          We were looking for it incident to a defense

14  request some weeks ago, or I think it was a week ago,

15  two weeks ago.  At any rate, apparently there is one

16  they finally dug up.  And Mr. Ward is bringing it with

17  him today.

18          Lastly, because we still have 10 minutes before

19  9 o'clock, today's witnesses we anticipate will be as

20  follows for the benefit of the clerk.  I'll speak a

21  little slower.

22          We anticipate Dennis Nelson will testify first.

23  It is likely his son Dustin will testify next.  They

24  will be testifying regarding some of the photos we

25  received Monday.

        Dusty Hammond is likely to be the third

witness.  Tammi, the one with the audiotapes we were

talking about, Judge, is number four.  Mr. Spannaus,

number five.  Number six is David Ward.  Number seven is

Mr. Shrader.

        Now, I have some other people after that and I

know the court wants to get ten witnesses in today, but

I think that would be a good day's work, but they're all

here.  And quite frankly, Judge, if we get through them

all, unless it's pretty early in the afternoon, I'd be

pretty worn out.  I'd just ask that you take that into

consideration, but they are here and we have other

people coming.

        Those are all the things I have for the court.

And I just need to have your ruling.

        THE COURT:  Thank you.  Any input?

        MR. MATASAR:  No, Your Honor.  On the 404

matters, I filed a memo.  I have nothing to add.  I know

I asked you to review it last week.  So I have nothing

to add on those matters.

        THE COURT:  All right.

        MR. BLACKMAN:  Do I understand that I'm -- I

may have missed something, but with respect to Dusty

Hammond, there is that whole issue of the so-called

sandpaper.  And I can't honestly remember if the court

1  has ruled that that's not admissible.

2          THE COURT:  I haven't.  In fact, I am not as up

3  to speed on that as I am the others.  I'll read ahead

4  here and so I have something for you.

5          MR. BLACKMAN:  I would like to have some

6  clarification before he is called to the stand.

7          MR. PAPAGNI:  I can tell you that I admonished

8  Mr. Dusty Hammond last night not to mention it, but he

9  will mention that one of the reasons why he waited eight

10  years to report this event, or at least talk about, is

11  that he was fearful of his uncle and somewhat of his

12  father.  I don't think he'll say it was his grandfather.

13  But I said not to go any further unless there's a ruling

14  from the court.  So the young man knows not to go into

15  it unless he's got direction.

16          THE COURT:  All right.

17          MR. BLACKMAN:  Then your clerk this morning

18  advised that we really hadn't addressed the exhibits

19  that the defense had brought to the court on Monday.

20          THE COURT:  True.

21          MR. BLACKMAN:  I would like to go through those

22  quickly if I -- I think --

23          THE COURT:  We have six minutes.

24          MR. BLACKMAN:  -- they have not been admitted

25  at this point.  What's that?

1         THE COURT:  We have six minutes.

2         MR. BLACKMAN:  Sure.  The exhibits are numbered

3   1125-A, which is a blowup -- excuse me, 1124-A, which is

4   a blowup of one of the photographs that's already been

5   admitted in 1124.  That's the clock --

6         THE COURT:  Is that the clock?

7         MR. BLACKMAN:  -- in the kitchen.

8         THE COURT:  Okay.

9         MR. BLACKMAN:  1125-A is a map of the Krumbo

10  Butte area that now shows the location of the two

11  lightning struck trees that were found by Mr. Hogue

12  while he was conducting the most recent examination of

13  the area, and that actually happened about ten days ago,

14  I think.

15        And he will be testifying that those -- the

16  location of those trees is significant to his analysis

17  of the cause and origin of the Krumbo Butte Fire.

18        And then 1125-B is a photograph taken of one of

19  those lightning struck trees.

20        1125-C is a photograph of one of the other

21  lightning struck trees -- or, excuse me, the other

22  lightning struck tree, the second one.

23        And then D is just a close-up of the lightning

24  struck tree showing the damage to it.

25        1134-A is a duplicate of 1134 with the location

1  of the lightning struck tree in the Lower Bridge Creek

2  circled after Mr. Hogue determined with some certainty

3  that lightning struck tree was the one that was

4  observed.

5  And then 1198-A is the actual use report filed

6  by Hammond Ranches in 2006.

7  THE COURT:  What report?

8  MR. BLACKMAN:  Actual use -- it's the actual

9  grazing use report.

10  THE COURT:  Thank you.

11  MR. BLACKMAN:  The exhibit is already in as

12  1198, but what we realized when we were looking at the

13  documents again was that Mr. Hammond had written a note

14  to his range con on the back side of that form, which we

15  had missed the first time, and so this is simply the

16  copy of that report as actually filed with the actual

17  note from Mr. Hammond.

18  Then 1203 is the audio recording of Jody

19  Starbuck's telephone calls to dispatch on the afternoon

20  of the 21st of August of 2006.

21  THE COURT:  The number again?

22  MR. BLACKMAN:  That's 1203.

23  THE COURT:  1203.  Thank you.

24  MR. BLACKMAN:  And that was produced by the

25  government in discovery among literally hundreds, if not

thousands, of audio recordings that the government had made.

Then 1204 is the actual recording of Joe Glascock's call to Hammonds on the morning of the 22nd.

1205 is the transcript of that call.

1206 is the call he made in the afternoon of the 22nd.

1207 is the transcript of that call.

1208 is Mr. Steninger's CV.

1209 is a cooperative range improvement agreement that was entered into between the Hammonds and the BLM in '05 for replacing certain fences.

1210 is the map that Mr. Steninger created after examining the location of things.

1211 is that same map with the location of this ignition points in the area.

And 1212 is the same map showing the movement of the cattle from the Lower Mud Creek -- excuse me, yes, Lower Mud Creek pasture to -- the Bridge Creek pasture to the north pasture.

Then 1213 is the photograph taken during the hunting of elk on the -- in the area on September 15th, 2001.

And 14 -- 1214 is a photo taken during that same hunt on the 16th of September 2001.

15 is a photo taken during the hunt for deer, not elk, on the 29th and 31st of October of 2001, as is 1216.

1215 is a photo taken on October 29th.

And 1216, a photo taken on the 1st.

THE COURT:  Other --

MR. MATASAR:  The only thing that I would amend to that, Your Honor, is on the dates, those are the dates that the camera shows, which are on or about dates, because cameras can be on or about.

THE COURT:  Any objections?

MR. PAPAGNI:  Quite a few, but not to take up the court's time now.  As far as these photos we got on Monday, I'm not going to put Mr. Choate back on the stand because we haven't seen him, but we do have some objections.  I'd like Ms. Sgarlata to have an opportunity to look at the -- I think there's 10 or 12 exhibits that have just come in.  She needs to look at them.  And I don't think they're going to come into court before then, Judge.

THE COURT:  That's fine.  We'll take them up later.  Please seat the jury.

MR. PAPAGNI:  As far as the four photos, 1213, 14, 15, and 16, I will be using those this morning, so we don't have objection to those.

1          THE COURT:  So those are 12, 13, 14, 15 and 16?

2          MR. PAPAGNI:  Correct.  With the understanding

3    that they are only on or about dates listed in this

4    camera.  I don't know who the foundation witness will

5    be.

6          THE COURT:  Exhibits 1213, 1214, 1215 and 1216

7    are received.  Do you need any of the others this

8    morning?

9          MR. MATASAR:  Your Honor, you may have

10   misspoken on the numbers.  I think the photos are 13,

11   14, 15 and 16.

12         THE COURT:  They're not 1213?

13         MR. MATASAR:  Oh, I'm sorry, yes, Mr. Schroeder

14   may have misunderstood you when you said 12, 13.  It's

15   one-thousand two hundred and thirteen through

16   one-thousand two hundred and sixteen.

17         THE COURT:  That's correct.

18         MR. MATASAR:  We're okay.

19         THE COURT:  On the other matters raised by

20   Mr. Papagni, you may use the Tammi Renfro tape.

21         Glascock's personnel file I'll look at when it

22   gets here.

23         With regard to the statement that Trooper

24   Spannaus heard about feeding wildlife on the ranch, I'm

25   not going to allow that under 403.

1            And you may mark the BLM permit for Mr. Jantze

2    as you wish.

3            All right.  Seat the jury, please.

4            MR. PAPAGNI:  Mr. Nelson is in the courtroom

5    ready to testify, Judge.

6            (The jury enters the courtroom at 9:07 a.m.)

7            THE COURT:  Good morning, Jury.  Thanks for

8    being prompt this morning.

9            Call your next witness, please.

10           MR. PAPAGNI:  Dennis Nelson, Your Honor.

11           Mr. Nelson, if you would come forward, please,

12   sir.

13           (The witness was sworn.)

14           THE CLERK:  Please have a seat.  Please speak

15   into the microphone and there is water here.

16           Please state your full name and then spell your

17   name for the record.

18           THE WITNESS:  Dennis Charles Nelson,

19   D-E-N-N-I-S, C-H-A-R-L-E-S, N-E-L-S-O-N.

20                       DIRECT EXAMINATION

21   BY MR. PAPAGNI:

22   Q.    Good morning, Mr. Nelson.  Mr. Nelson, I'd like

23   you to first tell us what you do for a living.  What's

24   your occupation?

25   A.    What's that again?

1      Q.      Do you have your hearing aid?  There you go.

2   What do you do for a living?  What is your occupation?

3      A.      I build houses, contractor, general contractor,

4   frame houses and stuff.

5      Q.      And where do you live, sir?

6      A.      In Roy, Utah.

7      Q.      Do you have a family?

8      A.      Yeah.

9      Q.      And do you have a son?

10     A.      Yep.

11     Q.      And his name is?

12     A.      My son's or --

13     Q.      Yes.

14     A.      I have Brandon, Curt, Dusty, and Kyle is my

15   sons, and I have one daughter, Brooke.

16     Q.      Okay.  Are you a hunter?

17     A.      Do they all hunt?

18     Q.      Yes.

19     A.      Yeah, they all hunt.

20     Q.      How long have you hunted, sir?

21     A.      Since I was old enough to tag along with my

22   dad, so I've been hunting most all my life, yeah.

23     Q.      Okay.  I want you to think back a number of

24   years to 2001, it would be September.  Before

25   September 30th, did you have occasion to try to come to

1    a hunt in Oregon?

2        A.    Did I come to?

3        Q.    I'm sorry, maybe I need to speak a little

4    louder, it's my fault.

5        A.    Well, I actually have lost one of my hearing

6    aids.

7        Q.    I'm sorry.  I'll speak a little louder and a

8    little slower.

9        A.    That's fine.

10       Q.    Okay.  Back in 2001, did you have occasion to

11   come to Oregon?

12       A.    Yeah, yep, yeah, we lined up a hunt.  My third

13   oldest son had just got back from a two-year mission,

14   and I wanted to do special for him.  When he got back it

15   was too late to put him in for any hunts in Utah.  So I

16   contacted a friend of mine that runs Garth Carter

17   Hunting Service.  And he lined up a hunt in Oregon for

18   us, for Dusty to go hunt on, so.

19       Q.    And do you remember who the person was you

20   contacted in Oregon to line up this hunt?

21       A.    He -- I don't know the guy's name exactly.  It

22   was -- who it was, but he lined him up, and then he got

23   us in contact with -- lined up Gordon to guide for us.

24   So we actually worked through Garth Carter Hunting

25   Services is who we worked through.

1    Q.    You mentioned "Gordon," that would be Gordon

2    Choate?

3    A.    Yeah.

4    Q.    Okay.  And how much did it cost you to have

5    this hunt for your son?

6    A.    I couldn't find the exact thing, but it was

7    around $2,000, I think is about what it costed (sic).

8    Q.    Okay.  Now, that was the total cost?

9    A.    Yeah.

10   Q.    Okay.  And when did you and your son come out

11   to Oregon to do this hunt?

12   A.    It was in that first -- that rifle season of

13   September, I believe, yeah.

14   Q.    And do you remember what day of the week it was

15   that you finally made it to Oregon?

16   A.    It was Friday, Friday before the hunt opened on

17   the Saturday, I believe.

18   Q.    Okay.  And where did you meet Mr. Choate?

19   A.    We actually met him just off the paved road.

20   We parked our truck and then we had to drive around on

21   a -- kind of a loop around the private ground on a dirt

22   road to where his camp, he had a spike camp.

23   Q.    And did you park your trucks at a -- near his

24   trailer before you went to the spike camp?

25   A.    Yeah.

1      Q.    I'll show you Exhibit Number 6, if I can,

2   please.  We're going to have it on the screen.  There

3   you go.  Does that look familiar, Mr. Nelson?

4      A.    Yeah, that was the camp that we stayed in.

5      Q.    Okay.  Was it all set up when you got there?

6      A.    Yeah.

7      Q.    Okay.  And it was just you and your son Dustin

8   that went to this campsite?

9      A.    Yeah.

10      Q.    Did you do any hunting on your first day there,

11   on this Friday?

12      A.    No, we just -- we got there and kind of walked

13   around the camp a little bit and checked out the area,

14   and then it opened up on the next day, so.

15      Q.    And did you receive any precautions on where

16   you should go and not go by Mr. Choate?

17      A.    Yeah, he seemed real familiar with the area and

18   knew where the private ground was and the BLM was.

19      Q.    And did you stay on the BLM ground, sir?

20      A.    Yeah, yeah, we stayed on there.

21      Q.    And on Saturday, the next day, did you and your

22   son and Mr. Choate go out hunting in the area?

23      A.    Yeah, we went -- we was there by daylight

24   opening morning, and seen a number of bucks and stuff.

25   And we decided to pass and wait on one nice buck, and we

1    decided to hunt the next day.  Just kind of get an idea

2    of what was in the area, the size of bucks and stuff.

3        Q.    The next day, sir, this would be September

4    30th, 2001, this would be a Sunday, do you recall

5    getting up to go hunting that particular day?

6        A.    We got up that next morning, yeah, real early

7    right before daylight and got over the same area.  And

8    Dusty and I decided if we seen that that one -- we seen

9    a pretty good buck -- if we seen him again, we'd

10   probably take him.

11       Q.    As daylight broke, did you see that particular

12   buck?

13       A.    Yeah, he was -- he had come across from the

14   private ground to the public ground by himself, the deer

15   was by himself.  That buck had split off from the other

16   group of bucks, yeah.

17       Q.    Did Dusty make the shot and get the buck?

18       A.    Yeah, he was able to get that, yeah.

19       Q.    I'm going to have you take a look at Exhibit

20   Number 7.  Now, is this the particular terrain that you

21   and your hunt -- son were hunting in?

22       A.    Yeah, that's the area.

23       Q.    As far as the hunting area itself, you being a

24   hunter all your life, how was it for deer hunting?

25       A.    It was a great area.  It was, you know, what

1   deer like to be in, you know, sagebrush and aspens and

2   stuff.  It was just great deer country, yeah.

3       Q.    How was the weather that morning, sir?

4       A.    It was great.  You can -- it was a beautiful

5   morning.

6       Q.    Any smoke in the air at that time, sir?

7       A.    No.

8       Q.    Okay.  After you shot the buck, did you take a

9   few photos?

10      A.    Yeah.

11      Q.    Number 8, please.  And we see that's you in

12  Number 8.  Who else is in Number 8?

13      A.    That's my son, Dustin.

14      Q.    And that's the buck you got or he got?

15      A.    Yeah.

16      Q.    Did you tag the buck?

17      A.    Yeah.

18      Q.    Okay.  Number 9.  Do you recognize the person

19  next to your son?

20      A.    Yeah, that's Gordon, that was our guide, yeah.

21      Q.    You took the photo?

22      A.    Yeah.

23      Q.    Number 10.  Now, this particular photo I want

24  you to pay a particular attention towards your son's

25  hands.  They appear to be a red or bloody?

1    A.    Yeah, that's natural getting a deer.  And most

2    of the hunts that we go on are not guided.  They are

3    just family hunts.  It's important that, you know, he

4    learned how to take care of the animal by himself if I'm

5    not there.  So we had him dress the deer and take care

6    of it.

7    Q.    Okay.  Now, what happens after your son got his

8    buck?  What did Mr. Choate do?

9    A.    He went back up to get the truck that we had

10   left on the back side of the ridge.  And he brought it

11   down and drove to where we could drag the deer to and

12   haul it off.

13   Q.    And were you and your son dragging the deer

14   toward his truck?

15   A.    Yeah.

16   Q.    And as you did that, did you notice if there

17   were any other vehicles in the area?

18   A.    Yeah.  There was another older model truck

19   coming down that came down the road while we were taking

20   care of the animal.

21   Q.    And while you were doing that, did you get

22   close enough to the two vehicles to hear anything that

23   was being said?

24   A.    I -- well, at first when they drove up the

25   passenger guy had his head out the window and was

1    looking at the buck that we had taken and said that

2    it --

3              MR. BLACKMAN:  Objection.

4              THE WITNESS:  Looked like we had --

5              MR. BLACKMAN:  I'm sorry, it was an objection

6    to hearsay, Your Honor.

7              THE COURT:  Yes.  You can't tell what he said.

8              THE WITNESS:  What's that?

9              THE COURT:  You can't say what he said.  You

10   can say what you saw.

