1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF OREGON

3  UNITED STATES OF AMERICA,          )
                                      )
4              Plaintiff,             )
                                      )
5    v.                               )   6:10-cr-60066-HO-1-2
                                      )
6  STEVEN DWIGHT HAMMOND,             )
   DWIGHT LINCOLN HAMMOND, JR.,       )
7              Defendants.            )

8

9    TRANSCRIPT OF TRIAL PROCEEDINGS

10    BEFORE THE HONORABLE MICHAEL R. HOGAN

11    UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12    WEDNESDAY, JUNE 20, 2012

13    PENDLETON, OREGON

14    DAY 7 A.M. SESSION - PAGES 1573 - 1708

15    -:-

16

17

18

19

20

21

22

23    Deborah Wilhelm, CSR, RPR
           Court Reporter
24       P.O. Box 1504
      Eugene, OR  97440
25       (541) 431-4113

```
 1                        APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:      FRANK R. PAPAGNI, JR.
                             ANNEMARIE SGARLATA
 3                           United States Attorney's Office
                             405 E. 8th Avenue
 4                           Suite 2400
                             Eugene, OR  97401
 5                           (541) 465-6771

 6    FOR THE DEFENDANT:      LAWRENCE H. MATASAR
      (Steven D. Hammond)    Lawrence Matasar, P.C.
 7                           621 S.W. Morrison Street
                             Suite 1025
 8                           Portland, OR  97205
                             (503) 222-9830
 9
                             W. ALAN SCHROEDER
10                           Schroeder & Lezamiz Law Offices
                             447 West Myrtle Street
11                           Boise, ID  83701-0267
                             (208) 384-1627
12

13    (Dwight L. Hammond)    MARC D. BLACKMAN
                             Ransom Blackman LLP
14                           1001 SW Fifth Avenue, Suite 1400
                             Portland, OR  97204
15                           (503) 228-0487

16

17

18

19

20

21

22

23

24

25
```

INDEX OF EXAMINATIONS

| FOR THE PLAINTIFF: | Direct | Cross | ReD | ReX |
|---|---|---|---|---|
| **CARRIE BILBAO** | | | | |
| By Ms. Sgarlata | 1576 | -- | 1622, 1630 | -- |
| By Mr. Matasar | -- | 1593 | -- | 1628 |
| By Mr. Blackman | -- | 1614 | -- | -- |
| | | | | |
| **RONALD HOLLE** | | | | |
| By Ms. Sgarlata | 1631 | -- | 1662 | -- |
| By Mr. Matasar | -- | 1654 | -- | -- |
| By Mr. Blackman | -- | 1658 | -- | -- |
| | | | | |
| **JEFFREY ROSE** | | | | |
| By Ms. Sgarlata | 1664 | -- | 1698 | -- |
| By Mr. Schroeder | -- | 1684 | -- | 1703 |
| By Mr. Blackman | -- | 1694 | -- | 1705 |

 1            (Wednesday, June 20, 2012; 8:57 a.m.)

 2                  P R O C E E D I N G S

 3            THE COURT:  Are you ready to go?

 4            MS. SGARLATA:  Yes, Your Honor.

 5            MR. MATASAR:  The defense is ready.

 6            THE COURT:  Bring the jury in, please.

 7            MS. SGARLATA:  Judge, would you like the

 8    witness to resume taking the stand?

 9            THE COURT:  Please take the stand.  You are

10    still under your previous oath.

11            (Jury enters the courtroom at 8:58 a.m.)

12            THE COURT:  Good morning, Jurors.  Go ahead and

13    continue.

14            MS. SGARLATA:  Thank you, Your Honor.

15                  DIRECT EXAMINATION (continuing)

16    BY MS. SGARLATA:

17       Q.    Ms. Bilbao, yesterday you testified that you

18    performed an origin and cause determination of what is

19    known as Ignitions 8 and 9 in the Grandad -- what is

20    called the Grandad Fires; is that correct?

21       A.    That's correct.

22       Q.    And I believe you were just about explaining to

23    us how you performed the methodology around Ignition

24    Number 8?

25       A.    Correct.

Bilbao - D by Ms. Sgarlata                    1577

1      Q.    So to your left is Government Exhibit 69.  Do

2  you recognize that exhibit?

3      A.    Yes, I do.

4      Q.    And do you see exhibit numbers on that

5  particular exhibit near the locations of Ignitions 8 and

6  9?

7      A.    Yes.

8      Q.    And can you tell us what those exhibit numbers

9  refer to?

10     A.    They refer to some of the photographs and scene

11 sketches that I picked for the -- for this trial,

12 basically.

13     Q.    And the photographs in questions were ones you

14 took yourself?

15     A.    Yes.

16     Q.    I would ask Ms. Root to bring up Government

17 Exhibit 146, please.  Now, do you recognize this?

18     A.    Yes.

19     Q.    Can you tell us what we're seeing here?

20     A.    This is the first photo that I took of Ignition

21 8 when I arrived on scene.  And this is where -- the

22 green flags represent the boot prints that -- where

23 Lance had seen Dwight Hammond crossing the road.

24           There were really no tracks there

25 distinguishable at that time.  You could kind of see an

Bilbao - D by Ms. Sgarlata                    1578

1    impression.  But he had marked some of those tracks.  He

2    had marked the area where he saw him cross the road.

3            And then back in the distance he had marked a

4    tree where he saw the fire.

5    Q.    And can you bring up, please, Ms. Root, Exhibit

6    147.  Do you recognize this?

7    A.    Yes.

8    Q.    And is this also the area of Ignition Number 8?

9    A.    Yes, it is.

10   Q.    Can you tell us what we're seeing in this

11   picture?

12   A.    The blue flags mark the backing indicators from

13   Ignition 8.  Over to the right here, more -- hard to

14   distinguish, but there is again some flagging on some

15   brush.  There was some other flagging of some general

16   foot tracks in the area.

17           The red indicator flags mark advancing

18   indicators.  And then I actually marked some of the

19   indicators, like the types of indicators they were, with

20   the markings of -- you know, 1 through -- I can't

21   remember.  I think I picked nine out on this fire to

22   describe what type of indicators they were at the scene.

23           And in this particular area, you see a lot of

24   grass still left.  And then as it starts taking off,

25   more is burned as it starts advancing away.

Bilbao - D by Ms. Sgarlata                    1579

1    Q.    Okay.  And I'd ask Ms. Root to bring up

2  Exhibit 149, please.  Can you tell us what we're seeing

3  in this exhibit?

4    A.    Yeah, this is the looking directly at the

5  origin area in here.  Again, a footprint marked over

6  here.  This is where I found the -- maybe the -- more of

7  the point of origin.  Couldn't find an exact ignition

8  source in the origin area.  But that's the general

9  location of it and it takes off from there.

10    Q.    And what do you mean when you say you couldn't

11  find the exact ignition source in the ignition area?

12    A.    There was no ignition source or device found in

13  the origin.

14    Q.    And what would be an example of an ignition

15  device?

16    A.    Like a device -- if you are looking at an arson

17  device, it may be a cigarette match, or a match, you

18  could find matches, you could find cigarettes left at

19  the scene.

20          There is other kinds of things that you would

21  find for different kinds of starts if it's not arson.

22  You know, pieces of metal or carbon particles if it's

23  from exhaust systems or catalytic -- I mean, there's a

24  lot of different things you look for.

25    Q.    So did you consider the possibility that this

1    particular fire was caused by some of those other things

2    such as exhaust?

3        A.    Well, you have to take into consideration all

4    the different types of causes when you are going to a

5    wildland fire.  There are things that could cause a

6    fire.  And then you look at the indicators at the scene,

7    what you have.

8            This -- I think it was about 464 feet from the

9    road, so you could pretty much eliminate vehicles.  If

10   somebody was driving off-road, you see it's pretty

11   brushy, it would be hard to drive out there.  Plus,

12   you'd have tracks in the area.

13           There was no, like -- things like saws or

14   equipment in the area.  You'd find stuff like that.  If

15   somebody was sawing, you'd see sawdust marks.  You'd see

16   that kind of thing.  So you just go through that list

17   and you rule out all other possible causes.

18       Q.    Can you remind us again how many

19   investigations, fire origin and cause have you

20   performed?

21       A.    Well over 800.

22       Q.    I'd ask Ms. Root to pull up Exhibit 150,

23   please.

24           Do you recognize this photograph?

25       A.    Yes.  This is the same fire just looking at the

Bilbao - D by Ms. Sgarlata                     1581

1    opposite direction.  And if you notice from the previous

2    photograph, how much more green it looked like looking

3    out towards the fire, the direction the fire was

4    burning, which was coming out this direction.  When you

5    look back this way, it's -- you can see the more

6    advancing indicators.

7              And then I'll also point out, like, on this

8    side, if you're wondering why that's darker, I mean, it

9    should be -- if it's backing, it should be a little

10   greener and more vegetation.

11             So Fire Number 9 was across the road, crossed

12   the road and burned into Number 8.

13   Q.   So the fire, do you mean Ignition Number 9?

14   A.   Uh-huh.

15   Q.   And you said crossed the road into the area of

16   Ignition Number 8?

17   A.   Yes.

18   Q.   And you were able to determine that how?

19   A.   By looking at the burn pattern indicators.

20   Q.   And can you give us an example of some of the

21   burn pattern indicators you saw at Ignition 8?

22   A.   At 8, for the backing, grass stem, a little bit

23   of die-out back in here.  There was a good V pattern for

24   the macro indicator coming out of this area.  We looked

25   at angle of char, and some of the cupping, degree of

Bilbao - D by Ms. Sgarlata                    1582

1    damage, protection.

2        Q.    Okay.  Now, you are an origin and cause

3    investigator.  You're not a dendrologist, correct?

4        A.    No.

5        Q.    Nevertheless, are you aware of what kind of

6    tree we're seeing in the picture here?

7        A.    Yes, it's a juniper tree.

8        Q.    Thank you.  Directing your attention to

9    Ignition Number 9.  I'd ask Ms. Root to pull up the --

10   on the monitor the same exhibit, I believe it's Number

11   69.

12            Can you -- using the laser pointer -- show

13   us -- just explain for us the approximate distance

14   between Ignitions 8 and 9.

15       A.    Well, this area measured -- I took a measuring

16   wheel and measured the distance from the road to the

17   Ignition Number 8, which is around approximately 464,

18   that number sticks in my mind.  And then from the road

19   down -- from the road down to Ignition 9, it was -- I

20   think it was over 1000 feet.

21       Q.    And regarding Ignition Number 9, I'd ask

22   Ms. Root to pull up Exhibit 159, please.  Do you

23   recognize this?

24       A.    Yes.

25       Q.    Is this a photograph that you took as well?

Bilbao - D by Ms. Sgarlata                        1583

1        A.      Yes.

2        Q.      What are we seeing here?

3        A.      This is a photograph of a foot track found in

4    Number 9 just below the point of confrontation or the

5    point -- an area where Lance Okeson confronted

6    Mr. Hammond.

7                Below that we followed some foot tracks out.

8    You could see the foot impressions pretty clear in some

9    of the areas, not so clear in others.  It was kind of

10   rocky in some of the areas, a little more grassy in

11   other areas.  But this one still remained pretty well

12   intact.  We marked it with the double flag just to kind

13   of make it stand out a little bit more from a distance

14   when you are looking at it.

15               And then you can see the heel is a pretty good

16   heel impression.  The toe, you kind of lose a little bit

17   out here.  So it's hard to tell exactly how long it is,

18   but you can definitely see the impression of the shoe.

19       Q.      Now, do you recall what kind of shoes you were

20   wearing during this investigation?

21       A.      Yes, I have a White type firefighting standard

22   firefighting boot.

23       Q.      What kind of bottom is there to that shoe?

24       A.      A Vibram sole.

25       Q.      What does that mean?

1      A.     That is -- well, all firefighters are required

2  to wear certain personal protective equipment.   And

3  boots are one of the requirements.   Leather, have to be

4  leather, eight inches tall, with a Vibram sole, which is

5  supposed to be a little more fire resistant.   And it's

6  kind of a lug sole.   And it's more durable than some of

7  the regular hiking boots.

8      Q.     When you say a "lug sole," is it a smooth sole?

9      A.     No.

10      Q.     I'd ask Ms. Root to bring up Government Exhibit

11  163, please.   Do you recognize this photograph?

12      A.     Yes.

13      Q.     Is this one that you took as well?

14      A.     Yes.

15      Q.     Can you tell us what we're seeing here?

16      A.     Yeah.   We are looking towards the origin of

17  start number -- Ignition Number 9, which is down in this

18  area under this juniper tree here.   And this is after we

19  had marked the burn pattern indicators.   And then

20  actually on this one, I did work with John Bird on this.

21  So we went through and marked the indicators.   And red

22  meaning advancing; blue, backing; yellow, flanking or

23  lateral.   And then the white were marked here were

24  actually foot tracks that we could see pretty well in

25  this origin.

Bilbao - D by Ms. Sgarlata                    1585

1    Q.    Now, did you cast any of these foot tracks?

2    A.    No, we did not.

3    Q.    Why not?

4    A.    For one reason, we didn't have the material

5    with us.  For another reason, there wasn't really a good

6    print -- a casting type print.

7          In order to get a good cast, you need a really

8    good print.  I mean, otherwise you are not going to

9    have -- I mean, it's not going to really buy you much as

10   far as a photograph.  A lot of the things can go wrong

11   in casting, too.

12         You have to get the mix just right when you

13   cast.  If it's lumpy, you could blow out the foot track.

14         So sometimes photographs, especially if they're

15   partial, they're just as good in my experience.

16         Also, casting -- if you are not -- if you don't

17   have anything to compare it with like a photograph, it's

18   not going to really tell you the size, per se, or

19   anything like that.  It could show you the

20   characteristics of the foot track, but you do need a

21   good print for that.

22   Q.    Now, have you casted footprints in the past?

23   A.    Yes.

24   Q.    Approximately how many times?

25   A.    Probably just a couple times.  We did on an

Bilbao - D by Ms. Sgarlata                        1586

1    arson case a couple years ago.  And I actually just got

2    done with a case where we casted a footprint a couple of

3    weeks ago.

4        Q.    Okay.  And I'd ask Ms. Root to pull up

5    Government Exhibit 164, please.  Do you recognize this

6    photograph?

7        A.    Yeah.  This is just another angle of Ignition

8    Number 9 looking -- the other photograph was taken from

9    this area over here looking this way.  This is on this

10   side looking this way.  And there's a little cattle --

11   cow trail right here (indicating).

12       Q.    Do you see in the upper region of this

13   photograph right in the center, in the tree area, it

14   appears -- can you explain to us what we're seeing here.

15   Why some of the trees look different from some of the

16   others?

17       A.    Well, this is where the fire started advancing

18   a little bit more.  You can see on this, there's

19   vegetation left on the brush; whereas, this, more of the

20   vegetation is taken out of the brush.

21             Same with behind where it's backing away from

22   the fire, it's a cooler burn behind it.

23       Q.    And I'd ask Ms. Root to pull up Exhibit 165,

24   please.  Can you tell us what we're seeing in this

25   photograph?

1    A.    This is looking at the origin, again, on the

2    other side of the tree.  And you can see all the

3    vegetation that's left.  There is more backing

4    indicators behind it, and it kind of dies out behind it.

5    Q.    How come -- were you able to examine or look at

6    this tree here in the center of the photograph and had

7    this tree -- did it appear to have been contacted by

8    fire at some point?

9    A.    It does out of the front.  Could have been more

10   vegetation right here that caught it, just when the fire

11   first ignited, taking out more of the tree here

12   (indicating).

13   Q.    Okay.  And I'd ask Ms. Root to pull up

14   Government Exhibit 166, please.  Can you tell us what

15   we're seeing in this photograph?

16   A.    This is another photo of Ignition 9, more

17   getting towards the point of origin.  The foot tracks

18   are marked.  We found four pretty distinct ones going

19   into the area where we think the fire started.

20   Q.    Okay.  And you didn't cast those either, did

21   you?

22   A.    No.  These -- they were kind of some -- some

23   partials you can make out the print.  There was a couple

24   that were more in grass, which when you step on grass,

25   it'll leave an impression sometimes and compressed fuel,

Bilbao - D by Ms. Sgarlata                    1588

1    basically.  When it burned over, you could still see a

2    little bit of the outline of the footprint, but not good

3    enough to cast.

4         I think if you tried to cast in grass, you

5    would just blow out all the grass because it's already

6    burned.

7    Q.    Okay.  And I'd ask Ms. Root to pull up

8    Government Exhibit 168, please.  Do you recognize this

9    photograph?

10   A.    Yes.

11   Q.    Is this a photograph that you took as well?

12   A.    Yes.

13   Q.    Can you tell us what we're seeing here.

14   A.    Yes.  This is one of those foot impressions,

15   you can make out the edge of it.  Heel probably

16   somewhere in here.

17        Out here, it's kind of hard to see exactly, but

18   there is definitely an impression of a side of a foot

19   where the grass was compressed prior to the fire burning

20   there.

21   Q.    Was this your ruler that you were using in the

22   photograph here?

23   A.    Yes.

24   Q.    Okay.  Now, you mentioned when we were talking

25   about Ignition Number 8 that the Ignitions Number 8 and

1   9 burned together in some way.  Can you explain for us

2   how you are able to tell that that happened?

3        A.    Ignition 8 right here (indicating) -- can the

4   jury see that?

5        Q.    We can bring it up on the screen here so they

6   can see it.

7        A.    Ignition 8 right over here, it looked like it

8   started, just as Lance had said, he saw the --

9   Mr. Dwight Hammond leaving that area, fire starting,

10  confronted him across the road, talked to him somewhere

11  in here, or I guess down here.  And then afterwards, a

12  fire started below that.  So as the fire progressed and

13  got larger, it built up more heat.  It's burning hotter.

14  It's moving quicker up this slope.  So there is a slight

15  slope here.  And hitting this road pretty hard.

16            This fire is already going.  And then the

17  advancing fire from Number 9 crossed the road and burned

18  into Number 8.

19       Q.    Okay.  And now did you come to a conclusion or

20  form an opinion as to the cause of Ignitions 8 and 9?

