1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4                  Plaintiff,        )
                                     )
5      v.                            )   6:10-cr-60066-HO-1-2
                                     )
6   STEVEN DWIGHT HAMMOND,           )
    DWIGHT LINCOLN HAMMOND, JR.,     )
7                  Defendants.       )

8

9       PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10       BEFORE THE HONORABLE MICHAEL R. HOGAN

11     UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12              THURSDAY, JUNE 21, 2012

13                PENDLETON, OREGON

14     DAY 8 A.M. SESSION - PAGES 1888 - 1992

15                     -:-

16

17

18

19

20

21

22

23            Deborah Wilhelm, CSR, RPR
                 Court Reporter
24               P.O. Box 1504
              Eugene, OR  97440
25               (541) 431-4113

```
 1                      APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:      FRANK R. PAPAGNI, JR.
                              ANNEMARIE SGARLATA
 3                            United States Attorney's Office
                              405 E. 8th Avenue
 4                            Suite 2400
                              Eugene, OR  97401
 5                            (541) 465-6771

 6    FOR THE DEFENDANT:      LAWRENCE H. MATASAR
      (Steven D. Hammond)     Lawrence Matasar, P.C.
 7                            621 S.W. Morrison Street
                              Suite 1025
 8                            Portland, OR  97205
                              (503) 222-9830
 9
                              W. ALAN SCHROEDER
10                            Schroeder & Lezamiz Law Offices
                              447 West Myrtle Street
11                            Boise, ID  83701-0267
                              (208) 384-1627
12

13    (Dwight L. Hammond)     MARC D. BLACKMAN
                              Ransom Blackman LLP
14                            1001 SW Fifth Avenue, Suite 1400
                              Portland, OR  97204
15                            (503) 228-0487

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX OF EXAMINATIONS

 2    FOR THE PLAINTIFF:       Direct  Cross      ReD      ReX

 3    CARRIE BILBAO (Rebuttal)
          By Mr. Papagni      1988      --        --       --
 4

 5

 6    FOR THE DEFENDANT:       Direct  Cross      ReD      ReX

 7    ROY HOGUE
          By Mr. Blackman     1893      --      1982       --
 8        By Mr. Matasar      1959      --        --       --
          By Mr. Papagni       --     1960        --     1986
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  (Thursday, June 21, 2012; 8:53 a.m.)
 2               (The jury is absent from the courtroom.)
 3                       P R O C E E D I N G S
 4          THE COURT:  Mr. Papagni, have you been able to
 5   get any response together on the motion based on the
 6   Second Circuit case?
 7          MR. PAPAGNI:  I have not.  I'm -- Ms. Sgarlata
 8   was working on it last night, and I have yet to see her
 9   this morning, Judge.
10          THE COURT:  All right.  Is there anything else
11   before we get going this morning?
12          MR. MATASAR:  Your Honor, I want to confirm
13   that we are not asking for the affirmative defense
14   instruction.
15          THE COURT:  Thank you.
16          MR. MATASAR:  Thank you.  So there will just
17   be -- well, we'll get a more final version before --
18          HE COURT:  You will.
19          MR. PAPAGNI:  I suspect Ms. Sgarlata might be a
20   little late.  When I spoke to her last night, she might
21   be working on a response for the court.  That's what I
22   would guess.
23          THE COURT:  All right.  Fine.  Okay.  If there
24   is nothing more, then, Ms. Wright, whenever our jury is
25   ready.  We're a few minutes early.
```

1          We have a juror driving 200 miles and one who

2    drives 180 miles each way for this trial.

3          MR. MATASAR:  Wow.

4          MR. PAPAGNI:  They're not spending the night,

5    huh?

6          THE COURT:  No.  One asked permission to spend

7    the night last night, who drives 66 miles.  But there is

8    one who drives 97 miles.  One, 200; one, 180 miles; one,

9    89.  And they have been doing it everyday both ways.  So

10   when you think of asking extra questions, they've been

11   putting in long days, as long as you have.

12         MR. PAPAGNI:  Judge, on the *Daubert* of

13   Mr. Hogue, how did you want to handle that?

14         THE COURT:  I'll listen to the early part of

15   his testimony and decide whether he's qualified.

16         MR. PAPAGNI:  Understood.

17         (Jury enters the courtroom at 9:00 a.m.)

18         THE COURT:  Good morning, Jurors.  I want you

19   to know how proud of you I am.  As a hard-working jury,

20   you certainly have been splendid.  According to my

21   notes, you are getting ready to hear your 42nd witness.

22         Please call your next witness.

23         MR. BLACKMAN:  Doesn't seem fair to go next

24   now, but all right, Roy Hogue.

25         (The witness was sworn.)

1          THE CLERK:  Please speak clearly into the

2   microphone.  And there is water if you'd like some.

3          Please state your full and spell your name for

4   the record.

5          THE WITNESS:  Roy Roscoe Hogue, R-O-Y,

6   R-O-S-C-O-E, H-O-G-U-E.

7                       DIRECT EXAMINATION

8   BY MR. BLACKMAN:

9     Q.    Mr. Hogue, what do you currently do for a

10  living?

11    A.    I'm self-employed.

12    Q.    What is the nature of your business?

13    A.    I have a consulting business.  I do natural

14  resource consulting, wildland fire investigation, and

15  aviation issues.

16    Q.    What is your educational background?

17    A.    I have a bachelor of science degree in

18  rangeland resources, and a bachelor of science degree in

19  forest management from Oregon State.

20    Q.    And did you obtain those degrees some time ago?

21    A.    1975.

22    Q.    And.  After getting your college degrees, what

23  did you do right after that?

24    A.    I was employed by the Bureau of Land Management

25  as a range conservationist for ten-and-a-half months in

Hogue - D by Mr. Blackman                              1894

1   Las Vegas, Nevada, and then transferred to Prineville,

2   Oregon.

3       Q.     And how long did you work for the BLM out of

4   the Prineville office?

5       A.     Thirty years.

6       Q.     So did you retire fairly recently?

7       A.     2007.

8       Q.     During your 30 years with the BLM in

9   Prineville, what were the nature of your duties?

10      A.     Initially, I was range conservationist.  And

11  due to the nature of the work that we were doing, I also

12  worked in some forestry issues, cruising timber.  And so

13  that job evolved into a natural resource specialist,

14  which just enabled me to cover more disciplines.

15             Eventually I moved into the division of

16  operations and was assigned in fire management.

17      Q.     So how long did you work for the BLM in fire

18  management?

19      A.     Since 1995, full time.

20      Q.     Tell us what that meant that you were working

21  in fire management?

22      A.     Primarily my duties were fire investigation.  I

23  also participated in fire suppression activities, as

24  well as prescribed fire.

25      Q.     Did you have additional training to work in

Hogue - D by Mr. Blackman                    1895

 1    both the fire management and fire suppression

 2    activities?

 3        A.    I did.  I took courses over the years starting

 4    in 1972, when I was a working as summer temporary for

 5    the Forest Service on throughout my entire career.  It

 6    amounted to 2500 hours of training that I received.

 7        Q.    And in addition to receiving training, did you

 8    provide training over the course of your career?

 9        A.    I did.

10        Q.    Can you tell the jury what kinds of training

11    you provided to others in the area.

12        A.    Focused on two primary areas of instruction.  I

13    instructed fire investigation, focusing mostly on cause

14    and origin determination, as well as the use of

15    aircraft.  And primarily the aircraft that I was focused

16    on was the single engine air tanker program.

17        Q.    And the single engine air tanker program is

18    what?

19        A.    It's the small agricultural aircraft that have

20    been converted to dropping retardant on fires.

21        Q.    Over the course of your career, how many fires

22    did you have the occasion to investigate origin and

23    cause?

24        A.    An estimate would be between 300, 500 fires.

25        Q.    And in how many of those cases were you working

Hogue - D by Mr. Blackman                    1896

1    in cooperation with other investigators?

2        A.    Several.  As -- you know, the bulk of the fires

3    that we look at are small single tree events, that sort

4    of thing.  One investigator would be involved in that.

5             Larger fires, larger incidents that were more

6    involved, I would work with one or more individuals.

7        Q.    Have you been the author, coauthor, or

8    developer of materials that are used commonly by fire

9    investigators in analyzing, investigating, and

10   determining origin and cause of fires?

11       A.    I have not authored any on -- in --

12   specifically addressing fire investigation.  I was part

13   of a task force that developed a handbook -- the BLM

14   handbook on fire cause determination.  Fire trespass is

15   what it was primarily involved with.

16       Q.    When did you do the work on the BLM manual and

17   handbook for fire investigation?

18       A.    If I could refer to my notes?

19       Q.    Sure.

20       A.    Initially I was assigned to a task force in

21   1987 that wrote the first BLM handbook for fire

22   trespass, and in its revisions that occurred in 1998 and

23   2005.

24       Q.    Okay.  Did you also participate in writing the

25   P 151 fire investigation course?

Hogue - D by Mr. Blackman                              1897

```
 1       A.     I did.

 2       Q.     What is that?

 3       A.     Well, when I became involved in fire

 4  investigations in 1983, there wasn't any real formal

 5  classes developed on a standard basis.  Every department

 6  or agency had their own training.

 7              The California Department of Forestry at the

 8  time had developed some training that they used.  Oregon

 9  Department of Forestry had some.  And to make it a more

10  standardized presentation of material, the federal

11  government decided that they needed to incorporate and

12  make a course.

13              And so I became involved in that.  It was known

14  at that time as a P 151 class.  And I believe -- I think

15  that took place somewhere in the mid to late '80s.

16       Q.     Are there other course materials that you have

17  developed and presented over the course of the years?

18       A.     Yes.

19       Q.     So how many times would you say you have

20  instructed others in fire investigation?

21       A.     Oh, I instructed the P 151 course 30 -- 32

22  times.  And then the later version was updated and it

23  became the FI-210 course.  And I was the lead instructor

24  on the beta test of that course in 2003 and have

25  participated in instruction of that course over the
```

Hogue - D by Mr. Blackman                          1898

1    years five times.

2       Q.    When you say beta version, you mean the test

3    version?

4       A.    Correct.

5       Q.    Okay.

6       A.    Yeah.

7       Q.    And then once that had gone through some kind

8    of vetting, then it was finalized?

9       A.    That's correct.  You know, the beta test was

10   when they first developed the course, they wanted to

11   field test, basically, to see if the course was --

12   flowed well or if it was -- needed some work on the

13   number of slides they used, the timing of it and all.

14      Q.    So I think there was testimony early in this

15   trial that Lance Okeson attended one of the courses you

16   taught.  Do you have any recollection of that?

17      A.    Not specifically.  I am -- I was teaching that

18   P 151 class every year at the community college for

19   several years.

20      Q.    Okay.  And have you, in addition to what you've

21   described for us, continued to be actively involved in

22   reviewing the literature and developments in the fire

23   investigation area?

24      A.    Yes.  I have been a member of the International

25   Association of Arson Investigators.  The international,

1  as well as the Oregon chapter, for 21 years.  And I have

2  attended their seminars regularly.

3          Along with that, I've attended other courses

4  and seminars put on one -- several by the Public Agency

5  Training Council.  And another area that I have attended

6  is the Evidence Photographers International Council.

7          MR. BLACKMAN:  Your Honor, I would ask that

8  Mr. Hogue be qualified as an expert in the area of

9  origin and cause investigation.

10          THE COURT:  That's fine.  He is.  Go ahead.

11 BY MR. BLACKMAN:

12  Q.    All right.  Now, Mr. Hogue, in your current

13 position as a consultant on fire cause and

14 determination, were you retained by Mr. Matasar and I to

15 assist us in our representation of the Hammonds?

16  A.    Yes, I was.

17  Q.    About how long ago did you get involved in that

18 investigation?

19  A.    December of 2010.

20  Q.    Since your involvement in December 2010, could

21 you tell us what materials you reviewed in familiarizing

22 yourself with the underlying facts and the nature of the

23 investigation?

24  A.    Well, I reviewed the material provided by the

25 government.  I think it's in excess of, like, 35,000

Hogue - D by Mr. Blackman                          1900

1    pages of material.  Along with documents, photographs,

2    weather data, radio logs.

3       Q.    In addition to all the material provided by the

4    government, did you do independent research regarding

5    such things as weather conditions, et cetera?

6       A.    Yes.  I looked at aerial photographs, more

7    weather data, forecasts.

8       Q.    For example, did you look at weather data that

9    followed in the years after the 2006 fires?

10      A.    I'm not sure I follow.

11      Q.    Okay.  In addition to looking at the material

12   regarding what happened in 2006, did you do

13   subsequent -- look at reports regarding subsequent

14   weather events to see if they might affect what you saw

15   on the ground, for example, when you went to the scene

16   years after the fact?  Are you following me?

17      A.    No.

18      Q.    Then let me ask it in a different way.  Did

19   you, in fact, make any visits to the locations that are

20   at issue in this case?

21      A.    Yes, I did.

22      Q.    And how many times did you do that?

23      A.    Four times altogether.

24      Q.    How long were each of those visits?

25      A.    I'd say probably two days each time.

Hogue - D by Mr. Blackman                          1901

1    Q.    Okay.  And during those visits, what did you

2  do?

3    A.    I visited the location of each of the fires and

4  walked around the area to get an idea of the terrain,

5  the vegetation, and overall sense of what was growing

6  there, what it would have looked like prior to the

7  fires, and possibly the -- what influences the terrain

8  would have on fire behavior.

9    Q.    Did you also look for specific points of

10  origin?

11    A.    After that many years, it's -- it was not

12  possible to trace back to a specific point of origin.  I

13  could get a general sense of how a fire would have

14  burned through, but -- you know, the micro indicators

15  were long gone.  And a lot of the macro indicators, you

16  could get an overall sense for how a fire burned, but

17  not anything that would lead me back to a specific point

18  of origin.

19    Q.    Did you look for such things as lightning-

20  struck trees?

21    A.    Yes, I did.

22    Q.    Were you able to find lightning-struck trees?

23    A.    Yes, I did.

24    Q.    How were you able to determine whether or not

25  those lightning-struck trees were struck in 2006 as

1    opposed to some other time?

