1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )   Case No. 6:10-CR-60066-HO
4           Plaintiff,               )
                                     )
5   v.                               )   June 12, 2012
                                     )
6   STEVEN DWIGHT HAMMOND (1) and    )
    DWIGHT LINCOLN HAMMOND, JR., (2), )
7                                    )   Volume 1B
            Defendants.              )
8   ═══════════════════════════════ )   Portland, Oregon

9

10              TRANSCRIPT OF PROCEEDINGS
            (Jury Trial – Afternoon Session)

11     BEFORE THE HONORABLE MICHAEL R. HOGAN, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21  COURT REPORTER:         AMANDA M. LeGORE, RDR, FCRR, CRR, CE
                            U.S. Courthouse
22                          1000 SW Third Avenue Rm 301
                            Portland, OR  97204
23                          (503)326-8184

24

25

APPEARANCES:
FOR THE PLAINTIFF:          FRANK PAPAGNI
                            ANNEMARIE SGARLATA
                            Assistant U.S. Attorneys
                            U.S. Attorney's Office
                            1000 SW Third Avenue
                            Portland, OR  97204
                            (503)727-1000

FOR DEFENDANT STEVEN
HAMMOND:                    LAWRENCE MATASAR
                            ALAN SCHROEDER
                            621 SW Morrison Street #1025
                            Portland, OR  97205
                            (503)222-9830


FOR DEFENDANT DWIGHT
HAMMOND:                    MARC BLACKMAN
                            Ransom Blackman, LLP
                            1400 - 1001 SW Fifth Avenue
                            Portland, OR  97204-1144
                            (503)228-0487

INDEX

Opening Statements                    Page
  By Mr. Matasar...................... 55
  By Mr. Blackman..................... 73

Witness Index

| FOR THE PLAINTIFF: | Direct | Cross | ReDirect | ReCross |
|---|---|---|---|---|
| Thomas Dyer | 101 | 115 | 121 | |
| Gordon Choate | 123 | 167 | 186 | |
| Gordon Choate | | 182 | | |

-oOo-

1          (Tuesday, June 12, 2012; 2:00 p.m.)

2

3                    P R O C E E D I N G S

4

5          THE CLERK:  This Court is back in session.

6          THE COURT:  Mr. Matasar.

7          MR. MATASAR:  Thank you, your Honor.

8          Ladies and gentlemen of the jury, I represent Steven

9   Hammond, along with Alan Schroeder.

10         First, I'm going to tell you a little bit about what

11  Hammond Ranches is.  The most important thing is it's a

12  cattle ranch.  That's what's going on out there in the Steens

13  Mountain.  Steven and Dwight Hammond and their family are

14  cattle ranchers.

15         It consists of Dwight Hammond, the father; Steven

16  Hammond, the son; Susan Hammond, who is Dwight's wife;

17  Earlyna Hammond, Steven's wife.  And -- sorry.  And -- and

18  Steven and -- sorry.  I'm having some problems.  (Pause,

19  referring.)

20         Let me just -- since I don't have Ms. Root or

21  Ms. Cooke to assist me, it's sometimes possible to hit the

22  wrong button.  Okay.

23         Steven Hammond, their three children, Corbin,

24  Claire, and Emery.  That's what Hammond Ranches is.

25         Hammond Ranches has been a cattle ranch for

1    generations, even before Dwight Hammond, his ancestors; maybe

2    from about the time Oregon became a state.

3         It's in Harney County, as you've heard, near

4    Frenchglen.  It consists of -- the ranching operation

5    consists of private land owned by the Hammonds, and also

6    public land that they use via a grazing permit, which they

7    get every ten years.  And that authorizes the grazing of

8    cattle on public land.  And there's intermingled

9    private/public land.  It sometimes seems -- looks like a

10   checkerboard with odd-shaped squares.

11        And the terms that we're going to use in this trial

12   consist of the allotments, the pastures.  That's the B.L.M.

13   or the public land that they use.

14        And the allotments that you'll hear throughout this

15   trial are the Hammond allotment, the Hammond FFR -- for

16   fenced federal range -- the Mud Crick allotment or creek.

17   Sometimes -- either way.  People say different -- different

18   terms.  I've been with the Hammonds so long I'm saying

19   "crick."  The Hardie summer allotment.

20        And within those allotment terms, there are not only

21   names for pastures, but there are also old names that are --

22   have been around for generations.  You'll see terms like the

23   Upper and Lower Field of Mud Creek.  You'll see it -- one

24   part called the School Section.  You'll see Bridge Creek.

25   There's Bridge Creek Road, which is not really that close to

1    Bridge Creek.  And there are all of these terms that we will

2    see throughout the case.  And when the time comes, we will

3    point them all out on a map.  For me to give you the

4    geography of them now will use up all of my time.  North

5    Field, which oddly enough is south of most of the other

6    places in this case.  And Dutch Oven, et cetera, et cetera.

7          The first thing I'm going to talk about -- and

8    you'll see -- this is odd.  But many of the things that I am

9    going to talk about are very, very similar to what

10   Mr. Papagni just talked about.

11         A lot of it is much different.  I didn't see his

12   opening statement before he gave it, so some of it will be

13   very similar, but with wrinkles.  The big difference is

14   what -- what Mr. Blackman and I hope to talk to you about is

15   what it means that there is a cattle ranching operation going

16   on there.  That's the thing we want to try to explain.

17         Mr. Blackman will have more of a detail than I about

18   that.  But that's -- that's the main thing that you need to

19   understand.

20         In 1999, what they call the Hammond prescribed burn,

21   this is the fire that Mr. Dyer is going to testify about.

22         Mr. Papagni, talked to you about it.  Talked about

23   this letter that he wrote.  This is to advise you of concerns

24   regarding the burning of public land.  Okay?

25         The important thing that the evidence will show --

1    this is Exhibit 1104 -- that after the complete investigation

2    occurred of this incident, for which they did get this

3    letter, it was described as the Hammond prescribed burn.  So

4    it's an important point for you to remember.

5            No costs or fees were against -- were assessed

6    against the Hammonds as a result of this incident.  And it's

7    important to also know in -- this is an exhibit.  I don't

8    have a number on there, by mistake.  But there isn't -- this

9    is an actual exhibit that will come into trial.  This is a

10   trespass register.

11           This will show you that in 1999, for example, two --

12   there's different kinds of trespass.  Of course, if cattle

13   gets in the wrong place, at the wrong time, that's a kind of

14   trespass.  And these trespass -- No. 2 is a fire trespass.

15           And you'll see, for example, that just in 1999,

16   there were five.  One, two, three, four, five.  And this is

17   the Hammonds.  And as Mr. Papagni told you -- case closed --

18   when they say, "collection amount," nothing.  But two of the

19   ranchers that got a trespass, they must have gotten more than

20   a stern warning because they had to pay some money.

21           Then 2001.  You won't hear a more different set of

22   facts in this case than 2001.

23           What's happening that day is it is a nice day.  And

24   the Government itself is doing a controlled burn in the

25   morning.  And you can see it.

1          And so what happens is -- and we will show you this,

2    Exhibit 1109 -- at noon, Steven Hammond calls to the

3    dispatcher and says:

4          Yeah, Tammi, this is Steve Hammond.

5          How are you?

6          Good.

7          Steven says, Good?  Is there any reason why a guy

8          can't be controlled burnin'?

9          The dispatcher says, All burn restrictions are off

10         right now.

11         Steven says where it's going to be.

12         And the dispatcher says, Well, we've got our

13         controlled burn going done right now, down there,

14         too, right now.  So there's going to be a lot of

15         smoke.  Laughing.

16         Okay.  Sounds good.

17         Good enough.  Bye-bye.  Steve.

18         Then you'll see at about one o'clock, 13:06:27, a

19   man named Pete Revak calls and calls the dispatcher -- a

20   different dispatcher.  And he's a little concerned.

21         He says, Hey, you guys got a controlled burn going

22         up above Bridge Creek, too?

23         Dispatch:  Above where?

24         Well, it's Bridge Creek on this north end of the

25         Steens.

1          And the dispatcher says, No, we just have the one

2          that's at V Lake.

3          Revak says, You've got this other fire.

4          And the dispatcher says, Oou, Hammonds is burning

5          up there.

6          Revak says, Okay.

7          The dispatcher says, Yep, yeah, yep, that's where

8          their ranch is located.  That is in there, too.

9          So that's what happened.

10          And Mr. Ward, the rangeland specialist, he is -- and

11   this may be important, may not be important.  When he writes

12   his report on October 24th, he gets the date wrong.  Says

13   September 31st.  He's also talking about what he sees.  He

14   does a map.  He maps the fire.  He uses GPS, and does a map

15   of the fire.

16          And I believe it was on Mr. Papagni's exhibit you

17   see this shaped map, which is Dave Ward's map of where the

18   fire was.

19          There was also a helicopter flight later on that

20   mapped the fire.  And this is the shape that was Dave Ward's

21   shape.  But the helicopter, which mapped the fire, mapped an

22   area far to the west and almost completely on the Hammonds'

23   land.  I believe the Hammond line might be around here.

24          And so the helicopter pilot saw the fire as

25   occurring far west -- much farther west and much -- started

1   much farther away from the hunters than Mr. Ward's map would

2   indicate.

3           As I said, this is Ward's GPS plot, and the

4   helicopter plot is the purple one.

5           The other thing I wanted to say about this fire is I

6   say, "No O & C report."  You will see throughout this case --

7   Mr. Papagni took about one minute talking about it, but it

8   will take a lot more time here -- his experts and ours -- to

9   talk about an origin and cause report about what really

10  caused these fires.

11          The science is extremely sophisticated.  They find

12  matches sometimes in fires.  They can find all sorts of

13  things.  And you'll hear a lot more.  But there was nothing

14  like that done on the 2001 fire.

15          And then after the fire, after the fire Steve

16  Hammond called B.L.M. at Frenchglen to tell them that the

17  fire had crossed onto B.L.M. land.

18          And so after the fire occurred, Dave Ward said --

19  and I think Mr. Papagni agreed with this -- there are two --

20  two important points.  One is there were no suppression

21  costs.  Two is range improvement.  It got -- the range was

22  improved.  There's -- that's perhaps why they didn't assess

23  any costs, because it had improved the range.

24          Now, there was a hunt going on on the 29th, 30th,

25  October 1st.  And we have some photos of that.

1        This is a picture of some of the people who were

2   there on the hunt.  Rusty Hammond who's Dusty Hammond's

3   father.  This is a deer hunt on 9-29-01.

4        We expect that both Rusty and Dusty will testify.

5        We will call him Russell because it's easy for us to

6   get Rusty and Dusty confused.  So we'll be calling him

7   Russell here, for this trial.

8        Another photo of people who will be here, you see

9   Scott Gustafson, who's an insurance agent from Canby.  We

10  expect he'll testify.

11       His son Tim, who you can't see very well in this

12  photo, he was too young at the time, but he was close with

13  Dusty.  And Steven Hammond.  And so that's a photo of them.

14       And I suppose it goes without saying that Rusty

15  Hammond was wearing a white cowboy hat.  And Steven Hammond,

16  at least in this picture, was not.  Rusty Hammond was.

17       Let me talk just briefly about the deer hunt.  And,

18  again, you'll have to decide when you hear these wildly

19  different stories.

20       They were hunting in the morning.  And what happened

21  that day was Dusty Hammond -- the son, the child, the witness

22  that's going to testify -- he was about 13 years old at the

23  time.  He was with another kid.  Maybe -- we think it was Tim

24  Gustafson.  And they shot from way too far away at deer that

25  were too young.  They shouldn't have taken that shot -- or

1   those shots.  And as you know kids that are hunting,

2   sometimes this sort of thing happens.

3          And what happened then was because they hit one of

4   the deer, Rusty, the father, or Russell, tried to get the

5   deer.  The animal was wounded.  He shot several more times at

6   the deer.  He's going to tell you that.  Rusty was wearing a

7   white cowboy hat.

8          Now, Jacon Taylor.  Jacon Taylor, we do not believe,

9   was there that day.  We will show you a photograph of Jacon

10  Taylor at the ranch with Dusty Hammond, except it was at an

11  elk hunt, and it was in early September.  It was like

12  September 15th.

13         So Jacon Taylor was not setting fires at the deer

14  hunt on September 30th.  He will tell you that, and we don't

15  think you will conclude that he was.  He wasn't even there

16  that day.

17         As we say, the call was made.  It had nothing to do

18  with the hunters.  Steven Hammond called.  Nothing to do with

19  the hunters.  We think it's just completely irrelevant,

20  unrelated.

21         Then in 2005.  There may be some testimony about a

22  fire in 2005.  You heard something about it.  Let me talk for

23  a minute about lightning.  I'll say a little bit more about

24  it.

25         This is the area where the 2005 fire occurred, and

1    you'll see that there are many red pins (pointing).  The red

2    pins signify where lightning struck.  There are machines out

3    there -- there's a company, Vaisala, which can detect -- not

4    100 percent.  And this is important.  Which can detect where

5    lightning strikes and when it strikes.

6          So for this -- and I'll tell you about the circles

7    for a minute.  Here, you will -- you can get a printout from

8    this company that will say something like 6:22 p.m. and 14

9    seconds, there was a lightning strike.  And they'll give you

10   a point.  They'll give you coordinates.  But, really, there's

11   this circle here, which is a confidence circle; which means

12   that it's X -- like 90 percent or 95 percent likely that the

13   lightning struck within the circle.  Not 100 percent.

14         And we'll talk about that.  Mr. Blackman will talk

15   about that.  And Mr. Hogue, in testimony in trial, will talk

16   about it.  But you can tell a lot more about lightning than

17   you would think.  But you don't know exactly for sure, 100

18   percent where it is.

19         But the reports of the fire -- the 2005 fire, it's

20   undisputed, is a lightning fire.  And a point that I want to

21   mention, because it's relevant to the fire that Steven

22   Hammond lit after that 2005 fire, is as a fire is entering

23   into different fuel types, where maybe it's moister or for

24   one reason or another the fire is dying down, the fire just

25   goes out.  And what happens, though, is the pattern of the

1   fire going out leaves some unburned parts.  So there will be

2   little islands or little fingers of unburned area.

3          And so what Steven Hammond did after this fire, he

4   called Bill Otley, the rancher, to tell him -- and, again,

5   here's where I think we don't dispute the Government's

6   position.  He called him to say he discovered some fingers.

7   That's the term that he used.  That's why I wanted to explain

8   it to you.

9          Steve told Mr. Otley that he had burned them.  He

10  said that one of the fires -- that he burned -- one of the

11  fingers burned through onto Bill's private property.  Steve

12  offered to pay, and Bill said, No problem.

13         2006, the Krumbo Butte fire.  Here's a map of --

14  this is an early map that was used in the case that explains

15  a lot of the fires.  The reason why I want to show you,

16  though, is much of the Grandad fire that we talked -- that

17  Mr. Papagni talked about, the Lower Bridge fire, is different

18  from the Krumbo Butte fire, which is much further north.

19         And here's a picture of all of the lightning on

20  August 21st, 2006.  All of the lightning strikes.

21         We will have people testify about the lightning.

22  There was lightning everywhere.

23         And this is the Krumbo Butte fire, in red

24  (pointing), and all of the lightning around there.  There is

25  a photograph, from very far away, of the Krumbo Butte fire on

1    August 22nd.

2            And I want to talk to you about the importance of

3    lightning and what -- what it means in this sort of setting.

4            This -- this is -- we expect that the Government and

5    our witnesses will say this.  This is not controversial in

6    any way.

7            It's not that lightning strikes and, boom, there's a

8    fire immediately.  Lightning may smolder, undetected for as

9    long as several days and/or weeks after a lightning strike

10   before transitioning to an active wildfire.

11           That means if you -- if -- if you're looking far

12   away, like that photo that I showed you and there's a

13   lightning strike, you may not see lightning right away.  You

14   may not see lightning -- I'm sorry.  You -- you may not see

15   the fire -- and by the way, I'm going to misspeak.  That was

16   probably not the first.  There's going to be more, and I'm

17   sorry for that.  It's a good thing this isn't evidence, so --

18   because it's possible I could mess it up.  For example, I get

19   April and August -- there's something -- sometimes that goes

20   wrong.  If I misspeak, I'm sorry.  I trust you'll know what

21   I -- what I mean, and I hope the evidence will come in

22   exactly right.

23           What fire investigators are instructed to do is to

24   interview local area witnesses to see if they observe a fire.

25   Don't trust the machine, interview.  And then, finally, to

1    obtain and review lightning detection maps and data for the

2    last 15 days.  Not one day or two days, but 15 days because

3    of that smoldering effect.

4         And more importantly, the 15-day rule is for all

5    fires, no matter what the fuel.  But for certain fuel

6    conditions, you would go for 30 days.  And you track and

7    locate all strikes within a one-mile radius of a fire area.

8         You can look for trees.  You can see if trees have

9    been struck.  You will see a lot of the information that --

10   that can be done to determine this.  And we'll show you some

11   in our part of the case.

12        I just wanted to show you one origin and cause

13   report.  I think several will come in in this case.

14        What happens is the experts, the investigators -- in

15   this case, it's the B.L.M. people, Gary White and John Bird,

16   they write up a report.  This is for the Krumbo fire that I'm

17   talking about.

18        And sometimes people don't get it right.  Okay?  In

19   this case they said they determined that based on the

20   directional indicators -- and I didn't put this in there

21   for -- for the mistake.  They say, The lack of no evidence of

22   a lightning strike.  But they mean no lightning strike.  They

23   decide that the fire was intentionally set.

24        Later on in this report they say, The records show

25   that there was no lightning near the origin of the Krumbo

1    Butte fire in the Bridge Creek Road area from August the 19th

2    through August 23rd.  They looked at the records.  Well, they

3    looked at the wrong records.  Because there's lightning

4    everywhere.

5           And there are other mistakes and other problems with

6    the other origin and cause reports.  You will hear us talk

7    about them.  There are many.

8           There are seven trail fires and about nine

9    ignitions -- separate ignitions, plus a few more.  There's

10   probably 20 origin and cause reports that you'll hear about

11   from the Government, and we will -- we'll respond.

12          Steven Hammond -- because of this big fire, Steven

13   Hammond lit some small part on his own property to protect it

14   from the fire on August 23rd.  And he told Mr. Lance Okeson.

15          Mr. Papagni talked a little bit about Brett Dunten

16   and Ryan Hussey, the firefighters.  I don't have their

17   photos, but I'm sure you'll remember them.  And I just want

18   to say a little bit about what they were doing and how it

19   fits into this case.  There's -- there's something else

20   that's important, not just the fact that they were there.

21          Okay.  This is the Krumbo fire, and that's where

22   they were, Dunten and Hussey.  And they're looking this way.

23   But as -- as Mr. Papagni said, the area of origin, they

24   claim, is here.  And there's lightning throughout here

25   (pointing).  They're looking on here, saying they see some

1    spots.  Those were never tested.  They were never

2    investigated.  That -- that -- in our view, you will not find

3    that significant.

4         But what is interesting about Firefighters Dunten

5    and Hussey?  And this is where the cattle ranching starts to

6    come into the case.  The importance of the fact that this

7    incident occurred on a working cattle ranch.  Because here,

8    they were told that to take their truck -- they have a fire

9    truck -- to Lance Okeson.  And backfires and burnouts

10   generally need significant support.

11        When the B.L.M. is out there lighting fires, they

12   have a drip torch.  I'll show you some pictures.  They, as

13   you heard, lit miles of road on fire at Bridge Creek Road.

14   They generally need support.

15        You'll hear about a plan on August 24th -- not

16   directly related to the fires you've heard about here.  But

17   the B.L.M.'s plan would require, for that burnout operation,

18   four engines and water tender before they would be allowed to

19   burn out, or before the plan would have them burn out.  And,

20   of course, it could be dangerous.

21        Dunten and Hussey -- Lance Okeson was going to light

22   his fire on Bridge Creek Road, and they couldn't find him.

23   And they had to abort.

24        And here is a -- I'll blow it up in a second.  It's

25   an incident card.  It's like the communications record.  And

1   you'll see here, 426 was Dunten and Hussey's number.  And

2   you'll see that this card shows -- which is, again, in

3   evidence, that they're going to go over to -- bump over to

4   Okeson's fire, to help him do some burnout.  But they can't

5   find him.  They're unable to contact Okeson.

6          Again, they say, Be advised.  We have no contact

7   with Okeson.  We'll try for another half-hour.  And then they

8   abort, and then they're still trying to reach him.

9          Another thing that's important -- Mr. Papagni also

10  mentioned this -- is relative humidity, RH.  It's important

11  for backburning.

12         And on the evening of August 22nd, which is when

13  Mr. Okeson and Mr. Glascock -- and Mr. Blackman's going to

14  say a lot more about this.

15         On the evening of August 22nd, when they were

16  backburning -- before they did so, the incident commander,

17  John Petty who was the commander at the time -- Toney, I

18  think, became later, on the 23rd.  He predicted the relative

19  humidity for that night at 35 to 50 percent.  Relatively safe

20  for backfiring.