11             THE WITNESS:  Yeah, I couldn't hear other than

12   their -- Gordon had walked up to him and talked to him

13   and recognized the people in the truck and talked to

14   them.

15   BY MR. PAPAGNI:

16     Q.    Okay.  After Mr. Choate spoke to the people in

17   the truck, where did that truck go, sir?

18     A.    He continued down the road to the west of us.

19     Q.    Okay.  And what did you and your son do?

20     A.    We ended up loading the deer -- Gordon got

21   there and we loaded the deer up and then we headed back

22   to camp.

23     Q.    As you were heading back to camp, sir, did

24   something happen that you recall clearly?

25     A.    Yeah, a group of bucks had come across from the

1  private up onto the public ground.  And there was a

2  number of shots from multiple places being shot at these

3  deer.  And we were watching the deer getting hit.  A few

4  of them got wounded.

5      Q.    Now, as you are going down the road toward this

6  area that you just described for us, where are you

7  seating in Mr. Choate's pickup?

8      A.    I'm in the passenger side.

9      Q.    So you are on the side closest to where the

10  shots were coming from, sir?

11     A.    Yeah.

12     Q.    And as you are going down there, you say you

13  first see these deer, correct?

14     A.    We seen the deer, yes.  What about it?

15     Q.    Tell us about the deer.  What did they look

16  like?

17     A.    It was a bunch of small bucks type thing,

18  probably seven or eight bucks, probably.

19     Q.    And did you have any binoculars or anything to

20  assist your eyes?

21     A.    Yeah, I had a pair of binoculars.

22     Q.    Where was your attention first directed before

23  you heard the shots?

24     A.    We were looking at the group of bucks.

25     Q.    And while you were doing that, why were you

1    doing it?  What was the purpose?

2        A.    Just looking at them.  For one thing, we were

3    deer hunting, so we were just looking at them.

4        Q.    Okay.  And then you said you heard these shots?

5        A.    Uh-huh.

6        Q.    Did you look in the direction of the shots,

7    sir?

8        A.    You could hear them coming from two

9    different -- well, first mainly from the right side, and

10   then we heard a few coming from another direction up

11   above, further to --

12       Q.    When you say "we," sir, that was you?

13       A.    And my son, yeah.

14       Q.    Okay.  Back then, did you have hearing aids

15   back then?

16       A.    No.

17       Q.    You've had an illness since then, have you not?

18       A.    Yeah, yeah, I do have a kind of a rare disease

19   right now I'm battling.

20       Q.    Okay.  But back then your hearing was fine?

21       A.    Yeah.

22       Q.    Okay.  As you first hear the shots, when you

23   first look out the passenger side window, are you

24   looking up a ridge or a hill?

25       A.    Kind of up that valley as it goes up there,

1    yeah.

2         Q.    Okay.  And who was the first person you saw?

3         A.    We seen a guy wearing a white cowboy hat, kind

4    of distinct, stands out for me.

5         Q.    Okay.  Now, when you say you saw this guy,

6    describe what he did, the guy in this white cowboy hat?

7         A.    Well, he was coming down after the shooting,

8    when we started driving away, he started walking down.

9    And then when he got fairly close to us, he seen us and

10   then he sat down.

11        Q.    He sat down.  Explain that, please, sir.

12        A.    I don't know, he just kind of sat down in the

13   sagebrush.

14        Q.    Could you see him any longer?

15        A.    I could still see him even though he was

16   sitting down.

17        Q.    Okay.  So you had seen him for about how long

18   before he squatted down behind this sagebrush?

19        A.    I don't know.  Ten, 15 seconds or something.

20        Q.    Okay.  Now, I'm going to have an exhibit that

21   we got on Monday, 1215, defense exhibit, last night --

22   you came in from Utah when this week, sir?

23        A.    What's that?

24        Q.    When did you come from Utah this week, sir?

25        A.    When did I?

1    Q.    Yeah.

2    A.    We came up -- let me -- we came up Monday

3 night.

4    Q.    And last night did you have a chance to look at

5 this photograph?

6    A.    Yes.

7    Q.    When you looked at this photograph, paying

8 particular attention to that hat.

9    A.    Uh-huh.

10    Q.    Okay.  You were asked about that hat, correct?

11    A.    Yeah.

12    Q.    And you were told or asked -- well, let's just

13 ask the question.  Is that the hat that this guy was

14 wearing that you saw shoot at the bucks?

15    A.    I didn't think it looked familiar.  Didn't look

16 like the one that we had seen.  The one I had seen

17 seemed to be more of a typical cowboy hat, more of a

18 classic original type cowboy hat.

19    Q.    And this hat, does it look like it at all, sir?

20    A.    It doesn't to me, no.

21    Q.    And about the person that's wearing the hat in

22 the photograph that the defense lawyers have, Defense

23 Exhibit 1215, the individual wearing that hat, does the

24 individual wearing the hat in the defense exhibit look

25 similar or dissimilar to the person you saw back in

1    2001?

2        A.    He doesn't -- he looks heavier set than the guy

3    I seen.

4        Q.    Describe the guy that you saw, if you can.

5        A.    What's that?

6        Q.    Describe the person you saw wearing a different

7    type of white hat.

8        A.    Well, he seemed a taller, thinner guy, type

9    guy.

10       Q.    The person in this white hat that you said was

11   shooting at the bucks, could you tell if he was an adult

12   or a teenager, say 12, 13, 14 years old?

13       A.    He was an adult, yeah.

14       Q.    Government's exhibit -- excuse me, Defense

15   Exhibit 1213, please.  Now, this is just a different

16   view.  You were shown this photograph last night, too,

17   were you not?

18       A.    Uh-huh.

19       Q.    And that particular photograph, again, gives

20   you a little bit better view or different view of the

21   hat.  Is that the hat that the man was wearing that shot

22   the bucks that you saw?

23       A.    It doesn't seem like it, no.

24       Q.    Why?

25       A.    The one that we seen seemed more like a

1    traditional type cowboy hat, straw hat type.

2         Q.    What about the coloration, sir?

3         A.    It seemed like it was a little whiter, the one

4    that we seen was whiter maybe.

5         Q.    Thank you.  You can take that off.  Now,

6    getting back to what occurred, you said after the first

7    shots were heard that was fired by this adult in a white

8    cowboy hat different than the one we've just seen --

9              MR. BLACKMAN:  Objection, Your Honor.  I object

10   to both --

11             THE COURT:  Sustained.

12   BY MR. PAPAGNI:

13        Q.    After you saw the shooting and you said there

14   was some other shots coming from someone else, sir, were

15   you able to get a view of that individual?

16        A.    You could just see him -- they was a lot

17   farther away.  We seen them, there was a group to the

18   left.

19        Q.    Do you recall how many people there might have

20   been, sir?

21        A.    Two or three.

22        Q.    And could you tell if they were adults or

23   teenagers or not able to?

24        A.    I couldn't tell.

25        Q.    What happened next, sir, after you made those

1    observations?

2       A.     We continued back to camp.  We headed back.  As

3    soon as we started driving away, the guy in the cowboy

4    hat started walking back up the direction that he came.

5       Q.     When you started the drive -- before you

6    started to drive back to the direction, just immediately

7    after these bucks were shot at, were there any comments

8    by Mr. Choate as to whether or not he was able to

9    identify -- not asking who he identified -- did he --

10   any comments -- was he able to identify who the person

11   was that he thought was shooting at the bucks?  Don't

12   say who it was.  Did he say it or not?

13      A.     Yeah, he did.

14      Q.     Now, I'm going to ask you the question, don't

15   answer until there is a chance to object.  Do you recall

16   who he said the person was?

17             MR. SCHROEDER:  Objection.

18             THE COURT:  Sustained.

19   BY MR. PAPAGNI:

20      Q.     About how long did it take you to get back to

21   the camp, sir?

22      A.     I'd say a half hour at the most, probably.

23      Q.     What happened when you got back to the camp?

24      A.     We hung up the deer and skinned the deer out,

25   took care of it.

1    Q.    When you say "we," who actually did the work on

2  the deer?

3    A.    Gordon did most of the work on the skinning.

4  We kind of assisted him, helped him.

5    Q.    And as he was doing that, did you notice

6  something that bothered you?

7    A.    Well, yeah, we did see smoke in the air after

8  that.

9    Q.    About what time of day or morning would you say

10  it was, your best estimate, sir?

11    A.    I would say 9, 10 o'clock, probably.

12    Q.    About how long after you saw the deer getting

13  shot did you first notice the smoke, would you estimate?

14    A.    Probably a couple of hours.

15    Q.    And after you noticed the smoke, what happened

16  next?  What did the three of you do after you noticed

17  the smoke?

18    A.    Well, we decided to get out of there and head

19  for home.  We had a long drive home anyway.  We --

20  rather than miss another day of work, we decided that

21  we'd -- instead of sticking around, that we'd head out

22  and let the deer cool out with the air over it.

23    Q.    And what did Mr. Choate do with your deer?

24    A.    He said, yeah, we loaded up and headed back to

25  our truck.

1     Q.    And as you headed back to your truck, how did

2     the intensity of smoke, did it dissipate or get worse?

3     A.    It got worse.  It was the definitely the topic

4     of conversation all the way back to the truck.

5     Q.    And were you able to see flames at any -- or a

6     fire at any particular point?

7     A.    After -- when we got closer to our truck, we

8     could see flames, yeah.

9     Q.    And as you say, as you got closer to your

10    truck, about how long did it take for you to get back to

11    your truck, sir?

12    A.    Probably 45 minutes to an hour, around that

13    loop.  It's kind of a rough little road around there.

14    Q.    And about what time did you get back to your

15    truck?

16    A.    I think we were probably gone by noon.

17    Q.    And did you calculate in your mind -- maybe

18    rephrase that.  Why do you think it was noon?

19    A.    Well, we had a probably eight -- nine-hour

20    drive home.  We wanted to get on the road and get home

21    before it got too late.

22    Q.    And as you were driving toward your truck, were

23    you able to see smoke and flames coming from the area

24    where you had left?

25    A.    Yeah, that's what we were amazed that it looked

1    like it was right where we had been hunting is where the

2    fire was.

3        Q.    And when you got back to your truck, then you

4    left for Utah, sir?

5        A.    Yeah.

6        Q.    Now, this is indicated it was in September 30th

7    of 2001, it's been quite some time.  How clear is this

8    recollection of these events in your mind?

9        A.    Well, there's a lot of it -- well, since it's

10   these past years that we got called up, a lot of it come

11   back, a lot of the memories have come back from it.

12       Q.    What did you recall back then -- what was

13   significant about what had occurred back in 2001 that

14   stuck in your mind?

15       A.    Well, definitely, the fire and the -- you know,

16   the deer getting wounded.  Of course, most hunts -- I

17   can remember most hunts that I go on, especially with my

18   kids.

19       Q.    In all the hunts you've gone on, sir, how many

20   times have you experienced fire occurring right after

21   you've seen deer getting shot?

22       A.    This is the only time, yeah.

23             MR. PAPAGNI:  That's all.

24             THE COURT:  Cross.

25

1                    CROSS-EXAMINATION

2    BY MR. SCHROEDER:

3        Q.    Good morning, Mr. Nelson.

4        A.    Good morning.

5        Q.    I'm going to have to shift over so I don't look

6    through this.

7        A.    I'm sorry.

8        Q.    My name is Alan Schroeder.  I have a few

9    questions for you, okay?

10       A.    Okay.

11       Q.    You indicated that you spoke with a man named

12   Garth Carter Hunting Services.  Are they in Utah or are

13   they in Oregon?

14       A.    They are in Utah.

15       Q.    And did you buy the hunt through them?

16       A.    Yeah.

17       Q.    And so then they contracted it out, to your

18   knowledge?

19       A.    Yeah.

20       Q.    And so you paid them the $2,000?

21       A.    I am not 100 percent sure on that, whether I

22   paid them or -- I think I did pay Garth.  I'm pretty

23   sure that's who we paid, yeah.

24       Q.    When you said that after your son killed the

25   deer and you drag it down the hill and put it in

1    Mr. Choate's truck, and then you were heading out and

2    you saw a group of smaller bucks come over, would it be

3    fair to say smaller bucks would be forked horn type of

4    bucks?

5         A.    Yeah, probably, two's and three point,

6    probably.

7         Q.    Were you looking for forked horns or were you

8    looking for three points?

9         A.    No.  We were looking for older sized deer to

10   harvest, yeah.

11        Q.    A lot of people call bucks differently.  They

12   count the horns on one side only or they count the

13   total.  How do you count them?

14        A.    We count them on one side.  Four point, yeah.

15        Q.    And this in this case was a four point?

16        A.    Yeah.

17        Q.    Okay.  After you returned to the camp, after

18   you had -- after your son had shot the deer, you cut it

19   up and loaded it up, and then you went back to your

20   truck where you had left it before?

21        A.    Uh-huh.

22        Q.    You had not driven your truck to the campsite;

23   is that right?

24        A.    No.

25        Q.    Okay.  My question is, is when you were at the

```
 1    campsite, is that the time that you saw the smoke?
 2        A.    At the -- before we left?
 3        Q.    Yes.
 4        A.    Yeah, we actually seen the smoke before we left
 5    the campsite.
 6        Q.    But you were at the campsite when you first
 7    noticed it?
 8        A.    Yeah.
 9        Q.    Okay.  You indicated that you had a long drive
10    home?
11        A.    Uh-huh.
12        Q.    Is that one of the reasons or the reason why
13    you wanted to -- your son had success, and you wanted to
14    go home?
15        A.    It was so we wouldn't lose another day of work
16    was definitely one of the things -- reasons that we
17    wanted to leave early, too.
18            MR. SCHROEDER:  Okay.  Thank you.  No further
19    questions.
20            THE COURT:  Just a moment.
21            MR. BLACKMAN:  I actually just have a couple.
22    Now, Mr. Papagni asked you --
23            (Court reporter interruption.)
24
25
```

1                     CROSS-EXAMINATION

2    BY MR. BLACKMAN:

3        Q.    I'm Marc Blackman.  Mr. Papagni asked you -- it

4    had been a number of years and how you remember some of

5    this stuff.  Do you remember getting together in July of

6    last year, less than a year ago, with a Mr. Windom from

7    the BLM?

8        A.    Yeah.

9        Q.    And you met with him, Dave Ward, your son, and

10   Gordon Choate all together, right?

11       A.    Yeah.

12       Q.    And ou sat together for, what, an hour talking

13   about all this?

14       A.    Probably about an hour, yeah.

15       Q.    Okay.  And that was to prepare you for the

16   trial in this case, wasn't it?

17       A.    Yes.

18       Q.    And so you sat there with Mr. Ward.  Did you

19   know him before?

20       A.    Did I know who before?

21       Q.    David Ward.

22       A.    No, I didn't know him before.

23       Q.    So you were introduced to him then?

24       A.    I believe so.  I can't actually remember

25   that -- David at that time.

1     Q.    Okay.  You remember Gordon?

2     A.    Yeah.

3     Q.    And you remember Mr. Windom?

4     A.    Uh-huh.

5     Q.    So Mr. Windom, from the BLM, at least your son

6  and you and Mr. Choate, tried to remember what happened

7  that day?

8     A.    Or they just got -- yeah, they let us read our

9  statements, and which -- to kind of refresh our

10  memories, too, and then go over what we remembered.

11     Q.    Okay.  Together in one room?

12     A.    Uh-huh.

13     Q.    The purpose of that was specifically to prepare

14  your testimony for trial?

15     A.    Probably, yeah, I imagine, yeah.

16     Q.    And did you have a cell phone with you that

17  day?

18     A.    Did I -- what's that?

19     Q.    Did you have a cell phone back on September

20  30th?

21     A.    At the hunt?

22     Q.    Yeah.

23     A.    I can't remember.

24     Q.    Do you remember Mr. Choate having a cell phone?

25     A.    I can't remember that either.

1    Q.    Do you have any recollection about how good the

2    cell phone service is in that area?

3    A.    I don't, no.

4    MR. BLACKMAN:  Thanks.  No other questions,

5    Your Honor.

6    MR. PAPAGNI:  I have some questions.

7                    REDIRECT EXAMINATION

8    BY MR. PAPAGNI:

9    Q.    Mr. Blackman just got through asking you about

10   this interview that happened with Mr. Windom, what was

11   it, a year ago or so?

12   A.    Uh-huh.

13   Q.    But you actually gave a statement about what

14   occurred back in December 18th of 2001 to a Mr. Shrader,

15   did you not?

16   A.    Uh-huh.

17   Q.    Back then, when you gave that statement, you

18   didn't have all these other people around you?  It was

19   just you and Mr. Shrader talking, correct?  And maybe

20   your son was nearby on the phone?

21   A.    Yeah, it was just me and him, I think, that

22   talked on the phone.

23   Q.    And in this statement that you gave back then,

24   it was regarding what occurred on September 30th, 2001,

25   while hunting with Mr. Choate, correct?

1    A.    Yeah.

2    Q.    So there was no one else around that could

3    influence you or prepare you for any trial back then?

4    A.    No.

5    Q.    There was no trial to go to at that point, was

6    there?

7    A.    No.

8    Q.    And during that time that you went ahead and

9    you gave statements like you testified here today?