21       A.    Yes.

22       Q.    What was your conclusion?

23       A.    We concluded that it was incendiary, arson set.

24       Q.    All right.  And did you consider the

25  possibility that it might have been something other than

Bilbao - D by Ms. Sgarlata                    1590

1   an incendiary or arson set?

2       A.      Yes.

3       Q.      What other kinds of hypotheses did you

4   consider?

5       A.      Well, you look at all the -- kind of the major

6   categories.  Like I said before, lightning, was there

7   lightning in the area?  There was prior to the 21st.

8   These -- from my understanding -- started on the 23rd or

9   were discovered on the 23rd.  There was no lightning at

10  that time.  There was no indicators of lightning in the

11  area, which, you know, especially with 8, you saw the

12  fuel types, they were lower to the ground.  Then you

13  have that one juniper standing there.  Usually lightning

14  strikes taller objects.  But there was just no

15  indication of lightning.

16          Ruled out like any children, there is not a lot

17  of houses in the area, no playground, not a big,

18  populated area.  So -- and, again, children tend to

19  leave things behind.  You'll find smaller foot tracks,

20  that kind of thing.

21          No railroads.  No power lines.  No sign of

22  fireworks.  No debris burning activity.  That kind of

23  thing.

24          And then also it came into question whether or

25  not any of the firefighting activity or spotting, but

1    with the fire -- the main fire being the Grandad Fire at

2    the time it was -- it was like three miles to the west

3    of either of these ignitions.  So it -- and from my

4    understanding, too, talking to some of the witnesses, it

5    was fairly inactive the morning that these started.

6              I know they did a burnout operation up here,

7    but that was, again, about two miles north of these

8    ignitions.

9        Q.    Now, have you in the course of conducting your

10   800 or so origin and cause determinations, have you ever

11   seen an instance where it appeared that lightning had

12   struck the ground nearby?

13       A.    Yes.

14       Q.    And so you are familiar with what it might look

15   like?

16       A.    Yes.  I've seen it strike power poles, brush,

17   and the ground, and some trees in instances in the

18   forest.

19       Q.    And you didn't see any indications of any of

20   that here?

21       A.    No.

22       Q.    Okay.  Now, your conclusion as to the

23   incendiary cause, does that apply both to 8 and to 9?

24       A.    Yes.

25       Q.    Okay.  And did you yourself interview

1    individuals, witnesses, in the area or did you rely on

2    reports from other people?

3        A.    I interviewed Lance Okeson.  I was at the scene

4    with him the first day I got to Ignition 8.  I looked at

5    that.  And then I can't say for sure -- I know I talked

6    to Joe Glascock at some point during that time.

7        Q.    Okay.  And did you also examine any of the

8    other or walk up to and look at any of the other

9    ignitions or Trail Fires in this area?

10       A.    When I first arrived at the area, as part of

11   the briefing, we came in -- we came in through a road,

12   I'm not even really sure how we got there.  There is a

13   road system out through here.  We came in down this

14   road.  And he was pointing out the other possible

15   ignition sites.  But the ones that he wanted me to

16   concentrate on, because he was kind of working those,

17   were these two down here.  Because he hadn't had a

18   chance to get to those yet.  So I kind of reviewed where

19   they were at, but we didn't really, you know, go into

20   the origin and cause, per se.

21       Q.    Okay.  Did you consider the possibility that a

22   discarded cigarette might have caused some of these

23   ignitions?

24       A.    Well, you look at it, but there is no

25   indication of any cigarette smoking activity in the

Bilbao - X by Mr. Matasar                          1593

 1    areas.

 2              MS. SGARLATA:  Okay.  I have no further

 3    questions.

 4              THE COURT:  Cross.

 5                        CROSS-EXAMINATION

 6    BY MR. MATASAR:

 7       Q.    Ms. Bilbao, who worked with you -- I'm Larry

 8    Matasar.  I represent Dwight Hammond -- sorry, Steven

 9    Hammond.

10              Who worked with you on Ignition Number 8 on the

11    investigation of that one?

12       A.    On Ignition 8, I did the origin and cause, the

13    specific pattern indicators.  Lynn Miracle gave me some

14    background, but not -- I was doing the specific origin

15    and cause.

16       Q.    So you did it yourself?

17       A.    Well, not completely by myself.

18       Q.    Okay.

19       A.    But I did -- yes.

20       Q.    You were on the scene yourself?

21       A.    Yes.

22       Q.    Okay.  And is it not the case that you're

23    supposed to have somebody with you when you are doing

24    this kind of investigation?

25       A.    It's suggested, but it doesn't -- I've done a

1    couple of fire investigations this year without other

2    people present, but there's usually somebody in the

3    area.

4        Q.    You are familiar with the Wildfire Cause and

5    Determination Handbook?

6        A.    Yes.

7        Q.    We've talked about that.  You've spent a lot of

8    time working on it?

9        A.    Yes.

10       Q.    And you follow the methods in it?

11       A.    Yes.

12       Q.    Ever heard it called the "Bible" or the "fire

13   investigator Bible"?

14       A.    No.

15       Q.    What was the point of creating that book?

16       A.    It was to give investigators kind of a

17   checklist.  Like for me, it's helpful because I don't

18   do -- I don't conduct wildland fires year-round.  In

19   some areas they do.  But, you know, it's helpful to have

20   that checklist as a reminder of things to do, to help --

21   you know, in these certain situations, you look for

22   these indicators, or that kind of thing.

23       Q.    And you're supposed to follow it, that's the

24   general idea?

25       A.    It's a guideline.

Bilbao - X by Mr. Matasar                    1595

1    Q.    Do you have a kit that you take with you when
2    you go on -- when you are called to do an investigation?
3    A.    Yes, I generally do.
4    Q.    Do you have camera?
5    A.    Yes.
6    Q.    Do you have a ruler?
7    A.    Yes.
8    Q.    Golf tee, maybe?
9    A.    Nope.
10   Q.    Don't take a golf tee?
11   A.    No.
12   Q.    Why not?
13   A.    We have other measurements of scale.
14   Q.    Okay.
15   A.    Like a ruler.
16   Q.    But doesn't the book say that the -- when
17   you're taking a photograph, a golf tee performs a
18   different function than the ruler?
19   A.    I'm not sure what it says.  You'd have to read
20   that to me or I'd have to look at it.  But it's for
21   shadowing effect or what you can get from different
22   lighting.
23   Q.    Yes.  So it sounds that that would be the kind
24   of thing that would be specifically in the book, is it
25   not?

Bilbao - X by Mr. Matasar                    1596

1    A.    Well, I know it's listed in the book as having

2  a suggestion to use a golf tee when you are

3  photographing, if you need to, but in a lot of cases,

4  you don't need to do that.

5    Q.    Are you saying it says if you need to?  Doesn't

6  it, in fact, say footwear and tire impression collection

7  procedures, insert a golf tee with a one-inch mark in an

8  upright position alongside the impression to provide

9  shadow correlation?

10    A.    You can get shadowing effects from other ways.

11  You can set your camera and different lighting.  Again,

12  it's a guidebook, it's a guideline, it doesn't -- it's

13  not "you have to do this" in order to get the photograph

14  taken.

15    Q.    What about the dental stone, you say you don't

16  bring dental stone with you?

17    A.    I have it in my investigation kit at home.

18    Q.    But you didn't bring it with you this time?

19    A.    I did not.  I was coming off another fire, and

20  meeting up with Lynn.  He provided me with a lot of the

21  investigation equipment I needed on scene that I did not

22  have with me.

23    Q.    But not the dental stone?

24    A.    Not the dental stone.

25    Q.    Now, in this handbook is it fair to say there

Bilbao - X by Mr. Matasar                    1597

1    are some things that are more important than others?

2        A.    I suppose.

3        Q.    And it uses bold print sometimes, does it not?

4        A.    Yes.

5        Q.    Okay.  And isn't one of the things that's in

6    bold in the section on footwear and tire impressions

7    doesn't it usually -- doesn't it say specifically in

8    bold print, "shoe impressions should usually be cast"?

9        A.    Should usually, so it's not a requirement to

10   get the job done.

11       Q.    You did bring a measuring wheel?

12       A.    Uh-huh.  I don't know if it was mine or if I

13   brought it, but I had a measuring wheel.

14       Q.    The BLM uses radios for -- used radios for

15   communication --

16       A.    Yes.

17       Q.    -- at this time?  And cellular phones are not

18   really recommended; is that fair to say?

19       A.    You can use cellular phones but not all the

20   time have the coverage, so.

21       Q.    Well, the handbook says they are not

22   recommended?

23       A.    Yeah.

24       Q.    Okay.  And is it a coverage question, is that

25   the reason?

Bilbao - X by Mr. Matasar                          1598

1     A.     I don't understand the --

2     Q.     I mean, let me ask, what -- you are familiar

3   that -- you are aware that BLM used Bendix King radios

4   at this time?

5     A.     I know some agencies did.  I had an EF Johnson.

6     Q.     Do you know what kind of radios BLM generally

7   used at this time?

8     A.     I can't speak to the whole BLM.  I know what we

9   had.  We're EF Johnson at the time.  And we did have

10  Bendix Kings prior to that.  But I don't know what every

11  other agency was using across the BLM.

12    Q.     Do you remember testifying at a previous

13  hearing in this case?

14    A.     Yes.

15    Q.     Do you remember Mr. Blackman, I think, asked

16  you just this question and you gave this answer:  "Do

17  you know what kind of radios BLM used generally at that

18  time?"

19    A.     Probably Bendix Kings, but I'm saying I can't

20  speak for all the agencies.  I know we had them for a

21  while, then we switched to EF Johnson, and then we went

22  back to the Bendix Kings because they're a better radio.

23    Q.     When you say "we," you're talking --

24    A.     Our agency.

25    Q.     -- about the Boise --

Bilbao - X by Mr. Matasar                    1599

 1      A.      The Boise District.

 2      Q.      -- part.  Okay.  And you know about Bendix King

 3   radios, they are a digital radio that requires a support

 4   network of digital towers?

 5      A.      Yes.

 6      Q.      That sort of thing?

 7      A.      From what I understand.

 8      Q.      Now, I want to ask you some questions about

 9   your report for Ignition Number 8.  Do you have it with

10   you?

11      A.      Yes.

12      Q.      First of all, you've reviewed it, I take it,

13   before you came today?

14      A.      Uh-huh.

15      Q.      Same with --

16      A.      Yes.

17      Q.      -- Ignition Number 9?

18      A.      Yes.

19      Q.      I first want to ask you about the location.

20   Can I ask Ms. Root to -- well, first, your location on

21   the first part lists it as a bunch of numbers T31S and

22   R38E in Section 36; is that right?

23      A.      Township, section, and range.

24      Q.      Right.  That's on the very first page of your

25   report?

1    A.    Uh-huh.

2    Q.    In Section 36?

3    A.    Yes.

4    Q.    So "T" means township?

5    A.    Yes.

6    Q.    "R" means range.   "S" means south.   "E" means

7    east.

8    A.    "S" means probably section.   Are you talking on

9    the first part of it, the Section 36?

10    Q.    Well --

11    A.    Oh, yes, 31 south --

12    Q.    Yes.   31 south --

13    A.    -- 38 east.

14    Q.    -- 38 east in Section 36.

15    A.    Yes.

16    Q.    Now --

17          MR. BLACKMAN:   Talk one at a time.

18    BY MR. MATASAR:

19    Q.    I'm sorry.   Can you pull out, Ms. Root,

20    Government Exhibit Number 70.   Could you expand it where

21    it says Ignition 8.   Now, there is a number under

22    Ignition 8 which says 14.

23    A.    Yes.

24    Q.    What does that mean?

25    A.    That's the -- that would be the Section 14.

1    The fire location on the report is from the initial -- I

2    believe it's from the initial location it was given.  I

3    don't -- I don't know.

4        Q.    Could -- Ms. Root, can you back out again.  And

5    I think if you expand where it says Hardie-Hammond Fire,

6    around there.  No.  Yeah, there.  I think a little bit

7    to the left of that.  At the far right, where it says

8    "near Hammond cabin" to the right there.  That's where

9    Section 36 is, is it not?  Make it bigger, Ms. Root, by

10   "Hammond cabin."

11       A.    Yes.

12       Q.    So your report placed it there?

13       A.    I think that was the initial again, where the

14   location -- where the initial fires may have been, the

15   general location.

16             The only way to really figure it is if I took

17   the GPS coordinate that I took at the origin to

18   determine -- because you can convert that to lat/long

19   and get the section, township, section, range,

20   specifically.

21       Q.    Let me ask about securing the scene at Ignition

22   Number 8.  By the way, when you say location there, that

23   doesn't mean the location of the fire on your report?

24       A.    That means -- well, the general location of

25   the -- I guess the Grandad Fire was within that area.

Bilbao - X by Mr. Matasar                          1602

 1   That doesn't mean the location -- location is a general

 2   area.  It doesn't mean like the point of origin.

 3       Q.    So your report on the face page for location is

 4   not supposed to indicate the specific place that you did

 5   your investigation?

 6       A.    The general area, which I guess it's in the

 7   general area up there.

 8       Q.    When did you get to the scene?

 9       A.    I believe I arrived on the 28th of August in

10   2006.

11       Q.    That's when you got to Oregon or when you

12   actually got to the scene?

13       A.    I can't remember if we went out there that day.

14   I know I got -- did the fire investigation for Number 8

15   on the 29th.

16       Q.    Okay.  That's what I was asking.  And did you

17   take any steps to secure the scene?

18       A.    I myself, no.  I arrived -- what is that?  Six

19   days after the report of initial ignitions.

20       Q.    When you got there, could you tell if there had

21   been any efforts to secure the scene?

22       A.    Not that I could tell, per se.  It was in a

23   remote area.  There weren't a lot of people around, so.

24       Q.    So it's not necessary to secure the scene in a

25   remote area?

Bilbao - X by Mr. Matasar                                    1603

 1      A.      I wouldn't say it's not necessary.  I guess it

 2   depends on the circumstance and the fire and where

 3   you're at.

 4      Q.      And pardon?

 5      A.      And where you're at, where --

 6      Q.      Okay.  But the handbook that you worked on says

 7   that one of the things that should be done is to secure

 8   the scene; is that right?

 9      A.      Yes.

10      Q.      And there is also a list of common mistakes at

11   the very beginning, a list of common mistakes.  And one

12   of them is failure to secure the scene; is that right?

13      A.      Yes.

14      Q.      And you say in your report that you walked the

15   perimeter of -- what you are calling Ignition 8?

16      A.      Yes.

17      Q.      Did you walk it once or twice?

18      A.      I don't remember.  I generally walk the area a

19   few times to get -- to look at the macro indicators on

20   all directions.  It was six years ago.

21      Q.      But it's six years ago, but you wrote a report?

22      A.      Uh-huh.

23      Q.      And the report is the sort of end to all or the

24   conclusion of your investigation; is that correct?

25      A.      Yes.

Bilbao - X by Mr. Matasar                          1604

1     Q.     And the handbook says that?

2     A.     I don't know if the handbook says that.

3     Q.     What about -- do you indicate in your report

4     that you walked it twice?

5     A.     I don't believe I did say that specifically,

6     no.

7     Q.     Did you use a magnet or metal detector in your

8     investigation of 8 or 9?

9     A.     I did not have a metal detector, so I didn't

10    use that.  I can't remember using a magnet.  It's

11    general practice for us to use magnets.  I mean, I do it

12    on all the other fire investigations.  I can't say for

13    sure.

14    Q.     Are there -- but if you did do it, you would

15    put it in your report?

16    A.     Not necessarily.

17    Q.     Do you search for accelerants?

18    A.     As far as looking at the general area where

19    they were at, didn't smell anything.  And there is

20    nothing that would suggest there could have been a

21    possible accelerant, so that's about as far as I went to

22    look at the indicators for that type of cause.

23    Q.     Now, it was dry and windy at the time of the

24    fire, you are aware of that, are you not?

25    A.     At the time of the initial Grandad Fire?

Bilbao - X by Mr. Matasar                          1605

1     Q.     On August 21, 22, and 23 of 2006 in the Steens

2   area?

3     A.     Yes, on and off, I suppose.

4     Q.     You don't know?

5     A.     Well, I don't know for sure.

6     Q.     And you know what spotting is?

7     A.     Yes.

8     Q.     And you are aware that spotting -- I won't get

9   into a detailed discussion, but you are aware that the

10  drier, the windier, and the warmer it is, the farther

11  the spotting distance will be?

12    A.     Yes.

13    Q.     Are you aware of the firefighting operations

14  that were going on during this fire?

15    A.     Some of them.  We were pretty far away from the

16  Grandad Fire itself, which I guess they're now calling

17  the Lower Bridge Creek Fire.  But we were pretty far

18  away from that.  I do know that some of the crews had

19  tried to conduct a burnout operation a couple days prior

20  to the fire.

21    Q.     Pardon me.  Go ahead.

22    A.     Or a day prior, I can't remember.

23    Q.     And that burnout operation was essentially near

24  Ignition sort of 1, 2, 3, 4, 5 up there in the top?

25    A.     This black line right here (indicating).

Bilbao - X by Mr. Matasar                          1606

1       Q.      Right.  And are you aware of a test fire that

2   was also done?

3       A.      Yes.

4       Q.      Okay.  And you know that sort of got -- I don't

5   know if out of control is a technical word, but they had

6   to call firefighting equipment -- for firefighting

7   equipment at the test fire, are you aware of that or do

8   you know anything about that?

9       A.      I heard -- no, I don't.

10      Q.      Now, you mentioned the Grandad Fire, you called

11  it the Granddad Fire, which I guess they're now calling

12  the Lower Bridge Creek Fire, is that what you said?

13      A.      Yes.

14      Q.      So when you were there, it was called simply

15  the Grandad Fire?

16      A.      Correct.

17      Q.      That whole area?

18      A.      The whole area.

19      Q.      Okay.  Now, you've talked a little bit about

20  the footprints at Ignitions 8 and 9.

21      A.      Yes.

22      Q.      And you said there were footprints -- foot

23  tracks between Ignitions 8 and Number 9?

24      A.      Yes.

25      Q.      Now, did you photograph a single footprint near

Bilbao - X by Mr. Matasar                              1607

1    Ignition 8?

2        A.    I can't say -- I think there was a partial

3    print in one of mine that didn't really show up very

4    well.  So I didn't have a good -- a good, I guess, track

5    or footwear impression to photograph.