2        A.    The trees that I found, I went back and

3    reviewed some aerial photography that was done by the

4    Farm Service Agency through the National Agriculture

5    Image Project, I believe it's called.  And they have --

6    they go through and fly -- try and fly every year, but

7    what I found out was through some of the budgeting and

8    all, they don't get every year of flight.  But they did

9    have flights in 2005 and 2006.

10            What I focused on was the aerial flights that

11   they took in 2006, which happened to have occurred late

12   July and early August in their flights over the area.

13       Q.    So those flights occurred literally less than a

14   month before the lightning storm on August 21st?

15       A.    That's correct.  In the series that I was

16   interested in in looking, individual frames varied in

17   times from July 26th through, I believe, August 17th.

18       Q.    And what is the quality of that imagery?

19       A.    The 2005 was what they call -- I believe it's

20   on some of these (indicating).  It's -- the resolution

21   was very good.  The 2006 wasn't quite as good of

22   resolution, but I could still find the trees that I

23   located.  They were in a spot that I could identify the

24   tree and at least find it was intact prior to the fire.

25       Q.    So using this imagery pre-fire, you were able

Hogue - D by Mr. Blackman                        1903

1    to actually locate the same tree that you found

2    lightning struck when you did your field work?

3              MR. PAPAGNI:  Objection to the form of the

4    question as leading.

5              THE COURT:  Overruled.

6    BY MR. BLACKMAN:

7        Q.    Is that what you are saying?

8        A.    Correct.

9        Q.    And then how were you able to determine whether

10   that tree hadn't been struck by lightning after August

11   of 2006?

12       A.    What I relied on was -- I took a look at the

13   historical fire data from the Burns BLM District.  And I

14   set some parameters for my search on fires in the area

15   that ranged from Diamond to the north, Frenchglen to the

16   west, the McCoy Ridge area to the east, and Steens Loop

17   and down a little bit lower towards Fields.  And then

18   within that area, what I did was reviewed all the

19   historical fire data to see if any lightning fires

20   occurred within that -- the parameters of my search.

21             And then I would have looked through and

22   requested the Vaisala data for lightning data

23   surrounding the dates of those events.

24             In my search, I didn't find any reports of

25   lightning fires or -- lightning fires was what I

Hogue - D by Mr. Blackman                    1904

1  primarily was looking at.  I didn't find reports of

2  lightning fires occurring in that area since 2006.

3          So I made -- that's part of the reasoning

4  behind identifying those lightning-struck trees

5  associated with this event.

6          The other -- the other instance that I used was

7  a photograph that was taken on the afternoon of August

8  22nd from P Hill looking to the east.  And I found what

9  I believe to be the lightning-struck tree in that

10  photograph.

11          What I did then was -- with the assistance of

12  Dave Freeman -- had him go and put up a reflective space

13  blanket on the tree that I had found that was lightning

14  struck.  Went to the location on P Hill where the

15  original photograph was taken, and was able to see that

16  reflective space blanket, and identified it from the

17  photo that I took of it, and matched it up with the one

18  that was taken on August 22nd.

19  Q.    Now, have you made an analysis of each of the

20  incidents that is at issue in this case?

21  A.    Yes, I did.

22  Q.    And, Your Honor, I think to make this

23  efficient, what I'd like to do is go through those

24  incidents, have him first identify the most pertinent

25  exhibits that he's relying on, and then just have him

Hogue - D by Mr. Blackman                          1905

1    talk about it.

2          So, first of all, let's talk about 2001.  Did

3    you make an analysis of determining the point of

4    origin -- the most likely point of origin of the fire

5    that occurred in September, I think on the 30th, of

6    2001?

7    A.    Well, given the limited amount of information

8    that I had regarding the 2001 fire, I wasn't able to say

9    where the specific point of origin was, but I had an

10   idea from the mapping provided and some of the

11   descriptions that were in radio logs that would lead me

12   to believe, given the weather and the maps of the fires

13   at that time, I would have an opinion about the general

14   location of the fire.

15   Q.    Okay.  And, again, for the 2001 fire, there was

16   no investigation by fire investigators at the time,

17   correct?

18   A.    That's correct.  I didn't have any origin and

19   cause reports to go by.

20   Q.    So I -- which of the exhibits in evidence did

21   you rely on primarily in forming your opinion about the

22   location of the origin of the fire in 2001?

23   A.    I relied on Exhibit 1111 and 1112.

24   Q.    I would ask that we bring up Exhibits 1112 and

25   then 1111.  Okay.  Using the pointer there that I think

Hogue - D by Mr. Blackman                        1906

1    is in front of you, could you tell us what Exhibit 1112

2    shows us?

3        A.    Based on the radio logs that I looked at, there

4    was a helicopter that flew over the area I think at the

5    time the fire was burning and probably post-fire.  And

6    the location they gave suggested to me that this map

7    that was drawn here was created from the helitac crew.

8            And in that -- the descriptions that they used,

9    they said that they had mapped the fire and put -- they

10   actually put it on a topography map.  And what I did was

11   retraced that over onto my mapping program that I had.

12   But they described that as a fire that burned with some

13   spotting, and was primarily on private land.

14       Q.    So can you tell us just -- what's the

15   technology involved in the helitac mapping of a fire

16   perimeter?

17       A.    Well, the way they described it in the radio

18   logs was very typical of what would happen back in 2001.

19   And they said there was enough terrain relief and all

20   that they could map it on a topog map.  So I don't know

21   specifically -- about that era, the GPS mapping was

22   coming about, but more than likely they would have taken

23   a topog map, flown around the fire, and just drawn the

24   outline of the fire on that topog map.

25           The way they described it with the spotting and

1    all, I think this is cut off, there was some spots like

2    this (indicating).  This map is oriented -- this is the

3    western edge of it.  And this slopes up in this

4    direction here.

5            I reviewed the weather for that days in 2001.

6    And it was a fairly typical burning type weather.  There

7    was a little bit of a wind but not a lot.

8            Temperatures, daytime temperatures were up

9    there, and then they cooled off at night.  It was, I

10   believe, late September or early October.

11           The way that I would have expected this fire to

12   burn would have been more slope driven with a bit of a

13   push by the wind, but the slope would be in this

14   direction here.

15   Q.    From the left side of the photograph to the

16   right side?

17   A.    Correct.

18   Q.    And do you know, this section that was mapped

19   by the helitac, what kind of land it's on, private,

20   public?

21   A.    I believe there is -- it's mostly private.  I

22   believe there is a strip in here that is public land.

23           That was another indicator to me because this

24   is the map that the helitac crew did, because they said

25   that they -- in flying the fire, it was primarily on

Hogue - D by Mr. Blackman                          1908

1    private land with 30 to 40 acres on public land.  And if

2    you look at these sections here (indicating), that would

3    account for about 30 to 40 acres.

4            So what I drew from that was that the

5    indications would be that the fire was probably started

6    down here.  These could have been starts that were

7    attempted that didn't go very far.  And there was a

8    couple more spots over on this side that would suggest

9    the same thing.  And then the fire just moved in this

10   direction.

11   Q.    So it is your opinion that the general origin

12   area of this fire is on which side of Exhibit 1112?

13   A.    This would have been on the west side.

14   Q.    Now let's look at 1111.  Can you tell us what

15   1111 is?

16   A.    This was the combination of the GPS map that

17   Dave Ward did.  This is in Section 15.  And this is what

18   I believe to be the -- what the helitac crew mapped in

19   section -- this is 15 and this is Section 16.

20           And this shows those little spots that they

21   identified, which would be consistent of somebody trying

22   to get a fire to go, and it just didn't find enough

23   fuels or went out in there.

24   Q.    So based on what you saw from both the helitac

25   and the Dave Ward map, what is your opinion about the

Hogue - D by Mr. Blackman                               1909

1    location of the origin of the fire that occurred on

2    September 30, 2001?

3        A.    Well, this seems to be consistent with someone

4    coming along -- and this is right along a line here.  It

5    looks like that may have been an attempt to do some

6    burning.  And this was one that was successful.  And

7    moved in this direction.

8        Q.    So is it your opinion that the general ignition

9    area was to the west side of the privately owned land?

10       A.    That's correct.

11       Q.    Now I'd like to turn your attention to 2006.

12   And I think, first, talk about the Krumbo Butte area.

13   And what I'd like you to do is first tell us which

14   exhibits, in addition to everything else that you've

15   looked at, were primarily involved in illustrating your

16   conclusions about the origin and cause of the Krumbo

17   Butte Fire.  So which exhibits would we be talking

18   about?

19       A.    I looked at 1138, 1141, 1142, 1145, 1125-B,

20   1125-C, and 1219.

21       Q.    I'd ask Mr. Schroeder to show you each of those

22   exhibits and have you tell the jury very briefly what

23   each one depicts, starting with 1138.  What is 1138?

24       A.    1138 is an overall map of the Krumbo Butte

25   Fire.  And it has -- the red pins in this represent the

Hogue - D by Mr. Blackman                          1910

1    area where lightning strikes were detected.  And I

2    believe now we refer to them as lightning strokes.

3        Q.    Okay.  And this has -- tell us what all the

4    different colors of the different things on this map

5    tell us.

6        A.    The red is the fire perimeter.  And the blue, I

7    mapped the confidence ellipse for the lightning strokes.

8              The -- I should point out that the confidence

9    ellipses that I had obtained were the lightning data

10   from Vaisala, but those ellipses were based on a

11   95 percent confidence level.

12       Q.    As opposed to the 99 percent that Mr. Holle

13   talked about yesterday?

14       A.    Correct.

15       Q.    All right.  So this tells us what, this

16   particular exhibit?

17       A.    Well, it shows that there was definitely

18   lightning in the area, and actually quite a bit of it.

19   Lightning activity in and around the Krumbo Butte Fire.

20       Q.    1141, please.  What does this photograph

21   depict?

22       A.    This is a photograph that, again, was taken

23   from P Hill outside of Frenchglen, which up P Hill is

24   just to the south -- primarily to the west of

25   Frenchglen.  And it's looking back.  And this is a

1  photograph showing the Krumbo Butte Fire.

2      Q.    And --

3      A.    From the metadata that was on this photograph,

4  the metadata was shown at -- in a file on a digital

5  photograph file, there is some data that's recorded

6  along with that.  And it's generally -- it has like the

7  camera, make of the camera, but it also gives a time

8  that the image was taken.

9          This -- the metadata for this photograph

10 indicated that it was taken on August 22nd, which also

11 is reflected on the date stamp on the image itself.  But

12 they had a time stamp of 3:40 p.m.

13     Q.    And how is it that you were able to determine

14 that the fire that's depicted in Exhibit 1141 was on

15 Krumbo Butte?

16     A.    I went to the mapping program that I used, and

17 I was able to locate the position where this photograph

18 was taken from.  And I used that location.  And there is

19 a distinctive land feature in here.  There is a pretty

20 good sized canyon going like that (indicating).  I

21 picked a point on that.  And then I just projected a

22 line on my mapping program that I used.  And it went --

23 projected right through the Krumbo Butte area.

24     Q.    And let's look at 1142.

25     A.    That shows that projection line that I made out

Hogue - D by Mr. Blackman                          1912

1    there.

2         Q.    Could you explain to the jury, because it's a

3    little beyond me, what -- it looks like there are

4    several red dotted, dashed lines that all start at the

5    same point in the lower left-hand corner of this image.

6    So what is that lower corner --

7         A.    Right there (indicating)?

8         Q.    Yeah.

9         A.    That is the location where the photographs were

10   taken from.

11        Q.    And explain to us, again, how you figured that

12   out.

13        A.    One -- there was a series that were taken from

14   the same location.  And one of the photographs that was

15   taken actually showed on the side of the vehicle that it

16   was taken from an engine.

17             In that photograph there was a power substation

18   right off of the photograph.  And a fairly distinctive

19   juniper tree on the edge of the road.  So I just drove

20   to P Hill and located that substation and matched up the

21   tree with a substation.  And I was in the right spot.

22             And then I -- from there I did the same thing.

23   I had that known point, another known point up here on

24   the topographic map that I located with a distinctive

25   feature, land feature, and then projected a line through

Hogue - D by Mr. Blackman                          1913

1    there.

2         Primarily I wanted to make sure that that was a

3    Krumbo Butte Fire and not one, say, of the Craters Fire,

4    which was nearby, but to the north.  And so I verified

5    that what I was looking at was the Krumbo Butte Fire.

6    Q.    Then let's look at 1145.  This is what?

7    A.    The cover page of the origin and cause report

8    for the Krumbo Butte Fire.

9    Q.    And 1125-B, what is that we're looking at?

10   A.    That's one of the lightning-struck trees that

11   we located at Krumbo Butte.

12   Q.    Tell us about locating the lightning-struck

13   trees on Krumbo Butte.  Tell us how you did it, when you

14   did it, what process you went through.

15   A.    Well, we had the lightning data for -- to give

16   us an idea of where to look, but also we knew that the

17   original investigators had located a lightning-struck

18   tree in the -- for Krumbo Butte.  And we started walking

19   and looking at all the trees along there to see if there

20   was any damaged trees, any evidence of lightning-struck

21   trees.

22        And in this particular tree, the top had been

23   taken out of it and was laying down there, and we could

24   see some fire scarring on there.  That resembled

25   lightning scars.

Hogue - D by Mr. Blackman                          1914

 1     Q.    And then did you go through the process you
 2  described earlier regarding the use of aerial
 3  photography from July and August of '06 and fire reports
 4  subsequent to August of '06 to determine whether or not,
 5  more likely than not, this tree was struck by lightning
 6  in August of '06?
 7     A.    Yes, we did.  Again, I looked at the aerial
 8  imagery from Farm Service Agency.  And all the trees in
 9  that drainage appeared to be intact just prior to that
10  lightning storm.
11          And, again, post-fire, I didn't have any
12  reports that I located in the fire history of the area
13  to suggest other storms that were nearby to suggest that
14  it may have occurred after the fire.
15     Q.    And then I'd ask you to look at 1125-C.  What
16  is this?
17     A.    The second tree that I located in the Krumbo
18  Butte area, same process that we just looked -- I -- it
19  should be noted that I found another tree initially that
20  I thought could have been lightning-struck tree, but
21  upon closer inspection of it, I saw no evidence that it
22  had that split appearance and mushroomed out.
23          This is pretty typical of what a lightning-
24  struck tree would look like.  It would come down and a
25  lot of times it will get a fire going in the center of

Hogue - D by Mr. Blackman                    1915

1    the tree.  And as they burn, they'll fall apart and have

2    this appearance.