21         But this is the -- I'll show you two:  The Moon

22  Hill -- there are two weather stations that are near there.

23  One's at Moon Hill, the other is at Pete Hill.

24         Remember, the predicted relative humidity was 35 to

25  50 percent, but at six o'clock it's at 4 percent.  Amazingly

1  low at the time they started their backburn.

2          At Pete Hill or Frenchglen, same thing.  Predicted

3  35 to 50.  Here, under 4, at six o'clock.  Under 4 percent

4  relative humidity.  Extremely dry.

5          So as I said, Dunten and Hussey had to abort their

6  plan.  Weather conditions were extremely dry, but they burned

7  anyway.

8          And I'm just going to briefly talk about where they

9  burned and why it's important, but let me just talk a little

10  bit about Lower Bridge Creek.

11          This is a photo taken, I think, by Mr. Okeson of

12  what was going on in Lower Bridge Creek.  And important for

13  the Hammonds, because this is a cattle ranching operation,

14  there's fire and cattle.  So it was a potential catastrophic

15  situation for cattle ranchers.

16          And so what happened was the Hammonds had to act

17  in -- in a way -- and, again, Mr. Blackman will say this, but

18  I'm just going to say a few things.  And we'll have an

19  expert -- Mr. Steninger, talk to you about cattle ranching.

20  He knows way more than we do.

21          And he will tell you, and the records show, that in

22  a cattle ranching operation, with the government, you just

23  don't have cattle that you can go to at any time.  There's a

24  rotation.  That you go from one allotment to the other, to

25  the other.  You may move on June 4th, 200 cattle from here to

1  here.  On June -- or on July 15th, et cetera.  And we'll talk

2  about that later, in more detail.

3          But what's happening is the Hammonds are moving

4  their cattle essentially this way, from here to here

5  (pointing).

6          There's Lower Bridge Creek fire, and they're going

7  this way.  And what happens is -- this is Bridge Creek Road.

8  And the Hammonds are moving their cattle.  And Mr. Blackman

9  will say it more.  They're originally going to go here, in

10  the fire, but then they have to go here.  And the point is

11  that they're moving from there to there (pointing).  And this

12  is not the backburn on Lower Bridge Creek Road, but I wanted

13  to show you what a backburn looks like.

14          These are firefighter -- firefighters using drip

15  torches and other things to burn the mountain.  Reminds me a

16  little bit of E.T.  But it's a scary sight.

17          And the important thing is, again, where they're

18  burning.  As I showed you on the map, they're burning right

19  there, (pointing) right in the path of the cattle.

20          And so it's in this context that when Steven

21  Hammond, my client, goes to Joe Glascock and they're saying

22  he's tampering with a witness, he's just seeing them burning

23  his -- right in the wrong spot, and he's upset.  And that's

24  when he says, I'm going to say you lighted those fires, not

25  me.  Because they did.

1        I'm going to let Mr. Blackman talk now.  But we're

2   confident that you'll find Steven Hammond, Dwight Hammond not

3   guilty of all charges by the time you're done.

4        THE COURT:  Mr. Blackman.

5        MR. BLACKMAN:  Your Honor, we have different laptops,

6   and it's going to take me a couple of minutes to switch.

7        MR. MATASAR:  Can I assist you here?

8        THE COURT:  Fine.  We'll just take a short recess

9   where we are.  If you want to stand and stretch, fine.

10       MR. BLACKMAN:  Ladies and gentlemen, if I addressed

11  you from here, would that be okay with you?  If I stood this

12  far back, can you hear me okay?  And do you mind if I --

13       THE JURORS:  (Nod heads.)

14       THE COURT:  Okay.  We'll go back on the record.

15       MR. BLACKMAN:  May it please the Court, counsel,

16  ladies and gentlemen.  My name is Marc Blackman.  I represent

17  Dwight Hammond.  And before I actually get to what I believe

18  the evidence in this case is going to show, I do want to talk

19  about a few kind of basic things.

20       As the judge told you in the preliminary

21  instructions, the burden of proof is on the Government.  And

22  Mr. Papagni correctly embraced that proof.  One of the

23  consequences of the Government having the burden of proof in

24  a case like this is that it gives them the opportunity to go

25  first.  And although it's good that they have the burden of

1    proof, if you're the defendant, it is sometimes difficult to

2    believe the jury can really wait until they've heard all of

3    the evidence, as the judge instructed you.  Heard all of the

4    witnesses, had a chance to see what -- I think you can get a

5    sense already -- are going to be voluminous number of

6    documents and evidence before you even begin to think what

7    does all of this mean.

8          And so my request to you, on behalf of Dwight and

9    Steven Hammond, is that you take the judge's admonition very

10   seriously, and that you don't even begin to think about what

11   does any of this mean until you've heard all of the evidence,

12   both sides of the story; not the first few witnesses or the

13   first opening statement.

14         Okay.  The other thing I want to talk a little bit

15   about is what opening statement really is about.  And it is a

16   prediction by the lawyers as to what the evidence will be.

17   Lawyers try to prepare for their cases.  They try to know

18   what the facts are going to be.  But they can't always get it

19   right.  And so what I say, what Mr. Papagni says, what

20   Mr. Matasar says, it isn't evidence.  It is to give you a

21   framework, hopefully a helpful framework, so that when you

22   begin to hear the evidence -- because this is not really a

23   conversation.  A trial is not like a conversation.  It's not

24   like you can sit there and say, Well, what about this?  What

25   about that?  And have Joe say this at this point, and at the

1  same time, Bill says this and Sue says that.  We have to hear

2  witnesses one at a time.

3       And sometimes somebody has a little piece of this

4  and a little piece of that.  And somebody else will have a

5  little piece of this and a little piece of that.  And it's

6  like giving -- giving the jury a bunch of jigsaw puzzle

7  pieces and saying, Okay, you know, without looking at the

8  cover of the box, what is this picture?

9       So you have to -- and I ask you please to do that.

10  Because Mr. Papagni is suggesting the Government's going to

11  take the balance of this week and next week to present

12  witnesses they will call.  That means it will be quite a

13  while before you hear the witnesses -- for example, Rusty

14  Hammond, Jacon Taylor, the Gustafsons, Scott Gustafson, about

15  what really happened in 2001 in that hunting party.  It could

16  not be different from the way it's been portrayed by

17  Mr. Papagni.

18       Now, that's not to say that Gordon Choate is not

19  going to come in here and wow you.  It's just that Gordon

20  Choate is their version of what happened.  And you're going

21  to hear that first.

22       But our version of what happened, which is verified

23  as Mr. Matasar pointed out, by contemporaneous records, just

24  couldn't be more different.  And Dusty Hammond couldn't be

25  more wrong; just about who was there, when, what, everything.

1   So please keep an open mind.

2          The other thing I want to say is I represent Dwight.

3   I don't represent Steven.  They're father and son, but

4   they're two different people.  I'm going to bring out what I

5   can, that I think is relevant to this case with respect to

6   Dwight.  Mr. Matasar is going to do that on behalf of Steven.

7   And because they're both named Hammond, I'm probably going to

8   occasionally refer to my client as Dwight, as opposed to

9   Mr. Hammond, just so it's clear who I'm talking about.

10         It's not because I'm trying to familiarize myself to

11  you or anything like that.  It's just for clarity's sake.

12         Mr. Matasar and I are going to try to work together,

13  so that if he takes care of an issue, I don't have to do it.

14  If I take care of an issue, he doesn't have to do it.  So you

15  don't have to hear everything twice.

16         But if there's something that Mr. Matasar asks about

17  that relates to Dwight Hammond and I don't ask it, please

18  don't think that it doesn't apply to Dwight Hammond, and vice

19  versa.  If I ask something that relates to Steven, please

20  recognize that that is just because it's all in many cases

21  wound up together.

22         Then I guess the other thing I want to say, before

23  we really get to the facts here, is that what I'm going to

24  focus on in my part of the case, in my part of the opening

25  statement, is 2006.  Because that's where we believe if

1   there's any basis at all for having a rational way of

2   figuring out what happened, it's there.  '01, we believe,

3   it's just -- there's just nothing there.

4           And I'm going to try and tell you what we expect the

5   evidence to show in some detail, and I hope I get it right.

6           The first thing we really do have to say is that

7   we're talking about a vast area.  This map, which will be

8   coming into evidence, is simply the area where the Hammonds'

9   ranching operation occurs.

10          Mr. Steninger will explain it in detail.  I'm not

11  going to try and do that.  Mr. Matasar made references to the

12  different pieces of the puzzle.  Some of it is private land.

13  Some of it is public land which they lease under grazing

14  permits with the B.L.M.  Some of it is a combination of both

15  of these.

16          There's also -- this is very rugged terrain.  And

17  maybe you guys all understand the ruggedness that can be the

18  lay of the land in -- in Southeast Oregon.  But just in case

19  you don't, this is rugged territory.

20          And although you can't see from where you're

21  sitting, probably, we've got this topographical stuff that

22  shows you the elevations, and you can get a sense of how much

23  up and down and gradual rise and -- and the elevation that

24  takes place here.

25          The things that are rugged are not just the terrain

1    but the way you get around it.  They call things roads on

2    Steens Mountain that wouldn't pass for -- I don't know what

3    to -- word to use.  Almost anywhere else.

4         And so when we talk about something like Bridge

5    Creek Road, it's really important not to picture Highway 205,

6    which goes south on the west side of this area.  Or even an

7    alley.  It's, at best, an eight-foot-wide, partially catted

8    out rocky, weedy thing.  That if you tried to take

9    something -- a normal vehicle up on those roads, you wouldn't

10   get very far.  Which means something else.  Physical

11   distances on the Steens Mountain are much longer than the

12   mileage, because you can't go 20 miles an hour.  You are

13   lucky if you can go seven.  And timing in this case is going

14   to be pretty important in a lot of ways.

15        So it's important to realize that when you're

16   talking about going two miles, if you're talking about two

17   miles on Bridge Creek Road, you're not talking 20 minutes.

18   You're talking a couple hours.  Okay?  So that's the basic

19   lay of the land.  I guess literally the lay of the land.

20        So now I want to talk a little bit about the setting

21   in which the events of August 20th, 21st, 22nd, 23rd, and

22   24th took place.  That is what I think the heart of this case

23   is about, and that is what I think Mr. Papagni may have made

24   some predictions that, if you keep your minds open, you will

25   find just don't play out.

1    This really began, in terms of evidence in this

2    case, by a really funny, happy coincidence.  Which is to say

3    that a guy named Hank Vogler, an old, old friend of the

4    Hammond family, happen to be in Oregon where he grew up, in

5    Burns, but hasn't lived for a long time.  He's a cattleman

6    and a sheep man in Nevada now.  Has been for many years.

7    But by coincidence, in August he had a family

8    wedding in Oregon, and he was up here with his fiancee at the

9    time -- now his wife -- his kid.  And he was hoping to meet

10   his daughter, who lives in Grants Pass, and pick up his

11   granddaughter, and have a little visit while he was up here.

12   So on the 20th of August, the wedding behind him,

13   Mr. Vogler comes to the Hammond ranch.

14   He's met his daughter, picked up his granddaughter,

15   Racine (phonetic).  He's got his son.  He's got his fiancee

16   with him.

17   The idea is he's driving back to Elk Grove, but they

18   want to visit with the Hammonds.  So they get there on the

19   afternoon of the 20th of August.  And the idea is he'll spend

20   the evening, catch up, and head off the morning of the 21st.

21   Well, it's a beautiful place.  And as dangerous for

22   fire as it is when it's really hot and dry, if you're a kid

23   and you're on a ranch that has beautiful reservoirs, it's a

24   great place to be.

25   So what happened was on the 21st, Racine convinced

1    Mr. Vogler to let them stay an extra day.  She wanted to go

2    swimming in the reservoir.  And so that day, August 21st, in

3    the afternoon, the Hammond kids, the Voglers, and the

4    granddaughter go swimming in Krumbo Reservoir.  Which is on

5    this map over here somewhere (pointing).

6          Here's -- Krumbo Reservoir is just above the Hammond

7    ranch, right there (pointing).

8          They're having a great time, but Susie Hammond has a

9    rule.  Mr. Vogler will tell you that she has a rule.  And

10   that rule is what she calls three strikes and you're out.

11   Three lightning strikes, and you get out of the water.

12         And sure enough, that afternoon, while the kids are

13   swimming in Krumbo Reservoir, the three strikes are seen.

14   Kids are told to get out of the water, and they do.

15         And you've seen this in Mr. Matasar's opening.  But

16   this is the lightning activity on the afternoon of the 21st

17   of August from Frenchglen to Krumbo Butte.  Scores of

18   recorded lightning strikes.

19         And we know that there was not just lightning but

20   that the lightning started fires, because people started

21   calling in.

22         And we have Jody Starbuck, who will be called as a

23   witness, who was down in -- near Frenchglen, working with her

24   husband, Wade, haying when she sees lightning hit the ground

25   to the east and start a fire.  And she calls it in.

1        And I'm going to play that call, which took place at

2    3:30 or 3:45.

3        She actually called twice.  Those little icons on

4    this display here, the little speakers, each represent a

5    different call.  It's getting late.  I'm only going to play

6    the second call.  Okay?  But she calls the second time.

7        Come on.

8        (Pause, audio playing and not transcribed herein.)

9        MR. BLACKMAN:  And they did have a bunch of stuff.

10   Because in addition to the lightning that is in this image,

11   lightning was hitting at Craters.  It was hitting down at

12   Fields, which is just south.  Craters is just west.  It was

13   hitting north.  There was fire started by lightning all over

14   the countryside.

15       The fire that Jody saw is in this picture.  And you

16   will hear testimony from Roy Hogue, who is our fire cause

17   expert in this case -- who you won't hear until the very near

18   end of the case because of the way these things happen.  But

19   he went out, after the Indictment in this case, and he went

20   to the scene that was described by Jody Starbuck in her phone

21   call.  And he walked that territory.  And guess what?  That's

22   what he found.  The lightning struck a tree right where Jody

23   saw the fire take off.  And that was in the late afternoon of

24   the 21st, just when the kids are getting out of the water and

25   coming back down to the ranch house.

1          So meanwhile, back at the ranch, the Hammonds are

2    hosting the Voglers and Steve Hammond and his family for

3    dinner that night.  I think this may be important because I

4    think Mr. Papagni -- he made some suggestion that the

5    Hammonds -- Steven and Dwight, the defendants in this case --

6    did something with respect to the fire at Bridge Creek Road

7    on the night of the 21st.  That's what I heard him say.

8          This is Susan Hammond in her kitchen.  That gray

9    thing with the black in the middle of it turns out to be a

10   digital clock.  Which -- I'm not very good at doing this, but

11   I was able to blow up.  And if you look closely -- and it's

12   not just my imagination -- you will see that the date on that

13   clock is 8-21-06.  This picture was at 6:15 in the evening.

14         And thank goodness for Mr. Vogler having taken a

15   bunch of pictures of the visit to the ranch, he took a

16   picture of Mr. Dwight Hammond with his grandson.  He took a

17   picture of Steve getting the kids ready for dinner.  Steve

18   Hammond is there, to the far left.  So we know where Steve

19   and Dwight Hammond were.

20         And if you look at the clock on the back of this

21   picture -- again, on the board it's not so good but on your

22   screen it's pretty good.  You can see this is at nine

23   o'clock.  The picture with Susie in it is at 6:15.  So we

24   know where the Hammonds are on the night of the 21st.

25   They're at home with the Voglers.

1        Now, the lightning has started fires all over the

2   countryside.  And what the evidence is going to show is that

3   at about 11:45, George Orr, one of the Government

4   investigators, law enforcement guy, was called to go down to

5   the Fields fire, which was about ten miles south of

6   Frenchglen.

7        And about 11:45 that night, George Orr, who we

8   believe the Government will be calling as a witness, is

9   driving past Frenchglen and sees to his left -- in other

10  words, to the east -- what he describes as heavy smoke and a

11  big fire.  That's in the Lower Bridge Creek area.  Okay?

12  That's here (pointing).  That fire is going.

13       The next morning the Voglers are still at the

14  Hammond ranch.  And Mr. Vogler can't be quite sure what time

15  of day they left, but we do know this.  Just as he crossed

16  into Nevada, he got a speeding ticket.  One of the few times

17  I'm glad somebody I have some need to know got a speeding

18  ticket.  And he got a speeding ticket at 9:40 a.m. on the

19  22nd.

20       We know he left the Hammond ranch -- we know it's

21  about 75 miles from the Hammond ranch to where the milepost

22  on this highway is made up on the ticket.

23       I covered it up here just because it's a little

24  embarrassing to Mr. Vogler with my notation there.  But what

25  that ticket is going to show you is that he was doing 90.  So

1   what we believe that's going to tell you is he left the ranch

2   after eight o'clock in the morning.  Probably closer to 8:30.

3   He'll do his best.  You know, it wasn't a big deal at the

4   time.  But we believe it's going to show that he was at the

5   ranch until well after 8:00.  Dwight Hammond was there, being

6   a good host.  Steven Hammond was there, having breakfast,

7   saying good-bye.

8              That's important in this case, I believe you will

9   find, ladies and gentlemen, because of the timing of what the

10  Government's trying to claim about the Lower Bridge Creek

11  Road.  What they're now calling the Lower Bridge Creek fire.

12  Which until the Indictment in this case was called the

13  Grandad fire.  Part of the same single incident that they've

14  now tried to tell you is two different things.

15             What we know is that they didn't leave the house

16  that morning until Mr. Vogler had already left.  We believe

17  the -- the best evidence is going to be that's close to 8:30

18  in the morning.

19             We also know -- this was a photo that Mr. Matasar

20  showed you in his opening.  That photo was taken, I believe,

21  by Joe Glascock, the range guy.  Who we know at some point

22  that morning was in the Lower Bridge Creek area, checking it

23  out.  He's making it sound like it was much earlier than we

24  believe it was.  And we believe that's going to be very

25  important evidence.

1    But he took a picture of two -- what we believe are

2   bulls.  Although, it's not the greatest photograph in the

3   world.  And you can see that there's fire behind them.

4   Because guess what?  That is exactly the pasture that

5   they're -- the Hammond herd, 374 cow/calf pairs, if I may so

6   disclose, were in the low -- Lower Bridge Creek field, in

7   that allotment, at that time.

8    And what the evidence is going to show is that

9   morning joe Glascock calls Steve Hammond.  And what he tells

10  him on the message -- which is still on their answering

11  machine -- is there's a fire down in Bridge -- Lower Bridge

12  Creek.  There's some cattle in there.  They're skunking

13  around.  Not doing too much.  But, he says, if the

14  temperature goes up, humidity goes down, it could take off.

15  Now, we have that.  We'll play it for you during the trial,

16  when Mr. Glascock is here.

17    What we also know is that early in the morning --

18  and I think the Government -- the climate guy, who will be

19  called, Charley Martin, will tell you, that it's not uncommon

20  at this time of the year, in this area, for there to be an

21  inversion.  That's where the cool air of the night settles

22  over the warmer air.  Sort of reverses the standard

23  arrangement.  And as Mr. Matasar said, a lightning-struck

24  fire can smolder.  Well, an inversion can hold down the fire

25  until -- guess what?  It gets warm and dry.

1        And you have seen this.  Exactly what happened later

2   that morning.  Not very late that morning, on the morning of

3   the 22nd.  By about -- I wrote it down.  At eight o'clock in

4   the morning, the temperature was 65 degrees.  At noon, it was

5   84.  At 8:00 a.m., the humidity was 30 percent.  At noon, it

6   was 5 percent.

7        So what we know is that over the course of that

8   morning that inversion breaks.  And I believe it will -- I'm

9   certain Mr. Hogue can tell you -- that it creates a chimney

10  effect.  Just -- when that -- the sun burns through the --

11  the cooler air, it creates a chimney, and the fire just hits.

12       This is the map you'll hear so much about you will

13  hate us all.  Of where the gates and fences in this vicinity

14  are.  Because this is what contains the cattle and how you

15  have to move them by opening the gates, getting them along

16  the fences to get them to move.

17       What everybody knew is that the Hammonds' cattle

18  were down there because that was the schedule that had been

19  set earlier in the year.  I believe Mr. Glascock will tell

20  you that before the grazing season begins every year, they do

21  a schedule, a grazing schedule.  Where the cattle are going

22  to go, from where to where, and when.

23       So this is one pasture.  This is another, another,

24  another, another.  And you go down here.  Okay.  And it has

25  the dates that the cattle are allowed to graze.

1    So I think Mr. Glascock will confirm to you --

2    excuse me -- that in '06, because it was a really late

3    spring, everything got pushed back a couple of weeks.

4    So, for example, in the Krumbo Creek, where they

5    were supposed to go April 1st, they really didn't go in until

6    April 20th.  And then they were there until May, whatever.

7    So they had moved into the lower field of Mud Creek

8    allotment, instead of in early July, in -- in late July.  And

9    into the upper field in August.  So that's where their cattle

10   are when this fire is taking off.