10   A.    Yeah.

11   Q.    And has anyone asked you to change your mind or

12   say anything different from what you said back in 2001?

13   A.    No.  They just said they just wanted the -- you

14   know, what I actually remembered, what was the truth and

15   what wasn't the truth.

16   Q.    And you had a chance to read the statement you

17   gave back in 2001, correct?

18   A.    Back last summer.  I didn't read it this time.

19   Q.    Okay.  And as far as these photographs you were

20   shown today about this hat that you saw on the screen,

21   anyone suggest to you any answer to that hat?

22   A.    No.

23   Q.    You just were asked whether or not it was the

24   hat or not?

25   A.    Whether it reassembled -- looked like the one

1  that we had seen, yeah.

2     Q.    And you said it was?

3     A.    It didn't seem like it was the one, no.

4           MR. PAPAGNI:  Thank you.  Those are all my

5  questions.

6           MR. BLACKMAN:  Your Honor.

7                     RECROSS-EXAMINATION

8  BY MR. BLACKMAN:

9     Q.    Have you -- you did look at your statement that

10 you gave back on the 18th of December, right?

11    A.    8th of --

12    Q.    18th of December.  I'm sorry (pulling

13 microphone closer).

14    A.    Oh, yeah.

15    Q.    You --

16    A.    The first statement that I gave?

17    Q.    Right.

18    A.    I read it last summer, yeah.

19    Q.    Did you read it again before you testified

20 today?

21    A.    No.

22    Q.    Okay.  If I told you that there is nothing in

23 your statement about the times of anything happening,

24 would that sound right to you?

25    A.    Probably, yeah.

1    Q.    So there was nothing when you gave your

2    statement in December of '01, about what time you got

3    up, what time you went hunting, what time you did this,

4    what time you did that, there was none of that?

5    A.    No.

6          MR. BLACKMAN:  That's all.  Thank you.

7          MR. PAPAGNI:  One more question based upon the

8    last series of questions.

9          THE COURT:  Go ahead.

10                    REDIRECT EXAMINATION

11   BY MR. PAPAGNI:

12   Q.    In the statement that you gave Mr. Shrader back

13   in December of 2001 that you were just asked about

14   times, do you remember you saying it was between a half

15   hour and an hour after a group of hunters had been

16   shooting at the deer, the fire started in the same area?

17   A.    Yeah, that's probably true, yeah.

18   Q.    So you did give some estimations of time back

19   in 2001?

20   A.    Yeah, a little bit, yeah.

21         MR. PAPAGNI:  That's all, Judge.

22         THE COURT:  Thank you, sir.  Please step down.

23         MR. PAPAGNI:  You are free to go, please?

24         THE COURT:  Yes.

25         MR. PAPAGNI:  We call to the stand your son

1    Dustin Nelson, please.

2              THE CLERK:  Please raise your right hand.

3              (The witness was sworn.)

4              THE CLERK:  Please have a seat.  Please speak

5    into the microphone.  And there is water if you would

6    like some.

7              Please state your full name and spell your name

8    for the record.

9              THE WITNESS:  Dustin Chet Nelson, D-U-S-T-I-N,

10   C-H-E-T, N-E-L-S-O-N.

11                   DIRECT EXAMINATION

12   BY MR. PAPAGNI:

13      Q.    Mr. Nelson, you weren't in the courtroom when

14   your father was testifying, were you, sir?

15      A.    No.

16      Q.    Okay.  Do you recall a hunt that your father

17   and you went on back in September of 2001?

18      A.    Yes.

19      Q.    And before today, you've had a chance to read

20   statements and look at photos and that sort of thing,

21   correct?

22      A.    Yes.

23      Q.    And, sir, I want to kind of get to the point

24   here, last night you were shown some photos, were you

25   not?

1    A.    Yes.

2    Q.    I'm going to ask by the courtesy of the bailiff

3 that we put on the screen Defendant's Exhibit

4 Number 215.

5          (Court reporter interruption.)

6    Q.    Excuse me, 1215, I'm sorry, thank you.  And do

7 you recall seeing this kind of a black and white photo

8 last night, sir?

9    A.    Yes.

10   Q.    And I want you to pay attention to the hat

11 first, please.  And do you recall being asked last night

12 questions about the hat?

13   A.    Yes.

14   Q.    And was there any suggestion to you whether you

15 should say you saw it, didn't see it, or didn't know

16 about it?

17   A.    What's that?

18   Q.    Was there any suggestions to you of what your

19 answer should be about this hat?

20   A.    No.

21   Q.    And you looked at it, did you not?

22   A.    Yeah, I looked at it.

23   Q.    And now directing your attention back to 2001,

24 do you remember a group of forked horn bucks that were

25 on a hill as you were heading back to camp getting shot

1  at?

2      A.    Yeah, I remember.

3      Q.    Where were you seated in the pickup at that

4  time, sir?

5      A.    I was in the middle.

6      Q.    And were you in a position to see the direction

7  or look toward the direction where you thought the shots

8  were coming from?

9      A.    Yeah, I looked in the direction.

10     Q.    How did you do that?

11     A.    I kind of leaned out and looked out the window.

12     Q.    And as you did, sir, were you able to see an

13  individual wearing a hat?

14     A.    Yeah.

15     Q.    What type of hat was this person wearing?

16     A.    It was a white cowboy hat.

17     Q.    And this particular person, do you know if

18  it -- was that the person that you thought was shooting

19  at the deer or not?

20     A.    Yeah, he was shooting at them.

21     Q.    Was this a teenage or an adult, in your

22  opinion, sir?

23     A.    He was an adult.

24     Q.    Now, looking at the hat to your right, is that

25  hat that's in the defense exhibits Number 215, is that

1  similar to the hat that the man was wearing that was

2  shooting at the deer or not?

3       A.    I don't think so, no.

4       Q.    What was the difference between this defense

5  exhibit hat and the one that you saw back in 2001, sir,

6  if there are any?

7       A.    It was just more of a regular style cowboy hat.

8       Q.    What about the coloration, sir, did you recall

9  something back in 2001 about the hat?

10      A.    I thought it was more of a brighter white hat,

11  but --

12      Q.    Now, if you'd just back off the photo a little

13  bit.  There we go.  As far as the individual wearing the

14  hat in this particular photograph, Defendants'

15  Exhibit 215, thinking back to 2001, Mr. Nelson, is the

16  individual in the photograph 215 similar in stature and

17  appearance to the person you saw shooting at the buck or

18  not?

19      A.    I don't think so, no.

20      Q.    What's the difference?

21      A.    I thought he was just a taller, skinnier guy.

22      Q.    Now, we're going to jump ahead again, again

23  trying to save a little bit of time for everybody, do

24  you recall getting back to the camp after you saw the

25  deer being shot, correct?

1    A.    Yeah.

2    Q.    Okay.  About how long were you back at the camp

3    before there was any notice of a smoke?

4    A.    Probably an hour, half hour.

5    Q.    And what was the first thing you noticed about

6    the smoke?  Was it -- did you smell it first?  Did you

7    see it first?  What was it?

8    A.    I don't remember if we smelled it or seen it.

9    I don't -- I'm not sure.

10   Q.    What happened after you noticed the smoke?

11   A.    It looked like it was in the area that we came

12   from.

13   Q.    Where did you go then?

14   A.    Then we packed up and left.

15   Q.    About what time did you make it back to your

16   dad's pickup?

17   A.    I think it was around noon.

18   Q.    Then where did you go?

19   A.    Then we headed home.

20   Q.    How old were you, sir, when this all happened?

21   A.    Twenty-one.

22         MR. PAPAGNI:  Thank you.  Those are all my

23   questions.

24         THE COURT:  Cross.

25

CROSS-EXAMINATION

BY MR. SCHROEDER:

Q.    Mr. Nelson, good morning.

A.    Good morning.

Q.    My name is Alan Schroeder.  And since I was calling your father Mr. Nelson and so we don't mess up the record, can I call you Dustin, is that okay?

A.    Yes, that's fine.

Q.    Thank you.  Mr. Papagni asked you some questions about this person that you saw in a white hat. When you first saw this person, was he walking down the hill or was he behind a brush?

A.    He was walking down it when we first seen him.

Q.    Okay.  And there is some indication about him walking behind a brush.  Did you see that at all?

A.    It looked like he sat down, crouched behind it, I thought.

Q.    Okay.  And the distance was how many yards away?

A.    I'm not sure.  I would think 100 yards.

Q.    100 yards or so?

A.    Yeah.

Q.    And you recall the area, there was a picture that they showed, a lot of brush, a lot of trees, a lot of grass, pretty day?

1    A.    Yeah, it was a nice day.

2    Q.    Rather excited about the buck that you got that

3  day?

4    A.    Yes.

5    Q.    And that probably was a good focus of your

6  attention?

7    A.    Yes.

8    Q.    When you were at the camp, after you had shot

9  the deer, what did you do in preparing the deer?

10   A.    I cleaned it when we first shot it.  And then

11 when we got back to camp, Gordon finished dressing it

12 out.  I was just helping when I needed to.

13   Q.    You helped him do that?

14   A.    Yeah.

15   Q.    Did that take some time to do all that?

16   A.    It took a little bit of time, not too long.

17   Q.    And in doing that, did you then pack up your

18 stuff with your dad?

19   A.    Yeah.

20   Q.    Okay.  And you made the decision or your dad

21 made the decision that you had a success, and it was

22 going to be a long day home, and so you decided to go

23 home?

24   A.    Yes.

25         MR. SCHROEDER:  Very good.  No more questions.

1    Thank you, Dustin.

2            MR. BLACKMAN:  No questions, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. PAPAGNI:

5        Q.    You were asked questions by Mr. Schroeder that

6    the decision to go home was that you got your buck,

7    right?

8        A.    Yeah, we got the --

9        Q.    What about the smoke and that situation, did

10   that affect you at all?

11       A.    Uh --

12       Q.    How soon after --

13           MR. MATASAR:  No.

14           THE COURT:  Just a moment, please.  Let him

15   finish the answer.

16           THE WITNESS:  We decided to go for -- just

17   because we had a long drive first, and then I think we

18   decided to go before we seen the smoke.

19   BY MR. PAPAGNI:

20       Q.    And did you tell Mr. Choate that before you saw

21   the smoke, sir?

22       A.    Yes.

23       Q.    What -- how thick was the smoke when you left?

24       A.    It was getting thicker.

25       Q.    Would you have stayed if the smoke wasn't

1   there?

2           MR. BLACKMAN:  Objection.

3           THE COURT:  Sustained.

4           THE WITNESS:  No.

5           MR. PAPAGNI:  Thank you.  No further questions,

6   Your Honor.

7           THE COURT:  Thank you, sir, you may step down.

8           THE WITNESS:  All right.  Thank you.

9           MR. PAPAGNI:  Free to go -- asked to be

10  excused, Judge.

11          THE COURT:  Yes.

12          MR. PAPAGNI:  Thank you.

13          THE COURT:  Your next witness, please.

14          MR. PAPAGNI:  Dusty Hammond will be the next

15  witness, please.

16          THE CLERK:  Please step forward.  Please raise

17  your right hand.

18          (The witness was sworn.)

19          THE CLERK:  Please have a seat.  Please speak

20  into the microphone here.  And there is water here if

21  you would like some.

22          Please state your full name and then spell your

23  name for the record.

24          THE WITNESS:  Dusty John Hammond.  D-U-S-T-Y,

25  John, J-O-H-N.  And Hammond, H-A-M-M-O-N-D.

1                          DIRECT EXAMINATION

2        BY MR. PAPAGNI:

3            Q.    Mr. Hammond, how old are you, sir?

4            A.    Twenty-four.

5            Q.    I'm sorry, you might want to put that

6        microphone a little -- there we go.  How old are you?

7            A.    Twenty-four.

8            Q.    And are you related to the defendants in this

9        case?

10           A.    Yes.

11           Q.    And Dwight Hammond, what's his relationship to

12       you, sir?

13           A.    My grandfather.

14           Q.    And Steven Hammond, what's his relationship to

15       you?

16           A.    He's my uncle.

17           Q.    Now, we've talked about a person named Russell

18       or Rusty Hammond, what's his relationship to you?

19           A.    Father.

20           Q.    And I'm going to ask -- 213, that's the

21       photograph of him.  215.  I want you to take a look to

22       your right, sir, Defense Exhibit 215.  Do you

23       recognize --

24               MR. MATASAR:  Excuse me, for the record, this

25       is 1213.

1          MR. PAPAGNI:  I'm sorry, I keep saying 2.  I

2    apologize.  1215.  I apologize, Mr. Matasar.

3          Do you recognize the person -- the persons in

4    that photograph, sir?

5          MR. MATASAR:  Your Honor, I'm sorry, again, but

6    it's important that we protect the record.  This is

7    1215.  The photo on the screen is 1215.

8          MR. PAPAGNI:  I'm sorry, I just got these

9    exhibits, I'll do the best I can.

10   BY MR. PAPAGNI:

11       Q.   Exhibit Number 1215, do you recognize the

12   people in that, Mr. Hammond?

13       A.   I recognize the two on the left side.

14       Q.   Pardon me?

15       A.   I recognize the two on the left.

16       Q.   Okay.  Who is the person in the hat?

17       A.   It would be Rusty.

18       Q.   That's your father?

19       A.   Yeah.

20       Q.   And who is the person -- looks like they are

21   trying to skin the deer?

22       A.   That would be me.

23       Q.   That's you?

24       A.   (Nodding head.)

25       Q.   Sir, if you just -- I know you are leaning into

1  it, maybe it's my bad hearing.  Okay.  And in this

2  particular photograph, you see your father is wearing a

3  particular type of hat, Russell Hammond is wearing a

4  hat.  Do you see it?

5     A.    Yeah.

6     Q.    Do you recognize the hat?

7     A.    Yes.

8     Q.    What hat is that, sir?

9     A.    It's a golf hat, I guess.

10    Q.    Why do you refer to it as his golf hat?

11    A.    Because he always said that where's he bought

12 them at, at the golf store.

13    Q.    And is that a hat he regularly wore or not, to

14 your knowledge, back in 2001?

15    A.    Yes.

16    Q.    Okay.  And back -- the person that's to the

17 right, that's you, correct?

18    A.    Yes.

19    Q.    And do you know when that photograph was taken,

20 sir?

21    A.    I don't know.

22    Q.    Now, we've been told that there is a date on

23 it, but that's just on or about date, so we don't need

24 to rely on that.  Do you remember this photo at all,

25 sir?

 1       A.    I remember skinning the deer.  I don't remember

 2   when it was exactly.

 3       Q.    Okay.  You say you remember skinning the deer.

 4   Do you recall whose deer that was?  Was it your deer or

 5   someone else's?

 6       A.    I'm pretty sure it was somebody else's.

 7       Q.    Thank you.  If you'd take that off.

 8             Now, Susan Hammond, what's her relationship to

 9   you?

10       A.    Grandmother.

11       Q.    And your mother's name is what?

12       A.    Jacquie McDonald.

13       Q.    And your father and mother got divorced when

14   you were about how old?

15       A.    I don't know the exact time that they got the

16   divorce.

17       Q.    During the time they were getting divorced,

18   sir, do you have occasion to live on Hammond Ranches

19   with your grandparents?

20       A.    Yes.

21       Q.    And with your uncle?

22       A.    Yeah.

23       Q.    Do you remember about how old you were when

24   that began?

25       A.    12 to 16 or 17.

1    Q.    Okay.  And when you were living on the ranch,

2  did you have occasion to do things with your grandfather

3  and your uncle?

4    A.    Yes.

5    Q.    Do you recall how the ranch was run back then,

6  the various vehicles that were there?

7    A.    I remember a few of them.

8    Q.    Now, I want to direct your attention -- this

9  would be back when you were just out of Frenchglen

10  Elementary, this would be in September of 2001.  It was

11  a particular hunting trip that you seem to recall.  I'm

12  going to ask to focus your attention on that day.  Can

13  you do that for us?

14    A.    Yes.

15    Q.    How old were you then?

16    A.    Thirteen.

17    Q.    And we have another photograph, if you would

18  show that, and I'm going to try to get the numbers

19  right.  1214.  One two one four.  Do you recognize the

20  person in that photograph, sir?

21    A.    Me holding a gun over an elk.  I don't know the

22  other guy.

23    Q.    Okay.  And is that your particular rifle, sir?

24    A.    I can't tell you by the picture, I don't

25  remember.

1     Q.    Okay.  Do you recognize the man that's behind

2 you in the photograph?

3     A.    No.

4     Q.    Do you remember where that photograph was

5 taken?

6     A.    No.

7     Q.    Just so we can complete this, let's look at

8 Exhibit Number 1216.  Now, can you recognize the people

9 in that photograph, sir?

10    A.    Yeah.

11    Q.    Okay.  Who is the person who is holding a rifle

12 in his right arm, sir?

13    A.    It's Scott Gustafson.

14    Q.    And who is the person in the middle, if you can

15 tell us?  It's pretty shaded.

16    A.    I don't know.

17    Q.    And then the person on the far right, if you

18 can tell, whose face is partially shaded?