6        Q.    So you didn't take any photographs of any

7    footprints at Ignition 8?

8        A.    No, not that I recall.

9        Q.    Okay.  Now, you drew diagrams for Ignitions 8

10   and 9, did you not?

11       A.    Yes.

12       Q.    Do you have them with you?

13       A.    I do.

14       Q.    Now, didn't you write on the diagrams "not to

15   scale"?

16       A.    Yes.

17       Q.    And that's because they weren't to scale?

18       A.    Correct.

19       Q.    Now, doesn't the handbook say that you should

20   prepare a scale diagram for your written report?

21       A.    I don't know.

22       Q.    Well, let me see if this will refresh your

23   recollection here.  Well, you know Gary White, right?

24       A.    Yes.

25       Q.    You know he's taught a class on -- or he's

Bilbao - X by Mr. Matasar                          1608

1  written an article about wildland fire sketches.

2     A.    I wasn't aware of that.

3     Q.    You weren't aware of that?

4     A.    I wasn't aware of that.

5     Q.    Would you agree that the handbook says on page

6  58, "after the rough sketch is prepared at the fire

7  scene" -- which is what you did -- "the investigator

8  should prepare a scale diagram for the written report"?

9     A.    Again, it's "should."  It's not a "must"

10  prepare.

11     Q.    You based your opinion -- it's sort of -- you

12  do what you think is right at the scene and at the time;

13  is that right?

14     A.    No.  You look at the situation.  Not all fires

15  are we going to have to use -- like you suggested maybe

16  accelerant testing, if there's no indication of it,

17  you're not going to take it beyond that point.

18     Q.    What about a scale diagram?

19     A.    I don't know.

20     Q.    You have a footprint, I take it -- in a case

21  where you have a footprint, and then you have a point of

22  origin, right, isn't it important to know how close the

23  footprint is to the point of origin?

24     A.    I guess.  But that's just a representative,

25  that's one footprint.

1        When I was looking Ignition 8, there were -- I

2    did take measurements between prints, and -- like the

3    measurement from where the origin area was to the road.

4    And, again, I didn't have like exact prints, like one

5    after another to measure.  They were just kind of

6    sporadic where we could find them.  So couldn't get the

7    exact, I guess, measurement between -- you know, like

8    the stride or anything or distance, that kind of thing.

9        Q.    Let me ask a more general question.  If you are

10   saying that a person used a portable ignition source to

11   ignite a fire, isn't it important, if you can, to

12   measure the distance between the footprint and the point

13   of ignition?

14       A.    Yeah, I suppose it would be if you could find a

15   good point of --

16       Q.    Certainly if it was 6 inches it would be

17   different than if it was 32 inches, right?

18       A.    Sure.

19       Q.    That would help you decide?

20       A.    (Nodding head.)

21       Q.    Okay.  Now, you based your opinion on Ignition

22   8 on the recovery of shoe impressions resembling those

23   located near the other wildland fire origins in the

24   area, right?

25       A.    Yes.

Bilbao - X by Mr. Matasar                          1610

1      Q.     Okay.  Was it your decision -- was it your

2   determination that they resembled other shoe

3   impressions?

4      A.     Yes.  I got to look at some of the other

5   prints.

6      Q.     So your impression -- your prints that you saw

7   at Ignition 8, which were not clear enough to even

8   photograph, you were able to compare those to other shoe

9   impressions and make a decision to call it the basis for

10   your -- your opinion?

11      A.     No.

12      Q.     No.  How did you do it then?

13      A.     Well, the fact that you have shoe impressions

14   to begin with, you have one type of shoe, it's a

15   smoother soled shoe, and all these ignition points.  And

16   they kind of follow a path or a line of -- the ignition

17   points follow the shoe prints, whether it's a partial or

18   whether it's a full print.

19      Q.     So you saw that there were a lot of footprints

20   in the area.  And you didn't really -- it wasn't

21   important to you what they looked like as much as that

22   they were in a certain path; is that what you're saying?

23      A.     So you take in what they look like and the fact

24   that they were in a path.

25      Q.     Well, let me ask about Ignition 9 because you

Bilbao - X by Mr. Matasar                              1611

1    did actually take photos there, did you not?

2        A.    Yes.

3        Q.    Let me show you one of them here.  This is

4    1331.  Is this one of the photos that you took?

5        A.    Yes.

6        Q.    That's one of the ones you took?

7        A.    Yes.

8              MR. MATASAR:  I move the admission of 1331,

9    Your Honor.

10             MS. SGARLATA:  No objection.

11             THE COURT:  Received.

12   BY MR. MATASAR:

13       Q.    Well, that's one of the photos that you took;

14   is that right?

15       A.    Yes.

16       Q.    Now, you did measure the footprints.  And,

17   again, just like at 8, none of these were cast, none of

18   these used a golf tee, none of these were taken with a

19   flash, none of the sort of things that are in the

20   handbook were followed, you just put your camera over

21   the photos where you could, although on some -- is that

22   right?

23       A.    Yes, I took a photo of the foot tracks.

24       Q.    Okay.  And how many footprints were there at

25   Ignition Number 9, do you recall?

1    A.    I recall four that we could distinguish in the

2  general origin area or specific origin area, actually.

3    Q.    And you measured them?

4    A.    When we took -- when I took the photographs,

5  tried to take one just of the shoe impression and then

6  one with the scale.  I -- as far as measurement, that's

7  how I measured them.

8    Q.    Pardon me?

9    A.    That's how I measured them.

10    Q.    And you came to a determination of how long

11  they were?

12    A.    The length of the track --

13    Q.    Yes.

14    A.    -- or the foot impression?  Couldn't make a

15  total determination as to how long approximate --

16  because you didn't have a complete like toe-heel perfect

17  impression.

18    Q.    Did you pick a number to put in your report for

19  the length of the boot print?

20    A.    Yes.

21    Q.    And what was that number?

22    A.    It was approximately 14 inches.

23    Q.    Okay.  And that was -- and are you saying that

24  a boot or a shoe that's 14 inches long made that

25  impression?

Bilbao - X by Mr. Matasar                          1613

1      A.    No.  The impression that was left at the scene

2   could have been approximately 14.  However, when you

3   look at some of these, they range from like more 13, 12,

4   to 14.

5      Q.    Did I not ask you at the last hearing this

6   question and didn't you give this answer:  "So are you

7   saying that a boot that's 14 inches or a shoe that's

8   14 inches made this impression?"

9           And you said, "yeah, approximately.  I mean, I

10   can't say for sure."

11          But you said that -- the point was the size of

12   the boot was 14 inches?

13     A.    I don't know if the size of the boot was

14   14 inches.

15     Q.    But is it your opinion that a person with a

16   14-inch footprint is the person that set these fires?

17     A.    I know the foot impression left resembled an

18   approximate 14 inches.  Whoever left that foot

19   impression is probably the one that started the fire,

20   because it's the same thing in all of the ignitions, the

21   same type of print found, not necessarily 14.  That's

22   the approximation number that we came up, I think, based

23   on the original measurement of the heel to toe in the

24   softer, sandy soil, but I can't say for sure that it was

25   a 14-inch foot or boot.

Bilbao - X by Mr. Blackman                                    1614

1    Q.    I may have been unclear in my question.  So is

2  it your opinion that a person with a 14-inch footprint

3  is the person who set the fires?

4    A.    It is my opinion that the person that had

5  the -- the shoe that resembled that was the same at

6  every ignition that we saw, resembled that and

7  approximately 14 inches in measurement was the one that

8  set the fire.

9    Q.    Well, didn't you give a much simpler answer

10  when I asked you this last time?  Didn't I ask you, "and

11  so" -- we had some discussion about the footprints.

12  "And so is it your opinion that a person with a 14-inch

13  footprint is the person who set the fire?"

14         Your answer was "I would say given all the

15  other evidence, more likely than not."

16    A.    Yeah.  And you're taking it in context of what

17  we're seeing on the fires, everyone was coming up with

18  the same approximation of a 14-inch footprint, so --

19  (nodding head).

20         MR. MATASAR:  You never did any comparison --

21  well, let me withdraw that.  I have nothing further.

22  Mr. Blackman has some questions.

23                        CROSS-EXAMINATION

24  BY MR. BLACKMAN:

25    Q.    I really have just a few.

Bilbao - X by Mr. Blackman                    1615

1              The methodology that's both in the handbook and

2      the FI-210 manual says that not only are you supposed to

3      have a hypothesis, in your case here the hypothesis is

4      that Ignitions 8 and 9 were intentional ignitions, but

5      you're also to test your hypothesis, correct?

6      A.     Yes.

7      Q.     You agree with that?

8      A.     Yes.

9      Q.     And to test the hypothesis that you have here,

10     wouldn't it be important to know whether or not in any

11     of the locations where foot tracks were found, they were

12     in close enough proximity to the specific point of

13     origin of any of the ignitions to account for the person

14     making the print having somehow ignited the ignition;

15     wouldn't that be close enough?

16     A.     I guess I don't fully understand the question.

17     Q.     Okay.  Well, let's say the hypothesis is, since

18     you found no, as you called it, incendiary device -- and

19     just to be clear, if someone uses a match to light a

20     fire, and that match is there, you will find evidence of

21     the match, won't you, more often than not?

22     A.     In some cases you will, yes.

23     Q.     And if someone uses, like -- as I have read

24     someplace -- a couple of cigarettes, maybe somehow

25     banded together --

Bilbao - X by Mr. Blackman                          1616

1      A.      Yes.

2      Q.      -- and you'll find the evidence of those

3  cigarettes?

4      A.      You should find remains of that.  Like I said,

5  depending on the fuels that it was placed in.

6      Q.      Right.  And in each of the locations that you

7  examined, you found nothing like that?

8      A.      No.

9      Q.      So the ignition could certainly be accounted

10 for in the fact that there is no ignition device located

11 in -- as a -- something natural that started that fire,

12 such as an ember or a burning material that is

13 indigenous to the location, having wafted over there,

14 landed, and started the fire, right?

15     A.      If that's all you had, we had -- you, again,

16 look at the totality of the evidence.

17     Q.      I understand.  But it would be consistent -- it

18 would be a hypothesis consistent with what you saw on

19 the ground that some vegetation, indigenous to the area,

20 that was burning landed in the location, and ignited the

21 similar material near where it landed?

22     A.      No.

23     Q.      Wouldn't that also explain an ignition for

24 which you could find no incendiary device?

25     A.      As -- if the fire were to spot and start a

Bilbao - X by Mr. Blackman                          1617

1  fire, yes, you would not find an incendiary device.

2      Q.    Right.  Or if a drip torch had started a fire

3  and an ember from that fire had drifted, that would be

4  the same thing, correct?

5      A.    Correct.

6      Q.    Or if a spark from something, right?

7      A.    Depends on the spark, sometimes you do find

8  metal materials.

9      Q.    Right.  So the hypothesis that you were

10 considering was rather than natural conditions, rather

11 than spotting, rather than any of those other

12 hypotheses, that this was based -- that your hypothesis

13 was that someone intentionally lit a fire with -- in

14 some manner that left no evidence, so not a match, not

15 cigarettes, none of the things that you would find

16 evidence of, and that person was responsible because

17 there were footprints in the area, right?

18     A.    You look at all possible causes.  And what is

19 the most probable, as you said, in forming your

20 hypothesis, what is all the evidence at the scene, so

21 you take the totality of everything you are seeing.  And

22 generally if you have a lot of spotting, I don't think

23 it comes with a trail of foot tracks.

24     Q.    I understand that.  That's why that's your

25 hypothesis.  And I'm trying to understand if, as the

Bilbao - X by Mr. Blackman                          1618

1  handbook and your training and the FI-210 manual all say

2  you are to test your hypothesis, I'm asking you once you

3  had that hypothesis and you had a foot track and you had

4  a specific point of ignition, did you test your

5  hypothesis to see if that footprint that you found was

6  close enough to that ignition point to be possible for

7  someone to have -- without leaving any other evidence

8  close to the point of origin -- to have done what you

9  are hypothesizing?

10  A.     Well, if I understand -- I guess you are trying

11  to suggest that if I had measured, I guess, the one

12  footprint or the couple that I found that was near the

13  point of ignition, that that would prove that it was or

14  wasn't --

15  Q.     For example, if the closest print that you saw

16  evidence of was three feet from the ignition point that

17  you had determined, wouldn't that be inconsistent with

18  your hypothesis because someone simply can't reach three

19  feet without getting some boot print closer?

20  A.     No.  Again, I didn't have consistent footprints

21  that we're looking at.  So there could have been -- he

22  could have stepped on some grass or could -- there could

23  have about been other prints closer to the area found,

24  so.

25  Q.     Let me simplify it.  Did you have anybody --

1    yourself or anyone else -- place a foot in the location

2    of the print that you found closest to either of these

3    points of ignition and see if they could reach the point

4    of ignition from that location?

5         A.    I don't recall doing that.

6         Q.    You didn't do that.  All right.  And isn't that

7    what testing the hypothesis would have required?

8         A.    No.

9         Q.    No.  You don't have to actually see if what you

10   are hypothesizing is physically possible?

11        A.    Again, you take all the evidence and data

12   collected and form a hypothesis.

13        Q.    Now, other than being told by other people what

14   had happened, which appears to have played a major role

15   in your origin and cause determination, did you, in

16   fact, try to independently locate the specific ignition

17   points of 8 and 9?

18        A.    On 8, I was working alone.  On 9, I did have

19   another investigator with me.

20        Q.    But I'm asking you if you did something to

21   specify, not just "this is where Lance said he saw a

22   fire"?

23        A.    Right.  That's where it comes in with the

24   methodology, you're looking at the macro indicators, the

25   micro indicators, you are taking the advancing burn

1    patterns, reading them down to the general origin area,

2    to the specific origin area, and kind of hone in on

3    that.

4        Q.    And then once you do that, did you, in fact,

5    plot those -- that location at some scientific way?

6        A.    Location, we took a -- I took a GPS point of

7    the origin and just measured, I think the distance from

8    the road to the origin.

9        Q.    Didn't you, in fact, plot what are called the

10    Universal Transverse Mercator coordinates of both 8 and

11    9?

12        A.    The UTM, yes.

13        Q.    Okay.  I was going to say UTM, but I didn't

14    want to sound like I knew what I was talking about here

15    because I don't know what I'm talking about.

16        A.    It's just a measurement, like, a lat/long, it's

17    a measurement of --

18        Q.    And isn't it true that --

19        A.    -- for location.

20        Q.    -- for Number 8 the UTM coordinates were

21    zone -- you have this in your notes, I believe, maybe in

22    the photo log.

23        A.    For Number 8?

24        Q.    For Number 8.  Why don't you tell us what the

25    UTM coordinates for Number 8 were?

1    A.    You want me to read out the --

2    Q.    Yeah.

3    A.    -- actual --

4    Q.    Or I can read it and you can tell me if I got

5    it right.

6    A.    Okay.

7    Q.    For Number 8, zone 11T 361531 4740019?

8    A.    Yes.

9    Q.    Got it right?

10   A.    Yes.

11   Q.    Even a trained monkey can do some things.

12         And for Number 9, did you do the same thing?

13   A.    I believe so.  Yes.

14   Q.    Okay.  And did you determine the UTM

15   coordinates at 9 to be zone 11T 360749 4740291?

16   A.    Yes.

17   Q.    Okay.  Have you taken those coordinates, looked

18   at any of the government exhibits that place the

19   location of 8 and 9 to see if they are accurately placed

20   on any of the exhibits the government has offered in

21   this case?

22   A.    No.

23   Q.    Okay.  So you don't know whether or not the

24   actual points of origin that you plotted on August 28

25   and 29 -- and 30, I believe, for 8 and 9, are actually

 1    in the places that the government has put on any of

 2    these exhibits?

 3        A.    I don't know.  Looking at a map, they look like

 4    the location, but, no, I can't say specifically.

 5              MR. BLACKMAN:  That's all, Your Honor.

 6              MS. SGARLATA:  Thank you, Your Honor.

 7                      REDIRECT EXAMINATION

 8    BY MS. SGARLATA:

 9        Q.    Ms. Bilbao, do the government's exhibit -- the

10    exhibit to your left, do they fairly and accurately

11    represent the locations of where you were when you took

12    the photographs listed or depicted or written on those

13    exhibits?

14        A.    Yes.

15        Q.    Okay.  Now, you were asked on cross-

16    examination, going back, about whether you did Ignition

17    Number 8 by yourself or whether you had another

18    individual with you.

19        A.    Correct.

20        Q.    And you were also asked questions about

21    securing the scene and other things that have been

22    mentioned as part of the methodology.

23              I would ask the clerk to hand you what has been

24    marked Government Exhibit 266 for identification.  And

25    let the record reflect I'm handing a copy of the same

 1    exhibit to counsel.  I only have one copy.  I'm sorry.

 2    I'll hand it to you.

 3            MR. MATASAR:  We're good.  We have a bigger

 4    version.

 5    BY MS. SGARLATA:

 6        Q.    Ms. Bilbao, are you familiar with Government

 7    Exhibit 266?

 8        A.    Yes.

 9        Q.    What is it?

10        A.    It is the Wildfire Origin and Cause

11    Determination Handbook.

12        Q.    Is that a document that you helped provide

13    input to?

14        A.    Yes.

15        Q.    In fact, is your name listed on Roman numeral

16    page four?

17        A.    Yes.

18        Q.    And can you please turn to page 2 of that

19    document.  You were asked questions on cross-examination

20    about a fire scene examination being taken alone.  Can

21    you please read -- or can you look at page 2, to the

22    extent that it discusses when a fire scene examination

23    should be undertaken alone.  And can you tell us does

24    that set forth a statement to that regard as a

25    commandment or as a prefatory statement or what kind of

 1  statement?

 2          THE COURT:  Don't read it.  Is it in evidence?

 3          MS. SGARLATA:  No, Your Honor.  It's just for

 4  identification.

 5          THE COURT:  Don't read it out loud.

 6          THE WITNESS:  Okay.  Examining it, it's a

 7  suggestion.

 8  BY MS. SGARLATA:

 9      Q.    I would ask you to turn to page 40 of that

10  handbook.  And you were asked questions on

11  cross-examination about security and whether the scene

12  was secured.