3            One of the things that I needed to do was to

4    rule out the possibility that the fire moved through the

5    area and got into the tree, burned in the center, and

6    then allowed it to fall out like that.

7            So I looked at several trees that had that

8    appearance, but they were also burned around on the

9    outside and up on the trunk of the tree.  And I could

10   not verify that that was a lightning-struck tree.

11           This one, on the other hand, didn't have all

12   the burning on the outside of it, appeared to have

13   lightning scars going into the tree.  And that's what I

14   based my conclusion that this was a lightning-struck

15   tree.

16       Q.    And then ask you to look on the ELMO at Exhibit

17   1219.  This is sort of washed out on the big screen, but

18   what is this?

19       A.    I think this as an aerial photo taken -- it's

20   on the southern edge of the Krumbo Butte Fire looking to

21   the northwest.

22       Q.    And where did this photograph come from?

23       A.    It was part of the material provided by the

24   government.

25       Q.    Do you know who took this photograph?

Hogue - D by Mr. Blackman                          1916

 1      A.    I believe Chuck Miller did.

 2      Q.    Do you know Chuck Miller?

 3      A.    Yes, I do.

 4      Q.    Did you work with Chuck Miller before you

 5  got -- you retired?

 6      A.    Yes, we taught classes together.

 7      Q.    So using the pointer, can you tell us what it

 8  is we're looking at here?

 9            THE COURT:  Counsel, this exhibit hasn't been

10  received.

11            MR. BLACKMAN:  I'm sorry.  I thought it had

12  been.  I would offer 1219.

13            THE COURT:  Any objection?

14            MR. PAPAGNI:  Not now.

15            THE COURT:  It's received.

16            THE WITNESS:  In reviewing the Krumbo Butte

17  Fire and all the material with it, there was information

18  that the private landowner had done some burnout

19  operation on the night of the 22nd, I believe.

20            And I believe that the burnout operation took

21  place somewhere along Krumbo Creek.  I guess, to me,

22  this photograph is important because it verifies that

23  that suppression effort by doing a burnout operation

24  along the creek was successful in stopping the fire from

25  progressing to the south.

Hogue - D by Mr. Blackman                          1917

1    BY MR. BLACKMAN:

2       Q.    And can you tell us where the creek is that you

3    just made reference to?

4       A.    It's starting along here, just going right

5    along the edge.  Actually, I guess, it's -- the fire

6    comes along the creek, not the creek goes along the edge

7    of the fire, but right up like that (indicating).

8       Q.    So based on all the material reviewed,

9    including these exhibits, do you have an opinion about

10   the cause of the Krumbo Butte Fire that's been described

11   in this case and in the indictment?

12      A.    I do.  Based on the initial observations of the

13   air tactical group supervisor that initially reported

14   the fire, based on the lightning and the evidence that

15   we discovered with the lightning, I believe that this

16   fire had -- was initially a lightning-caused fire,

17   possibly in two places.  I don't -- you know, I don't

18   know the sequence of that, although the -- where the

19   aircraft turned the fire in would have been up in here

20   about where they -- was the location of the initial

21   report, at 60 acres would have -- you know, I think

22   would have covered this area here.  That one tree that

23   was -- that we found was located in that area

24   (indicating).

25              The initial cause determination report talked

Hogue - D by Mr. Blackman                              1918

1   about having a -- some fire on the north side of Krumbo

2   Creek that moved to the south.  That seems to make sense

3   there.

4           The other lightning-struck tree would have been

5   off the photo over to the left, but it would suggest

6   that possibly the fire progressed up the butte.  I would

7   imagine that it was on this -- somewhere in this slope.

8           Then the suppression efforts by the private

9   landowner were successful in stopping that fire to the

10  south.

11      Q.    Now, I'd like to turn to the fires in the Lower

12  Bridge Creek area that you took a look at and analyzed.

13  And in making your opinion about the cause of the fire

14  in the Lower Bridge Creek area, which exhibits did you

15  primarily rely on in addition to everything else?

16      A.    I took a look at 1133, 1134, 11 -- excuse me --

17  1134-A, 1137, 1127, and 1128.

18      Q.    So let's start with 1134, okay?  1133 is the

19  WildCAD report, is that right, for the Grandad Fire?

20      A.    I believe it is.  I'm not positive.

21      Q.    We can bring it up if we need to.  But what did

22  you rely on from the WildCAD report?

23      A.    In the WildCAD report --

24      Q.    And I'm not sure the jury knows.  What is a

25  WildCAD report?

Hogue - D by Mr. Blackman                            1919

1      A.      WildCAD report is -- in their dispatch office,

2   they have -- they record all the radio conversations.

3   And now they use, of course, an electronic form of it.

4   And that's just a program that's called WildCAD.  But

5   basically they record the time of a radio transmission,

6   who is making the call, and what is said.

7           In this particular case on the evening of

8   August 21st, there was a report from the air tactical

9   group supervisor.  And the way that's recorded is the

10  tail number of the aircraft, which in this case was 96

11  November.

12          And what they were doing was going in after

13  this fire deal, lightning storm, and they would report

14  smokes, and they'd give a size up on the smoke.

15     Q.      Where was the location of that initial fire

16  reported by an air attack 96 November?

17     A.      It would have been an area just north of Bridge

18  Creek.

19     Q.      So then let's go to 1134.  And tell us if you

20  can -- just tell us what that is.

21     A.      This is one of the photos that were taken on P

22  Hill from Engine 614, I believe, on the afternoon of

23  August 22nd.  And I think it's a very good photograph

24  for identifying a snapshot of the time of what was going

25  on in Lower Bridge Creek, but of particular importance

Hogue - D by Mr. Blackman                              1920

1   here was -- the area that we were interested in was over

2   in here (indicating).

3           And they could identify this area from the

4   photograph because this is that P Ranch, they call it.

5   It's the headquarters for the wildlife refuge down here.

6           Some other distinctive features in here, this

7   is a road that goes up through the Lower Bridge Creek

8   area.  And this is Bridge Creek itself in here

9   (indicating).  And it doesn't show very well on this

10  photograph, but you can follow right up this -- it shows

11  up as a fence line in there.  You can see that

12  difference.

13  Q.    So, generally speaking, the major slope in the

14  center of this photograph is located -- could you place

15  that -- if I were to take one of these exhibits, may

16  Mr. -- just any one that has Lower Bridge Creek area.

17          MR. MATASAR:  Ms. Wright, I think -- would it

18  be okay -- do you want me to hand it to you?

19  BY MR. BLACKMAN:

20  Q.    Mr. Hogue, can you tell us, the yellow sticker

21  at the top of that, what number is that?

22  A.    070.

23  Q.    Okay.  So I'm not sure if Mr. Schroeder can

24  pull that up on the screen.  Okay.

25          So can you tell us where that major smoke that

Hogue - D by Mr. Blackman                    1921

 1   you were just -- that was in that photograph was located

 2   on Exhibit 070?

 3       A.    It would have been, I believe, this area right

 4   in here (indicating).

 5       Q.    So that's an area that is in the vicinity, I

 6   guess I'll say, of note on this particular exhibit

 7   saying "approximate 1:30 unloaded ATV"?

 8       A.    I believe so, yeah.

 9       Q.    Okay.  All right.  Let's go back then to -- I

10   think we were on 1134.  Based on this photograph, what

11   did you do to try to determine the location of that

12   burning area?

13       A.    Of this burning area?

14       Q.    Yes.

15       A.    Well, I used this road as a reference point.

16   And like I say, there is a -- in the actual photo, I

17   could pick out the fence line that went across there.

18   And based on my field examination up there, we found a

19   lightning-struck tree.  And then upon further

20   examination of this photo, I could find that tree in

21   here.

22       Q.    Let's look at 1134-A.  And what is depicted in

23   1134-A?

24       A.    That shiny spot right there is the space

25   blanket that Mr. Freeman was holding up to reflect

Hogue - D by Mr. Blackman                    1922

1    sunlight.  And I took this photograph from back on P

2    Hill to verify that that was a tree that was on fire in

3    the photograph that was taken August 22nd.

4        Q.    Okay.  So that's the same area as we saw on

5    fire in 1134?

6        A.    It is.

7        Q.    Okay.

8        A.    This is the road that -- I believe that's the

9    road coming up through there.  Distinctive features that

10   allowed me to make that projection from P Hill on

11   through here to also verify this is a correct tree,

12   where this grove of juniper trees is distinctive enough

13   that I could pick that out on a photograph, and also

14   from the aerial photograph that I reviewed.

15       Q.    Okay.  Then let's look at 1137, I guess, start

16   with the second page of that.

17       A.    This is one of the photographs that I took of

18   the lightning-struck tree.  This is just one half of the

19   tree.  The other half looked similar to it.  And what I

20   noticed in that tree was both halves had a deep scar

21   down the center of them that was apparently the

22   lightning stroke coming down through there and this tree

23   went into two.

24            The inside was all burned.  And there was

25   charring on -- all the way up to the top of the tree.

1   There was no burning underneath those branches.  There

2   was no -- no burning above the -- beyond the outside of

3   the tree.

4       Q.    And how about 1137, I guess, page 1, what does

5   that depict?

6       A.    Well, that's a photograph that I took from

7   the -- the tree looking back to P Hill.  This would be

8   like a back shot from the tree back to where the

9   original photo was taken.

10      Q.    And 1127?

11      A.    Oh, the weather data for P Hill.  I believe

12  this is -- boy, it's hard to read some of this.

13      Q.    We can -- do you want the relative humidity or

14  the temperature?

15      A.    Well, there, that's good for the temperature.

16  There has been a lot of discussion about this -- the

17  fire and being how it laid down.  I think it's important

18  to note the weather conditions on the morning of the

19  22nd.  And you can see at -- starting at about 6:00

20  a.m., 5:30, the temperature started going up quite a

21  bit, and peaked out at just under 90 degrees.

22          Also, if you could scroll down just a bit to

23  the humidity.  Humidity was really dropping down in

24  here.  What's important to me about the weather in Lower

25  Bridge on the morning of the 22nd was that, you know,

Hogue - D by Mr. Blackman                    1924

1    the report of an inversion layer in there, and the talk

2    about that inversion breaking up, and also a crested

3    wheat stand, and holdover, and that sort of thing.  It's

4    been my experience that crested wheat is a plant that's

5    not easy to burn.

6              I've been on fires in similar country around

7    Hampton, Glass Butte area where you can have a pretty

8    intense fire.  And it'll hit a crested wheat seeding and

9    really won't go out -- or won't go through the crested

10   wheat.

11             I had an occasion that where we had a fire, one

12   that reburned several years later in the same area.  And

13   we were thinking that, well, no problem, it'll hit that

14   seeding and that will -- it'll not go through the

15   crested wheat.  But actually it hit that crested wheat

16   and burned right through it.  And that seemed really

17   peculiar.  We were trying to determine what the

18   difference was, why it wouldn't burn one time and burn

19   the other time.  And all the other conditions of time of

20   year and all were about basically the same.

21             We had -- fortunately, we had one of those

22   remote automated weather stations close by that area.

23   And we got to looking at it.  The relative humidity was

24   at 4 percent that day.  So it's -- it was a striking

25   deal to me that at one time the fire wouldn't go through

Hogue - D by Mr. Blackman                    1925

1    that crested wheat seeding; and another time, when the

2    humidity was low, it burned right through it.

3          So I -- when I heard that they had 2500 acres

4    of crested wheat that had burned, to me that was an

5    indication that the relative humidity was pretty low,

6    especially if that burned at night.

7          The other thing with regard to inversions, it's

8    been my experience that those inversions will hold down

9    a fire and let it just sort of smolder.  And I liken it

10   to you -- you know, when they talk about when an

11   inversion starts to break up, that they'll punch a hole

12   in it.  Well, it almost acts like a chimney on a wood

13   stove.  When that starts breaking up, it's like cracking

14   a door open on your wood stove and letting some air get

15   into the fuel.  And it will start to burn very rapidly.

16         And I think down in this country, the morning

17   of the 22nd, just reviewing some of the radio traffic

18   and all when they were describing events, it appeared

19   that that -- you could tell when that inversion started

20   to lift because things became very active.  And once

21   they became active, I think that fire started moving and

22   developing.

23   Q.    About what time did it appear that that

24   inversion was lifted?

25   A.    From what I could gather on the radio traffic

Hogue - D by Mr. Blackman                          1926

1    and all, I would say somewhere in the neighborhood of

2    10:00 a.m.

3        Q.    And then let's look at the last one you

4    mentioned for playing a major role in your assessment of

5    the cause of Lower Bridge Creek, 1128.  It doesn't come

6    across very clearly at all on the big screen, but it

7    does come across, I think, on the smaller screen.  What

8    are we seeing here?

9        A.    This is a dust devil.  And there was -- again,

10   this is a photograph that came out of some of the

11   material provided by the government.  I'm not sure of

12   the exact location of this, but I do know it was taken

13   in the area of this fire.

14            Again, there was several fires going at the

15   same time.  And a lot of them were -- several of them

16   were large -- there is reference in the radio traffic

17   about several fires that went over 10,000 acres.  And I

18   know there is a lot of talk about spotting.  And we talk

19   about predictive modeling and how spotting can occur.

20   And one thing that the predictive models don't allow for

21   are events like these dust devils.  And you can see,

22   this is a pretty well formed dust column right up here.

23   And they call them dust devils because that's primarily

24   what you see.  But in this event, that will also pick up

25   burning material and distribute it.

Hogue - D by Mr. Blackman                    1927

1          There was -- again going back to the radio

2    logs, there were several comments made about dust devils

3    going through and ripping up sagebrush and transporting

4    them quite a distance.

5          So in terms of spreading the fire or moving it,

6    it's not just a simple matter of would this be

7    conductive to a spot?  It also needed to consider the

8    events such as this dust devil.

9    Q.    So based on your review of all the material,

10   including the exhibits that we've just reviewed, do you

11   have an opinion as to the cause of the spread of the

12   Lower Bridge Creek area fire on the morning of the --

13   and early afternoon, I guess, of the 22nd of August?