11   So this is what they do on the morning of the 22nd.

12   Voglers leave.  Steve Hammond, Dwight Hammond, and Steve's

13   kids get on down there so that they can open the gates and

14   begin to move their cattle out of harm's way to where they're

15   next scheduled to go, which is the Bridge Creek pasture of

16   the Hardie summer allotment.

17   I know this means nothing to you now, and I

18   apologize.  But I want you to hear it now because you're

19   going to hear it a lot, and maybe it will ring a bell.

20   And that's what they're doing out there.  They're

21   getting their cattle out of harm's way.

22   Mr. Papagni suggested in his opening statement that

23   the fire was not doing nothing when they got done.  Well,

24   that's not -- when you listen to Mr. Glascock's message,

25   that's not what I believe you will hear him saying.

1    More importantly, he mentioned Ms. Elshoff.  She's

2 the refuge volunteer.  She'd been working with her husband

3 Cal the day before, and had left some equipment down at the

4 refuge.  And I believe her testimony will be that that

5 morning, on the 22nd, she got a call -- I forget the name of

6 the guy who called -- to report that the fire had jumped the

7 creek already.  Jumped the creek.  And they might want to get

8 down there to get the equipment out of the way.  And that's

9 what's going on.

10    What's also interesting -- and I believe this will

11 come in through Mr. Toney.  Certainly Mr. Glascock -- it

12 wasn't only the Lower Bridge Creek area that the fire was

13 suddenly much greater in the morning of the 22nd, but

14 there -- the fire in the division E-Complex -- they give

15 these locations different names.  And what a complex means,

16 as I understand it, is -- you know, it's not like a unitary

17 thing.  You've got fire here, you've got a fire here, you've

18 got fire here.  And you treat it, for administrative

19 purposes, as a unit.  It's called a complex.  So it's a

20 collection of a bunch of fires.

21    So in E-Complex, which was six miles west of Fields,

22 at 1:00 a.m. on the 22nd -- so this is early, early in the

23 morning.  Just when Mr. Orr is seeing the big fire at

24 Frenchglen, the fire at six miles west of Fields is described

25 as rapid rates of spread, 20- to 30-foot flame lengths.

1      The division C-Complex, which is 20 miles southwest

2   of the Narrows -- which is right in that area as well --

3   rapid spread through tall brush, spotting, running 6- to

4   20-foot flames.

5      The division F, which is our fire, is where George

6   Orr sees the big fire.

7      So that fire is a major fire, ladies and gentlemen.

8   The night of the 22nd -- excuse me.  The early morning of the

9   22nd, through the morning of the 22nd.  And the Hammonds are

10  out there for a legitimate reason:  To get their cattle out

11  of harm's way.

12     And to get their cattle out of harm's way as they

13  are scheduled to do by moving -- although not as scheduled

14  because this -- we have the emergency -- out of the lower

15  field, up to the Hardie summer allotment, the Bridge Creek

16  pasture No. 3.

17     Okay.  (Pause, referring.)  This is a sketch that is

18  actually taken off of this big map -- that's been sitting in

19  front of you this whole time -- that shows the movement of

20  the cattle on the 22nd.

21     They have opened the gates.  They're getting the

22  cattle up, over, across the upper field.  This is the upper

23  field of the Mud Creek allotment.  That's the lower creek.

24     Moving them over here, to where they're supposed to

25  go next, which is up here, this Hardie summer allotment,

1    right in there.

2              And guess what that yellow thing right there is?

3    That's Bridge Creek Road.

4              So they spend the day doing that.

5              Meanwhile, this is what the fire looks like down in

6    Lower Bridge Creek.

7              This was taken by the B.L.M., from Pete Hill, which

8    is by Frenchglen, at 3:40 in the afternoon on the 22nd.  And

9    you can see, it's a major fire.

10             So we're now -- again, that major fire derived from

11   that same tree we've talked about.

12             Now we get to Mr. Okeson and Mr. Glascock's decision

13   to rendezvous up at Antelope Reservoir, as you've heard,

14   where they decide to do a backburn along Bridge Creek Road.

15             And what the evidence is going to show, ladies and

16   gentlemen, is that at the time -- I don't think either of

17   them is going to say this at trial.  But at the time, they

18   reported that they used drip torches -- which we've seen a

19   picture of -- to light from a point north of where Knox

20   Springs Road Ts into Bridge Creek Road, about a half-mile

21   north of that.  Using their drip torches, starting at 5:30 in

22   the afternoon, burning for four-and-a-half hours; going

23   south.

24             And as Mr. Matasar pointed out, even though they

25   couldn't make contact with their water support, their

1   protection, they did it anyway.  And what they're going to

2   testify at trial is that they burned on the west side of

3   Bridge Creek Road.

4        What the reports say they said at the time, when the

5   investigators for the Government came in later to try to

6   figure this all out, was that they burned on the east side of

7   Bridge Creek Road.

8        And as you can imagine, assuming Bridge Creek Road

9   is anything -- and I do have some pictures here, but I guess

10  I'm not going to bother showing them to you.  This eight-foot

11  dirt division would be any kind of fire break at all.  If

12  you're -- if the fire's coming from the west, it might burn

13  on the west side to try to stop it.  And that may be what

14  they intended to do.  But what they said they did was burn on

15  the east side, which is the side that would advance the fire.

16       And what the evidence will show is that they did

17  that for four-and-a-half hours.  And what they reported at

18  the time was until they ran out of fuel.

19       And what you will see, ladies and gentlemen -- and

20  Mr. Hogue, I think, will explain clearly -- is that the fires

21  that the Hammonds are accused of setting -- what are called

22  Ignitions 2, 3, 4, and 5 along Bridge Creek Road -- all of

23  those ignitions are directly across Bridge Creek Road from

24  the west side; if you give them credit for burning on the

25  west side of where they did their torching on the night of

1   the 22nd, when the temperature and humidity were just

2   extraordinarily volatile.

3           They quit about ten o'clock, went back to Antelope

4   Reservoir, and then -- the evidence is going to show -- and

5   this is what it looks like, by the way, about where they

6   stopped the night before and started the morning after.

7           Mr. Okeson went back up to Antelope -- up to Moon

8   Hill, excuse me, to get more fuel to burn more.  Even though

9   they said that they quit because they ran out of fuel, what

10  Mr. Glascock did was went back to where they stopped, and

11  burned again.  We don't know -- we'll find out in trial --

12  what he used, how he did it.  Apparently they must have had

13  some torch fuel left, or something.  And he burns for about a

14  half an hour around a little cabin on the west side.  And

15  guess what?  It's directly across the road from what the

16  Government's calling Ignition 5, trying to blame the

17  Hammonds.  And you will hear that Ignition 5 is in rocky

18  terrain, very steep and rugged.

19          My client was a bit younger at the time, but not

20  that much younger.  They're going to suggest that Dwight

21  Hammond hiked up this road with B.L.M. Firefighters Rott and

22  Megargee coming down behind him.  Right?  That's their

23  suggestion.  That he ducked over and lit a fire while the

24  fire truck's 20 minutes behind him.

25          In the meantime, after they -- Mr. Okeson and

1  Mr. Glascock do their burning the night before -- and

2  Mr. Glascock the next morning -- they rendezvous again, and

3  they go south about two miles to an area of what they called

4  a test fire.

5          And the evidence is going to show that by the time

6  they set the test fire, they were receiving a report from

7  the -- the commander, saying that the weather conditions were

8  extremely volatile and dangerous.  That was at 8:40 in the

9  morning.  And they lit the fire anyway, without the water

10 support there, again.  And that fire again burned out of

11 control, as did their initial fire at the far north end where

12 they started.

13         The Government used to call it Ignition 1, and

14 blamed the Hammonds.  They've since withdrawn that

15 allegation.

16         So what we know is the B.L.M. people were burning

17 Bridge Creek Road for hours and hours on the 22nd and 23rd.

18 In the meantime, of course, what happens on the evening of

19 the 22nd -- or afternoon -- is that Mr. Glascock calls

20 Mr. Steve Hammond again and says, Hey, Steve, it's Joe.

21 We're going to burn on Bridge Creek Road.  And just wanted to

22 let you know -- and you know this country better than me --

23 I'll tell you where I'm going to be, that area where we did

24 some blading, just to let you know.

25         Well, guess what?  He calls.  And what's he telling

1    him?  We're about to start fires right where you just moved

2    your cattle.

3              So guess what they do on the morning of the 23rd?

4    They head back down there to open the gates and get the

5    cattle out of the pasture that they were destined for, until

6    they heard that they were burning Bridge Creek Road, to get

7    them down to the next place they were due, which is the

8    north.  And that's what they do on the 23rd.

9              Now, after -- and you will see where the gates are.

10   It gets -- you know, the devil's in the details in this

11   situation.  But there are gates due east of where Lance

12   Okeson is sitting on the top of the slope there, that

13   Mr. Papagni told you about.  After Rott and Megargee show up

14   to put out their so-called test fire that had gotten out of

15   control.

16             And he's sitting up there when he says he sees

17   Dwight Hammond coming out from the east.  And it's true.  He

18   did.

19             Now, what is different is that Mr. Okeson -- we

20   believe the evidence will show -- his identification was

21   identified by Joe Bates, the pilot that Mr. Papagni mentions

22   here.  The location Mr. Bates puts Mr. Okeson at is about

23   four football fields from where Dwight Hammond was walking

24   across that road.  He couldn't see clearly anything of what's

25   happening, other than Dwight crossing that road.

1      And then after they had their -- he confronts him,

2  and Dwight says, Come on up to the house, and we'll talk this

3  out.  He sees a footprint, and he puts boulders around the

4  footprint.  And that's true.  And later that afternoon, that

5  very afternoon -- I guess it was Dave Glerup.  We thought it

6  was George Orr -- comes in and takes a photograph of that

7  boot print.

8      It is probably Dwight Hammond's boot print.  We'll

9  have to wait until they testify to understand why they didn't

10  have a ruler to tell us how long that boot print was.  They

11  used a pen.  It's the only standard we have to try to guess

12  what that boot size is.  But what we can tell from this

13  photograph, which is the best photograph I think in this

14  case, is that it's a very pointed-toed boot.  And we believe

15  you will find that it does match Dwight.  We've had his feet

16  measured and drawn.  And you'll see that.

17      And Dave Freeman, our investigator, will tell you

18  how he took these images to figure out what size boot print

19  Dwight has.

20      The next morning, the 24th, after Steve Hammond

21  meets with Joe Glascock at the Frenchglen cafe in the

22  morning, Sheriff Glerup is waiting for him, follows him up

23  the North Loop Road, pulls him over, and tells him he's under

24  arrest for setting fires.  This is sometime after 8:35 in the

25  morning.

1          And what we know is that Mr. Hammond has somebody

2    following him, who are fencing contractors, who are going to

3    start repairing fences.

4          And so Mr. -- or Sheriff Glerup said, Okay, go ahead

5    and take care of your animals and your fencing, but I want

6    you and your dad to turn yourselves in by one o'clock this

7    afternoon at the Harney County Sheriff's office.

8          And they do.  1:15.  But it's close.  All right.

9          What's important about that is -- what it tells you

10   is that Steve Hammond is hours away from Burns, where the

11   Harney County Sheriff's office is.  He has to go to the

12   ranch, and pick up his dad.  So that's what they're doing,

13   that morning.  And then they're under arrest.  Okay?  Charged

14   with starting fires.

15         That afternoon, another investigator goes to the

16   scene where Mr. Okeson says he crossed paths with Mr. Dwight

17   Hammond, and they see a footprint.  They can't find the

18   footprint that was photographed the day before by, I guess,

19   Sheriff Glerup, but they find another one that Mr. Okeson

20   says that's the same -- Dwight Hammond made that footprint.

21   And they measure it.  And that footprint is 14 inches long

22   and 5 inches wide.  And to the extent you can tell, the toe

23   is round.

24         We know, of course, that they then searched the

25   Hammonds' house.  They do not find boots that match the

1    description of the boots they're looking for.  That's on the

2    26th.

3          And then on the 3rd of September -- Mr. Papagni

4    glossed over this entirely.  Actually, on this one -- on the

5    2nd of September, during an aerial surveillance, B.L.M.

6    seized a set of little ignitions, that they mapped on the

7    trail fires, that had not been ever noticed before.  And it's

8    near Bridge Creek Road, to the east.  Sort of not far from

9    the Ignition 5, or what they call Ignition 6.

10          So the next day a bunch of investigators go to that

11    scene, and the first thing they find when they come off of

12    the road is a boot print and, what's called, a BK radio tag

13    lying adjacent to it.

14          And they map the whole thing.  And all of the

15    footprints they see and all of the fires that they see there,

16    they do this nice little sketch.  And that BK radio tag is

17    adjacent to that very first footprint that they're seeing.

18    And that's a photograph -- again, not the world's greatest

19    quality image.  But 14 inches, 5 inches wide.  And there's

20    that little tag they find next to it.  They turn it over.

21    It's a BK radio.

22          What the evidence in this case is going to show,

23    ladies and gentlemen, is that the only people who carry BK

24    radios -- they're a fancy digital radio -- are B.L.M.

25    personnel.

1    That BK radio tag was recognized by the

2  investigators on the scene as very significant evidence.

3  Potentially very significant evidence.  They seize it.

4  They -- the fire investigators, I think, will testify -- at

5  least they did in a previous hearing -- that they seized it

6  to turn it over to law enforcement, to make appropriate use

7  of it in finding out what was the cause and origin of these

8  fires.

9    What the evidence is going to show is that we don't

10  know what happened, other than a BK radio tag was -- after

11  the defense asked for it, when we discovered this in the

12  discovery in this case -- a BK radio tag was found in a box

13  of stuff in the B.L.M. office in Burns in March of this year.

14  And nothing had ever been done.

15    Assuming the BK radio tag that was found in that box

16  is the one pictured here, it was never tested for

17  fingerprints.  It was never tested for DNA.  It was never

18  tested for anything that might take us somewhere, in terms of

19  what would account for that BK radio tag being adjacent to

20  that footprint at the site of the trail fires.

21    But what is significant is that footprint, at the

22  trail fires, is identified by the Government and the origin

23  and cause investigators as similar to the footprints found at

24  Ignitions 6, 7, 8, 9.  Therefore, the person who made that

25  footprint is responsible, if -- and we don't think the

1    evidence will even show that these were anything more than

2    spotting fires from the fires that were burning all over the

3    place.  But if they weren't, the person whose footprint --

4    the person who made that footprint is the person who made

5    those other fires.

6          What we believe you will find, when you look at all

7    of this evidence, is that is not the footprint of Dwight

8    Hammond.  And if he didn't make that one, under the

9    Government's theory, he didn't do any of them.

10         So I've talked forever, and I hope you don't mind

11   the detail I went through.

12         But I think you will find, when you have heard all

13   of the evidence, that what the Government is trying to

14   portray as some kind of malicious misconduct couldn't be

15   anything further from the truth.  That you have the history

16   of people -- yes -- wanting to control the -- the invasive

17   species on their land.  Yes, believing that fire -- just like

18   everyone down there believes fire is good.  Everyone believes

19   that it's necessary to control.

20         I think the evidence will show that because there's

21   been -- for -- there were many years when all fires were

22   viewed as bad.  What that did is it gave the juniper, which

23   is this terribly invasive species that just sucks the life

24   out of the native plant, spread like crazy.  And it was -- I

25   almost said "wildfire."

1    And I think everybody agrees that's bad.  It's bad

2    for the sage grouse because of the sage.  It's bad for the

3    deer.  No place to hide.  It's not good for the cattle,

4    either.

5    So there's an interest in returning the Steens to

6    the native habitat.  And everyone recognizes that fire is a

7    good way to do that.

8    And the Hammonds made no bones about that.  That's

9    why they called in advance in '99.  They called in advance in

10   '01.  That's why when they cleaned up the fire in '05, they

11   called Mr. Otley, to let him know.

12   But that is the complete reverse of suggesting that

13   they maliciously were setting fires for any purpose.  They

14   just weren't.

15   So please keep your minds open.  I won't say it

16   again.  And thank you for your patience in listening to my

17   very over-long opening statement.

18   Thank you.

19   THE COURT:  Thank you.

20   Off the record a moment.

21   (Pause, the Court and the court reporter

22   conferring.)

23   THE COURT:  Members of the jury, do any of you need a

24   break right now?

25   All right.  Okay.

1          (Pause.)

2          THE COURT:  Mr. Papagni, please call your first

3    witness.

4          MR. PAPAGNI:  Call Mr. Thomas Dyer, please.

5          He should be outside the courtroom.

6          THE CLERK:  Please raise your right hand.

7          (Witness sworn.)

8          THE WITNESS:  So help me God.

9          THE CLERK:  Please have a seat.

10          Please speak into the microphone, and there's water

11    here, if you would like some.

12          Please state your full name, and then spell your

13    name for the record.

14          THE WITNESS:  Thomas H. Dyer.  T H O M A S.  H.

15    D Y E R.

16                          DIRECT EXAMINATION

17    BY MR. PAPAGNI:

18    Q.  Sir, you're retired now, aren't you?

19    A.  Yes.

20    Q.  And before you retired, sir, what did you do for a living?

21    A.  I worked for the Forest Service and the Bureau of Land

22    Management for 35 years.

23    Q.  In that regard, sir, I want to direct your attention back

24    to the -- some time ago, back into 1999 time period.

25          And before court today, you had a chance to look at

1    some documents, did you not?

2    A.   Correct.

3    Q.   And back in 1999, sir, what was your job back then?

4    A.   I was the -- from the -- the district manager, starting in

5    the spring of '99, through 2000 -- through the fall of 2003.

6    Q.   And when you were the district manager, briefly describe

7    what some of your duties were.

8    A.   Well, first I had the responsibility over the -- the

9    district itself, which had two resource areas.  I can't even

10   tell you how -- the number of people total on the district.

11   Roughly five million acres of public land responsibility.

12          All of the resource-type issues associated with it.

13   Responsibility for working on a variety of issues.  Trying to

14   keep the people informed at the state office.  Also keeping

15   the congressional folks informed in the State of Oregon, and

16   as well as the county elected officials.

17   Q.   And as the district manager, were you also supervising

18   various people like resource field managers and rangeland

19   specialists, sometimes referred to as range --

20   A.   Yeah.  Usually I -- I would be the supervisor over the area

21   managers or field managers.  And then the ranch

22   conservationists were under them.

23   Q.   Could you give us a little heads-up on this thing, how it's

24   going?  Would you tell us what a range con or rangeland

25   specialist job was?

1   A.  A rangeland specialist is a person that usually has a

2   four-year degree out of the university, college.  They're given

3   a certain geographic area of responsibility within a district

4   or resource area, where they would be responsible for managing

5   the -- the grazing program within that particular geographic

6   area.  Sometimes they would report directly to the -- the area

7   manager, field manager, or a supervisory range conservationist.

8   Q.  Now, back in 1999, sir, was one of the -- one of the

9   folks -- or one of the grazing lease people that you were

10   dealing with, was that the Hammond Ranch folks?

11   A.  Correct.

12   Q.  And were they your largest ranch that you were dealing

13   with, sir?

14   A.  I don't think so.

15   Q.  No.

16        What were some of the other ranchers you were

17   dealing with other than the Hammond Ranch, sir?

18   A.  I think Roaring Springs was -- was larger.  I don't know

19   about the Otleys.  I don't know about some of the other ones in

20   the area.  But I couldn't tell you how -- the size of the

21   particular ranches.

22   Q.  Well, directing your attention then, sir, to -- this would

23   be the fall of 1999.  So September.

24        Did you become aware that there was some public land

25   that had gotten burned in the Hardie summer allotment area?

1   A.   Yes.

2   Q.   How did that come to your attention?

3   A.   Do you happen to have the --

4   Q.   Government's Exhibit -- Government's Exhibit No. 5, please.

5   A.   I start to get -- I need that kind of stuff to remember.

6        Oh, it's up, but it's from an angle here.

7        THE CLERK:  Do you want this as well (indicating

8   notebook).  Is that --

9        MR. PAPAGNI:  Might be easier.

10       THE WITNESS:  (Handed notebook.)

11       Can I come down to get it?

12       MR. PAPAGNI:  With permission of the Court.

13       THE CLERK:  The clerk will get it.

14       MR. PAPAGNI:  Thank you, sir.

15       THE WITNESS:  (Handed document.)  Thank you very much.

16  BY MR. PAPAGNI:

17  Q.   Have you had a chance to look at this letter before today?

18  A.   Correct, yeah.

19       And how I learned about it is that -- that on the

20  Hardie summer allotment, that Steve Hammond had called in and

21  identified to -- to dispatch that he planned to do a burn,

22  intended to conduct a burn in Sagebrush, Fir Creek -- on

23  Sagebrush and Fir Creek and Bridge Creek allotments.

24       And he was advised at that particular time not to

25  allow the fire to burn onto public land.  And if he did so,

1  he may be held responsible for the suppression and rebuild

2  costs associated with that, with that slopover or the burned

3  area.

4  Q.  Well, apparently -- refreshing your recollection from those

5  letters in front of you, apparently, after Mr. Steve Hammond

6  did that burn, it did go onto the public land.  And there

7  was -- about how many acres were burned?