19    A.    That's Steven Hammond.

20    Q.    That's your uncle?

21    A.    Yeah.

22    Q.    Then going on to 1213.  You were shown this

23 photograph, sir, last night when we got it.  Do you

24 recognize the hat?

25    A.    Yes.

1    Q.    Whose hat is that?

2    A.    Rusty's.

3    Q.    And do you recognize the house?

4    A.    Yes.

5    Q.    Whose house is that?

6    A.    Steven's.

7    Q.    And do you remember where the house was

8    located?

9    A.    Yes.

10   Q.    Where is it?

11   A.    It's coming in the driveway, it's at the top of

12   the hill before you drop down to Dwight and Susie's

13   house.

14   Q.    We see there is -- it's hard to see them, but

15   there is some people over to the left.  If you can focus

16   on that, please, Ms. Root.

17         Those individuals, do you recognize those folks

18   or not, Mr. Hammond?

19   A.    Looks like Jacon Taylor and I don't know the

20   other ones.

21   Q.    When you say it looks like Jacon Taylor, which

22   person are you referring to there?

23   A.    The one in the green shirt.

24   Q.    Okay.  You said it looks like him, correct?

25   A.    Yes.

1     Q.    Thank you.  Now, we can go back -- thank you,

2  Ms. Root.

3           On the morning of this hunt on September 30th,

4  sir, do you remember getting up that morning to go

5  hunting on a Sunday?

6     A.    Yes.

7     Q.    Again, you are going to have to speak a little

8  louder, I'm sorry, I'm hard of hearing.

9     A.    Yes.

10    Q.    Okay.  And was this a particularly -- why did

11 this day -- I mean, was it a particularly good day that

12 you were looking forward to?

13    A.    Yes.

14    Q.    Why?

15    A.    It was the first year I got to go hunting, so.

16    Q.    Pardon me?

17    A.    It was the first year I was able to go hunting.

18    Q.    That's better.  Thank you.  And that particular

19 morning, who were you supposed to be going hunting with?

20    A.    Russell, Steven, Dwight, and Jacon.

21    Q.    Okay.  And that morning when you got up, do you

22 recall what time you got up, if it was daylight yet or

23 still dark?

24    A.    It was just breaking daylight.

25    Q.    Okay.  And as you were getting up, did you have

 1  breakfast that morning?

 2      A.    Yeah.

 3      Q.    Was this at the ranch house?

 4      A.    Yes.

 5      Q.    Before or after breakfast, do you remember your

 6  grandfather doing something?

 7      A.    I remember the plane taking off when I was

 8  waking up.

 9      Q.    Okay.  And your grandfather owned a plane back

10  then?

11      A.    Yeah.

12      Q.    What type of plane do you recall him having?

13      A.    He had a Super Cub, black and white; and he had

14  like a turquoise and white Cessna.

15      Q.    And you say you remember hearing it take off.

16  You didn't see it take off, though, did you?

17      A.    No.

18      Q.    Okay.  Did you get up and have breakfast?

19      A.    Yep.

20      Q.    What did you have for breakfast that morning,

21  if you remember?

22      A.    Half a grapefruit and a bowl of oatmeal.

23      Q.    Okay.  Why do you remember that, sir, as

24  opposed to any other day that you had breakfast?

25      A.    It was pretty much the same thing everyday.

1    Q.    Okay.  And do you remember who was at the

2  breakfast table, sir?

3    A.    Yeah.  Steven was having coffee across the

4  table.  And Jacon was sitting kind of to my left.

5  Russell was there.  And Dwight, when he came back.

6    Q.    Dwight came back, he'd been flying?

7    A.    Yeah.

8    Q.    When he came back, what did Dwight say to you

9  and the group, if anything?

10   A.    That he had seen some deer that weren't where

11 they'd usually be at, but they were between the watering

12 hole and the reservoir.

13   Q.    The watering hole and what, sir?

14   A.    A reservoir down by the School Section kind of.

15   Q.    Thank you.  Again, you are going to have to

16 speak a little louder so all the jurors can hear you.

17 Just speak up.

18   A.    Sorry.

19   Q.    Okay.  In addition to saying they were through

20 the watering hole and that sort of thing, what else did

21 he have to tell you he'd seen, if anything?

22   A.    That he seen some hunters up there.  I didn't

23 really catch that whole part of the conversation.

24        MR. BLACKMAN:  I'm sorry, Your Honor, I just

25 can't hear.

1          MR. PAPAGNI:  Is there some way we can --

2          THE COURT:  You just need to do your best to

3    speak up.

4          MR. PAPAGNI:  Thank you.

5    BY MR. PAPAGNI:

6      Q.    Mr. Hammond, you are going to have to speak

7    louder so the defense lawyers and everybody can hear

8    you.

9      A.    Okay.

10     Q.    I know you're soft spoken, but you might want

11   to pull a little farther up to your mouth there and just

12   talk right into it, okay?  Try again.

13     A.    How does it work now?

14     Q.    That's better.

15     A.    All right.

16     Q.    Okay.  You said that your grandfather talked

17   about something else besides the deer.  What else did he

18   talk about?

19     A.    He talked about burning some junipers or

20   something.  I just overheard a little bit, so.

21     Q.    And when he was talking about -- when you said

22   he talked about some hunters, what did he have to say

23   about them, if anything?

24     A.    I don't remember.

25     Q.    Okay.  At that particular point, sir, after --

1  during the breakfast time, was there any further

2  conversations about the hunters being on the mountain?

3     A.    No.

4     Q.    Okay.  Had there been talk about hunters being

5  on the mountain previously, sir, by your grandfather

6  that you heard talking to your uncle Steve?

7     A.    No.

8           MR. MATASAR:  Objection, Your Honor, these are

9  leading questions.

10          THE COURT:  Sustained.

11 BY MR. PAPAGNI:

12    Q.    After you went ahead, sir, and your grandfather

13 came back, where did the group go?  What did you do

14 next?

15    A.    Well, we all loaded up in pickups.  I rode with

16 my dad in his flatbed.  Steven took a ranch pickup.  And

17 somebody drove a dark blue, it was like a '70s Ford.

18 And we all went up to the cabin.

19    Q.    When you say the cabin, I'm going to ask that

20 Ms. Root put on Government's Exhibit Number 1, sir.  It

21 will be to your right.  You've seen this map before

22 today, have you not?

23    A.    Yeah.

24    Q.    And you helped prepare it, did you not?

25    A.    Yeah.

1    Q.    And when you prepared it, not everything on

2    this map was there, correct?

3    A.    Correct.

4    Q.    You see on there where it says Hammond cabin,

5    if you would focus on that, please, Ms. Root.  That

6    was -- what was Hammond's cabin?  Where was that

7    located, Mr. Hammond?

8    A.    It's about 50, 60 yards off the main road in a

9    patch of trees.

10   Q.    When you say it was a cabin, describe what you

11   mean by that?  What did it look like?

12   A.    Well, it wasn't really a cabin.  It's like a

13   single-wide trailer under a pole barn covering, tin

14   roof.

15   Q.    And you said you -- the group of hunters, did

16   you guys go to that location first?

17   A.    Yes.

18   Q.    When you went to that location, was your

19   grandmother -- did she go with you or not, sir?

20   A.    She drove her own car.

21   Q.    Okay.  When you got to that location, about how

22   long did it take to get from the ranch to that location

23   at the cabin, Hammonds' cabin?

24   A.    Half hour, 45 minutes.

25   Q.    When you got to the cabin, what happened next?

1   What did the group do?

2       A.    Well, Dwight and one of the older guys and a

3   kid got in the front seat of '70s Ford pickup.  And

4   myself, my dad, Jacon, and Steven got in the back.  And

5   we all drove out to the old gravel pit up the road.

6       Q.    When you drove out to the old gravel pit, did

7   you take firearms with you?

8       A.    Yes.

9       Q.    What type of firearm was Steven Hammond

10  carrying, if you recall?

11      A.    I believe it was a .243.

12      Q.    And what type of firearm was Russell Hammond,

13  your father, carrying, sir?

14      A.    A Remington 7-millimeter.

15      Q.    And the firearm you were having, sir.

16      A.    .308 Winchester.

17      Q.    Do you recall what firearm Jacon Taylor was

18  carrying?

19      A.    I don't.

20      Q.    Did he have a rifle with him, sir?

21      A.    Yes.

22      Q.    Okay.  When you say the old gravel pit and you

23  described how -- who drove you there?

24      A.    Dwight.

25      Q.    And you described you were in the inside cab or

1  in the back?

2      A.    In the back.

3      Q.    Do you recall who was on the inside cab?

4      A.    Dwight and some guy from Alaska.

5      Q.    And was there any other person inside the cab

6  that you recall?

7      A.    A younger kid.

8      Q.    Do you know the kid's name, sir?

9      A.    I don't remember it.

10     Q.    And this guy from Alaska, was there something

11 that you might recall that he brought that you remember

12 being kind of special?

13     A.    King crab.

14     Q.    When you got to -- say the old gravel pit here

15 on the map, is that what you marked on the map to your

16 right?

17     A.    Yes.

18     Q.    Why was it referred to as the old gravel pit,

19 sir, if you know?

20     A.    It was kind of like where they crushed rock and

21 make gravel and stuff, back before my time.

22     Q.    And was this gravel used for a particular

23 reason that you knew of on the ranch?

24     A.    I was told it was what they used in the

25 driveway in grandma and grandpa's house.

1     Q.    Who told you that?

2     A.    Dwight told me that at one point in time.

3     Q.    When you got to the area of the old gravel pit,

4  what did the four of you do that were in the back of the

5  pickup?

6     A.    We all got out and started walking, I guess it

7  would be west down the hill.

8     Q.    Now, what was the -- how did you walk?  Would

9  you describe, how did the four of you go?

10    A.    Jacon Taylor was to my left.  Then it was me.

11 And then Rusty and Steve, we just kind of fanned out

12 over the top of the ridge, hanging out both sides.

13 Jacon walked down the bottom of one draw.  Steven down

14 the other.  And me and dad were kind of easing across

15 the top, I guess.

16    Q.    Now, you recall Jacon Taylor being there.  Was

17 there something unusual or something almost funny that

18 happened as you were walking down the -- as he was

19 walking down the draw?

20    A.    His breakfast didn't really agree with him that

21 morning, kind of smelled the place up a little.

22    Q.    Pardon me?

23    A.    His breakfast didn't really agree with him.  He

24 smelled the place up and we all made fun of him for it.

25    Q.    Why do you recall that?  What did the group do

1    toward Jacon for that?

2        A.     Just made fun of him for scaring all the deer

3    off.

4        Q.     As the group started walking as you described

5    for us on the map, and, Ms. Root, if you could focus in

6    on that little area there, where were you walking

7    toward, Mr. Hammond, if you recall?

8        A.     Towards the Rock Jack Gate.

9        Q.     Why were you headed there, sir, if you know?

10       A.     It was just -- my thought -- heard that we were

11   supposed to meet Dwight there.

12       Q.     And when you got there, sir, was Mr. Dwight

13   Hammond, your grandfather, present or not?

14       A.     No.

15       Q.     And do you recall -- why do you recall that?

16   What was significant in your mind?

17       A.     Because I was kind of planning on getting a

18   drink because I left my water bottle in the pickup, and

19   I didn't get it.

20       Q.     Now, while at the Rock Jack Gate, sir, we're

21   going to talk about hats.  What type of hat was your

22   uncle Steve wearing that day, sir?

23       A.     White straw hot, string out the back side of

24   it.

25       Q.     What type of style was it?

1      A.      Just a cowboy hat.

2      Q.      You say there was string off the back of it?

3      A.      Yeah, like the tie string that you put

4 underneath your chin, he always wears them in the back,

5 puts them under his hair.

6      Q.      And what type of hat was your father, Russell

7 Hammond, wearing?

8      A.      Straw golf hat.

9      Q.      The hat we saw in the photos earlier?

10     A.      Yes.

11     Q.      That particular -- what type of hat were you

12 wearing?

13     A.      Kind of an Elmer Fudd hat, the kind that's got

14 the ear flaps on it, blue with a red and dark blue

15 checkered interior.

16     Q.      And why were you wearing that hat, sir?

17     A.      Because it was cold.

18     Q.      Do you recall what Jacon Taylor was wearing,

19 sir, if anything, in the way of a hat?

20     A.      I believe it was a baseball cap, kind of red.

21     Q.      And when you didn't meet up with your

22 grandfather at Rock Jack Gate, where did the four of you

23 go next, sir?

24     A.      We kind of walked down to the bottom of that

25 draw there and then fanned out a little bit going across

1    the top towards the fence line.

2        Q.    We're going to have that highlighted there for

3    you in just a second.  There we go.  It has those

4    initials.  Are those initials, sir, you put on that map?

5        A.    Yes.

6        Q.    What does the J stand for?

7        A.    Jacon.

8        Q.    D?

9        A.    Dustin.

10       Q.    And the R?

11       A.    Russell.

12       Q.    And the S?

13       A.    Steven.

14       Q.    Now, this particular map has them spread out a

15   certain way that you just described.  Describe how were

16   spread out on the land.  What was the distance between

17   yourselves.  Who was in the lead, if anybody?

18       A.    Steven was quite a bit farther ahead of the

19   rest of us.  My dad was farther ahead of me.  We were

20   walking to the top of the hill.  And Steven disappeared.

21   And Jacon was about the same distance from the bottom as

22   I was.  We were probably 50 yards apart.

23       Q.    After Steven went across the top of the hill

24   wearing his white cowboy hat, what, if anything, did you

25   hear?

1    A.    I heard gunshots.

2    Q.    Do you recall how many?

3    A.    Several.  I didn't really count them.

4    Q.    Have you ever met Gordon Choate?

5    A.    No.

6    Q.    Pardon me?

7    A.    No.

8    Q.    Okay.

9    A.    Doesn't sound familiar.

10    Q.    Have you ever met Dustin or Dusty Nelson?

11    A.    No.

12    Q.    After you heard these shots, who was the next

13 person to go over the ridge?

14    A.    Russell took off like a freight train.  I

15 couldn't keep up with him, so.

16    Q.    And did you hear anything else after Russell

17 went over the top?

18    A.    I still heard a couple of shots, but by the

19 time I got there, it was pretty much over.

20    Q.    When you got to the top, what did you do?

21    A.    I looked through my scope trying to figure out

22 what they were shooting at, and kind of get the jitters

23 and didn't really get to do anything.

24    Q.    When you did that, did you see any deer when

25 you looked through your scope?

1     A.     I didn't see any.

2     Q.     And did you see any people down below?

3     A.     No.

4     Q.     Any trucks or pickups?

5     A.     No.

6     Q.     When you reached the top, where was Jacon?  Who

7  was next up on the hill?

8     A.     Jacon.

9     Q.     Do you recall whether or not he fired any

10 shots?

11    A.     I don't recall, no.

12    Q.     After you got to the top of the hill, sir, what

13 happened at that point?

14    A.     Russell and Steven told me just to stay there

15 for a moment and they went down the other side.

16    Q.     What, if anything, did your dad do towards you

17 or say towards you as you were at the top of the hill

18 before he went down the hill?

19           MR. BLACKMAN:  Objection.

20           THE COURT:  Sustained.

21 BY MR. PAPAGNI:

22    Q.     How were you treated when you got to the top of

23 the hill?

24           MR. BLACKMAN:  Objection.

25           THE COURT:  Sustained.

1    BY MR. PAPAGNI:

2        Q.    After you saw Russell and Steven go down the

3    hill, what happened next, sir?

4        A.    Well, a few minutes went by, and Russell came

5    back up, and said that --

6            MR. BLACKMAN:  Objection.

7            THE COURT:  Sustained.

8    BY MR. PAPAGNI:

9        Q.    After you spoke with your father, where did the

10   two of you go next?

11       A.    We started walking west down the hill.

12       Q.    What path did you take, if you recall, sir?

13       A.    We kind of followed the fence line.

14       Q.    Looking now at this map that's Government's

15   Exhibit Number 1, you see the two initials, R and D, did

16   you prepare that, sir?

17       A.    Yes.

18       Q.    And you see there is a fence line that goes

19   across -- looks like Section 15, do you see that, sir?

20       A.    Yes.

21       Q.    Is that the path that you and your father

22   walked?

23       A.    Yes.

24       Q.    Where were you going towards?

25       A.    Top of the School Section.

1     Q.    And you say the School Section, whose property

2  is the School Section?

3     A.    I believe it's Steven and Dwight's.

4     Q.    And there is a thing on the map that says a

5  rock crib.  What's a rock crib, sir?

6     A.    It's pretty much a piece -- well, it's what

7  they use to make gates with.  It's hog panel that's

8  wrapped in a circle full of boulders, rocks.

9     Q.    In this case, this rock crib, how many fences

10 went into that rock crib that you went to?

11    A.    Two, I think.

12    Q.    When you got to the rock crib, was there a

13 creek nearby or at that location?

14    A.    No.

15    Q.    And was there a Mud Creek in the area,

16 something you referred to as Mud Creek?

17    A.    Yes.  South of there.

18    Q.    In that regard, then, sir, when you got there,

19 who was the first people to that rock crib area?

20    A.    Me and my dad showed up there.  And then Jacon

21 came walking kind of from the south of there.