13      A.    Okay.

14      Q.    Would you -- looking at page 40 and directing

15  your attention to anything having to do with securing a

16  scene, could you take a look at what that page says, and

17  look up at me when you are done reading what, if

18  anything, that page says about security.

19      A.    (Witness complies.)

20      Q.    Now, is it a requirement, according to the

21  handbook, to post a security person at the general

22  origin area?

23      A.    No.

24      Q.    Okay.  Can you turn to page 52 of that manual

25  and look at anything on page 52 that refers to shoe

Bilbao - ReD by Ms. Sgarlata                    1625

1   impressions.  And when you are done looking at that,

2   would you look back up at me.

3       A.     (Witness complies.)

4       Q.     Now, does the handbook dictate that shoe

5   impressions must always be cast?

6       A.     No.

7       Q.     Can you please to turn page 58 of the handbook

8   and look at anything on that page that discusses

9   sketching a scene.  And when you are done reading that

10  page, would you look up at me.

11      A.     (Witness complies.)

12      Q.     Does the handbook dictate that a sketch must be

13  to scale?

14      A.     No.

15      Q.     Would you please turn to page 77 of the

16  handbook and look at what, if anything, on that page

17  discusses arson or incendiary cause indicators.  When

18  you are done, look up at me.

19      A.     (Witness complies.)

20      Q.     Can you explain to the jury what are some arson

21  or incendiary cause indicators, without reading it from

22  the handbook?

23      A.     Sure.  We look for -- like in spree arson,

24  multiple fires set at one time, so you have multiple

25  fires within a proximity of time and location.  The lack

Bilbao - ReD by Ms. Sgarlata                1626

1    of ignition source, what we call hot set, somebody could

2    use a lighter to start it, take it with them.  Sometimes

3    that could be a match left at the scene, sometimes it's

4    not.

5         I think in the majority of wildland arson

6    fires, it is generally a hot set.  So you would look at

7    the other evidence.

8         What we look at a lot are the footprint tracks,

9    are there foot tracks going in and out of the scene?

10   Are they in close proximity to where the fire was set?

11   And you are looking at ruling out other possible causes.

12   We rely a lot on witness statements and other things

13   found at the scene.

14   Q.    And you were asked on cross-examination about

15   ignition devices and whether you would find matches, for

16   example, someone used matches to set a fire, whether you

17   would find some indication of that at the scene or the

18   general or specific origin area.

19        Now, is it possible in your experience and your

20   training and experience in this area, is it possible for

21   someone to use a portable ignition device to set a fire?

22   A.    Yes.

23   Q.    What does it mean to use a portable ignition

24   device?

25   A.    That's usually a lighter, which you can just

1   light, especially being in a remote area, you are more

2   likely not to be seen, but you can light the grass, this

3   type of fuel type, especially if it's dry enough, it

4   will ignite quickly, and you just take the ignition

5   source with you.

6       Q.    You were also asked on cross-examination about

7   a footprint being three feet away from a point of

8   origin.  Now, do you recall -- were there -- do you

9   recall the terrain in the areas of Ignitions 8 and 9?

10      A.    Yes.

11      Q.    Did any part of that terrain include rocks?

12      A.    Yes.

13      Q.    Is it possible to step on those rocks?

14      A.    Yes.

15      Q.    Are you familiar with whether or not footprints

16  leave impressions when someone steps on rocks?

17      A.    In my experience, they do not.

18      Q.    Now, that handbook, the origin and cause

19  determination handbook that you helped write, what year

20  is that handbook?

21      A.    May 2005 is when it was published.

22      Q.    And so that was approximately seven years ago?

23      A.    Yes.

24      Q.    Okay.  And you explained how macro and micro

25  indicators led you to determine the origin area.  Are

 1  micro indicators frequently something that remain

 2  on-site five to six years later?

 3      A.    Not generally.  It's more the macro indicators.

 4           MS. SGARLATA:  Okay.  No further questions.

 5           MR. MATASAR:  Just a few follow-ups, Your

 6  Honor.

 7                    RECROSS-EXAMINATION

 8  BY MR. MATASAR:

 9      Q.    Ms. Bilbao, could you -- just two general

10  areas.  Can you look at pages 49 through 52 of the

11  handbook.

12      A.    (Witness complies.)

13      Q.    Is there anything in bold on 49 -- on page 49,

14  50, or 51, other than the headings?

15      A.    49, 50 and 51.  In the print?

16      Q.    Yes.  Nothing is bolded except the headings,

17  correct?

18      A.    Correct.

19           MR. MATASAR:  And, Your Honor, just for

20  purposes -- demonstrative purposes, since it's been

21  discussed, I would like to show the jury page 52.

22           THE COURT:  Instead, you can use it -- you can

23  ask her a question from it.  I don't want to put it up.

24  It's not necessary.

25  BY MR. MATASAR:

1       Q.      All right.  Is it your testimony that you were

2   asked about shoe impressions, it doesn't matter, it's

3   not in here?  It's bolded in here, right?

4       A.      It is bolded, yes.

5       Q.      The only thing that -- you wrote this book.

6   Doesn't that mean it's particularly important?

7       A.      No, it's not the only thing.  Right -- the line

8   right below it is in bold also.

9       Q.      And that says casting a tire impression is

10  problematic, but we're not talking about tire

11  impressions.  We're talking about shoe impressions,

12  right?

13      A.      Correct.

14      Q.      And shoe impressions should usually be cast?

15      A.      If it is needed, if it's called for on the

16  scene.

17      Q.      I'm asking you, that's bold in there?

18      A.      It's bold in there, but -- it's bold in there.

19      Q.      Now, when you were questioned about page 58,

20  and the diagram being drawn to scale, I didn't exactly

21  understand what you were saying.  Are you saying that

22  the final diagram should not be drawn to scale?

23      A.      No.  I said I -- we didn't do -- I didn't do it

24  in this case.  It's not a requirement to do scale.

25      Q.      And that's from what you are reading on page

Bilbao - ReD by Ms. Sgarlata                1630

1    58?

2       A.    (No answer.)

3       Q.    When Ms. Sgarlata asked you the question -- I

4    guess my question is -- doesn't -- on page 59, the

5    second-to-the-last sentence, doesn't that simply say,

6    "final diagram should be drawn to scale"?

7       A.    On 59?

8       Q.    Page 59.  Do you see those bullets there?

9       A.    Yeah, it says, yeah, "final diagram should be

10   drawn" --

11      Q.    Go ahead.

12      A.    "Should be drawn to scale," should be.

13            MR. MATASAR:  Okay.  That's all I have.

14            MS. SGARLATA:  Two questions, Your Honor, if I

15   may?

16            THE COURT:  Short.

17                  REDIRECT EXAMINATION

18   BY MS. SGARLATA:

19      Q.    Ms. Bilbao, is there a difference between

20   "should" and "shall"?

21      A.    I would say so.

22      Q.    And last question, with regard to the map to

23   your left, did you give Stacey Fenton coordinates to

24   plot the location of the photographs you took?

25      A.    No.

1     Q.    Okay.  Did you review -- did you review a copy

2  of this map essentially?

3     A.    I looked at this map, yes.

4     Q.    And I think I might have already asked you

5  this, but are the location of the exhibit numbers fairly

6  and accurately represented on the map?

7     A.    Yes, of the general areas, yes.

8           MS. SGARLATA:  No further questions.

9           THE COURT:  Thank you.  You may step down.

10  Your next witness, please.

11           MS. SGARLATA:  Government would call Ron Holle.

12           (The witness was sworn.)

13           THE CLERK:  Please have a seat.  Please speak

14  clearly into the microphone here.  And there is water if

15  you would like some.

16           Please state your full name, and then spell

17  your name for the record.

18           THE WITNESS:  Ronald Lee Holle, last name is

19  H-O-L-L-E.

20                    DIRECT EXAMINATION

21  BY MS. SGARLATA:

22     Q.    I would ask the clerk's assistance in bringing

23  up the maps Exhibits Number 29 and 30, if possible.  And

24  while Ms. Wright is assisting us in at that regard,

25  Mr. Holle, could you please tell us how you are

Holle - D by Ms. Sgarlata                    1632

1    employed.

2       A.    I am self-employed.  I am a meteorologist and

3    am a consultant to a company in Tucson that owns and

4    operates the National Lightning Detection Network, the

5    NLDN.  I am a meteorologist first and work in lightning

6    as a subspecialty.

7       Q.    How long have you been so employed?

8       A.    It's been ten years as a consultant.  I was

9    with the company two years before that.

10      Q.    And what was your employment before that?

11      A.    I was with the National Oceanic and Atmospheric

12   Administration, NOAA, N-O-A-A, for 38 years.

13      Q.    Okay.  And can you tell us some about your

14   education.

15      A.    I have a bachelor's and a master's degree in

16   meteorology and some additional course work at the --

17   those were at Florida State University, and additional

18   course work at the University of Miami in meteorology.

19      Q.    Okay.  And have you served on any committees or

20   advisory panel memberships?

21      A.    Yes, I have, quite a few.

22      Q.    Can you give us a brief summary of those with

23   respect to lightning or meteorology.

24      A.    Well, I've been on the -- the American

25   Meteorological Society has a lot of different

Holle - D by Ms. Sgarlata                                    1633

 1   committees.  I've served on half a dozen different

 2   committees over the years.  Most recently a committee on

 3   atmospheric electricity.  And most recently, the last

 4   ten years, I've been cochair of the International

 5   Lightning Detection Conference, ILDC, that Vaisala

 6   sponsors every two years.  We just held our last one

 7   early April in Colorado.

 8       Q.    Okay.  And have you also served on technical or

 9   advisory committees?

10       A.    Yes, I have.  For conferences and also for a

11   number of committees, particularly organizations dealing

12   with lightning safety and lightning education and

13   cochairs of conferences, session chairs and so on.

14       Q.    Okay.  Now, have you been involved in writing

15   any scientific publications?

16       A.    Yes, I do.

17       Q.    Can you approximate how many for us?

18       A.    Oh, I think it's about 350, something like

19   that.

20       Q.    What did those have to do with?

21       A.    The last couple hundred papers have primarily

22   been in lightning, lightning education.  Earlier years I

23   was known as a photographer and a writer in field

24   projects in Africa and Florida and the Caribbean and

25   co-wrote some books that are fairly commonly available,

Holle - D by Ms. Sgarlata                      1634

1    and studied thunderstorms in lots of different ways.

2    Career has been thunderstorms.

3        Q.    Now, have you also given media interviews

4    concerning lightning or meteorological events?

5        A.    Yes, I've done a lot of those.

6        Q.    Can you give us some examples.

7        A.    Oh, the Weather Channel, National Geographic,

8    Discovery Channel, just about all those types of

9    programs.

10       Q.    Okay.  Now, were you asked to provide

11   information in this case concerning whether and to what

12   extent lightning occurred in certain locations in the

13   Steens Mountains in 2001 and in 2006?

14       A.    Yes, I was.

15       Q.    Okay.  And were you, in particular, asked about

16   whether there was any lightning in September 30, 2001,

17   in the general location of what's called the

18   Hardie-Hammond Fire in the Steens Mountains?

19       A.    In 2001 we looked at the data, but I haven't

20   looked at that in detail.

21       Q.    Okay.  Can you tell us, how do you know whether

22   or not lightning occurred in certain locations?  How

23   does that work?

24       A.    Okay.  I have been around the National

25   Lightning Detection Network, the NLDN, since it began in

1    1978.  I was working on another, entirely different

2    program in Florida in the Everglades, and some

3    professors came and bought this equipment in 1978.

4            We had the first two sensors in the network.

5    And then since then, it gradually has grown.  And in

6    1989 the whole U.S., the 48 states, were covered by the

7    National Lightning Detection Network.  I was with the

8    federal government at the time, and was working with

9    data.

10           And then in 2000, the company running the

11   network called me and asked me to come to work for them,

12   and I've been there as an employee or a consultant since

13   then.

14           The network has about 100 sensors across the

15   U.S.  They're scattered equally a few hundred miles

16   apart in sort of a lattice, honeycomb sort of pattern.

17   They are just about six feet tall.  The sensors are

18   quite -- they don't look like much of anything.  They

19   have a little bit of a dome over the top and they're

20   about six feet high with electronics inside, and angular

21   and time measurement systems inside.

22           These are very mature things that have been

23   around for -- since the late '70s.  There is a new

24   design or an upgrade every five years or so.

25           Sensors like this are in 45 countries built by

1    Vaisala, the company that I am a consultant to.  So

2    these are quite common.

3            They detect the angle and the time when a

4    cloud-to-ground flash hits the ground.  When a

5    cloud-to-ground flash hits the ground it emits a unique

6    signal, electromagnetic -- that's the word -- anyway, it

7    sends out a signal across the ground and mostly in the

8    air.  And when it arrives at one of these sensors, the

9    sensor compares it to what a lightning strike is

10   supposed to look like and says that was a

11   cloud-to-ground strike.

12           It sends the angle and the time, in GPS, time

13   and its amplitude and a number of other things to the

14   control center in Tucson.  My cubicle is about ten feet

15   from the control center.  And that's manned 24 hours a

16   day.

17           And it calculates the position based on the

18   angles and times from up to six or eight and ten at any

19   given time.  So most of the time, most lightning is

20   detected by multiple sensors.  So they give the angle

21   and the time, it then locates the position.

22           And in 2006, which is the one we're discussing

23   here, the accuracy was about 500 meters or about

24   500 yards at that time.  And the timing is down to a

25   thousandths of a second and now it's down to one

Holle - D by Ms. Sgarlata                    1637

1    millionth of a second.

2        Q.    And when you mentioned cloud-to-ground

3    lightning, why do you specify cloud-to-ground?  Is there

4    another kind of lightning?

5        A.    Actually, there's about three or four times as

6    much lightning in the cloud as there is that strikes the

7    ground.

8              Those also can be detected, but the NLDN is not

9    tuned to detect cloud lightning as well.  It's getting

10   better.  But it doesn't detect as much of that.

11             So the unique thing about a cloud-to-ground

12   flash is that it is able to be detected strictly by

13   these antennas unambiguously or clearly and we know for

14   sure where they were.

15       Q.    You mentioned the word "flash."  Is flash the

16   same thing as a lightning strike?

17       A.    Oh, boy, there is a lot of terminology here.

18   Let's keep it simple.  A cloud-to-ground flash has one

19   or more return strokes.  Something to remember.  The

20   flash is the entire event from the beginning of it up in

21   the top of the cloud until it comes to the ground and

22   the thunder is gone.  That's the whole flash.

23             Within the flash, when you watch lightning,

24   perhaps, flickering like this, those are return strokes

25   going up and down the channel.  So some -- most flashes

1    have more than one return stroke.  And those are the

2    ones that actually -- each one of those is measured by

3    the National Lightning Detection Network.

4        Q.    Okay.  Now, with respect to -- you mentioned

5    the sensors that, I guess, sense these lightning events,

6    and you mentioned there can be a difference in the

7    number of sensors that will pick up a certain lightning

8    event.

9        A.    Right.

10       Q.    Can you tell us a little bit more about that.

11   What -- why does that matter what number of sensors pick

12   up an event?

13       A.    The more sensors you have, the better the

14   position is.  Think of a flash hitting the ground at one

15   point.  It's only about an inch across.  It hits a

16   point.  Each of the sensors, if there are sensors on all

17   sides looking at that point, you do locate it very, very

18   well.

19            Sometimes when the flash is very weak or just

20   is an odd shape, there may be as few as two that are in

21   a long ellipse looking toward that flash.  When you're

22   not so sure where along that line connecting those two

23   is where -- is the location of the stroke.  So the more

24   sensors you have, the more accurately the location is

25   given.  And that's -- a typical number of sensors, I

Holle - D by Ms. Sgarlata                    1639

1    think I've looked at the reports, is somewhere between

2    four and eight.  Sometimes it can be more.  Sometimes it

3    can be down as low as two.  Never less than two because

4    you can't locate it with less than two.

5      Q.    Now, you mentioned another word in your

6    explanation there.  And because lawyers can be known to

7    be somewhat mathematically or geometrically challenged,

8    I'd ask, could you please tell us what the word

9    "ellipse" mean.

10     A.    An ellipse is just a long -- a circle that's

11   been pulled out.  In this case if you have two sensors,

12   they are looking at a point in the middle.  And so you

13   actually have an ellipse that can define the area where

14   a strike could have occurred.

15           A circle is a special kind of an ellipse.  It's

16   just round, but it's actually an ellipse that's been

17   shrunk down to a circle, so to speak.

18     Q.    So with respect to what the lightning detection

19   sensors detect, is the appropriate terminology for --

20   well, can you tell us about the error rate with this

21   lightning detection -- with the lightning detection

22   sensors that you are discussing.

23     A.    The network itself is the way we like to look

24   at it.  Each sensor is just a part of the whole system.

25           In 2006, at that particular time, the error

Holle - D by Ms. Sgarlata                    1640

1   average, median error was 500 meters or 500 yards.  Now

2   it's 250 meters due to some improvements since 2006.

3            In 2006, half of the error, half of the

4   locations are known to be better than 500.  We'll call

5   it yards.  And half of them are less accurate than

6   500 yards.  And that can actually be proven.  And that

7   comes from calibration by hitting tall towers that we

8   know the locations of, sending out graduate students

9   with cameras to chase the lightning, and sending up

10  rocket trigger lightning.  It's a famous thing you've

11  probably seen in some programs at the University of

12  Florida where you send up a rocket and it induces a

13  flash or a stroke in a cloud and brings it down to

14  ground so we know where that is.

15           And so by all those comparisons in the U.S. and

16  similar studies in Brazil and Austria, we know that the

17  accuracy at that time was about 500 meters.

18  Q.    Okay.  And so does that mean essentially that

19  when the lightning detection network detected a

20  lightning stroke at a certain location in 2006, it was

21  accurate about the location within approximately

22  500 meters?

23  A.    Yes, the median accuracy.  So half of them are

24  better than 500 meters and half of them are not as good

25  as 500 meters.  And many of those that are not as good

1   are the two-sensor solutions.

2       Q.    So the greater the number of sensors that

3   detect a particular event, the more accurate?

4       A.    In general, yes.

5       Q.    Okay.  Now, turning to this particular case,

6   were you asked about whether, and to what extent,

7   lightning was present in the general area of what's

8   called Lower Bridge Creek, Grandad, and Krumbo Butte

9   Fires in the Steens Mountains in the time period of

10  approximately August 19th through the 21st, 2006?