14   A.    I do.  I believe it was a lightning-caused

15   ignition.  And I believe that its spread was due to the

16   weather extremes, and the fire behavior associated with

17   a breakup of that inversion and the weather that is

18   associated with it.

19   Q.    Now, I'd like to draw your attention to August

20   23rd and the ignitions the government has been talking

21   about along Bridge Creek Road.  And I think it's easiest

22   to talk about those in two groups.  The first being what

23   are being called Ignitions 1 through 5 and the second

24   group 6 through 10, okay?

25   A.    Okay.

Hogue - D by Mr. Blackman                    1928

1    Q.    So with respect to Ignitions 1 through 5, and I

2    think if you -- if we take down Exhibit 70 and just put

3    back Exhibit 65, so 65 is the map that shows the Bridge

4    Creek Road area and the Ignitions 1 through 10, I

5    believe?

6    A.    Okay.

7    Q.    Right?

8    A.    Correct.

9    Q.    Okay.  And let's talk about what exhibits you

10   relied on in forming an opinion about the cause of the

11   Ignitions 1 through 5, okay?

12         So what exhibits did you primarily rely on in

13   addition to the ones -- all the other material you've

14   referred to in forming your opinion about the causes 1

15   through 5?

16   A.    I looked at Exhibits 80, 79, 98, 99, 119, 122,

17   131, 136, and 1185.

18   Q.    Did you also look at 1159?

19   A.    I did.

20   Q.    So, again, I'd like to have Mr. Schroeder --

21   just have you walk the jury through those specific

22   exhibits and tell us what they show, starting with 80.

23   What is this?

24   A.    80 is an aerial view depicting the area of

25   Ignition 1 -- I guess, first off, I should identify that

Hogue - D by Mr. Blackman                    1929

1   this is Bridge Creek Road coming down here.

2      Q.    So the road that is basically horizontal -- not

3   perfectly straight -- but horizontal in the photograph

4   is Bridge Creek Road?

5      A.    Correct.

6      Q.    And what is the road that appears to be more to

7   the vertical?

8      A.    This is what is referred to as Knox Springs

9   Road.

10     Q.    Where is the location of Ignition 1 on this

11  Exhibit 80?

12     A.    Ignition 1 is in here.  This is also the

13  location of where Mr. Okeson and Mr. Glascock began

14  their burnout operation on the night of the 22nd, along

15  this area.

16     Q.    So what was of significance to you in this

17  photograph of the area of Ignition 1?

18     A.    In reviewing all of the material, one of the

19  things that I reviewed was an investigation report done

20  on what was known as the Knox Road ignitions.  And the

21  investigators were looking at ignitions along this road.

22  And one of the things that they concluded were they

23  were -- well, basically they had two possibilities for

24  the ignitions along Knox Springs Road.

25            One, they thought it could possibly be

Hogue - D by Mr. Blackman                    1930

 1    incendiary.  The second one they referred to was the --

 2    due to the weather and the fire behavior, they could not

 3    rule out the possibility of spotting from the main fire.

 4        Q.    And just to orient the jury, although on this

 5    photograph the area you've described as Knox Springs

 6    Road, in the vertical position, what direction is the

 7    top of this photograph?

 8        A.    That generally is looking to the west.

 9        Q.    Okay.  So on Exhibit 65, which is the exhibit

10    that shows the Bridge Creek Road, where is Knox Spring

11    Road?

12        A.    This is Knox Spring Road right there

13    (indicating).

14        Q.    Okay.  So the one that goes off again to -- T's

15    into Bridge Creek Road and goes to the west?

16        A.    Correct.

17        Q.    Okay.  So what was significant to you about the

18    fact that there was fire on both sides of Knox Springs

19    Road?

20        A.    Well, it's -- it's one of those that makes you

21    go hmmm.  To me, it was significant in the fact that it

22    was probably spotting and -- you know, it's just another

23    one of those that I didn't -- wasn't there to do an

24    investigation on it, but it also would be an indicator

25    that the -- that that could have been coming from that

Hogue - D by Mr. Blackman                          1931

1    main fire.

2       Q.    So then let's look at 79.  Now, give us our

3    orientation.  What are we seeing here in the way of

4    roads and what are we seeing in the way of burn.

5       A.    Bridge Creek Road down here (indicating).  Knox

6    Springs Road (indicating).  And this is apart of the

7    burnout operation.  And this is Ignition 2.

8       Q.    And then 98.

9       A.    This is a photograph that Mr. Okeson took on

10   the evening of August 22nd.  And I believe he was just

11   to the west of Antelope Reservoir, which is maybe a mile

12   away from where there's ignitions in Bridge Creek Road.

13          To me, the significance of this photograph is

14   the flame lengths that we're seeing here, this is pretty

15   active fire.  That's some pretty big flame lengths that

16   we've got going on in here.  And you can see columns of

17   smoke.  And my belief is there would be a lot of debris

18   flying in that.  And that would be conducive to a

19   spotting issue right there.

20      Q.    And 99, what is this?

21      A.    Again, it's another photograph that Mr. Okeson

22   took.  Looking back towards what we were calling the

23   Grandad fire, the main part of it.  Also on the evening

24   of the 22nd.  And I believe that this -- what he's

25   looking at this fire front here is probably about three

Hogue - D by Mr. Blackman                    1932

1    miles away.  But, again, you can see, there is a pretty

2    good flame front coming through there.  And it would

3    still suggest to me that this fire is very active.  In

4    fact, reports that I read, oh, in all of the radio

5    traffic and reports going back to the dispatch center

6    from other fires in the area, and there was at least two

7    major fires -- one to the north called the Craters Fire

8    and one to the south that they referred to as the Pueblo

9    Fire that was all around Fields -- were burning actively

10   all night long.  And to me that says that they were --

11   continued to move.

12       Q.    So you are saying that here you see active

13   fire, you have reports of active fire at Craters --

14            MR. PAPAGNI:  Objection, leading.  Objection,

15   leading, Your Honor.

16            THE COURT:  Yeah, it's leading.

17            MR. BLACKMAN:  I understand.

18            THE COURT:  But it's a little bit goose and

19   gander here, Mr. Papagni.

20   BY MR. BLACKMAN:

21       Q.    I just want to make sure it's -- I'm

22   understanding correctly that the behavior of the fires

23   at Craters and Pueblo had some effect on your judgment

24   as to the cause of the Ignitions 1 through 5 in Grandad?

25       A.    Yeah.

Hogue - D by Mr. Blackman                          1933

1      Q.     Is that what you are telling us?

2      A.     Yes, they did.

3      Q.     And it's because of what was being reported

4   about Pueblo and Craters?

5      A.     Yes, they were reported to be very active all

6   night long.

7      Q.     Now 119.  What are we seeing here?

8      A.     This is looking up Bridge Creek Road, Ignition

9   1 here, Ignition 2 there.  This was determined to be

10  probable coming from this fire on this side of the road.

11          I thought it was important to see that there is

12  a significant burn in here in the vicinity of Ignition

13  2, along with the other photos showing there was other

14  burning in here from the black line on Ignition 2.

15     Q.     And so it's clear, the area that you pointed to

16  initially saying a lot of burning in there is in what

17  portion of Exhibit 122 -- I'm sorry, 119?  Could you

18  just point out the area and describe it on the

19  photograph?

20     A.     This portion here (indicating)?

21     Q.     Yes.  What area of the photograph is that?

22     A.     That's part of the burnout operation.

23     Q.     And where is it located actually on the

24  photograph?  If you would describe just in terms, the

25  right side, the left side, the top side, the bottom

Hogue - D by Mr. Blackman                                1934

1   side.

2       A.      It's the top side of -- be to the west of

3   Bridge Creek Road.

4       Q.      Okay.  Is there anything else in this

5   photograph that is of significance to you in forming

6   your opinion?

7       A.      Not in this.

8       Q.      Then 122.

9       A.      This is more of an overhead view of Ignition 2.

10  And just showing that there is burning operation.  This

11  right in here was significant to me as it shows that

12  there was a heavier pocket of fuel that had burned.  And

13  I believe you see some burned spots in here that would

14  account for the possibility of material to be blown

15  across the road there.

16      Q.      So the area that you were pointing out as being

17  hot material or whatever is on the west side of Bridge

18  Creek Road?

19      A.      Correct.

20      Q.      Okay.  Then 131.

21      A.      This is Ignition 3.  And it -- I think it's

22  important to talk a little bit about the weather events

23  on the morning of the 23rd as they relate to these fires

24  along Bridge Creek Road.  And there has been a lot of

25  discussion about red flag warnings, and what they mean.

Hogue - D by Mr. Blackman                    1935

1   And a couple of significant factors, the red flag

2   warnings for high winds were forecasted for 1 o'clock in

3   the afternoon, and we've heard that they actually were

4   earlier, began about 9:00.  And then also that a cold

5   front had moved through.  And that also was responsible

6   for bringing on these strong, gusty winds and all.

7       I look at this and I see along this area, this

8   is where the area that was the origin for Ignition 3,

9   but I also see these trees here that had torched out.

10  And torching will be a good reason for having spots go

11  across there.  Plus, you also have this is a pretty

12  heavy burn in here, too, with a lot of torching going

13  on.  There is a lot of possibility there for an ember to

14  get blown across the road.

15  Q.    Okay.  136, what are we seeing here?

16  A.    This is the area of Ignition 5.  And, again,

17  this photo provided me a couple of key elements in

18  forming my opinion on all of this.  It was apparent that

19  this is an old juniper cut in here.  And all of these

20  heavy wide spots along here, you can see they have a

21  length to them.  That would have been carcasses of trees

22  that had been cut down.

23      My understanding is that juniper cut occurred

24  sometime in the 1990s.  So it would have been fully

25  cured.  So you've got a fuel bed there of old, downed

Hogue - D by Mr. Blackman                    1936

1  juniper trees.  And those trees would still have -- I'm

2  not sure if they would have had red needles on them or

3  just been carcasses laying there.  But those juniper

4  trees when they were old and dried out like that, that

5  dark is real shaggy on them.  There is a lot of things

6  that -- when they get on fire, they burn very hot.

7          Again, when those winds picked up in the

8  morning, it would not be hard to believe that they would

9  cast material across the road there.

10         The other thing is this is a -- this photo

11  doesn't really depict it that well, but this is a pretty

12  good slope going up there.  I walked up into the area of

13  Ignition 5.  And I could look straight across.  And I'd

14  be eye level with this slope over here (indicating).

15         The other part that is significant to me in

16  this photo is right down here was where Mr. Glascock, I

17  believe, said he ended up burning on the night of the

18  22nd.  And in his report, he mentioned that when he came

19  back the next morning, this was a slop-over area.  This

20  had burned after he left the night before.

21         So what that tells me is that the conditions

22  were ripe for that fire on the night of the 22nd to move

23  across the road.

24         Right around the corner from this, not very

25  far, is the Ignition 4.  It would not be improbable at

Hogue - D by Mr. Blackman                    1937

1    all for me to -- if this occurred on the night of the

2    22nd, that that's what happened on the Ignition 4.

3              And, there again, looking at the weather from

4    Moon Hill, we're talking about real low humidities.  The

5    humidity recovery was in the teens at best.  And which

6    is still pretty severe burning conditions.

7    Q.    Now, does this photograph depict the cabin that

8    Mr. Glascock talked about burning around on the morning

9    of the 23rd?

10   A.    Could you zoom down on that.  I'm not sure that

11   it does.

12   Q.    What is your understanding of the general

13   location of the cabin he burned around?

14   A.    I believe it's right -- I don't think -- I

15   think it would be right in here.  I think it might just

16   be off the photo.  It was right along the creek there.

17   We walked down there and found remnants of it.

18   Q.    Remnants of?

19   A.    The cabin.

20   Q.    Okay.  Then let's look at 1159.  And what is

21   that?

22   A.    This, I believe, was a reconnaissance flight.

23   It was a photo that was in the material provided by the

24   government, but there was not a photo log.

25              What I know about it was that it was a Grandad

1    Fire, August 26th.  And there was a photo -- a couple of

2    photos that were taken on McCoy Ridge.  And this -- and

3    I don't know for sure who took them or why, but it would

4    appear to be a reconnaissance photo that they were doing

5    at the time.

6              This is the area of Ignition 5 (indicating) in

7    here.  This is the juniper cut on the opposite side of

8    the road.

9    Q.    So what does this depict, the smoke, what does

10   the smoke in the photograph depict?

11   A.    Well, that fire had not gone out.  It had

12   still -- it was moving around from the 23rd.  And my --

13   I would imagine that there is no suppression action

14   taken on it.  But it just shows -- these fires can hold

15   over and come back to life.

16   Q.    And then 1185.

17   A.    One more thing before we leave this.

18   Q.    Sorry.

19   A.    I think it's important to show that this is

20   Bridge Creek Road coming down here (indicating).  And

21   right in there would be Ignition 3.  But the part

22   that's -- that I think was important in my analysis of

23   all of this whole case was this photo shows right up

24   here is a little burn spot.  And that's where Mr. Okeson

25   finished his burning on the night of the 22nd.  And that

Hogue - D by Mr. Blackman                    1939

1    was significant to me -- and I think we'll see it here

2    in a moment -- when I took a look at the infrared

3    mapping that was done on the 26th.

4        Q.    So point out to us, again, where Mr. Okeson, by

5    his description, ceased his back burn activity on the

6    22nd?

7        A.    Right here (indicating).  And you can see that

8    little black spot right there.

9        Q.    Okay.  So the black spot that's now been

10   magnified?

11       A.    Yeah.

12       Q.    Now let's look at 1185.  Now, there has been

13   some talk -- maybe only by me -- of an IR map in this

14   trial.  What does IR stand for?

15       A.    Infrared.

16       Q.    And what is IR or infrared mapping, what is it

17   about?

18       A.    It's a technique used to fly fires -- fly the

19   perimeter of the fires.  And it will detect sources of

20   heat.  They use the infrared imagery to project feet.