8  A.  Roughly 90 acres.

9  Q.  And did that cause you to have a meeting with Mr. Steven

10  Hammond, his father, and with his -- with Susie Hammond?

11  A.  Yeah.  We had a meeting with -- with -- with the family,

12  there at the -- at the district office.

13  Q.  Did that take place on October 28th, 1999?

14  A.  Correct.

15  Q.  And at that meeting, did you call Mr. Steven Hammond,

16  discussing the fire?

17  A.  Correct.  What -- what I recall, in the -- in the document

18  here, is basically a feeling that the fire could not be

19  controlled; a prescribed burn, a fire, and that it -- it

20  couldn't be maintained.  It would go where it wanted to go.

21  Q.  So Mr. Steven Hammond, when you spoke to him in the

22  presence of Miles Brown, Mr. Brown -- who was Mr. Brown?

23  A.  Mr. Brown was the field manager.

24  Q.  And did Mr. Brown express any statements in -- to you --

25  or, excuse me, to Mr. Steven Hammond about his taking no action

1    to prevent the burning of public land?

2    A.  Taking no action to prevent the burning of public land --

3    public land is not acceptable.  In fact it was a fire trespass.

4    Q.  Well, in that regard, sir, there's -- before you came into

5    this courtroom, there's been some discussion about burning

6    public land, the benefits and the liability.

7             Now, in your next paragraph in this letter that

8    apparently you sent to him, was on November 5th, 1999, did

9    you discuss with the Hammonds the Burns district's position

10   on burning grazing lease property?

11   A.  As far as a coordinated --

12   Q.  Correct.

13   A.  -- burn plan?

14            Yeah, in this particular -- and probably more so

15   in -- in the Burns district than just about any place I've

16   ever been in the bureau, is they've had a very strong

17   coordinated prescribed burning plan.  And by that, I mean,

18   they're working with a cooperating effort between the public

19   land and the private folks.  So there's been a pretty strong

20   history of those cooperative burn plans.

21   Q.  Apparently in your letter, sir, you mentioned how many

22   acres were treated that fall?

23   A.  Yeah, approximately 25,000 acres.

24   Q.  But your prescribed burn plan has certain guidelines or

25   certain things that must be complied with.  Correct?

1   A.  Correct.

2   Q.  Did you offer an opportunity to the Hammonds to engage in

3   such prescribed burns with your agency?

4   A.  Correct.  I think -- that is the strongest focus that we

5   wanted to make, is the importance of the cooperative Burn

6   plans, and how -- how -- how important that is, and how that

7   can set a whole landscape for improvements.  So not only do you

8   manage for your private, you're also looking at the public.

9   Q.  Well, speaking of the public, clearly the -- there's a

10  grazing use benefit to ranching folks.  But what else are these

11  public lands being used for?

12  A.  Public lands are also being used for a variety of interests

13  in recreation to wildlife issues, to watershed issues, to --

14  anymore, threatened and endangered species is a big issue.  But

15  a variety of issues that have to be taken into account in every

16  one of the -- of our coordinated burn plans.

17  Q.  So unlike the private landowner, who can do pretty much

18  what he or she wants with their property, you -- as a

19  representative of the public -- you have to consider a lot of

20  various things?

21  A.  I do.

22          MR. BLACKMAN:  I'm just going to object for the record

23  to leading.  It's not important now, but it may be.

24          THE COURT:  Sustained.

25  BY MR. PAPAGNI:

1 Q. What factors do you take into consideration before doing a
2 prescribed burn, sir?
3 A. The factors that I have to take into consideration are --
4 are the -- the other resource values that are out there, as
5 well as the public interest and safety.
6 Q. Now, on the second page of this letter, sir, there's a
7 paragraph that refers to "future."
8     And would you tell us what you informed the Hammonds
9 on October 28th, and also in this letter; what were you
10 advising them?
11 A. In the future, we wanted to make it clear that we really
12 want to work on a coordinated burn plan. And in the future,
13 if -- if they decide to burn and -- and the burn gets over on
14 the public land, that we will be taking legal action to recover
15 the cost of the suppression and the fire rehabilitation.
16     So we wanted to really make it key that the focus
17 was going to be the next time, that we're going to go after
18 the suppression and costs -- recovery -- rehabilitation
19 costs.
20 Q. Is one of your options, sir, to refer matters to law
21 enforcement, to B.L.M. for investigation?
22 A. Correct.
23 Q. And then in this particular letter, you refer to an
24 individual --
25 A. Dave Ward.

1  Q.  And --

2  A.  To be their contact.

3  Q.  And why --

4  A.  Because that's their -- the range conservationist.

5      Rangeland management specialist is their title.

6  When I started, it was rangeland conservation -- rangeland

7  management specialist is the title now.

8  Q.  And when someone wants to go ahead and engage in this -- to

9  burn public land with agreement, is permission given by the

10  range con person?  Or does it have to be from someone else?

11  A.  Now, this is what -- I'm going by memory on that, okay?

12  On -- for the -- when -- when you work on a coordinated burn

13  plan in there, you're -- the whole business is coordinated;

14  your -- your prescriptions, your time frames that you're

15  wanting to get the burn done, the whole business.  So you work

16  together on those initiation times.

17  Q.  Can a dispatcher at the burn center give permission for

18  someone to burn public property?

19  A.  No.  No.

20  Q.  Now, after this letter in 1999 -- I want to see if I can

21  refresh -- refresh your memory with a letter dated January 6th,

22  2002.

23      MR. PAPAGNI:  And I don't want it on the ELMO yet, but

24  if I can approach -- hand it to the witness, please.

25      Ms. Root -- 2 --

1    MS. ROOT:  It's going to be 227.

2    BY MR. PAPAGNI:

3    Q.  227.  For purposes of identification.  For purposes of your

4    testimony, sir, just take a look at that.

5    A.  Okay.  I have.  Now --

6    Q.  I just want to have you refresh your recollection.  I don't

7    want you to go into it yet.

8         Do you recognize the letter?

9    A.  I recognize the letter.  I saw it yesterday.

10   Q.  And the date of the letter, sir?

11   A.  The date of the letter is -- has two dates on it.  It has

12   July 15th, 2002.  Also June 26th, 2002.

13   Q.  And it's a letter from whom, sir?

14   A.  It's a letter from Steve Hammond.

15   Q.  And --

16        THE COURT:  Have you given this to defense counsel?

17        MR. PAPAGNI:  Pardon me?

18        THE COURT:  Have you given this to defense counsel?

19        MR. PAPAGNI:  Yes.  In fact, it's one of the exhibits

20   attached to one of their pleadings.

21        THE COURT:  Is it marked?

22        MR. BLACKMAN:  If they could identify the pleading, we

23   might be able to find it.  But without that --

24        MR. PAPAGNI:  If I could have it back, I'll give you

25   the exact --

1          THE COURT:  Is it marked as an exhibit?

2          MR. PAPAGNI:  It is marked as an exhibit, Judge.

3          THE COURT:  What's the number, please.

4          MR. PAPAGNI:  The exhibit number is -- 227 is what

5     we're marking that as.

6          MR. MATASAR:  I don't think it's been marked yet, your

7     Honor.  It has not been marked.

8          MR. PAPAGNI:  The document was attached to -- it was

9     Document 111.  And it was filed on May 18th, 2012, by the

10    defense.

11         THE COURT:  Just a moment.  227?

12         MR. PAPAGNI:  It's -- it's 227 for identification,

13    your Honor.

14         It was not part of your exhibit book yet.

15         THE COURT:  227 is the Department of Transportation --

16    a copy of the document from them.

17         MR. PAPAGNI:  I'm sorry?  That's not the -- 227 -- I'm

18    sorry, your Honor.

19         THE COURT:  Show this to counsel, please.

20         MR. PAPAGNI:  (handed document.)  Oh, I'm sorry,

21    Judge.  This one was withdrawn, as you might recall.  This was

22    another matter.  That's why it's a new number.

23         THE COURT:  Well, we need to give it a different

24    number than the exhibit we had before.

25         MR. PAPAGNI:  Thank you, Judge.  I'll take care of

1  that right now.

2          I take it defense counsel recognized the document?

3          MR. BLACKMAN:  Not yet.

4          THE COURT:  Do I have it?

5          MR. PAPAGNI:  Yes, you do.  It was a pleading that was

6  filed by the defense, and it was one of the exhibits that they

7  attached to it.

8          THE COURT:  Go ahead.

9          MR. PAPAGNI:  I'll need the letter back when you're

10  done with it, Mr. Matasar.

11          MR. MATASAR:  Oh, sorry.

12          MR. PAPAGNI:  If I may, your Honor.

13          (Clerk handed document.  Witness handed document.)

14  BY MR. PAPAGNI:

15  Q.  Mr. Dyer, I'm going to have you take another look at this

16  letter.

17  A.  Okay.

18  Q.  And I think where I was, sir, I was at the point where you

19  were identifying this letter from Mr. Hammond.

20          Who's it addressed to, sir?

21  A.  It's attentioned to Tom Dyer.  So it's attentioned to me

22  regarding a telecon -- teleconference on 6-26-2002.

23  Q.  And I don't have that letter in front of me.  But would you

24  turn to the third page for me, please, sir.

25  A.  Okay.

1   Q.   And about the middle of the third page, sir, is there a

2   paragraph that dealt with an incident in 2001?

3   A.   There is.

4   Q.   And, sir, could you -- with the permission of the Court --

5   read that for us.

6   A.   Sure.  This says --

7            THE COURT:  Do you intend to offer this as an exhibit?

8            MR. PAPAGNI:  I do, your Honor.  If --

9            THE COURT:  What's the number, again?

10           MR. PAPAGNI:  The number, Ms. Root?

11           (Pause, Mr. Papagni and Ms. Root conferring.)

12           MR. PAPAGNI:  Since the other exhibits were withdrawn,

13  I want to make sure our record is complete.

14           The exhibit number we would like it to have is 227.

15  I understand that was an exhibit that was withdrawn

16  previously.

17           THE COURT:  We have to keep -- do that to make the

18  record.

19           MR. PAPAGNI:  Correct.

20           THE COURT:  But I'll -- even though it's unrelated, in

21  this case I'll identify the exhibit as 227A.

22           MR. PAPAGNI:  227 -- thank you, Judge.

23  BY MR. PAPAGNI:

24  Q.   Mr. Dyer, we're now referring to Government's Exhibit 227A.

25           THE COURT:  All right.  First, are you offering it?

1      MR. PAPAGNI:  I'm going to offer it.

2      THE COURT:  Yeah, okay.  I don't want anything read

3   from it unless it's in evidence.

4      Do you object?

5      MR. BLACKMAN:  No, your Honor.

6      THE COURT:  Received.

7      MR. BLACKMAN:  As long as the entire letter comes in.

8      THE COURT:  Received.

9      Go ahead.

10     MR. PAPAGNI:  The exhibit that we'll be offering --

11  just to make sure what our record is -- is a clean copy and not

12  the copy I provided him.

13     THE COURT:  Yes.

14  BY MR. PAPAGNI:

15  Q.  Now, we're to the point, sir, where we can read the

16  paragraph, if you would, please.

17  A.  It says -- this is -- this is from Steve.  It says, We met

18  in the B.L.M. office with a fire investigator last summer.

19        I was accused of setting a fire and a deer

20        slaughtering episode that I was blindsided with

21        after getting to the meeting.  I was not there.  I

22        still have not received information that is being

23        protected by the B.L.M.  Dave was -- and Dave Ward

24        is -- I -- who I think they're referring to -- Dave

25        was the B.L.M. employee that had the responsibility

1           of informing and relaying information to the

2           investigator.  He had critical information that

3           would have been beneficial to the investigation and

4           instrumental in defense of our ranch, and without

5           it, would imply my guilt.

6    BY MR. PAPAGNI:

7    Q.  Thank you, sir.

8           Does that finish the paragraph?

9    A.  No.

10   Q.  I'm sorry.  Finish the paragraph.

11   A.  But did not see fit to relay the information.

12          I have asked for the information to be sent to me

13          when the investigation is complete.

14          MR. PAPAGNI:  Thank you.

15          That's all I intend to offer on that letter.

16          I have no further questions of the witness.

17          THE COURT:  Thank you.

18          Cross.

19                   CROSS-EXAMINATION

20   BY MR. MATASAR:

21   Q.  Mr. Dyer, you indicated that Steven Hammond called before

22   he set the fire.  Right?

23   A.  Correct.

24   Q.  Isn't it true that he also called after the fire was set,

25   to inform the B.L.M. that the fire got onto B.L.M. land?

1   A.  (Pause, referring.)

2   Q.  You might want to look at -- oh, I'm sorry.

3   A.  Pardon?

4   Q.  You might want to look at 1105.

5           Do you have the book there?

6           MR. BLACKMAN:  It's ours.

7   BY MR. MATASAR:

8   Q.  Oh, I'm sorry.

9           Well, exhibit you're -- yeah.  1105.

10          (Witness handed notebook.)

11  BY MR. MATASAR:

12  Q.  Do you see the second page there?

13  A.  The second page okay.

14  Q.  It's --

15  A.  In --

16  Q.  It says, Page 2 of 4, on the bottom.

17  A.  2 of 4.  And it has the Rich Finnerty at the top.  Correct?

18  Q.  Yes.

19          And does it refresh your recollection, if you look

20  at the paragraph that starts on 9-13-99?

21  A.  It says on 9-13-99 at 11 -- 11:00 hours, Hammond

22          contacted Fire Control Officer Steve Morefield at

23          the Frenchglen guard station.  Hammond said that

24          the fire had crossed on to B.L.M. land and had

25          burned approximately 40 acres.  A GPS plot was done

1          of all --

2    Q.  So --

3          MR. PAPAGNI:  I'm sorry.  May he finish the paragraph,

4    if he may?

5          MR. MATASAR:  Well, I have no objection.  Go ahead.

6          THE WITNESS:  Did you want me to --

7          Plot was done of all of the three fires, started by

8          the Hammonds.  And it was determined that the --

9          the middle fire had burned 217.4 acres of B.L.M.

10         land.

11   BY MR. MATASAR:

12   Q.  So he called and alerted you.  Although he got the amount

13   wrong, he called and alerted you that it had burned on to

14   B.L.M. land?

15   A.  Correct.

16   Q.  And it's true, is it not, that no costs were assessed

17   against the Hammonds?

18   A.  Correct.

19   Q.  And there were other trespass fires in the Burns district,

20   were there not, in '99?

21         You could look at 1107, and that might refresh your

22   recollection.

23   A.  You're going to have to refresh my recollection a lot, by

24   the way.  Okay?

25         MR. MATASAR:  Cheryl, do you know where the ELMO

1  button is?

2          There it is.  Okay.  All right.

3  BY MR. MATASAR:

4  Q.  Now, you're looking at the first page?

5  A.  Correct.  Correct.

6  Q.  And two are trespass fires?  Type 2 is a trespass -- is a

7  trespass fire, is it not?

8  A.  I can't tell from this, if it's a fire or just a trespass.

9          It looks like it's --

10 Q.  Well, look at the second line.  What's the name of the

11 trespasser?

12 A.  Steve Hammond.

13 Q.  And what's the reported date?

14 A.  4-7.

15 Q.  No.  Is that not the number?

16 A.  Oh, I see.  9-11.

17 Q.  Okay.  And do you think that's the fire that we're talking

18 about?

19 A.  (Pause, referring.)  I don't know.  I -- I would guess.

20 Q.  I don't want you to guess.

21          What about -- do you know about the Otley ranching

22 operation?

23 A.  Um-hmm.  Yes.

24 Q.  Are you aware if there was a trespass fire involving

25 Mr. Otley on 10-22-99?

1  A.  (Pause, referring.)  They have -- they have it registered

2  in the book, anyway.

3  Q.  Fine.

4       And what about on 11-6-99, involving Alan Bossout?

5  Is that how you would say it?

6  A.  Bossout.

7  Q.  Do you know him?  Is it Bossout?  Is that the right

8  pronunciation?

9  A.  Your guess is as good as mine.

10  Q.  Oh, you don't know him.

11       Well, it -- on the far right -- have you never seen

12  this form?  A form like this before?

13  A.  I've seen forms like this, but I have not seen -- at least

14  to my memory -- this form.

15  Q.  Okay.

16  A.  And I would not normally see this form.

17  Q.  Okay.  So you've seen forms like this.  And what's the far

18  right column for?

19  A.  Collection.

20  Q.  Collection of money as a result of a trespass?

21  A.  Correct.

22  Q.  And is it fair to say that Otley and Bossout's fires -- or

23  trespasses resulted in collection of money, but the Hammonds'

24  did not?

25  A.  Correct.

1   Q.   In the -- are you aware that Mr. Steven Hammond was upset

2   that he was accused in effect of unethical hunting?

3   A.   Unethical hunting?

4   Q.   Hunting.

5        His concern was, was it not, in the letter that you

6   read -- that Mr. Papagni gave you -- that's 227A --

7        MR. MATASAR:   May I see that?   (Handed computer.)

8   BY MR. MATASAR:

9   Q.   Steven Hammond said he was accused of setting a fire and a

10  deer slaughtering episode that he was blindsided with.   Is that

11  correct?

12  A.   Correct.

13  Q.   Was it not your understanding?   Do you have some memory at

14  all that he was upset that he was accused of a deer

15  slaughtering episode?

16  A.   (Pause.)   No, not the deer -- not a deer slaughtering

17  episode.

18  Q.   So you don't recall that?   Even though it's in the letter,

19  you just don't recall it?

20  A.   I don't take that as a deer slaughtering episode.

21       What I saw that was -- is -- is a -- an

22  investigation of a particular fire that occurred on the Burns

23  district that involved a hunting situation.   I did not take

24  that as a deer slaughtering, when I read that --

25  Q.   Okay.

1   A.   -- yesterday.

2   Q.   But it was a hunting situation?

3   A.   Correct.

4   Q.   And that's what his concern was?

5   A.   Yes.

6        MR. MATASAR:  Okay.  That's all I have.  Thank you.

7        THE WITNESS:  Okay.

8        MR. BLACKMAN:  No questions.

9                    REDIRECT EXAMINATION

10  BY MR. PAPAGNI:

11  Q.   The only question I have, sir -- they used this exhibit.

12  To the far right, where it says -- the initials, says "case

13  closed," it has the initials, it looked like MB.  You said you

14  didn't use these forms.  That would be the form of --

15  A.   Miles Brown.

16  Q.   And he's a resource -- that person that was --

17  A.   He's the field manager or area manager.

18  Q.   And he was the person with you during the October 28th,

19  1999, meeting that you --

20  A.   Correct.

21  Q.   -- you testified about?

22  A.   Correct.

23  Q.   And this letter that has caused some confusion here, sir,

24  after you have seen this letter, were you still in the district

25  when a new range con was signed for the Hammonds?

1  A.  Yeah, I --

2          MR. MATASAR:  You know, that's outside the scope --

3          MR. PAPAGNI:  I'll withdraw the question.

4          THE WITNESS:  I really can't --

5          THE COURT:  That's all right.  You're excused, sir.

6          MR. PAPAGNI:  Our next witness would be Gordon Choate,

7  Judge, but he's going to take a few minutes to prepare for his

8  testimony.

9          THE COURT:  Fine.

10          Let's take a short break.

11          We'll keep it short, so --

12          THE WITNESS:  Do you want this?

13          (Clerk handed notebook.)

14          THE COURT:  Members of the jury, if you want to step

15  out to use the restroom, you certainly may.  It's up to you.

16          THE JUROR:  Can we go to our room now?

17          THE COURT:  If you would like.

18          THE CLERK:  You can use the restroom even down here.

19  That would be even faster.

20          (Recess taken.)

21          THE COURT:  All right.  Call your next witness,

22  please.

23          MR. PAPAGNI:  Mr. Choate.

24          Oh, he's coming through that door.  There we go.

25          THE COURT:  And members of the jury, I may stand up

1    once in a while, wander around the courtroom.  Don't pay any

2    attention to me.  Okay?

3            THE CLERK:  Please raise your right hand.

4            (Witness sworn.)

5            THE WITNESS:  Yes, I do.

6            THE CLERK:  Please have a seat.  Please speak into the

7    microphone.

8            And then there's water here, if you would like some.

9            THE WITNESS:  Thank you.

10           THE CLERK:  Please state your full name, and then

11   spell your name for the record.

12           THE WITNESS:  My name is Gordon Choate.  The last name

13   is spelled C H O A T E.

14                        DIRECT EXAMINATION

15   BY MR. PAPAGNI:

16   Q.  Mr. Choate, I want you to give us some background about the

17   work you've done in the world of hunting, and the things you've

18   done as a sportsman in that world, sir.

19   A.  Just in the world of hunting.

20   Q.  Let's start with that.

21   A.  Basically, I started hunting when I was -- I don't even

22   know.  I was going hunting with my dad when I was five, six,

23   seven years old.  And I have hunted pretty much my whole life.