22    Q.    And who was the next people to show up at that

23 location, sir?

24    A.    Dwight showed up in the pickup and --

25    Q.    What direction was he coming from?  Excuse me

1    for interrupting.

2       A.    He came up the road from the trail from the

3    west.

4       Q.    Okay.  You say up the road.  Is there a road in

5    that area or was it a creek?

6       A.    It's kind of a road.

7       Q.    Okay.  And who was in the pickup with him?

8       A.    The older guy from Alaska and some kid.

9       Q.    When you saw your grandfather come up in the

10   pickup, why do you recall that specifically?

11      A.    Because that's where my water jug was.  I went

12   over and got a drink of water.

13      Q.    You say you got a drink of water.  What did you

14   grab?

15      A.    A jug of water and I drank that, and then

16   that's it.

17      Q.    What happened next?

18      A.    Steven and my dad and Dwight were all talking

19   over by the gate.  And Jacon was not in the group, but

20   he was standing there.  My dad called me over, and Jacon

21   and everybody was all pretty much in a group right

22   there.

23      Q.    Once you got into that group area, what, if

24   anything, did Uncle Steve and Dwight, excuse me, your

25   uncle and your grandfather say, if anything, at that

1    point?

2        A.    Steven started handing out boxes of Strike

3    Anywhere matches and said we were going to light up the

4    whole country on fire.

5        Q.    And had you seen Steven with any matches before

6    while you were hunting, boxes of matches in his

7    possession?

8        A.    No.

9        Q.    And who was standing next to him when he

10   started handing out these matches?

11       A.    Dwight was standing next to him, and Jacon was

12   on the other side.

13       Q.    Had you seen Jacon in any possession of matches

14   while you were hunting?

15       A.    No.

16       Q.    I'd ask that Ms. Root put up Government's

17   Exhibit 22, please.  If you'd take a look at that, sir.

18   Do you recognize -- that's not the box that you were

19   given, is it?

20       A.    No, but it's just like it.

21       Q.    Okay.  And inside that box, sir, looking at 23,

22   do you recognize those?

23       A.    Yes.

24       Q.    What are they?

25       A.    They're Strike Anywhere matches.

1    Q.    And you were handed a box of those matches by

2  whom?

3    A.    Steven.

4    Q.    And after he said, light the whole countryside

5  on fire, did he give you any directions?

6    A.    He told me to start walking towards the Loop

7  Road, and I wasn't exactly sure where that was.  So he

8  pretty much pointed out on the skyline a little

9  landmark, I guess, and just said head for that point.

10    Q.    And where were you supposed to walk to?

11    A.    Loop Road cattle guard.

12    Q.    And was there any particular -- any

13  instructions that you were given by either Mr. Dwight

14  Hammond or Steve Hammond as to where you were to light

15  these matches?

16    A.    No.  Just said start lighting them and walking

17  in that direction until you run out.

18    Q.    And did you go by yourself or were you

19  accompanied by someone?

20    A.    I started out walking with my dad not very far

21  away from me, and then he disappeared within a couple of

22  hundred yards of the gate.

23    Q.    Who, if anyone, gave you any directions of

24  where to walk as far as the fence line was concerned?

25    A.    Steven just said to walk the fence line and

1    head for Loop Road.

2        Q.    I'm sorry, I didn't hear you.

3        A.    I said Steven just told me to walk along the

4    fence line and head for Loop Road.  I stayed within 15,

5    20 feet of it.

6        Q.    And what did you do?

7        A.    I started lighting matches.

8        Q.    What happened when you lit your matches?

9        A.    First couple go-rounds it went out before it

10   hit the ground.  And then my -- Russell showed me how to

11   do it.  Just take a handful and light them, and they all

12   light up and make a big flame, and just drop them all at

13   the same time and they stay lit.

14       Q.    Drop them into what?

15       A.    The grass.

16       Q.    Before you left the group with your matches,

17   did you see what direction Jacon Taylor went?

18       A.    Southwest.

19       Q.    And do you recall whether or not you saw him

20   light any matches?

21       A.    I didn't actually see him light any.

22       Q.    Okay.  And what about Dwight Hammond, your

23   grandfather, what direction did you last see him before

24   you started lighting along the fence within 15, 20 feet?

25       A.    He turned around and was headed back down the

1  road towards the west.

2     Q.    And as you started lighting these fires that

3  you're describing for us, were there any other fires in

4  the area that you observed?

5     A.    I started seeing smoke behind me.  I just

6  assumed that it was from everybody else that walked the

7  other direction.

8     Q.    And what direction did you last see your uncle

9  Steve Hammond walking as you started walking down the

10  fence line with your matches?

11     A.    North up to the fence that comes into the rock

12  crib.

13     Q.    When you say you started walking north, when,

14  if ever, did you see Steven Hammond light any matches?

15     A.    I didn't actually see him lighting any.

16     Q.    In the direction that he walked as you were

17  walking the opposite direction, what, if any, smoke or

18  fire did you see coming from where you last saw Steven

19  Hammond?

20     A.    I saw smoke from that direction about the time

21  I was getting low on matches.  I'd actually turned

22  around and was looking because I didn't see Russell or

23  anybody else.

24     Q.    You were by yourself at that point?

25     A.    Yeah.

1    Q.    What happened at that point when you were by

2  yourself?

3    A.    Well, fire was like knee high to start with,

4  and then it -- I was looking, trying to figure out where

5  everybody else went, and I kind of got like trapped by

6  it.

7    Q.    When you say you kind of got trapped by it,

8  describe that for us and what did you do.

9    A.    It came up behind me faster than I expected it

10 to.

11   Q.    How high was it?

12   A.    It was over my head, 8, 10 feet, probably.

13   Q.    So what did you do?

14   A.    Took off down the hill towards all the rocks

15 and there was Mud Creek was just a little bit of water,

16 not much, but everything was green around it, so I went

17 down there in the rocks and waited for most of it to go

18 by, and then a big part of it.

19   Q.    Mr. Hammond, you said you are how old today?

20   A.    Twenty-four.

21   Q.    And this happened when you were 13?

22   A.    Yeah.

23   Q.    How come you remember this so well?

24   A.    Just that incident, I thought I was going to

25 get burned up.

1    Q.    Have you recalled it a number of times over the

2  years, sir?

3    A.    Yeah, I -- there is -- I remember it pretty

4  clearly.  I just -- I don't really talk about it.

5    Q.    When you say the fire was around you, you went

6  to some rocks and Mud Creek, how did you get out of the

7  fire?

8    A.    After the big flames pretty much passed over,

9  it burned everything, I just walked up the fence line,

10  there is an old logging trail up there.  The fence,

11  there is a gate, and I walked up the old logging trail

12  and it pretty much takes you right to Loop Road.

13    Q.    About how long did it take you to get from the

14  old logging trail to the Loop Road, sir?

15    A.    Half hour, 40 minutes.

16    Q.    When you got to the road, did you go to this

17  location that you referred to as the -- go down to it,

18  Ms. Root, the cattle guard, is that where you went?

19    A.    Yeah, came out probably 100 feet above it.

20    Q.    And who was there when you got to the cattle

21  guard, sir?

22    A.    Nobody was actually at the cattle guard.  I

23  started walking up the roads toward the cabin and Dwight

24  met me in the pickup.

25    Q.    What happened when he met you?

1    A.    I got in the pickup, and he took us back up to

2  the cabin.

3    Q.    You say the Hammond cabin is there on the map

4  there to your right?

5    A.    Yes.

6    Q.    After you got back to the cabin, sir, where did

7  you go next?

8    A.    Well, Dwight and my dad and I, Jacon and the

9  old guy from Alaska and the kid, they all took the

10  pickups that we drove up in, and went back to the ranch.

11    Q.    As you were driving back to the ranch, was any

12  discussion held regarding this -- what you had done,

13  what had just happened?

14    A.    Not on the way back, no.

15    Q.    How long did it take you to get back to the

16  ranch?

17    A.    About 45 minutes.

18    Q.    When you got back to the ranch, do you remember

19  what you did there, the first things you did?

20    A.    Ate lunch.

21    Q.    Pardon me?

22    A.    Ate lunch.

23    Q.    So do you remember about what time it was when

24  you got back there?

25    A.    A little after noon, probably.

1    Q.    And the lunch, do you recall the lunch, since

2  you remembered the breakfast?

3    A.    Not particularly.  I remember the egg salad.

4    Q.    Okay.  And who had prepared the lunch?

5    A.    Susie.

6    Q.    Your grandmother?

7    A.    Yes.

8    Q.    And had it been prepared or was it -- she had

9  to prepare or not, do you recall?

10   A.    It was done when we got there.

11   Q.    You've described you went back to the ranch,

12 but you omitted mentioning Mr. Steven Hammond, your

13 uncle.  Did Steven Hammond go back to the ranch with you

14 guys?

15   A.    No, he -- there is a -- drove an old Willies

16 Jeep that's been parked at the cabin.  He took that and

17 started out the road that goes towards Rock Jack Gate.

18 Said he had to go move a backhoe or something.  I just

19 overheard him talking to Dwight.

20   Q.    And do you recall when -- after you got back to

21 the ranch, if you had any conversations with Mr. Dwight

22 Hammond, your grandfather, or your uncle, Steven

23 Hammond?

24   A.    Yeah.  Dwight told me to keep my mouth shut,

25 that nobody needed to know about the fire, and they

1  didn't need to know anything about it.

2      Q.    And where did he tell you this?  Where were you

3  at, if you recall?

4      A.    We were all sitting at the table in the

5  kitchen.

6      Q.    When you say you all were sitting at the table,

7  who is you all?

8      A.    Steven and Dwight, my dad and Susie.

9      Q.    Besides Dwight, did Mr. Steven Hammond ever

10  talk to you about this particular fire?

11      A.    No.

12      Q.    Did he have anything to say to you regarding

13  saying anything to anybody else, talking to anybody else

14  about the fire?

15      A.    Just told me to keep my mouth shut.

16      Q.    And where did he tell you that?

17      A.    He was sitting across the table next to Dwight.

18      Q.    And after that occurred, sir, did you talk

19  about this incident to anybody else?

20      A.    No.

21      Q.    You later went to live with your mother,

22  correct?

23      A.    Yeah.

24      Q.    And from the time you were 13, do you recall

25  when you left the Hammond ranch, how old you were?

1      A.      Middle of my sophomore year.

2      Q.      Then you went to live with your mother for a

3   while?

4      A.      Yes.

5      Q.      You also lived with your father for a while?

6      A.      Yes.

7      Q.      And then you went back to live with your

8   mother?

9      A.      Yes.

10     Q.      Why didn't you -- specifically, why didn't you

11   tell anybody?  What was the reason why you kept this

12   secret?

13     A.      I was afraid of Steven and Susie.  And I don't

14   like to talk about it.  Just never said anything about

15   it.  Nobody ever asked.

16     Q.      Someone eventually did ask, did they not?

17     A.      Yeah.

18     Q.      Do you remember someone coming to your mom's

19   house up in Washington?

20     A.      Yes.

21     Q.      Mr. Shrader?

22     A.      Yep.

23     Q.      In March 9th of 2011?

24     A.      Yes.

25     Q.      Came with someone else?

1    A.    Yeah.  He -- there was two of them that came

2  up.

3    Q.    And at that time, did you tell Mr. Shrader what

4  you've been telling the jury today?

5    A.    Yes.

6    Q.    Why?

7    A.    Because he asked.  And I'm not afraid of him

8  anymore.

9    Q.    After the fire and after your grandfather spoke

10  to you, do you recall whether or not he left and went

11  somewhere?

12    A.    Yeah, he and Dwight and Steven both went up in

13  the Super Cub again.

14    Q.    Where did they go?

15    A.    Said they were going to go fly over and see

16  what the fire did, and see if they got rid of the

17  juniper trees and something else.

18    Q.    How many times did you -- when you lived --

19  I'll phrase it this way:  How long do you recall living

20  at the ranch with your uncle and your grandparents?

21    A.    From like the sixth grade to my sophomore year.

22    Q.    During that time that you were there, what, if

23  any, conversation did you hear your uncle and

24  grandfather have about hunters hunting the mountain?

25          MR. BLACKMAN:  Objection.

 1          THE COURT:  Just a second.  I need you to

 2    identify time and place.

 3    BY MR. PAPAGNI:

 4      Q.    I'm sorry.  Let me phrase it this way:  While

 5    you were at the ranch, do you recall overhearing any

 6    conversations between your uncle and grandfather about

 7    hunters being on the mountains before September 30th of

 8    2001?  No.

 9          MR. PAPAGNI:  Okay.  Thank you.  Those are all

10    my questions.  Your witness.

11          THE COURT:  Cross.

12                   CROSS-EXAMINATION

13    BY MR. MATASAR:

14      Q.    Mr. Hammond, I'm Larry Matasar.  I'm Steven's

15    lawyer.  I first want to show you a photo, which is

16    Number 1216.  Oh, you can put it up.  That would be

17    better if you do it.  Can you do it?

18          MS. ROOT:  I need to switch that back.

19    BY MR. MATASAR:

20      Q.    Can you see that okay?

21      A.    Yeah.

22      Q.    So you identified the person on the left,

23    correct, as Scott Gustafson?

24      A.    Yes.

25      Q.    And you are saying you don't know who the

 1    person in the middle is?

 2        A.    I don't recognize him.  It just looks like a

 3    hat to me.

 4        Q.    Do you know that Scott Gustafson has a son

 5    named Tim?

 6        A.    I don't remember.

 7        Q.    You don't remember?

 8        A.    (Shaking head.)

 9        Q.    You don't remember ever going hunting with a

10    child about your own age named Tim Gustafson?

11        A.    I don't remember.

12        Q.    Do you know Scott Gustafson is an insurance

13    agent in Canby?

14        A.    No.

15        Q.    Was he -- he was at that deer hunt that you've

16    been talking about?

17        A.    I don't remember him being there.

18        Q.    On this hunt that you've talked about, is it

19    your testimony that you never fired your weapon once?

20        A.    Yes.

21        Q.    Do you recall seeing any forked horn deer?

22        A.    I don't recall seeing any deer.

23        Q.    The only person -- who did you see fire a

24    weapon?

25        A.    I didn't actually see anybody shooting.  I just

1    heard the shots as soon as they got over the hill.

2        Q.    So you never fired and you never saw anybody

3    fire anything?

4        A.    No.

5        Q.    When you talked to Mr. Orr and Mr. Shrader a

6    few years ago, Mr. Papagni asked you about that?

7        A.    Yes.

8        Q.    Do you remember talking to them?

9        A.    Yes.

10       Q.    Did you talk to them about hunting at all?  Did

11   you tell them the story about how you were hunting that

12   day?

13       A.    Yeah.

14       Q.    Are you sure you didn't just tell them that you

15   were out setting wildland fires?

16       A.    No, I told them the whole story.

17       Q.    You did, okay.  Now, isn't it true that you had

18   said that you spent most of the day hunting down the

19   gorge before any fires were set?

20       A.    Not the gorge.  The draw, our property.

21       Q.    But you didn't you say most of the day hunting

22   before the fires were set?

23       A.    No.

24       Q.    Do you remember testifying in the grand jury in

25   this case?

1     A.     Yes.

2     Q.     Do you remember there is a big room and 20 some

3  people are in the room and you were called as a witness?

4     A.     Yes.

5     Q.     And a government lawyer asks you some

6  questions?

7     A.     Yeah.

8     Q.     Okay.  Do you remember being asked this

9  question and giving this answer:  "In the summer of

10 2001, or early fall, were you present when you were

11 asked to participate in basically setting a fire?"

12          And you said "yes."

13          The question was:  "Can you tell us a little

14 bit about that?  How did that happen?  And just kind of

15 walk us through the event."

16          And you answered, and you said "it was the last

17 day of deer season and we -- we walked down, we spent

18 most of the day hunting down the gorge."

19          Might you have said that you spent most of the

20 day and then you said hunting down the gorge?

21    A.     Yes.

22    Q.     Okay.  So was it that you spent most of the day

23 hunting before any fires were set?

24    A.     Yes.

25    Q.     Okay.  How many people were given matches?

1    A.    Steven had a box.  Dwight had a box.  I had a

2  box.  My -- Russell had a box.  And Jacon had a box.

3    Q.    Those are the only people that were there

4  during that hunting time?

5    A.    Yes.

6    Q.    Now, was there not a -- can you show him 1214.

7  Was there not an elk hunt a few weeks before the deer

8  hunt?

9    A.    Yeah, there was, but I don't remember a whole

10 lot about it.

11   Q.    You don't?  Is that you?

12   A.    Yes.

13   Q.    What's in front of you?

14   A.    I'm actually sitting on an elk head.

15   Q.    Okay.  And you shot that elk?

16   A.    Yeah.

17   Q.    Okay.  And you don't remember when that was at

18 all?

19   A.    I don't remember the exact dates of it, no.

20   Q.    Didn't you say that the deer hunt was your

21 first hunt?

22   A.    It was the first deer season.

23   Q.    The first deer.  Had you shot other animals

24 before the deer hunt?