11      A.    Yes, I was.

12      Q.    Okay.  And were you able to cull that

13  information?

14      A.    Yes.  There is a product that Vaisala sells.

15  Let's go back to Vaisala, V-A-I-S-A-L-A, is the company

16  that owns and operates the network.

17           Vaisala has a service where you can go in on

18  the Web and order lightning for any time since 1989,

19  specify the locations, specify the time, and pay your

20  credit card bill, and you get back the answer.  You can

21  do it 100 times and get the same answer back every time

22  because it goes to the same database.

23      Q.    Okay.  And I'd ask Ms. Root to please bring up

24  Government Exhibit 29 on the screen.  Mr. Holle, there

25  should be a laser pointer up on the stand next to you

1    with two buttons, one of which brings out a red light

2    and the other some other color.

3            I'd ask Ms. Root to enlarge it, if possible.

4    How about in particular up by Krumbo Butte.

5            Now, Mr. Holle, do you recognize this exhibit?

6    Is this something you've seen before?

7    A.    Yes, I have.

8    Q.    Can you tell us what are the items depicted on

9    this particular exhibit?

10   A.    Well, let's take this one, it's a little bit

11   out in the open.  Let's see fairly --

12   Q.    We will enlarge it.

13   A.    There we go.  It has the time in local Daylight

14   Time.  It's 5:42 something p.m.

15           MR. BLACKMAN:  I'd be happy to let him have my

16   copy.

17   A.    There we go.  Now we can see it.  5:42:57 p.m.

18   Actually, it's measured to a thousandths of a second,

19   but we don't -- that's not on there.  And --

20   Q.    Then could you back out this way.

21   A.    And the peak amplitude is a measurement of the

22   strength of it.  It also has the -- each strike to the

23   ground actually has an intensity.  It ranges over a

24   factor of 100 or 1000 from very weak to very strong.  So

25   utility companies use that information very intently for

Holle - D by Ms. Sgarlata                          1643

1   knowing how strong it is.

2           So there's a minus 10.7 kiloamp, about 1000

3   amps.

4     Q.    Does that mean it's particularly weak or strong

5   stroke?

6     A.    The median intensity is around 20 kiloamps, I

7   believe it is, in the negatives.  And I think all the

8   strokes on this particular case were negatives,

9   actually.

10    Q.    Okay.  And is that significant in any way?

11    A.    Not really.  Every lightning stroke that hits

12  the ground is fully capable of causing fires or damage

13  or injury or killing someone.  There are no weak

14  lightning strikes.

15    Q.    Now, I would ask Ms. Root, if possible, to

16  enlarge in particular the entire top part of that map,

17  so that -- pretty much right here, if possible.  Is it

18  possible to make it even bigger?  We're attempting to

19  zoom in a little bit more.  If it's not possible,

20  Mr. Holle, I'll just direct your attention to the

21  exhibit on the easel to your left.  It's not possible.

22          So directing your attention to the exhibit on

23  your left, are the lightning -- do you see various

24  lightning strokes depicted on that exhibit?

25    A.    Yes, I do.

Holle - D by Ms. Sgarlata                          1644

1      Q.    And did you have an opportunity to review this

2  exhibit and determine whether the lightning strokes on

3  that exhibit are accurately set with respect to the

4  latitude and longitude?

5      A.    Yes.  We looked at the error ellipses on these

6  strokes.  And for the most part, they are very well

7  located.  There aren't very many long ellipses.

8            A lot of times there's -- a fairly high

9  percentage of them have two-sensor solutions that are

10  all strung out in ellipse.  Most of them are quite tight

11  circles.

12      Q.    Okay.  And are you aware of whether the

13  lightning strokes depicted on this particular exhibit

14  are the same ones produced in the Vaisala report in

15  response to the query of what lightning strokes occurred

16  in the Krumbo Butte -- in the general Krumbo Butte,

17  Lower Bridge Creek and Grandad area on or about August

18  21st of 2006?

19      A.    Yes.  I think we went through and compared all

20  of them.  They are the correct ones.

21      Q.    Okay.  And can you tell us what period of time

22  or what portions of the day was lightning actually

23  detected?

24      A.    It shows on the top here.  All of the lightning

25  on this day, which is August 21st, was between 3:19 and

1   6:12 in the afternoon.

2       Q.    Okay.  And do you recall approximately how many

3   strokes hit the ground between those hours on August 21,

4   2006, in this area on the map?

5       A.    I think the number was 131, something like

6   that.

7       Q.    Do you have a copy of your report with you?

8       A.    No, it's across the hall.

9       Q.    Okay.  Let me see if I can find my copy to

10  refresh your memory, just so we know exactly -- you know

11  what, I would actually ask, Your Honor, I'd like to ask

12  one of my assistants to get Mr. Holle's copy of the

13  report, because I've written all over mine, and I don't

14  want to hand him this one.  Would that be okay?

15           THE COURT:  Sure.

16           THE WITNESS:  It's in my briefcase or maybe

17  somewhere else.

18           THE COURT:  Why don't we ask the jury, are we

19  ready for a break?  Let's take a break.

20           MS. SGARLATA:  Okay.  Thank you.

21           MR. BLACKMAN:  Is it the morning recess, Your

22  Honor?

23           THE COURT:  Yes, we can call it that.

24           (Recess:  10:28 until 10:42 a.m.)

25           THE COURT:  Okay.  Let's finish the witness,

Holle - D by Ms. Sgarlata                              1646

1  please.

2  BY MS. SGARLATA:

3      Q.    Mr. Holle, have you had a moment to review your

4  report?

5      A.    Yes, I have.

6      Q.    And after reviewing your report, do you recall

7  the approximate number of strokes that the lightning

8  sensors picked up in the area of Krumbo Butte, Lower

9  Bridge Creek and the Grandad Fires on August 21, 2006?

10     A.    Yes, I have.

11     Q.    And what is that number?

12     A.    The number -- there were 116 strokes during

13  this period from 3:19 to 6:12 p.m., and within a 15-mile

14  radius of the point that was specified, was 116 strokes.

15          115 of them were actually within the 15-mile

16  range.  And there was another 11 that had their error

17  ellipses go into the 15-mile circle, or actually located

18  just outside the circle.

19     Q.    Okay.  And speaking of ellipses, I would ask

20  Ms. Root to enlarge in the legend, essentially,

21  underneath the title of Exhibit 30, and do you see the

22  specification lightning confidence ellipse on the top of

23  that map?

24     A.    Yes, I do.

25     Q.    And can you tell -- can you explain to us what

Holle - D by Ms. Sgarlata                1647

1   the 6 -- .64-mile radius means with respect to those

2   circles or ellipses?

3       A.    Yes.  The ellipses are measuring the 99 percent

4   chance that the stroke in the middle fell within that

5   ellipse.  In this case most of them are circles.  So

6   there is error in every measurement in angle.  There is

7   error in every measurement in time.  When you look at

8   all the random errors -- and we know that very well from

9   all these studies -- you can be 99 percent certain that

10  the stroke actually occurred within the ellipse or in

11  this case the circle.

12      Q.    Now, were there any lightning strokes in this

13  area on the -- on August 22, 2006?

14      A.    Yes, there were.

15      Q.    And can you refer to your report and tell us

16  how many strokes were on August 22, 2006?

17      A.    There were 116 strokes in that day.

18      Q.    Directing your attention to Exhibit Number 30

19  and I'd ask Ms. Root to enlarge in the Krumbo Butte area

20  around the circles that appear.  Do you see on Exhibit

21  30 on the screen here two lightning strokes with red

22  circles around them?

23      A.    Yes, I do.

24      Q.    What does that mean?

25      A.    Okay.  We have the point in the middle of this

Holle - D by Ms. Sgarlata                      1648

1   one, for example, right here, and there is a circle

2   around it there.  It might be a slight ellipse.  It

3   looks like it may not be exactly round.  But there is a

4   99 percent confidence that the strike located in the

5   middle is somewhere in this circle or ellipse.

6        Q.    So does that mean there's a 1 percent chance

7   that the lightning strike was outside of that circle or

8   ellipse?

9        A.    Yes.

10       Q.    And there is a second circle or ellipse in

11  close proximity to the one you just pointed to.  Can you

12  tell us about that one.

13       A.    Yes.  There is another one right to the north

14  of there.  And it also has an associated ellipse.  And

15  it's the same size.

16       Q.    And is that the same confidence interval or

17  percentage of confidence, so in other words, a

18  99 percent chance that the second stroke occurred within

19  the confines of the circle or ellipse depicted on

20  Exhibit 30?

21       A.    Correct.

22       Q.    Now, I'd ask Ms. Root to do the same thing but

23  toward the Lower Bridge Creek area.  Directing your

24  attention to Exhibit 30, where we've magnified the

25  lower -- the area of the Lower Bridge Creek Fire, can

1    you tell us what we are seeing here in this magnified

2    portion of the map.

3        A.    Well, we see here the best estimate of the

4    location with a 99 percent ellipse around here.  There

5    is another stroke with 99 percent and so on.  And two

6    more over here.

7        Q.    Okay.  And I would ask Ms. Root to do the same

8    with respect to the general area of the Grandad Fire on

9    Exhibit Number 30.

10           And, Mr. Holle, could you look at Exhibit 30

11   and explain to us what we're seeing here with respect to

12   these red circles or ellipses in the lightning strokes?

13       A.    Well, I see two of them located, one here with

14   the ellipse around it, and another one up here with an

15   ellipse around it.

16       Q.    So what conclusion can we draw from the

17   ellipses around the circles here?

18       A.    The fact that they are all basically round is

19   showing that the data were very accurate in this

20   particular storm.  Most strokes in this storm are

21   located quite well, almost better than average.

22       Q.    Okay.  And were you able to pull up information

23   or apprise yourself of approximately how many sensors

24   detected each of the strokes on these maps?

25       A.    It varied from three or four.  And I think one

1   of them was up at 12 or 13 sensors.

2       Q.    Okay.  Now, direct your attention to -- I

3   believe it is page -- page 3 of your report, section --

4   I'm sorry, page 2 of your report, Section D, do you see

5   that?

6       A.    Yes, I do.

7       Q.    And is the title or the emboldened heading that

8   you see by D, does that say 19 August 2006 strike net

9   report?

10      A.    Correct.

11      Q.    Can you tell us, after looking at your report,

12  were there any lightning strokes detected in the

13  vicinity of the Krumbo Butte, Lower Bridge Creek, and

14  Grandad Fires on August 19, 2006?

15      A.    No, there were none.

16      Q.    Okay.  And then can you tell us whether there

17  were any lightning strokes in those same areas on August

18  20, 2006?

19      A.    No, there were none.

20      Q.    Can you tell us whether there were any strokes

21  in these areas on August 21, 2006?

22      A.    Yes.  That's the day we looked at a minute ago

23  with 116 strokes either in the circle or with

24  overlapping ellipses.

25      Q.    And those were all between what hours of day?

1    A.    Between 3:19:56 and 6:12:44 p.m. Pacific

2  Daylight Time.

3    Q.    Can you tell us, do you recall whether you

4  looked into whether there were any strokes on August 22,

5  2006, in the vicinity of Krumbo Butte, Lower Bridge

6  Creek, and Grandad?

7    A.    Yes, we looked at that day, and there were no

8  strokes.

9    Q.    So the only -- and I would ask you the same

10  question with respect to August 23, 2006.

11    A.    There were none that day.

12    Q.    So the only -- of those days that we just spoke

13  about, the only day on which lightning -- there were

14  lightning strokes -- cloud-to-ground lightning in the

15  vicinity of Krumbo, Lower Bridge Creek, and Grandad was

16  on the 21st of August?

17    A.    That's correct.

18    Q.    Okay.  And are you confident about that -- are

19  you sure about that to a reasonable degree of certainty

20  in your field?

21    A.    Yes, I am.

22    Q.    Okay.  And so you have been working with

23  this -- these sensors or the Lightning Detection Network

24  for a number of years?

25    A.    Yes, I have.

Holle - D by Ms. Sgarlata                         1652

1    Q.    And you are confident in the ability of the

2  sensors to properly document where these strokes

3  occurred?

4    A.    Yes.  And on the first two days and the last

5  two days, the lack of any lightning means that it's

6  virtually certain that there was no thunderstorm,

7  because almost virtually every storm has more than one

8  stroke, and you can't miss more than one stroke in a

9  storm.

10    Q.    Okay.  So with respect to the fact that on

11  August 21st, there were 116 strokes on that particular

12  day, within 15 miles around the same center point, is

13  that a large number of strokes to have in a particular

14  weather event?

15    A.    I'd say it's about average.  Not a big storm,

16  but it's not a tiny storm either.  Small storms may have

17  5 or 10 or 20 strokes.  Large storms can have hundreds

18  on a day.  Within 15 miles, it could go up into many

19  hundreds of storms -- of strokes.  So this is -- 116 is

20  pretty run of the mill.

21    Q.    Okay.  So this was not a particularly -- this

22  was not a particularly abnormal storm with respect to

23  the number of lightning strokes?

24    A.    No, it wasn't.

25    Q.    Okay.  Now, does that break down to

Holle - D by Ms. Sgarlata                       1653

1    approximately an hourly rate of 30 to 40 strokes an

2    hour?

3        A.    Correct.

4        Q.    Okay.  And --

5        A.    That actually breaks down -- I hadn't thought

6    of that -- it breaks down to one every two minutes,

7    which is not a very strong storm.

8        Q.    Okay.  So you've seen storms that are stronger

9    than that in your career?

10       A.    Much stronger, yes.

11       Q.    Now, will you go into a little bit more detail

12   with the confidence ellipses.  Is there -- you say it's

13   99 percent likely that the stroke did, in fact, hit the

14   ground somewhere within the confidence ellipses,

15   correct?

16       A.    Yes.

17       Q.    Is there a difference -- are you able to

18   determine how likely it is that the stroke hit the

19   ground in the center of the ellipses versus toward the

20   outer edge of the ellipses?

21       A.    The most likely solution -- I can't turn this

22   laser off.  But, anyway, the most likely solution is in

23   the middle, and less and less likely is going outward

24   till the outer edge is unlikely but possible at

25   99 percent, would be the way I'd put it.

Holle - X by Mr. Matasar                    1654

1    Q.    Okay.  So in other words, the outer edge of

2  these circles or ellipses that we're seeing, there is 1

3  percent or less or approximately 1 percent chance that a

4  stroke actually happened around the outer edge?

5    A.    Well, let's just say it becomes less and less

6  likely.  It's most likely at the position where it's

7  been located.  And less and less likely outward.

8    Q.    And then there's a 1 percent chance that it

9  happened outside of the circle --

10   A.    Yes.

11   Q.    -- or ellipses altogether?

12   A.    Correct.  And that's been verified by a lot of

13  studies.

14        MS. SGARLATA:  Thank you.  No further

15  questions.

16        THE COURT:  Cross.

17                    CROSS-EXAMINATION

18  BY MR. MATASAR:

19   Q.    Mr. Holle, you've indicated your 99 percent

20  rate.  Earlier you were talking about 50 percent within

21  500 meters.  Can you relate those two -- those two

22  measurements?

23   A.    Okay.  The location accuracy in 2006 of the

24  network was 500 meters, let's call it 500 yards.  Half

25  of them are better than 500 yards, half of them are not

1   as good as 500 yards.

2       Q.    So that means -- go ahead.

3       A.    That's just a little different way -- that's a

4   distribution measurement, while this is an aerial

5   measurement.  So they don't quite relate exactly the

6   same way.

7       Q.    But if you have a center point -- Ms. Root, can

8   you make just any one of those circles bigger.  So let's

9   just take this one here.  If you have center point and

10  you drew a 500-yard circle around that, 500-meter circle

11  around the center point --

12      A.    Right.

13      Q.    -- which means essentially that it's 1000

14  meters in diameter?

15      A.    Correct.

16      Q.    So are you then saying that there is a

17  50 percent chance that it's outside of that circle?

18      A.    I don't think the circle relates directly.  The

19  circle -- I think on the top of the thing there, it was

20  measured.  I didn't have the number.  It's a .64-mile

21  radius, which is about one kilometer.

22      Q.    But what I'm saying is if you envision a point,

23  this point right here where we are now, and you drew a

24  line from here 500 meters in a circle, right, that would

25  be 1000-meter-in-diameter circle, right?

Holle - X by Mr. Matasar                              1656

```
1       A.     Right.

2       Q.     And that's more than a half a mile circle, is

3    it not?  There is like 1700 --

4       A.     That's about two-thirds of a mile.

5       Q.     Yeah, that's about a two-thirds of a mile

6    circle?

7       A.     Right.

8       Q.     So are you saying that the -- there is only a

9    50 percent chance that the lightning is within that

10   circle?

11      A.     It's a different way of looking at it than

12   having a circle --

13      Q.     I understand that.

14      A.     -- measurement.

15      Q.     I'm just trying to understand what you mean

16   because I didn't really understand it, what you mean

17   that there is a 50 percent chance that the lightning

18   strike is more than 500 meters from that lightning bolt?

19      A.     It's actually the error of the measurements

20   from past studies, from all these ground truth studies,

21   finding that half of them are within 500 yards or

22   500 meters and the other half are further than that.

23   The ones that are further away become -- large distances

24   become less and less likely.

25      Q.     I understand.
```

Holle - X by Mr. Matasar                    1657

1    A.    So it's actually clustered toward the smaller

2    values.  That's why there is a -- appears to be a

3    mismatch between these -- this 99 percent.  But they do

4    match out.  This has been worked out very carefully.  I

5    don't understand it either.

6    Q.    I have no doubt you've matched it out, but I'm

7    just trying to figure out that if what you are saying is

8    there is a 50 percent chance that -- studies have shown

9    that there's a greater than 50 percent chance that a

10   lightning strike is more than 500 meters from that

11   yellow lightning bolt in the map?

12   A.    It's 50 percent.

13   Q.    50 percent chance.  Okay.  So you've talked

14   about lightning strokes that are detectable, correct,

15   throughout your testimony?

16   A.    Correct.

17   Q.    What is the percentage of lightning strokes

18   that are detected?