21            Primarily what this -- my understanding of this

22   particular application was that the infrared equipment

23   was utilized in a helicopter.  And it was in conjunction

24   with the overhead team that had assumed command of all

25   the fires in this, what became known as the South End

Hogue - D by Mr. Blackman                    1940

 1    Complex.
 2              So they would fly infrared and locate hot spots
 3    on the perimeter of the line so that they could send
 4    crews back in and have them mop those areas up.
 5              But it's good at detecting where those hot
 6    spots are located.  And they use that as a mapping
 7    process.
 8    Q.    Okay.  Can you take your pointer and show us
 9    what the perimeter -- I'm not sure, did you know what
10    day this map -- this IR map was created?
11    A.    Looks like it was created on August 26th.
12    Q.    Okay.  So show us what is inside the perimeter
13    and what's outside the perimeter.
14    A.    The perimeter that's going like this
15    (indicating), this is -- all of this area here has been
16    burned.  This area would be outside the perimeter.  This
17    would be burned area, burned area, burned area here
18    (indicating).  This is not burned (indicating), not
19    burned in here.  This is all not burned.
20    Q.    And what role did this mapping play in your
21    conclusions about the causes of Ignitions 1 through 5?
22    A.    What I -- if you can blow this up a little bit
23    like this area (indicating).  This shows that to me the
24    burnout operation was right along here (indicating).
25    This is the road.  And what I thought was significant on

1    this is it actually kind of shows what was burned here

2    (indicating).  But I -- if you remember from the photo

3    in there, there really wasn't any burning -- this is a

4    rock scab flat up in here.  And there really wasn't any

5    burning going on.  But I found it pretty interesting

6    that the infrared picked up that little spot, which is

7    right here.  And that's why you see this loop around and

8    come back.

9        Q.    So that's the spot where Mr. Okeson said he

10   stopped?

11       A.    That's correct.  This mapping down here will be

12   that juniper cut.  And, again, that was all burned off

13   of there.  And then Ignition 5 and 4.

14       Q.    So this shows, as I understand it, that there

15   was detected fire in the areas within the red circles

16   adjacent to the areas along Bridge Creek Road where the

17   slop-over fire Ignitions 1 through 5 occurred, right?

18       A.    That's correct.

19       Q.    Okay.  So based on all of those exhibits and,

20   of course, everything else that you reviewed, do you

21   have an opinion as to the probable cause of Ignitions 1

22   through 5?

23       A.    I do.

24       Q.    And what is that?

25       A.    I believe those ignitions were the result of

Hogue - D by Mr. Blackman                        1942

1    the burnout operation on the opposite side of the road,

2    and coupled with the weather, and the weather event on

3    the morning of the 23rd, with the high gusty winds

4    coming along, and that would be consistent with picking

5    up material and transporting it across the road.

6        Q.    Now, as long as we have this exhibit in front

7    of us, was this also important to you in determining

8    when the Trail Fires must have occurred?

9        A.    Yes, it was.

10        Q.    Tell us why it's important in terms of the

11    Trail Fires.

12        A.    Well, when I reviewed all the material on this,

13    it was very curious to me in several of the overflights

14    over the whole area why it was not until September 3rd

15    that the Trail Fires were located.  One of the things

16    that I looked at was this IR mapping.  And when they

17    were flying the fire, this is the route that -- I'm not

18    sure which direction they went -- but the route that he

19    traveled was in this area like this (indicating).

20        I was perplexed why he would pick this location

21    up, and this is fairly small burned area, quite a ways

22    away from anything else, and not have noticed the Trail

23    Fires in there.

24        And reviewing a report from the -- Mr. Newman,

25    he described how he flew that mission, and he would fly

Hogue - D by Mr. Blackman                    1943

 1    the fire perimeter.  And if he had questions or look at

 2    things, it wasn't like he just made one pass and went

 3    around the area and called it good.  He would travel

 4    back and forth and make sure he could pick up everything

 5    he could find.  So I was -- it seemed odd to me that he

 6    wouldn't have picked up those Trail Fires, especially

 7    the first one, and I think it would Number 1 and 2 that

 8    are actually burned together.  But they were roughly the

 9    same size as that one he did pick up along Bridge Creek

10    Road.

11        Q.    So just to be clear, you've marked on Exhibit

12    1185, the Trail Fires location and could you point that

13    out with the pointer to the jury?

14        A.    Right here.

15        Q.    And is that inside or outside the perimeter

16    created on the 26th of August?

17        A.    Outside.

18        Q.    So based on that, do you have an opinion as to

19    the time that the Trail Fires would have occurred?

20        A.    I do.

21        Q.    And what is your opinion?

22        A.    Well, based on that, I would say that they were

23    after the 26th.

24        Q.    And based on your knowledge of the fire

25    progression of the Grandad Fire between the 23rd and

1   26th, do you have an opinion as to whether or not the

2   progression of the Grandad Fire could account for the

3   Trail Fires that were later detected on the 3rd of

4   September?

5       A.    It's possible that -- you know, that's

6   certainly well within reason that you would expect some

7   spotting in that distance.  This is a canyon here.  The

8   elevation would be similar, it's certainly a

9   possibility.

10      Q.    Then let's turn to the Ignitions 6 through 9.

11  And before we actually get to those specific ignitions,

12  I'd like to talk to you about the location of Ignition

13  8.  Did you make an effort to determine the location of

14  Ignition 8 based on the information that was created at

15  the time that the origin and cause investigators looked

16  at Ignition 8?

17      A.    I did.

18      Q.    Okay.  And what information did you rely on?

19      A.    I relied on the coordinates that were in the

20  investigative reports.

21      Q.    And that was the UTM coordinates that I talked

22  to Ms. Bilbao about?

23      A.    Correct.

24      Q.    Could you bring up Exhibit 65, please.

25            MR. BLACKMAN:  Your Honor, I think I may be

Hogue - D by Mr. Blackman                     1945

1    another 20 minutes.  I don't know if you want me to just

2    finish this or how you want us to do that.

3              THE COURT:  All right.  Let's take ten minutes.

4              (Recess:  10:37 until 10:46 a.m.  Jury is

5    absent from the courtroom.)

6              THE COURT:  All right, folks, we'll go back on

7    the record.

8              MR. MATASAR:  Your Honor, I just wanted to

9    mention that -- to try to head off a problem that may

10   come during the cross-examination -- Mr. Hogue has

11   talked about a landowner's decision to do a back burn.

12   And I don't think there should be any questions about

13   his discussions with either Mr. Hammond.  I think he

14   could indicate that his decision was based on the

15   reports which indicate that.  I don't think he should be

16   asked questions about whether he talked to Mr. Hammond

17   or that sort of thing.

18             THE COURT:  Well, he can be asked on what the

19   basis of his discussion is.

20             MR. MATASAR:  But the -- I --

21             THE COURT:  I understand the law pretty well on

22   this.  Let's bring the jury back.

23             MR. BLACKMAN:  May I approach the witness just

24   for a moment, Your Honor?

25             THE COURT:  Yes.

Hogue - D by Mr. Blackman                    1946

```
 1              (Jury enters the courtroom at 10:50 a.m.)

 2              THE COURT:  Go ahead.

 3              MR. BLACKMAN:  Thank you.

 4  BY MR. BLACKMAN:

 5     Q.    Mr. Hogue, what did you do to determine the

 6  location of Ignition 8?

 7     A.    I used the UTM coordinates that were provided

 8  in the investigation report.

 9     Q.    And so how did you go about doing that?  What

10  does that mean, UTM coordinates?

11     A.    Well, it's a coordinate system much like a

12  latitude and longitude, just a different coordinate

13  system.  But it basically is a GPS location.  And I --

14  what I did was go back and retrace putting in those UTM

15  coordinates into my GPS and used the go-to function to

16  go back and find those locations.

17     Q.    All right.  Now, looking at Exhibit 65, I'd ask

18  Mr. Schroeder to blow up the lower portion of that

19  exhibit so we have a location of Number 8.  Okay.

20              Based on your use of the UTM coordinates

21  plotted by Ms. Bilbao when she did her origin and cause,

22  does this Exhibit 65 or any of the other government

23  exhibits accurately depict the location of Ignition 8?

24     A.    Not to me.  Several reasons.  It's like a

25  twofold answer.  I put in the UTM coordinates in my
```

Hogue - D by Mr. Blackman                          1947

1    mapping program.  And I did that for all of the other

2    ignitions.  In all the other ignitions, the UTM

3    coordinates that I entered and the maps that the

4    government produced and the map that I produced in my

5    mapping program were the same.

6           In this particular instance, where I put in the

7    coordinates, showed Ignition 8 to be probably in this

8    area here.  And Ignition 9 to be in this area.

9           Additionally on the -- I did some ground

10   truthing on that -- on all of them.  The UTM coordinates

11   that I put in -- or I believe they were all in UTM.  On

12   Ignitions 1 through 5 went to the same place that was

13   located on the maps and also with the photos that were

14   taken at the time.

15          On 8 and 9, like I say on 8, I put in --

16   somewhere in this location, and 9 right in there.  The

17   other thing that I did was go to those locations.  And

18   in viewing those locations on the ground, and using some

19   photographs as reference, I just felt certain that I was

20   in the correct spot.

21          The most striking one would be in 8.  The

22   photographs showed several trees in the area.  And this

23   suggests that there is several trees in that area.  Down

24   here, not so much.  And that's what bothered me when I

25   first saw this exhibit.

Hogue - D by Mr. Blackman                          1948

1          Then I got to looking -- when we did the field

2    exam on that, I did remember coming across -- it's

3    very -- this is not anything but an imaginary road to

4    speak of.  Really, the only way to detect that today,

5    although it does show up in earlier aerial photos, today

6    it's pretty well overgrown.  The one thing that you

7    notice on there is -- this country is very, very rocky.

8    And that is at least passable in -- with a vehicle.

9          The other thing that I came up and found this

10   grove of trees and I -- that wouldn't match up with some

11   of the photos and all that I saw of Ignition 9.

12   Q.    Okay.  So I'd ask to have the clerk give you

13   this yellow marker.  And I'd ask the government's

14   permission to have Mr. Hogue make entries on Exhibit 65.

15        MR. PAPAGNI:  Wherever he thinks it was.

16   BY MR. BLACKMAN:

17   Q.    And I'd ask you to mark with the yellow marker

18   the UTM coordinate locations of Ignitions 8 and 9 as you

19   plotted them.

20   A.    It's hard to -- it's pretty hard to see with

21   that yellow pen.

22   Q.    Oh, it's not -- I may have a different color.

23   I thought yellow might show up.

24        THE CLERK:  I have purple.

25   BY MR. BLACKMAN:

Hogue - D by Mr. Blackman                     1949

1    Q.    Purple, that's a unique one, I think, for our

2    exhibit.

3    A.    (Witness drawing.)

4    Q.    All right.  And then if you would take the

5    pointer and point on the screen to the actual location

6    of 8.  Mr. Schroeder tells me he actually has the

7    capacity to actually mark that on the display.

8          So has he correctly placed the actual location

9    of Exhibit 8?

10   A.    Correct.

11   Q.    Ignition 8?

12   A.    Yes.

13   Q.    And then would you do the same for 9 with your

14   pointer.

15   A.    (Witness complies.)  In that area.

16   Q.    Now, what is the difference north/south from

17   the placement on all the government exhibits of Ignition

18   8 to the placement that you identified?

19   A.    Using the mapping feature on my -- or the

20   measuring feature on my mapping program, I'd say

21   950 feet.

22   Q.    Okay.  About 300 yards?

23   A.    Yes.

24   Q.    With respect to Ignitions 6 through 9, what, in

25   addition to everything else you looked at, specific

Hogue - D by Mr. Blackman                          1950

1  exhibits illustrate your opinion about the cause of

2  those ignitions?

3     A.    There was a fire progression map that we

4  received.  I believe it's Exhibit 1220.

5          MR. BLACKMAN:  Your Honor, this is a map the

6  government provided to us -- I think they thought they

7  provided it quite a while ago, but I think it was

8  actually more recently, because we didn't realize what

9  it was, but I believe it's -- the government is familiar

10 with what I'm referring to and I would ask the witness

11 to look at Exhibit 1220.

12         THE COURT:  What's it marked?

13         MR. BLACKMAN:  It's marked 1220.

14         THE COURT:  Okay.

15         MR. PAPAGNI:  Is this the Stampfly map?

16         MR. BLACKMAN:  Yes.

17         MR. PAPAGNI:  Fine.

18 BY MR. BLACKMAN:

19    Q.    So you relied on 1220?

20    A.    Correct.

21    Q.    Any other exhibits of significance?

22         THE COURT:  Mr. Baker?

23         MR. BLACKMAN:  I'm sorry?

24         THE COURT:  No.  I was trying to get her some

25 help.

1   BY MR. BLACKMAN:

2        Q.    Any other specific exhibits?

3        A.    Look like 65.

4        Q.    Right.

5        A.    And 1184.

6        Q.    So if this -- 65 is currently on the screen.

7   Let's look at -- did you say -- what number did you say?

8        A.    I believe 1184.  I may be mistaken on that.

9        Q.    Maybe 142?

10       A.    Pardon me?

11       Q.    How about 142?

12             MR. SCHROEDER:  That's 142.

13   BY MR. BLACKMAN:

14       Q.    Is that one of them or not?

15       A.    Yes, it is.

16       Q.    Tell us what 142 is?

17       A.    142 is a photograph -- an aerial photograph of

18   Ignition 7.

19       Q.    What was it about this photograph that was of

20   significance to you in making your assessment?

21       A.    Well, part of this refers back to the Trail

22   Fires.  And according to this photo log on this

23   particular aerial photo, this was taken on an aerial

24   flight on August 25th.  And part of the Trail Fires was

25   back off in this direction, but it just was another

Hogue - D by Mr. Blackman                          1952

1   example to me of they had personnel flying looking for

2   starts in the area.  And it would appear that they would

3   have flown right over that Trail Fires.

4           In that first Trail Fire 1 and 2 was in fairly

5   open country.  I would have thought they'd have seen it.

6   The other part referring back to this exhibit here

7   (indicating).

8     Q.    1220?

9     A.    1220, was -- the fire progression map that has

10   got three overlays on the map.  And according to the

11   legend, they mapped -- one mapping was done on 8/22 at

12   2300 or 11 o'clock at night.  The other map was done on

13   8/23 at 6:45 a.m.  And the third was done on 8/23 at

14   9 o'clock p.m.