24   Q.  The area that you primarily hunted in, sir?

25   A.  Southeast Oregon.

1  Q.  And -- and the Steens Mountain area, have you hunted that
2  area regularly?
3  A.  Yes, many times.  I grew up hunting in the Steens Mountain
4  area.
5  Q.  And have you had occasion to be hired as a professional
6  guide on occasion?
7  A.  Yes, I have.
8  Q.  And in that regard, had a Greg Jantze hired you at one
9  point?
10  A.  Yes, he did.
11  Q.  And was this your first -- how long had you been guiding
12  for Mr. Jantze?
13  A.  I'm sorry.  I didn't hear that.
14  Q.  How long had you guided for Mr. Jantze, been one of these
15  guides?
16  A.  I guided professionally that year.
17  Q.  Okay.
18  A.  I got paid for that year, and then that's the only year I
19  guided for him.
20  Q.  And in Mr. Jantze's hiring of you, did you have occasion to
21  come in contact with a Dennis and Dustin Nelson?
22  A.  Yes, I did.
23  Q.  And were those people you were supposed to guide for?
24  A.  Yes, they were.
25  Q.  And this would be in September of 2001.  Correct?

1   A.  Yes.

2   Q.  Now, I digress just a second.

3           In addition to your hunting, what other occupations

4   have you had?

5   A.  I worked at the mill from 1965.  The mill in Hines from

6   1965 to 1980.  I logged for three or four years.  Left Burns

7   and then went to college and got my college degree.  And became

8   an alcohol and drug counselor, and then I became a director of

9   an alcohol and drug treatment center in Madras.  I left Madras

10  in 1994, and purchased an antique store in Redmond, Oregon.

11  And we had an antique store in Redmond, Oregon, for

12  approximately 12 years.  And then I started doing real estate,

13  and just in time for the real estate market to crash.  So --

14  didn't do so good with that.

15  Q.  Directing your attention to the time in September, 2001.

16  A.  Yes.

17  Q.  My voice is starting to crack a little bit, so I'll try to

18  speak louder.

19          Before you met the Nelsons, where did you decide

20  that it would be a good area to take them to hunt?

21  A.  I looked at quite a few different areas on the Steens.  But

22  I decided that the northwest side would be the best, lower

23  down, because it's where -- where I saw some of the nicest

24  animals.  A lot of scouting up there, prior to that.

25  Q.  And you hunted that area, you said, for how many years

1    before?

2    A.  (Shakes head.)  I don't know.  Many times.

3    Q.  Before you met the Nelsons, did you have occasion to set up

4    a base camp?

5    A.  Yes, I did.

6    Q.  And do you recall when you did that?

7    A.  It was during the month of September.  I don't remember

8    exactly when I set up the camp.

9         It was probably two weeks prior to their arrival.

10   And then I spent some time up there by myself, scouting and

11   looking, and -- and seeing what was -- what was up there.

12   Q.  I'm going to have the -- on the computers here -- there you

13   go.  That's Government's Exhibit No. 6.

14        Do you recognize that, sir?

15   A.  Yes.

16   Q.  And did you take that photo?

17   A.  Yes, I did.

18   Q.  And was that your camp site?

19   A.  Yes, it was.

20   Q.  -- back in September of 2001?

21   A.  Yes, it was.

22   Q.  This camp site was set up before you met the Nelsons?

23   A.  Yes.

24   Q.  Now, I have two maps here.  And someone took the easel down

25   so you can see.

1           And I'm going to --

2           MR. PAPAGNI:  Judge, the rule is -- I don't like to

3    get near the witness, and I know that.  But we have these two

4    maps.  Could the bailiff put them there, on --

5           THE CLERK:  Do you want to use this easel?

6           MR. PAPAGNI:  That's good enough there.  He can point

7    to it.

8           THE CLERK:  Right here?

9           Which one --

10          MR. PAPAGNI:  Start with the lowest number.

11          Which one is that?

12          THE CLERK:  1.

13          MR. PAPAGNI:  1 is good.

14   BY MR. PAPAGNI:

15   Q.  And we're going to try to put it up on the screen here.

16          There you go.

17          Sir, I want you to look at the screen, in

18   Government's Exhibit No. 1, and could you point to the area

19   where your camp site was located?

20   A.  My camp was right here (pointing).

21   Q.  Now, let's be fair about it.  It's already on the map.

22   Before today you had a chance to look at this map, did you not?

23   A.  Yes, I did.

24   Q.  You had a chance to help prepare it?

25   A.  Yes.

Choate - D

1  Q.  Is that map -- disregarding the green lines and anything

2  that indicates a name not related to you -- does that fairly

3  and accurately represent the -- the area that we're concerned

4  with today, on -- that you were hunting back at the end of

5  September, 2001?

6  A.  Yes, it's a very good depiction.

7  Q.  So you set up yourself your camp site.  Then you had

8  occasion to meet the Nelsons.  Where did you meet the Nelsons,

9  sir?

10 A.  I met the Nelsons in Frenchglen.

11 Q.  And did you take them to a base camp for them?

12 A.  Yes, I did.

13 Q.  And is that also on this map that's next to you,

14 Government's Exhibit 1?

15 A.  Yes.  It's up here, just off of Fish Lake road, about a

16 half a mile down to Moon Hill Road.

17 Q.  And in that particular location, sir, in addition to what

18 we call a base camp, that's where you kept -- what?  A trailer

19 or --

20 A.  I had a camp trailer with water and shower and food, and

21 that type of thing, yes.

22 Q.  And the Nelsons had their vehicle there?

23 A.  Yes.

24 Q.  Okay.  So after you set that camp up, where did you take

25 them?

1  A.  We drove from -- we left their vehicle at the base camp,

2  and we drove all the way down there.  It doesn't show up.  You

3  come down by Moon Hill, and then come back up in here and our

4  camp.

5  Q.  And what date did you and Nelsons get to your camp site, to

6  begin your hunt where you guide for them?

7  A.  It was Friday afternoon.  I can't remember the exact date.

8  It would be the -- probably September 27th.  Whatever the

9  Friday before the day before -- the day before hunting season

10  was.

11  Q.  And the reason why I asked you about the base camp where

12  the Nelson's vehicle was to your camp site -- about how long

13  was that drive?

14  A.  It's -- it was a rough road.  It -- probably depends on how

15  you're driving, of course.

16        We took our time.  Probably took us three hours to

17  go around there because I wanted to show them parts of the

18  country and some of the places they would be going through

19  and hunting.  And -- and we also drove up to the top of the

20  Steens, and I showed them the view off the top.

21        So we just kind of meandered around and -- for

22  probably about three -- three hours, down from there to get

23  to the camp.

24  Q.  And how much would you get paid for your guide services?

25  A.  I got paid a thousand dollars.

1  Q.  And before you took them hunting had you obtained a B.L.M.

2  permit tag, do you recall?  Or was that obtained by Mr. Jantze?

3  A.  That was obtained by Mr. Jantze.

4  Q.  Did you obtain an Oregon Department of Fish & Wildlife tag

5  for Dustin Nelson?

6  A.  Yes, I did.  I did see that tag.

7  Q.  Now, what type of vehicle were you driving, sir?

8  A.  I was driving an '86 GMC, gray in color, with four-wheel

9  drive, with a rack on the back.

10  Q.  Now, assuming for purposes of this next question, the

11  opening weekend of mule deer hunting season was Saturday,

12  September 9th -- 29th.

13  A.  Yes.

14  Q.  Did you go hunting that day with the Nelsons?

15  A.  Yes, we did.

16  Q.  Would you briefly describe what you did that day with the

17  Nelsons.

18  A.  We -- we went out from our camp a ways.

19        They wanted to kind of kick off by themselves, which

20  I told them where to go and how to circle back around.

21  And -- and so they did that for a while.  And then I found --

22  I went off by myself and found a group of -- of six or seven

23  bucks.  I finally got them called back.  And we made a hunt,

24  and stalk on -- on those bucks and decided that none of those

25  bucks were good enough for -- it was Dustin's first -- first

1  hunt, and I was going to try real hard to get him a pretty
2  nice buck.  So we let all of those bucks go that day, and
3  didn't take anything that day.  So --
4  Q.  On Sunday morning, sir, did you have occasion to resume the
5  hunt?
6  A.  Yes, we did.
7  Q.  About what time did the three of you gentlemen get up?
8  A.  We got up before daylight.
9      I don't remember the particular time, but it was
10  before daylight.  And we drove from our camp, over to here,
11  all the way down to right -- right in here (pointing), we
12  parked our truck.
13      And it was daylight before we -- or, I mean, it was
14  before daylight before we got out of the truck.
15  Q.  Now, sir, before today, you've had a chance to meet with
16  myself and the paralegal next to me and prepare what's
17  sometimes referred to as a Google Earth.  If you will, kind of
18  like a -- a video of the topography in this particular area.
19  True?
20  A.  Um-hmm.  Yes.  (Nods head.)
21  Q.  Now, I need to ask you a few questions to make sure it's
22  clear.
23      This particular Google Earth that we're looking at
24  isn't of the terrain and the -- the trees and the situation
25  at the time in 2001, is it?

1   A.  Not to my knowledge, it's not, no.

2   Q.  But you sat down with a young man, and you went through it

3   to make it -- to go through it to see if it would be a fair and

4   accurate description of the topography of the ground, the land?

5   A.  Yes.

6   Q.  And we're not claiming that it is the condition it was at

7   the time in September 30th of 2001, as far as the actual trees

8   and things.  Correct?

9   A.  Right.  Correct.

10  Q.  You also, during the course of preparing this Google Earth

11  for this young man, you have what I'll call bubbles, which are

12  particular stop points where certain events took place.

13  Correct?

14  A.  Yes.

15  Q.  You reviewed those before today.  Correct?

16  A.  Yes.

17  Q.  And are those accurate, and would you adopt those

18  statements in that Google Earth as part of your testimony?

19  A.  Yes.

20       MR. PAPAGNI:  With that in mind, Judge, recognizing

21  that we're offering it only for demonstrative purposes, I would

22  ask permission of the Court to play it.

23       THE COURT:  I'll allow that.

24       Jurors, when you hear a demonstrative purposes, I'm

25  going to let them use it to explain their story.

1    But you may not take it for the exact conditions

2  that were there.  All right?  Just to illustrate the

3  witness's testimony.

4  BY MR. PAPAGNI:

5  Q.  Now, Mr. Choate, I do have the benefit of a lady who seems

6  to know how to work the machinery.  So with the permission of

7  the Court, I'll ask that she begin it.

8    My intent, Mr. Choate, is to first begin it, and

9  then take you from bubble to bubble and ask you questions as

10  we go, so that I can save the court and the jury some time.

11    MR. PAPAGNI:  So if we can start, please, Ms. Root.

12    (Video playing.)

13  BY MR. PAPAGNI:

14  Q.  Now, sir, we'll stop right there, if I can.

15    It says, "Choate's truck."  Now, what does that

16  represent, sir?

17  A.  That represents where we -- I believe, where we got --

18  parked the truck and got out of the truck, and begin our

19  morning hunt on September 30th.

20  Q.  So that takes us to the point where I had you with my

21  questions where I said where you parked your GMC.  Correct?

22  A.  Right.

23  Q.  Okay.  Good.

24    So after you parked your truck, where did you --

25  where -- where did you go?  Did you indicate there --

1   A.  We got out of the truck, and it was still dark.  And we

2   walked to the west.  It would be to the -- to the left of the

3   screen.  And I had a very good spot out there, where I like to

4   set a lot, and do binocularing, and looking for game.

5          And we walked out, approximately 30 -- 300 yards

6   from that point, and set down and began looking.

7   Q.  Now, sir, this particular area that you were in, was it

8   public land, to your knowledge?

9   A.  Yes, it was B.L.M. land.

10  Q.  And you checked it out before you went there?

11  A.  Oh, yes.

12  Q.  And after you got to your site, how long were you there

13  before the young man was able to get a buck?

14  A.  We were there probably half an hour, 45 minutes.

15          MR. PAPAGNI:  If you would go next, please, Ms. Root.

16          THE WITNESS:  Oop, I went the wrong way.

17          MR. MATASAR:  Pardon me?

18          MR. PAPAGNI:  He wants you to say that you said it was

19  the wrong way.

20          THE WITNESS:  I pointed to the left, but it was

21  actually to the right.

22          MR. PAPAGNI:  And if you can stop there.

23  BY MR. PAPAGNI:

24  Q.  And what represents that, Mr. Choate?

25  A.  That's where we were setting.  Where Choate and Dennis and

1  Dustin Nelson -- that's where we set up, and sat for a

2  half-hour to 45 minutes.

3          And then we saw some -- a group of mule deer bucks

4  come across the draw, and they walked up to us, and -- and

5  then Dustin killed a buck right there, with one shot.

6          MR. PAPAGNI:  Okay.  Continue, Ms. Root.

7          Now, you can stop right there.  I think those are

8  going to be exhibits, and I want to make sure I get the

9  numbers for us.

10          (Pause, referring.)

11  BY MR. PAPAGNI:

12  Q.  I don't think that is an exhibit.  That just looks like

13  it's Dustin up there.  Correct?

14  A.  Yes, that's Dustin.

15  Q.  Is that the buck he shot?

16  A.  Yes, it is.

17  Q.  Did you take that photo, or did his dad?

18  A.  I don't remember --

19  Q.  Okay.

20  A.  -- whether I took the photo, or -- or Dennis did.

21  Q.  Could you go on to the next one, please.

22  A.  I think I --

23  Q.  And who is in that photograph, Mr. Choate?

24  A.  That's Dennis Nelson and Dustin Nelson, father and son.

25  Q.  Now, sir, in that particular photograph, if I can stop for

1  a second, does it look like -- what's the weather conditions

2  that particular morning?

3  A.  Absolutely clear and beautiful and cool, and one of the

4  prettiest hot mornings anybody could ever ask for.

5  Q.  And while you were out there waiting, did you see any other

6  hunting parties go by during the time you were there, before

7  the buck was shot?

8  A.  No.

9       MR. PAPAGNI:  Continue, Ms. Root.

10      (Video playing.)

11 BY MR. PAPAGNI:

12 Q.  And who's in this photograph, sir?

13 A.  That would be myself and Dustin.

14      MR. PAPAGNI:  Continue, Ms. Root.

15      (Video playing.)

16 BY MR. PAPAGNI:

17 Q.  Now, we're back to the Google Earth, sir.  What happens

18 next?

19 A.  Well, I was going to dress out the deer, but Mr. Nelson

20 decided it was Dustin's first deer.  And he wanted him to dress

21 it out.

22      So I said I will go back to the pickup and bring the

23 pickup down, around to blow them, where they could drag the

24 buck down to the pickup.  And they got it dressed.  And so

25 that's what I did, walked back to the pickup, and got in the

1  pickup and drove it around to where I was just -- just about
2  right below them.
3          MR. PAPAGNI:  Continue, Ms. Root.
4          (Pause, video playing.)
5  BY MR. PAPAGNI:
6  Q.  How was the driving in that area, sir?  How were the road
7  conditions?
8  A.  Pardon me?
9          The road was very rough at that time.  It has been
10 bladed since then, but it was very rough and rocky, and
11 driving was very, very slow.
12 Q.  And once you got to that location, sir, did something occur
13 that got your attention, coming from the east?
14 A.  Yes, it did.  I saw a pickup approaching us.
15 Q.  And would you describe what happened next, please.
16 A.  I was parked there.  I saw a pickup coming.  Would be from
17 the east.  Would be going toward the top of the map.
18         And the road was very rough and narrow, so I pulled
19 my pickup off the road, so that the approaching pickup could
20 get by.  There wasn't any wide spots right there.  So I got
21 my pickup off the road.
22         MR. PAPAGNI:  Continue, Ms. Root.
23         (Pause, video playing.)
24         MR. PAPAGNI:  Continue on, please.
25         (Video playing.)

1         MR. PAPAGNI:  Stop there, please.

2    BY MR. PAPAGNI:

3    Q.  As the truck approached you, did you have contact with its

4    occupants?

5    A.  Yes, I did.

6    Q.  And who were the occupants?

7    A.  One was Mr. Dwight Hammond, and I didn't know the name of

8    the other one.  And then there was a little boy sitting in the

9    middle of the truck, between the two; the passenger and the

10   driver.

11   Q.  And for purposes of our record, sir, would you identify

12   Dwight Hammond in the courtroom, sir, if you can.

13   A.  Yes.  He's sitting right there, with the headphones on his

14   head.

15   Q.  When Mr. Hammond came up to you, did you have occasion to

16   have a conversation with him?

17   A.  Yes, I did.

18   Q.  Okay.  Had -- did you recognize him, or had you recognized

19   him from a previous contact?

20   A.  I knew who he was, and I had had previous contacts with

21   him.  And, yeah, I knew who he was.

22   Q.  And once you contacted -- or Mr. Hammond contacted you, did

23   you have a conversation with him, or did he ask you any

24   questions?

25   A.  Yes, he did.

1  Q.  What did he ask you, sir?

2  A.  I can't remember if it was him or the passenger that asked

3  me how we did.  How we were doing --

4          MR. BLACKMAN:  Objection.

5          THE WITNESS:  -- and I told him --

6          MR. BLACKMAN:  Objection.

7          THE COURT:  Sustained.

8  BY MR. PAPAGNI:

9  Q.  Okay.  You have to only attribute to Mr. Hammond.

10  A.  Okay.

11  Q.  Do you remember Mr. Hammond specifically asking you any

12  questions?

13  A.  Yes, he asked where I was camped.

14  Q.  And when he asked you where you were camped, did you tell

15  him?

16  A.  I -- no, I didn't tell him.  I just motioned -- made a

17  motion that we're camped back up -- back up there a ways.

18  Q.  And was there a reason why you were not precise --

19          MR. BLACKMAN:  Objection.  Objection.

20          THE COURT:  Well, overruled.

21  BY MR. PAPAGNI:

22  Q.  Was there a reason why you were not precise about telling

23  him where you were camped, sir?

24  A.  Yes, I didn't want him to know where I was camped.

25  Q.  And why did you not want him to know, sir?

1      MR. BLACKMAN:  Objection.

2      THE COURT:  Sustained.

3  BY MR. PAPAGNI:

4  Q.  Did Mr. Hammond advise you about anybody else who was going

5  to be in the area?

6  A.  Yes.  He said he had some hunters coming over the hill.

7  Q.  Did he tell you how many?

8  A.  No.

9  Q.  And as you're having a conversation with Mr. Dwight

10 Hammond, where was Dennis and Dustin Nelson, if you can recall?

11 A.  They were up the -- the hill, behind us, coming -- dragging

12 the buck down, off the hill, toward the pickup.

13 Q.  After the -- you told him where -- generally where you were

14 camped, and he [sic] told you he had a couple of people coming

15 down the hill who were hunters, did he ask you a question about

16 what you were doing?  What was happening?

17 A.  Not that I recall, other than he asked where we were camped

18 and -- and --

19 Q.  I'm sorry.  My question was inarticulate.

20      Was there any discussion with Mr. Hammond and you

21 about the deer that was shot?

22 A.  Not with Mr. Hammond.

23 Q.  Was there a conversation in Mr. Hammond's presence about

24 this deer?

25 A.  Yes, there was.

1  Q.  And what was that?

2        MR. BLACKMAN:  Objection.

3        THE COURT:  Sustained.

4  BY MR. PAPAGNI:

5  Q.  After you spoke to Mr. Hammond, was there any other further

6  conversation regarding any -- Mr. Hammond give you any

7  indication of any intentions they intended to do after he left?

8  A.  No.

9  Q.  And after you were through speaking with him, what

10 direction did he drive?

11 A.  He drove to the west.  It would be toward the bottom of the

12 map.

13 Q.  And looking back now, at Exhibit No. 1 behind you, sir, you

14 see a little dotted line there on that yellow?

15 A.  Right here?

16 Q.  There you go.

17       Now toward the yellow, would be toward your left

18 there.

19 A.  Right -- right here (pointing)?

20 Q.  I want you to look at that, and it says there, "Choate's

21 conversation with Dwight Hammond."

22       Is that the approximate location you were when you

23 spoke with Mr. Hammond?

24 A.  Yes, it is.

25 Q.  And then after you're through speaking with him, what

1  direction did he travel?

2  A.  He traveled right on down this road here (pointing).

3  Q.  And after he left, what did you do next, sir?

4  A.  We loaded the buck up in the back of the pickup.  Dennis

5  and Dustin were there, and we loaded the buck in the back of

6  the pickup and headed back toward our camp.

7        MR. PAPAGNI:  Ms. Root, if you would continue, please.

8        (Video playing.)

9  BY MR. PAPAGNI:

10 Q.  And then you see it says --

11       MR. PAPAGNI:  Stop there, please, Ms. Root.

12 BY MR. PAPAGNI:

13 Q.  It says, "Choate and Nelsons."  And then it has a couple of

14 icons for bucks.

15       Is that approximately your location when you saw the

16 group of bucks, sir?

17 A.  Yes, it is.

18 Q.  And behind you, sir, on the map it says, "Choate party

19 observes deer and hunter."

20 A.  Yeah.  Right about there (pointing).

21 Q.  So would you please testify, Mr. Choate, when you got to

22 that location, describe what you saw.