25   A.    Just this elk hunt.  It was my first year.

1    Q.    Your first deer?

2    A.    First year.

3    Q.    Oh, first year.  So it wasn't that you

4    remembered that deer hunt because it was your first hunt

5    ever?

6    A.    No.

7    Q.    You had shot the elk before that?

8    A.    Yes.

9    Q.    You are sure that was before the deer hunt

10   then?  You are sure this elk hunt was before the deer

11   hunt or after?

12   A.    I'm sure it was before it.

13   Q.    What makes you say that?

14   A.    Because after the fire thing, there was no more

15   hunting.  That was the end of my season, you know.

16   Q.    Cheryl, can you show him 1213.

17         And you've identified already that there is

18   Jacon Taylor there; is that right?

19   A.    It looks like it.

20   Q.    He's the person on the far left.  You don't

21   have to blow it up.  You did that before.

22         The person on the far left with the greenish

23   shirt?

24   A.    Yeah.

25   Q.    And can you tell what kind of animal that is?

1    A.    That's an elk in the back of Russell's pickup.

2    Q.    Okay.  And that was the same elk hunt that

3  you've just testified about?

4    A.    I believe so.

5    Q.    Okay.  Your shirt looks the same, does it not?

6    A.    Yes.

7    Q.    Is that you on the right?

8    A.    Yes.

9    Q.    Blue striped shirt --

10    A.    Yes.

11    Q.    -- that you had in the picture when you were

12  sitting on the elk?

13    A.    Yes.

14    Q.    And Jacon Taylor was there?

15    A.    Yeah.

16    Q.    Was he -- do you know -- was he also at the

17  deer hunt?

18    A.    Yes.

19    Q.    Do you know what kind of job he had at that

20  time?

21    A.    I don't.

22    Q.    He was working outside the ranch?

23    A.    Yeah.

24    Q.    So he wasn't there all the time?

25    A.    No.

1    Q.    Just sometimes there and sometimes not?

2    A.    Yes.

3    Q.    But it's your testimony he was there both at

4    the deer hunt and at the elk hunt?

5    A.    Yes.

6    Q.    And that he was lighting fires?

7    A.    Yes.

8    Q.    How much of that day were you with your uncle

9    Steven Hammond?

10   A.    At the beginning of it and from the time we

11   came up into a group.

12   Q.    So much of the time?

13   A.    Not a lot of it.

14   Q.    Did he have a cell phone with him?

15   A.    Not that I know of.

16   Q.    You've testified that he told you it was --

17   Steven Hammond also told you not to tell anybody about

18   setting the fires?

19   A.    Yes.

20   Q.    Did you hear him call anybody to say he was

21   setting a fire?

22   A.    No.

23   Q.    Because he said he didn't want anybody to know

24   that he set any fires, right?  That's what he told you?

25   A.    He just told me to keep my mouth shut.

1    Q.    There was no mention at the time you say he

2    gave you the matches as to why he wanted to set the

3    fires; is that right?

4    A.    No.

5    Q.    No discussion of any hunters, any hunting,

6    anything like that?

7    A.    No.

8          MR. MATASAR:  I have nothing further.  I think

9    Mr. Blackman has some questions.

10                    CROSS-EXAMINATION

11   BY MR. BLACKMAN:

12   Q.    Mr. Hammond, my name is Marc Blackman.  I

13   represent Dwight Hammond.  So your memory of that

14   morning is that you get up, and we're talking now the

15   deer hunt, not the elk hunt, okay.  You get up, and you

16   are -- are you staying at the ranch at that time?

17   A.    Yes.

18   Q.    Are you living at the ranch at that time?

19   A.    Yes.

20   Q.    Are you sure?

21   A.    Yeah.

22   Q.    Okay.  And so you get up and it was planned to

23   go hunting that day, right?

24   A.    Yes.

25   Q.    Do you recall that your grandpa went and flew

1    someplace?

2        A.      Yeah.

3        Q.      So that would have been after it's light out,

4    right?

5        A.      Right when it was starting to break light.

6        Q.      And how long was he -- where did he park his

7    plane?

8        A.      He takes off -- there is two airplane hangars

9    at the end of the driveway.

10       Q.      So after light, he takes off, and he's gone for

11   a while?

12       A.      Yes.

13       Q.      And how long would you say that is?

14       A.      I'd say about half hour, or 45 minutes to an

15   hour.

16       Q.      45 minutes to an hour?

17       A.      (Nodding head.)

18       Q.      Okay.  And then he gets back; and then after he

19   gets back, you guys load up?

20       A.      We ate breakfast and then we loaded up.

21       Q.      I'm sorry, so you didn't have breakfast until

22   grandpa is back?

23       A.      I started eating without him, but he came back

24   and finished our breakfast.

25       Q.      All right.  So he gets back, has breakfast, and

1    then people start loading up?

2        A.    Yes.

3        Q.    Okay.  And then are you all in one pickup at

4    that point or are you in different vehicles?  It was

5    hard for me to understand.

6        A.    Different vehicles.

7        Q.    Did you all drive together?

8        A.    I'm not sure --

9        Q.    In other words, were you in sight of the other

10   vehicles from the vehicle you were in as you are driving

11   from the ranch to the cabin?

12       A.    Yes.

13       Q.    What's the name of the road that you drove

14   down?

15       A.    I don't know.  I'm not sure of the name of it.

16   I -- we drove down the driveway and hit the highway, the

17   two-lane highway that goes to Frenchglen.

18       Q.    Okay.  So if I understand, then, you left the

19   ranch, drove on what's called Hammond Road, I guess,

20   sort of a dirt road?

21       A.    Yeah.

22       Q.    And then you lived there how many years?

23       A.    From like my sixth grade to my sophomore year.

24       Q.    Okay.  So it's about how far from the ranch

25   along that dirt road or gravel road?  I think it's part

1    of it, until you get to 205, the road to Frenchglen?

2        A.    It's probably two, three miles.

3        Q.    Okay.  And then it's about 20 miles to get to

4    Frenchglen, right?

5        A.    Yeah.

6        Q.    So would you -- do you have a memory of how

7    long it took after you finished breakfast to drive to

8    get just to Frenchglen?

9        A.    Naw, probably -- I don't know, 20, 30 minutes.

10       Q.    Okay.  So 20, 30 minutes.  And then once you

11   get to Frenchglen, where do you go?

12       A.    Went up the Loop Road towards the cabin.

13       Q.    That's called the Steens Loop Road or North

14   Loop Road or something like that?

15       A.    Yeah.

16       Q.    And how far up the Loop Road do you go?

17       A.    Up to the cabin.  I mean, it's -- there is a

18   cattle guard at the bottom of the hill, and there's a

19   cattle guard right before you get to the cabin.

20       Q.    So is that another mile, mile and a half, two

21   miles?

22       A.    It's -- there is probably five or -- close to

23   five, I would guess.

24       Q.    Five miles?

25       A.    (Nodding head.)

1     Q.     And the North Loop Road is not a fancy road, is

2   it?

3     A.     No, but, you know, kind of washboardy, but --

4     Q.     Sorry?

5     A.     It's kind of washboardy, but you can still get

6   up to speed on it.

7     Q.     So then you get to the cabin and you unload; is

8   that right, all the stuff?

9     A.     Yes.

10     Q.     And then you all rendezvous at -- is it the

11   gravel pit?

12     A.     No.  We all loaded into one pickup from the

13   cabin and drove to the gravel pit.

14     Q.     How long did that take, about?

15     A.     Probably five to ten minutes.

16     Q.     And then it's at that point you start hunting;

17   is that right?

18     A.     Yes.

19     Q.     Okay.  How far did you hike looking for deer as

20   you described the row of Jacon and you and your dad and

21   your uncle Steven?

22     A.     How far?

23     Q.     Yeah?  Mile and a half?

24     A.     I don't know.  I mean --

25     Q.     Did you cross over sections?  Do you know

1   that -- you know this area, don't you?

2       A.    I know the area, but I can tell you miles in a

3   car.  I can't tell you walking.

4       Q.    So how much walking -- how much time did you

5   spend walking?

6       A.    Few hours, I guess.  I don't have a watch, I

7   don't know.

8       Q.    And when you told the grand jury some years ago

9   you spent most of the day hunting, that's what you did,

10  right?  You spent most of the day hunting?

11      A.    Yes.

12      Q.    And it was only after you had spent most of the

13  day hunting that the decision was made to light the

14  fire, right?

15      A.    I don't know when the decision was made.  I

16  just --

17      Q.    It was then that the matches were handed out?

18      A.    Yes.

19      Q.    Do you have any estimate at all as to how long

20  you spent after the matches were handed out up until you

21  all rendezvoused again?

22      A.    From the time the matches were handed out?

23      Q.    Yes.

24      A.    Probably two, three hours.  I don't know for

25  sure.

1    Q.    Okay.  And then two or three hours go by, and

2  then you go back to the ranch?

3    A.    Yes.

4    Q.    You retrace the route that you took to get to

5  the cabin, right?

6    A.    Yeah.

7    Q.    Okay.  So you go back to the cabin, you go down

8  the Loop Road, you get back on 205, you go north, and

9  then you get to Hammond Road, and you drive back to the

10  ranch house?

11    A.    Yeah, I believe.

12    Q.    And you think you got home at lunchtime?

13    A.    It was after -- it would have been a little bit

14  after lunch, but it was --

15         MR. BLACKMAN:  That's all, Your Honor.

16         (Court reporter interruption.)

17         MR. PAPAGNI:  I'm sorry, I didn't hear the last

18  of his answer.  What did you say about lunch?

19         THE WITNESS:  It was the lunch meal that I got

20  to have.

21         MR. BLACKMAN:  That's all.  Thank you.

22         MR. PAPAGNI:  Just a few questions.

23                   REDIRECT EXAMINATION

24  BY MR. PAPAGNI:

25    Q.    Mr. Nelson, Mr. Matasar asked you several times

1  you never fired the weapon once.  Why do you remember

2  that you never fired the weapon once?  What, if

3  anything, happened to you?

4     A.    Well, when all the shooting was going on, and I

5  got to the top of the hill and I didn't find a deer or

6  nothing in my scope, Russell got a little pissed off

7  because I didn't shoot anything.

8     Q.    I'm sorry, I didn't hear the last of that?

9     A.    Russell got a little pissed off because I

10 didn't actually shoot at anything.

11    Q.    He got pissed off at who?

12    A.    At me.

13    Q.    And you said you thought it was the last day of

14 the deer hunting season.  Why did you think it was the

15 last day of the deer hunting season?

16    A.    I was told it was the last day that we'd be

17 able to go.

18    Q.    And who told you it was the last day you'd be

19 able to go?

20    A.    Dwight.

21    Q.    And as far as the cell phone was concerned for

22 Mr. Steven Hammond, you couldn't recall if he had one

23 that day, correct?

24    A.    I don't know if he did or not.

25    Q.    But do you remember if he had a cell phone back

1   then?

2       A.      Yeah, he had a little blue Nokia.

3       Q.      But you didn't see it that day?

4       A.      No.

5       Q.      Now, you were asked several questions about how

6   it took most of the day to hunt or whatever.  The

7   lunchtime, were you done hunting when you had your lunch

8   that day?

9       A.      Yeah.

10          MR. PAPAGNI:  Those are all my questions.

11          THE COURT:  Any more?

12                      RECROSS-EXAMINATION

13  BY MR. BLACKMAN:

14      Q.      We're talking about the meal that you are --

15  you're associating getting back to the ranch and having

16  the meal that you associate having at lunchtime, right?

17      A.      Yeah.

18      Q.      Not the time?

19      A.      Right.

20          MR. BLACKMAN:  Thanks.  Thanks.

21          THE COURT:  Anything else?  All right.  You may

22  step down.  Thank you.  We'll take a morning recess.

23          (Recess:  10:45 until 11:04 a.m.)

24          THE COURT:  Your next witness, please.

25          MR. PAPAGNI:  Tammi Renfro.

1          THE CLERK:  Please raise your right hand.

2          (The witness was sworn.)

3          THE CLERK:  Please have a seat.  Please speak

4  into the microphone.  And there is water if you would

5  like some.

6          Please state your full name and spell your name

7  for the record.

8          THE WITNESS:  Tammara Lynn Renfro,

9  T-A-M-M-A-R-A, L-Y-N-N, R-E-N-F-R-O.

10          (Court reporter interruption.)

11          THE WITNESS:  T-A-M-M-I.

12                          DIRECT EXAMINATION

13  BY MR. PAPAGNI:

14     Q.    Ms. Renfro, what do you do for a living?  What

15  is your job?

16     A.    I'm currently unemployed.

17     Q.    Before that, you worked for?

18     A.    Before that I worked for the District Attorney

19  in Prineville.

20     Q.    And so you worked for the Crook County DA's

21  Office for about how long?

22     A.    Seven years.

23     Q.    And before that, did you have occasion, when

24  you were younger, to work for the Burns Interagency

25  Communication Center?

1        A.      I did.

2        Q.      About how old were you when you worked for

3    them?  It's a bad question to ask a lady, I'm sorry, but

4    I --

5        A.      23ish, maybe.

6        Q.      Okay.  And how were you hired at the Burns

7    Interagency Communication Center, what was your job?

8        A.      I was offered a job at BLM in the front office

9    starting in May of 2001.  And I was asked to apply for

10   that position at the front desk.  And I didn't get that

11   job.  And so they said, well, if you'd like to work in

12   dispatch for the summer, we'll put you in there.  And so

13   I went in there probably -- I want to say July of that

14   year.

15       Q.      Now, I get the criticized for talking too fast,

16   but I think you may outdo me.  So you need to slow down.

17   And a little bit louder into the speaker system.

18       A.      Okay.

19       Q.      So you were kind of summer help in the year

20   2001?

21       A.      Yes.

22       Q.      Okay.  And at that point, you worked as a

23   dispatcher?

24       A.      Yes and no.

25       Q.      Okay.  Explain that.

1     A.     I started out just answering phones because I

2   never worked dispatch before.  So I answered phones,

3   took messages.  I didn't get on the radio probably until

4   later in the season, just because of experience.

5     Q.     Towards September of 2001, were you then doing

6   dispatcher duties?

7     A.     I think I was doing pretty much everything by

8   then, yeah.

9     Q.     And had you received any training as far as

10  what you could or could not authorize to other people as

11  a dispatcher?

12    A.     Not really.

13    Q.     Okay.  I'm sorry?

14    A.     Not really.

15    Q.     Okay.  Did you have any authority to authorize

16  let's say a burn on public land?

17    A.     No.

18    Q.     Now, before today, you had an opportunity to

19  listen to a couple of audios and look at a transcript

20  about two calls that you received on September 30th,

21  2001, have you not?

22    A.     Yes.

23    Q.     Okay.  And you've had a chance to listen to

24  them to see if you could recall them and see if they

25  were accurate, correct?

1      A.     Yes.

2      Q.     And are you able to say that's your voice and

3  that they appear to be accurate?

4      A.     Yes.

5      Q.     Okay.  Government's Exhibits Number 17 and 18,

6  Ms. Renfro, do you recall reviewing the transcripts in

7  which a Mr. Steven Hammond called you on September 30th,

8  2001, at 12 o'clock and 12 seconds, so basically high

9  noon and 12 seconds on September 30, 2001?

10     A.     Yes.

11     Q.     With permission of the court, we'd ask to play

12  it and have the transcript shown to the jury.

13         THE COURT:  You may.  Now, members of the jury,

14  the evidence here to consider is the recording.  It's

15  not the transcript.  The transcript is here as an aid to

16  you if it's helpful to you.  But it's what you hear that

17  matters, not what you read on this.  Okay?  Go ahead.

18         MR. PAPAGNI:  Thank you, Your Honor.  Ms. Root.

19         (Tape played to the court and jury.)

20  BY MR. PAPAGNI:

21     Q.     And that's the recording that you recall as

22  talking to Mr. Hammond on that day, correct?

23     A.     Yes.

24     Q.     Was there anything in addition to that

25  recording, was there any authorization you gave him to

1   do any burn on public land?

2       A.    No.

3       Q.    Thank you.  Did you later that afternoon also

4   receive a phone call from a Gordon Choate?  This would

5   be about three minutes before 6 o'clock.

6       A.    I believe so.

7       Q.    And you had a chance to review the recording?

8       A.    Yes.

9       Q.    As well as the transcript?

10      A.    Yes.

11      Q.    All right.  Please the court, Government's

12  Exhibits Number 19 and 20, again, we'd ask permission to

13  play the audio and show the transcript.

14            THE COURT:  Same caution about the transcript.

15            MR. PAPAGNI:  If you would, Ms. Root.

16            (Tape played to the court and jury.)

17  BY MR. PAPAGNI:

18      Q.    To finish up the record, those -- that call of

19  Mr. Choate appears to be accurate to you, correct?

20      A.    I think so.

21      Q.    Okay.  You think so, that's your best --

22      A.    Yes.

23      Q.    And the transcript didn't include the music,

24  right?

25      A.    No.

1          MR. PAPAGNI:  Those are all my questions.

2          THE COURT:  Cross.

3                    CROSS-EXAMINATION

4   BY MR. BLACKMAN:

5      Q.    Well, I'm Marc Blackman, Ms. Renfro.  I just

6   have a question.  There are how many people that worked

7   dispatch on this particular day?