19   A.    Okay.  There's three things called detection

20   efficiency, DE.  It's very well known.  Thunderstorm

21   detection efficiency, let's start with the biggest

22   thing, you have multiple strokes in a storm, that's

23   virtually 100 percent.  It's more than 99 percent.  We

24   basically never miss a thunderstorm.

25         Now, in a thunderstorm there are these flashes,

Holle - X by Mr. Blackman                    1658

1    which are the big events, the whole event, including the

2    thunder and so on.  That detection efficiency is -- I

3    think in 2006 was about 90 percent.  So we detect 90

4    percent of the flashes with -- now, when you go down to

5    the strokes, let's say there is four strokes in a flash,

6    we detect 70 percent of the strokes.  So we might miss

7    one out of the four strokes in a flash.  So we got three

8    out of the four.  And they are closely clustered in time

9    and space.

10       Q.    As you've indicated, each of these strokes

11   could be dangerous and could start a fire?

12       A.    Correct.

13       Q.    And that you are saying in effect you miss, in

14   a storm, of the cloud-to-ground ones, which are the ones

15   we're concerned about, you only detect about 70 percent

16   of the lightning strokes from the cloud to the ground?

17       A.    Correct.

18            MR. MATASAR:  That's all I have.

19                       CROSS-EXAMINATION

20   BY MR. BLACKMAN:

21       Q.    I shouldn't ask you anything, but I was -- I am

22   still really confused about the difference between the

23   probability that the stroke is where it's recorded and

24   then the confidence circle.  Okay.

25            Isn't that -- wherever the stroke is recorded,

Holle - X by Mr. Blackman                      1659

 1   that there is a 50 percent chance that that stroke is

 2   within a diameter of 1000 meters?

 3       A.    Correct.

 4       Q.    Okay.  And then is it also true that if you

 5   take that 1000 meters and try to figure out how likely

 6   it is to be in a particular location, then you would

 7   have this 99 percent probability that it's within that

 8   1000-meter-diameter circle?

 9       A.    Yes.  I think the part that we're not seeing

10   here is that some of these locations aren't circular.

11   They are very large.  They are very long.  Sometimes 10

12   or 20 miles long.  We don't -- we only have a few of

13   those.  We don't have those plotted on here.  That's

14   what helps contribute to these measurements coming out

15   that -- it appears not to match.  But we're seeing the

16   best ones here because almost all of them in this

17   particular storm were well located.

18           The ones that we're not showing here in other

19   studies and other places and other days can be very

20   large.  And those are the ones that have the long

21   distances.

22       Q.    Okay.  Then my only other area -- and I try to

23   only ask a couple of questions.  The confidence level

24   that you have developed about the location is based, as

25   I understood what you were saying, in part anyway,

Holle - X by Mr. Blackman                    1660

1    sending graduate students out and actually looking for

2    evidence on the ground of where the --

3        A.    No.

4        Q.    -- lightning hit the ground?

5        A.    No, not looking for evidence on the ground.

6    They are looking at camera studies.  They have the angle

7    from two different cameras and they can locate the

8    channel of the lightning very accurately, and then

9    compare that back to the network.  Nothing on the ground

10   is looked at.

11       Q.    Okay.  So, for example, if the data that is

12   developed by this system places a lightning stroke in a

13   particular area with all these probabilities of accuracy

14   and all that stuff, and somebody had looked at the area

15   the day before, the week before, and there was no

16   evidence of recent -- of a lightning event in that area,

17   and then after that event went and found clear evidence

18   that lightning had struck a tree, for example, and that

19   tree was outside one of these confident circles or this

20   500 yards or meters, whatever, that would indicate that

21   the data was not quite right because clearly the

22   lightning had struck the tree, tree is outside the

23   circle, but the tree was struck during this storm; is

24   that fair?

25       A.    Well, there is a number factors involved in

Holle - X by Mr. Blackman                    1661

1   there.  It's getting into some conjecture but you -- the

2   network picks up 70 percent of strokes.  And there could

3   have been a stroke, which is usually near another one,

4   that came to ground and just wasn't one of those that

5   was picked up by the network.  Typically they cluster

6   close together.  And if we miss one out four, one of

7   those could have been one of those that was missed.

8       Q.    So just to maybe oversimplify it, if there were

9   116 actually recorded, then at least based on the

10  standard error rate that you've talked about, there were

11  likely to be another 34 or so?

12      A.    Something like that, on the average.  These

13  data were developed in Florida and other places.  And we

14  can't necessarily apply them to another place and

15  another storm and another time.  The network has

16  different performance on different days and different

17  locations and different storms.  So on the average, that

18  would be the number, but we can't really verify that.

19      Q.    I understand we can't verify it, but that's

20  what that 70 percent means?

21      A.    That would be a typical long-term average,

22  which may or may not apply in this particular case.

23          MR. BLACKMAN:  That is all.  Thank you.

24

25

1              REDIRECT EXAMINATION

2    BY MS. SGARLATA:

3        Q.    Mr. Holle, how closely related in time and

4    space are the strokes that we're talking about in this

5    particular case?

6        A.    You can look at the raw data, and see the

7    timing.  And if you look at the time of the strokes in

8    the flash -- remember the phrase?  A flash has one or

9    more return strokes.  You can actually see, for example,

10   the flash hits at 3:15:00, point -- the next, then there

11   will be another one 3:15:01, that belongs to the same

12   flash.  There will be one at 3:15:02.  Those are three

13   strokes in the same flash.  You can actually see it very

14   clearly in the data.  It's not a real active storm that

15   these -- all these strokes have occurred within the same

16   one.

17            The typical distance of a stroke from one

18   stroke to the next, half of them are within half a mile.

19   And most of them are within one to two miles, if I

20   remember the numbers correctly.  So they're usually

21   quite close together in time and space.

22       Q.    I'd ask Ms. Root to put on the projector over

23   here what's labeled Defense Exhibit 1139.  It's page 2

24   of 8.  And I'd ask her to -- thank you very much.

25            So have you seen this document before?

1    A.    Yes, I have.

2    Q.    And is this essentially -- is this similar to

3    what you're talking about showing the time and location

4    of the strokes in question?

5    A.    Yes.  There are a couple of them that -- in

6    here -- where did it go?  It's not very bright.  There

7    we go.  You can look at this -- oh, boy, which one was

8    it?  Here's one right here, 15:31:31.503 and .7 seconds.

9    They are typically about a tenth of a second apart.  So

10   these are the same flash, two strokes in the same flash.

11          Here's one here that's not correlated.  And

12   then you go on down here.  And there is another one at

13   18.8 seconds and then 8.8 -- 18.833 seconds, 18.876

14   seconds --

15          THE COURT:  Thank you.  Let's go on to the

16   next.

17          THE WITNESS:  So those are the kind of things

18   that show up.

19          MS. SGARLATA:  Thank you.  No further

20   questions.

21          THE COURT:  Anything further?

22          MR. MATASAR:  No.

23          THE COURT:  You may step down, sir.

24          Call your next witness, please.

25          MS. SGARLATA:  The government would call Jeff

 1  Rose.

 2              (The witness was sworn.)

 3              THE CLERK:  There is water if you would like

 4  some.

 5              Please state your full name and then spell your

 6  name for the record.

 7              THE WITNESS:  Jeffrey Rose, R-O-S-E.

 8              THE REPORTER:  And how do you spell Jeffrey?

 9              THE WITNESS:  J-E-F-F-R-E-Y.

10                          DIRECT EXAMINATION

11  BY MS. SGARLATA:

12      Q.    Mr. Rose, can you tell us where you are

13  employed?

14      A.    I am employed with the Bureau of Land

15  Management in Burns, Oregon.

16      Q.    How long have you been so employed?

17      A.    I have been in my current position since March

18  of this year, but I was in a detail since March of the

19  previous year, in that current position.

20      Q.    And what is your title or what is your job?

21      A.    I'm the associate district manager for the

22  Burns District of BLM.

23      Q.    And that's since earlier this year?

24      A.    Since earlier this year.  Officially early this

25  year, full-time.

Rose - D by Ms. Sgarlata                                1665

1    Q.    What was your title before that position?

2    A.    Before that position, I was the restoration

3  reclamation coordinator for Eastern Oregon for the

4  Bureau of Land Management working for the Portland

5  office but stationed in Burns.

6    Q.    Okay.  Have you ever been a fire ecologist?

7    A.    I was the fire ecologist on the Burns District

8  from October 1999 to May 2008.

9    Q.    What is a fire ecologist?

10   A.    As a fire ecologist I'm responsible for

11  assisting the fuels and fire management program and

12  setting direction and evaluating the effects of

13  prescribed burns and wildfires, both in the --

14  evaluating the vegetation before and after the fires.

15   Q.    Can you tell us a little bit about -- what's

16  your education?

17   A.    I have a bachelor's in biology from a small

18  school in South Dakota, Yankton College.  I have a

19  master's in rangeland resources from Oregon State

20  University.

21   Q.    And have you been involved in any publications

22  in your career?

23   A.    I have a number of publications.  I was a

24  research associate at the Eastern Oregon Agriculture

25  Research Center in Burns.  I was an Oregon State

1    University employee following my master's work.

2        Q.    What is the Eastern Oregon Agriculture Resource

3    Center in Burns?

4        A.    The Ag. Research Center there in Burns is a

5    joint Oregon State University branch experiment station,

6    but they also are a USDA -- U.S. Department of

7    Agriculture ag. research service experiment station.

8    And they are co-located and operate together.  And their

9    main emphasis is agricultural research looking at

10   sagebrush and juniper plant communities and vegetation.

11   And they also do a lot of livestock production type of

12   work, mainly cattle.

13       Q.    Okay.  And looking to your left, do you see an

14   exhibit on the easel there?

15       A.    Yes, I do.

16       Q.    Can you tell us that exhibit number, please?

17       A.    Exhibit Number 2, this right here.

18       Q.    Yeah, above that in the yellow -- on the

19   sticker.

20       A.    Can I stand up and use my bifocals?

21       Q.    Please.

22       A.    030.

23       Q.    Okay.  Are you familiar with the general area

24   depicted in that exhibit?

25       A.    Yes, I am.

1    Q.    And how familiar are you with that area?

2    A.    I've worked there as part of the ag. research

3    service and Oregon State University, I did some research

4    plots in there.  And then since coming to BLM, I've

5    worked on some projects in that area.

6    Q.    What kind of research did you do in this area?

7    A.    We started out looking at the effects of

8    juniper, western juniper, and -- everything from trying

9    to figure out the population dynamics, how to grows,

10   where it grows, how long -- how old is it, and what

11   affects it, and why does it grow in certain locations.

12         We also looked at the effects of fire on the

13   sagebrush and the grasses after we do a treatment in

14   those areas.

15   Q.    Is sagebrush important to this area?

16   A.    Sagebrush is very important for a number of

17   reasons in these areas.

18   Q.    Can you tell us some of those reasons.

19   A.    It's a -- in this part of the mountain, it's --

20   sagebrush dominates the area.  It's very common.  It's

21   very obvious.

22         It also is important for a lot of wildlife

23   species in the area.  Mainly in this area sage grouse is

24   one of the main species, but it's also important for

25   mule deer and antelope and elk kind of wander down there

1    every once in a while.

2        Q.    Can you tell us why sagebrush is important to

3    sage grouse, mule deer, antelope and elk?

4        A.    For sage grouse it's -- they -- that -- it's a

5    bird.  And it relies on it for a large part of its life

6    cycle.  It nests underneath it.  It eats sagebrush in

7    the wintertime when other things aren't available.  It

8    provides cover, hides from predators.

9            Mule deer, similar.  They'll eat some of it.

10   Mainly it's a habitat, a place for them to hide, place

11   for them to raise their young in.

12       Q.    Okay.  And what happens when fire burns

13   sagebrush out of an area, typically?  Do sagebrush come

14   back and re-inhabit the area soon thereafter?

15       A.    Sagebrush is killed outright by fire.  And it

16   only reestablishes by seed from the area.  So it takes a

17   while for it to move into an area.  As opposed to a

18   grass plant which sprouts from underneath and grows

19   right back, and the next year you'll have it come back.

20       Q.    Is there any particular interplay between the

21   role -- or between the establishment of say juniper

22   and -- so when fire covers an area like this that's

23   typically covered in sagebrush and no seeds are planted

24   to replace the sagebrush, does juniper then start to

25   play a certain role?

Rose - D by Ms. Sgarlata                    1669

1    A.    Yeah.  Juniper in this area is actually

2  moved -- has increased in its density and cover in the

3  last 120 years.  And we worked on some of that research

4  at the experiment station.  And we found that it

5  displaces sagebrush in some areas.  So when the

6  sagebrush leaves, it changes the dynamics of community

7  plants.  And it open ups bare ground, it opens up for

8  weed encroachment.  It also increases the amount or the

9  potential for erosion, the soil washing away.  It also

10  removes that important plant for habitat for the

11  animals.

12    Q.    What's wrong with weed encroachment?

13    A.    Well, weeds, there is some other weeds,

14  primarily in some of these areas, they are cheatgrass

15  or -- it's an annual -- introduced annual grass will

16  establish, and it basically limits the establishment of

17  desirable plants, perennial plants, native plants that

18  we have in the area.

19    Q.    Is there a wilderness study area in this

20  vicinity?

21    A.    Yes.  In -- on the map, it's wilderness study

22  area is in spots north of the road.  And I'm not sure

23  where the boundary is but there is what we call WSA in

24  this area.

25    Q.    And what is a wilderness study area?

Rose - D by Ms. Sgarlata                    1670

1    A.    A wilderness study area is a classification

2  that was established in the '80s.  And there were areas

3  that are under consideration for being classified or

4  established as wilderness, but we're studying them.

5  We're seeing if those characteristics are required or

6  present, so you can basically make it wilderness.

7  Congress makes it wilderness.

8    Q.    Directing your attention to Exhibit 71 on the

9  projector, and I'd ask Ms. Root to actually back out a

10 little bit and to enlarge, if possible, more like that.

11 To show both -- yeah.

12        So do you see on this map in black font, sort

13 of yellow highlight, both USA wilderness study area and

14 USA Steens Mountain wilderness?

15   A.    Yes, the wilderness study areas are north of

16 the Loop Road.  And then there is wilderness south of

17 the Loop Road.

18   Q.    What is the difference between Steens Mountain

19 wilderness versus a US wilderness study area?

20   A.    The south of the road it was in the Steens Act,

21 Congress established what we would call true wilderness,

22 which has a classification of certain things we can and

23 can't do there.  So it basically limits some of the

24 activities we can do.

25   Q.    All right.  As opposed to the wilderness study

Rose - D by Ms. Sgarlata                    1671

1    area?

2        A.    Wilderness study area, we still get in -- for

3    example, in the wilderness we're not, unless it's an

4    extreme emergency situation, allowed to drive a vehicle

5    or operate machinery in the wilderness.  North of the

6    Loop Road in the WSA, we're allowed to drive on the

7    roads and to operate machinery in that area.

8        Q.    Okay.  And are you familiar with the USA

9    Malheur National Wildlife Refuge?

10       A.    Yes, I am.

11       Q.    What is a wildlife refuge.

12       A.    The wildlife refuge -- and I believe the

13   Malheur National Wildlife Refuge was one of the early

14   refuges established.  And it's another department in the

15   Department of Interior, or another group in the

16   Department of Interior.  Their main mission is to

17   enhance wildlife habitat and wildlife populations.  So

18   it's -- their mission is a little bit different than

19   ours.

20       Q.    Now, directing your attention in particular to

21   August 2006 and the areas depicted on this map.  Were

22   you working for the BLM at that time?

23       A.    I was.  I was the fire ecologist in 2006.

24       Q.    So are you familiar with the fact that there

25   was a fire up at Krumbo Butte, a fire at what's marked

Rose - D by Ms. Sgarlata                    1672

1    Lower Bridge Creek and fire at what's marked Grandad?

2        A.    Yes, I was.

3        Q.    Now, were you involved in the response to that

4    fire, BLM's response with respect to the land?

5        A.    I was involved in the early stages of the fire.

6        Q.    Can you tell us what BLM -- how BLM responded

7    after these fires occurred?

8        A.    Could you rephrase that?

9        Q.    With respect to plants, animals, and what have

10   you --

11       A.    Oh, as -- even as the fire is going on is we --

12   we have folks that come on, we call them resource

13   advisors.  And they are assigned to the fire.  Usually

14   they are a resource person from the District.  Could be

15   a range conservation specialist, could be a wildlife

16   biologist, would even be an archeologist somebody who

17   has a background in some of the resources that we

18   manage.  And we have them get in contact the incident

19   commander and some of the folks that are actually

20   suppressing the fire.

21            And when the fire going on, we'll even start to

22   evaluate what needs to be done following the fire.  Is

23   the vegetation being damaged?  Are structures being

24   damaged?  Or are facilities -- some kind of a --

25   something that we've built being damaged that needs to

1    be replaced.  So these groups get together and start

2    forming an initial plan on how we're going to respond

3    after the fire is out to try to fix some of the issues

4    the fire has caused.

5        Q.     And were you involved in that process or the

6    groups you worked for?

7        A.     Yes, I was.  I was part of the group that -- we

8    call it the -- it's a BAER team, burned area response

9    team.  And they come in.  And it's a Department of

10   Interior team that comes in and helps us establish what

11   needs to be done and do a plan for what's going to be

12   done after the fire.

13       Q.     So were there things that needed to be done by

14   a BAER team after the August, September 2006 fires?

15       A.     Yeah.  Through the evaluations we did, we

16   determined that some fences were damaged.  We determined

17   that some seeding needed to occur.  Some areas where

18   there was vegetation or plant mortality.  Plants were

19   killed over a significant area that we had to put some

20   seed back on the ground.  We also tried to put some

21   structures in to control sediment movement or soil

22   erosion across the surface.

23       Q.     Why is it necessary to control sediment erosion

24   across the surface.

25              MR. BLACKMAN:  Your Honor, I'm going to object

Rose - D by Ms. Sgarlata                          1674

1   on relevance grounds.

2            THE COURT:  Sustained.

3   BY MS. SGARLATA:

4       Q.    Were fences damaged in the fires in

5   August 2006?

6       A.    Yes, there were.  There were evaluations done

7   and some fences were damaged.

8       Q.    And did those fences need to be replaced?

9       A.    Yes.  The -- some of the metal was actually --

10  tensile strength was lost and -- was one of the things.