15           MR. BLACKMAN:  Your Honor, at this point I'm

16   not going to be using the screen.  And I would ask that

17   we be able to move the easel so that the jury can see

18   what is being addressed.

19           THE COURT:  That's fine.

20           THE CLERK:  It has not yet been received,

21   Judge.

22           THE COURT:  It has not been received.

23           MR. BLACKMAN:  Oh, I'm sorry, I thought the

24   government said they had no objection.

25           MR. PAPAGNI:  No, I said I knew what it was.

1    Are you offering it?

2            MR. BLACKMAN:  Yeah.

3            MR. PAPAGNI:  What's the foundation, it's from

4    Mr. Stampfly?

5            MR. BLACKMAN:  Yes.  The foundation is it was

6    provided by the government in discovery as --

7            MR. PAPAGNI:  I would have a question or two in

8    aid of objection, it will be quick.

9            Mr. Hogue, did you call Mr. Stampfly up to ask

10   why he used this map?

11           THE WITNESS:  No, I did not.

12           MR. PAPAGNI:  Did you talk to Mr. Stampfly

13   about how he used this map?

14           THE WITNESS:  No, I did not.

15           MR. PAPAGNI:  Did you discuss with Mr. Stampfly

16   his report regarding this map?

17           THE WITNESS:  No, I did not.

18           MR. PAPAGNI:  Did you ask him how his findings

19   were made or not made regarding any spotting that he

20   thought may or may not have occurred on the night of

21   August 22nd?

22           THE WITNESS:  No, I did not.

23           MR. PAPAGNI:  But you said you're going to rely

24   upon this map to form an opinion?

25           THE WITNESS:  Well, the map was provided by the

Hogue - D by Mr. Blackman                              1954

1    government.

2              MR. PAPAGNI:  Sure.  But did you talk to the

3    person who prepared it?

4              THE WITNESS:  No, I did not.

5              MR. PAPAGNI:  I object.  Lack of foundation.

6              THE COURT:  The objection is overruled.  The

7    exhibit is received.

8              MR. BLACKMAN:  Thank you, Your Honor.

9              I would ask that we now make it available so

10   that --

11             THE COURT:  I said you can.

12             THE CLERK:  Where do you want it?

13             MR. BLACKMAN:  I think we can just turn the

14   screen off and set it here where the court and the jury

15   can see it.

16             THE COURT:  Why don't you help her, Mr. Hogue.

17   That's fine right there.

18             MR. BLACKMAN:  Just so Mr. Hogue can see it

19   from wherever he's going to be.

20   BY MR. BLACKMAN:

21   Q.    So, Mr. Hogue, what, in general, was the role

22   of 1220 in your assessment of the cause of the fire 6

23   through 9?

24   A.    Well, it gave me a glimpse of where the fires

25   were at at a particular time.

Hogue - D by Mr. Blackman                    1955

1      THE COURT:  You need to be seated in the back

2  of the courtroom, please.

3      THE WITNESS:  The first polygon that is mapped

4  on here was 11 o'clock on the night of the 22nd.  The

5  second polygon that's mapped on there was at 6:45 a.m.

6  on the 23rd.  And those gave me a better idea of where

7  that fire was at at those two particular times.  In

8  conjunction with the photographs that were taken right

9  at dusk on the night of the 22nd and showing active

10  flaming and active burning in there, suggest to me that

11  that fire was still active all night long.

12      What it does in my opinion is allows me to have

13  a better reference point on where that fire might have

14  been earlier in the morning on the 23rd relative to the

15  starts that we're interested in.

16  BY MR. BLACKMAN:

17      Q.    Okay.  So what else did you rely on in forming

18  an opinion about the cause of Ignitions 6, 7, 8 and 9?

19      A.    I relied on -- again, the -- both the weather

20  that was recorded by the Moon Hill RAWS, the forecasted

21  conditions, reports made by individuals on the fire

22  itself, and also reports of the fire behavior in the

23  surrounding areas, the -- primarily the fire at Craters

24  and Pueblo.

25      Q.    And what did that information tell you?

Hogue - D by Mr. Blackman                        1956

1    A.    Well, I -- you know, all the reports were that

2    the fires were active all night long, suggesting to me

3    that they were moving.  So where that perimeter was

4    mapped at 11 o'clock was probably not as far advanced as

5    it would have been, say, at 9 o'clock the next day.

6          The other part is that it's still active, and

7    there is going to be short-range spotting and all

8    associated with that.

9          We still had the view of all the trees torching

10   and all in there.  And one of the more significant

11   comments that were made about fire behavior and all was

12   some radio traffic that what they were talking about the

13   whirlwinds and they were ripping up sagebrush and

14   scattering that.  They were having real control issues.

15         So with that in mind, I took a look at -- for

16   one thing in the -- in the map in front of us here, puts

17   that fire within -- at 11 o'clock at night on the

18   22nd -- puts that fire within a half a mile of Ignition

19   10.

20         It also suggests to me that there may have been

21   opportunities in there where the two lightning strikes

22   that were up in that area, with those events happening

23   on the morning of 23rd, and that front moving through

24   earlier than expected, would provide an excellent

25   opportunity for any fire that would be, say, a lightning

Hogue - D by Mr. Blackman                    1957

1    fire that was holding over, any material on there would

2    be advanced with that front moving through.

3        Q.    So do you have an opinion as to the cause of

4    Ignition 6, 7, 8, and 9 based on all of that material?

5        A.    Well, two things on 6 and 8.  My understanding

6    from reading the reports were that their initial

7    discovery was on the 25th of August.  I would, you know,

8    have to say that it's highly likely that they were

9    caused by spotting from that fire when it moved through

10   on the afternoon of the 23rd.

11           As far as 8 and 9, there is -- I think there is

12   a high likelihood that there was an event such as when

13   that front went through and it was creating all these --

14   pretty good wall of flame and all in there, the

15   lightning strikes could take off, there is a high

16   likelihood that there might have been an event such as a

17   dust devil that goes through and transports material up

18   there.  And that would be consistent with some things

19   that I have seen in the past along fire behavior.

20       Q.    Then finally we have Ignition 10.  And you've

21   just made reference to the lightning strikes.  So I

22   guess we'll move the easel.  For now, I'll just move it

23   out of the way here.

24           And I'd ask, Mr. Hogue, what specific exhibit

25   illustrates the basis of your opinion about Ignition 10?

Hogue - D by Mr. Blackman                                    1958

1      A.      I believe 1184.

2      Q.      I'd ask Mr. Schroeder to bring that up.

3              Could you tell us what that is?

4      A.      Well, that's a combination of lightning data.

5  And, again, that infrared map that was taken on the

6  26th.

7      Q.      So the two -- tell us what -- the pins are

8  what?

9      A.      Pins are the lightning stroke data from

10 Vaisala.

11     Q.      And the circles are?

12     A.      That 95 percent confidence ellipse.

13     Q.      And where is Ignition 10 located?

14     A.      Ignition 10 is located right here (indicating).

15     Q.      So it's within the confidence circle of one of

16 the lightning strikes?

17     A.      Correct.

18     Q.      So do you have an opinion about the likely

19 cause of Ignition 10?

20     A.      Well, based on the -- this Exhibit 1220 and the

21 weather data that was provided, I would believe that was

22 a spotting event from that main fire.

23             MR. BLACKMAN:  That's all, Your Honor.  Thank

24 you.

25             THE COURT:  Cross.

```
 1              MR. MATASAR:  Your Honor, I just have one
 2   question.
 3              THE COURT:  Okay.  Fine.  Sorry.  That's fine.
 4                    DIRECT EXAMINATION
 5   BY MR. MATASAR:
 6      Q.    I want to show Mr. Hogue two photos and ask him
 7   one question.  And I think you can hold me to that.
 8              1125-C, and I'll also show you 1125-B.  And
 9   what I want to ask you, Mr. Hogue, if you could explain,
10   what lightning does when it strikes a tree, and what the
11   potential is for causing fire after the strike or
12   stroke?
13      A.    Well, in this particular instance, it looked
14   like the top blew out of that tree.  It's going to hit
15   it with -- you know, I think Mr. Holle had all the
16   technical data on temperatures and -- it's -- it's
17   pretty significant.
18              It can happen in several different ways and
19   cause several different -- all the way from shattering
20   to -- in the one instance down in Lower Bridge in the
21   first photo that you showed here, would hit and actually
22   split the tree or find a weak spot in there if it's got
23   a branch gone.  But basically -- and I've seen this
24   many, many times in junipers -- it will go in and catch
25   that tree on fire.
```

1          Junipers, especially older ones, are pretty

2    unique.  A lot of times they'll be hollow and rotten

3    inside.  That fire will get in there and burn from the

4    inside out.  And can take several days.

5       Q.    Go ahead.

6       A.    Part of my experience in the past has been

7    flying aerial observer and looking for those.  And we

8    would find lightning-strike trees days after the event.

9    A lot of times what we'd see is if a tree happened to

10   grow in a rocky spot or had out competed the grass and

11   there is nothing around there, a lot of times what you

12   end up with is just a big pile of white ash.  And

13   they'll just burn until they go out, or you have an

14   event come through such as a wind event that can pick

15   some of that hot material up and catch whatever else is

16   available on fire.

17          MR. MATASAR:  That's all.  Thank you.

18          THE COURT:  Cross.

19                    CROSS-EXAMINATION

20   BY MR. PAPAGNI:

21      Q.    Mr. Hogue, I think just a few minutes ago you

22   were talking about Ignitions 8 and 9.  And I think

23   mentioned something about a dust devil as a possible

24   cause of those two fires.

25      A.    Correct.

Hogue - X by Mr. Papagni                          1961

1     Q.     You were in court when Mr. Bates, the person

2   that was circling over Lance Okeson and Joe Glascock

3   testified, weren't you?

4     A.     Yes, I was.

5     Q.     He was a trained aerial observer, you heard how

6   many years he'd been in the air doing these things,

7   right?

8     A.     Correct.

9     Q.     And when did you hear him testify as to whether

10   or not there was any dust devils down below when he was

11   trying to evacuate Mr. Okeson?

12     A.     I did not hear him say that.

13     Q.     Isn't your training -- doesn't your training

14   tell you that some of the best evidence you can get is

15   talking to the people that are there when the fire is

16   occurring?

17     A.     That's correct.

18     Q.     And yet you did not talk to Mr. Bates, did you?

19     A.     No, I did not.

20     Q.     You've known Mr. Okeson's dad for how many

21   years?

22     A.     Thirty.

23     Q.     Did you talk to Mr. Okeson at all about what he

24   saw on August 23rd, sir?

25     A.     No, I did not.

Hogue - X by Mr. Papagni                         1962

1    Q.    You formed an opinion on Krumbo Butte that the

2    landowner had done this.  We saw the photograph that was

3    put up.  Had done a back burn.  You testified that was

4    one of causes of the fire, didn't you?

5    A.    Yes, I did.

6    Q.    So how did you determine that the landowner did

7    that back burn?

8    A.    Through his statement from Lance Okeson.

9    Q.    So you considered that statement given to Steve

10   Hammond to Lance Okeson in helping you form an opinion

11   regarding the fire cause, did you not?

12   A.    Yes, I did.

13   Q.    Did you take into consideration the statement

14   that Dwight Hammond made to Lance Okeson near Ignition

15   Number 9 when you formed your opinion about a dust

16   devil?

17   A.    I don't recall his statement.

18   Q.    You were in court when Mr. Okeson testified,

19   were you not?

20   A.    Yes, I was.

21   Q.    Right back here, correct?

22   A.    Yes.

23   Q.    You heard what Mr. Okeson said happened out

24   there on Bridge Creek Road, did you not?

25   A.    Yes.

Hogue - X by Mr. Papagni                              1963

1    Q.    Is white smoke an indicator of a recently

2  started fire in your extensive experience?

3    A.    Not necessarily.

4    Q.    Did you hear what Mr. Okeson testified what he

5  saw?

6    A.    Yes.

7    Q.    Was that consistent with a recently set fire,

8  sir, based upon your expert opinion?

9    A.    Not necessarily.

10    Q.    How many years of firefighting experience did

11  Mr. Okeson have, sir?

12    A.    I believe he said -- I'm not sure -- 15.

13    Q.    Right.  And how many fire cause experts looked

14  at these fires in this case, sir?

15    A.    Four or five.

16    Q.    And how many second opinions did you get for

17  your lightning strike decisions and opinions?

18    A.    Second opinion?

19    Q.    Yeah.  Who reviewed your work to affirm that

20  what you are saying in your expert opinion was accurate?

21    A.    No one.

22    Q.    This book -- you talked about the fire trespass

23  book you did.  But you are familiar with the Wildfire

24  Origin and Cause Determination Handbook, are you not?

25    A.    Yes, I am.

Hogue - X by Mr. Papagni                          1964

1    Q.    In fact, that's considered the go-by in your

2  business, is it not?

3    A.    Yes, it is.

4    Q.    You did a fire trespass book.  That's different

5  than an origin and cause determination, is it not?

6    A.    Yes, it is.

7    Q.    And on the acknowledgements of people who made

8  this book, there is listed Gary White and Carrie Bilbao,

9  is there not?

10   A.    Yes, there is.

11   Q.    You are not listed on this, are you?

12   A.    No, I'm not.

13   Q.    You didn't participate in it, did you?

14   A.    No.

15   Q.    But you agree it's a book that you should go

16 by, correct?

17   A.    Yes, I do.

18   Q.    And when you look at the book -- the area of it

19 when it's called incendiary arson caused fires, is one

20 of the indicators is when fires set in locations where

21 detection is limited and may be set after hours of

22 darkness, origins will most often be near roads and

23 trails.

24         Do you know that to be one of the indicators

25 for an arson or incendiary fire?

Hogue - X by Mr. Papagni                          1965

1      A.      That's generally accepted, yes.

2      Q.      Looking at -- if you could put up Exhibit

3  Number 68, please.  While she's doing that, I can save

4  some time.   68 is the large map with the ignitions on

5  the side.

6              Dealing with the Knox Spring Road that you and

7  the other investigators could not determine the cause

8  of, those ignitions along the road, that would be an

9  indicator -- only an indicator -- of an arson-caused

10 fire, would it not?

11     A.      I'm not sure I understand your question.

12     Q.      Knox Spring Road, sir, did you examine that

13 area in your investigation?