23 A.  We were all three sitting in the front of the pickup,

24 driving down the road.  And we looked up on the hill, and we

25 saw some -- some bucks.  There was approximately six, seven,

1  eight of them.  They were coming down off the hill, where

2  they -- on the -- on the right, and going toward the left.

3  They were trotting, walking.  They crossed down, right in front

4  of us.  And they trotted up on the far hill, on the left side

5  and just stopped up there and started milling around.

6          We -- we were done hunting.  But we -- it was a

7  nice, pretty sight.  And we stopped.  And we were -- put our

8  binoculars on the group of bucks, and we were looking to see

9  if there was any -- any good ones, any bigger than we had

10 got, or -- or just they're a beautiful animal.

11         And we were -- two of us -- I know Dennis was

12 looking through his binoculars, and I was looking through my

13 binoculars at the group of bucks.

14 Q.  And as you were doing that, what else -- what happened

15 next, sir?

16 A.  A whole bunch of shooting started.

17 Q.  Describe that, please.

18         What -- what did you do when the shooting began,

19 sir?

20 A.  What did I do?

21 Q.  What did you see?

22 A.  What did I -- what I saw was I had my binoculars on the

23 herd of bucks, and I sawdust flying.  I saw at least four bucks

24 get hit by bullets.  I saw one with a leg flopping, running.

25 And basically the -- the herd of bucks just exploded like a

1    flock of quail.  They just went in all different directions.

2          I saw one running off with his hind leg a waving

3    like that (indicating with hand), because he had been shot in

4    the hip, it looked like to me, and his leg was broke.

5          And I saw dust and blood fly off of at least three

6    other ones.  And there was quite a number of shots.  It's

7    hard to say exactly how many there was.  There was between --

8    probably between 10 and 20 shots.  We all agreed that it was

9    probably 15 to 17 shots fired at the herd of bucks.  It was a

10   very disgusting site.

11         MR. PAPAGNI:  Continue, Ms. Root, please.

12         (Video playing.)

13         THE WITNESS:  I was very upset that that was happening

14   at the end of my -- my clients' hunt, which was nearly a

15   perfect hunt for them, and then this was happening.

16   BY MR. PAPAGNI:

17   Q.  After you saw the bucks scatter, sir, did you -- what did

18   you do with your two passengers that you were guiding?

19   A.  We put our binoculars down and said -- I don't remember.

20   Something to the effect, Oh, my God, and stuff like that.

21         And I said, Well, we need to get out of here.  And

22   we started driving on down the road, toward the -- I went

23   back to our camp, which was just down there, and goes back to

24   the left.  So we started driving down that way.

25         MR. PAPAGNI:  Continue, Ms. Root.

1          (Video playing.)

2          MR. PAPAGNI:  Go ahead.

3          (Video playing.)

4          MR. PAPAGNI:  Stop there.

5    BY MR. PAPAGNI:

6    Q.  At one point, as you're trying to leave the scene, do you

7    have occasion to look in the direction where you believe the

8    shots were coming from?

9    A.  Yes.

10   Q.  Describe for the jury what you saw, please.

11   A.  As we driving out, we hadn't gone maybe 50 yards, driving,

12   and Mr. Nelson said, There's -- there's somebody right there.

13   And I -- it was out the right passenger window and up the hill,

14   from above me.  And I bent down and -- by my steering wheel,

15   and looked up the hill.  And I saw a person with a white cowboy

16   hat standing up there.  And it was just almost as soon as I saw

17   him, he just dropped down in the sagebrush and hid.

18   Q.  Could you give us the best description of who you thought

19   it was, or what this person looked like?

20   A.  I was probably 95 percent positive it was Steve Hammonds.

21   Q.  You'd seen him before?

22   A.  Yes.

23   Q.  Was the person you saw drop down a -- a teen -- appeared to

24   be a teenager, sir?

25   A.  No, it was not a teenager.

1   Q.   Did you see anyone up at that -- up that side of the hill,

2   besides the man in the white hat?

3   A.   No.

4          MR. PAPAGNI:   Continue, please.

5          (Video playing.)

6          MR. PAPAGNI:   Stop there, please.

7   BY MR. PAPAGNI:

8   Q.   Now, you're heading on your way back to camp, you said?

9   A.   Yes.

10  Q.   Before you headed on your way back to camp, did you have

11  occasion to look back up in the area where you had seen this

12  person that you saw wearing the white cowboy hat?

13  A.   Yes, I did.

14  Q.   Describe for the jury how you looked back and what you saw.

15  A.   We -- we drove on down the road.  And then that switch

16  back, right there, goes up you over the hill.  And we got about

17  two-thirds of the way up, over that hill.  And I was driving,

18  and I saw some people in my rearview mirror, and I stopped.

19          And Mr. Nelson and his son and I turned around and

20  looked back behind us.  And there was four men with rifles,

21  which included the guy -- the -- the person in the white

22  cowboy hat.  There was four men with rifles standing over

23  there, in a group, and it looked like they were just standing

24  there, talking.

25          I told the Nelsons that we needed to get out of

1  there, that I was very uncomfortable with the situation, and

2  we needed to leave.  And -- which is what we did.

3          MR. PAPAGNI:  Continue, Ms. Root.

4          (Pause, video playing.)

5  BY MR. PAPAGNI:

6  Q.  Now, sir, this -- this shooting of these deer that you

7  described for us, approximately how long was it after -- the

8  shooting of the deer was it after you would converse with

9  Mr. Dwight Hammond?

10  A.  Repeat the question, please.

11  Q.  Sure.  Approximately how long was it after you had spoken

12  with Dwight Hammond did this shooting of the deer take place?

13  A.  Probably half an hour, 45 minutes, because what we did was

14  we drug the deer on down to the pickup, and loaded the -- after

15  Mr. Hammonds left, we drug the deer on down to the pickup, and

16  loaded the deer in the back of the pickup, and then proceeded

17  to drive down the road.

18          And we -- we talked a little bit, you know.  And we

19  were all happy that Dustin -- Dustin had got a really nice

20  buck.  But then we wanted to get back to camp.  So --

21  Q.  Now, you -- you weren't wearing a watch that day, I take

22  it.  Didn't see it in the photo.  Were you wearing a watch?

23  A.  Was I wearing a watch?

24  Q.  Yeah.

25  A.  No, I don't wear a watch out in the brush.

1   Q.  Do you have any estimation of the time it was when the

2   shooting of the deer took place?

3   A.  The shooting of the group of deer?

4   Q.  Yes.

5   A.  It was probably 8:00, 8:30 maybe.  It was still fairly

6   early.

7   Q.  Approximately how far from the area where the deer were

8   shot was your camp site?  What distance would you estimate it

9   to be?

10  A.  About a mile, mile and a half.

11  Q.  And the approximate time to get to that location, over that

12  rough road?

13  A.  Probably 20 minutes.

14  Q.  When you got back to the camp site -- that we now have back

15  on the screen --

16  A.  Um-hmm.

17  Q.  -- what did you do, sir?

18  A.  They got something to eat, and I got the buck out and

19  proceeded to begin skinning the buck and hanging it up and --

20  and finished the final processing, so we could do a good job on

21  the game and preserve the meat real well for them.

22  Q.  And as you were doing that, sir, did something cause you to

23  stop dressing the deer out?

24  A.  Yes.

25  Q.  What was that, sir?

1  A.  Mr. Nelson said, I see smoke.

2  Q.  What happened next, sir?

3  A.  I turned around, and I saw clouds of smoke bill --

4  billowing up from the country that we had just came out of.

5  Q.  So looking at the map that's behind you, that -- that I

6  referred to before, could you put your hand in the general area

7  where you saw that smoke coming from?

8  A.  Right in there.

9       We were up here, looking back that way.

10  Q.  And as you say, this smoke was coming to your camp.  Could

11  you describe the intensity of the smoke.

12  A.  I'm sorry?

13  Q.  You said you saw smoke coming into your camp.  I'm sorry.

14  I'm mumbling.

15      Could you describe the intensity of the smoke?  Was

16  it wispy?  Was it thick?  What was it?

17  A.  It was a little bit wispy at first, and then it just kept

18  getting thicker and thicker and thicker.  And it was blowing

19  right directly at our camp.  And it got -- it got thick at our

20  camp rather quickly.

21  Q.  So what did you do?

22  A.  I told the Nelsons that we needed to get their deer and

23  their buck and get out of there.

24  Q.  And is that what you did?

25  A.  Yes, that's what we did.

1  Q.  Approximately what time would you estimate it to be when

2  you left your camp site that morning?

3  A.  Probably 9:30 to ten o'clock.

4  Q.  And where did you drive, sir?

5  A.  We drove back out the way we had come in.  Back out that

6  way, and all the way around, and back up to the base camp,

7  where we -- we had left Mr. Nelson's pickup.

8  Q.  And do you recall about how long this drive was, sir?

9  A.  I made it rather quickly, because I was in a hurry.

10        I would say probably two hours.

11  Q.  And where did you take the Nelsons, sir?

12  A.  I took them back to our base camp, where we left his

13  pickup, over there on the mountain.

14        MR. PAPAGNI:  Is the Google Earth --

15  A.  And --

16        MR. PAPAGNI:  Go back to the Google Earth, please.

17        Continuing playing.

18        (Video playing.)

19  BY MR. PAPAGNI:

20  Q.  We're trying to fast-forward as quickly as we can,

21  Mr. Choate, so if you can bear with us.

22        On this particular Google Earth, it indicates the

23  location of some smoke.  Did you have that smoke put in on

24  Google Earth when you were preparing it?

25  A.  Yes.

1        MR. PAPAGNI:  Continue.

2        (Pause, video playing.)

3   BY MR. PAPAGNI:

4   Q.  After you got the Nelsons back to their base camp, what did

5   they do?

6   A.  They decided they wanted to head on back home.

7   Q.  And where was home for them, sir?

8   A.  Salt Lake City.

9   Q.  And it indicates on the Google Earth -- it was

10  approximately what time, sir, did you dropped them off?

11  A.  It was probably 11:30.  And they probably left about 12:00,

12  to my best estimate.

13  Q.  You prepared this particular Google Earth and that bubble.

14  Correct?

15  A.  I helped prepare it, yeah.

16  Q.  And after they left, then, sir, what did you do next?

17  A.  I was rather upset.  And I had left all my gear down at my

18  camp, in a rush to get them and their gear out of there.

19        So I slowly started driving back down to my camp,

20  just taking my time up along the top, up on Moon Hill Road,

21  and watching the fire.  And watching what it was doing and

22  where it was going.  And thought if it would change

23  directions that might try to get back to my camp and get my

24  stuff.

25  Q.  As you were headed back, sir, did you stop to take photos?

1   A.   Yes, I did.

2   Q.   And looking again at Exhibit No. 1 -- the exhibit behind

3   you, sir, it says, "Choate approximate photo point."

4   A.   Right.

5   Q.   Is that where you took your first set of photos, sir?

6   A.   Approximately, yeah.

7   Q.   And you were the one who helped prepare that map?

8   A.   Yes.

9        MR. PAPAGNI:  Go on, Ms. Root.

10       (Pause, video playing.)

11  BY MR. PAPAGNI:

12  Q.   Now, we have on the screen a photograph.

13       Is this one of the photos you took, sir?

14  A.   Yes, it is.

15  Q.   Would you describe this photo for us, sir, because we

16  weren't there.

17  A.   I'm not sure how far away it was at this point.  I had a

18  pretty good camera with a telephoto lens.  And I took -- I took

19  wide-angle shots of the flame, and then I would zoom in on

20  the -- on the smoke and the flames, too.

21       I wanted to show how big the fire was by that time,

22  and I also wanted to show that smoke was blowing directly

23  right at my camp.  My camp -- you can't see it with the

24  picture, of course.  But my camp would be right down on the

25  right-hand side.  And when we left the camp, the smoke was

1  very -- very thick when we left the camp, and it was blowing

2  right at us.

3  Q.  And this is a photograph that you took?

4  A.  Yes.

5  Q.  And this would be approximately what time?

6  A.  It would probably be 12:30, one o'clock.

7       MR. PAPAGNI:  Go on, Ms. Root.

8  BY MR. PAPAGNI:

9  Q.  Is this a photograph you also took, sir?

10  A.  Yes.

11  Q.  And is this at the same location that we were looking at

12  before?

13  A.  Yes.

14  Q.  That you have on the map?

15  A.  Yes.

16  Q.  And what you did you do after you took those two photos

17  sir?

18  A.  I just kept driving.  I took more than two.

19  Q.  We'll see it.

20  A.  But I just kept driving slowly down the road and watching

21  the fire and seeing what it would do.  And seeing if I could

22  see anybody else, or -- or -- basically working my way back to

23  the camp.

24  Q.  Now, we're going to come back to the other photos that you

25  took, sir.  But for now, you're back at -- for Google Earth

1   purposes, you're back at your camp.

2         How long did it take you to get back to your camp?

3   A.  It took me quite a while because I went very slow.

4   Q.  Why did you go very slow, sir?

5   A.  I was still very concerned about the fire and what the fire

6   was going to do and which direction it was going to go.

7         You get on those roads up there, you can drive maybe

8   three or four miles an hour.  And if the wind's blowing ten

9   miles an hour, 20 miles an hour, you're toast.  So I was very

10  cautious on my way back, about which direction and how the

11  fire was going to act.

12  Q.  And when you did get back to your camp, sir, what was the

13  condition that you found it in?

14  A.  It was as I had left it.

15  Q.  And the smoke?

16  A.  The smoke had started going toward the south more.

17  Q.  And it was about what time?

18  A.  Probably about four or five o'clock.

19  Q.  And did you make a phone call at that particular time?

20  A.  Yes, I did.

21  Q.  Where did you call?

22  A.  I called the B.L.M. fire dispatch.

23  Q.  Before you called the fire dispatch, did you call other

24  phone numbers trying to reach dispatch or a particular

25  individual?

1   A.   Yes, I did.

2   Q.   And where was that?  Briefly describe what you did.

3   A.   The phone call?

4   Q.   Yes, sir.

5   A.   I called Mrs. Whitsel (phonetic).  I can't remember her

6   first name.  And talked to her, to get the phone number from

7   her.  Her husband was guiding some other hunters further to the

8   north that was up there.  And she gave me the fire dispatch

9   number to call.

10  Q.   Do you know her husband?

11  A.   Yes, I do.

12  Q.   His name is?

13  A.   Ah, I think it's Dan.

14  Q.   After you spoke to her, did you get the number you needed?

15  A.   Yes, I did.

16  Q.   And did you call -- you said Burns?

17  A.   Yes.  I called the Burns fire dispatch.

18  Q.   And what was the purpose of your making that call?

19  A.   I wanted to report the fire and get ahold of some game

20  cops, and tell them what I had saw about the shooting of the

21  bucks.

22  Q.   And were you able to reach him about -- what?  Six o'clock

23  in the evening?

24  A.   Approximately that time, yeah.

25  Q.   And after you spoke with him, what did you do next?

1  A.  I started cooking me some supper.

2  Q.  And did you notice anything go over your head, or fly

3  over -- did you notice anything fly over you at that time?

4  A.  Yes.  There was --

5  Q.  Before -- before I go onto this, there's questions.

6      Do you have any experience -- we talked about your

7  background.  Do you have any experience in flying?

8  A.  Yes, I have a private pilot's license.

9  Q.  And what type of planes have you flown?

10 A.  I've flown 172s and Pipers, B-12s and Super Cubs.

11 Q.  And this particular plane that went overhead, sir, did --

12 you saw a plane go overhead, I take it?

13 A.  Yes.

14 Q.  What type of plane was it?

15 A.  It looked to me like a Super Cub.

16 Q.  And had you seen that plane before, sir?

17 A.  Yes, I had.

18 Q.  And when had you seen it before?

19 A.  I had seen it circling over that area several times before.

20 And I think I saw it at the airport one time, and somebody told

21 me that it was --

22      MR. BLACKMAN:  Objection.

23      THE COURT:  Sustained.

24 BY MR. PAPAGNI:

25 Q.  Do you know whose plane it was, without someone telling

1  you, sir?  Did you see someone in it?

2  A.  I believed it was Dwight Hammond's airplane, yes.

3          MR. BLACKMAN:  I object and move to strike.

4          THE COURT:  The objection is sustained.  The answer is

5  stricken.

6  BY MR. PAPAGNI:

7  Q.  This particular plane, after it went overhead, sir,

8  where -- where did you camp for the night?

9  A.  After it went over my head?

10  Q.  Yes, sir.

11  A.  By that time I was very nervous, so I took my sleeping bag

12  and a sandwich, and I moved probably 75 yards up into the

13  trees, and I slept in the trees overnight.

14  Q.  Next morning, sir, did you have occasion to come in contact

15  with any game officers?

16  A.  Yes, I did.

17          MR. PAPAGNI:  And -- go ahead, please, Ms. Root.

18          (Video playing.)

19  BY MR. PAPAGNI:

20  Q.  Now, that bubble contains something that you have to

21  testify to, sir.  I want to stop it right there.

22          This particular plane that circled over your camp,

23  it indicates, in the bubble, it went a particular direction.

24          Can you testify that was the case?

25  A.  Yes, it was.

1    Q.   Do you know where Hammond ranch is located?

2    A.   Yes, I do.

3    Q.   Okay.  Was that the direction -- was that the direction it

4    flew, sir?

5    A.   That was the direction it came from and the direction it

6    went back to.

7    Q.   Thank you.

8         MR. PAPAGNI:  Continue on, Ms. Root.

9    BY MR. PAPAGNI:

10   Q.   About what time did you meet with them on October 1st,

11   Monday, the game officers?

12   A.   They arrived at about nine o'clock in the morning.

13   Q.   And what did the three of you do, at first?

14   A.   They ate breakfast.

15   Q.   Whose breakfast?

16   A.   Mine.

17   Q.   And then --

18   A.   The food I had.

19   Q.   Pardon me?

20   A.   Food I had with me.

21   Q.   And then where did you go?

22   A.   We drove on over -- we talked for a while, while they were

23   eating breakfast, and I told them the situation.  And I got in

24   with them, and we drove all the way back over to where the deer

25   herd had been shot up.

1        This fire was still burning, up toward the road.

2   These two fingers were -- we drove right by those two fingers

3   of flame, as we went by.

4        And then we got out and started looking -- they

5   started looking for blood trails, to see if they could find

6   crippled or dead deer.

7   Q.  Did you look yourself?

8   A.  Not very much.

9   Q.  Why not?

10  A.  Because I knew that the day after, blood trails are very

11  difficult to see.  They -- the blood dries, turns dark.  It

12  looks like dirt.  And I didn't expect to find any blood trails

13  that day.

14  Q.  And to your knowledge, did either of the officers?

15  A.  No, they did not find anything.

16  Q.  At some point were you standing by yourself while the

17  officers were out looking for the wounded deer or dead deer or

18  blood trails?

19  A.  Yes, I was.

20  Q.  And as you were standing there, sir, did other -- another

21  group of people come by?

22  A.  Yes, they did.

23  Q.  Would you describe for the jury -- well, let's catch up to

24  the Google Earth, before we do that.

25        (Pause, video playing.)

1  A.  It was the same pickup I had seen the day before, with

2  Mr. Hammonds in it.  And they were coming back out this way

3  (pointing).

4  Q.  So on the map you're mentioning, Exhibit No. 1, you say

5  they're coming out this way, they're going from the west,

6  driving toward the east?

7  A.  The east, yes.

8  Q.  And you were at what location when you saw them?

9  A.  I was probably up on this ridge, right here (pointing).

10 Q.  And that was the area where the deer had been shot?

11 A.  Yes.

12 Q.  And were you by yourself at that point?

13 A.  Yes, I was.

14 Q.  What were you wearing?

15 A.  I don't remember.  Probably camo.

16 Q.  Same clothes you wore the day before?

17 A.  Um-hmm.

18 Q.  And as they came by, were you in a position close enough to

19 see or at least observe who was in the pickup?

20 A.  I couldn't tell different individuals.

21      I did see the person in the white cowboy hat.  And

22 there was three or four people in the back of the pickup, had

23 a seat in the back of the pickup.  And there was three or

24 four people with rifles in the back of the pickup.  And I

25 could not tell if it was -- who -- who was in the pickup.

1  And who -- it was far enough away -- it was about 100 yards
2  away from me.
3  Q.  Did you tell -- from where you were, since you couldn't
4  tell who they were, as far as identification purposes, could
5  you tell by their height, their weight, if they were teenagers
6  or children in that pickup?
7  A.  No.
8  Q.  As they came by, did they stop and get out and talk to you
9  or have any conversation with you?
10  A.  No.  They just looked at me as they drove by, and kept
11  going.
12  Q.  And that was the same pickup you said you saw who driving
13  the day before?
14  A.  I saw Dwight Hammond driving it the day before.
15        MR. PAPAGNI:  Continue, Ms. Root.
16  BY MR. PAPAGNI:
17  Q.  And that was the end of the Google Earth search.
18        So give us just one moment.  We'll organize for a
19  second, and I'll have a few more questions.
20  A.  Okay.
21        Is there water in this?  (Indicating decanter.)
22  Q.  While Ms. Root is getting organized, sir, I'll try to be as
23  efficient as I can with our time.
24        While you were up there, you described who you met
25  and who you were with.