8      A.    I want to say less than ten.

9      Q.    Okay.  And did you get to know each other?

10     A.    Yes.

11     Q.    Do you work in like a center?

12     A.    Yes.

13     Q.    Okay.  And is that in Burns?

14     A.    Yes.

15     Q.    So was Cathy working that day with you?

16     A.    Best of my recollection, according to

17  transcripts, yes.

18     Q.    Okay.  And who is Cathy?

19     A.    She was a dispatcher there.

20     Q.    Do you know her last name?

21     A.    Baird, I believe.

22     Q.    Are you aware that she got a call from Pete

23  Revak that day?

24     A.    I saw the transcript from that, yes.

25     Q.    Would you have been there at that time?

1      A.     I'm not sure.

2      Q.     Okay.  So if Mr. Revak called at 13:06:27,

3   that's military time, do you understand that to mean

4   1:06 p.m.?

5      A.     Right.

6      Q.     You are aware that he called to report that --

7             MR. PAPAGNI:  Well, excuse me, that's going to

8   be an objection to hearsay.  I'll be agreeing to the

9   transcript at some point but not through this witness.

10             MR. BLACKMAN:  It's been received, Your Honor.

11   It was received pretrial.  It's Defense Exhibit 109 --

12   1109.

13             THE COURT:  Is that person going to be here?

14             MR. BLACKMAN:  No, the transcript has been

15   admitted so -- it's been admitted into evidence.  So

16   we're just going to be relying on the transcript.

17             THE COURT:  Well, I need to know more than "are

18   you aware of."  That's not enough to qualify this

19   witness.  It is hearsay otherwise.

20   BY MR. BLACKMAN:

21      Q.     Do you know who Pete Revak is?

22      A.     I know the name.

23      Q.     Do you know what position he held back in '01?

24      A.     I do not.

25             MR. BLACKMAN:  Okay.  That's all.  Thank you.

 1              THE COURT:  Thank you.  You may step down.

 2   Thank you very much.

 3              MR. PAPAGNI:  Permission that the witness be

 4   excused, Your Honor.

 5              THE COURT:  Yes.

 6              MR. PAPAGNI:  Thank you.  Next witness will be

 7   Rod Spannaus.  If Mr. Spannaus could be brought in,

 8   please.

 9              (The witness was sworn.)

10              THE CLERK:  Thank you.  Please have a seat.  If

11   you would please speak into the microphone.  And there

12   is water here if you would like some.

13              Please state your name and then spell your full

14   name for the record.

15              THE WITNESS:  Rod Spannaus.  Last name is

16   S-P-A-N-N-A-U-S.

17                        DIRECT EXAMINATION

18   BY MR. PAPAGNI:

19      Q.    Tell us your occupation, sir.

20      A.    I'm currently employed by the Harney County

21   Sheriff's Office, Burns, Oregon.

22      Q.    And you've been a deputy sheriff for about how

23   long?

24      A.    This will be my tenth season.  I work about six

25   months a year there.

1      Q.      And before you became a member of the Harney

2   County Sheriff's Office, were you an Oregon State

3   Trooper and game officer?

4      A.      Yes, sir.

5      Q.      And how long were you a game officer?

6      A.      Eleven years.

7      Q.      And during that time period, do you recall

8   having to examine documents to ascertain if people were

9   properly licensed to hunt and fish and do such things

10  under the Oregon Department of Fish and Wildlife?

11     A.      Yes, sir, that's what I did.

12     Q.      And Exhibit Number 21, I'm going to ask

13  Ms. Root to put up, it will be to your right.  It just

14  makes it a little easier for everybody.  We'll enlarge

15  the document.  There we go.  Eyesight gets a little bad.

16             This particular document, have you had a chance

17  to generally review before today?

18     A.      Yes, sir.

19     Q.      Okay.  Now, for those of us that are not

20  familiar with the documents, this refers back to the

21  year of what?

22     A.      That was -- says on the top left, 2001.

23     Q.      And this particular document refers to

24  Mr. Steven Hammond, does it not?

25     A.      Yes, sir.

1    Q.    And then we see a group of names that -- under

2    the hunter, and we have an address.  Does this give you

3    enough information as to know who had hunting tags back

4    in 2001?

5    A.    Yes, it does.  It indicates either a general

6    season tag or a landowner tag also.

7    Q.    And as far as Mr. Steven Hammond, the number

8    one person there, what type of tag did he have?

9    A.    It was a landowner tag.

10    Q.    Now, what's a landowner tag, sir?

11    A.    That's a tag that someone has they can get if

12    they have 160 acres or more.  It allows them to hunt on

13    their deeded property.

14    Q.    But does it allow you to hunt on public land

15    such as BLM land?

16    A.    No, sir.

17    Q.    And the next -- we'll go by Mr. Rhoads, we've

18    seen Mr. Robert Rhoads and Andrew Rhoads, but let's go

19    next to Mr. Russell Hammond, and let's evaluate his tag

20    if you can.  In 2001, did he have a tag, sir?

21    A.    Yes, he did.

22    Q.    What type of tag was he authorized?

23    A.    He had a general season tag.  You can see on

24    the yellow there is an N there.  That indicates that he

25    did not have a landowner tag but he had a general tag.

1    Q.    And a general tag does what, sir?

2    A.    That means he can hunt the whole unit.

3    Q.    And when you say the whole unit, Mr. Spannaus,

4  what do you mean?

5    A.    That means the Steens Unit, 169 is deer,

6  indication for the Steens Unit.

7    Q.    And then we have under that, we have a Dwight

8  Hammond, and once again the question is the same, what

9  type of tag was he authorized to hunt with that year?

10    A.    It indicates he had a landowner tag as well.

11    Q.    And then we have, underneath Mr. Dwight

12  Hammond, a Dusty J. Hammond, and what type of tag did he

13  have, sir?

14    A.    Dusty had a landowner tag as well.

15    Q.    Okay.  Now, if we go to the next page, if you

16  will, please, Ms. Root.  And if you can kind of enlarge

17  this again, we're going to be going through about five

18  or six of these pages.  Do you recognize this particular

19  document?

20    A.    Yes, I do.

21    Q.    Okay.  And what is it, sir?

22    A.    That indicates that the hunt choices that that

23  individual put in for, starting hunt number one through

24  number five, then the last one is the landowner

25  reference, this individual, Steven Hammond, he just put

1    in for a landowner tag.

2        Q.    And this landowner tag, as you said before,

3    would allow him to hunt on his property?

4        A.    Yes, sir.

5        Q.    But not outside it?

6        A.    No.

7        Q.    Next document, please, Ms. Root.  This is

8    Russell Hammond.  And we see a couple of boxes are

9    checked on that one, sir.

10       A.    Yes.  Russell put in for Steens, hunt number

11   one, that's a Steens buck tag.  He also put in for a

12   landowner, again in case he didn't get the general

13   season tag.

14       Q.    Again, if you say it just a little louder.  I

15   have a hearing difficulty.  So he was allowed to hunt

16   only on landowner property or is this a little broader?

17       A.    No.  This individual drew a general area tag

18   for the Steens Unit.  He could hunt the entire unit.

19       Q.    Let's go to the next document, please,

20   Ms. Root.  Again, this would be now Mr. Dwight Hammond

21   of Hammond Ranch.  And he, too, sir?

22       A.    Yes.  This -- Dwight is the same thing as

23   Steven.  He didn't put any hunt choices in except for

24   the landowner preference.  And that's the one he got.

25       Q.    So these documents are pretty much verifying

1    what that first document we talked about stated,

2    correct?

3        A.    Yes, just a different form.

4        Q.    Okay.  And then the next one would be a Dusty

5    Hammond?

6        A.    The same as the other two Hammonds, Dwight and

7    Steven.  No hunt choices, just a landowner preference.

8        Q.    Okay.  Then we're going to go to -- Mr. Rhoads,

9    we're not going to go through that, just highlight this

10   for a second to show we have the document.  And just

11   generally I'm going to ask you the question.

12   Mr. Rhoads, his tag that he had, sir, gave him -- where

13   could he hunt, if he received permission?

14       A.    It indicates that it's also a landowner

15   preference, so on the land of the sponsor that he had.

16       Q.    And that sponsor would be who, sir?

17       A.    Appeared to be Steven Hammond on the other

18   form.

19       Q.    Okay.  Next one, please.  Then we have an

20   Andrew Rhoads, and it gives us some information about

21   him.  And then we also see the same thing, correct?

22       A.    Yes, it's the same landowner only.

23       Q.    So Mr. Andrew Rhoads had a right, at least what

24   it says on the far right, to hunt on Hammond Ranch

25   property?

1       A.      Yes, sir.

2       Q.      Next one, please.  Just take a moment, here.

3    There we go.  Jacon Taylor, this is a little bit

4    different than what we've been seeing.  Would you

5    describe that for us, please, sir.

6       A.      Okay.  On this form, Mr. Taylor was successful

7    for buck deer and elk.  And then it also indicates he

8    has a resident combination of upland bird, waterfowl,

9    and elk, controlled hunt tag.

10      Q.      And focusing, sir, just on the big animals, the

11   elk, he had an elk tag you see there.  And was he also

12   allowed to shoot at buck deer, mule buck deer?

13      A.      He was successful in drawing a buck deer tag,

14   yes.

15      Q.      So he could shoot at elk or had a right to take

16   an elk or harvest an elk and a mule buck deer, correct?

17      A.      Yes, sir.

18      Q.      This was for 2001?

19      A.      Yes, sir, it indicates 2001 there.

20      Q.      Okay.  Go on to the next one, please, Ms. Root.

21   Again, we're referring to Mr. Jacon Taylor.  Could you

22   explain this document to the jury for us, please.

23      A.      When you buy a sportsman package, it's

24   called -- you get your hunting license, and the buck

25   deer, turkey, cougar, anyway, all those tags are

1  included in that.  That's a slightly discounted fee.

2  And evidently that's what Mr. Taylor got there.

3      Q.    So he was successful in getting tags for all

4  that, correct?

5      A.    Well, this is -- when you buy it, you are

6  guaranteed these tags.  And you can also put in for a

7  controlled hunt for like deer and elk.  If you draw

8  those tags, you can purchase -- say you get a High

9  Desert or a Steens Mountain deer tag, if you want to,

10  you can buy that or trade -- basically trade your West

11  rifle deer tag for that Steens tag.

12      Q.    Thank you.  Next document, please.  This is

13  basically the same package that you are referring to?

14      A.    Yes, sir.

15      Q.    So we don't need to go through that.  We can go

16  to the next document, please.  Again, we're referring to

17  Jacon Taylor, but this looks a little bit different

18  document.  What does this one reflect, Mr. Spannaus?

19      A.    That's kind of his hunting history there from

20  2000 to 2008.  You are interested in 2001.

21      Q.    Correct.

22      A.    For buck deer, he got the High Cascade deer tag

23  which is over between Eugene and Bend, basically on the

24  Cascades.  And the elk tag was a High Desert, 278-A, I

25  believe that's an early cow hunt.

1    Q.    Is there any indication of any successful

2  hunting by Mr. Taylor in the Steens Mountain area?

3    A.    Say again.

4    Q.    Is there any indication on this document of any

5  successful hunt by Mr. Taylor in the Steens Mountain

6  area?

7    A.    Well, the High Desert includes the Steens Unit,

8  it's about a quarter of the state.  That's the tag he

9  had.

10    Q.    Thank you.  Next document, please.  This one

11  here, sir, Mr. Dustin C. Nelson, what does that

12  indicate, sir?

13    A.    That indicates he was successful in drawing a

14  Steens Mountain buck deer tag.  That was not a landowner

15  tag.

16    Q.    And Mr. Dustin C. Nelson here, indicates he

17  lives where?

18    A.    In Roy, Utah.

19    Q.    Thank you.  Now, Mr. Spannaus, we've gone

20  through the documents here.  The other question I have

21  of you is directing your attention to September 30th,

22  actually it would be October 1st, 2001.  But on

23  September 30th, 2001, the day before, had you received a

24  report or a request that you go to an area near the

25  Hammond property in Sections 15, 16 to investigate a

1   complaint by Gordon Choate of some unlawful hunting?

2       A.    Yes, sir, I did.

3       Q.    And did you go to that location on October 1st?

4       A.    Yes, I did.  I met Mr. Choate up there.

5       Q.    When you went there, sir, were you by yourself

6   or were you accompanied by another individual?

7       A.    I had another law enforcement with me, Pete

8   Revak, U.S. Fish & Wildlife Service.

9       Q.    And would you describe basically what you

10  gentlemen did first that morning before you met

11  Mr. Choate?

12      A.    We just drove up on the mountain, contacted

13  Mr. Choate up -- we had a predetermined point up there.

14      Q.    And did you meet him at his camp?

15      A.    Yes, yes, I did.

16      Q.    And this particular time of year sir, was deer

17  hunting season.  Were you particularly busy that time of

18  year?

19      A.    Yes.  Deer season in Harney County is a zoo.  I

20  was the only game officer at the time.  It was quite

21  busy.

22      Q.    And so when you went up there with Mr. Revak,

23  did you have a chance to go ahead and take Mr. Choate's

24  complaint, and go to the location where he said the

25  unlawful hunting had taken place?

1      A.      Yes, we did.

2      Q.      And about what time did you get there, do you

3   recall?

4      A.      I don't recall.  It was in the morning.

5      Q.      And would you describe what you were looking

6   for when you got there?

7      A.      Well, Mr. Choate had called me the night

8   before, and we talked to him that morning, and he said

9   that they had observed several individuals shooting at

10  some deer.

11          And, anyway, they had apparently crippled at

12  least a couple of them, a couple of bucks.  As they

13  started down the hill towards the deer, they evidently

14  noticed Choate and his hunters and then they --

15          MR. BLACKMAN:  Objection to the hearsay, Your

16  Honor.

17          THE COURT:  Sustained.

18  BY MR. PAPAGNI:

19     Q.      As -- after you spoke with Mr. Choate, what did

20  you start looking for, sir?

21     A.      Indication of, you know, injured, crippled

22  deer, dead deer, carcasses --

23     Q.      And was there --

24     A.      -- tracks.

25     Q.      -- something occurring at the time that made it

1   particularly difficult for you to go ahead and conduct

2   the search.

3       A.      Yes.

4       Q.      Would you describe what was happening.

5       A.      The evening before, there was a fire had been

6   started, and it had drifted through that area.  In fact,

7   right through that area.

8       Q.      And so would you describe the condition of the

9   land as well as the visibility while you were trying to

10  track down these reportedly injured animals?

11      A.      Well, it had been a hot fire and the ground was

12  kind of like blistered.  It totally took out any track

13  signs.  So basically what we were looking for was

14  carcasses.  Because they wouldn't have been consumed by

15  the fire.  But like I say, there was no tracks at all.

16  It was just clean, the area was clean.

17      Q.      How was the smoke conditions there, sir?

18      A.      It was smoky.  I don't remember what visibility

19  was, but it was uncomfortable.

20      Q.      What about the ability to find blood trails,

21  sir?

22      A.      No, that was gone, too.

23      Q.      What would you expect that to be gone after a

24  day, sir?

25      A.      Not normally, without a fire, no.

1    Q.    In this case, you thought the fire made a

2   difference to your ability to track down the animals?

3    A.    Definitely.

4    Q.    At one point while you and Mr. Revak were

5   conducting your investigation, did you leave Mr. Choate

6   by himself?

7    A.    Yes, we did.  We went down over the hill to --

8   in the direction that Mr. Choate said the deer had run.

9   So we just kind of fanned out down through that area

10  looking for some sign or carcasses and left Mr. Choate

11  up on the road.

12   Q.    While you were looking unsuccessfully for

13  carcasses, did you observe any other vehicles besides

14  yours or the one that you were with Mr. Choate in?

15   A.    No, we did not.

16   Q.    Directing your attention forward just briefly

17  to 2006, on or about August 28, 2006, at 8:30 in the

18  morning, did you have occasion to accompany a West

19  Virginia Division of Forestry fire cause investigator

20  John Bird to the Krumbo Butte area?

21   A.    Yes, sir, I did.

22   Q.    And did you arrive there at approximately

23  11 o'clock with Mr. Bird?

24   A.    Yes, sir.

25   Q.    And Mr. Bird then conducted an investigation --

1    you are not a fire cause person, correct?  Fire cause

2    investigator?

3        A.    No, sir.

4        Q.    Okay.  You just were there to accompany

5    Mr. Bird in that particular area?

6        A.    Yes, sir.

7        Q.    And then on September 9, 2006, at approximately

8    7:00 a.m., did you, along with a Mr. Orr, a Mr. Miracle,

9    a Mr. Bird, a Mr. Flores, and a Mr. White involve in a

10   search warrant on Hammond Ranch?

11       A.    I wasn't present during -- oh, on the fire part

12   of it, I was, yes.  Not on the ranch buildings, no.

13            MR. PAPAGNI:  Thank you.  Those are all my

14   questions.

15            THE COURT:  Cross.

16                        CROSS-EXAMINATION

17   BY MR. BLACKMAN:

18       Q.    Is it Officer Spannaus, Detective Spannaus,

19   what title do you use?