11  Wooden fence posts are real commonly burned up and we

12  had to replace those.

13      Q.    So now directing your attention in particular

14  to the location which is labeled Krumbo Butte Fire, and

15  I'd ask Ms. Root to enlarge in that area if she would

16  thank you.  Were some of the fences you're talking about

17  that were damaged, were they in the general vicinity of

18  the Krumbo Butte Fire?

19      A.    Yes, they were.

20      Q.    And did you personally go to those locations?

21      A.    I did personally go to part of Krumbo Butte and

22  look at some of the damage.

23      Q.    Okay.  And what needed to be done to -- in

24  response to the damage?

25      A.    I don't --

1          MR. SCHROEDER:  I'd object as to the foundation

2     as to which fences and who owns the fences.

3          THE COURT:  Sustained.

4     BY MS. SGARLATA:

5       Q.    Which fences?

6       A.    We concentrated on just the BLM, what we call

7     BLM fences, pasture or allotment fences.

8       Q.    And do you have a laser pointer up there --

9       A.    I do.

10      Q.    -- in front of you.  Can you point out which

11    fences you are talking about?

12      A.    They would be the -- these fences that form

13    these lines in this -- this is the primary fence that we

14    worked on.

15      Q.    So is that BLM land that you just pointed to?

16      A.    Yes.

17      Q.    How much did it cost to fix those fences?

18          MR. BLACKMAN:  Objection, irrelevant.

19          THE COURT:  Overruled.

20    BY MS. SGARLATA:

21      Q.    You may answer.

22      A.    Okay.  That one was not that expensive.  There

23    wasn't a lot to do.  I believe we spent about $877 on

24    that fence.

25      Q.    And was that for fence materials, for labor,

Rose - D by Ms. Sgarlata                         1676

1    how was that?

2       A.     For materials and labor on that.

3       Q.     Okay.   Did -- were there other expenses

4    incident to repairing fences in the location that you

5    just pointed to on the map on Krumbo Butte?

6       A.     Yes.   There were planning -- what we call

7    planning -- the BAER team was -- there was a cost to

8    bring them in, so that was about a $600 cost.

9       Q.     Now, how do you know how much those costs were?

10      A.     We -- there was -- the -- we called it the

11   South End Complex, emergency stabilization plan, it was

12   a very large plan because it encompassed a number of

13   fires that occurred at that area.   We tried to be

14   efficient and lumped the plans together instead of doing

15   a number of small plans.   We did one big plan.   And so

16   we took the total number of acres from the fire and

17   divided by the total cost of what the plan cost was for

18   that fire.

19      Q.     And how does the BLM keep track of the costs

20   for a particular event?   How do you know when money is

21   being spent to -- at a particular location, for example,

22   Krumbo Butte?

23      A.     The folks code -- the Krumbo Butte fire had a

24   specific fire code.   And when you were working on that,

25   you would charge your time to that specific fire code.

Rose - D by Ms. Sgarlata                              1677

1    Q.    Okay.  And how do you know that people charged

2    their time properly to codes?

3    A.    It's part of the supervisors and their

4    supervisors, there are checks and balances that we have.

5    Q.    Okay.  And other than supervisors, is there any

6    level of review to that particular action?

7    A.    Periodically they'll come and do audits and

8    look at that -- an outside group, a state office, which

9    is in Portland, or even a national office from either

10   Washington, D.C. or from NIFC, which is the Fire --

11   National Interagency Fire Center.  It's basically the

12   Washington office for fire, state office.

13   Q.    Why did fences need to be put back or repaired

14   on Krumbo Butte?

15   A.    It -- the fences help us control livestock in

16   the area and help us improve plant response after, so if

17   we can control livestock, we can make sure that they

18   stay out of areas that are recovering.

19   Q.    I see.  So now I would ask Ms. Root to zoom

20   back out on this exhibit and then zoom into the Lower

21   Bridge Creek and Grandad area, to the extent possible.

22   So maybe like this square like this.

23         Are you familiar with this area depicted in the

24   map?

25   A.    Yes, I am.

Rose - D by Ms. Sgarlata                          1678

1      Q.    And were you involved at all in any responses

2    or -- yeah, in responding to effects -- to these

3    particular areas that appear to result from the fires?

4      A.    On this part of the fire, I actually did work

5    with the BAER team on some of the evaluations following

6    the fire.  And then during the ES, the emergency

7    stabilization rehab work, I was on the field and did

8    some site visits, and then monitoring after some of the

9    treatments to measure the plant response, which is part

10   of my fire ecology job.

11     Q.    Why did those things need to be done?

12     A.    We wanted to see if we achieved our goals from

13   the plan, just to check to see if we did what we thought

14   we'd do.

15     Q.    Were there any fence repairs that took place in

16   the Lower Bridge Creek Fire area depicted on this map?

17     A.    Yes.  Most of it -- most of the interior fences

18   were hiked by a crew.  And when they found an area that

19   needed to be repaired, they repaired those fences.

20     Q.    And how much did it cost to repair those

21   fences?

22           MR. BLACKMAN:  Same objection, Your Honor.

23           THE COURT:  Overruled.

24           THE WITNESS:  The Lower Bridge Creek Fire was a

25   little bit bigger deal, and in the area that -- the

1    total cost of fence repair was $38,400.

2    BY MS. SGARLATA:

3        Q.    Can you say that again?

4        A.    $38,400 -- I'm sorry, $406.

5        Q.    $38,406 for fence repair in the Lower Bridge

6    Creek area.  Now, is that just for the costs of

7    materials or is that labor as well?

8        A.    That was the labor cost.  The material cost was

9    $10,956 for fence material.

10       Q.    And what kind of materials are those?

11       A.    It was a combination of barbwire, smooth wire,

12   fence posts, fence clips, wooden posts, and they're all

13   parts of what we needed to put the fence back together.

14       Q.    And were there any other costs incurred in

15   order to repair those fences?

16       A.    No.  That was the main -- the larger pieces

17   that we did.

18       Q.    Why did fences need to be repaired?  Why

19   couldn't it just be left as it was?

20       A.    There were some holes in the fence.  Livestock

21   could move through the fence.  And we wanted to make

22   sure -- again, to help facilitate recovery of the site,

23   we wanted to make sure we could control livestock in the

24   area.  So once they come back in, they wouldn't be in an

25   area that needed to be recovering, the plants needed to

Rose - D by Ms. Sgarlata                     1680

1   recover.

2       Q.    So was there seeding also done in this area in

3   response to the fires?

4       A.    We did do a seeding -- we did a couple of

5   seedings.  We did a seeding right off of Loop Road here.

6   And then we did a -- kind of in this area here, we did a

7   seeding in the Mud Creek/Bridge Creek area.

8       Q.    Why did you do those seedings?

9       A.    The post-fire evaluation indicated there was

10  high plant death in that area.  So we wanted to put

11  some -- try to put some perennial -- desirable plants

12  back in the area.

13      Q.    Why was that necessary?

14      A.    To protect the soil -- mainly to protect the

15  soil resource.  Also, to kind of give the recovery a --

16  kind of a shot in the arm, a jump start, to get it -- so

17  that it doesn't have to start from ground zero, bare

18  ground.

19            We also used it to hold the soil in spots, so

20  you reduce erosion over time.

21      Q.    And why is erosion undesirable, if at all?

22      A.    Well, it would -- with the soil movement, you

23  get -- it gets down to the streams, damage fish habitat,

24  riparian areas.  And, of course, it could go straight

25  downhill to the refuge where there is some -- they have

Rose - D by Ms. Sgarlata                    1681

1   some fish that they manage for us down there, and it

2   would just kind of clog up their system.

3       Q.    So were there costs incurred in order to reseed

4   the area where the plants had died in the fire?

5       A.    Yes, there was.  The -- we spent on the mud --

6   or the Mud Creek/Bridge Creek area here, we spent

7   $62,253 on that --

8       Q.    Is that for -- I'm sorry?

9       A.    -- kind of -- no, that was it.

10      Q.    Was that for the cost of seeds or seeds plus

11  labor?

12      A.    That was seeds, labor, and we had to rent

13  tractors, large tractors, to pull the rangeland drills

14  that we have to seed with.

15      Q.    What portion of that expense was incurred

16  because of the tractors?

17      A.    Tractor costs were -- it was a $21,000 cost for

18  tractors.

19      Q.    And those tractors were rented from some sort

20  of --

21      A.    We picked them up local from a dealer we had

22  there.

23      Q.    And with this -- the seeding that was done, who

24  decided what seeds should be put down on the ground

25  here?

Rose - D by Ms. Sgarlata                        1682

1     A.    We worked with, again, the BAER team, and we

2    worked with the local range folks, and I helped decide.

3    And we picked some native species -- because it was a

4    wilderness study area, we're limited to what we can put

5    back in there.  We have to concentrate on native or

6    plants that are from the area.

7     Q.    Who makes -- who limits you in that regard?

8     A.    It's a regulation that we have.  It's a rule

9    that we have in the BLM.  It's part of the WSA

10   regulations that we have to follow.

11    Q.    So you helped select the kinds of seeds that

12   were going to be put down here?

13    A.    Correct.

14    Q.    And can you tell us what some of those seeds

15   were and why they were chosen?

16         THE COURT:  We've been over this.  Go into

17   something else.

18   BY MS. SGARLATA:

19    Q.    Okay.  In order to determine what needed to be

20   reseeded, were there satellite images of burned plants

21   used?

22    A.    There were satellites areas of the burned area

23   that we looked at to try to evaluate where we would

24   potentially have hot spots or areas of high mortality or

25   plant death.

1    Q.    And was the primary goal in reseeding the area

2    to establish plant cover to protect the soil?

3    A.    Correct.

4    Q.    Were you able to put down seeds for sagebrush?

5    A.    We looked at sagebrush seed and the costs of

6    the sagebrush seed is very high, and also our success in

7    seeding has been very low in the past, so we chose not

8    to put that money into that.

9    Q.    Okay.

10   A.    That effort.

11   Q.    Directing your attention to the lower -- do you

12   see the area just north of where it says "August 22

13   black line operations, Toney"?

14   A.    Right there (indicating).

15   Q.    Yeah.  Are the costs of reseeding or

16   rehabilitating that land included in any of the numbers

17   you gave us?

18   A.    No.  The costs of that seeding was $34,664.

19   Q.    And that was a separate expenditure that is not

20   included in any of the numbers you just told us about?

21   A.    Correct.

22        MS. SGARLATA:  Okay.  No further questions.

23        THE COURT:  Cross.

24

25

1                        CROSS-EXAMINATION

2   BY MR. SCHROEDER:

3       Q.      Mr. Rose, good morning.

4       A.      Good morning.

5       Q.      My name is Alan Schroeder.  I represent Steve

6   Hammond.  I have a few questions for you.  You spoke

7   about wildlife.  And do you agree that at least in the

8   State of Oregon that wildlife is the property of Oregon?

9       A.      I believe that's the rule, yes.

10              MR. SCHROEDER:  Okay.  As a matter of fact, I

11  think the court could take judicial notice of Oregon

12  Revised Statute 498.002(1), which states wildlife is the

13  property of the state, end quote, Your Honor.

14              THE COURT:  Thank you.

15  By MR. SCHROEDER:

16      Q.      At the time you were doing your review of this

17  2006 event relative to the Krumbo Fire and the Lower

18  Bridge Fire and the Grandad Fire, were you a state

19  certified general appraiser in Oregon?

20      A.      No.

21      Q.      In making your assessment of the costs

22  associated with this, are you generally aware of the

23  different type of appraisal methods that exist?

24      A.      No.

25      Q.      So you are not aware of the three general

Rose - X by Mr. Schroeder                    1685

1   methods of, like, a cost approach, a comparison

2   approach, or an income approach, are you not familiar

3   with those approaches?

4       A.    No.

5       Q.    So I take it, then, that you are not familiar

6   with the Uniform Standards of Professional Appraisal

7   Practice?

8       A.    No.

9       Q.    And you didn't apply any of those standards in

10  preparing any report that you're testifying to today; is

11  that correct?

12      A.    No.  That's correct.

13      Q.    Now, as employee -- as a matter of fact, you're

14  the associate district manager position of the Burns

15  District right now; is that correct?

16      A.    Correct.

17      Q.    You are aware that in the grazing rules there

18  is the standard called the fundamentals of rangeland

19  health standards, are you aware of those?

20      A.    Correct, yes.

21      Q.    Can you tell me what those are?

22      A.    They are a set of criteria that we use and

23  designed to be done in the field to evaluate the health

24  of the rangeland, how well the ecology is working, how

25  well the hydrology is working, how well all the pieces

1    of that area are functioning based on a standard that's

2    established for different areas based on the plants in

3    the community.

4        Q.    And while those rules are within the grazing

5    rules, they don't necessarily limit themselves to

6    evaluation of livestock but relate to certain standards

7    like watershed, I believe that's standard 1; watershed

8    functions, which is standard 2; ecological processes,

9    which is standard 3; water quality, which is standard 4;

10   and native and threatened and endangered and locally

11   important species, which is standard 5, would you agree

12   with that?

13       A.    I'd have to look at the guide, but that -- it

14   sounds familiar, yes.

15       Q.    Let's not take my word for it.  You are

16   familiar with the Andrews Resource Management Plan and

17   the Steens Mountain Resource Management Plan, aren't

18   you?

19       A.    Yes.

20       Q.    As a matter of fact, those are the land use

21   planning documents that cover a larger area but

22   certainly cover the four grazing allotments or portions

23   of the four grazing allotments that the Hammonds have;

24   would you agree with that?

25       A.    Yes.

1      Q.     Madam Clerk, could you show Mr. Rose pages G4,

2   G5, G6, G7, G8 and G9, and just conform for me,

3   Mr. Rose, that those are the five standards of rangeland

4   health that we've talked about here.

5      A.     Are these the ones you just read?

6      Q.     Yes, sir.

7      A.     Okay.  And based on when this was published,

8   those are the standards.

9      Q.     And those were the standards in effect as of

10  July 2005 and remain effective to this day, correct?

11     A.     Yes, correct, based on the RMP.

12     Q.     Yes.  Thank you.  Now, do you know in your

13  preparation for your testimony here today that the

14  Bureau of Land Management did a fundamental range on

15  health determination for the Hardie summer allotment and

16  for the Mud Creek allotment?

17     A.     I did not know that they -- I knew they'd been

18  done.  I don't know what the results are.

19     Q.     Okay.  But the idea of the fundamentals of

20  rangeland health determination is it's the BLM's going

21  out on the ground, collecting information, assessing

22  that information relative to each of the five standards

23  that you and I have just gone over, and making a

24  determination whether or not that standard has been

25  achieved or not; is that a fair summary?

Rose - X by Mr. Schroeder                    1688

1      A.    Yes.

2      Q.    Now, I show you (brief pause) -- I show you an

3   exhibit in this case, which is the summary sheet for the

4   Hardie summer allotment.  Do you see that?  It's

5   Exhibit 1201.  Have you ever seen that document before,

6   Mr. Rose.

7      A.    I don't remember.

8      Q.    Okay.  But you as the associate director or

9   associate district manager for the Burns District know

10  that this is a common type of a document that the BLM

11  will prepare to make an evaluation of allotment and

12  report determinations of fundamentals of rangeland

13  health?

14     A.    Could you restate that for me?

15     Q.    Sure.  This certainly is a document published

16  and reported out of your office --

17     A.    Sure, yes.

18     Q.    -- the Burns BLM District?

19     A.    Correct, yes.

20     Q.    This is not a document that Hammonds or Alan

21  Schroeder has prepared?

22     A.    No, no.

23     Q.    So this is a document prepared in the ordinary

24  course of business of the BLM District office, correct?

25     A.    Correct, correct.

Rose - X by Mr. Schroeder                                    1689

1    Q.    And, in fact, on page 18 of this report, it's

2   not very clear, it shows up there on top very vaguely,

3   but maybe I should show it to you and have Madam Clerk

4   show it to you, but it identifies the team participants

5   associated with this allotment evaluation.  Do you see

6   those signatures?

7    A.    Yes.

8    Q.    Let me just have the -- Madam Clerk show you

9   it, but before she shows it to you, there are signatures

10  by the natural resource specialist, the ecologist, the

11  fish biologist, the lead range management specialist,

12  the recreational planner, the specials areas

13  coordinator, the supervisory range resource specialist,

14  the T and E, which is threatened and endangered plant

15  coordinator, the weed coordinator, the wildlife

16  biologist, and then finally by the field manager, all of

17  which these signatures are in September 25, 2007.  Can

18  Madam Clerk show you Exhibit 1201, page 18.

19   A.    Okay.

20   Q.    And will you agree that those are the

21  signatures of people within your employ or the BLM's

22  employ as of 2007 that signed that document?

23   A.    Yes.

24   Q.    Thank you.  And so given this document, looking

25  at Exhibit 1201, at least as it relates to the Hardie

Rose - X by Mr. Schroeder                          1690

1    summer allotment, the BLM had determined that relative

2    to watershed functions as of the signing of this

3    document, which, again, was in that September 2008 -- or

4    2007 date, that watershed functions achieved, watershed

5    function was achieved, ecological processes was

6    achieved, water quality was achieved, and native and

7    special status and locally species was achieved,

8    correct?

9         A.    Yeah, that's what it says.

10        Q.    And so that was determination by the Bureau of

11   Land Management of the Burns District office, correct?

12        A.    By that team, yes.

13        Q.    Now, I want to show you Exhibit 1202.  And this

14   relates to the Mud Creek allotment.  Now, this is a

15   little bit different document, is it not, Mr. Rose?

16        A.    I'm not familiar with that at all.

17        Q.    Okay.  This is a determination for standards of

18   rangeland health and guidelines for livestock management

19   for Oregon for allotment 6005 of the allotment, Mud

20   Creek?

21        A.    Okay.

22        Q.    Are you familiar with that form of the Bureau

23   of Land Management?

24        A.    I -- no.  This is not something that I would

25   usually work with.  I've never seen this before.

Rose - X by Mr. Schroeder                          1691

1    Q.    So you've never seen this kind of document

2    before?

3    A.    I don't remember seeing this, no.

4    Q.    Okay.  Could you go to the second page of that

5    document, do you recognize the signature of the person

6    that's signed that?

7    A.    At the very bottom?

8    Q.    Yes, sir.

9    A.    Karla Bird.

10   Q.    And who was she?

11   A.    At that time she was the area manager or the

12   field manager.