14     A.      Yes.

15     Q.      And that road if you got on it and you drove it

16 north, whose ranch would it take you by, sir?

17     A.      Hammond Ranch.

18     Q.      Pardon me?

19     A.      The Hammond Ranch.

20     Q.      And did you take into consideration

21 Mr. Glascock's statement that he saw tire prints coming

22 off Knox Spring onto Bridge Creek Road as he went back

23 to evacuate fencing contractors in assisting you in

24 determining the potential cause of the ignitions along

25 Knox Spring Road?

Hogue - X by Mr. Papagni                    1966

1      A.      Yes, I did.

2      Q.      And is one of the indicators in the book on

3  page 77 referring to incendiary arson caused fires,

4  these fires are often set in more than one location and

5  in areas that are frequently traveled.

6              That's an indicator is it not, sir, for an

7  arson-caused fire?

8      A.      It can be.

9      Q.      Now, when you were describing the Knox Spring

10 fire area, for example, one of the things you were

11 describing was that the slop-over along Ignition 1 was a

12 factor in evaluating whether or not that was a spot fire

13 or an incendiary fire, correct?

14     A.      That's correct.

15     Q.      And in this particular case, you heard the

16 testimony of Mr. White that when he reviewed another

17 investigator's work, a Mr. Miracle's work, there was a

18 disagreement, correct?

19     A.      That's correct.

20     Q.      Because in your line of work it's better to

21 have more than one opinion so that we can be as accurate

22 as we can before we give our opinion in court, correct?

23     A.      Yes, sir.

24     Q.      And when it comes to spot fires, looking behind

25 you, sir, and you see all those ignitions, in your

Hogue - X by Mr. Papagni                                    1967

1    extensive career, how many times do spot fires occur in

2    a line on one side of the road and not the other?

3        A.    I can't say.

4        Q.    Has it happened in your career?

5        A.    Boy, I don't recall.  I can't say.

6        Q.    Well, if the main fire, sir, was two to three

7    miles to the east -- and I can show you a map and

8    probably will in a moment -- would you not think it

9    reasonable, as Charley Martin said, that there should be

10   spot fires kind of like in a shotgun type of appearance

11   along the road instead of just on one side?

12       A.    Well, I think there might have been where --

13   they very likely could have been a lot of spot fires in

14   there when the main fire burned over.

15       Q.    Well, let's talk about that for a second.  Were

16   you in court when Lisa Megargee, the young, little hot

17   shot firefighter, took the stand and testified about her

18   job on the morning of August 23rd?

19       A.    Yes.

20       Q.    And did you hear her talk about how important

21   it was to firefighter safety to make sure that line was

22   out cold?

23       A.    Yes, I was.

24       Q.    And did she indicate to you in her testimony,

25   before you gave your opinion a few minutes ago, that

1    there were spot fires on the side of the road closest to

2    the main fire?  Did you ever hear her say that once?

3        A.    No.

4        Q.    So let's get back to the question I just asked

5    you.  Were there any spot fires seen on the west side of

6    the road in the distance between two and three miles to

7    Bridge Creek Road by any observers on the morning of

8    August 23rd that have testified in this case?

9        A.    Now which areas are you talking about?

10       Q.    Okay.  Let's go one at a time.  Let's go for

11   Ignition Number 3.  This would just after the tree was

12   cut across the road.  This be the big ignition.  Do you

13   recall either Chad Rott or Lisa Megargee saying that as

14   they approached that ignition that they saw any spot

15   fires to the west, which would be to their right, as

16   they neared Ignition 3?

17       A.    No, I do not.

18       Q.    So based upon a percipient witness's eyewitness

19   observation at the time Ignition 3 was burning, would it

20   be fair to say there were no spot fires in the area,

21   sir, if you were forming an opinion?

22       A.    No spot fires that were detected.

23       Q.    Oh, so they didn't detect any.  Well, did they

24   detect any spot fires between the time they cut down the

25   tree to the time they got to Ignition 4?

1    A.    What I recall their statements were was there

2    was smoldering trees along the west side of the road.

3    Q.    Did you hear Ms. Megargee's testimony,

4    Mr. Hogue?

5    A.    I did.

6    Q.    And you heard Mr. Rott's testimony, Mr. Hogue?

7    A.    I did.

8    Q.    And their testimony was what regarding that

9    black line?

10    A.    I believe their testimony was that it was -- I

11    don't remember their exact words.

12    Q.    Mr. Rott -- do you remember Mr. Rott saying he

13    saw no connection with the black line at Ignition Number

14    3?

15    A.    Correct.

16    Q.    Do you remember him testifying, "no embers

17    flying, no fire brands, and no lightning, and that the

18    Lower Bridge Creek Fire was still miles away"?

19    A.    I do.

20    Q.    Do you remember Ms. Megargee telling

21    Mr. Blackman, "when we check a fire line, we check the

22    whole fire line.  We don't just check spots.  We check

23    the whole line."

24    Do you remember her saying that?

25    A.    I do.

1    Q.    And do you remember the question being, "so how

2    important is it to you as a firefighter for your safety

3    to make sure a black line is out before you leave?"

4         And her answer was, it's critical because it's

5    firefighter safety"?

6         MR. MATASAR:  I'm going to object, Your Honor.

7    These are not questions.  This is argument.

8         THE COURT:  Sustained.

9         MR. PAPAGNI:  Goes to his --

10   BY MR. PAPAGNI:

11   Q.    Did you interview either of these firefighters

12   in ascertaining whether or not your opinion that there

13   were spot fires for Ignitions 2, 3, 4 and 5?

14   A.    No, I did not.

15   Q.    Did you interview Mr. Okeson or Mr. Glascock,

16   who also patrolled that line the morning of the 23rd, to

17   see if their opinions were different than either Chad

18   Rott or Lisa Megargee?

19   A.    No, I did not.

20   Q.    So now as far as the Trail Fires to the south,

21   sir, these particular Trail Fires in Ignition 7, 8 -- 6,

22   7, and 8, they were all on the east side of the road,

23   correct, sir?

24   A.    Correct.

25   Q.    And you were in court when we had not one but

1    several, three fire cause investigators, plus Mr. Okeson

2    talk about how there were footprints near these

3    ignitions, correct?

4        A.    That's correct.

5        Q.    And do spot fires come with footprints?

6        A.    No, they do not.

7        Q.    So if your analysis is correct and these were

8    spot fires, there should have been no footprints,

9    regardless of the size, near them, correct?

10       A.    Well, I don't know that it's been established

11   when those footprints were made.  If they were made

12   prior to the spot fires or after the spot fires.

13       Q.    How about Ignition 8, regardless of where you

14   want to put it on the map, you heard the testimony of

15   Mr. Okeson, who he saw walking away from it, right?

16       A.    Yes.

17       Q.    You mentioned lightning, sir.  Does lightning

18   strikes go in a straight line also that would cause this

19   type of ignitions along the east side of Bridge Creek

20   Road?

21       A.    There again, I -- they may, may not.

22       Q.    Do you recall the testimony of Mr. Glascock as

23   to his interview of -- or talking to Mr. Steven Hammond

24   on August 17th as to what they did to start fires?

25       A.    Yes, I do.

1      Q.    Walking along in a straight line, wasn't it,

2   and dropping matches?  Do you remember that?

3      A.    I believe --

4            MR. MATASAR:  Same objection, Your Honor.

5            THE COURT:  Sustained.  This is not appropriate

6   cross.

7   BY MR. PAPAGNI:

8      Q.    You mentioned you relied on weather data.

9   Yesterday we had an exhibit offered by the defense that

10  had the red flag warning on it for August 22nd and 23rd.

11           Did you utilize that particular exhibit in

12  formulating your opinion regarding the weather?

13     A.    I did.

14     Q.    Did you know at the time that the red flag

15  warning had been cancelled on both days, as testified by

16  Mr. Manski yesterday?

17     A.    I did not.

18     Q.    So would that change your opinion now that you

19  know the weather conditions were different for what you

20  formed your spotting opinions based upon, sir?

21     A.    No, it would not.

22     Q.    But you did say the weather conditions were

23  pertinent to your decision and your opinion, correct?

24     A.    That is correct.

25           MR. PAPAGNI:  If I may, I have my -- can I have

 1    my spotter back, please, Mr. Blackman, that I loaned

 2    you.

 3              MR. BLACKMAN:  Of course.

 4              MR. PAPAGNI:  Thank you, sir.

 5    BY MR. PAPAGNI:

 6      Q.    Exhibit 1111, four ones.  Thank you,

 7    Mr. Schroeder.

 8              This is the 2001 fire, Mr. Hogue, that I'd like

 9    to ask you questions about.  We can put it on the ELMO

10    if we need to.

11              MR. BLACKMAN:  We'll get it.

12              MR. MATASAR:  We'll do it.

13              MR. PAPAGNI:  Thank you.

14    BY MR. PAPAGNI:

15      Q.    Mr. Hogue, on this particular -- you talked

16    about this area down in through here and about your

17    opinion.  I think you testified that you thought it was

18    an incendiary set fire or burning?

19      A.    I think it was a part of a prescribed fire.

20      Q.    That's because you relied upon statements as to

21    what the people said they were doing, correct?

22      A.    Correct.

23      Q.    But -- well, you only rely on statements some

24    of the time or not all the time, sir?

25      A.    I'm not sure I follow what you are --

1    Q.    Well, you relied upon it when you formulated

2    your opinion on this fire in 2001 and on the Krumbo

3    Butte Fire but apparently you didn't rely upon any

4    statements being made by people on the Bridge Creek Road

5    Fire, correct?

6    A.    I went -- in the case of the 2001, I had that

7    to go on.  There was -- other information was -- I went

8    on all the information that I had available in 2001.

9    Q.    Let's look at the exhibit right here, sir, see

10   that fire to the north there?

11   A.    I do.

12   Q.    That was a GPS done by Mr. Ward, right?

13   A.    Correct.

14   Q.    And that was right along the property line

15   between the BLM property in red and the purple that was

16   on the Hammond property, correct?

17   A.    Correct.

18   Q.    Well, Mr. Hogue, the only other place the fire

19   seems to join is down here.  And do you know that

20   location, sir?  Is there a rock crib right about that

21   location?

22   A.    I couldn't say.  I --

23   Q.    You didn't walk that area?

24   A.    I've been in that area, but I can't say that I

25   walked that area.

Hogue - X by Mr. Papagni                    1975

1    Q.    Well, sir, this top one here, how is that

2   connected to any fire that was set on the Hammond side

3   of the property fence?

4    A.    It doesn't appear to be.

5    Q.    No.  In fact, if the wind is blowing to the

6   east, this fire up here, what would be the cause, sir,

7   of that particular fire burning there?

8    A.    I cannot say.

9    Q.    Did you take a look at Mr. Choate's photographs

10   as to the wind direction, sir, since that's important to

11   your decision, correct?

12   A.    Correct.

13   Q.    So what -- you can't say what the cause of the

14   fire is there that burned on September 30, 2001, and

15   then burned onto BLM property, can you?

16   A.    I'm sorry?

17   Q.    Can you say that cause of what started the fire

18   at that location, sir?

19   A.    No, sir.

20   Q.    You say you take into consideration statements.

21   Did you take into consideration the statement of Dusty

22   Hammond as to how those fires got started at those

23   locations, sir?

24   A.    No, sir.

25   Q.    You were in the courtroom when he testified,

1    weren't you?

2        A.    Yes, I was.

3        Q.    On Krumbo Butte -- changing topics and

4    locations, sir, if you would bear with me, please.  You

5    did read the report of Mr. Bird and Mr. White about the

6    fact that they did observe a lightning strike on the

7    left fork of Krumbo Butte Creek, correct?

8        A.    Yes.

9        Q.    And so you heard their testimony that they did

10    find a lightning strike fire in that area, correct?

11        A.    I did.

12        Q.    And when you formed your opinion about these

13    lightning strikes in Krumbo Butte, did you take into

14    consideration the wind direction that particular night

15    in ascertaining if there was a need for a back burn by

16    Mr. Hammond?

17        A.    I don't recall if I did.  I --

18        Q.    Well, if you are going to do a back burn, sir,

19    because you are trying to save your winter feed, and if

20    the wind is blowing away from what you are concerned

21    about -- probably be best to put a map up, if we can,

22    for you.  Thank you, Ms. Root.

23            Mr. Hogue, I've got Exhibit 46 up there.  Do

24    you see the area in through here that you had the

25    photograph that Mr. Blackman put on the -- published for

1    the jury, do you remember that?

2       A.    Yes.

3       Q.    Okay.  And here is the butte here, correct?

4       A.    Correct.

5       Q.    And there was a lightning strike tree here --

6    lightning-struck tree here, correct?

7       A.    Well, the one I found was like right in here

8    (indicating).

9       Q.    Okay.  So when you reviewed Mr. Bird's decision

10   in his report, do you have any difference of opinion as

11   to his area of origin?

12      A.    I have no reason to have a different opinion

13   than Mr. Birds's about an area of origin down there.

14      Q.    Okay.  So you concur with Mr. Bird's area of

15   origin on Krumbo Butte?

16      A.    I have no reason not to, yes.

17      Q.    Well, do you concur with his area of origin on

18   the Trail Fires?

19      A.    I guess I don't have an opinion on that -- on

20   whether I concur with his area of origin?  Yeah, I -- I

21   believe that it's probably accurate on the origin area.

22      Q.    Do you concur with his findings that those

23   Trail Fires were incendiary set because of what he

24   observed in the micro factors?

25      A.    I would concur with his location of the area of

1    origin.  I wouldn't concur with his conclusion that they

2    were incendiary.

3        Q.    Your opinion is they were caused by what, sir?

4        A.    Most likely cause would have been -- you know,

5    it's hard to say if it would have come on the spotting

6    as the main fire went through or -- it's difficult to

7    tell without determining when they were made.

8        Q.    So you don't know what the cause of the Trail

9    Fires are?

10       A.    That is correct.  If it was me, I would have

11   said "undetermined."

12       Q.    Well, you actually did put an opinion in your

13   report, though, didn't you, on the Trail Fires?  You put

14   down it was spotting, didn't you?