1    Besides the folks you had described for the jury

2 today, were there any other hunters or hikers, or any other

3 people in the area other than the folks that you described?

4    THE WITNESS:  There was nobody in -- in this area here

5 (indicating), other than the people I described.

6    Mr. Whitsel had a group of hunters back over this

7 way, about a mile.  But we never came in contact with any of

8 them.

9    And, to the best of my knowledge, there was no one

10 in that whole area.

11 BY MR. PAPAGNI:

12 Q.  Now, I mentioned, sir, that I would go back to these fires.

13    MR. PAPAGNI:  And if it's available, I would have you

14 pull up, if you would, Government's Exhibit, 11, 12, 13, and

15 14.  Starting with 11.

16 BY MR. PAPAGNI:

17 Q.  A photograph you took, Mr. Choate?

18 A.  Yes.

19 Q.  And this, again, would what would be Moon Hill Road?

20 A.  Moon Hill Road, yeah.  There's different names for it,

21 but --

22 Q.  And this particular photograph we're looking at, sir, do

23 you recall whether it was the one you first took, that you

24 were -- just after you left the Nelsons?  Or was it further up

25 the road after --

1  A.  It was further -- further down the road.

2       And you can tell by the smoke that the wind is dying

3  down a little bit because the smoke is going more straight

4  up.

5       MR. PAPAGNI:  No. 12, please.

6  BY MR. PAPAGNI:

7  Q.  Again, a photograph you took, sir?

8  A.  Yes.

9  Q.  And the wind is blowing smoke, still in the direction of

10 your camp?

11 A.  It is still blowing in the direction of my camp, yes.

12 Q.  And then No. 14, the final one, please.

13 A.  Now, that's one of the earlier pictures, when -- when the

14 wind was blowing stronger and keeping the smoke lower to the

15 ground, and blowing right at my camp.

16       MR. PAPAGNI:  Now, if I would -- Ms. Root, No. 7,

17 please.  If we could do No. 7.

18 BY MR. PAPAGNI:

19 Q.  This would be earlier in the morning.  Correct?

20 A.  Yes.

21 Q.  This is when you guys are still doing your hunt?

22 A.  It's probably the day before.

23 Q.  And that's the terrain and the territory we're looking at?

24 A.  Yes.  In fact that's where the bucks came from, and that's

25 where the hunters came from, is through that green trees and

1   right down off that hill.

2   Q.  When you were in this particular area, sir, did you see any

3   cattle?

4   A.  Any what?

5   Q.  Cattle; cows, calves.

6   A.  Not that trip, I don't believe, no.  We didn't see any

7   cattle that trip.

8   Q.  And Exhibit No. 8.

9           This is a photograph of the father and son.  We've

10  seen it.

11          No. 9, that's you.

12          And then No. 10, please.

13          That photograph we've seen, but that's the one of

14  Dustin Nelson?

15  A.  Yes.

16  Q.  Now, sir, to your back, I've got number -- Exhibit No. 1.

17  And we're going to ask, through the courtesy of the clerk, to

18  move No. 1.  And there should be a map aside -- behind it.

19          (Pause, exhibit placed on easel.)

20  BY MR. PAPAGNI:

21  Q.  And, sir, I have been referring you to exhibit numbers, and

22  I want to have it on the record.

23          If you look to your left, sir, you see those little

24  white circles.  They have numbers inside them.  And it's the

25  same thing with the photographs in the areas there.

1           Do you see them?

2   A.  Yes.

3   Q.  And before today you've had an opportunity to look at

4   those.  Correct?

5   A.  Yes, I've seen them.

6   Q.  And that represents the approximate location you were at

7   when you took those photos -- or the photographs were taken in

8   your presence?

9   A.  The photographs were taken from up in here, yeah

10  (pointing).

11  Q.  Thank you.

12          MR. PAPAGNI:  And just, to complete the record, Nos. 3

13  and 4, if we could just show them to Mr. Choate, off to the

14  side, please.

15  BY MR. PAPAGNI:

16  Q.  And I just want you to take a look at these, Mr. Choate, to

17  identify them, since they do contain reference to you, sir.

18  And just indicate if they're accurate.

19  A.  What was your question?

20  Q.  If you would just look at them, sir, and indicate whether

21  they are accurate and the locations that are indicated on those

22  particular maps.

23  A.  Yes.  As far as where I was.  It's --

24  Q.  With your name we're referring to.  Correct?

25  A.  The camp and the road and where the fire burned up and

1  across the road, and -- yes.

2  Q.  Now, Exhibit No. -- I'm sorry.  I'm getting a little ahead

3  of you.

4        If you would say the exhibit for me, Mr. Choate.  If

5  you can -- in the upper left-hand corner.

6  A.  Yeah.

7  Q.  And the Exhibit No. is what?

8  A.  No. 4.

9  Q.  Thank you.

10        And that, too, is accurate, sir?

11  A.  Yeah, it is.

12  Q.  Thank you.

13        MR. PAPAGNI:  Thank you, ma'am.

14        If you would go ahead and put up Exhibit No. 15,

15  please.

16  BY MR. PAPAGNI:

17  Q.  Now, 15 appears to be a map of the area.

18        Do you recognize that, sir?

19  A.  Yes, I do.

20  Q.  And why do you recognize it?

21  A.  It was a map that was given to me to describe where I was

22  and what happened, and different spots.

23  Q.  And did you draw that map yourself, sir?

24  A.  I didn't draw the map.  I drew the figures on the -- down

25  on the lower right side of it, where it's -- right there.

1      MR. PAPAGNI:  Thank you for enlarging it, Ms. Root.

2   BY MR. PAPAGNI:

3   Q.  So the -- the -- if you will, the markings on this map were

4   done by who, Mr. Choate?

5   A.  The camp, the -- No. 2, and the deer, and the arrows were

6   drawn by me.  I don't know what the 90 is.  That's not my

7   writing.  But I -- I wrote everything else on there.

8   Q.  Thank you.

9       And why did you draw -- prepare this particular map,

10  sir, and why did you draw it?

11  A.  Because -- I believe it was you that asked me to, to show

12  the directions of when I -- when the pictures of the deer were

13  taken, the directions we were facing when we took the pictures.

14  Q.  Thank you.

15      MR. PAPAGNI:  Other than the audio recording, your

16  Honor, Government -- Government's Exhibit No. 19 and the

17  transcript, No. 20 -- which I think the Court asked me to

18  request before I offered it, to review it, I'm done with my

19  direct examination.

20      THE COURT:  Cross.

21      MR. MATASAR:  Mr. Schroeder will be doing it.

22                      CROSS-EXAMINATION

23  BY MR. SCHROEDER:

24  Q.  Good afternoon, Mr. Choate.  My name is Alan Schroeder.

25      A few questions.

1    Who was the person that held the permit to allow the

2  Nelsons to go hunting with you?  What's the name of the

3  person?

4  A.  It was Brett Jantze.

5  Q.  Jantze is his name?

6  A.  Um-hmm.

7  Q.  And he was the one who held the permit?

8  A.  Yes.

9  Q.  And so were you within his employ to -- to work under his

10  permit?

11  A.  Yes.

12  Q.  And so were you paid as an employee, or were you paid as an

13  independent contractor?  How were you paid?

14  A.  Probably paid as an independent contractor, because he just

15  gave me a thousand dollar check, without any withholdings on

16  it.

17  Q.  And do you need any special permit, independent of that,

18  with the Oregon Department of Outfitters and Guides to do that,

19  or you can do it under his permit?

20  A.  I can do it under his permit, to the best of my knowledge,

21  yeah.

22  Q.  At that time, to the best of your knowledge?

23  A.  Um-hmm.  (Nods head.)

24  Q.  And so when you got this job, had you done any other jobs

25  with Mr. Jantze?

1  A.  No.

2  Q.  How did Mr. Jantze contact you for this job?

3  A.  He was put into contact with me by my son-in-law.  I

4  mean -- excuse me, my stepson, Lance Thurmond.  And he knew

5  Brett Jantze.  They had hunted together.  And he told Brett --

6  Brett got a Steens Mountain tag, and he told Brett that he knew

7  somebody that knew the Steens Mountains very well.  So he put

8  us in contact with each other.

9  Q.  And so you didn't have any independent permit with Oregon

10 Outfitters and Guides.

11         Did you have one with the B.L.M?

12 A.  No.

13 Q.  Did Mr. Jantze have one with B.L.M?

14 A.  I don't know.

15 Q.  You indicated that you communicated with the B.L.M. to try

16 to under -- understand things.

17        Before you went out on this hunt with the Nelsons,

18 did you go to the B.L.M. office?

19 A.  Yeah.  I had been to the B.L.M. office several times.

20 Q.  No, I am specifically asking you, before you went out on

21 the ground with the -- with the Nelsons, in preparation for

22 your hunt with the Nelsons, did you go to the B.L.M. office?

23 A.  No.

24 Q.  So you didn't go to the B.L.M. office and ask him if you

25 need any permitting?

1  A.  No.

2  Q.  Did -- you didn't go to the B.L.M. office to ask for any

3  land status mapping of the area?

4  A.  No.

5  Q.  You didn't go to the B.L.M. office to ask him if they had

6  any prescribed fires that were planned during the time of your

7  fire -- or --

8  A.  No.

9  Q.  -- excuse me, at the time that you were going to go out

10  with the Nelsons?

11  A.  No.

12  Q.  So when you went out with the Nelsons, you did not know

13  that the -- the Government had planned a prescribed fire

14  within -- on the Steens Mountains?

15  A.  No, I did not know that.

16          MR. PAPAGNI:  I'm sorry.  What was that last question?

17  On the Steens Mountain?

18          MR. SCHROEDER:  Yeah.  He did not know that.

19          THE WITNESS:  I assumed -- I assumed there was,

20  because we saw a large amount of smoke, way to the south of us

21  on Friday.

22  BY MR. SCHROEDER:

23  Q.  I know.  But my specific question is, in advance, in your

24  planning, did you -- did you find out or investigate whether or

25  not there was going to be any prescribed burning out there?

1  A.  No, I did not.

2  Q.  Okay.  Now, I was a little confused at -- at the base camp.

3  The photograph that had the tent in it, that was the

4  base camp that -- can you look over your left shoulder and

5  tell me what that exhibit number is, Mr. Choate, please.

6  Help me out.

7  A.  Over here?

8  Q.  Yes, sir.

9  A.  That's No. 2.

10  Q.  Thank you.

11  Looking at No. 2, where it says "Choate/Nelson camp

12  site," is that the base camp where the tent was?

13  A.  Yes.  This camp site right there is where the tent was.

14  Q.  Okay.  So when it says "base camp" on the bottom right-hand

15  corner of Exhibit 2, that wasn't the base camp where you had

16  the tent?

17  A.  No.  This was the base camp where the -- I called it the

18  base camp, because that's where the trailer -- my camp trailer

19  was and where he left his pickup.

20  Q.  Okay.  Now, when you met with Mr. Jantze about this, did he

21  tell you the period of time that you were expected to take the

22  Nelsons out on this hunt?

23  A.  They paid for up to a five-day hunt.

24  Q.  Okay.  And until they got success, they could leave at that

25  point in time, if they wished?

1   A.   Either or, yeah.   They could count five days or until they

2   got a buck, yes.

3   Q.   In this case they were successful -- what?  On -- in a

4   sense, the second full day?

5   A.   The second day, yes.

6   Q.   And so under your contractual relationship with them, they

7   certainly were welcome and free to leave at that point in time,

8   regard --

9   A.   Yes, they were.

10  Q.   Okay.

11  A.   And they could have stayed, if they so --

12  Q.   And they could have stayed.

13  A.   Yes.

14  Q.   But, certainly, you didn't have any obligation or -- strike

15  that.

16       They didn't have any obligation to stay, if they had

17  success; they could leave, if they wanted to?

18  A.   Yeah.   (Nods head.)

19  Q.   And in this case, they had success.

20  A.   (Nods head.)

21  Q.   And you helped them with that, and they went home?

22  A.   Yes.

23  Q.   Now, I think it was, you said, the morning of September

24  30th, 2001, when you stayed at the camp site, that's noted on

25  Exhibit 2.  And you drove down a road.

1    Would it be fair if I could call that the Bridge

2    Creek Road?

3    A.   Where do you mean?

4    Q.   Well, it's marked in yellow on Exhibit 2, just where your

5    Choate/Nelson camp site is.

6    A.   Um-hmm.  Right here (pointing).

7    Q.   Yes.

8    A.   This is one of the Bridge creeks.

9    Q.   Right.  I just want to get on the same terminology with you

10   relative to this exhibit because sometimes people will be

11   reading this transcript who aren't here and see your hand

12   movements.

13   A.   Right.

14   Q.   And so I'm going to be calling that road the Bridge Creek

15   Road, so you and I understand things.  Is that okay?

16   A.   Sure.

17   Q.   So when you got up in the morning, you said you got up at

18   daybreak?

19   A.   Yes.

20   Q.   And --

21   A.   No, we got up before daybreak.

22   Q.   Thank you.  And did you serve the Nelsons breakfast?

23   A.   Yes, I did.

24   Q.   And at what point in time?  Was it daybreak that -- when

25   you left the camp site?

1  A.  Which morning?

2  Q.  I'm talking the morning of September 30th.

3  A.  The day we killed the buck or the first --

4  Q.  Yes, sir.

5  A.  The day we killed the buck?

6  Q.  Yes, sir.

7  A.  It was before daylight we left camp and drove all the way

8  over to where we parked the pickup, in the dark.

9  Q.  Okay.  And then you drove south onto Bridge Creek Road from

10  your camp site location?

11  A.  Yes.

12  Q.  And then you went to a point where you said you had scouted

13  deer before.  Is that right?

14  A.  Um-hmm.

15  Q.  How much earlier had you scouted the deer before?

16  A.  I had been up there probably five or six times in the month

17  prior to hunting season.

18  Q.  Oh, so we're talking between -- maybe July and August of --

19  A.  It was part -- a couple of times in August, and probably

20  three or four times in September.

21  Q.  And based upon that information, you knew it was probably a

22  reliable place for deer to be observed and potentially hunting?

23  A.  Yes.

24  Q.  And obviously that day, that came to be true?

25  A.  Yes.

1    Q.   Now, when you saw the deer at the time, when you were

2    scouting for it, did you see the type of deer that Dustin ended

3    up shooting on September 30th?

4    A.   I saw several bucks that size, and I also saw some bigger

5    ones.

6    Q.   Did you see any forked horns in that area?

7    A.   Oh, yeah, yeah.   There was lots of forked horns.

8    Q.   I'm sorry.   Did you --

9    A.   There's lots of forked horns in that area, too.

10   Q.   Okay.   And when you saw -- saw this particular deer, was

11   the one that Dustin shot at, was that the only one?   Was he by

12   himself, or was there a number of deer with him?

13   A.   No, there was probably five or six deer altogether, with

14   him.

15   Q.   And did you station him and help him pick out the best one

16   to shoot at?

17   A.   Yes, I did.

18   Q.   And did he -- did he get the best one?

19   A.   Yes, he did.

20   Q.   Good.

21   A.   In that group.

22   Q.   In that group.

23   A.   Um-hmm.

24   Q.   After -- after this was done, you indicated in your

25   testimony that Mr. Nelson wanted Dustin to dress it out.

1    A.  (Nods head.)

2    Q.  Does that mean clean it and skin it, and -- and package it

3    for removal?

4    A.  No.  That means taking the intestines out.  Field dressing,

5    it's called, where you just remove the intestines and the

6    stomach and the lungs.

7    Q.  And -- and Mr. Nelson wanted his son to experience that?

8    A.  Yes.

9    Q.  Okay.  And so why -- why was it at that point in time that

10   you brought the truck around?  Just so they could drag it down

11   the hill?

12   A.  It was -- I could get the truck a lot closer to them, and I

13   could be right below them, where they could drag the deer

14   downhill, instead of having to go around the side hill.

15       Deer don't drag very easily, but if you're going

16   downhill, it makes it a little bit easier.

17   Q.  Understood.  And so Dustin and Mr. Nelson stayed with the

18   deer?

19   A.  Yes.

20   Q.  And you went back to the truck and then drove it down so

21   that they could drag it down the hill?

22   A.  Yes.

23   Q.  And that's when you said you had the encounter -- or you --

24   you saw Dwight Hammond at that point in time?

25   A.  Yes.

1  Q.  You did not see Steve Hammond in the truck at that time?

2  A.  No.

3  Q.  After Dwight Hammond left in his truck, you indicated that

4  the deer was brought down, and you put it in the back of the

5  truck.

6       Did -- did you begin to dress it at that time, or

7  did you just put it in the truck?

8  A.  We put it in the truck, and I covered it up with some deer

9  bags that I had to keep the dust out of the interior.

10 Q.  Understood.

11      And so then you turned around, and then you were

12 going to head back up Bridge Creek Road, back to your camp?

13 A.  Yes.

14 Q.  And is that the place you were going to dress it out, or

15 were you going to dress it out clear over at your other base

16 camp that's indicated on Exhibit 2?

17 A.  I was going to dress it out at this camp here.

18 Q.  Okay.

19 A.  Where the tent was.

20 Q.  Mr. Choate, make sure that I finish my question, and then

21 you -- you finish the answer, okay?  And I'll do the same with

22 you.

23 A.  Thank you.

24 Q.  Thank you.

25      And so when you got back to the camp, to dress it

1   out, you hang it on a tree?

2   A.   Yes.

3   Q.   Okay.  And at what point in time are you saying that you

4   got back to the camp site?

5   A.   Again, it's just a best guess because I didn't have a

6   watch.  But I estimate it to be about ten o'clock.

7   Q.   And so in between daylight and ten o'clock is the time when

8   all of the hunting occurred; you're seeing Dwight Hammond, and

9   your seeing the other hunters coming across the hill and

10  shooting at deer?

11  A.   Yes.

12  Q.   And once you got back -- strike that.

13        When you saw the other hunters, you indicated you

14  saw one with a white hat.  And you're saying it's a white

15  cowboy hat?

16  A.   Yes.

17  Q.   You didn't see -- you say you were certain -- or 95 percent

18  certain it was Steve Hammond.

19  A.   Um-hmm.

20  Q.   Did you see him in a baseball cap that day?

21  A.   No.

22  Q.   And so it's your testimony it was Steve Hammond, with a

23  white cowboy hat that day?

24  A.   I saw a person with a white cowboy hat that I guessed was

25  Steve Hammonds.  It looked like Steve Hammonds, from about 60

1  yards away.

2  Q.  Okay.  And so that's your guess as to who it was?

3  A.  Yes.

4  Q.  Okay.  Now, once you're back at the camp site, dressing out

5  the deer, did you serve the Nelsons lunch?

6  A.  They -- they helped themselves.  I didn't serve it to them.

7  I said, I'm going to take -- told them I'm going to take care

8  of the deer and finish gutting it, skin it out and bagged up

9  and cleaned up.  And they could just dive into the food and

10  have a snack, whatever they wanted to do.

11  Q.  So Dustin did the dressing out, and you did the rest of

12  the --

13  A.  Yes.  Yes.

14  Q.  -- preparation of the deer --

15  A.  Yes.

16  Q.  -- to get it transported?

17  A.  Yes.

18  Q.  And so to do that, you do what?

19  A.  I left it in the back of the pickup, and uncovered it, and

20  proceeded to skin the -- the hind legs out, and split the skin

21  up the brisket, and up to the neck.  And then I hung it up in a

22  tree, and proceeded to skin the rest of it.

23          And when I had it skinned -- I got interrupted

24  before I finished the skin.  But afterwards, when I got to

25  finish the skin, I skinned it.  And got a bunch of water, and

1   washed it all out, and cleaned it all up as best I could.

2   Q.   Takes some time to do that?

3   A.   Yes, it does.

4   Q.   Now, once you did all of that, you indicated that the

5   Nelsons decided to -- to go -- to go back to Utah.  Is that

6   where they were from?

7   A.   Yes.

8   Q.   And so you had to transport them back?

9   A.   Yes.

10  Q.   And at that point in time you decided to leave all of your

11  camp stuff there at the camp site?

12  A.   I wouldn't have, if it wouldn't have been for the smoke.

13  Q.   Well, at least at that point in time you felt it was safe

14  enough to leave it there.  Isn't that correct?

15  A.   No, I didn't think it was safe enough to leave it there.  I

16  expected to find -- find a burned up camp when I got back.

17  Q.   But I guess in this case you made the judgment to leave it

18  there, and you didn't pack it up.  Is that correct?

19  A.   That's correct.

20  Q.   Okay.  Now, after making that judgment call that you made,

21  you drove the -- the Nelsons back to the base camp where their

22  vehicle was staying -- at, noted on Exhibit 2?

23  A.   Yes.

24  Q.   Okay.  And then you said your good-byes, and they said

25  thank you, and the congratulations, and they went home?