20       A.    I'm a deputy right now.

21       Q.    Deputy Spannaus, my name is Marc Blackman.  I

22   represent Dwight Hammond in this case.  I'd like to

23   clarify a few things about the hunting seasons,

24   locations and times in '01, okay.

25       A.    Okay.

1    Q.    The stuff you just talked about.  May I

2    approach the witness, Your Honor.

3          THE COURT:  Yes.  Go ahead and help him,

4    please.  She'll help you.

5    BY MR. BLACKMAN:

6    Q.    Deputy Spannaus, I'm handing you an item called

7    or labeled Exhibit 1401, which is a cover page, and then

8    two excerpts.  And I'm going to ask you if you can

9    recognize what this document is?

10   A.    It's a 2001 Oregon Big Game Regulations.

11   Q.    So at the time in '01 when you were enforcing

12   the game laws in the State of Oregon, were you familiar

13   with the Oregon Big Game Regulations?

14   A.    Yes, sir.

15   Q.    Okay.  And are you able to recognize Exhibit

16   1401 as an excerpt from the regulations setting the

17   various -- seasons for various big game animals in

18   Oregon that year?

19   A.    Yes.

20   Q.    Okay.  So could you tell us just very briefly,

21   what is this all about.  What are those regulations all

22   about?

23   A.    Well, in the State of Oregon and virtually

24   every state that I'm aware of, they have different units

25   that are divided up either by roads or geographical

1    features that biologists determine how many animals are

2    in there and how many are going to be harvested.  And

3    then they allot tags due to the information that they

4    have.

5              And this just indicates the various units in

6    the northeast and southeast areas of Oregon.  And the

7    number of tags that were given out the year before,

8    2000.  And the number of applicants that applied for

9    those tags in 2000.

10    Q.    Now, each of these units has a designation by a

11   number?

12    A.    Yes, sir.

13    Q.    And is it correct that 169-A was the unit

14   for -- this is for controlled hunts, right, these

15   regulations?

16    A.    Yes, sir.

17    Q.    Okay.  That's the ones where you have to have a

18   special tag, not a general tag?

19    A.    Yes.  You have to put in for that ahead of time

20   in order to attempt to draw it.

21    Q.    And is it right that 169-A was the Steens

22   Mountain designation for buck deer?

23    A.    Yes, sir.

24    Q.    Okay.  So if I could use the ELMO for a moment.

25              THE CLERK:  I'll power it again.  It seems like

1    it sticks.

2              MR. PAPAGNI:  I'm sorry to interrupt,

3    Mr. Blackman.  I can't find your exhibit in the exhibit

4    book.

5              MR. BLACKMAN:  This is a new exhibit I'm using

6    on cross-examination of your witness.

7              MR. PAPAGNI:  I don't wish to interrupt things,

8    Judge, but I do have an objection.

9              THE COURT:  Have you marked it, Mr. Blackman?

10             MR. BLACKMAN:  Yes.  It's 1401.  And I would

11   offer it.  The witness has identified it.

12             (Equipment being worked on.)

13             MR. BLACKMAN:  Sorry.  It's showing that it's

14   displaying but it's not coming up on the projector.  I'm

15   sorry, it has not been received.

16             THE COURT:  Well, are you offering it?

17             MR. BLACKMAN:  Yes, I did offer it.

18             THE COURT:  Is there any objection?

19             MR. PAPAGNI:  Mr. Spannaus -- question in aid

20   of an objection?  It will be brief.

21             THE COURT:  Yes.

22             MR. PAPAGNI:  Mr. Spannaus, I just had a chance

23   to look at this document.  I haven't seen it.  I want to

24   make sure that you've had a chance -- have you seen this

25   document before today?

1              THE WITNESS:  About 11 years ago.

2              MR. PAPAGNI:  Okay.  And as far as the document

3    itself is concerned, on the third page there seems to be

4    some information.  Do you see that, sir?

5              THE WITNESS:  Yes, sir.

6              MR. PAPAGNI:  And just so I can understand

7    this, does this include information about 2001?

8              THE WITNESS:  Yes, that's what it is referring

9    to.

10             MR. PAPAGNI:  Okay.  And there is some

11   information which I'm not going to necessarily go into.

12   I just want to make sure it's relevant here.  Is that it

13   refers to southeast area hunts and it refers to elk,

14   antlerless elk.

15             THE WITNESS:  Yes.

16             MR. PAPAGNI:  And it has some time periods in

17   there, do you see that?

18             THE WITNESS:  Yes.

19             MR. PAPAGNI:  Okay.  Does this information --

20             THE COURT:  Excuse me, Counsel, is there any

21   objection?

22             MR. PAPAGNI:  Well, the question I was just

23   going to ask one more, and then I'm done, is this

24   information you relied upon by you folks in the game

25   business back in those days?

1          THE WITNESS:  Yes, sir.

2          MR. PAPAGNI:  In that situation, okay, Judge.

3          THE COURT:  Proceed.

4          MR. BLACKMAN:  We're looking for some technical

5    support to try to make the ELMO display.

6          THE COURT:  Members of the jury, lawyers really

7    don't learn how to run this stuff.  We do have people

8    here who can do it, probably.  So just if you want to

9    stand and stretch while they are working on it here.

10   I'm one of those people who does not know how to run it,

11   by the way.

12   BY MR. BLACKMAN:

13     Q.    Well, rather than take up the time, Your Honor,

14   I'll just do it without -- well, okay, we do want it to

15   function during the examination by Mr. Schroeder, but

16   for my purposes I'll go the old fashioned way, if I

17   might.  Ladies and gentlemen of the jury, please bear

18   with me.

19          I just want to make clear here that the season

20   for buck deer in Steens Mountain Unit 169-A was

21   September 29 to October 10, correct?

22     A.    Yes, sir.

23     Q.    Okay.  And then on the next page, we have the

24   season in the same area of this Steens for antlerless

25   elk, correct?

1    A.    Yes, sir.

2    Q.    And that hunt number is 269-A, correct?

3    A.    Yes, sir.

4    Q.    And that season in the High Desert was 278-A,

5    correct?

6    A.    Yes, sir.

7    Q.    The High Desert includes that same area,

8    correct?

9    A.    Yes, it does.

10    Q.    Okay.  And the season in 278-A was September 15

11    to September 23?

12    A.    Yes, sir.

13    Q.    Okay.  So one was authorized if you drew a tag

14    to hunt elk on Steens Mountain from September 15th to

15    September 23rd?

16    A.    Yes, sir, if you drew that hunt number.

17    Q.    And if you drew a tag for buck deer, it would

18    be September 29 to October 10?

19    A.    Yes, sir.

20    Q.    Okay.  Now I'd like to return to Government

21    Exhibit -- I'd ask that we turn to display the tags that

22    were drawn that year by Jacon Taylor.

23         MS. ROOT:  It's not working at all.

24         MR. BLACKMAN:  Okay.  It's not working at all.

25    Okay.

1       So we're really back to the old fashioned way.

2   BY MR. BLACKMAN:

3       Q.    Do you have -- you don't even have a set of

4   those, do you?  Can you give the witness -- so if you

5   turn to tab 21, which are the series of tags that you

6   testified about in your direct, and turn to the Jacon

7   Taylor section.  And I believe the Jacon Taylor starts

8   on a page that has a number at the bottom 06.G18385.

9       A.    Yeah, I'm there.

10      Q.    Now, if you turn to the history of Mr. Taylor's

11  hunting, which is I believe the page 06.G18388; is that

12  right?

13      A.    Yes.

14      Q.    Okay.  For 2001, that shows that he was

15  successful in the sense not just that he got a tag but

16  he got an elk, correct?  He actually took an elk?

17      A.    No.

18      Q.    Okay.  Does that tell us -- I'm sorry, maybe

19  it's the next page.

20      A.    It means he was successful in drawing that tag.

21      Q.    Okay.  So Mr. Taylor had -- was successful in

22  getting an elk tag in Unit 278-A for elk for that year,

23  right?

24      A.    Yes.

25      Q.    And that's a season that was September 15 to

1  September 23?

2      A.     Yes.

3      Q.     Was he successful in getting a tag to hunt deer

4  in 2001?

5      A.     Yes, sir.

6      Q.     In what unit?

7      A.     High Cascade, 119-A.

8      Q.     That's not near the Steens, is it?

9      A.     No.

10     Q.     It's a different unit altogether?

11     A.     It's east of Bend, Oregon.

12     Q.     So Mr. Nelson had a tag to hunt elk in Steens

13  Mountain, but no deer.  His deer tag was for a different

14  location in the state?

15     A.     Yes, sir.

16     Q.     Now, have you ever in your investigations of

17  potential hunting violations involving, say, poaching or

18  taking a deer out of season or out of compliance with

19  the rules, used a dog to track -- to find the location

20  of a possible animal?

21     A.     Yes, sir.

22     Q.     And that's a very efficient and effective way,

23  isn't it, of actually finding out if there are any deer

24  there?

25     A.     If you have the right dog.

1    Q.    Right.  And you knew from the evening before

2  talking to Mr. Choate that he was making this accusation

3  about numerous animals being shot at, several being

4  wounded and all of that, right?

5    A.    Yes, sir.

6    Q.    And you apparently knew that there had been a

7  fire in the area?

8    A.    Yes, sir.

9    Q.    From your experience, you would have known then

10  that it would not necessarily be that easy to use simple

11  human senses to track?

12    A.    That's correct.

13    Q.    Did you consider taking a dog with you to try

14  to follow up on that?

15    A.    I no longer have that dog.

16    Q.    How about Mr. Revak?

17    A.    To my knowledge, I don't know if he had a dog

18  or not.  I don't remember.

19          MR. BLACKMAN:  That's all I have.

20          MR. PAPAGNI:  Couple of questions.

21          MR. MATASAR:  Wait a second.

22          MR. SCHROEDER:  Excuse me.

23          MR. PAPAGNI:  I'm sorry, Mr. Schroeder.

24

25

1                    CROSS-EXAMINATION

2   By MR. SCHROEDER:

3       Q.     Detective Spannaus --

4       A.     It's deputy.

5       Q.     Or Deputy?

6       A.     There you go.

7       Q.     Did I promote you or demote you?

8       A.     I don't know.

9       Q.     I'm Alan Schroeder.  I'm a lawyer representing

10  the Hammonds in this matter.  And Mr. Blackman cleared

11  up the success issue, so I'll focus on one part where

12  Mr. Papagni asked you some questions about going up

13  there with Mr. Choate.

14           Did he show you where he saw these deer get

15  shot at?

16      A.     Yes, sir.

17      Q.     And I believe in your preparation of your

18  testimony, did Mr. Papagni show you any exhibits in this

19  case?

20      A.     Yes, they did.

21      Q.     Did he show you Exhibit Number 2?

22      A.     Don't know.

23      Q.     Could you put that up?  You can't put that up.

24  I believe we have a big one there.

25           THE CLERK:  I have it.  It's also in your book

1    here.

2    BY MR. SCHROEDER:

3        Q.    Looking at Exhibit 2, I believe they even put a

4    bubble there where Choate party observed deer and deer

5    hunter.  Do you see that?

6        A.    Yes, sir.

7        Q.    Do you agree that's about the location that

8    Mr. Choate told you that the deer occurred?

9        A.    Yes, sir.

10       Q.    Okay.  And there is also an indication as to

11   some kind of reddish marking on this Exhibit 2.  I guess

12   just for discussion, it says in the legend, that's the

13   Hardie-Hammond fire that they are saying on the exhibit.

14   Do you see that?  The Hardie-Hammond fire, the reddish

15   part?

16       A.    This here (indicating)?

17       Q.    Yes.

18       A.    Yes, sir.

19       Q.    So right at the intersection there, none of

20   that area is burned up, is it?

21       A.    Not according to this map.

22       Q.    Okay.  And so nothing would have prevented you

23   in that area to track -- I mean, the fire wouldn't have

24   burned over that area for you to track anything in that

25   area; is that right?

1    A.    Apparently not, no.

2          MR. SCHROEDER:  One moment.

3          (Discussion held off the record between

4    co-counsel.)

5          MR. SCHROEDER:  No further questions.  Thank

6    you, Your Honor.

7                  REDIRECT EXAMINATION

8    BY MR. PAPAGNI:

9    Q.    A few.  Mr. Spannaus, since we're using the

10   government's exhibit, would you look up on the corner

11   there, it should be Number 4, or, excuse me, probably be

12   2.  Which one is it?

13   A.    Number 2, yeah.

14   Q.    Yeah.  We'll use that one and then we'll use

15   Number 4 in a moment because the machine is not working.

16         When Mr. Schroeder asked you about those red

17   marks, when you and Mr. Revak ran out there and

18   Mr. Choate showed you the area that the deer were shot,

19   did you just go to the area that was burned or did you

20   do kind of a perimeter type search and try to look all

21   over for carcasses and such?

22   A.    No.  We looked -- we were up there for -- I

23   can't remember exactly how long, but we were up there

24   for quite a while looking around.  We wanted to recover

25   those carcasses if we could.

1    Q.    But you indicated there were problems trying to

2    do that, correct?

3    A.    Yes, yeah.

4    Q.    Okay.  The other thing while we're talking,

5    since the topic has been brought up, looking at that

6    exhibit that's behind you there, you see those green

7    lines that are kind of coming up on that map there, got

8    some initials on them?

9    A.    (Indicating.)

10   Q.    Yeah, those.

11   A.    Yes.

12   Q.    Is that property where you were looking for

13   those deer that were slaughtered, was that BLM property

14   or private property?

15   A.    This is all BLM.

16   Q.    Pardon me?

17   A.    It's all BLM.

18   Q.    So if you had landowner tag and you were

19   authorized to hunt on your land, if you shoot deer in

20   that area, would that be legal or illegal under Oregon

21   law?

22   A.    That would not be legal.

23   Q.    One of the reasons why you were up there

24   investigating, wasn't it?

25   A.    Yes, sir.

```
 1          MR. PAPAGNI:  Those are all my questions.

 2          THE COURT:  Anything more?

 3          MR. SCHROEDER:  No questions.

 4          THE COURT:  Thank you.  You may step down.

 5   Your next witness, please.

 6          MR. PAPAGNI:  Well, looking --

 7          THE COURT:  Go ahead.

 8          MR. PAPAGNI:  The next witness, I'm looking at

 9   the clock, if we want to start a little earlier --

10          THE COURT:  Let's take a break, all right, for

11   lunch?  And we'll take an hour, all right?  Thank you.

12   Ten till.

13          I'll keep the lawyers.

14          (Jury exits the courtroom at 11:52 a.m.)

15          MR. PAPAGNI:  We're doing well today, Judge.

16   And we have Mr. Ward.  Mr. Shrader will testify after

17   that.  And then we have Ms. Bird.  We have people on the

18   road as we speak.  But there is a potential that -- and

19   hopefully you won't make me dismiss -- or stop my case,

20   but there is a good potential that we'll be done 3:30,

21   4 o'clock, if we have some folks that don't get here

22   when they are supposed to.  I just wanted to give you a

23   heads-up, but we're moving.

24          THE COURT:  I knew that when we started.

25          MR. PAPAGNI:  I thought you might, but we're
```

1  doing good.

2      MR. BLACKMAN:  Again, Your Honor, on behalf of

3  the Hammonds, I can only say that I got a call this

4  morning very early from one of our witnesses from the

5  Frenchglen area asking if I could give her, it's Jody

6  Starbuck, any better idea of when she should be here.

7  And I told her that I had conferred with the court about

8  that.  And as of yesterday, you advised us that you

9  would keep track and give us your best prediction, but

10 that we were advised by you yesterday that we should be

11 prepared to have witnesses available on Friday

12 afternoon.

13     She would be, at least in an orderly fashion,

14 probably our first or, you know, Mr. Vogler will

15 probably be our first witness, but she'd be probably the

16 second.  She has a small child, so I told her I would

17 ask you for greater clarification, and --

18     MR. PAPAGNI:  If it makes life easier, she can

19 testify on my case because we're moving good.  I don't

20 have a problem, if you want, Mr. Blackman.

21     THE COURT:  All right.  At the end of the day,

22 we'll talk more about it.  I'll tell you a story about

23 my first elk hunt in the Imnaha Unit and then moving on

24 to some other selections.  No, you don't know what that

25 means, I know, but --

1          MR. PAPAGNI:  Please the court, I'd ask that

2   Mr. Spannaus be excused.

3          THE COURT:  All right.  He is excused.  Thank

4   you.  We're in recess.

5          (Lunch recess:  11:54 a.m.)

6          (Further proceedings were had by Reporter

7   Amanda LeGore, and are bound under separate cover.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2       I, Deborah Wilhelm, Certified Shorthand Reporter

3 for the State of Oregon, do hereby certify that I was

4 present at and reported in machine shorthand the oral

5 proceedings had in the above-entitled matter.  I hereby

6 certify that the foregoing is a true and correct

7 transcript, to the best of my skill and ability, dated

8 this 13th day of June, 2012.

9

10

11                        /s/ Deborah Wilhelm

12                      _____

                        Deborah Wilhelm, RPR

13                      Certified Shorthand Reporter

                      Certificate No. 00-0363

14

15

16

17

18

19

20

21

22

23

24

25