13   Q.    So the area manager would be the manager or the

14   authorized representative of the Bureau of Land

15   Management in Burns District relative to the Mud Creek

16   allotment as of May 29, 2007?

17   A.    Yes.

18   Q.    Now, similar to the determination document we

19   discussed about in 1201, you are not familiar of this

20   document being similar in making a determination as to

21   the five standards we've gone through?

22   A.    I don't remember seeing this form before.

23   Q.    Okay.  But would you agree that this is a

24   document of the Bureau of Land Management?

25   A.    It could be, yes.

Rose - X by Mr. Schroeder                          1692

1      Q.    Well, it was signed by Karla Bird, wasn't it?

2      A.    Yes.

3      Q.    And she was an employee of -- as you've already

4    mentioned -- of the Burns District as of May 29, 2007?

5      A.    Yes.

6      Q.    And in this, she checkmarks as to watershed

7    function standard 1, that that standard was achieved,

8    correct?  Looking down on the first page --

9      A.    Yes.

10     Q.    -- of Exhibit 1202.  And standard 2, relating

11   to watershed functions, was achieved, correct?

12     A.    Correct.

13     Q.    And that standard 3 relating to ecological

14   process, the standard was achieved, correct?

15     A.    Correct.

16     Q.    And the standard dealing with water quality,

17   the standard was achieved, correct?

18     A.    Correct.

19     Q.    And the standard relative to native and T and E

20   species and locally important species, the standard was

21   achieved, correct?

22     A.    Correct.

23     Q.    And so this represented the BLM's determination

24   relative to the public land within the Mud Creek

25   allotment, correct?

Rose - X by Mr. Schroeder                                    1693

1          A.    For the range program, correct.

2          Q.    Okay.  Now, you talked -- beyond the lack of

3     your appraisal report, you made certain statements

4     regarding costs.  I want to ask you about that.  Now, do

5     you know that at least the Krumbo Fire and the Lower

6     Bridge Fire and the Grandad Fire, there were lightning

7     strokes, ignitions associated with each of those fires?

8          A.    Yes.

9          Q.    And, in fact, in terms of the Grandad Fire

10    specifically, there has been testimony about certain

11    ignitions, and they've been calling them, just as a

12    matter of convenience, Ignitions 1 through 10, do you --

13    are you familiar with that?

14         A.    Yes.

15         Q.    And, in fact, Trail Fires 1 through 7, I think

16    that's an additional separate fires they are talking

17    about; is that right?

18         A.    I'd have to look at the map, but, yeah.

19         Q.    But that's your understanding anyway?

20         A.    Correct.

21         Q.    Now, in your allocation of costs, did you make

22    any allocation as to those costs associated with

23    Ignitions 1?

24         A.    On -- no, not specifically with Ignition 1.

25         Q.    Okay.  How about Ignition 2?

1     A.     No.

2     Q.     How about Ignition 3?

3     A.     I'd have to look to see which ignitions those

4  were.

5     Q.     Well, I guess you need to tell me in terms of

6  your report, you just testified to a lump number of

7  costs, and I'm just asking you -- and I guess I'll just

8  do it in a summaril (sic) form, did you do it for each

9  of these 1 through 10 ignitions?

10    A.     No.  But if we had the location, we -- you

11 could do it as a percentage -- you could do that

12 calculation.  We just didn't do that at the time that we

13 did the project.

14    Q.     Okay.  But in terms of your testimony here

15 today, the opinions you are expressing on the stand

16 today, you didn't make these allocations?

17    A.     No.

18           MR. SCHROEDER:  Thank you, Mr. Rose.

19                      CROSS-EXAMINATION

20 BY MR. BLACKMAN:

21    Q.     Just -- I think -- there has been some

22 confusion about terms, so I want to clarify.  When you

23 were talking about Grandad and when you were doing your

24 allocation or your computations, the Grandad covered the

25 area from Lower Bridge Creek all the way past Bridge

 1  Creek Road, right?  That was all the Grandad?

 2      A.    Originally that was -- that's how we -- the

 3  plan was written as, it was -- it was included as one

 4  fire.

 5      Q.    And that whole event was given an ICF 209

 6  number of 2501, right?

 7      A.    I don't know.  I don't remember what that

 8  number was.

 9      Q.    But it was considered a unitary complex?

10      A.    Correct, it would be given a number.

11      Q.    And do you know when, if ever, the BLM made a

12  determination to try to segregate sections of the

13  Grandad Fire?

14      A.    No, not -- no.

15      Q.    It never did, right?  It was always the Grandad

16  Fire?

17      A.    When we wrote the plan, the plan was written as

18  the Grandad Fire.

19      Q.    Right.  And that covered from the farthest west

20  of the events that were triggered by lightning on the

21  21st of August to the farthest east?

22      A.    Correct.

23      Q.    With respect to the area farthest west, were

24  the numbers which you are now, I think, talking in terms

25  of the -- what's now being called the Lower Bridge Creek

1  Fire, did you determine which fences had been burned on

2  the 21st and 22nd?

3      A.    We didn't evaluate the fences until after the

4  incident was over and it was safe for the crews to go in

5  and look at that.

6      Q.    So you don't know when those fences might have

7  been lost or damaged?

8      A.    No.

9      Q.    The same would be true about the sagebrush that

10  burned, you don't know when it burned?

11      A.    No.  I mean, it was part of the -- part of the

12  fire.

13      Q.    Right.  So at some point after the fire died

14  out, you guys went in there and looked around, right?

15      A.    Correct.

16      Q.    And it was all after the fact?

17      A.    No, no, I'm sorry, no.  We had crews -- we had

18  folks out in the fire, resource advisors, and they can

19  partition out at what day in the fire progression, so we

20  knew when pieces of it were burning.

21      Q.    So do we know what portions of your numbers

22  here relate to the area that is between the western most

23  part of the fire and, say, two miles to the east?

24      A.    I'm not sure where you are talking about on the

25  maps.

1      Q.    Well, you are now calling it the Lower Bridge

2   Creek, but it's -- at the time you called it Grandad, so

3   I'm talking about from the farthest west portion of the

4   Grandad Fire, which would be the farthest to the left on

5   the Exhibit 30 you are looking at.

6      A.    Okay.

7      Q.    Say to the next three miles to the east.

8      A.    This way (indicating)?

9      Q.    Correct.

10      A.    Okay.

11      Q.    Did you ever allocate the cost of the

12   replacement of the fences or the seeding?

13      A.    There is some numbers that we can pull out

14   that -- let me look at my numbers.  The numbers that I

15   gave on fence repair did not include the -- what was

16   identified as a lightning -- the lightning cause on a

17   map.

18      Q.    Well, was it the area north of Bridge Creek

19   that was included in your numbers?  Because you were

20   pointing at the area north of Bridge Creek when you were

21   talking, although you didn't make the specific

22   references.

23      A.    Correct.  There was some areas there.

24      Q.    That was included in your numbers, right?

25      A.    I'm having a hard time going back and forth on

1    the maps figuring out where you are at.

2        Q.    Well, if, in fact, you were referring to areas

3    north of Bridge Creek, my question is, are you aware

4    that fire was burning north of Bridge Creek on the night

5    of the 21st of August?

6        A.    Correct, yes.

7        Q.    Okay.  And that was included in your area?

8        A.    It was included in the plan, correct.

9            MR. BLACKMAN:  That's fine.

10            THE COURT:  Redirect.

11            MR. PAPAGNI:  I do have some, Your Honor.  I'm

12    replacing Ms. Sgarlata temporarily.

13            MR. BLACKMAN:  Objection.  Are we allowed to

14    switch lawyers?

15            THE COURT:  No.  We'll stay with the same

16    lawyer for this witness.

17            MR. PAPAGNI:  Pardon me?

18            THE COURT:  We'll stay with the same lawyer.

19            MR. PAPAGNI:  Ms. Sgarlata.

20                        REDIRECT EXAMINATION

21    BY MS. SGARLATA:

22        Q.    Mr. Rose, directing your attention to

23    Government Exhibit 60 on the screen before you.  Can

24    you -- I'd ask if you could increase the size of the

25    area in through here, please.  Which --

1          (Discussion held off the record between

2    co-counsel.)

3    BY MS. SGARLATA:

4      Q.     Did you -- when you were tabulating the costs

5    attributed to this particular area, did you include in

6    those numbers the area surrounded by the fence -- the

7    fenced portion that is signified by a red and black

8    alternating fence line?

9      A.     Is this the one right here?

10     Q.     Yes.

11     A.     No.  The cost did not include that part of the

12   lightning fire area.

13     Q.     What does your cost include?

14     A.     It includes the seeding that's outside of that.

15   It includes the fence repair.  These fences like these

16   here and these here (indicating).

17          (Discussion held off the record between

18   co-counsel.)

19   BY MS. SGARLATA:

20     Q.     When do -- do the permittees who are using a

21   particular allotment have to pay for the costs of the

22   fence repairs?

23     A.     Excuse me, in this fire we applied for the

24   national office to give us the funding to fix the fences

25   in this area.  And we took the responsibility to fix the

 1    fences.

 2        Q.    Is that unusual?

 3        A.    It's not outside of policy if it's -- if the

 4    fences are used to protect seedings or protect areas

 5    that are naturally recovering, we will pay to fix those

 6    fences.

 7              (Discussion held off the record between

 8    co-counsel.)

 9    BY MS. SGARLATA:

10        Q.    In this particular case, did the Hammonds or

11    the permittees make any of those payments?

12        A.    I'm not aware of them making any.

13              (Discussion held off the record between

14    co-counsel.)

15    BY MS. SGARLATA:

16        Q.    So I'd ask Ms. Root to zoom out on this map and

17    zoom in on the location -- this map does not have the

18    ignitions.  Are you familiar with the locations depicted

19    on Government Exhibit 71 on the screen?

20        A.    Yes.

21        Q.    Were you involved in -- were you involved in

22    any seeding, fencing, or other operational or labor

23    expenditures in the areas of Ignitions 1 through 10 and

24    the Trail Fires after the time of the August,

25    September 2006 Lower Bridge Creek and Grandad Fires?

1      A.    There was some fences that we fixed between the

2  perimeter fence here (indicating) and here.  So that

3  would be around Ignitions 3 -- I guess Ignition 3.  And

4  then there was some -- there is a fence line on the

5  trail fire near the trail fire that we worked on.

6      Q.    Why were those fences repaired?

7      A.    Well, it's a boundary fence -- the one up by

8  Ignition 3 was a boundary fence between the BLM and

9  Diamond Ranches, I believe it's Otley's.  And we

10  repaired that so we could control the livestock

11  movements.

12      Q.    What, if any, costs were associated with the

13  costs of the fencing?

14      A.    We could calculate it.  The cost per mile for

15  fixing the fence is about 30 -- or about $3,000 and we

16  can calculate the distance in that -- so it's -- it

17  looks about a couple of miles.  Looks like it's -- about

18  a mile, say a mile, it would be about $3,000.

19      Q.    And can you use your laser pointer to show what

20  area you are talking about?

21      A.    Sure.  That would be this area here

22  (indicating).

23      Q.    Can you -- I don't know, Ms. Root, can you make

24  out -- zoom in more so we can see the numbers of

25  sections, if that's possible.

1          And I'd ask the witness to -- after Ms. Root

2   has zoomed in, I'd ask the witness to describe some of

3   the sections around which these fences were repaired?

4     A.     It looks like section -- between Section 36 and

5   31, and Section 36 and 1.

6     Q.     Are you familiar with those particular areas

7   yourself personally?

8     A.     No, I didn't -- I don't remember going --

9   visiting those areas.

10    Q.     And --

11          (Discussion held off the record between

12   co-counsel.)

13   BY MS. SGARLATA:

14    Q.     And, Ms. Root, can you zoom out a little bit

15   more and then can you enlarge this area.  Can you -- I

16   don't know if you're able to see some of the additional

17   section numbers that fence repairs bordered like --

18   perhaps we can enlarge in around here.  Are you able to

19   see some of the numbers of the sections associated with

20   the locations of the fence repairs?

21    A.     Section 10, 6, and 11, were some fence repairs

22   were done.  Those would have been evaluated in those

23   areas.

24          Again, section -- again, these -- this boundary

25   fence Section 11 would have been worked on.

1     Q.    And the expenditures for those fence repairs

2  were what?

3     A.    If you total -- it looks to be about another

4  $3,000 per mile, so three --

5     Q.    Were there any additional expenses that -- were

6  there any additional expenses as a result of the fires

7  in this particular areas?

8     A.    I guess -- could you restate that,

9  additional --

10    Q.    In addition to -- aside from fences, were there

11  any other expenses?

12    A.    On that area, we didn't do any seeding work

13  or -- or I'm -- there is some catchment clean-out work

14  that we did, which is sediment trap, and I don't think

15  we did anything in that area there.  Oregon Department

16  of Fish & Wildlife did some work in that area.

17         MS. SGARLATA:  Nothing further.

18         MR. SCHROEDER:  Just a few questions, Your

19  Honor.

20                   RECROSS-EXAMINATION

21  BY MR. SCHROEDER:

22    Q.    Could you -- Ms. Root, could you put back

23  Exhibit 71, please.  Could you zero in on Sections 10

24  and 11, please.

25         Mr. Rose, you just testified as to that

1    particular fence on Exhibit 71, which is kind of --

2    bisects the Bridge Creek pasture, the Hardie summer

3    allotment.  Do you see that red line I'm putting there.

4         A.    Correct.

5         Q.    And are you saying that the BLM repaired that

6    fence as part of its activities associated with the 2006

7    Grandad Fire?

8         A.    I didn't personally inspect that.  I don't know

9    if that was -- that was inside what we were calling the

10   fire perimeter.  It would have been evaluated to be

11   fixed.

12        Q.    Okay.  You are not aware of the testimony of

13   Joe Glascock in this case where he said that that was

14   nonfunctional fence, and per a 2005 cooperative

15   agreement, the BLM was to remove that fence?

16        A.    I did not know that, no.

17        Q.    And so when you were asked on redirect about

18   certain fences, you were just speculating as to

19   particular fences that may or may not have been repaired

20   by the BLM within certain areas; is that your testimony?

21        A.    We concentrated on the boundary fences between

22   us and the Otleys in that area to make sure those were

23   solid fences.

24        Q.    Okay.  In terms of this fence looking at

25   Exhibit 71, of the fence boundary between the Bridge

1   Creek pasture of the Hardie summer allotment and the

2   Otley FFR allotment, at least according to BLM's

3   Exhibit 71, it doesn't indicate any burn associated with

4   lat area in Section 11, does it?

5       A.    I -- the red -- if the red is what is being

6   indicated is burned, I don't know how that was

7   evaluated.  There was -- the area was burned and it was

8   checked.  And anyplace that was broken was fixed.

9       Q.    So are you telling us in your cost estimates

10  that there was costs associated with evaluation and

11  repair of fences that were not burned?

12      A.    The -- all the perimeter fences were hiked to

13  look to see if they were burned.  And then if they were,

14  they were fixed.

15      Q.    And so the answer is, yes, in terms of the

16  costs associated with it, that was included in your

17  estimate?

18      A.    Correct, yes.

19            MR. SCHROEDER:  No further questions.

20                    RECROSS-EXAMINATION

21  BY MR. BLACKMAN:

22      Q.    I hate to do it, but I do have this one

23  question.  If I understand correctly -- because there

24  was testimony earlier in this trial that fence

25  maintenance is an obligation of the permittee.  And so

1    is it my understanding that fences in allotments that

2    were assigned to, say, the Hammonds, the BLM could have

3    said, you have to fix it at your cost; isn't that right?

4    That's your obligation as a permittee?

5        A.    Could -- I'm sorry, you could you just -- I

6    trailed off.  Could you say that again?

7        Q.    And I understand.  It's been a long morning.

8    But I think Ms. Sgarlata asked you whether or not BLM

9    paid for fence repair in the Mud Creek area.

10       A.    Uh-huh.

11       Q.    And you said it was within policy and BLM had

12   decided to do it.  But, in fact, under the agreement

13   between Hammond Ranches and the BLM, fence repair was

14   the obligation of the permittee, correct?

15       A.    The emergency stabilization and rehab policy

16   states that we -- if we, the BLM, decide that it's for

17   protection of seeded areas or areas naturally

18   recovering, the BLM will pay for that fence.

19       Q.    I understand that there is a policy that allows

20   it, but the permit between the BLM and the permittee

21   places an obligation on the permittee.

22       A.    I don't know about the permit.

23       Q.    All right.  So if there has been testimony at

24   this trial that the obligation of fence maintenance is

25   with the permittee, then it would be correct, wouldn't

 1    it, that the BLM could have said to the Hammonds, you

 2    fix the fences in your allotments as your expense?

 3        A.    We decided on the ESR project to do it because

 4    we had the opportunity to.

 5            MR. BLACKMAN:  No other questions.  Sorry, Your

 6    Honor.

 7            MS. SGARLATA:  Nothing further.

 8            THE COURT:  Thank you.  You may step down.

 9            All right.  Does the government wish to call

10    any other witnesses?

11            MR. PAPAGNI:  The one last witness, Your Honor,

12    will be Mr. Gonzalez, and Ms. Sgarlata will handle that.

13            THE COURT:  All right.  Members of the jury,

14    we're going to take a shorter break than usual.  I'm

15    trying to get us to the end of the line here.  We'll

16    come back at ten till 1:00.  All right?  Thank you.

17            (Lunch recess:  12:07 p.m.)

18            (Further proceedings were had by Reporter

19    Amanda LeGore, and are bound under separate cover.)

20

21

22

23

24

25

```
 1                          CERTIFICATE
 2          I, Deborah Wilhelm, Certified Shorthand Reporter
 3    for the State of Oregon, do hereby certify that I was
 4    present at and reported in machine shorthand the oral
 5    proceedings had in the above-entitled matter.  I hereby
 6    certify that the foregoing is a true and correct
 7    transcript, to the best of my skill and ability, dated
 8    this 20th day of June, 2012.
 9
10
11
                              /s/ Deborah Wilhelm
12                            _____
                              Deborah Wilhelm, RPR
13                            Certified Shorthand Reporter
                              Certificate No. 00-0363
14
15
16
17
18
19
20
21
22
23
24
25
```