15       A.    Could have been, yes.

16       Q.    So which is it?  Spotting or you don't know?

17       A.    Spotting.

18       Q.    Okay.  On Krumbo Butte, did you take into

19   consideration at the time the backfire was going, that

20   the wind direction was going toward where my pointer is,

21   in the direction where Moon Hill Road was?

22       A.    Well, given the location of the fire and the

23   reports that that was all right in there, it would seem

24   like a prudent thing to do.  This wind will shift.  You

25   get those diurnal shifts all the time.

Hogue - X by Mr. Papagni                    1979

1    Q.    Okay.  Well, the reason why I asked about the

2    wind, sir, is, did you talk to Mr. Dunten about the

3    three ignitions that he saw right below him on Krumbo

4    Butte?  Did you discuss that at all with Mr. Dunten?

5    A.    No, I did not.

6    Q.    Defendant's Exhibit 1134.  Thank you, sir.

7    This is a photograph.  Thank you, Mr. Schroeder.

8          What time was this photo taken?

9    A.    According to the metadata on the photo, it was

10   3:40.

11   Q.    3:40 in the afternoon?

12   A.    Correct.

13   Q.    Where is the flame activity on there?

14   A.    I believe it's -- it's hart to tell on the

15   picture in here, but this -- there was some flaming in

16   there (indicating).

17   Q.    And this is 3:40 in the afternoon of August

18   22nd, correct?

19   A.    Correct.

20   Q.    I'm just about done, Judge.

21          If Government's Exhibit 218 could be placed in

22   front of the -- thank you.

23          You were talking about infrared images that you

24   utilized when you were -- by the way, did you ever

25   interview Mr. Newman who did the infrared?

Hogue - X by Mr. Papagni                      1980

1      A.    No, I did not.

2      Q.    So the infrared maps that we've been looking

3  at, you never spoke to the guy who did them?

4      A.    No, I did not.

5      Q.    Behind you, sir -- we can do it this way -- in

6  fact, I'm sorry, that wasn't fair.  I've got it up

7  there.

8            From your spot fires that you have -- these are

9  where the ignition sites were located.  From the main

10 edge of the fire, which we know was given to us by

11 Mr. Bates and also Mr. Toney -- did you talk to

12 Mr. Toney at all, sir, the incident commander?

13     A.    No, I did not.

14     Q.    This edge of the fire on the morning of August

15 23rd was -- do you have any dispute that it was

16 2.61 miles to the first ignition on Bridge Creek Road,

17 sir?  Do you have any objection or disagreement with

18 that?  Mr. Martin used this in his testimony that you

19 were here for.

20     A.    Well, I guess I wouldn't dispute the distances

21 that you have there.  I --

22     Q.    We're going to go through these because I want

23 to make sure you don't dispute them.  And we'll do it

24 quickly.

25            We have 2.61 miles, 3.26 miles, 3.40 miles,

Hogue - X by Mr. Papagni                    1981

1    2.54 miles, and 2.84 miles from the various Ignitions

2    10, going back up to Bridge Creek Road, to Ignition 1,

3    correct?

4         A.    That's what you have on there.

5         Q.    Okay.  And so it's your testimony, after you

6    heard Mr. Charley Martin's testimony -- and, by the way,

7    are you a fire behavior analyst?

8         A.    No, I'm not.

9         Q.    Mr. Martin is, correct?

10        A.    Correct.

11        Q.    And so would you rely upon his information in

12   formulating your opinions as a fire cause origin expert?

13        A.    I would take them into account.  Also making

14   into consideration that his modeling and all is a

15   primarily predictive modeling.

16        Q.    Right.  But even with predictive modeling, sir,

17   you would have expected some spotting in between the

18   edge of the fire and Bridge Creek Road if, in fact, your

19   theory, your opinion was correct, and there was none

20   that was observed, was there?

21        A.    Was there somebody to observe it though?  I --

22        Q.    The question, sir, was there any spotting by

23   any witnesses that testified in this trial that in those

24   distances that I've just given you that there were

25   spotting between the Bridge Creek Road and the front

Hogue - ReD by Mr. Blackman                    1982

1    edge of the fire that was smoldering at 10 o'clock on

2    August 23rd, did you hear anyone say that?

3        A.    No, I did not.

4            MR. PAPAGNI:  Thank you.  Those are all my

5    questions.

6            MR. BLACKMAN:  I just have a couple.

7                    REDIRECT EXAMINATION

8    BY MR. BLACKMAN:

9        Q.    In formulating your opinion about, for example,

10   the fires along Bridge Creek Road, did you rely on the

11   statements that the witnesses gave at the time of the

12   events?

13       A.    I did.

14       Q.    Okay.  And they had all made statements to

15   various people that were recorded and you reviewed,

16   correct?

17       A.    I did.

18       Q.    And was one of those statements Ms. Megargee's

19   statement?

20       A.    Yes, it was.

21       Q.    And was there anything in Ms. Megargee's

22   statement that you relied on in forming your opinion?

23       A.    Yes, there was.

24       Q.    And what was that?

25       A.    That there was a fire on the west side of the

1    road.

2       Q.    Okay.  And how did she describe the size of

3    that fire in the statement you relied on that she gave

4    at the time?

5       A.    I believe her statement was that it was a large

6    fire.

7       Q.    And then you heard her come to court and say,

8    "oh, I don't know west from east" and --

9            MR. PAPAGNI:  Objection.  The question is

10   argumentative.  That's not what she said.

11           MR. BLACKMAN:  I withdraw the question.

12   BY MR. BLACKMAN:

13      Q.    But her testimony at trial was different,

14   wasn't it, from the report she made at the time?

15      A.    Yes, it was.

16      Q.    And is it your experience that reports given by

17   witnesses close in time to the events are reliable?

18      A.    Yes, they are.

19      Q.    Were there similar statements that you relied

20   on from the witnesses at the time in formulating your

21   opinions about the cause of these fires?

22      A.    I did rely on their statements, yes.

23      Q.    Is it, in fact, common to rely on the

24   statements that were recorded at the time when you are

25   doing something five-and-a-half years after the fact?

Hogue - ReD by Mr. Blackman                          1984

1     A.     Absolutely.

2     Q.     If the evidence was that the back burn was

3     smoldering on the west side of the road on the morning

4     of the 23rd at 9 o'clock, what would the significance of

5     that be in light of the fact that the conditions

6     predicted to set in at 1 o'clock actually set in at

7     9 o'clock?

8     A.     I think it would be a very significant -- it

9     would have a big impact on a smoldering fire early in

10    the morning when the winds hit, the sun is coming up,

11    and it would be very likely that it would be affected by

12    winds that came up.

13    Q.     So something that's smoldering at 9 o'clock

14    might become active and blow across the road at 9:30?

15    A.     Absolutely.

16    Q.     And with respect to the Martin projection map

17    or the predictive map, I think you started to say in

18    answer to one of Mr. Papagni's questions, that the

19    question was if there was anyone in the area to make an

20    observation, correct?

21    A.     That is correct.

22    Q.     Did you in all of your -- in your review of all

23    the material provided by the investigation in this case,

24    do you know if they had any observers between where

25    Mr. Martin marked the progression of the fire and Bridge

1    Creek Road at -- from 6:45 in the morning until 9

2    o'clock in the morning?

3        A.    I don't recall seeing any evidence that anybody

4    was in there.

5        Q.    Now, do you know what the purple represents in

6    the exhibit that Mr. -- what is it?  218.  Do you know

7    what the purple represents in that exhibit?

8        A.    There is no legend on there.

9        Q.    Okay.  Assuming it represents fire, is there

10   fire burning between the point that Mr. Martin is

11   measuring from and Bridge Creek Road?

12       A.    Yes, there is.

13       Q.    Okay.  And do you have any reason to believe

14   that that color, whatever it represents, represents

15   something different in the area between the main fire

16   line that he's measuring from and Bridge Creek Road?

17       A.    I'm sorry?

18       Q.    Do you have any reason to believe that whatever

19   that color depicts on the west side of the line is

20   different than what it depicts on the east side of the

21   line?

22       A.    No.  My thinking would be that it would be the

23   same.

24       Q.    Okay.  So if purple represents fire, does his

25   map indicate the presence of fire between the main line

1    and Bridge Creek Road whenever this map depicts the

2    time?

3        A.    Yes, it does.

4        Q.    And in your experience in mapping and use of

5    maps, is color consistency important?

6        A.    Yes, it is.

7             MR. BLACKMAN:  I think that's all, Your Honor.

8             MR. PAPAGNI:  I got a couple more.

9                         RECROSS-EXAMINATION

10   BY MR. PAPAGNI:

11       Q.    You were asked about witnesses that could

12   observe -- that black line was put on there, and you

13   were in court when Mr. Bates and Mr. Toney testified

14   that was the edge of the fire at 10:00 -- about

15   10 o'clock the morning of August 23rd, correct?  You

16   were in the courtroom to hear that?

17       A.    I believe so.

18       Q.    So this red in between wasn't in existence

19   according to their testimony, that you rely upon, as you

20   said, when you form an opinion, correct?

21       A.    I'm not -- could you ask that again.

22       Q.    The fire that Mr. Blackman has been asking you

23   about, that -- if you rely upon the testimony of

24   Mr. Bates and Mr. Toney, that fire that he was referring

25   to, the purple he was talking about, wasn't there yet,

1    correct?

2        A.    I don't know.

3        Q.    Well, let's do it simpler then.  You -- the

4    question he asked you was any observers that could see

5    any spotting in this area here.  Was there an observer

6    who could see any spotting in front of that fire?

7        A.    Not to my knowledge.

8        Q.    Didn't you listen to Joe Bates, the man who was

9    in the airplane flying over that line, who made a right

10   turn because he saw the spotting fires or ignitions on

11   Little Bridge and Big Bridge along Bridge Creek Road?

12       A.    Yes.

13       Q.    So he was available to see that, was he not?

14       A.    At the time of -- yes.

15       Q.    And he testified he saw no spotting, didn't he?

16            MR. MATASAR:  Objection, again, Your Honor.

17            THE COURT:  Sustained.

18            MR. PAPAGNI:  Withdraw the question.  No

19   further questions.

20            THE COURT:  Thank you.  Anything more?

21            MR. BLACKMAN:  No, Your Honor.

22            THE COURT:  You may step down.  Any other

23   witnesses?

24            MR. BLACKMAN:  I don't believe so, Your Honor.

25   I think the defense is prepared to rest.

1          THE COURT:  Rebuttal.

2          MR. PAPAGNI:  Judge, if I just may have a

3    moment.

4          THE COURT:  Yes.

5          (Discussion held off the record.)

6          MR. PAPAGNI:  Briefly.  Ms. Bilbao can take the

7    stand, Your Honor.

8          THE COURT:  Thank you.

9          THE CLERK:  You are still under your oath.

10          THE COURT:  She remains under her previous

11    oath.

12          MR. PAPAGNI:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14    BY MR. PAPAGNI:

15     Q.    And, again, for the record, just state your

16    name, please.

17     A.    Carrie Bilbao.

18     Q.    Ms. Bilbao, to kind of get to the point here,

19    you were in court when Mr. Hogue was on the stand,

20    correct?

21     A.    Yes.

22     Q.    And you observed him and heard him testify as

23    to what he said was the misplacement of Ignitions 8 and

24    9 --

25     A.    Yes.

Bilbao - D by Mr. Papagni                    1989

1    Q.    -- on -- and I would ask the bailiff to remove

2    that.

3          So you saw where he marked -- I think he used

4    purple on a different map where he said that your

5    figures indicated the ignition should be, correct?

6    A.    Correct.

7    Q.    Do you disagree or agree with his changes?

8    A.    I can't say I agree with his changes.  The

9    coordinates that I was given in my report were where I

10   took my UTM locations.  Those locations were then given

11   to the team and given to the people that made maps.  So

12   I am relying on the person who made the map that put in

13   the coordination that I gave.

14   Q.    And that's something that's commonly done in

15   preparing your reports and also preparing maps?

16   A.    Yes.

17         MR. PAPAGNI:  That's all.

18         MR. BLACKMAN:  No questions.

19         MR. MATASAR:  No questions.

20         THE COURT:  Thank you.  You may step down.

21         Anything further?

22         MR. PAPAGNI:  No, Your Honor.  That's it.  We

23   rest our rebuttal case.

24         THE COURT:  Hang on just a second.

25         (Brief pause.)

1           THE COURT:  Members of the jury, we're going to

2   take a short break today.  I haven't decided whether to

3   give you the break right now because I've ordered some

4   lunch right now, as you know.  And there is no sense

5   taking the break until it's here.

6           Judge Sullivan, who works in this courthouse,

7   warned me that people can be a tiny tardy sometimes.

8           And Ms. Wright is supposed to be notified when

9   they are arrive.

10           I'm thinking about giving you the instructions

11   on the law at this time, which will take about

12   40 minutes.

13           Are you all okay with that or do you need a

14   break?  Anyone need a break?

15           (Jury answers no.)

16           THE COURT:  Counsel, will you have anything for

17   me on the instructions I shared with you last night that

18   you need to talk about before this?

19           MR. MATASAR:  No, Your Honor, just the point I

20   made at the very beginning this morning which I think

21   you've already taken care of.

22           THE COURT:  Yes.

23           MR. BLACKMAN:  And we would renew --

24           THE COURT:  Yes, your motions.

25           MR. BLACKMAN:  -- the matters we raised.

1991

1          THE COURT:  Of course.

2          And, Mr. Papagni, did you have anything?

3          MR. PAPAGNI:  No, Your Honor.

4          (Further proceedings were had by Reporter

5    Deborah Wilhelm and by Reporter Amanda LeGore, and were

6    either not transcribed or are bound under separate

7    cover.)

1992

```
 1                      CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3      for the State of Oregon, do hereby certify that I was

 4      present at and reported in machine shorthand the oral

 5      proceedings had in the above-entitled matter.  I hereby

 6      certify that the foregoing is a true and correct

 7      transcript, to the best of my skill and ability, dated

 8      this 21st day of June, 2012.

 9

10

11
                                /s/ Deborah Wilhelm
12                              _____
                                Deborah Wilhelm, RPR
13                              Certified Shorthand Reporter
                                Certificate No. 00-0363
14

15

16

17

18

19

20

21

22

23

24

25
```