1   A.   Um-hmm.

2   Q.   Okay.  And then you traveled back?

3   A.   Yes.

4   Q.   Okay.  And you said you went slowly?

5   A.   Very slowly.

6   Q.   Now, once you got back, at what point in time did you

7   say -- well, strike that.

8        At what point in your travels back -- I'm not asking

9   a time -- did you call dispatch?

10  A.   It was after I got back to camp.

11  Q.   Okay.  So it was at the camp that you called dispatch?

12  A.   Yes.

13  Q.   Is there cell coverage there?

14  A.   Yes.

15  Q.   And -- and so that's when you called.

16        Did -- did you have an occasion when you indicated

17  that you met with Mr. Papagni in preparation of today?  Did

18  he show you any dispatch records at all?

19  A.   Yes, he did.

20  Q.   And did he show you any dispatch records indicating that

21  you called dispatch on September 30th, 2001, at 17:57 hours?

22  A.   Whatever time it was.  I don't know military hours.  It was

23  five or six o'clock.

24  Q.   Were you in the military?

25  A.   No.

1   Q.  Can you tell me what 17:57 means, in terms of time?

2   A.  Probably about 5:00 or 6:00.

3   Q.  So that would be at 5:57 that you made the call to

4   dispatch?

5   A.  Um-hmm.

6   Q.  And so when you testified that it was at 4:00 to 5:00, that

7   was a little bit earlier than what the dispatch records would

8   indicate.  Is that correct?

9   A.  Um-hmm.  I guess, yeah.

10          MR. SCHROEDER:  No further questions, your Honor.

11          THE COURT:  Redirect.

12          MR. BLACKMAN:  Oh, I think -- I -- I'll be brief, your

13  Honor.

14                      CROSS-EXAMINATION

15  BY MR. BLACKMAN:

16  Q.  When did you first see the smoke to the south?

17  A.  When did I first see the smoke to the south?

18  Q.  To the south.  You mentioned something about smoke to the

19  south.

20  A.  Yes, that was after Mr. Nelson pointed out to me that there

21  was a bunch of smoke coming from where we had just came from.

22          And I turned around and looked, and I had saw it at

23  that time.

24  Q.  Okay.  So I thought you said that you had seen smoke

25  further south.

1  A.  We did.

2  Q.  Okay.

3  A.  On Friday.  That was the day before the season.

4       We saw a bunch of smoke coming from way south, like

5  20, 30 miles away from us.

6  Q.  Okay.  So you do not recall seeing smoke to the south on

7  the day you were talking about, September 30th?

8  A.  No.  There was no smoke came from the south, that day.

9  Q.  Okay.  So you're not aware that the B.L.M. was burning to

10  the south that day?

11  A.  No.

12  Q.  Okay.  The game officers that came the next day, do you

13  know their names?

14  A.  Yeah.  It was Rod Stannus (phonetic), and the other guy was

15  a sheriff's deputy.  He wasn't really a game officer.  His name

16  was -- I believe it was Matt Revak.

17  Q.  Might have been Pete Revak?

18  A.  Might have been Pete Revak, yeah.

19  Q.  And might Pete Revak have been with U.S. Fish & Wildlife?

20  A.  I'm not sure.

21  Q.  Okay.  Did you have a conversation with either of them

22  about the burning activity that had been done by B.L.M. the day

23  before?

24  A.  No.  I don't recall mentioning that to them.

25  Q.  Or did they mention it to you?

1   A.   No.

2   Q.   Have you ever tried to find an injured buck using a dog?

3   A.   Yes, I have.

4   Q.   Okay.  And that's -- if you're trying to find an injured

5   animal, rather than tracking it by humans, isn't the easiest

6   way to use a dog?

7   A.   Yes, but I believe that's illegal.

8   Q.   Well, it's illegal if you're hunting down a -- an alleged

9   illegal shooting?  In other words, if you're a law enforcement

10  officer?

11  A.   Probably it would be legal for a law enforcement officer to

12  do it.

13  Q.   And you had called in at 5:57, the night before, to report

14  what you had believed to have been illegal hunting?

15  A.   Yes.

16  Q.   And the officers who were responding to you the next day

17  were there to investigate that report of illegal hunting?

18  A.   Yes.

19  Q.   There was no dog, no other assistance in trying to actually

20  track any --

21  A.   No.

22  Q.   -- animal that might have been injured?

23  A.   No.

24  Q.   You have to speak loud enough so --

25  A.   No, there was no dog with them.

1  Q.  Does the camera that you use have a capacity to capture the

2  date and time of the photograph?

3  A.  Yes, it does, but I had that turned off, I believe.

4  Q.  Okay.  At least it's not on the photos.  You agree with

5  that?

6  A.  It's not on the photos.

7  Q.  Last question.

8      Do you know Russell Hammond?

9  A.  No, I don't.

10  Q.  Do you know who that is?  Do you recognize that name?

11  A.  All I know is it's the Hammonds.  I don't know how he's

12  related.  No, I don't know who that is.

13  Q.  Okay.  Do you know Scott Gustofson?

14  A.  No.

15  Q.  Do you know Jacon Taylor?

16  A.  No.

17  Q.  Do you hunt -- I lied -- I guess I lied.  I do have another

18  question.

19      Do you hunt for yourself?

20  A.  Yes, I do.

21  Q.  Are you familiar with the fact that there are different

22  seasons for different wildlife?

23  A.  Oh, yeah.

24  Q.  Do you remember in '01 when the elk season was?

25  A.  That year?

1    Q.    Um-hmm.

2    A.    No, I don't remember that year.  It changes every year, it

3    seems like.

4          MR. BLACKMAN:  That's all.  Thank you.

5          MR. PAPAGNI:  Couple of questions.

6                      REDIRECT EXAMINATION

7    BY MR. PAPAGNI:

8    Q.    When Dustin Nelson shot his deer, who tagged it?

9    A.    He did.

10   Q.    And how many times have you dressed a deer?

11   A.    Lots.

12   Q.    So when you were asked this question by this gentleman here

13   about how long it took to dress a deer, some people can do it a

14   little quicker if they've got a little more experience?

15   A.    Oh, yeah.

16   Q.    And this gentleman was asking you about leaving your camp

17   to maybe burn up.

18          What was more important to you at the time, the

19   Nelsons or your camp?

20   A.    The Nelsons were definitely the most important.

21   Q.    And I don't want to strike that.

22          And as far as the V Lake is concerned, do you know

23   where V Lake is located?  Have you heard of V Lake, in that

24   neck of the woods?

25   A.    V Lake.

1  Q.  V Lake.  Have you ever heard of that sir?

2  A.  No.

3  Q.  Okay.  And you were asked a series of questions regarding

4  this phone call that you made to the Burns dispatch center.

5        MR. PAPAGNI:  By courtesy of the bailiff, I would ask

6  you to look at Government's Exhibit No. 20.

7        Don't put it up on the screen yet.  I want to make

8  sure the judge knows which one I'm referring too, first.

9        THE WITNESS:  Yes, I recognize that as a transcript of

10  my phone call.

11  BY MR. PAPAGNI:

12  Q.  You were asked about the gentleman about this transcript.

13  And you've seen it before today.  Correct?

14  A.  Um-hmm.

15  Q.  And it has the military time at the top.  Correct?

16  A.  Yes.

17  Q.  And you used that transcript to refresh your recollection

18  about the phone call you made to the Burns Interagency

19  Communications Center.  Correct?

20  A.  Yes.

21        MR. PAPAGNI:  Okay.  Now, we have the audiotape here,

22  and I believe it's been admitted into evidence, but I don't

23  want to go into it yet.

24        So with that, I have no further questions of my

25  direct -- redirect, your Honor.

1          THE COURT:  Thank you.

2          Anything else?

3          All right.  Members of the jury, some of you are

4   farm folks.  That's my background, too.

5          You don't always finish things at five o'clock, do

6   you?  If you're on the farm.  And we didn't today, but I'll

7   work hard to do that.  But better to finish this witness, and

8   take a new one in the morning.

9          We'll start at nine o'clock.  Thank you very much.

10  Have a good weekend.

11         MR. MATASAR:  Your Honor?

12         Could we have just one minute after the jury leaves?

13         THE COURT:  Yes.  Of course.  I'll stay right here.

14         THE WITNESS:  Am I excused?

15         THE COURT:  You are excused.

16         Thank you, Mr. Choate.

17         MR. PAPAGNI:  Mr. Choate, if you would please wait

18  outside for me, sir.

19         (Jurors exit.)

20         THE COURT:  All right.  Mr. Matasar.

21         MR. MATASAR:  Your Honor, I just want to follow up on

22  our objection to the Google Earth exhibits.

23         There's -- there's just two things I want to

24  mention.

25         One is the sort of rehearsed nature and preparation

1    with the witness of a movie that has been shown that is

2    wholly unlike what typical testimony is.  It may be where

3    we're going in the future, but I want to reiterate my

4    objection.

5         And, second of all, specifically there were several

6    times that it acted as a -- a -- sort of a super gigantic

7    leading question, because the Google Earth was shown past the

8    point where the witness was testifying.

9         And so I -- if you're going to let them continue to

10   do them, in general I would ask that you and the Government

11   be particularly alert that they can't be showing things like

12   Choate back at camp ground, phones in a report to the B.L.M.

13   dispatcher, the airplane in a certain direction.  We really

14   can't have that kind of super, fancy leading questions.  So I

15   make both objections.

16        THE COURT:  You do it after the questions asked.  You

17   should see -- I'm going to talk on computer-generated evidence.

18   And it is -- some of the theoretical questions involved --

19   involved are fascinating.  Some of the best have been done

20   concerning airplane accidents.  I don't know if you've seen any

21   of those, but they really are quite fascinating.

22        I've seen -- I've seen an excellent one done on a

23   murder case, and which was much more suggestive than we saw

24   today, frankly.

25        But I understand.  And we will -- I'll continue to

1  tell the jury that this is -- I think I even used the words

2  today, which I tried to make the point pretty strongly with

3  the jury when I said they're showing this to illustrate their

4  story.

5          MR. MATASAR:  And maybe you can also tell them it's

6  not going back to the jury room.  I know we know that, that

7  that's what you mean when you say it's demonstrative.  But

8  maybe they should --

9          THE COURT:  Well, eventually they'll ask for it, and

10  I'll tell them no.

11          MR. MATASAR:  So you're saying I should make leading

12  question objections at the time.

13          THE COURT:  If you wish.

14          MR. MATASAR:  Understood.

15          THE COURT:  And then you'll do it a couple of times.

16  I'll tell the jury what you're doing, and you'll stop.

17          MR. MATASAR:  That's okay.  That's how it works.

18          MR. PAPAGNI:  I appreciate Mr. Matasar's objections.

19  But I think we did a pretty good job of trying to get the

20  witness to testify before the bubble popped up.  I think there

21  were two occasions it did not.

22          And I think I even made the point of saying that, so

23  the jury would know it.

24          And so I apologize, Mr. Matasar, by Ms. Root was

25  doing the best she can.  And we'll try do the best with

1    Mr. Glascock and Mr. Okeson.  Unfortunately, they're not

2    until probably next week.

3         So we have that little issue.  I apologize to the

4    Court about the letter that came in through Mr. Dyer.  It was

5    a letter the defense had given me, so I thought they were

6    aware of it.  And it was my mistake, and Ms. Root.  We had

7    had it marked, but there was some confusion, as to having an

8    earlier withdrawal of letters.

9         I do know that after Mr. Blackman's done saying some

10   things, I do know my co-counsel has some things for the

11   Court.

12        THE COURT:  All right.  Well, before she speaks,

13   I'll -- none of you need to take your testosterone before

14   tomorrow.  You're doing just fine in that regard.

15        You'll find a pace that works just fine.  I'm

16   planning on about ten witnesses a day, just so that you know.

17        Ms. Sgarlata.

18        MS. SGARLATA:  Thank you, your Honor.

19        From the defendants' opening statements, I have a

20   couple of issues.  One was there was a mention of origin and

21   cause reports, and there was specific mention that my ears

22   heard to say those reports would be offered to the jury.  And

23   I'm aware of one origin and cause report in the defendants'

24   exhibits that's been admitted.  I'm not aware of plural.  And

25   I wonder if they mean --

1          THE COURT:  There was a remark made about plural.

2          MR. BLACKMAN:  Your Honor.

3          THE COURT:  Is that a misstep?

4          MR. BLACKMAN:  I cannot answer.

5          I intend to cross-examine the Government witnesses

6   with the statements in the O and C reports that say that they

7   were torching on the D side of the road.

8          THE COURT:  You have the same ones.  That's what I

9   understood him to mean.

10          MS. SGARLATA:  That's fine, your Honor.  But my issue

11   is this.  If that's what they want to do, use those reports to

12   impeach my witnesses with -- as prior inconsistent statements,

13   or what have you, I would like the Court to admonish the jury

14   that those are not for the truth.  They're only for

15   impeachment.  And that those are not going back to the jury

16   either.

17          THE COURT:  Well, I'll handle it when we get to it.  I

18   understand how that works.

19          MS. SGARLATA:  I have another issue that was raised as

20   well in the opening statement, and that goes to proposed expert

21   testimony.

22          We haven't been advised of any experts who are

23   experts in lightning or lightning-struck trees or anything

24   having to do with fire behavior, frankly.

25          We know that we have Roy Hogue who has origin and

1   cause determination experience.  A lightning struck tree from

2   six years later, I think it's difficult to look at a tree six

3   years later.  I don't think Mr. Hogue has the expertise for

4   that.  So I would like to know who is going to be testifying

5   to that.

6           THE COURT:  I will tell you that before -- he's the

7   only expert I know of.  And I'll -- before he's called, we'll

8   have a little mini-**Daubert** hearing, on non-8:00-to-5:00 hours.

9   And you'll have a chance to ask him:  Are you sure you can tell

10  six years later?

11          MS. SGARLATA:  We appreciate that.

12          MR. BLACKMAN:  And, your Honor, with all due respect

13  to Ms. Sgarlata, she was present with me when we talked with

14  Mr. Hogue on the phone quite recently, when he explained to her

15  how he had walked the areas, located lightning struck trees,

16  located aerial photographs that preceded --

17          THE COURT:  Okay.  You're too early -- you're too

18  early for that.  I don't need argument.  But with a few

19  questions of him we can make the record in this regard, and

20  I'll give you a decision.

21          MS. SGARLATA:  Thank you, your Honor.

22          MR. PAPAGNI:  I think it would make judicial efficient

23  use of time, while we're doing Mr. Hogue, we might want to take

24  care of -- what is his name?  Senator (phonetic)?  We just got

25  his report.  We might take care of him, too.

1          THE COURT:  That's fine.

2          MR. PAPAGNI:  Thank you, Judge.

3          MR. BLACKMAN:  The only thing I want to raise, your

4    Honor, is scheduling.

5          I had assumed -- foolishly thought that we might

6    have made a mistake by scheduling our first witnesses for

7    Monday; that the Government might finish, and you might

8    expect us to call witnesses on Friday.  And we were

9    discussing last night whether we ought to have some people

10   available on Friday.

11         Then in -- I think it was in opening, Mr. Papagni

12   mentioned that Mr. Glascock would be testifying on Monday.

13   And I think he may have just mentioned that somebody else

14   might be testifying --

15         THE COURT:  Let me tell you how that's going to work,

16   all right?

17         MR. BLACKMAN:  Because I want to know when you want to

18   have -- I want to be clearly instructed on when we're expected

19   to have a witness, so if we don't have somebody -- but it's

20   before we were told to -- we are not in trouble.

21         THE COURT:  You probably should have someone hanging

22   around on Friday.  And if Mr. Papagni can tell me a reason he

23   needs to hold the witness until later because of some personal

24   issue, I'll consider it.  But in that case we may not wait for

25   all of his witnesses before you call some.  I'll reserve any

1  motion/right you have.

2        With regard to -- frankly, I know that -- well,

3  Mr. Papagni has witnesses listed at 30-some, or something

4  like that.  And if he calls them all, it will be the first

5  time he's done it.  So maybe he will.  We'll see.  You know,

6  usually that doesn't tend to happen, as you know; as we all

7  know.  Right?  We -- we do -- we do prophylactic witnesses.

8        MR. BLACKMAN:  And, let me say, we can arrange to have

9  some witnesses available Friday afternoon.

10        THE COURT:  Um-hmm.

11        MR. BLACKMAN:  It would be very inconvenient if we did

12  that and then they had to go back.

13        THE COURT:  I understand.  I'm going to watch it

14  carefully, and I expect that as we get closer -- well, what --

15  here's what I want you to do.  Mr. -- for the Government's

16  side, and you later.  As we get there, I would like to have you

17  to give me for -- at least on a half-day basis, witnesses you

18  have lined up to call and exhibit numbers which you'll need, so

19  Ms. Wright can be --

20        MR. PAPAGNI:  The exhibit list we amended has exhibit

21  numbers with the witnesses all ready for her.  We did that.

22        THE COURT:  Okay.  All right.  Let's just watch and

23  see how we do.

24        But, Mr. Papagni, if we're getting closer to the

25  end, they do need some time to get people here.  And you know

1   how impatient I am with time off of the trial.

2           MR. MATASAR:  Could we hear the witness -- tomorrow's

3   half day?

4           MR. PAPAGNI:  You've got --

5           MR. MATASAR:  We have a whole list, and I don't know

6   if you're cutting people out.

7           MR. PAPAGNI:  Well, right now I think that Dusty

8   Hammond's going to be taking the stand tomorrow afternoon.

9   We've got the Nelsons in the morning.  He has dialysis, but we

10  think that is taken care of.

11          I sent my agent out to tell our witnesses,

12  assistant, to make sure we get -- you know, the judge wants

13  to do ten a day.  So we better line them up.

14          THE COURT:  Right.  And if you're running out of --

15          MR. BLACKMAN:  Excuse me, your Honor.

16          But in the order you list them probably?

17          MR. PAPAGNI:  That's my hope.  And if I don't have a

18  witness here, then I'll take them out of order because I have a

19  few backups.

20          MR. BLACKMAN:  So that means that, for example, you're

21  not calling Mr. Jantze, because he was between Mr. Dyer and --

22          MR. PAPAGNI:  Mr. Jantze will probably testify on

23  Friday, if I want him to.

24          THE COURT:  Basically -- you know, there's this little

25  book that the Federal Bar Association in Oregon puts out, tell

1  about the quirks of the judges of the court.  And I stopped

2  filling out the questionnaire.  But I particularly liked the

3  answer of one of my courtroom deputies.  I just -- a previous

4  one, Pat Mermis.  I just handed it to her.  You fill it out,

5  you know my quirks.

6        And to the -- to the question that it asked, What is

7  the penalty for running out of witnesses, and she wrote, A

8  savage lecture from the bench.

9        (Laughter.)

10       MR. PAPAGNI:  You told me one time my case was done.

11       THE COURT:  Well, I -- I am capable of that, if I

12  think I've heard enough.

13       MR. PAPAGNI:  There are -- there were some issues we

14  left unresolved last Tuesday, Judge.  One of them was this

15  recusal issue, and I tried to skirt it during my opening

16  statement.  Not very well, apparently.

17       But we also have the Dusty Hammond issue.  We also

18  have some tape recordings.  I don't want to go afoul of the

19  judge who can give you a savage lecture.  But if there's some

20  point that -- I don't want to step over the line --

21       THE COURT:  You want to ask some questions about the

22  tape before they're offered?

23       MR. PAPAGNI:  Some things like that, yes, Judge.

24       THE COURT:  Okay.  Well, do you need to put those tape

25  recordings in right away?

1        MR. BLACKMAN:  Are you talking about the Joe Glascock

2   calls?

3        MR. PAPAGNI:  Correct.

4        THE COURT:  Yes.

5        MR. BLACKMAN:  Your Honor, again, our intention was to

6   use those in cross-examination of Mr. Glascock, until we got

7   Mr. Steninger.  We knew about them about a week before that.

8        THE COURT:  Yeah.

9        MR. BLACKMAN:  When Steninger's report came out, and

10  he made reference to them, then we realized -- we provided

11  them.

12       THE COURT:  You can use them for that reason.

13       MR. BLACKMAN:  And at this point, since I didn't use

14  them in opening, they'll come in when Mr. Glascock testifies.

15       THE COURT:  Sure.  Okay.

16       MR. PAPAGNI:  Thank you, Judge.

17       THE COURT:  Thank you all.  Have a good evening.

18       (Court adjourned.)

19                        -0-

20

21

22

23

24

25

1

2                                  --oOo--

3

4    I certify, by signing below, that the foregoing is a correct

5    transcript of the oral proceedings had in the above-entitled

6    matter this 12th day of June, 2012.  A transcript without an

7    original signature or conformed signature is not certified.  I

8    further certify that the transcript fees and format comply with

9    those prescribed by the Court and the Judicial Conference of

10   the United States.

11

                  /S/ Amanda M. LeGore

12               _____

13                  AMANDA M. LeGORE, RDR, CRR, FCRR, CE

14

15

16

17

18

19

20

21

22

23

24

25