IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,        )
                                 )   Case No. 6:10-CR-60066-HO
            Plaintiff,           )
                                 )
v.                               )   June 20, 2012
                                 )
STEVEN DWIGHT HAMMOND (1) and    )
DWIGHT LINCOLN HAMMOND, JR., (2), )
                                 )   Volume 7B
            Defendants.          )
================================ )   Pendleton, Oregon


TRANSCRIPT OF PROCEEDINGS
(Jury Trial – Afternoon Session)

BEFORE THE HONORABLE MICHAEL R. HOGAN, DISTRICT JUDGE


COURT REPORTER:              AMANDA M. LeGORE, RDR, FCRR, CRR, CE
                             U.S. Courthouse
                             1000 SW Third Avenue Rm 301
                             Portland, OR  97204
                             (503)326-8184

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:          FRANK PAPAGNI
 2                               ANNEMARIE SGARLATA
                                 Assistant U.S. Attorneys
 3                               U.S. Attorney's Office
                                 1000 SW Third Avenue
 4                               Portland, OR  97204
                                 (503)727-1000
 5
     FOR DEFENDANT STEVEN
 6   HAMMOND:                    LAWRENCE MATASAR
                                 621 SW Morrison Street #1025
 7                               Portland, OR  97205
                                 (503)222-9830
 8
                                 W. ALAN SCHROEDER
 9                               Schroeder & Lezamiz Law Offices, LLP
                                 P.O. Box 267
10                               Boise, Idaho  83701
                                 (208)384-1627
11
     FOR DEFENDANT DWIGHT
12   HAMMOND, JR.:               MARC BLACKMAN
                                 Ransom Blackman, LLP
13                               1400 - 1001 SW Fifth Avenue
                                 Portland, OR  97204-1144
14                               (503)228-0487

15

16

17

18

19

20

21

22

23

24

25
```

1711

```
                              INDEX



                          Witness Index

FOR THE PLAINTIFF:          Direct  Cross    ReDirect   ReCross
Daniel Gonzalez             1712    1727



FOR THE DEFENDANT:          Direct  Cross    ReDirect   ReCross
Jacon Taylor                1733    1740     1750
Jacon Taylor                        1744
Scott Gustafson             1751    1757
Jody Starbuck               1763    1768
Jonathan Manski             1769    1776
Henry Vogler                1779    1792
David Freeman               1793    1803     1807       1808
Al Steninger                1810    1855                1868
Al Steninger                        1865
```

-oOo-

1712

Gonzalez – D – By Ms. Sgarlata

1    (Wednesday, June 20, 2012; 12:50 p.m.)

2

3                    P R O C E E D I N G S

4          (Jurors enter.)

5          THE COURT:  I see more water bottles now.

6          What my staff does to get me to take breaks in the

7    afternoon is bring me Diet Cokes.

8          (Laughter.)

9          THE COURT:  Go ahead.

10         MS. SGARLATA:  Your Honor, the Government calls Daniel

11   Gonzalez.

12         THE CLERK:  Please raise your right hand.

13         (Witness sworn.)

14         THE WITNESS:  I do.

15         THE CLERK:  Thank you.  Please have a seat.

16         Please speak clearly into the microphone, and here's

17   some water, if you want some.

18         Please state your full name and spell your full name

19   for the record.

20         THE WITNESS:  Daniel Gonzalez.  D A N I E L,

21   G O N Z A L E Z.

22                    DIRECT EXAMINATION

23   BY MS. SGARLATA:

24   Q.  Mr. Gonzalez, can you tell us where you're from.

25   A.  My last place of residence was Burns, Oregon.  I had lived

Gonzalez – D – By Ms. Sgarlata

1   there for approximately 21 years.

2   Q.   Okay.  And are you familiar with the agricultural culture

3   of Eastern Oregon, the Steens -- in the Steens Mountains?

4   A.   Yes.  From the time I was in Burns I spent a lot of time

5   working on farms and ranches and participated in a lot of the

6   community events that were associated with those kind of

7   cultural backgrounds, from rodeo to team branding.  All kinds

8   of stuff.

9   Q.   Okay.  And where were you employed while you were living in

10  that location?

11  A.   My first professional position was with the Native American

12  tribe.  It was Burns Paiute Indian Reservation.  And I was

13  there for approximately seven years.  I was their first fish

14  biologist.  And when I left the program, I ended up becoming

15  the program manager for their natural resource -- well,

16  program.

17  Q.   And then after the Burns Paiute tribe, where were you

18  employed?

19  A.   With the Oregon Department of Fish & Wildlife.  I was the

20  district wildlife habitat biologist for the watershed.

21  Q.   And were you employed in that capacity in 2006, 2007?

22  A.   Yes.

23  Q.   And that was in the location -- in the general vicinity

24  of -- can you look to your left, at the map.

25       Where were you in relation to this location?

1714
Gonzalez - D - By Ms. Sgarlata

1    A.  Well, this is on the Steens, so we were -- my field office
2    was about 60 miles west, in Hines.  But this was part of my
3    management area, as far as the state -- state's involvement on
4    the Steens Mountains.
5    Q.  Okay.  And that was with the Oregon Department of Fish &
6    Wildlife?
7    A.  Yes.
8    Q.  Okay.  Were you involved, in that capacity, in a reseeding
9    project that involved the area near Ignition 3, on the map to
10   your left?
11   A.  Yes.  We were -- we worked cooperatively with the --
12   Charlie Otley and his ranch, as well as the B.L.M. folks that
13   were managing that area, the range cons and some of the
14   wildlife biologists.  We partnered up to help reseed the
15   private land and then part of that public land as well.
16   Q.  Okay.  And what B.L.M. individuals were involved in that?
17   A.  Well, in the field, it was the range conservationist for
18   the B.L.M. at the time, which was Joe Glascock.
19   Q.  Okay.
20   A.  And in more of our office setting, where we were doing
21   planning, it would have been their wildlife biologist.  I think
22   it was Matt O'Bradovich, and -- oh, I can't remember his name.
23   He -- he was the head of the range program there at the B.L.M.
24   Q.  Okay.
25   A.  Anyways, there was some internal staff.  But the field guy

Gonzalez - D - By Ms. Sgarlata

1   that I dealt with was Joe Glascock.

2   Q.  Okay.  And why were you involved in reseeding in the

3   vicinity of Ignition No. 3?

4           And I see that the projection screen to your right

5   has a blown-up version of that general area.

6   A.  Well, this red section down here, it's the Grandad fire.

7           And there was a lot -- well, it was -- the private

8   land is what we were concerned with.  The private land, as

9   well as the public land.  But the private land is where we

10  had -- we were able to have the most impact because of the

11  resources we had available for private landowners.

12          With Mr. Otley, we worked together on putting an

13  emergency seeding -- reseeding project together through the

14  access and habitat program, which is facilitated through

15  Oregon Fish & Wildlife.

16          I was responsible for that program.  And Charlie and

17  I put together this application.  Before I submitted it,

18  though, I coordinated with the B.L.M. staff, and others, to

19  make sure that the prescriptions we were proposing were

20  adequate for the area.  And they fit kind of the objectives

21  that were not only satisfying the Oregon Fish & Wildlife but

22  as well as B.L.M. and the private landowner at the same time.

23          So wildlife, recreation, and then whatever grazing

24  attributes Mr. Otley was trying to recover.

25  Q.  Okay.  So what were the characteristics of the particular

Gonzalez - D - By Ms. Sgarlata

1   area you were involved in reseeding that required there be

2   reseeding?

3          MR. BLACKMAN:  I just object, your Honor, to

4   relevance.

5          MS. SGARLATA:  It's relevant to -- in particular to

6   the charge of depredation of Government property with respect

7   to the Grandad fire.

8          THE COURT:  Just a moment.  Don't -- please.  The

9   objection is overruled.

10          MS. SGARLATA:  Thank you.

11          THE WITNESS:  Can you state that question again,

12   please.

13   BY MS. SGARLATA:

14   Q.  Why did this area need to be reseeded?

15   A.  Well, it was particularly important to a lot of wildlife

16   species that were significant to the citizens of Oregon for

17   recreation, as well as some of the sensitive species that were

18   critical to our government partnering agency, B.L.M., like sage

19   grouse.

20          This area had a lot of high-value recreation for

21   public use.  Not so much on Otley's property, but in and

22   around the public lands.

23          Eventually we negotiated an agreement with Mr. Otley

24   to access his property for recreation because of the -- the

25   values that it supported for -- for the public.  And --

1717

Gonzalez - D - By Ms. Sgarlata

1    Q.   What kind of recreation does the public -- or would the

2    public be doing in this area here?

3    A.   It would be -- a lot of it would be hunting-type

4    recreation.  So big game, as well as some birds, including sage

5    grouse.

6         But we also had a significant number of our citizens

7    that used it for viewing.  Wildlife viewing.  And then just

8    general recreation, camping, fishing.  So --

9    Q.   Now, I think you mentioned some of the wildlife, in

10   particular, that would be involved in rec -- in recreation and

11   viewing.  You mentioned sage grouse and mule deer.

12        Are there any other types of wildlife that fall

13   within the category?

14   A.   Yes.  There's a -- any of our big game species would be

15   considered -- well, at least in Southeast Oregon, aside from

16   the bighorn sheep.

17        So we -- your more common species that the public

18   would seek in this area would be your mule deer, antelope,

19   pronghorn, elk, and as well as your upland game birds like

20   sage grouse, California quail, and maybe Chukars.  Although

21   they wouldn't be as common there.  But in some of those areas

22   you would find them.

23        MS. SGARLATA:  Now, I would ask Ms. Root to pull up

24   Exhibit 71, and to magnify it in that same area that Exhibit 70

25   was just magnified.

Gonzalez – D – By Ms. Sgarlata

1    BY MS. SGARLATA:

2    Q.   Are you familiar with the location shown in this map?

3    A.   Yes.

4    Q.   Does the location shown in this map include the area that

5    you were involved in reseeding?

6    A.   Yes.

7    Q.   Now, I'm not sure if it's up there right now.  Can you tell

8    me, is there a laser pointer up there in front of you?

9    A.   Right here (indicating).

10   Q.   Now, would you be able to point on the map, to show the

11   jury what you were involved in reseeding?

12   A.   Well, we have a -- there's an application that we filled

13   out that had legal descriptions of the areas.  But from what I

14   remember, it had most of this area (pointing), in here, the

15   private land.  And I think McCoy Creek is down on this end.

16   But everything from this area, all the way through on this

17   B.L.M. land -- which is, I think, Ignition 3 -- and then on

18   south, down in this general area as well.

19          Even though this wasn't considered the Grandad fire,

20   it did -- it did have fire damage, and we reseeded this area

21   down in here as well.

22          For the purposes of this fire here, we did reseed

23   most of this, excluding this little corner here.  But most of

24   the perimeter of this area.

25   Q.   Okay.  And what kind of seeds were involved in the

Gonzalez - D - By Ms. Sgarlata

1   reseeding?

2   A.  It was a mixed selection of native and non-native.  Partly

3   because of the limited funding we had available for this

4   program.  There was a lot of fires throughout the state, and so

5   there was -- because of that limited funding we had to be

6   really selective on what we chose.  We would have liked to stay

7   with a purely native mix.  But at the time, from what I

8   remember, we were looking into putting in sagebrush as part of

9   our prescription.  But it was so expensive that we couldn't

10  afford any significant amount that would make a difference.  So

11  we chose other species that were comparable and had the same

12  kind of effect.  Maybe in a shorter period.  But we put, maybe,

13  non-native seed in the ground that would secure it, but it

14  would provide maybe some cover, some forage.  And the life

15  expectancy would be short enough that it allowed the natives to

16  recover themselves over a period of time and reduce any

17  potential weed infestations.

18  Q.  Okay.  So was there concern that if this reseeding wasn't

19  done as you did it, that the area that you actually did reseed

20  would have been -- would not have been an appropriate habitat

21  for the animals that you've just mentioned?

22  A.  Well, any time this kind of fire occurs, there's always a

23  level of, like, successional recovery that occurs.  And with

24  the threat of -- of weeds, there's always a chance that that

25  succession will get interrupted and maybe taken over by

Gonzalez – D – By Ms. Sgarlata

1  something that -- that is not beneficial or useful to our

2  wildlife species.

3          So it was important for us to make sure that we got

4  a jump -- at least on the recovery part of the burned area --

5  to -- to encourage at least the regrowth of the habitat, as

6  well as preparing and -- and securing the soils so you would

7  minimize the erosion effect.

8          But from what happened in the fire, we had

9  displacement with our wildlife species that occurred.  So

10  some of the usual uses that were associated with this area,

11  we lost that -- that effect because of the lack of habitat

12  cover that was associated with this type of terrain.  More or

13  less, your low-end sagebrush that supported your mule deer,

14  your antelope, and your sage grouse birthing and rearing

15  areas.

16          So in that general vicinity, you would have sage

17  grouse rearing their young.  And same with the antelope and

18  the mule deer.  And with a lack of that habitat that

19  supported those characteristics, they were displaced.  So it

20  was important for us to recover it because of the fragmented

21  habitat, you know, in and around the area.

22  Q.  And so the sage grouse and the mule deer that were in this

23  location, are those animals that the public can go there to

24  hunt?

25  A.  Well, definitely on the public land, and with the right

Gonzalez – D – By Ms. Sgarlata

1  permits and tags.  But on the private land, up until we secured

2  that access from Mr. Otley, that was excluded.

3       But with this program, the Access and Habitat

4  Program, we were able to secure the use of the road, that

5  Moon Hill Road, as well as, you know, all of that private

6  land that he owns, you know, in that area.

7  Q.  Now, what actions did you undertake in order to

8  rehabilitate this land?

9  A.  Well, we -- I had prior knowledge of the area because of

10  the work I did with the Oregon Fish & Wildlife.  I managed a

11  640-acre piece of state property just south of that that's

12  known as Fish Lake.  We have a -- a mutual management agreement

13  with the Bureau of Land Management.  They do a lot of the

14  recreational support for the Fish Lake campground area.  And

15  then we manage the grazing in and around the site.

16       So because of my exposure and even some of the

17  wildlife surveys I performed in this area, I knew kind of

18  what it -- well, I knew what it looked like, and I knew what

19  we -- would like to recover it and -- you know, to get that

20  similar characteristic.

21       But it was important enough because of the -- the

22  sensitivity of the sage grouse and our wildlife species, and

23  we knew that it was highly used by those -- by those animals.

24  So we were trying to recover it the best we could with the

25  resources we had.

Gonzalez - D - By Ms. Sgarlata

1  Q.  Why couldn't the sage grouse just go somewhere else?

2  A.  Well, they could, but some of these areas are unique to

3  certain populations.  And when you have populations that are

4  used to -- accustomed to these kinds of sites, they tend to

5  come back and try to use it again.  And with a lack of that

6  cover, you get that displacement.  So when they go somewhere

7  else, they have a higher risk of predation.  And then also

8  competing with other resources that maybe other animals are

9  using.

10          So there's a level of competition, there's increased

11  predation.  And so the success rate of those birds generally

12  declines.  So --

13  Q.  So without the plants there that the sage grouse need, the

14  sage grouse are more likely to get eaten by other animals, or

15  what have you?

16          MR. BLACKMAN:  Objection, leading.

17          THE COURT:  Sustained.

18          MS. SGARLATA:  I direct your attention to Government

19  Exhibit 65.  And ask Ms. Root to bring that exhibit up.

20          And could you enlarge the section near Section 11,

21  if you're able to.

22          See those numbers.

23          Is this the shaded relief version of that?

24          (Pause, Ms. Sgarlata and Ms. Root conferring.)

25  BY MS. SGARLATA:

Gonzalez - D - By Ms. Sgarlata

1   Q.  Do you see Section 11 on the map, Government Exhibit 64?

2   A.  (Pointing).  This section right here?

3   Q.  Yeah.

4   A.  Yes.

5   Q.  Okay.  Now -- and do you see Section 2 on that map, as

6   well?

7   A.  Section 2.  Right above it.  Yes.

8   Q.  Okay.  Are you aware of the section, township, and range

9   that you were involved in seeding the parts that were on

10  Government land?

11  A.  Yeah.  I mean, I know -- I know from looking at documents

12  that I had in the application that it included this area right

13  in here.

14  Q.  Okay.  And were -- you were involved in choosing the kinds

15  of seeds that were going to be put down there for the

16  reseeding.  Correct?

17  A.  Right.

18  Q.  Do you know how much those seeds cost?

19  A.  Well, altogether, it was -- it was proposed as a seed mix.

20  So individually, I can't remember.  But I know that the total

21  cost of the seeding area was about 50,000 dollars.

22  Q.  And how much of that was on Government B.L.M. land?

23  A.  At least 100 acres that we seeded on B.L.M., in this --

24  in -- between Section 2 and 11.

25  Q.  And how much did it cost to seed the hundred acres that

1724

Gonzalez – D – By Ms. Sgarlata

1    were on B.L.M. land?

2    A.  Well, if you took the 50,000 and divided it by how many

3    acres we seeded, it was approximately 20 dollars an acre.

4    Q.  Okay.

5    A.  So about 2,000 dollars.

6            MS. SGARLATA:  So I'm going to ask the assistance of

7    the clerk to hand you Government Exhibit 237.  And I'll put a

8    sticker on it.

9            Oh, I'm sorry.  Government Exhibit 267.

10            And I'll also show this to defense.  This is

11    Discovery Nos. 06G18172.

12            And I do believe I have another copy of it here.

13            (Pause, the clerk and Ms. Sgarlata conferring.)

14            (Witness handed document.)

15    BY MS. SGARLATA:

16    Q.  Now, do you recognize that document that you're looking at?

17    A.  Yes.

18    Q.  What is that?

19    A.  This is a breakdown of the seeds that we proposed for the

20    reseeding project, with the associated costs.

21    Q.  And are those in fact the seeds that you ended up reseeding

22    with?

23    A.  Yes.

24    Q.  All right.  And are those the numbers that you were using

25    when you determined how much it cost to reseed the Government

Gonzalez - D - By Ms. Sgarlata

1  portions of the land that you reseeded?

2  A.  It would all be included, yes.

3  Q.  Okay.  Now, I'm going to ask if -- you recently located

4  photographs of the particular areas that you reseeded in

5  reference to the Grandad fire.  Is that correct?

6  A.  Correct.

7          MS. SGARLATA:  I'm going to ask Ms. Root to put --

8          MR. BLACKMAN:  Your Honor, I'm going to object, again,

9  on relevance grounds.

10         With respect to the last exhibit, it doesn't appear

11 to lead to anything but private land.  I don't see what

12 relevance it has to anything we're talking about.

13         THE COURT:  It hasn't been offered.

14         MS. SGARLATA:  It's not going to be offered.  It was

15 just to -- for his reference.

16         THE COURT:  Then the objection is sustained.

17         MR. BLACKMAN:  Thank you.

18         MS. SGARLATA:  I would ask that Ms. Root bring up

19 Government Exhibits 236 through 258.

20         Do we have a copy for the judge?

21         Your Honor, I believe yesterday we provided the

22 Court and counsel with copies of Government's Exhibit 236

23 through 258, which are photographs of the particular area in

24 question that Mr. Gonzalez is testifying about having

25 reseeded.  And -- (Pause, conferring.)

1726

Gonzalez – D – By Ms. Sgarlata

1          I have an extra copy of it, in case we actually --

2          And then I would ask Ms. Root to show Government

3   Exhibit 236.

4   BY MS. SGARLATA:

5   Q.  And now I'll ask, Mr. Gonzalez, do you recognize this

6   photograph?

7   A.  Yes, I do.

8   Q.  Did you take this photograph?

9   A.  I did.

10  Q.  What is this photograph of?

11  A.  It's a -- a view of the southern part of the area that we

12  seeded on Mr. Otley's project.

13  Q.  And what does this photograph show that's relevant to what

14  we're talking about?

15  A.  Well, it shows the recovery after the fire, and a lot of

16  it -- what you're seeing is more of your forbs and grasses,

17  which is what you would expect in recovery.

18  Q.  Okay.  I would ask you --

19          MR. SCHROEDER:  Your Honor, could -- were these

20  exhibits admitted?

21          MS. SGARLATA:  They have --

22          MR. SCHROEDER:  They're being published to the jury,

23  your Honor.

24          MR. PAPAGNI:  You have to offer them.

25          MS. SGARLATA:  I'm sorry, your Honor.  The Government

1727
Gonzalez – X – By Mr. Schroeder

1    would offer Government Exhibits 236 through 258.

2         MR. SCHROEDER:  May I ask a question in lieu of an

3    objection?

4         THE COURT:  You may.  Yes.

5         MR. SCHROEDER:  Mr. Gonzalez, is Exhibit 236 a picture

6    looking east onto Otley's private land, as opposed to public

7    land?

8         THE WITNESS:  Yes, this particular picture.

9         MR. SCHROEDER:  Just objection then, following up --

10         THE COURT:  The objection is sustained.

11         Please take the picture down.

12    BY MS. SGARLATA:

13    Q.  Are these pictures substantially the same as the Government

14    part of the lands that you reseeded?

15    A.  Yes.

16         THE COURT:  They're not received.

17         MS. SGARLATA:  Okay.  I have no further questions.

18         THE COURT:  Thank you.

19         You may cross-examine.

20         MR. SCHROEDER:  One moment, please, your Honor.

21                        CROSS-EXAMINATION

22    BY MR. SCHROEDER:

23    Q.  Mr. Gonzalez, my name is Alan Schroeder.  I have a few

24    questions.

25         You indicated that you did this reseeding on

1728

Gonzalez - X - By Mr. Schroeder

1    Mr. Otley's private land and apparently a few acres on the

2    public land.  Is that correct?

3    A.   Correct.

4    Q.   I believe you said -- what?  100 acres of public land?

5    A.   Yes.

6    Q.   And so the rest of the acres were on private land?

7    A.   That's correct.

8    Q.   Now, you also mentioned that to give Mr. Otley the

9    incentive for you to go on and do this seeding on his private

10   land, you had got the money from some kind of habitat access

11   fund.  Is that correct?

12   A.   Yes.

13   Q.   And that habitat access fund is a fund in which the Oregon

14   Department of Fish & Wildlife will give a private landowner

15   sums of money for projects on his private land, but in return,

16   the private landowner has to give Oregon Department of Fish and

17   Game and the citizens of Oregon access to the private land for

18   hunting and fishing and recreational purposes?

19   A.   That's only partially correct.

20   Q.   Okay.  Tell me what -- the part that is correct?

21   A.   The project we seeded Mr. Otley's land in was through the

22   Access and Habitat Emergency Seeding Program.  So that's unique

23   just to habitat.  There's no requirement to allow any public

24   access on his property.  That was a separate program.

25   Q.   Okay.  But was he part of that, then, program?  That public

Gonzalez – X – By Mr. Schroeder

1    access program?

2    A.   After the reseeding, yes.

3    Q.   Okay.  And did that have to do with any part of the

4    activity associated with this seeding, or independent of it?

5    A.   It was independent.

6    Q.   Okay.  Now, what part of it is that Mr. Otley is part of

7    this access, allowing public access to private land?

8    A.   I don't understand what you mean by "what part."

9    Q.   Poor question.  Thank you.

10        Is this land that's covered by the seeding part of

11   the habitat access program in which the public is allowed

12   access to it?

13   A.   Say that again, please.

14   Q.   This reseeding area, is the public entitled to public

15   access to it because of some agreement that you have with

16   Mr. Otley?

17   A.   It was independent of -- both projects were independent of

18   each other.  So we reseeded through the emergency seeding

19   program.  And that didn't require any access, other than him

20   allowing us to enter into a cooperative agreement for

21   restoration.  And it was for the benefit of the wildlife.

22        The access part of it was separate.  And that -- it

23   was exclusive for allowing public use on his property for --

24   for the purposes of recreation.

25   Q.   Okay.  But did Mr. Otley allow that access as part of this

1730

Gonzalez - X - By Mr. Schroeder

1   overall agreement?

2   A.  Well, it wasn't overall.  They were separate.  And I -- I'm

3   trying to make that distinction.  Because it wasn't like we

4   asked him, We'll give you the seed, if you allow access.

5   Q.  Okay.

6   A.  They were independent of each other.

7   Q.  Okay.  That was my question.  Thank you.

8         Now, the other -- other part of your testimony is --

9   is the -- the seed mix.  And I have a few questions about

10  that.

11        You indicated that you worked for -- in the Burns

12  area for 21 years, and you worked with the Burns Paiute

13  tribe.  And then you worked for Oregon Department of Fish and

14  Game.

15        Who do you work for right now?

16  A.  U.S. Forest Service.

17  Q.  Okay.  And are you testifying here today as an employee of

18  the Forest Service or as a representative employee of the

19  Oregon Department of Fish & Wildlife Service?

20  A.  I believe it's the Oregon Fish & Wildlife.

21  Q.  Okay.  And so are they paying you to -- not paying you to

22  testify.  But they're paying you for your employment here

23  today?

24  A.  No.

25  Q.  Okay.  You're still on the salary of the -- of the Forest

1731

Gonzalez – X – By Mr. Schroeder

1    Service, but you're here, representing the Oregon Department of

2    Fish and Game?

3    A.   I don't believe the Forest Service is paying my salary

4    today.  It's on a unique code that's specific to this case.

5    Q.   Okay.  I guess I'm trying to understand which hat you have

6    on.

7          Let's make it simple.  Which hat do you have on

8    today?  A hat of the Oregon Department of Fish & Wildlife

9    Service or a hat of the U.S. Forest Service?

10   A.   Well, I'm here speaking about the activities that took

11   place when I worked for Oregon Department of Fish & Wildlife.

12   Q.   Okay.  So then if that's the case, then let me ask you

13   this.

14         At the time, then, that this occurred in 2006 -- and

15   that's what you are apparently here to testify for -- were

16   you -- were you an appraiser of the Oregon Department of Fish

17   & Wildlife?

18   A.   No.

19   Q.   Okay.  You were just a biologist?

20   A.   Yes.

21   Q.   And did you prepare any report for the Oregon Department of

22   Fish & Wildlife in doing this in accordance with any type of

23   appraisal standards?

24   A.   Like property appraisals?  Or wildlife appraisals?

25   Q.   No, property appraisals.

Gonzalez - X - By Mr. Schroeder

1  A.  No.

2  Q.  Okay.  So you didn't -- you didn't conform to the uniform

3  standards of professional appraisal practice in pre --

4  performing your analysis of the cost/benefits associated with

5  this activity.  Is that correct?

6  A.  No, we were strictly focused on wildlife and the habitat.

7  Q.  I understand.  But you have testified as to certain

8  numbers, certain cost numbers.  And I'm just simply asking you

9  that in any appraisal report, applying these particular uniform

10  standards of professional appraisal practices, using the cost

11  approach, did you do that?

12  A.  No.  The costs I gave you were associated with the price of

13  seed and the costs for the application.

14  Q.  I understand.  But you didn't apply any particular -- I

15  don't want to argue with you about it.

16       But you didn't apply any particular approach,

17  according to these standards that I have indicated, that

18  there may be some cost-benefit analysis associated with it?

19  You didn't do any of that?

20  A.  No.

21       MR. SCHROEDER:  No further questions.  Thank you.

22       MR. BLACKMAN:  No questions.

23       MS. SGARLATA:  No further questions.

24       THE COURT:  Thank you, sir.  You may step down.

25       MR. PAPAGNI:  Please the Court, the Government rests

Taylor - D - By Mr. Matasar

1    its case.

2              THE COURT:  Thank you.

3              Counsel, I'll reserve your motions.

4              Please call your first witness.

5              MR. MATASAR:  Okay.  Jacon Taylor.

6              (Pause.)

7              THE CLERK:  Please step forward.

8              Please raise your right hand.

9              (Witness sworn.)

10             THE WITNESS:  Yes, I do.

11             THE CLERK:  Thank you.

12             Please have a seat.  Thank you.

13             Please speak clearly into the microphone, and

14   there's water if you want some.

15             THE WITNESS:  Thank you.

16             THE CLERK:  Please state your full name and then spell

17   your name for the record.

18             THE WITNESS:  Jacon Taylor.  J A C O N, T A Y L O R.

19                       DIRECT EXAMINATION

20   BY MR. MATASAR:

21   Q.  Mr. Taylor, how are you employed?

22   A.  I work for a marketing company right now.

23   Q.  Okay.  Where do you live?

24   A.  Eugene, Oregon.

25   Q.  Where did you grow up?

1734

Taylor - D - By Mr. Matasar

1   A.   Graduated high school in Eugene, so that's probably where I

2   grew up.

3   Q.   Okay.  Did you ever work at Hammond Ranches?

4   A.   Yes, I have.  Various times.  Yes.  I guess, growing up,

5   the first time would have been in high school, between, I

6   believe, my sophomore and junior year.

7   Q.   Okay.  And did that continue on from time to time?

8   A.   Yes, it sure did.  Over the years, for various lengths of

9   time.  Yes.

10  Q.   Are you related to anybody in the Hammond family?

11  A.   Yes, I am.  Earlyna is my aunt.  She is my mother's sister.

12  Q.   And Earlyna is Steve Hammond's wife?

13  A.   Correct.

14  Q.   Okay.  Were you in an elk hunt at Hammond Ranches in

15  September of 2001?

16  A.   Yes.

17  Q.   I would like to show you what's been admitted as Exhibit

18  1215.

19           I'm sorry.

20           THE COURT:  Wrong elk.

21           (Laughter.)

22           MR. MATASAR:  How about -- let me see.  Which one

23  here?  I'm sorry.

24           THE COURT:  That elk has big floppy ears.

25           (Laughter.)

1735

Taylor - D - By Mr. Matasar

1          MR. MATASAR:  Yes, there we go.

2          MR. BLACKMAN:  That's Exhibit --

3          MR. MATASAR:  That's 1213.

4    BY MR. MATASAR:

5    Q.  Do you -- could you identify the people in that photo.

6    A.  Yes, I believe I can.

7    Q.  Okay.  Could you do that.

8    A.  You want me to --

9    Q.  Let me -- I can -- I can use the pointer, and then you

10   could just -- I'll follow it -- I'll start here with this

11   person with the green shirt.

12   A.  That would be me.

13   Q.  Okay.  And how about this person?  Could you tell who that

14   is?

15   A.  I believe that to be Rusty.

16   Q.  Okay.  Rusty who?

17   A.  I'm sorry.  Rusty Hammond.

18   Q.  Okay.  Was -- was -- as far as you recall, was he at the

19   elk hunt in September of 2001?

20   A.  Yes.

21   Q.  Okay.  And do you recall if Dusty Hammond was at the elk

22   hunt at that time?

23   A.  Yes, I do.  He -- he was.

24   Q.  Could -- could you tell -- this is only a small part.

25          Can you tell who that is?

1736

Taylor - D - By Mr. Matasar

1  A.  I believe that to be Dusty Hammond.

2  Q.  Now, you see Rusty Hammond is wearing a white hat.

3  A.  Yes.

4  Q.  Did he wear that hat when he was hunting?

5  A.  I believe so.  He -- I would believe so, yes.

6  Q.  Okay.  Is it common that people wear a white hat when

7  they're deer hunting?

8         MR. PAPAGNI:  Objection.  Asking the witness to

9  speculate, what's common.

10        THE COURT:  Overruled.

11        THE WITNESS:  So the question is is it common --

12  BY MR. MATASAR:

13  Q.  Is -- are --

14  A.  Is it common to wear a white hat?

15  Q.  A white hat during deer hunting season, or when you're

16  hunting for deer?

17  A.  I wouldn't think it would be common.  I wouldn't do it.

18  Q.  Okay.  Why wouldn't you do it?

19  A.  The deer can see you.  Deer can -- it's white.  It's --

20  Q.  And what about other hunters?

21  A.  I wouldn't expect them to be, just because it's white.

22  Q.  Might they get confused, if they see somebody -- some

23  white?  Might they think it's a deer?

24  A.  They could think it was a deer butt, yes.

25  Q.  Where were you living at the time of this elk hunt?

1737

Taylor - D - By Mr. Matasar

1   A.   I was living in Eugene at the time, in September 2001.

2   Q.   About how long of a drive is it from Eugene to the Hammond

3   ranch?

4   A.   It is about -- it's a solid six-hour drive from door to

5   door.

6   Q.   And you were working at that time?

7   A.   Correct, I was.

8   Q.   Were you at a deer hunt about two weeks after this elk

9   hunt?

10  A.   No, I wouldn't have been there.  The job I had at the time

11  wouldn't have allowed me to take multiple weekends off in a

12  row.

13  Q.   Okay.  Now, I'm not going to go through it because it's

14  kind of cumbersome.  But if you assume that there's evidence

15  that's been admitted in this court that you didn't have a deer

16  tag to go hunting for deer in late September of 2001, would you

17  have gone hunting?

18  A.   If I did not have a tag, I would not have gone hunting.

19  Q.   Okay.  Let me show you Exhibit 2001 -- I'm sorry.  Exhibit

20  1001.  It's a Government map.

21          MR. MATASAR:  That's -- you're going too fast.  Up --

22          (Pause, counsel conferring.)

23          MR. MATASAR:  Do we have a hard copy of No. 1?

24          (Witness handed notebook.)

25  BY MR. MATASAR:

1738

Taylor - D - By Mr. Matasar

1  Q.  Okay.  That's the one I'm looking for.  Thank you.

2       Can you see that?

3  A.  Yes.  Both places.

4       MR. MATASAR:  Now, could you, Ms. Root, enlarge the

5  part from -- just the green part.

6       MS. ROOT:  (Nods head.)

7       MR. MATASAR:  The green arrows, and such.  Okay.

8  BY MR. MATASAR:

9  Q.  Are you familiar with the old gravel pit?

10 A.  Yes, I am.

11 Q.  And what about Rock Jack Gate?

12 A.  Yes.

13 Q.  Okay.  Do you recall ever hunting -- and you would hunt

14 from time to time at the Hammond ranch.  Right?

15 A.  Yes, that is correct.

16 Q.  Do you recall ever hunting in the area of the rock pit or

17 the rock -- or the gravel pit or the Rock Jack Gate?

18 A.  Yes, I do recall hunting in that area.

19 Q.  Okay.  Could you tell the jury, was it a deer hunt?

20 A.  No, it was an elk hunt.

21      And the reason I remember that is because typically

22 we walk from that -- if we start at that gravel pit,

23 typically we'll walk --

24 Q.  So starting down here (pointing)?

25 A.  Correct.  Start in the bottom right-hand corner.

1739

Taylor - D - By Mr. Matasar

1  Q.  Okay.

2  A.  If we do that, typically we'll walk all down-country,

3  and -- and be picked up on the road where the red dots are.

4  Q.  Here?

5  A.  No, it would be further north.  Yeah, right about in there.

6  Q.  Okay.

7  A.  Or even sometimes in the bottom, where the creek is,

8  actually.

9  Q.  Okay.

10  A.  And the reason I remember is only one time I walk --

11  Q.  Do you have a pointer there --

12  A.  Oh, maybe.  Yeah.  If I can make it work.

13  Q.  Don't point it -- there you go.  Go ahead.

14  A.  So the reason I remember, is because only one time I've

15  walked up here, and (pointing) I remember because it was so

16  steep.  It's -- it's a climb to go from here to here.

17          You can get there other ways that aren't as

18  strenuous, but I do remember that specifically because I

19  didn't want to do it anymore.

20          (Laughter.)

21  BY MR. MATASAR:

22  Q.  And was Dusty Hammond with you at that time?

23  A.  He was there at the hunt, but I'm not -- I'm not for sure

24  if he actually did this (pointing).

25          And -- and for this particular day, as I recall, I

Taylor - X - By Mr. Blackman

1   went -- I went down into this area, where the elk were

2   supposed to be.  And then ended, essentially, hunting in my

3   mind, there, to climb out right there.

4   Q.  Okay.  And you don't recall if Dusty Hammond was there, or

5   not?

6   A.  I don't recall if he was on this particular drive.

7       I -- I do recall that he was there that day because

8   after that -- because -- because after that, we left and went

9   to the top of the school section.

10  Q.  Okay.

11  A.  And -- and he accidentally fired his gun right at the

12  beginning of the hunt.  And so I remember, because it upset me.

13  Q.  But you're certain that was an elk hunt, not a deer hunt?

14  A.  I'm certain it was an elk hunt, yes.

15  Q.  And you're certain you were not deer hunting on --

16          MR. PAPAGNI:  Objection, leading.

17          THE COURT:  Sustained.

18          MR. MATASAR:  Okay.  That's all I have.

19          Thank you, Mr. Taylor.

20          THE WITNESS:  Um-hmm.

21          MR. BLACKMAN:  I would ask my learned counsel,

22  Mr. Schroeder, to put Exhibit 1210 on the screen, please.

23                      CROSS-EXAMINATION

24  BY MR. BLACKMAN:

25  Q.  And while he's doing that, Mr. Taylor, as I understand it,

Taylor - X - By Mr. Blackman

1   you have worked over the years for Hammond Ranches?

2   A.   Correct.   Yes.

3   Q.   And how would you -- describe how often -- how much time

4   you've spent working on Hammond Ranches.

5   A.   I don't know an exact time.   I would go out there during

6   the summer, in high school.   And then after high school, I

7   would come out and work for anywhere from nine months to a

8   year, to a little over a year during various times.   I just

9   enjoy it out there.   I like the smell of the sagebrush, I

10  guess.

11          And then I think I would need to go make money

12  somewhere, and so I would go back and do that, or thought

13  maybe I needed to do something else.   So -- but at various

14  times.   I don't know exactly how many.

15  Q.   Okay.   And I'm just going to ask you, you're familiar with

16  the areas of the different pastures that they use on the Steens

17  Mountain?

18  A.   Yes.

19  Q.   And you're familiar with an area that's on 1210 labeled

20  Hardie summer allotment?

21  A.   Yes.

22  Q.   Okay.   Have you ever spent time working on the ranch in

23  that area?

24  A.   Yes.

25  Q.   And what kind of work have you done in that area?

1742

Taylor - X - By Mr. Blackman

1    A.  I've fixed some fences, just going on this -- trying to

2    figure out -- I would have fixed some fences there.  I would

3    have moved some cattle through there at various times.

4    Q.  Okay.  Would you take your pointer and show us where you

5    worked on the fences.

6    A.  Okay.  Primarily in the (pointing) -- well, primarily, it

7    would have been fences in -- let me make sure I get my map

8    right here, guys.  Sorry.

9    Q.  The arrows are -- the words are outside the areas, and the

10   arrows are inside the areas.

11   A.  Yeah.  Primarily, it would have been fences in -- just in

12   this hole.  And I don't know what all is considered Hardie

13   summer, because I just don't.  But primarily the fences would

14   be in, I believe, this area, and all the way down into there.

15   Q.  So with respect to the fences in the area to the -- I guess

16   that would be east, to the right side of that map.

17   A.  Okay.

18   Q.  And the area right around the words "Hardie summer

19   allotment," you're familiar with the fences in that area?

20   A.  Yes.

21   Q.  And are you also familiar with the gates in that area of

22   that fencing?

23   A.  Yes.

24   Q.  And how many gates are in that area?

25   A.  Are you meaning like in here (pointing)?  Or --

1743

Taylor - X - By Mr. Blackman

1    Q.  And further up north.  Yeah, right about in that corner,

2    and up in around that area.

3    A.  Well, from here (pointing) there's -- there's a gate in the

4    bottom.  There's a gate in the road, two.  Three, in the

5    corner.  Four, in the bottom there.  And then, five, halfway

6    up, out of that canyon there (pointing).

7            As far as this -- yeah, as far as that fence, I

8    believe -- I don't believe -- do you know?  Is that -- what

9    boundary fence is that?

10            Is that -- I'm trying to figure out what is private

11   land and what isn't, is what my question is.

12   Q.  Okay.  I think the private land is the land with the

13   crosshatching, that goes --

14   A.  With these red -- with those?

15   Q.  Right.

16   A.  Is that correct?

17   Q.  Correct.

18   A.  Yeah, because I think Charley fixes that fence, is why I

19   was asking.

20   Q.  So there are about five gates in the area?

21   A.  Yeah, in this fence there are.  There's, like I said, one

22   in the bottom.  One in the road.  One in the corner's three.

23   One in the bottom, and one halfway up.

24   Q.  And those -- the fence where those gates are divide what

25   pastures?

1744

Taylor - X - By Mr. Papagni

1   A.  The north field from the -- and this is over the years, has

2   been called a lot of other fields.  Just -- at the ranch.  So I

3   would say below the north field, but I don't know what it's

4   called to people who know.

5   Q.  Okay.  And when you say "below," you mean downhill?

6   A.  Correct.  Yes.  Downhill.  Um-hmm.

7           MR. BLACKMAN:  Thank you.  No other questions.

8           THE COURT:  Cross.

9                          CROSS-EXAMINATION

10  BY MR. PAPAGNI:

11  Q.  In 2001, Mr. Taylor, were you successful in getting a tag

12  for buck deer and elk?

13  A.  In 2001, was I successful for getting a tag for buck deer,

14  and elk.

15  Q.  Deer and elk.

16  A.  The way I recall that is that I did have an elk tag, and I

17  also believed that I purchased a deer tag.  But I believe it

18  was for outside of Oakridge, somewhere.

19  Q.  And in that regard, sir, when you testified before the

20  grand jury, you were asked questions about 2001 hunting.  And

21  you said you didn't recall hunting that particular year, didn't

22  you?

23  A.  That is correct.  I did not recall.

24  Q.  So what has changed that made you recall so well, as

25  opposed to what you told the grand jury a couple of years ago?

Taylor - X - By Mr. Papagni

1    A.   I've been trying to think a lot about this issue.

2    Q.   Right.  And your relationship to --

3         THE COURT:  Let him finish his answer.

4         MR. PAPAGNI:  I'm sorry, Judge.

5         THE WITNESS:  That was my answer.  I've been thinking

6    a lot about this issue.

7    BY MR. PAPAGNI:

8    Q.   And what is your relationship with Steven Hammond?

9    A.   Steven would be my uncle.

10   Q.   And you've gone hunting with him on several occasions, have

11   you not?

12   A.   Yes, I have.

13   Q.   And you've been employed on the Hammond ranch for several

14   years, were you not?

15   A.   Yes, I was.

16   Q.   And you left the ranch how many years ago?

17   A.   Well, this last time, it was just this last fall.

18   Q.   Now, you worked full time on the Hammond range from May

19   2008 to June 2010, did you not?

20   A.   No, this last time would have been from -- yeah, May 2008

21   to just this last fall in 2011.

22   Q.   So the question I asked you is correct?  From May 2008 to

23   June 2010?

24   A.   No.  I think you're saying 2010.

25   Q.   Correct.  You worked there longer?

Taylor - X - By Mr. Papagni

1    A.  Yes.  I worked there from May 2008 to just this last fall.

2         So if this is 2012, then this last fall would be

3    2011.

4    Q.  And what work -- what work did you do on the Hammond ranch?

5    A.  Just whatever needed to be done.  We would raise hay, and

6    we would raise cattle.

7    Q.  And how many times did you go hunting with Dusty Hammond?

8    A.  I only recall the one time.  Because, like I say, it sticks

9    out because he frustrated me.

10   Q.  Pardon me?

11   A.  I say it sticks out because he frustrated me on that one

12   elk hunt.  And that's the only time I recall.

13   Q.  So when you were asked in grand jury on June 17th, 2010:

14            Question:  More specifically around 2001, the last

15            day of deer hunting season, do you recall an event

16            that occurred?

17            You now recall only the elk hunt?

18   A.  Well, yeah.  I only -- I do -- I believe I only recall

19   hunting one time with Dusty.  And I believe it was during elk

20   season.  So --

21   Q.  At the time you were hunting with Dusty, did you have an

22   upset stomach?

23   A.  I --

24   Q.  Do you remember that?

25   A.  I don't think -- I don't know.  Perhaps.

Taylor - X - By Mr. Papagni

1   Q.  And when you go hunting, you don't wear a hat, is what

2   you're saying?

3   A.  Oh, sometimes I would wear a ball cap, or something, yes.

4   Q.  And Steve Hammond would wear a white cowboy hat?

5   A.  I -- I don't recall that.  No.

6   Q.  But you recall that Dusty -- or that Rusty Hammond wore the

7   hat you saw in the photograph.  Right?

8   A.  Well, yeah, it was in the picture.

9   Q.  Yeah.  So did he wear that -- when?

10  A.  Well, whatever date was on the picture.

11  Q.  When were you showed that picture, Mr. Taylor?

12  A.  I saw that picture a little over a week ago, perhaps.

13  Q.  Who showed it to you?

14  A.  It was e-mailed to me by Larry Matasar.

15  Q.  And did you also get interviewed by a Mr. Freeman?

16  A.  Correct.  I've been interviewed by Mr. Freeman.

17  Q.  And what did Mr. Freeman tell you about what you were going

18  to testify here today?

19  A.  He said that there was some speculation as to whether I was

20  deer hunting with Dusty.

21  Q.  And when you were asked questions in the grand jury about

22  any of your hunts in 2001, you repeatedly said you didn't

23  recall.  Correct?

24  A.  Yeah, the way I remember that is he was asking for

25  specifics and for specific years.  And, no, I did not recall

Taylor - X - By Mr. Papagni

1  what the specifics were at that time.

2  Q.  And do you ever recall being hunting with Dusty Hammond in

3  which there was a group of deer that Steven Hammond shot at?

4  A.  No.

5  Q.  Steven Hammond, when -- in 2001, drive a green Jeep on

6  occasion, a Willys?

7  A.  Yes, I believe around that time period he was driving a

8  green Jeep.

9  Q.  And you've been down to the Hammonds' cabin off of Steens

10  Loop Road on several occasions, have you not?

11  A.  Yes, I have.

12  Q.  And you've used that cabin on occasion, when you've been on

13  hunting trips?

14  A.  Yes.

15  Q.  And you've hunted the schoolhouse section.  Correct?

16  A.  Yes.  Correct.

17  Q.  Have you ever shot at animals off the schoolhouse section,

18  in that general area?

19  A.  No, I have not.

20  Q.  Have you ever been on a hunt with Steven Hammond, Rusty

21  Hammond, Dusty Hammond, and yourself?

22        Pardon me?

23  A.  I don't recall if Steve was there for that specific elk

24  hunt.  I know it was Dusty and Rusty and I, because when we

25  walked out the fence line, Rusty and I decided to keep Dusty in

Taylor - X - By Mr. Papagni

1  between us.  And so I stopped walking first, allowing them to

2  continue the fence line, and we were going to make a hunt down.

3        And as I recall, I waited for as long as I thought I

4  should, to give them time to scatter out.  And just as I

5  crossed the fence, that's when I heard the shot go off.  And

6  I thought, Oh, okay, this could be what we were looking for.

7        So I waited for a while.  And then I thought, well,

8  I better investigate.  So I walked over, and -- and Rusty and

9  Dusty were there.  And Dusty's story was when he ducked under

10  the fence, somehow his rifle went off.

11        And I remember that because I remember being really

12  excited that there might be elk there.  And for the rest of

13  that hunt -- of course, in my eyes, it was over.

14  Q.  And what of that story did you tell a grand jury -- what

15  part of that story did you tell the grand jury back on June

16  17th, 2010?  Any of it?

17  A.  No, I did not.  I didn't put together a time frame.  He

18  seemed to be asking me more general questions.

19  Q.  He asked you about 2001.

20  A.  Yes.  And he would say, generally, are there -- did you

21  remember meeting anybody in particular or anybody in general,

22  is how I recall that.

23  Q.  Do you remember a Scott Gustafson?

24  A.  Yes, I do.

25  Q.  Oh.  Did you mention that in 2010, when you were in front

Taylor - ReD - By Mr. Matasar

1    of the grand jury, sir?

2    A.  I didn't know if that was a hunting trip in 2001.

3    Q.  Your memory has just come back in the last couple of weeks?

4    A.  Since I realized that I was going to be called here today,

5    yes.

6    Q.  But you were called before a grand jury in 2010.  Didn't

7    your memory come back then?

8    A.  Didn't know what questions he was going to ask me about,

9    sir.

10   Q.  You didn't know, when you came to the grand jury -- after

11   you were interviewed by a B.L.M. agent -- what the questions

12   were going to be about?

13   A.  I was not interviewed by a B.L.M. agent prior to going to

14   grand jury, that I recall.

15          MR. PAPAGNI:  Those are all of my questions.

16          THE COURT:  Anything further?

17          MR. MATASAR:  Yes, your Honor.

18          Let me have a second here.

19                    REDIRECT EXAMINATION

20   BY MR. MATASAR:

21   Q.  Mr. Taylor, was part of the way that you refreshed your

22   recollection in reviewing the photographs that you were sent?

23   A.  Yes, that helped.  I have a hard -- I have -- I don't pay

24   attention to -- I don't keep scores very good.  So I don't keep

25   attention to what year this particular, you know, event was.

1751

Gustafson - D - By Mr. Matasar

1   So, yes.

2   Q.  You told a grand jury that you didn't recall going deer

3   hunting with Dusty Hammond.  Right?

4   A.  Yes, I believe that is what I said.

5   Q.  And that's what you're saying today too.  Right?

6   A.  That is what I'm saying today.

7           MR. MATASAR:  Okay.  Nothing further.

8           MR. BLACKMAN:  No other questions.

9           MR. PAPAGNI:  No other questions.

10          THE COURT:  You may step down.

11          Your next witness, please.

12          MR. MATASAR:  Scott Gustafson.

13          THE CLERK:  Please raise your right hand.

14          (Witness sworn.)

15          THE WITNESS:  Yes.

16          THE CLERK:  Thank you.

17          Please have a seat.

18          Please speak clearly into the microphone here, and

19  there's water here, if you would like some.

20          Please state your full name, and then spell your

21  name for the record.

22          THE WITNESS:  Scott Gustafson.  S C O T T,

23  G U S T A F S O N.

24                      DIRECT EXAMINATION

25  BY MR. MATASAR:

1752

Gustafson - D - By Mr. Matasar

1    Q.   Mr. Gustafson, how are you employed?

2    A.   I'm an insurance agent.

3    Q.   Okay.  How long have you done that?

4    A.   30 years.

5    Q.   Where do you live?  What city?

6    A.   I live in Canby.

7    Q.   And that's where you work out of?

8    A.   That's correct.

9    Q.   Do you know the Hammonds?

10   A.   I do.

11   Q.   Tell the juror -- jurors, how you know them and how long

12   you've known them.

13   A.   I have known them socially and as friends and as hunting

14   companions for, I'll say, since 1995.  Somewhere in that range.

15   Q.   Okay.  From time to time do you go hunting at their place?

16   A.   Yes, I do.

17   Q.   Do you recall going hunting in September of 2001?

18   A.   Yes, I do.

19   Q.   We -- we have -- we seem to have a slight numbering problem

20   here.

21           I would like to show you a photograph which I have

22   as 1213.  Sorry.

23           (Pause, referring.)

24   BY MR. MATASAR:

25   Q.   Is -- can you describe, first of all, from left to right --

1753

Gustafson – D – By Mr. Matasar

1    from here to right, who's in that photograph?

2    A.   From left -- from my left to right, that's me before

3    glasses.

4    Q.   Pardon?  That's you before the glasses?

5    A.   Me before the glasses.

6         My son Tim, and Steve Hammond.

7    Q.   Okay.  Let me show you what I have as 1214.

8         No, I guess -- well --

9         MR. MATASAR:  Your Honor, at some point we're going to

10   make sure that -- it's either Mr. Schroeder or I or the Court

11   may have the numbering system wrong.  So we'll make sure at a

12   break.

13   BY MR. MATASAR:

14   Q.   But how about this photograph?  Do you know who this person

15   is?

16   A.   That would be Rusty Hammond.

17   Q.   And who is Rusty?

18   A.   Rusty is Steve's brother.

19   Q.   Okay.  Now, do you recall hunting at their place in

20   September of 2001?

21   A.   Yes.

22   Q.   By the way, is -- how old is your son, compared to Dusty?

23   A.   Well, I don't know Dusty's age.  But at the time, Tim would

24   have been 15.

25   Q.   Okay.  Were they the only kids, teenagers at that time,

1   during the hunt?  If you recall?

2   A.  As far as I can recall, I would say yes.

3   Q.  Okay.  Do you recall where you stayed the night before you

4   actually went out?

5   A.  I believe we stayed at what they call their cabin.  And I'm

6   assuming we stayed in our -- my family stayed in our tent.

7   Q.  Okay.  How many days did you hunt that time?

8   A.  I would say two.

9   Q.  Okay.  So you actually went out two days?

10  A.  Two days.

11  Q.  And that was a deer hunt?

12  A.  It was a deer hunt.

13  Q.  Okay.  And what do you recall about the first day, going

14  out?  Did everybody go out together?  Same direction?  How did

15  that work?

16  A.  Yeah, typically the hunt would start at the cabin.  And the

17  hunters -- there would be a group of hunters.

18          We would head off to the north, going through

19  several drainages.  And it's a big area.  It's a big country.

20          Everybody's feet would get sore, so we would all

21  kind of meet up at a place.  And then figure out what we saw,

22  what happened, and then go on to the next hunt.

23  Q.  Do you recall that day anybody in your party firing a

24  weapon?  Did you hear a weapon fired?

25  A.  I -- yes, I had heard a weapon fired.

1755

Gustafson – D – By Mr. Matasar

1   Q.  Tell the jurors what you recall about that.

2   A.  I was hunting down a ridge, and I heard several shots.  And

3   it was distant from me.  I'm guessing 600 yards, something like

4   that.  So I sat down.  I carry binoculars.  I put the

5   binoculars up.  And I could see deer running up this hillside.

6   And by that point there was probably three or four or five

7   shots.  And so I had my binoculars on the deer.  I was trying

8   to see if anything was hit.  And from what I could tell, from

9   where I was at, there was nothing hit, and everything got away.

10  And it was probably eight -- eight to ten shots.

11  Q.  Do you recall where Steve Hammond was at that time?

12  A.  I don't, because we hunted in, you know, different

13  directions.

14  Q.  What kind of day was it?  Do you recall?

15  A.  It was a pleasant day.  It was sunny, as I recall.

16  Q.  Do you recall that day seeing any smoke to the south at any

17  time?

18  A.  I do.

19  Q.  Okay.  What did you see?

20  A.  We had all met up in a spot, and we were all congregating,

21  talking about what we had seen.  And there was a big smoke

22  plume to the south.

23          There was a helicopter flying around, possibly

24  another aircraft, fixed wing.  And so we -- as a group, we're

25  just asking the Hammonds what was going on there.  And my

1756

Gustafson – D – By Mr. Matasar

1   recollection is that they said it was controlled burning.

2   That was the smoke we saw.  And that was the conversation.

3   Q.  Do you recall anybody making a telephone call about burning

4   that day?

5   A.  I do.

6   Q.  First, tell the jury, if you recall, what kind of telephone

7   that call was made on.

8   A.  It was made on a cell phone.

9          And my recollection is as we were -- after we

10  discussed the smoke -- with the Hammonds -- to the south,

11  Steve asked if anybody had a cell phone.  And I did carry a

12  cell phone.  That was kind of in the early stages of cell

13  phones, but I had one in my fanny pack.  So I gave my cell

14  phone to Steve, is my recollection.

15         And I was very close to him.  The group was there.

16  And he made a phone call to the B.L.M.  And it was a fairly

17  short phone call.

18  Q.  What did you hear?

19  A.  I heard Steve say, This is Steve Hammond.  I wanted to let

20  you know I'll be doing some controlled burning this weekend.

21  And -- and that was it.  It was pretty short.

22  Q.  Was there any encounter, that you're aware of, between your

23  party -- anybody in your hunting party and another group of

24  hunters at that time?

25  A.  Absolutely not.

Gustafson – X – By Mr. Papagni

1  Q.  Was there any discussion about any sort of encounter with

2  other hunters, at any time?

3  A.  No.

4  Q.  Any discussion, before the phone call, about any other

5  hunters?

6  A.  None.

7          MR. MATASAR:  Okay.  That's all I have.

8          Thank you, Mr. Gustafson.

9          MR. BLACKMAN:  No questions.

10                   CROSS-EXAMINATION

11  BY MR. PAPAGNI:

12  Q.  What color of pickup was Dwight Hammond driving that day?

13  A.  What kind of pickup?

14  Q.  What color of pickup did he drive?

15  A.  (Pause.)

16  Q.  You can't remember?

17  A.  Typically it was a blue pickup, so --

18  Q.  And who was in it with him?

19  A.  The members of the hunting group -- it's been so long ago,

20  I just don't know.

21  Q.  And do you -- does your family own some property with the

22  Hammond family?

23  A.  It's not co-owned.  It's owned by us.

24  Q.  And who pays the taxes on it?

25  A.  Who pays the taxes?  The Hammonds do.

Gustafson - X - By Mr. Papagni

1   Q.   So explain that to me.

2        You own it, but they pay the taxes?

3   A.   Back in the mid-'90s, the Hammonds talked to my father and

4   myself, and offered to sell us some property for recreational

5   purposes.  We -- they sold it to us for hunting, hiking,

6   fishing, camping, those kinds of things.  They kept the right

7   to farm it.  And so part of the deal was they pay the taxes,

8   and we had the use of it for recreational purposes.

9   Q.   Okay.  And you're an insurance agent.  Right?

10  A.   Yes.

11  Q.   Are you the insurance agent for the Hammond Ranches?

12  A.   Yes, I am.

13  Q.   And is there -- are they one of your largest clients?

14  A.   No.

15  Q.   Top ten?

16  A.   No.

17  Q.   Okay.  Lot of insurance clients?

18  A.   What's that?

19  Q.   You have a lot of insurance clients, apparently.

20  A.   I do.

21  Q.   This shooting of the deer that you described for the

22  jury -- do you recall you describing your binoculars, and

23  stuff?

24  A.   Um-hmm.

25  Q.   That takes place before or after Mr. Hammond had -- Steven

1759

Gustafson - X - By Mr. Papagni

1    Hammond had made this call from your cell phone?

2    A.    That happened after.

3    Q.    So you're absolutely certain that this deer shooting

4    incident you've described for the jury came after Steven

5    Hammond got your cell phone and called the B.L.M. to say he was

6    going to do a controlled burn?

7    A.    Absolutely certain.

8    Q.    And what area were you hunting in -- or what area -- this

9    map behind you -- were you at when this cell phone call was

10   made?

11   A.    Okay.  Let me orient myself here.

12   Q.    That's -- the map's given us a lot of trouble, so if you

13   can just take your time, sir.

14   A.    Where is the loop road?

15   Q.    Loop road's that yellow one on the very bottom, if I may

16   help you there, sir.

17   A.    This one (pointing)?

18   Q.    Yeah.

19   A.    Hammond.  So -- so tell me the question, again.

20   Q.    Where were you at when he made the phone call?

21   A.    Would have been somewhere up in here, I believe (pointing).

22   Q.    Okay.  I'm going to hand you a blue pen, and I want to have

23   you write down where you were at.

24   A.    Okay.

25             MR. BLACKMAN:  Your Honor, I don't mean to interrupt

1760

Gustafson - X - By Mr. Papagni

1  his examination but, at least for my purposes, I think there's

2  probably a better map for -- for this than one of these from

3  the '06.

4          MR. PAPAGNI:  I can change --

5          MR. BLACKMAN:  It seems to me it's an inappropriate

6  use of an exhibit.  There must be one from '01 that might be

7  more useful.  That's all I'm suggesting.

8  BY MR. PAPAGNI:

9  Q.  Let me ask you this question.

10         Are you able to find where you were at, when

11 Mr. Steven Hammond made this call about 11 years ago, on the

12 map in front of you, sir?

13 A.  Am I able to find it?

14 Q.  Yeah.

15 A.  Not specifically.  It is a little bit of a confusing map.

16 Q.  Okay.  Well, I can get you another one.

17         Would it be easier if you had another one?

18 A.  Well, let me just look at the roads here.

19 Q.  Moon Hill Road would be to your right.

20         And then I'm going to ask you to give us the number

21 of the exhibit to the left, when you're ready.

22 A.  Yeah.  We would have been right up -- right up in here

23 (pointing).

24 Q.  Okay.  If you would just go ahead and write your name where

25 you believe you were on that map, please, sir, when the call

1761

Gustafson - X - By Mr. Papagni

1   was made.

2   A.   (Complies.)

3   Q.   That marking there pretty good?

4   A.   Pretty good.

5   Q.   And in the left-hand corner up there, that little yellow

6   sticker, what's the number?

7   A.   Exhibit 070.

8   Q.   And the date that you made this call in 2001?

9   A.   Well, I have to believe it's the same day.

10  Q.   Well, what day?   September --

11  A.   September 30th.

12  Q.   October?

13       Pardon me?

14  A.   The opening day of hunting season, whatever that is.

15  Q.   The opening day of hunting season.

16  A.   Um-hmm.   (Nods head.)

17  Q.   Would that have been September 29th, is the opening day?

18  A.   I don't know.

19  Q.   So your recollection is that everything you're testifying

20  about took place on the opening day of hunting season?

21  A.   Correct.   (Nods head.)

22  Q.   If I told you the opening day was September 29th, 2001,

23  sir, would you dispute that?   Would that be fair?

24  A.   Well, it was 11 years ago.   I have no clue of the date.

25  Q.   Okay.

1762

Colloquy

1    A.  So you could tell me it was September 15th, and I would

2    agree with you.

3    Q.  That's probably -- was it a Saturday?  Do you remember?

4    A.  It was a Saturday.

5    Q.  You're certain it was a Saturday?

6    A.  Yep.  (Nods head.)

7    Q.  Just as sure as you're certain that the shots you heard

8    about the deer came after the telephone call was made?

9    A.  I'm sure it was opening season, opening day of deer season.

10        MR. PAPAGNI:  Thank you, sir.  Those are all of my

11   questions.

12        MR. MATASAR:  No questions.

13        THE COURT:  Thank you, sir.  You may step down.

14        Your next witness, please.

15        MR. BLACKMAN:  Jody Starbuck.

16        And, your Honor, I think I -- we're having some

17   technical issues here.  So I --

18        MR. MATASAR:  May these witnesses be excused?

19        MR. PAPAGNI:  No objection.

20        MR. BLACKMAN:  I need to play the audio off my laptop,

21   which I don't think is connected to the system at the moment.

22        Do we know if I can simply plug in the audio?  I

23   don't need any video.

24        THE COURT:  Why don't you just put it up next to the

25   microphone.

1763

Starbuck - D - By Mr. Blackman

1      MR. BLACKMAN:  Do you think that will work?

2      THE COURT:  Don't know.

3      MR. BLACKMAN:  Oh, well, we can try it.

4      THE COURT:  I'm just a lawyer.

5      (Pause.)

6      THE CLERK:  Please raise your right hand.

7      (Witness sworn.)

8      THE WITNESS:  Yes, I do.

9      THE CLERK:  Thank you.

10      Please have a seat.

11      Please speak clearly into the microphone, and

12 there's water here, if you would like some.

13      Please state your full name and then spell your name

14 for the record.

15      THE WITNESS:  Jody Starbuck.  J O D Y,

16 S T A R B U C K.

17      MR. BLACKMAN:  And, your Honor, I won't be using this

18 diagram, so I would ask that it just be taken down.

19      THE COURT:  Thank you.

20                    DIRECT EXAMINATION

21 BY MR. BLACKMAN:

22 Q.  Ms. Starbuck, where do you live?

23 A.  I live in Diamond, Oregon, on the Hammond ranch.

24 Q.  How long have you lived in that area?

25 A.  I was born and raised in Crane, but have lived in

Starbuck – D – By Mr. Blackman

1    Frenchglen the last six years.

2    Q.   What do you do for a living?

3    A.   I'm a registered nurse at Harney District Hospital, in

4    Burns.

5    Q.   Okay.  Can you talk up just a little bit.  I'm having

6    trouble hearing you.

7             So what do you do for a living?

8             THE COURT:  Might move it a little closer.  Might

9    help.

10            THE WITNESS:  I'm a registered nurse.

11   BY MR. BLACKMAN:

12   Q.   How long have you been doing that?

13   A.   Five years.

14   Q.   Have you worked as a firefighter at any time during your

15   life?

16   A.   Yes, I have.  I worked three summers during my college --

17   to get me through college.

18   Q.   Are you currently married?

19   A.   Yes.

20   Q.   How long have you been married?

21   A.   Six years.

22   Q.   Were you married in '06?

23   A.   Yes.

24   Q.   And what's the name of your husband?

25   A.   Wade.

1765
Starbuck - D - By Mr. Blackman

1  Q.  Directing your attention to the summer of '06, did you and

2  Wade have any kind of a job that took you down into the

3  Frenchglen area?

4  A.  Yes.  We were working for Gary Miller, in Frenchglen, and

5  we were cutting hay on the refuge.

6  Q.  Okay.  So could you explain to the jury, just briefly, what

7  does that mean, that you were cutting hay?

8  A.  There's meadow hay at the refuge.  And we cut it, and put

9  it into bales.

10  Q.  Now, I'm going to direct your attention to a particular day

11  in August of 2006.  And I'm going to ask you, without telling

12  you the date, if there was a date when something unusual

13  occurred while you and -- and Wade were cutting hay for

14  Mr. Miller.

15  A.  I couldn't tell you the date exactly.

16  Q.  I understand you can't tell me the date.  But was there

17  something that struck you -- not to use a pun, but did

18  something happen that caused you to take some action?

19  A.  Yes.

20  Q.  Okay.  What happened?

21  A.  We were finishing our day of cutting, and there was

22  numerous lightning strikes throughout that day.  And I watched

23  a strike hit the ground, start a fire.

24  Q.  Okay.  And once you saw that stroke hit the ground and

25  start a fire, what did you do?

1766

Starbuck - D - By Mr. Blackman

1    A.   I called B.L.M. dispatch.

2    Q.   Okay.  And I'm going to play for you a recording, and I

3    hope you can hear it.  And ask you if you can identify the

4    recording and who's talking.  Okay?

5    A.   Okay.

6    Q.   Let's give it a shot.

7            It's not playing, but let me give it a try.

8            (Pause, referring.)

9            MR. BLACKMAN:  That's it.  Sorry.

10           (Audio playing.)

11   BY MR. BLACKMAN:

12   Q.   I'll stop it.  Can you hear it now?

13   A.   Yes.

14           (Audio playing.)

15           (Audio concluded.)

16   BY MR. BLACKMAN:

17   Q.   So was that the call you made to B.L.M. when you first saw

18   fire?

19   A.   Yes.

20   Q.   Okay.  And what did you do after you first saw the fire?

21   A.   After we called the B.L.M., we just continued there in that

22   field for about an hour.

23           We were fueling up our swathers and greasing, and we

24   just continued to watch it while we were in the field.

25   Q.   And what did you see, as you were watching the fire?

1767

Starbuck - D - By Mr. Blackman

1    A.  It continued to grow, moving uphill.

2    Q.  And "uphill," you mean moving to the east?

3    A.  Correct.

4    Q.  Okay.  So what did you do when you saw that happen?  Do you

5    recall calling the B.L.M. a second time?

6    A.  No.

7    Q.  Okay.  Let me play you a second call, and see if you can

8    recognize yourself calling the B.L.M.

9            (Pause, audio playing.)

10           (Audio concluded.)

11   BY MR. BLACKMAN:

12   Q.  So, Ms. Starbuck, can you estimate what time of day it was

13   that you made those calls?

14   A.  I believe the first call I made was approximately after

15   four o'clock.  And we stayed in the field for maybe an hour.

16   And I believe that call was a call back to me.  So we were

17   probably -- after 4:00.  We were gone by the field by 5:30.

18   Q.  Okay.  So the -- the call back to you would have been --

19   what?  An hour later?

20   A.  No.  Maybe 15, 20 minutes.

21   Q.  And then did you continue to observe the fire that

22   afternoon?

23   A.  Yeah.

24   Q.  And how would you describe its appearance?

25   A.  It was actively growing.

1768

Starbuck – X – By Mr. Papagni

1  Q.  Did you see any kind of fire suppression activity while you

2  were there?

3  A.  No.

4           MR. BLACKMAN:  That's all I have, your Honor.

5           Thank you.

6           THE COURT:  Mr. Matasar?

7           MR. MATASAR:  No questions, your Honor.

8           THE COURT:  Mr. Papagni.

9           MR. PAPAGNI:  Just a couple.

10                        CROSS-EXAMINATION

11  BY MR. PAPAGNI:

12  Q.  Ma'am, you were a firefighter, and then you became a nurse?

13  A.  Correct.

14  Q.  Okay.  And the events you're talking about took place the

15  day there was a lot of lightning hitting in the area?

16  A.  Yes.

17  Q.  And that's the way you recall the date.  Correct?

18  A.  Yes.

19  Q.  And so based upon all of this lightning that was hit --

20  that was going on, you saw a fire start south of Bridge Creek

21  but north of the loop road.  Right?

22  A.  Correct.

23  Q.  And then it grew?

24  A.  (Nods head.)

25  Q.  True?

Manski – D – By Mr. Blackman

1    A.    Yep.

2          MR. PAPAGNI:  Thank you.  Those are all of my

3    questions.

4          THE COURT:  Thank you.  You may step down.

5          Your next witness, please.

6          MR. BLACKMAN:  Jonathan Manski.

7          THE COURT:  Thank you.

8          MR. BLACKMAN:  Your Honor, I'm going to have this one

9    just look at Exhibits 1431 and 1432.

10         THE CLERK:  Please raise your right hand.

11         I'm sorry.

12         MR. BLACKMAN:  Go ahead.

13         THE CLERK:  Please raise your right hand.

14         (Witness sworn.)

15         THE WITNESS:  I do.

16         THE CLERK:  Thank you.  Please have a seat.

17         Please speak clearly into the microphone, and

18   there's water if you would like some.

19         THE WITNESS:  Okay.

20         THE CLERK:  Please state your full name, and spell

21   your name for the record.

22         THE WITNESS:  My name's Jonathan Manski.

23   J O N A T H A N.  Manski, M A N S K I.

24                    DIRECT EXAMINATION

25   BY MR. BLACKMAN:

Manski - D - By Mr. Blackman

1   Q.   Mr. Manski, can you tell us what you do for a living.

2   A.   Currently, I'm the unit aviation officer for the B.L.M. in

3   Southeast Oregon.

4   Q.   How long have you worked with the B.L.M?

5   A.   Since 1989.

6   Q.   What was your position back in 2006?

7   A.   I was the dispatch center manager.

8   Q.   And what is the dispatch center manager's job?

9   A.   It's an overall coordination job.  Taking care of whatever

10  the incidents -- all risk incidents that may occur within the

11  jurisdiction of our district.

12  Q.   What's a red flag warning?

13  A.   A red flag warning is a notice that is issued by the

14  National Weather Service of an indication of severe weather

15  conditions.

16  Q.   And as the manager position that you held in 2006, did that

17  kind of information come to you?

18  A.   It would come to the dispatch center, and it would be

19  brought to my attention, certainly, because it's a matter of

20  importance that would be passed on to firefighters or folks --

21  you know, when those are issued, they have to be reported to

22  the folks in the field.

23  Q.   Thank you.

24       MR. BLACKMAN:  I would ask the clerk to show you

25  Exhibit 1431.

                    Manski - D - By Mr. Blackman

1              I believe, Counsel, you have a copy of 1431.

2              MR. PAPAGNI:  I do.  Thank you.

3              (Witness handed document.)

4   BY MR. BLACKMAN:

5   Q.  Drawing your attention to Exhibit 1431, first of all, do

6   you recognize what that is generally?

7   A.  Yes.  It's a standard red flag warning issued by the

8   National Weather Service.

9              MR. BLACKMAN:  Your Honor, I would offer Exhibit 1431.

10             MR. PAPAGNI:  No objection.

11             THE COURT:  1431 is received.

12  BY MR. BLACKMAN:

13  Q.  And, Mr. Manski, could you tell us if this is in fact a red

14  flag warning?

15  A.  It is a red flag warning because that's the header of the

16  information here, "red flag warning."

17  Q.  And if you would turn to the second page of that exhibit,

18  1431, and look at the box that's been blocked in red.

19             Could you tell us if that indicates the period of

20  time that this red flag warning was in effect?

21  A.  There is a date and time on the -- within the red box, that

22  you indicate, that indicates the date and time that it was

23  issued.

24  Q.  Okay.  And when was it in effect?

25  A.  You want me to read from here?  Is that what you're asking

Manski – D – By Mr. Blackman

1    me --

2    Q.  Yes.  I'm just put it on the ELMO.

3            MR. BLACKMAN:  Is the ELMO up?

4            MS. ROOT:  Yeah.  (Nods head.)

5    BY MR. BLACKMAN:

6    Q.  Give it one second.  It will shift, I think.

7            Okay.  What is the effective time for this

8    particular red flag warning?  And let me just give it a

9    second.

10           There's a way of making this focus.

11   A.  Okay.  Not for me, it's not.  So, you know, I can read it

12   here better than I can read it there.  Is that okay with you?

13   Q.  I'm not sure why that's happening.  But, anyway.

14           So when was it in effect?

15   A.  This says it was in effect at 08:03 a.m. on Pacific

16   Daylight Time, Tuesday, August 22nd, 2006.

17   Q.  And until what hour was it in effect?

18   A.  The next paragraph says the red flag warning remains in

19   effect from noon, mountain time -- which would be 11:00 o'clock

20   Pacific Time -- for the day -- through midnight Mountain Time,

21   or 11:00 p.m. Pacific Daylight Time.

22   Q.  And what is a red flag warning?

23   A.  Are you asking me that again, because I think I've already

24   answered that.

25   Q.  What weather conditions are attached to a red flag warning?

1773

Manski - D - By Mr. Blackman

1  A.  This particular red flag warning, as it states in this

2  issuance, has to do with gusty winds and low humidity, which

3  are a couple of the criteria that the National Weather Service

4  uses to issue red flag warnings --

5  Q.  Now, in your position as the EICC center manager, did you,

6  after the Grandad fire in 2006, have occasion to submit a

7  report about the resources and events surrounding the fire

8  activity in the Burns district during August of 2006?

9  A.  I wrote a summary report of some of the activity, yes.  I'm

10 not sure if that's what you're looking at, or what?

11         I guess I didn't see it.

12 Q.  I'll have the clerk show you 1432.

13         (Witness handed document.)

14         MR. PAPAGNI:  Thank you.  (Handed document.)

15         THE WITNESS:  Yes, this is my report.

16 BY MR. BLACKMAN:

17 Q.  So you did a report sometime after August of 2006,

18 summarizing the fire activity in the Burns district.  Is that

19 right?

20 A.  It summarizes not only the fires occurring on the Burns

21 district, but the, you know, general situation nationally,

22 regionally; as well as some of the critical issues that were

23 going on during the fire season in August of 2006.

24         MR. BLACKMAN:  Your Honor, I would offer 1432.

25         MR. PAPAGNI:  No objection.

Manski – D – By Mr. Blackman

1        THE COURT:  Received.

2    BY MR. BLACKMAN:

3    Q.  And, Mr. Manski, as part of that report, did you

4    summarize –– and, again, it's hard to read in here.

5            But did you summarize the –– why is it not ––

6            (Pause, referring.)

7            MR. BLACKMAN:  Just doesn't want to focus for me, your

8    Honor.  Well, what can I say?

9    BY MR. BLACKMAN:

10   Q.  Does it in fact summarize the fire activity for August

11   21st, 22nd, 23rd, 24th?

12   A.  No.  What it actually says is August 19th, 20th, 21st,

13   22nd, 23rd, and 26th.  If I'm reading in the red box.  Is that

14   what you're asking?

15   Q.  No, that –– no.  I'm talking about the upper part, first.

16   The general ––

17   A.  The general fire situation, yes, it does.

18   Q.  So how many fires –– how many new fires occurred in this ––

19   not nationally but in your region, on August 22nd, of –– excuse

20   me, August 21st of 2006?

21   A.  This information would have come from the regional

22   situation report, reflecting the fire activity from the entire

23   region of Oregon and Washington, Region 6.

24           This says there were –– on August 21st, there were

25   52 new fires in Region 6.  And new and existing fires that

Manski - D - By Mr. Blackman

1    day burned 8,226 acres.

2    Q.  And how many fires on the 22nd, just in the Region 6, which

3    is Oregon and Washington?

4    A.   Okay.  It says, there were 88 new fires on August 22nd

5    within Oregon and Washington.  And those new and existing fires

6    burned an additional 33,167 acres.

7    Q.  And the 23rd?

8    A.   The 23rd said, 28 new fires in Region 6, and those new and

9    existing fires burned 75,444 acres that day.

10   Q.   Now, turning to the red box.

11            Does that summarize what the weather situation was

12   during that same period of time?

13   A.  It says that during that period of time, the National

14   Weather Service issued numerous red flag warnings for the area

15   in our fire zone, yes.

16   Q.  And what dates does it indicate there were red flag

17   warnings in effect through the National Weather Service in the

18   Burns district?

19   A.  For our zone, they -- this says that they were issued on

20   August 19th, 20th, 21st, 22nd, 23rd, and 26th.

21            MR. BLACKMAN:  Thank you, your Honor.

22            No other questions.

23            THE COURT:  Mr. Matasar?

24            MR. MATASAR:  No questions.

25            THE COURT:  Mr. Papagni.

1776

Manski - X - By Mr. Papagni

1    CROSS-EXAMINATION

2   BY MR. PAPAGNI:

3   Q.  Mr. Manski, during a fire season, a red flag warning is

4   issued fairly regularly?

5   A.  During an active fire season, there are numerous red flag

6   warnings, that is correct.

7   Q.  In fact most of the firefighting is done during that period

8   of time.  Is that true?

9   A.  Most of the active firefighting is done -- if the

10  conditions are such that doesn't promote active fire activity,

11  then, you know, those fires are easily caught, and it's --

12  Q.  One of your jobs is to go ahead and put out the weather

13  warnings to assist firefighters in the field, is it not?

14  A.  It's a requirement for a safety aspect, so firefighters are

15  aware of, you know, fire conditions and as they change.

16  Q.  And -- and these red flag warnings -- for example,

17  Defendant's Exhibit 1431, which you had to look at --

18  A.  Yes, sir.

19  Q.  -- do these red flag warnings sometimes get cancelled or

20  rescinded, sir?

21  A.  They're issued by the National Weather Service for a period

22  of time.  When the conditions change and the -- and the red

23  flag warning criteria are no longer met, they cancel the red

24  flag warning, yes.

25  Q.  In fact on 1431, that was cancelled at 6:17 p.m., wasn't

Manski - X - By Mr. Papagni

1    it, on --

2    A.   This red flag warning was cancelled at 6:17 in the evening

3    of the 22nd.   That's correct.

4    Q.   So despite what it says on the second page, the fact of the

5    matter is it was cancelled at 6:17 p.m., that day?

6    A.   It says on the second page it would be in effect until

7    midnight, because that was issued at 8:00 in the morning.

8         As those conditions change throughout the day, the

9    National Weather Service would certainly update that

10   information and cancel it as it was deemed necessary.

11   Q.   And this one was cancelled.   Correct?

12   A.   This one had been cancelled.   That's correct.

13   Q.   And it was cancelled at 6:17 p.m?

14   A.   6:17 Pacific Time by the National Weather Service.

15   Q.   And the other exhibit that was shown you -- it got marked

16   1432 -- that talked about some other days:   The 19th, 20th,

17   21st.

18        We already dealt with the 22nd.   So the other

19   relevant day would be the 23rd of August, for our purposes.

20        Was the red flag warning on the 23rd also cancelled

21   later in the day?

22   A.   Yes, it was.   It was mid-afternoon.   I don't recollect the

23   exact time that it happened, but it was early afternoon on the

24   23rd.

25   Q.   And when it's cancelled, why is it cancelled, sir?

1778

Manski - X - By Mr. Papagni

1  A.   The National Weather Service, using their instruments and

2  technology and -- and technical knowledge realized that the

3  conditions that generated the red flag warning -- for example,

4  extreme winds or high winds, low humidities, that those

5  conditions were changing and subsiding to where they would not

6  meet the minimum criteria for -- for issuance of a red flag

7  warning.  And they would have a certainty that they would not

8  return.

9  Q.   But the two documents, Defendant's Exhibits 1431 and 1432,

10  don't include those cancellations in them, do they?

11  A.   No, they don't.  They just -- it's just the original

12  product that was developed at 8:00 in the morning.  And no

13  further issue -- you know, the issuance that would have

14  cancelled this was not included in this.

15         MR. PAPAGNI:  Those are all of my questions.

16         MR. BLACKMAN:  No other questions.

17         THE COURT:  Thank you.  You may step down.

18         Your next witness, please.

19         MR. BLACKMAN:  Henry Vogler.

20         MR. PAPAGNI:  May Mr. Manski be excused, your Honor?

21         THE COURT:  Yes.

22         MR. PAPAGNI:  Thank you.

23         THE CLERK:  Please raise your right hand.

24         (Witness sworn.)

25         THE WITNESS:  So help me God.

1779

Vogler – D – By Mr. Blackman

1        THE CLERK:  Thank you.  Please have a seat.

2        Please speak clearly into the microphone, and here's

3    water, if you would like some.

4        THE WITNESS:  Thank you.

5        THE CLERK:  Please state your full name and spell your

6    name for the record.

7        THE WITNESS:  Henry Conrad, V, as in Victor,

8    O G L E R, IV.

9                    DIRECT EXAMINATION

10   BY MR. BLACKMAN:

11   Q.  Mr. Vogler, please speak up.  Okay?  Speak right into that

12   microphone.  Okay?

13   A.  Oh, sorry.

14   Q.  Mr. Vogler, what do you do for a living?

15   A.  I'm a stockman.

16   Q.  How long have you been a stockman?

17   A.  Since I graduated from college in 1971.

18   Q.  Where did you go to school?

19   A.  University of Nevada, at Reno.

20   Q.  What kind of livestock have you raised over the years?

21   A.  Cattle and sheep and horses.

22   Q.  Where do you currently reside?

23   A.  North Spring Valley, Nevada.

24   Q.  And how long have you lived in Nevada?

25   A.  This is my 28th year.

Vogler – D – By Mr. Blackman

1    Q.  Okay.  Before living in Nevada, where did you live?

2    A.  In Harney Valley.

3    Q.  That's here in Oregon?

4    A.  That's in -- out at Burns, south and east of Burns.

5    Q.  And is that where you were born and grew up?

6    A.  No.  I was born right here in Pendleton.

7    Q.  Okay.  And so when did you move to the Burns area?

8    A.  I was about a year old.  I don't have much recollection.

9    Q.  So you can claim Pendleton as your birthplace, but you

10   really didn't grow up here?

11   A.  Well, I'm not sure.  We drove out there yesterday, and it's

12   a state hospital now.

13          (Laughter.)

14   BY MR. BLACKMAN:

15   Q.  So you grew up in Burns?

16   A.  Yes.

17   Q.  Do you know the -- Dwight Hammond?

18   A.  Yes, I do.

19   Q.  How long have you known Dwight Hammond?

20   A.  Since the mid-'70s, when I came back to Harney County, out

21   of college.

22   Q.  And how long did you live in Harney County at that point?

23   A.  Well, from 1950 to 1975.  Would be 25 years.

24   Q.  And how long have you kept in touch with the Hammond

25   family?

1    A.  My whole -- whole life.  I mean, they're friends.

2    Q.  Now, since you lived in Nevada, have you held any positions

3    with any organizations or with the state?

4    A.  Oh, boy.  I've been a state tax commissioner for seven

5    years.  Resource advisory council for the northeast RAC, for

6    the Bureau of Land Management.  Coordinated resource management

7    for the White Pine district, B.L.M./Forest Service combination.

8         I've been president of the wool growers, Public

9    Lands Council, N-4 Grazing Board.

10         All of that and 50 cents will get you coffee

11    anywhere but Starbucks.

12         (Laughter.)

13    BY MR. BLACKMAN:

14    Q.  Now, I want to direct your attention to August of 2006.

15         And you've been asked to think about this, haven't

16    you?

17    A.  Yeah.  Yes.

18    Q.  Where were you living in August of 2006?

19    A.  North Spring Valley, Nevada.

20    Q.  And was there an occasion that brought you to Oregon?

21    A.  Yes.

22    Q.  And what was that?

23    A.  A good Irish wedding in Ontario, Oregon.

24    Q.  Do you recall when that wedding took place?

25    A.  It had been on a Saturday.  It was pretty close to the

Vogler - D - By Mr. Blackman

1    middle of the month.  I -- whatever the calendar said.  But

2    I -- I -- I think it must have been the 18th or 19th.  It was

3    on a Saturday, I know that.

4    Q.  Did you make any arrangements to visit with the Hammond

5    family since you were going to be in Oregon?

6    A.  Yes.

7    Q.  Tell us how that -- those arrangements got made.

8    A.  Well, my daughter, Kiki, met me in the Burns parking lot

9    Sunday, which was the day after the wedding.

10            And we visited there, and then we went to the

11    Hammonds's sometime Sunday afternoon.

12   Q.  Now, Kiki is your daughter, I think you said?

13   A.  My second daughter.

14   Q.  And she lives in Klamath Falls?

15   A.  Yes.  She's a parole and probation supervisor for Southeast

16   Oregon, for the Oregon Department of Correction.

17   Q.  And her daughter's name is?

18   A.  Racine.

19   Q.  How old was Racine at the time, about?

20   A.  Six years ago, she would have been 11.

21   Q.  Who else was with you at that time?

22   A.  My son, Stenson Robert.

23   Q.  Anyone else?

24   A.  Dana.

25   Q.  Anyone else?

1783

Vogler - D - By Mr. Blackman

1    A.  Dana Vogler.

2    Q.  Okay.  Your now wife?

3    A.  Yes.

4    Q.  So do you recall about the time it was that you and Dana

5    and Stenson and Racine got to the Hammonds'?

6    A.  It would have been late in the afternoon.  Because I took

7    the Wilber family to breakfast in Ontario at -- I think it's a

8    Denny's, or one of those kind of fast restaurants.  And -- and

9    then we visited and -- you know, I have a lot of roots that are

10   still in Oregon.

11            And then we took off from Ontario to Burns.  It's

12   probably three, four -- three and a half hours.  So I would

13   say it's -- probably picked her up sometime in the afternoon;

14   2:00, 3:00, maybe four o'clock.  I don't wear a watch.

15   Q.  Right.  And how long does it take to get from Burns to the

16   Hammond ranch?

17   A.  Typical Eastern Oregon road.  You know, crooked and

18   potholes named after presidents.  So -- it's crooked.

19   Probably -- I believe it's 60 miles, probably, to the dust

20   bowl.  Probably an hour and a half.

21   Q.  And when you say "the dust bowl," is that the general

22   vicinity of where the Hammond residence is on their ranch?

23   A.  Yes.  That was what -- I know Ben Kerns used to have it,

24   and they always called it the dust bowl.

25   Q.  What was your plan for the visit to the Hammonds?

Vogler - D - By Mr. Blackman

1  A.  To say howdy, and get back to my business.  (Laughing.)

2  Q.  Is that how it worked out?

3  A.  No.  I had a mutiny.  Everybody told me I shouldn't get

4  home so quick.  I should give them a little vacation.  So we

5  stayed.  Monday.

6  Q.  And so on Monday, of that visit, you stayed.  And what were

7  the kids doing?

8  A.  Some time in the early afternoon we decided to go up to the

9  Hammond reservoir, and take the kids swimming and fishing and

10  visiting.

11      MR. BLACKMAN:  I'd ask to show the witness Exhibit

12  1124, page 27.

13  BY MR. BLACKMAN:

14  Q.  Oh, I should ask you.

15      While you were visiting the Hammonds, did you take a

16  bunch of pictures?

17  A.  Yes.

18  Q.  And are these the pictures you took when --

19  A.  Yes.

20  Q.  When you were visiting the Hammonds?

21  A.  Yes.  That's my son Stenson, holding up whatever that is.

22  And that's my granddaughter Racine, standing next to him.

23  Q.  Okay.  And so what time of day would you guess it was that

24  the kids were up at the reservoir?

25  A.  Be early afternoon.

1785

Vogler - D - By Mr. Blackman

1  Q.  And who was up at the reservoir?  And what adults went up

2  to the reservoir?

3  A.  Dwight and Susie and some of Steve's kids.

4  Q.  How about Steve?

5  A.  No, he -- roll those other pictures there.  There might

6  even be a picture of him in that tractor.  He was out, working

7  in the hay field, where all of the antelope, and the stuff was

8  at.  He was in the tractor.

9  Q.  Do you recall how long the kids stayed in the water?

10  A.  Yes.  (Laughing.)

11  Q.  What -- what is it that -- that makes you recall how long

12  the kids were in the water?

13  A.  Well, a big old lightning bolt hit just the other side of

14  the lake.  And Ms. Hammond said, Okay, kids, there's a rule

15  here.  Three strikes and you're out.

16        She no more than said that, then boom, boom, twice

17  more.  We loaded up and went back to the house.

18  Q.  Now, when you say there was a lightning bolt, what

19  direction from the reservoir did that lightning hit?

20  A.  East, on -- on the mountain itself.

21  Q.  Okay.  And do you know what that area is called up there?

22  A.  Steens Mountain.

23  Q.  When you went back down to the house, what did you guys do?

24  A.  Told wild west stories, visited, and talked about this guy

25  or that guy, or who tipped over last year, and things like --

Vogler – D – By Mr. Blackman

1   you know, just what people that haven't seen each other for a

2   while talk about.

3   Q.  And what did you guys do for dinner?

4   A.  We ate right there, and some people came over that wanted

5   to meet me, I guess.  They -- I write stories for the

6   *Progressive Rancher*, and *Range Magazine*, and then I am on a

7   radio show, too.  And so they wanted to meet me.

8           Again, that and 50 cents will get you coffee.

9   Q.  But I would ask you to look at page 41 of that exhibit.

10          Okay.  Is that a picture that you took that evening?

11  A.  Yes.

12  Q.  And that's who?

13  A.  Emery and Dwight.

14  Q.  Okay.

15  A.  He's pretty short in the britches in those days.

16  Q.  And was Mr. Hammond there all evening?

17  A.  Yep.

18  Q.  How about page 46, please.

19          Not too clear on that screen.

20          But is that also at dinner?

21  A.  Yes.  That would be Dwight, setting next to my son, I

22  believe.  And that's my daughter [sic] Racine, standing up.

23          The two little shavers there, I believe, are Steve's

24  kids.  And that might be Corbin at the end.

25  Q.  Okay.  And is Steve Hammond in that picture?

1787

Vogler – D – By Mr. Blackman

1   A.  Boy, if he is, I can't see him.  But I know he was there.

2   He –– he and Earlyn were both there.

3   Q.  Yeah.  It's just not very bright.  But if you –– maybe I

4   should just ask you to look at the actual photograph.

5   A.   If they're not in the picture, they're in the room.  But I

6   see a plaid shirt over on the left.  That could be –– oh, I see

7   an arm now, too.

8        Maybe I ought to put my seeing eye dog on.

9        (Retrieving eyeglasses.)

10        THE WITNESS:  Yeah, that's –– now I can see him.

11   That's Steve on the left, right behind Emery.

12   BY MR. BLACKMAN:

13   Q.  So he was there that evening?

14   A.  Yes, sir.

15   Q.  Now, did you –– when you sent those pictures to us, tell us

16   if there was a clock in one of the pictures that showed the

17   date.

18   A.  Ah, Susie was standing in her kitchen, I believe.  Either

19   the morning we left or the morning we went up to the reservoir.

20   Q.  Okay.  Well, I'm going to ask you to look at page 31 of

21   this series of photos you took.

22   A.  (Pause, referring.)  Yep, there it is.  See the clock right

23   back there?

24   Q.  Right.

25   A.  See the gray outline?

1788

Vogler – D – By Mr. Blackman

1   Q.   Okay.  That's the clock.

2        And is that at dinner that night?

3   A.   Well, I think Susie's drinking orange juice.  It would be a

4   little early in the day.  It's probably in the morning.

5   Q.   Okay.  And we made another picture, 1124A.

6   A.   There it is.

7   Q.   Is that that clock?

8   A.   Yes.

9   Q.   And can you tell, looking at that clock, what date it was?

10  A.   Is it 6-21?  Or 8-21.  And it's --

11  Q.   8-21?

12  A.   And it's 6:15.

13  Q.   P.m., right?

14  A.   I -- yeah.

15  Q.   So how late did you guys stay up that night?

16  A.   Hadn't seen each other for a long time.  Probably stayed up

17  way longer than we should have.

18  Q.   Okay.  And then you spent the night there?

19  A.   Yes.

20  Q.   What about the next morning?  What time did you get up the

21  next morning?

22  A.   Oh, after staying up all night, I don't suppose very early.

23  It was probably 6:00, 6:30, when we had breakfast.

24  Q.   And who all was there when you had breakfast?

25  A.   Same crew that was there the night before, except the

Vogler – D – By Mr. Blackman

1  people that -- the visitors.  Steve, Earlyn, and all of their

2  kids, and Dwight and Susie.

3  Q.  Do you have any recollection of the time that you left the

4  place that day?

5  A.  It would have to have been 7:30 or eight o'clock.

6  Q.  And were both Steve and Dwight Hammond there at the time?

7  A.  Shook hands as I got in the car.

8  Q.  And what did you see them do as you were getting ready to

9  go?

10  A.  Went over to the shop.  I think they had a couple of bad

11  tires on the truck.  On their cattle truck.

12         And Steve had walked back and forth to the shop two

13  or three times.

14  Q.  So when you left the ranch, they were both there?

15  A.  Yes, sir.

16  Q.  And then where did you go from there?

17  A.  We went back out to where -- well, it was the old Witzel

18  place, they used to live there, on the road.  And we went

19  south.  I think they might call it Ten Mile now.  And we headed

20  south, towards Frenchglen.

21  Q.  As you're driving south, through Frenchglen, what do you

22  notice, if anything?

23  A.  Smoke.

24  Q.  Now, you lived in that area a long time.  You've been a

25  stockman for a long time.

Vogler - D - By Mr. Blackman

1     What kind of weather conditions did you think you

2 were seeing when you drove by?

3 A.  Well, it's Steens Mountains.  They're nine or 10,000 feet

4 high.  There's a temperature inversion, especially that late in

5 the year.  All that dust bowl, and every little hole -- the air

6 was hanging right there, thick.  And you could smell smoke when

7 we left the Hammonds.

8 Q.  And what did you see in terms of the conditions -- either

9 smoke or fire -- as you're getting closer to Frenchglen?

10 A.  Well, at first, as you're going along that road early in

11 the morning, with the temperature inversion still there, that

12 smoke is just hanging in every little draw.

13         So it wasn't until we got right straight across from

14 Frenchglen -- which I believe that's called Bridge Creek.

15 And you could then see flames.  And we called Susie.

16 Q.  Do you have any idea what time of day that was?

17 A.  Oh, must have been 9:00 -- well, just depends.  Again,

18 Eastern Oregon does not get any highway funding since I've been

19 here.  Big potholes.  And it's crooked.

20 Q.  So did something else, hopefully, unusual happen to you

21 during that morning, as you're driving back to Heely -- or

22 Nevada?

23 A.  We saw this lady in the B.L.M. truck going by like she was

24 on fire.  And we drove up Long Hollow, and drove right into a

25 fire.  Drove -- I mean, there was fire on both sides.  There

Vogler - D - By Mr. Blackman

1    was fire all the way along there.

2            And -- and we had -- you know, once -- Long Hollow,

3    once you start up Long Hollow, there's no place to turn

4    around.

5            So when we broke out on top, we could only do one

6    thing, is make a quick decision and go.

7            And then we got over the hill and got to Fields.  We

8    stopped and visited with an old friend of mine that used to

9    work for Caterpillar, Johnny Hodges.  And Johnny Hodges was

10   setting in Ed Davis's water truck.  And all behind Fields was

11   on fire.

12   Q.  And then you keep driving.  And then does something happen

13   when you cross into Nevada?

14   A.  Yeah, I got a speeding ticket.

15   Q.  I would ask you to look at Exhibit 1136.

16           Do you recognize that ticket?

17   A.  Well, yes.  He was pretty charitable to me, I believe.

18           What time was it?  I -- looking for the --

19   Q.  9:40 in the morning.

20   A.  9:40.  That would be about right.

21   Q.  So you -- and that ticket was issued -- where were you, in

22   terms of in Oregon and Nevada?  Where?

23   A.  Well, just after you go out of Denio, you go up over that

24   Kings River Summit, and you can see all the way to Paradise

25   Hill, about 75 miles of straight road.

Vogler - X - By Mr. Papagni

1   Q.   Okay.  So you were -- what?  Just entering Nevada about

2   when this --

3   A.   Probably ten miles in.

4        MR. BLACKMAN:  All right.  No other questions, your

5   Honor.

6        THE WITNESS:  He's got my birthday wrong.  It says I

7   was born in 40.  I was born in 49.

8        MR. BLACKMAN:  Duly noted.

9        THE WITNESS:  Wonder if I could get that ticket

10  brought back.

11                    CROSS-EXAMINATION

12  BY MR. PAPAGNI:

13  Q.   Only question I have, sir, is you left the Hammond

14  residence, it's your testimony, on August 22nd, between 7:30

15  a.m. and 8:00 a.m.  Right?

16  A.   I would figure that was about it.

17       MR. PAPAGNI:  That's all my questions.

18       THE COURT:  Thank you.  You may step down.

19       Your next witness, please.

20       THE WITNESS:  Am I out the door?

21       THE COURT:  Yes, sir.

22       THE WITNESS:  Thank you.

23       MR. BLACKMAN:  Your Honor, since we didn't take a

24  break --

25       THE COURT:  We can take a break now.

1793

Freeman - D - By Mr. Blackman

1        MR. BLACKMAN:  I think it would be appropriate.

2        Thank you.

3        THE COURT:  All right.  We'll take a break.

4        (Jurors exit.)

5        (Recess taken.)

6        (Jurors enter.)

7        THE COURT:  All right.  Your next witness, please.

8        MR. BLACKMAN:  David Freeman.

9        THE COURT:  Thank you.

10        THE CLERK:  Raise your right hand.

11        (Witness sworn.)

12        THE WITNESS:  I do.

13        THE CLERK:  Thank you.  Please have a seat.

14        Please speak clearly into the microphone here.  And

15   there's water, if you would like some.

16        Please state your full name, and then spell your

17   name for the record.

18        THE WITNESS:  David Freeman.  That's D A V I D,

19   F R E E M A N.

20                    DIRECT EXAMINATION

21   BY MR. BLACKMAN:

22   Q.  Mr. Freeman, how are you currently employed?

23   A.  Sir, I'm an Oregon licensed private investigator.

24   Q.  How long have you been an investigator -- private

25   investigator?

1794

Freeman - D - By Mr. Blackman

1    A.  Private investigator for a little over 20 years.

2    Q.  Before you went into the private investigation business,

3    what did you do for a living?

4    A.  I started many years ago as a military policeman, for three

5    years.  Then I served as an Idaho state trooper for four years.

6          Then I went to college.  I was a loss prevention

7    manager for all Sears Roebuck in Idaho.

8          After I graduated from college, I was hired by the

9    Federal Bureau of Investigation as an agent, and sent to Los

10   Angeles, California.

11   Q.  And how long were you an F.B.I. agent?

12   A.  Eight years.  I was medically retired.

13   Q.  Were you -- came to assist in the investigation of -- by

14   the defense in this case?

15   A.  Yes, sir, I was.

16   Q.  And in connection with that assignment, did you attempt to

17   contact various people who might be witnesses in the case?

18   A.  I did.

19   Q.  Was one of those people that you contacted Stacey Davies?

20   A.  Yes, sir.

21   Q.  Who was he?

22   A.  Stacey Davies is the manager or director of Roaring Springs

23   Ranch, here in Oregon.

24   Q.  How did you -- were you able to contact Mr. Davies?

25   A.  Yes, sir, I did.

Freeman - D - By Mr. Blackman

1   Q.   How did you do that?

2   A.   I contacted him by telephone, and asked if he would be

3   available and if I could interview him.

4   Q.   Was he agreeable?

5   A.   He was.  He said that he would like for me to send him

6   copies of reports that were made by B.L.M. investigators when

7   they had visited him, so that he might review them.  And then

8   he would have an interview with me regarding those reports

9   only, by telephone.

10  Q.   So did you in fact make arrangements to provide a copy of

11  that B.L.M. investigative memorandum of his interview by them

12  to him?

13  A.   Yes, sir, I did.

14  Q.   And how did you do that?

15  A.   I sent it to him by e-mail.

16  Q.   About when was that?

17  A.   I would have to refer to my notes, or my report.

18  Q.   Do you have that with you?

19  A.   I do.

20  Q.   Why don't you go ahead.

21  A.   (Pause, referring.)  I contacted him on -- for the

22  interview on April 25th, 2011.

23  Q.   Okay.  And when did you actually talk to him, to go over

24  the report that had been written by the B.L.M?

25  A.   That would be the April 25th, 2011.

Freeman - D - By Mr. Blackman

1    My previous contact with him was on April 15th,

2    2011.

3    Q.  So when you talked to him, after he had a copy of the

4    report, how did that interview get conducted?

5    A.  We spoke on the phone.  And as per his request, I asked him

6    if he could go through the B.L.M. investigator's report, and

7    make comments on that report.

8    Q.  Did he then read the report and talk to you about it?

9    A.  He apparently had already read the reports, and he went

10   through the reports with me as we spoke, yes.

11   Q.  Okay.  Now, in the report, was there a section in which he

12   was quoted by the B.L.M. investigator as saying that on -- on

13   an occasion, Steve Hammond stated to him, Why go through all of

14   this burn prescription stuff in what two matches can do in

15   August?  Did he make any comment to you about that part of that

16   report?

17   A.  Yes, sir, he did.  His comment to me was that -- if I could

18   get my spectacles out, so I can read.  (Pause, referring.)

19       I asked him -- he reviewed the report, and then said

20   that in paragraph 1, page 1 -- and that's where it reflects

21   that statement that you just mentioned -- there's mention of

22   Steve saying a couple of matches in August would be a simple

23   way to handle things.

24       Stacey said that Steve has said a couple of times

25   that if B.L.M. would use a couple of matches in August, it

Freeman – D – By Mr. Blackman

1    would be a lot simpler than all of the complicated plans that

2    they do.

3    Q.   Okay.  Now, was there also, as part of your assignment, an

4    effort to determine what kind of foot track would be left by

5    Dwight Hammond?

6    A.   Yes, sir.

7    Q.   Okay.  And tell us what you did to try to make that

8    determination.

9    A.   Well, the easiest and -- and most logical thing to do is to

10   measure their feet, to find out what size feet and what size

11   boots they wear.

12          So I did that.  I went to Mr. Hammond's home.  And I

13   had him get a pair of boots.

14          I measured his feet in his stocking feet, and I

15   traced those out very carefully on paper, which I initialed

16   and dated.

17          And then I had him put boots on and I -- using other

18   pieces -- separate pieces of paper, traced out the boot size

19   and the outline of the boots.

20          I photographed both him with his feet in the

21   outlines of -- of my drawings, and his boots on him and the

22   outlines of my drawings.

23   Q.   And I would like you to look, now, at Exhibit 1186.

24          And the -- do you recognize what that is?

25   A.   That's Dwight Hammond's left foot in his stocking, or sock.

1798

Freeman - D - By Mr. Blackman

1   It has -- bears my initials, 1-23-11.

2   Q.  And what was his foot length?

3   A.  You're going to ask me to read that?  (Laughing.)

4   Q.  I can give you a hard copy, if you would like.

5          THE CLERK:  I have one here.

6          THE WITNESS:  Here we go, 11 3/16 inches in length.

7   And it was -- there we go.

8          The bigger you get it, the worse it looks.

9          A little over four inches in width.

10  BY MR. BLACKMAN:

11  Q.  And then if you would look at the next page of that

12  exhibit.

13         What is this?

14  A.  This is a right foot.  If you pull it -- there we go.

15  Dwight Hammond's right foot, also in a stocking.

16         Again, my initials and the date appear thereon.

17         And I put measurements, from toe to heel, on it; as

18  I did with the others.

19  Q.  And the length of that foot?

20  A.  Ten and -- I believe it was 10 15/16.  That's correct.

21  Q.  And then the next page of that exhibit.

22  A.  That would be Dwight Hammond's left bootprint.  This is

23  with his feet in the boot.  And I traced this out on

24  legal-length paper.

25  Q.  And the length of that boot?

Freeman – D – By Mr. Blackman

1   A.  Length of that boot is 11 3/4 inches.

2   Q.  And the next page.

3   A.  That would be Dwight Hammond's right bootprint.

4        Again, he was wearing the boot, standing on an 11

5   by -- or 8-1/2-by-14 piece of paper.

6        It does contain my initials and the date.  And it is

7   Dwight Hammond's right bootprint.

8   Q.  And the length of that bootprint?

9   A.  I would say 11 7/8 inches.

10  Q.  Okay.  Now, I would like you to look at Exhibit 1187.

11       And tell us if this is the actual pictures showing

12  how you made those tracings and measurements.

13  A.  That's correct.  After I made the tracings, I took

14  photographs of Mr. Hammond standing with his feet on the tracks

15  that I had made, the outlines that I had made, with a ruler.

16       That's a 12 1/2-inch ruler, by the way.

17  Q.  And so that is showing the actual length of his boot being

18  what you had measured it, at 11 3/4 inch?

19  A.  Yes, sir.

20  Q.  And did you do -- let's go to the other two pages of that

21  exhibit list.

22       That's, again, another photograph that shows how you

23  took that measurement?

24  A.  Yes, sir.

25  Q.  And the next page, as well.

1800

Freeman - D - By Mr. Blackman

1      Okay.  Then, in addition to that, did you see what

2  kind of print he would leave in soil?

3  A.  I did.

4  Q.  And how did you do that?

5  A.  Took Mr. Hammond outside, to an area that was dirt, while

6  he was wearing his boots.  And I had him walk in soil.  And I

7  put a measurement to the -- and took a photograph and measured

8  the bootprint that was left behind.

9  Q.  Showing you what's been marked as 1188.

10      Can you tell us if that is the bootprint and the

11  measurement?

12  A.  Yes.  That is the bootprint that I took.  That is the

13  measurement.

14      And I used the pen for one end and the cap for the

15  other, just to show the outside edges of both the toe and the

16  heel.

17  Q.  And what was the bootprint that you measured?

18  A.  As I recall, it was 11 7/8.  Just a hair -- right at 12, I

19  guess you would say.  Right at 12 inches.

20  Q.  Now, in addition to that -- in addition to that, were you

21  asked to look at Government Exhibit 197?

22      Which is going to be brought up on the screen, here,

23  in a moment.

24      Do you recognize that as Government Exhibit 197?

25  A.  Yes, I recognize the photograph.

Freeman - D - By Mr. Blackman

1    Q.  And what do you understand that to be a photograph of?

2    A.  I understand that to be a photograph of a footprint that

3    was alleged to be Dwight Hammond's.

4    Q.  Okay.  And were you asked to do anything, based on the

5    things that are portrayed in that photographs?

6    A.  Yes, I was.

7          I was asked to determine the manufacturer,

8    dimensions, and period of manufacture of the pen that's shown

9    in the photograph.

10   Q.  Okay.  So I would ask Mr. Schroeder if he can blow up that

11   portion of the photograph.

12          And were you able, over time, Mr. Freeman, to

13   identify the make and model of the pen?

14   A.  Yes, I was.

15   Q.  And how did you do that?

16   A.  Well, we went to various supply places.  We went to

17   catalogs.  We looked at pens.  And I had people searching to

18   find pens that looked like this, with this particular

19   photograph.

20   Q.  And were you ultimately able to identify the kind of pen it

21   was?

22   A.  Yes.  And my mind just went completely blank.

23   Q.  Well --

24   A.  (Laughing.)

25   Q.  We could blow it up a little more.

1802

Freeman – D – By Mr. Blackman

1    A.   It's a P-145, is the model of the pen.  I know it's 5 5/8

2    inches in length.  And it's a Pilot.  It's also called the

3    Pilot Better pen.

4         I was able to determine from Pilot International, in

5    Florida, that this pen was manufactured before, during, and

6    after the year 2006.

7    Q.   And were you actually able to find and acquire a box of

8    these pens that are the same pen that's in this picture?

9    A.   Yes, sir, I did.

10   Q.   I would ask to have the clerk show you what's been marked

11   for identification as -- as Defendant's Exhibit 1217.

12   A.   (Handed box.)

13   Q.   And is that a box containing pens that match the one that's

14   in that photograph?

15   A.   Yes, sir, it is.

16   Q.   And I think you've already said it, but just to be clear,

17   did you then, at some point, measure the length of that

18   particular pen?

19   A.   Yes.  It's -- we did a measurement.  It's 5 5/8 inches,

20   with the point retracted.

21   Q.   All right.  So in the -- in the form in which it is

22   portrayed, in this exhibit, Government Exhibit 197, the pen is

23   5 5/8 inches?

24   A.   That's correct.

25        MR. BLACKMAN:  I would offer 1217.

1      MR. PAPAGNI:  No objection.

2      THE COURT:  Received.

3      MR. BLACKMAN:  That's all I have.

4      Thank you, your Honor.

5      MR. MATASAR:  No questions, your Honor.  I'm sorry.

6      THE COURT:  Mr. Papagni.

7      MR. PAPAGNI:  Thank you.

8                      CROSS-EXAMINATION

9  BY MR. PAPAGNI:

10  Q.  The boots that we just got through talking about, when you

11  had him put them on, did you smell -- smell them to see if they

12  smelled like smoke?

13  A.  No, sir.  I did not.

14  Q.  And this one photograph that had the ink pen in it, do you

15  know what happened to it?  The print itself, what occurred?

16  A.  Say that again, sir.

17  Q.  This one photograph that he showed you, that was a print

18  where it had the ink pen in it, that you spent so much time

19  tracking down, do you know what happened to that print that was

20  on the side of the road, sir?

21  A.  I do not.

22  Q.  So you didn't read the report about how it got destroyed?

23  A.  I don't know if this particular print was destroyed or not.

24  Q.  You didn't read the reports that were done regarding the

25  rocks being put around a bootprint, by Mr. Lance Okeson, which

1804

Freeman - X - By Mr. Papagni

1   was the basis of the photograph in which the pen was in?  You

2   didn't read those?

3   A.  I read such a report, but I don't know -- when I saw this

4   particular print, I don't know if that's the same print that

5   was mentioned in that report.

6   Q.  I'm sorry.

7        Wouldn't it have made a difference if you read the

8   report that Mr. Okeson described how this individual was

9   walking at the time the print was made?

10  A.  My task was to determine, if possible, the -- the make,

11  model, and dimensions of the pen.

12  Q.  That was the extent of your task.

13       When you were doing these outlines of the bootprint,

14  you had him standing there.  Right?

15  A.  Yes, sir.

16  Q.  And the boots that he was wearing, he didn't tell you --

17  wear the boots that he was wearing back in 2006, did he?

18  A.  No, sir.

19  Q.  And the boots that he was wearing, when you did this --

20  when did you do this -- these photos here?  How long ago was

21  that?

22  A.  That was January 23rd, I believe, of 2011.  It would show

23  on -- is reflected on the --

24  Q.  Okay.

25  A.  On the thing.  My initials and date are on --

Freeman - X - By Mr. Papagni

1  Q.  So it would have been after Mr. Hammond was charged with

2  the offenses he's facing today?

3  A.  Yes, sir.

4  Q.  Okay.  And you didn't read the report to see how the man

5  was walking, according to Mr. Okeson, as he crossed the Bridge

6  Creek area, did you?

7  A.  I recall a report of Mr. Hammond walking across Bridge

8  Creek Road.

9  Q.  Was he walking or was he running?  Was he walking fast?

10 Was he falling down?  Do you know at all?

11 A.  I don't have a direct recollection.  I've read many

12 thousands of pages on this.

13 Q.  Yeah, there's a lot.

14      And so the best you can say is while he was

15 standing, his foot size -- or the boot he gave you was about

16 11 3/4 inch.  And in the sandy print that you did -- was that

17 print that you did in the dirt, was that at the ranch itself?

18 A.  Yes, sir.

19 Q.  So that was about 12 inches, approximately?

20 A.  Approximately 12 inches.

21 Q.  Okay.  Now, let's see.

22      You mentioned your -- you've been a private

23 investigator for quite some time, and you had this little

24 interview with Stacey Davies you were telling us about.

25 Right?

1    A.   Yes, sir.

2    Q.   And you did a report.  Correct?

3    A.   Yes, sir.

4    Q.   And you did this interview -- when did you talk to

5    Mr. Davies about the statement that you say Mr. Davies made to

6    you?

7    A.   You mean, when did I interview him?

8    Q.   When did you do your report of the interview that contains

9    the statement --

10   A.   I can't give you an exact date.

11            I can say that with this particular report.  I

12   dictated it, and it was typed by someone else --

13   Q.   Oh --

14   A.   -- and I reviewed it.  Excuse me, sir.

15   Q.   I'm sorry.  I interrupted you.  It's my fault.

16            Go ahead, sir.

17   A.   (Shakes head.)

18   Q.   And then after you spoke to Mr. Davies, you dictated this

19   report, and you had someone type it for you.

20   A.   (Nods head.)

21   Q.   You sent it to Mr. Davies to review so he could sign and

22   correct it.  Right?

23   A.   No, I did not.

24   Q.   Pardon me?

25   A.   I did not.  It is not my habit to send reports that I've

1807

Freeman - ReD - By Mr. Blackman

1  typed to anyone.

2  Q.  Including the person you interviewed?

3  A.  That's correct.

4  Q.  You don't send it to them and say, Sir, I've interviewed

5  you.  This is the statements I'm attributing to you.  Would you

6  review it and make any corrections, and then sign it and send

7  it back to me.

8      You didn't do that, did you?

9  A.  No, sir, I did not.

10  Q.  Did you record the conversations, sir?

11  A.  No, sir.

12  Q.  Do you have a transcript of anything that would indicate

13  that besides you writing this report, that's what Mr. Davies

14  said?

15  A.  That's my only recollection.

16  Q.  And you were in the courtroom when Mr. Davies testified?

17  A.  No, sir, I was not.

18      MR. PAPAGNI:  No further questions.

19              REDIRECT EXAMINATION

20  BY MR. BLACKMAN:

21  Q.  Mr. Freeman, did you have a copy of the memo of interview

22  that you sent to Mr. Davies?

23  A.  Yes.

24  Q.  Do you have it with you today, as part of your report?

25  A.  Yes, sir.

1808

Freeman - ReX - By Mr. Papagni

1    Q.   Is that a statement that Mr. Davies signed?

2    A.   No, sir.

3    Q.   Isn't it merely a memorandum of interview written by Dennis

4    Shrader, a resident agent of the B.L.M?

5    A.   That's correct.

6    Q.   So did you ever see any report of a statement by Mr. Davies

7    that he had signed?

8    A.   No, sir.

9    Q.   All right.  Did the Government have him sign the statement

10   that -- where they're attributing words to him?

11   A.   I don't have any knowledge of that.

12   Q.   All they had was a memorandum written by their agent after

13   he talked to Mr. Davies?

14   A.   That's all I've seen, sir.

15          MR. BLACKMAN:  Thank you.

16          THE COURT:  Anything further?

17          MR. PAPAGNI:  Just one moment, your Honor.

18          (Pause, referring.)

19                      RECROSS-EXAMINATION

20   BY MR. PAPAGNI:

21   Q.   You weren't in the courtroom when Mr. Davies was asked if

22   he had seen a copy of his report, which included his statement,

23   and he testified he had.

24   A.   Say that again, sir.

25   Q.   Sir, were you -- you were not in the courtroom when he was

1809
Freeman – ReX – By Mr. Papagni

1   asked -- Mr. Davies was asked, while he was on the stand, that
2   you've seen --
3            MR. MATASAR:  Objection, your Honor.  I think the
4   question should be if he was in the courtroom when Mr. Davies
5   testified.  Nothing more should be part of the question.
6            THE COURT:  I agree.
7            MR. PAPAGNI:  I'll rephrase the question.
8   BY MR. PAPAGNI:
9   Q.  Do you have -- did you ever ask Mr. Davies if he was shown
10  a copy of Mr. Shrader's report before he testified in this
11  case?
12  A.  I don't understand your question, sir.
13  Q.  Before Mr. Davies took the stand, was he given a copy of
14  Mr. Shrader's report to review?  Do you know if he was or the
15  wasn't?
16  A.  I have no idea, sir.  I was in Idaho at the time.
17           MR. PAPAGNI:  Those are all of my questions.
18           Those are all of my questions.  Thank you.
19           THE COURT:  You may step down.  Thank you.
20           Your next witness, please.
21           MR. SCHROEDER:  Al Steninger, your Honor.
22           THE CLERK:  Please raise your right hand.
23           (Witness sworn.)
24           THE WITNESS:  I do.
25           THE CLERK:  Thank you.  Please have a seat.

1810

Steninger - D - By Mr. Schroeder

1      MR. SCHROEDER:  Madame clerk, could I give you this

2  Exhibit 1210 -- which is the large one -- to put up behind

3  Mr. Steninger, on the easel, please.

4      THE CLERK:  Please speak clearly into the microphone.

5  And here's water, if you would like some.

6      If you would please state your full name, and then

7  spell your name for the record.

8      THE WITNESS:  Al Steninger.  S -- A L,

9  S T E N I N G E R.

DIRECT EXAMINATION

11  BY MR. SCHROEDER:

12  Q.  Good afternoon, Mr. Steninger.  Can you hear me okay?

13  A.  I can.

14  Q.  Are you going to be testifying about some range and grazing

15  permits this afternoon, for a little bit?

16  A.  I will.

17  Q.  First of all, can you tell the jury your educational

18  background.

19  A.  I have a -- bachelor's degree in animal husbandry.  A

20  master's degree in range management.  Both from Colorado State

21  University.

22  Q.  And when did you graduate from Colorado State?

23  A.  When?

24  Q.  Yes.

25  A.  I received a bachelor's degree in 1958 and a master's

Steninger - D - By Mr. Schroeder

1  degree in 1962.

2  Q.  Can you try to get that mic closer to you, Mr. Steninger,

3  please.  You can try to move it a little bit, too.

4  A.  It's moved as far as it's going to go.

5  Q.  That would be fine.

6       Prior to going to college and graduating from

7  Colorado State to -- were you ever a buckaroo or a cowboy?

8  A.  Yes, I was.

9  Q.  And can you explain that to the jury, please.

10  A.  Oh, I buckarooed for a number of the large outfits in

11  Northern Nevada.  And was the assistant cow boss -- they call

12  them a jigger boss -- for the Ellison Ranching Company Midas

13  operation in Elko County, Nevada.

14       I worked for a number of the large outfits over a

15  period of four or five years as a buckaroo.

16  Q.  And can you explain a little bit more about being a

17  buckaroo at any point in time, or do you spend any time on a

18  horse?

19  A.  A buckaroo in Nevada -- particularly for those large

20  outfits -- is you are exclusively working with booming the

21  cattle, the processing of the cattle.  It's -- it is no ranch

22  work.  It's strictly working with cattle, and booming the

23  cattle and the processing of the cattle.

24  Q.  And at that point in time, would you use horses to move

25  cattle?

Steninger - D - By Mr. Schroeder          1812

1   A.   Yes.

2   Q.   At any point in time would you get on your feet to move

3   cattle?

4   A.   Yes.  But the buckaroo doesn't get on his feet very much.

5   Q.   Okay.  Can you explain those circumstances where a buckaroo

6   would get on his feet to move cattle.

7   A.   Well, you would -- you would -- if it were an area that was

8   difficult to go through with a horse, extreme rockiness,

9   extreme brush, that sort of thing, where it would be safer and

10  more expedient to move afoot than you would horseback, then

11  that's what you do.

12  Q.   And since those earlier years, have you continued to

13  periodically ride horses?

14  A.   Yes, I have.

15  Q.   And use horses to help move cattle?

16  A.   Yes.

17  Q.   Now, after graduating from Colorado State, what did you do?

18  A.   I went to work for the Bureau of Land Management, in the

19  Lakeview district, which lays immediately south of the Burns

20  district.  I was a range conservationist for two years, 1962

21  and 1963.

22       And I was among the first slate of area managers in

23  the United States.  I was the area manager of the High Desert

24  resource area, which was the western half of the Lakeview

25  district.

Steninger – D – By Mr. Schroeder

1  Q.  And how long did you stay working for the B.L.M?

2  A.  I worked for four more years, from 1962 to 1968.  I was

3  area manager.

4  Q.  And after you -- did you end your employment with the

5  B.L.M.?

6  A.  Yes, I did.

7  Q.  Did you end in good standing?

8  A.  Yes.

9  Q.  And what was the reason why you changed employment from the

10  B.L.M.?

11  A.  I went into the range and ranch management consulting

12  business.

13        And, incidentally, I not only left in good standing,

14  but I was approached by the associate director of the Bureau

15  of Land Management to be in charge of the range management

16  program for the entire Bureau of Land Management.

17  Q.  And you declined that job?

18  A.  I did.

19  Q.  And you decided to do something else?

20  A.  I decided -- I had been in business a couple of years, and

21  I decided to continue as a range and ranch management

22  consultant.  My name of my firm was Western Range Service.

23  Q.  And how did you get into working for and with Western Range

24  Service?

25  A.  I organized Western Range Service.  During the time of my

Steninger - D - By Mr. Schroeder

1    college years, I found a mentor who was -- probably the first

2    range management consultant in the United States, among them.

3    And he advised me on the education and the practical experience

4    that I needed to -- to get into the range management

5    profession.

6    Q.   And have you stayed with Western Range Service ever since

7    then?

8    A.   Yes.

9    Q.   And so how many years has that been?

10   A.   1st of July, it will be 44 years.

11   Q.   And as a range consultant, do you also -- are you also a

12   licensed appraiser?

13   A.   Yes, I'm a general certified appraiser in the state of

14   Nevada.

15   Q.   Now, in those 40-plus years that you've been a range

16   consultant and an appraiser, have you been employed by any

17   federal court to provide any expertise or any service to the

18   federal court?

19   A.   I was employed by the U.S. Federal District Court in Nevada

20   to do an economic analysis of the Big Springs Ranch, which is

21   in Eastern Elko County, in conjunction with a bankruptcy filing

22   that the judge was handling.

23   Q.   And in the course of these 40 years, have you been employed

24   or engaged by the Bureau of Land Management to provide any

25   service?

Steninger - D - By Mr. Schroeder

1    A.   I was authorized by a B.L.M. solicitor out of Idaho to

2    testify for the B.L.M. in regard to a grazing decision in the

3    Lakeview district involving the Viewpoint Ranch, which is a --

4    a -- probably 50 -- 50 miles south of Steens Mountains.

5    Q.   Have you, in your 40 years as a consultant appraiser,

6    worked for private individuals or entities dealing with range

7    management and grazing-related management issues?

8    A.   Continuously.

9    Q.   And can you explain generally the scope of your work and

10   duties that you will typically do and have done the last

11   40-plus years.

12   A.   We operate as kind of a liaison between the -- primarily

13   between the owners of livestock ranches with grazing permits

14   and working out grazing plans and doing extensive rangeland

15   monitoring, in which we do studies of grazing utilization, the

16   use of the -- of the forage by -- by cattle, long-term trend

17   measurements.  We've done -- and we have some clients that work

18   for -- doing those types of monitors for single clients for as

19   much as 30 years.

20   Q.   Can you explain to the jury the different sizes of

21   operations that you work for now and have worked for in the

22   past?

23   A.   They range from operations of approximately 500 cattle up

24   to over 9,000 cattle.

25        And in addition to the grazing, I've also managed

Steninger - D - By Mr. Schroeder

1   ranches, as well.

2   Q.  And can you explain what that entails?

3   A.  Well, it involved both liquidation management, where

4   ranches were being -- large ranches were being liquidated.  And

5   that particular liquidation management was a ranch of 65,000

6   acres and about 6,500-cattle operation.  Liquidated that for

7   Chase Manhattan Bank.

8           I have been the overall supervisor for a large ranch

9   in Nevada for seven years, that had 244,000 deeded acres and

10  three quarters of a million acres public land administered by

11  the B.L.M.

12          I've managed ranches in Central Nevada.  Done the

13  grazing and ranch management activity for many years.  The

14  grazing part for 30 years.  Ranch management part probably

15  for the last ten years.  A ranch in -- several in Nevada.

16  One's about a half-a-million acres of federal lands

17  administered by -- part of it by the Forest Service.  The

18  remainder by the Bureau of Land Management.  Acres of private

19  land of about 5,000 -- 5,000 acres.

20  Q.  What percentage of your work over the last 40 years have

21  been related to ranching operations that are dependent on

22  public land use or national forest systems land use?

23  A.  At least 90 percent.

24  Q.  And what does that mean when there's a dependency by use?

25  When I use those words, what does that mean to you, as a

Steninger - D - By Mr. Schroeder

1   consultant in range?

2   A.  With respect to the Bureau of Land Management, grazing

3   preferences on these ranches are based upon the dependency by

4   use, the grazing use, prior to 1934, or -- or the dependency by

5   location.

6        Those ranches made applications after the passage of

7   the Taylor Grazing Act of 1934.  And their base properties,

8   the private lands they -- they owned or leased or controlled,

9   received grazing preferences, which is -- a grazing

10  preference would be the -- the quantity of forage expressed

11  in animal unit months.  Meaning basically one mature cow, or

12  cow and calf, or their equivalent for one month; the amount

13  of forage they would consume in a month.

14       That's the way the Bureau of Land Management

15  quantifies the forage and the grazing preference.

16       And that -- primary -- what I've worked with is

17  Section 3 of the Taylor Grazing Act, which the Hammond ranch

18  falls under.

19  Q.  Do you have any certifications -- do you have any

20  certifications with, like, any particular societies,

21  Mr. Steninger?

22  A.  Well, I have had, over the -- over the years, I think --

23  I -- may I look at my curriculum vitae, to tell you the names

24  of them?

25  Q.  Absolutely.

Steninger - D - By Mr. Schroeder

1   A.  That would be -- (pause, referring to notebook.)  If you

2   could tell me my curriculum vitae number.

3   Q.  Yes, that's 1208.

4   A.  (Pause, referring.)  Well, I've -- I've been, either past

5   or present, a certified member of the American Society of

6   Agriculture Consultants.  A professional member of the American

7   Society of Farm Manager and World Appraisers.  Charter member

8   of the Association of Rangeland Consultants.  Federal Lands

9   Legal Foundation, I'm a member of.  National Association of

10  re -- Review Appraisers and Mortgage Underwriters.  Senior

11  designated member.  Certified review appraiser.  National

12  Cattleman's Association member.  Nevada Cattleman's Association

13  member.  The Society of Range Management, life member.

14  Q.  And does the Society For Range Management have any

15  particular certifications for professional range consultants?

16  A.  They do.

17  Q.  And do you hold that certification?

18  A.  I do not.

19  Q.  And what is the -- the Society for Range Management?

20  A.  It's an international society, and it is made up -- the

21  principle membership are public employees, primarily.  And

22  those that are in the independent consulting businesses, as I

23  am; which there aren't many.  And they have annual meetings.

24  They have continuing education.  And state society -- state

25  organizational meetings.  And they have -- they have annual

Steninger - D - By Mr. Schroeder

1    meetings as well.

2    Q.   And you're a life member of the SRM?

3    A.   Yes.

4    Q.   Have you been the author or co-author of any publications?

5    A.   Yes.

6    Q.   And what are those?

7    A.   Well, there's quite a few here.  Do you want me to go

8    through all of them?

9    Q.   Well, why don't you first tell us how many you've been an

10   author or co-author of in the last 40 years, Mr. Steninger.

11   A.   Ten.

12   Q.   And what have been the general topics of those?

13   A.   Mainly to do with livestock grazing and appraisal issues.

14   And also research I did at the university -- or Colorado State

15   University on the effects of sagebrush treatment on beef

16   production, which might -- was my master's thesis.  And

17   research I did in Western Colorado on the sagebrush rangeland.

18   Q.   During the last 40 years and as a matter of your ongoing

19   practice, do you stay current with the B.L.M. grazing rules,

20   the B.L.M. grazing manuals, the B.L.M. grazing handbooks, the

21   B.L.M. technical references relating to monitoring and

22   evaluation of rangelands, as well as the authorization of

23   grazing use on public lands?

24   A.   Yes.

25   Q.   Can you tell us what a grazing permit is?

Steninger - D - By Mr. Schroeder

1   A.  Well, a grazing permit would then be the document that

2   specifies what the grazing preference I earlier described was

3   on that base property.

4        And then it sets forth the numbers of livestock.

5   Typically sheep or cattle.  The season of use, the time of

6   year they would graze, and the qualification of the location,

7   and the amount of forage expressed in AUMs as authorized for

8   that permit holder to use on public land.

9   Q.  And how does -- excuse me.

10       How does a permittee get a grazing permit?

11  A.  Well, all of the -- all of the permits date back to the

12  grazing preferences that were issued following the 1934 Taylor

13  Grazing Act, in which the -- in which the Taylor Grazing

14  Service, by dependency by use or dependency by location,

15  allocated and assigned this grazing through that base property.

16       So you would have to either purchase the base

17  property or have a transfer of the grazing that's on the base

18  property to other -- other base property you would have.  And

19  that base property would have to be enough to support the

20  livestock that are authorized to graze on the public lands

21  when -- during the offseason.  And, in Oregon, it's five

22  months of base property requirements.

23  Q.  What is an annual grazing billing associated with the

24  grazing permit?

25  A.  An annual grazing billing would be one thing -- you get the

Steninger – D – By Mr. Schroeder                    1821

1   bill, and -- which charged the permittee for the use of grazing

2   for that year.

3          Typically, in the wintertime, prior to the -- the

4   grazing year -- the grazing year, incidentally, begins on

5   February 1, and it ends -- around March 1, and it ends on --

6   in February, is when the grazing year occurs.

7          So during the winter, typically the permittee would

8   sit down with the Bureau of Land Management and work out --

9   say, maybe it changes, or modifications of the grazing system

10  that -- the grazing plan that existed on the ranch with

11  respect to the numbers of livestock, the fields they would be

12  grazing, and -- the pastures or fields that they would be

13  grazing in during the course of the year, for the -- for the

14  grazing year.

15  Q.  What is an actual use report?

16  A.  An actual use report then would be the report that the

17  permittee submits to the Bureau of Land Management.

18         After the following -- after the following of the

19  annual year grazing unit, in which they would report the

20  actual numbers of livestock, the -- the fields or pastures

21  they were in, the allotments they were in, how long they were

22  in.  And the purpose of that would be for the Bureau of Land

23  Management to calculate the amount of grazing that took

24  place, the amount of AUMs that were taken from the land.

25         For their monitoring purposes, they would then look

Steninger - D - By Mr. Schroeder                        1822

1   at their range monitoring studies; the utilization, which

2   would be the amount of grazing that had taken place; trend

3   work; change in the condition of the range, in evaluating

4   changes in the grazing management that they may want to

5   institute on that particular operation.

6   Q.  What's a compliance inspection form?

7   A.  A compliance inspection report would be one that would be

8   made out of -- by a Bureau of Land Management employee when --

9   in which he would allow the allotment, and was observing if

10  your cattle were in the place they had been scheduled to be.

11  Primarily, that would -- how they were complying with the

12  grazing billing for that year.

13  Q.  Let's talk about Hammond Ranches, Incorporated.

14         Did you have an opportunity to make a field

15  inspection of the Hammond -- the Hammond FFR, the Mud Creek,

16  and the Hardie summer allotments?

17         MR. PAPAGNI:  Excuse me, Judge.  Before he starts go

18  into that --

19         THE WITNESS:  I did.

20         MR. PAPAGNI:  Before he starts going into that area, I

21  think there needs to be a qualification by your Honor under the

22  **Daubert** decision.

23         THE COURT:  I'm going to allow him to testify.

24         MR. PAPAGNI:  Thank you.

25         THE WITNESS:  I'm sorry.  I didn't hear what he said.

Steninger - D - By Mr. Schroeder                1823

1          I'm hard-of-hearing.

2    BY MR. SCHROEDER:

3    Q.  That's okay, Mr. Steninger.

4          Did you make a field inspection of the Hammond --

5    the Hammond FFR, the Mud Creek, and the Hardie summer

6    allotments?

7    A.  I did.

8    Q.  And when did you do that?

9    A.  On May 30th and May 31st, 2012.

10   Q.  And where did you go?

11         And maybe it would help you, if you look over to

12   your left shoulder, there's Exhibit 1210.

13         And let me open that, here, on the --

14   A.  If I can figure out how to run this thing (indicating

15   pointer).

16   Q.  And if you would point to the spring -- the screen -- and

17   this is Exhibit 1210.  And if you want me to blow up any

18   area --

19   A.  Just a moment.  She's going to have to show me how to run

20   this strobe.  (Pause, referring.)

21         What's the question, again?

22   Q.  Can you -- can you generally tell -- tell the jury where

23   you went.

24   A.  The first day (pointing), here's the headquarters, where

25   the alfalfa fields are.

1824

Steninger - D - By Mr. Schroeder

1    We traveled up -- oh, to the area of the -- Krumbo
2  Springs, No. 2, and the Krumbo Creek fields -- that's better.
3        First I will point out that the blue circles are
4  units of the federal range on their grazing permit.  These --
5  there was four of them.
6        There's -- on the north end there's two.  What they
7  call the dust -- the unit -- dust bowl No. 1 unit and the
8  Krumbo Springs No. 2 unit.
9        You can see the blue outline is -- is the fenced
10 federal range.
11       Well, the fenced federal range means -- is there's a
12 small amount of public land acreage within this fenced field
13 or fenced area.
14       So what the Bureau of Land Management does is simply
15 charge them for what they calculated to be the AUMs that are
16 within that field.
17       And in this case, in the grazing permit, they're
18 authorized to use these fenced federal range fields any time
19 of the year.  They basically collect the -- collect a fee for
20 the amount of forage the Bureau determines that's in those
21 fenced federal range units, and the time of use is up to the
22 operator.
23       With -- and -- so that they -- the first day that we
24 left, we came out and looked around at Krumbo Creek.  And
25 the -- and it's confusing.

Steninger – D – By Mr. Schroeder

1    Krumbo Creek is a -- these three -- the three

2    fields -- the holding field, the Krumbo Creek field, and the

3    other field here are really all the Krumbo Creek pasture or

4    field, as you may want to call it, as shown on their grazing

5    billing within the Hammond allotment.

6    So this is the Krumbo Creek unit of the Hambo --

7    Ham -- of the Hammonds' -- Hammond allotment.  And right

8    below it is the unit -- the fenced federal range unit called

9    Krumbo Springs No. 2.

10    And we went from the main headquarters out into the

11    north end of the Krumbo Springs unit, or the fenced federal

12    range unit.  And into the Krumbo Creek pasture of the Hammond

13    allotment.

14    Q.  And what did you do on the second day?

15    A.  On the -- on the -- well, on the -- on the first day, we

16    also went to the south end of the allotment.

17    Q.  Oh.

18    A.  I need to move the map up a bit.

19    In the afternoon of the second day, we went and

20    inspected the Mud Creek allotment of the Hammond ranch, which

21    is made up of two fields, the lower field and the upper

22    field.

23    We entered it off the refuge.  The lower end of the

24    field, we went in and inspected it.  In pasture No. -- the

25    lower pasture.  Went through this gate, and continued up to

Steninger - D - By Mr. Schroeder

1  where the -- essentially where the road ended in the upper

2  field of the Mud Creek allotment.  That was the afternoon of

3  May 30th.

4  Q.  And so I might have said the second day.

5       So the first day you were up in the Krumbo Springs

6  area, and the latter part of the -- excuse me.

7       The first day you were up in the upper part, in the

8  Krumbo Springs area.  And on the latter part of the first

9  day, you were down in the Mud Creek area?

10 A.  That's correct.

11 Q.  Okay.  And what did you go -- and where did you go on the

12 second day?

13 A.  Have to -- move -- move it to the north.  Move your map

14 up -- other direction up.

15 Q.  Okay.  Well, first of all, can you trace the direction of

16 how you got to the south?

17 A.  Well, we left from the headquarters, went down past the

18 Malheur refuge, and to Frenchglen.  Frenchglen is a little

19 further south.  And came in on the loop road, which would --

20 the loop road -- whoop.

21 Q.  Let me get --

22 A.  You're in Mud Creek, and you need to go to the right.

23 You're a little bit -- too much magnification.

24      Move it to the right, please, and -- and reduce the

25 magnification a bit.

Steninger - D - By Mr. Schroeder

1    Q.  No, reduce.

2    A.  Okay.  Just -- just move the map up, and we can -- I can

3    show you where the -- well, Frenchglen would be off to the

4    lower left corner of the map.

5         You don't need to move it anymore.  We're just

6    moving it back to -- over.

7         This is the area we want to look at, in here

8    (pointing).

9         We came up the loop road -- the loop road.  And it

10   brings you into the cabin allotment.  And we went in the

11   cabin allotment through -- through the loop road, back down

12   to the corner of the fenced federal range Mud Creek No. 4

13   field.  Back up through the north field, Thompson field, and

14   the Bridge Creek field on what they call the Bridge Creek

15   Road.  And then went out of the -- circling up to the -- out

16   of the north end of the allotment and back into the

17   headquarters.

18   Q.  And so that's what you did over those two-day period?

19   A.  Yes.

20   Q.  In your years of experience within this general area, have

21   you done any other work or similar inspections with similar

22   type of topography and vegetation that you saw here in these

23   four allotments that you looked at on those two days?

24   A.  Yes, I have.  It's juniper and sagebrush, grasslands that

25   are common in Northern Nevada -- Northern Nevada, Oregon, and

Steninger – D – By Mr. Schroeder

1    Idaho.

2            And a number of years ago, I worked with the Roaring

3    Springs Ranch, which is a large ranch immediately -- almost

4    immediately south of this, that is also on the Steens

5    Mountains, in developing property with the B.L.M., a grazing

6    management program for the Roaring Springs Ranch.

7    Q.  Before and after making your field inspections of these

8    four allotments, did you review information provided by the

9    Government to defense counsel relating to the B.L.M.'s grazing

10   files as to the Hammond Ranches?

11   A.  Yes, I did.

12   Q.  And in reviewing those documents, did you review the

13   Hammonds' permit that was effective between 1994 and 2004?

14   A.  Yes, I did.

15   Q.  And did you review Hammond Ranches' application to renew

16   their grazing permit in 2003?

17   A.  Yes, I did.

18   Q.  And did you review Hammonds' grazing permit effective

19   between 2004 and 2014?

20   A.  Yes.

21   Q.  Did you review Hammond Ranches' 2006 grazing billing?

22   A.  I did.

23   Q.  Did you review Hammond Ranches' 2006 actual use report?

24   A.  Yes, I did.

25   Q.  Did you review B.L.M.'s 2007 Mud Creek allotment,

Steninger - D - By Mr. Schroeder

1    federal -- or fundamentals of rangeland health determination?

2    A.   Yes, I did.

3    Q.   Did you review B.L.M.'s 2007 Hardie summer allotment

4    evaluation?

5    A.   Yes, I did.

6    Q.   Did you review B.L.M.'s 2007 Hammond allotment -- allotment

7    evaluation?

8    A.   Yes, I did.

9    Q.   Did you review B.L.M.'s 2006 Hammond FFR allotment,

10   fundamentals of rangeland health determination?

11   A.   Yes.

12   Q.   As to Hammond Ranches -- and let me open up that first.

13   It's 1192.

14   A.   (Pause, referring.)

15   Q.   Is that the Hammond -- this is Exhibit 1192, Mr. Steninger.

16   A.   Yes.

17   Q.   Is that Hammond Ranches' grazing permit that was effective

18   between March 1st, 1994, and February 28th, 2004?

19   A.   Yes, it is.

20   Q.   And, to your knowledge, was it in good standing in 2001?

21   A.   Yes, it was.

22   Q.   Showing you Exhibit 1194.

23        Is that Hammond Ranches' grazing permit effective

24   March 2nd -- or March 1st, 2004, to February 28th, 2004?

25   A.   Yes, it is.

Steninger – D – By Mr. Schroeder

1830

1    Q.   Excuse me.  February 28, 2014.

2              So what was the term of -- of the most recent

3    permit, Mr. Steninger?

4    A.   Went from March 1, 2004, until February 28th, 2014.

5    Q.   I want to show you Exhibit No. 1193.

6              And can you tell me what that is, Mr. Steninger?

7    A.   That is their -- this is No. 1193?

8    Q.   Yes, sir.

9    A.   This is their 2003 application for a grazing permit

10   renewal.

11   Q.   And can you tell the jury the significance of this

12   document, 1193?

13   A.   Well, the permittee is applying to renew -- ten-year

14   permits are typically issued -- or term -- term grazing permits

15   are typically issued for a ten-year period.

16             So at the end of the term permit that was expiring

17   in 2004, they would make an application to renew that grazing

18   permit with the Bureau of Land Management.

19   Q.   And is this Exhibit 1193 such a grazing application?

20   A.   Yes.

21   Q.   And this was signed by the Hammonds, to submit this

22   application?  Looking at page 3 of 1193.

23   A.   It was.

24   Q.   And as a product of that application, was the 2004 grazing

25   permit, Exhibit 1194, issued?

Steninger – D – By Mr. Schroeder                 1831

1    A.   Yes, it was.  The permit was issued then, for the period

2    March 1, 2004, through February 28th, 2014.

3    Q.   And was this grazing permit, Exhibit 1194, was it in good

4    standing with the B.L.M. in 2005 and 2006?

5    A.   Yes, it was.

6    Q.   And can you explain that?

7    A.   Well, if it -- if it was not in good standing, B.L.M. would

8    issue a grazing decision, taking action on the permit.  And

9    there was no action taken.  And so the permit was in good

10   standing.

11   Q.   In your experience, what did you find relative to the

12   B.L.M.'s 2007 Mud Creek allotment fundamentals for rangeland

13   health determination as to the permit status of this allotment?

14   And that's Exhibit 1202.

15   A.   (Pause, referring.)  The determination standard for

16   rangeland health was conducted, and all of the five standards

17   were achieved.

18   Q.   And can you tell -- and was it signed by the area manager

19   for the B.L.M.?

20   A.   It was.

21   Q.   A Karla Bird, on May --

22   A.   May the 29th, 2007.

23   Q.   And that's Exhibit 1202?

24   A.   Correct.

25   Q.   And can you tell the jury what the significance of these --

1832

Steninger - D - By Mr. Schroeder

1    the standards being achieved on the public land within the Mud

2    Creek allotment?

3    A.  Well, they have five standards for rangeland health.  That

4    they go out and make a determination whether the standards were

5    achieved or not achieved.  And if they were not achieved, what

6    the problem might be.

7            And -- and in this report here, it even reports --

8    not only were the standards met, but the -- then things were

9    doing well in the Mud Creek allotment.

10   Q.  And when B.L.M. makes a determination, can you explain --

11   like looking at Standard 1, watershed function, uplands, what

12   goes into the B.L.M.'s determination?

13   A.  Whether -- they're looking at the -- the soils.  Primarily

14   the soils and general condition of the upland watershed.

15   Upland being as opposed to riparian.

16           The riparian would be the meadows, lands that have

17   more water, so they stay greener throughout the year.  So the

18   upland would be more the dryland vegetation.

19           And this would be a determination as to the

20   functioning of the uplands with regard to rangeland health.

21   Q.  And can you explain that relative to Standard 2?  How is

22   that different than Standard 1?

23   A.  Well, it -- it then is in focus -- it's focused on these

24   riparian areas.  You people would probably call it the meadow

25   types.  More the meadow type.  The vegetation that takes seed

1    along water.  And they're looking as to the conditions of the

2    vegetation there, the soils on -- on those lands.

3    Q.  And what about Standard 3, ecological processes?

4    A.  In ecological process, they would be looking at, basically,

5    the -- the conditions of the vegetation with respect to its

6    ability to support livestock grazing, wildlife; those type of

7    things.

8    Q.  And looking on page 2 of Exhibit 1202, what about water

9    quality?

10   A.  Basically looking at the water quality, particularly

11   standards for water purity, sediment, those type of things;

12   whether it was satisfactory or not.

13   Q.  And what about Standard 5?  What is that?

14   A.  That would be the determination if there was any problem

15   with either threatened or endangered species, or species of

16   concern that are located within the allotment.

17   Q.  Now, looking at Exhibit 1207, in your experience what did

18   you find relative to B.L.M.'s 2007 Hardie summer allotment --

19   allotment evaluation as to the permit status?

20   A.  Say again your exhibit number.

21   Q.  1207.

22   A.  I don't -- I don't believe 1207 is correct.

23   Q.  Yeah, that's correct.

24        That's 1201.  Excuse me.

25   A.  1208 is my curriculum vitae.

Steninger - D - By Mr. Schroeder

1  Q.  1201.

2  A.  1201 would be a -- an allotment evaluation that was

3  conducted in 2007 in the Hardie summer allotment.

4  Q.  And I won't go through each of the standards.

5       But similar to the Mud Creek allotment, did the

6  B.L.M. make a determination as to the fundamentals of

7  rangeland health standards on the Hardie summer allotment?

8  A.  They did.  It's paragraph 8 there, and all five standards

9  were achieved.

10  Q.  I want to show you Exhibit 1198, Mr. Steninger.

11       And is that the 2006 actual use report of Hammond

12  Ranches?

13  A.  (Pause, referring.)  What's the number again?

14  Q.  It's Exhibit No. 1198.

15  A.  (Pause, referring.)  Okay.  Yes, that's a 2006 actual use

16  report that was submitted by the Hammond Ranches in January

17  2007.

18  Q.  And can you explain again why it was signed in January

19  2007?

20  A.  Well, Steve Hammond makes an entry.  He says, Sorry this

21  report wasn't timely.  I thought we would be meeting, and we

22  would talk then.  The last entry on the front was the bowls.

23  Thought it was easiest to figure them separately.

24  Q.  Mr. Steninger, I'm -- my question is focused in on -- this

25  is an actual use report.

1835
Steninger - D - By Mr. Schroeder

1    A.   Yes.

2    Q.   And -- and is it -- does a permittee submit it to the

3    B.L.M. after the end of the grazing season?

4    A.   They do.

5    Q.   Okay.  And this is reflective of that?

6    A.   Yes.  And then this actual use report then -- the B.L.M. --

7    in -- in the right-hand columns, determine the numbers of

8    cattle by the different fields or allotments and the number of

9    AUMs that were consumed.

10   Q.   And when you make reference to that, are you looking at

11   Exhibit 1198, on the right-hand side, where it says for B.L.M.

12   use only?

13   A.   Correct.

14   Q.   Okay.  Did you find -- did you find anything in the B.L.M.

15   record, that you reviewed, that this actual use report, Exhibit

16   1198, was incorrect?

17   A.   I did not.  I found nothing.

18   Q.   Now, in looking at the 2006 grazing billing, which is

19   Exhibit 1197, can you just explain to the jury generally -- I

20   don't want to get into specifics right now because I'll do that

21   a little bit later.

22        But, generally, looking at this grazing rotation

23   schedule on Exhibit 1197, which is the Hammond's 2006 grazing

24   billing, can you tell -- describe for the jury using Exhibit

25   1210, the general pattern of the rotation.

Steninger – D – By Mr. Schroeder

1    So why don't you keep the billing in front of you,
2  and I'll put up the big map.
3  A.   Well, it -- after they had -- they would meet -- they had
4  met with the Bureau of Land Management sometime prior to
5  February -- I mean, March 31st, 2006.  And they then had worked
6  out the fields, the numbers of cattle, and the dates that would
7  be scheduled for use during 2006.
8        It would be a consideration of the actual use
9  reports that had been filed the prior year, and -- and the
10 desires of the permittee for the grazing for that year, and
11 the desire of the Bureau of Land Management to come to an
12 agreement as to how many cattle would be in which fields and
13 for how long.
14 Q.  And using your pointer, and looking at Exhibit 1210 on the
15 screen, can you generally just describe the rotation of the
16 movement of the livestock that was planned per that grazing
17 billing?
18 A.   Whoop.  Pointing the wrong direction.
19       In April, the north -- well, during the winter
20 months, the two units of the -- of the fenced federal range
21 were used during the winter months.
22       And then into April, they began grazing in the
23 Krumbo Creek pasture, and -- and -- and some of the other
24 northern pastures.
25       As the season progressed, the cattle moved south.

1837

Steninger – D – By Mr. Schroeder

1    And, finally, then moving into the -- out of the -- into the

2    Hammond allotment during the spring, early summer, they were

3    scheduled.  And then they were to enter the Mud Creek

4    allotment.  First the lower field, upper field, and then

5    progressing into the -- into the Hardie summer field --

6    Hardie summer allotments later in the year.

7    Q.  Thank you, Mr. Steninger.

8            And then looking at the grazing billing, Exhibit

9    1197, you commented about Krumbo Creek.

10           What was the grazing authorization within that

11   Krumbo Creek pasture?

12           Let me zoom in on that area.

13           And you've kind of already described it.  But can

14   you outline the Krumbo Creek pasture, and tell the jury what

15   the grazing authorization was within that area?

16   A.  The Krumbo -- the Krumbo Creek would -- of the Hammond

17   allotment would be -- going around -- it's (pointing) outlined

18   in brown against the blue here.  That's the Krumbo Creek unit.

19   And that was grazed in April.

20   Q.  And is that all public land within the Krumbo Creek pasture

21   of the Hammond allotment?

22   A.  Yes.

23   Q.  And would that be classified as spring range,

24   Mr. Steninger?

25   A.  Yes.  Yes, it would.

1838

Steninger - D - By Mr. Schroeder

1    Q.  Now, the area that you said was winter range, is that part

2    below the Krumbo Creek pasture of the Hammond allotment,

3    looking at Exhibit 1210?

4    A.  And that would be the Krumbo Springs unit of the fenced

5    federal range.  And it would be the area that's encircled in

6    blue, right here.

7    Q.  And that -- that area you've encircled in blue, is it

8    predominantly private land by --

9    A.  Yes, it is.

10   Q.  And the private land is represented by those hash marks?

11   A.  Correct.

12   Q.  On Exhibit 1210?

13   A.  Correct.

14          The only -- only public land in there would be --

15   looks -- this little piece here, and then down at the bottom

16   of the allotment.

17   Q.  And that's why it would be classified as FFR, as you've

18   explained?

19   A.  Correct.  Because it was primarily private land.

20   Q.  And is the Krumbo Springs No. 2 of the Hammond FFR

21   allotment, is that classified as winter range?

22   A.  It uses -- winter range on the grazing permit, they can use

23   it any time they want.  But in there -- in their operation of

24   the ranch, they use it as winter range.

25   Q.  In looking at the 2006 grazing billing and the 2006 actual

Steninger - D - By Mr. Schroeder                1839

1   use report relative to the Mud Creek allotment, was there a

2   difference in 2006, Mr. Steninger?

3   A.  Yes, there was.

4   Q.  And can you explain that to the jury, and why that

5   occurred?

6   A.  When they make the grazing billing out in the grazing --

7   basically the grazing plan for the year, it's still wintertime.

8   And as -- as spring progresses, there are things that would

9   cause you to turn out later.  They were authorized to be

10  turning out the 1st of April.

11          But that year they delayed turnout until the 17th of

12  April.  Meaning there -- because of conditions of range

13  readiness, the growth of the plants, whether -- whether the

14  ground was wet, weather conditions, they -- they delayed the

15  turn -- turnout.

16          Consequently, when you delay the turnout, it will

17  slow down the movement of your cattle through the pastures,

18  as you go through the year.

19  Q.  And so in comparing the 2006 grazing billing and the 2006

20  extra use report, did you see differences, also, in -- within

21  the Hardie summer allotment?

22  A.  Yes.  They -- and they -- so they were moving into the Mud

23  Creek allotment later because of this delayed turnout, and --

24  and were coming in -- about on schedule into the Hardie summer.

25  Q.  Mr. Steninger, I'm now going to ask you some more specific

1840

1    questions on August 22nd, 2006, and August 23rd, 2006.

2            But before I do that, in looking at the exhibit

3    behind you, the -- the actual copy of Exhibit 1210, I want

4    you to look at the Bridge Creek pasture of the Hardie summer

5    allotment.

6            And can you tell the jury whether there is a mistake

7    on that -- on that exhibit as to two of the fences?

8    A.   Yes, there is.

9    Q.   And can you go up with this red pen and make the

10   corrections associated with that, as to your understanding of

11   the fenced pasture boundaries within the Hardie summer as of

12   August 21st, 2006.

13   A.   This exhibit shows a -- a fence between the Bridge Creek

14   and Thompson.   That was approved by a cooperative range -- a

15   cooperative agreement with the Bureau of Land Management for

16   that fence to be put in new and for the fence you'll see marked

17   as right below there, between the Thompson and the Bridge

18   Creek, that was an agreement that the permittee had as -- a

19   cooperative agreement with the Bureau of Land Management to

20   make those changes and put in new fencing and take out old

21   fencing.   But by the 2006 grazing season, that had not yet

22   occurred.

23           So how do you want me to mark this?

24   Q.   Well, why don't you just mark out, in red, the -- the fence

25   that should be removed.

Steninger - D - By Mr. Schroeder                    1841

1    A.   With hash marks?

2    Q.   That would be fine.  With a red marker pen.

3              And then put, using a red line, where it is.  And

4    then just initial that, both of those spots, Mr. Steninger.

5              Thank you.

6              Now, looking up on -- Mr. Steninger, looking, now,

7    up on this screen -- because some in the jury may not have

8    seen the changes that you made.  And can you show the jury,

9    looking on the screen, the two changes that you made using

10   the red marker -- or, excuse me, your red pointer.

11             It's been a white -- a whiting out.  Basically done

12   the same thing.  But just so we can see on the screen.

13   A.   Oh, I see.  I see.  Yeah, this is the one (pointing) --

14   this is the fence shown on the other exhibit that was taken out

15   because it had not yet been constructed.  And this fence still

16   existed.

17   Q.   Okay.  And so it's your understanding, in reviewing the

18   records and files, that what's on Exhibit 1210 -- as you have

19   now modified it -- would constitute the pasture boundaries of

20   the Mud Creek allotment and the pasture boundaries of the

21   Hardie summer allotment?

22   A.   Correct.

23   Q.   Based upon this information that you've reviewed, do you

24   have an opinion, given a lightning event on the evening of

25   August 21st, 2006, whether Hammond Ranches was prudent in

1842

Steninger - D - By Mr. Schroeder

1   removing their cattle in the lower pasture of the Mud Creek

2   allotment to the north pasture of the Hardie summer allotment

3   between August 21st, 2006, and August 23rd, 2006, as stated in

4   their 2006 actual use report?  And just give me a yes or no.

5   Do you have an opinion, first?

6   A.  Yes.

7   Q.  And let's get into some -- some specifics as to the basis

8   for that opinion.  Okay, Mr. Steninger?

9   A.  All right.

10  Q.  First of all, in looking at the actual use report -- and

11  let's -- let's get that up in front of the jury, which is 1198.

12          And can you tell the jury, looking at Exhibit 1198,

13  where you -- where you see the fact that the cattle were to

14  be -- or were removed from the Mud Creek area, up to the

15  north pasture; is my question asked.

16  A.  The actual use report for the -- for the Mud Creek

17  allotment is identified on here as the Grandad, which is

18  another name for the Mud Creek allotment.

19          It showed that the 374 cattle went into the Mud

20  Creek allotment on July 20th.  You see the seven twenty in

21  the second column -- or 7, slash, 20.  That's July 20th.

22  They entered the allotment.  374 head.

23          And on the 22nd of August, 374 head left the

24  Grandad -- Grandad, which is the upper and lower pastures of

25  the Mud Creek allotment.

Steninger - D - By Mr. Schroeder                    1843

1    Q.  And then they went to -- as I said -- in the north field.

2    And looking at the actual use report, 1198, can you explain

3    where they went when they were taken out on August 22nd?

4    A.  On August 22nd, which is in the second column on the

5    Grandad, the 374 head left that allotment and went to the north

6    field on the 23rd, at 374 head.  Entered the north field of the

7    allotment -- of the -- of the -- of the north field of the

8    Hardie summer allotment.

9    Q.  So, Mr. Steninger, I want to talk to you about that time

10   period between August 22nd and August 23rd, that's in this

11   actual use report.  Okay?

12   A.  Okay.

13   Q.  First of all, can you tell the jury, generally speaking,

14   does -- does an operator like -- are they 374 head of cattle,

15   like, right at the gate, and then a nanosecond later they're in

16   the north field?

17            I mean, that's a bizarre question.  But can you

18   explain that?

19   A.  No.  Kind of what -- it's -- well, let me see.

20   Q.  I will -- I will put back up the map, Mr. Steninger.  So --

21   A.  Let me explain that.  Of the -- it's about --

22   Q.  There we go.

23   A.  (Pointing.)  It's about -- roughly four or five miles is

24   the Mud Creek -- whoop.  Here's the Mud Creek allotment.

25            So it's in -- these lines, here, are sections.

1844

Steninger - D - By Mr. Schroeder

1    That's one mile.  So you see that -- one, two, three -- say

2    five or six miles to -- to remove, say, the cattle from the

3    lowest end of the Mud Creek allotment, to -- to enter into

4    the Hardie summer, which would be here.

5         You would have to move those cattle, or the cattle

6    would naturally drift, because they're accustomed to grazing

7    this area.  And they know at about that time of the year

8    they're moving into higher country.

9         It's roughly about a 1400-feet difference in

10   elevation from the bottom of the Mud Creek allotment to the

11   top.  So they -- they've got -- over a period of -- a

12   distance of about six miles, or so, they've got to move up --

13   uphill about 1400 feet to enter into the Hardie -- Hardie

14   summer allotment.  Which, incidentally, is about the same --

15   about 14 to 1500 feet elevational change from the beginning

16   of the Hardie summer allotment to the top of the Hardie

17   summer allotment.

18        But they were scheduled in 2006, was to go from the

19   Mud Creek to Bridge Creek.  And the actually move that shows

20   on the actual use report, which -- which would have -- over a

21   period of, say, 48 hours, if you're looking at the strict

22   entry of the 23rd -- 22nd and 23rd, over a period of 48

23   hours, essentially with the movement of the cattle from the

24   Mud Creek into the Hardie summer, and they went into the

25   north field, across the Bridge Creek, along into -- into the

Steninger - D - By Mr. Schroeder                    1845

1   north field.

2   Q.   In reviewing the record, what did you understand was

3   accomplished by the Hammonds on August 22nd, 2006?

4   A.   Restate the question.

5   Q.   In your review of the record, what did you understand was

6   accomplished by the Hammonds on August 22nd, in doing this

7   transition that you've talked about between August 22nd and

8   August 23rd, up to the north field?

9   A.   Well, the actual use report would say -- is that beginning

10  the morning of the 22nd and ending the evening of the 23rd, the

11  movement of the cattle went from the Mud Creek to the Hardie

12  summer allotment.

13  Q.   And in terms of in the 22nd, what would one do if one would

14  go into the lower pasture?  What -- what would a prudent

15  operator do to begin making that move?

16  A.   Well, to begin with, not only do the elevations change

17  here, but you've got Mud Creek to the south.  You've got Bridge

18  Creek to the north.  And the country is sloping up onto the

19  Steens Mountains.

20       So you would get these cattle started.  And, of

21  course, their custom and habit is to move to higher country.

22  And they know this country.  When you begin making some

23  movement, you could stir them around a little bit, get

24  them -- maybe holler at them, get them started, they would

25  naturally -- in a natural progression of it, you would get

1846

Steninger - D - By Mr. Schroeder

1  the cattle started.  And -- and in this case, you would be

2  moving through, to the gates right in this area here, between

3  the upper Mud Creek and the Bridge Creek field.

4        The cattle would then be entering into this field.

5  After they had moved up, you would check it either horseback

6  or afoot or with an ATV, or however, down in this lower

7  country, to be sure you had all of your cattle moved up.  And

8  then you would close the gates behind it.

9        But the natural movement of the cattle would be to

10  move to that higher country, what they were accustomed to.

11  Q.  In looking at Exhibit 1210 of the boundary fence between

12  the lower field and the upper field, would any operator go and

13  open up gates in between those two -- those two pastures, to

14  make the move?

15  A.  Certainly.  You would be -- you would be opening the gates

16  between the lower and the upper, so that the cattle can move

17  into the upper field -- upper field of Mud Creek, as they

18  progressed up the mountain into the Hardie summer.

19  Q.  And in looking at Exhibit 1210 -- and you indicated there

20  was a road that you went through.  Is that a particular gate

21  that you went through?

22  A.  Yes, it is.

23  Q.  And in terms of going, if you were down here, right at the

24  boundary of the Mud Creek allotment and -- and the refuge,

25  what's the distance between about the western boundary of the

Steninger - D - By Mr. Schroeder

1  Mud Creek and -- and the gate locations at least that you went

2  through?

3  A.  A couple of miles.

4  Q.  And could one do that on a horse?

5  A.  Yes.

6  Q.  Could one do that via walking?

7  A.  Yes.

8  Q.  Could one do that via truck?

9  A.  Yes.

10  Q.  Could one do that via ATV?

11  A.  Yes.

12  Q.  Now, is -- is there anything, in terms of any gates on the

13  northern part of the lower field -- at least in your

14  observations -- and you weren't there in 2006.  But in -- what

15  is your opinion of your observations about opening up any gates

16  that may be in water gaps on Bridge Creek, about getting access

17  down in that area?

18  A.  Bridge Creek is a very deep, steep canyon.  And there is --

19  I went to the water gap at the lower end of it, where the

20  cattle could go into -- into Bridge Creek.

21        But mostly it's a natural barrier on the north end,

22  on -- on the Bridge Creek.  The primary fencing in there

23  would be between the Lower Bridge Creek and the Upper Bridge

24  Creek.

25  Q.  Would you find it customary that somebody may want to walk

1848

Steninger – D – By Mr. Schroeder

1   down in that canyon to open up gates, or to move any cattle

2   that may be trapped in a water gap?

3   A.   Yes.   And on that canyon, it may be easier to go afoot than

4   it would horseback.   It's real steep, rough country.

5   Q.   Now, in all of your buckaroo days of being on a horse

6   and -- and walking or trotting up to different gate locations

7   to move cattle, what's your experience about horses?   I think

8   there's been some suggestion about lathering up, or horses

9   sweating.   What's your experience with that?

10  A.   With respect to this issue right here?

11  Q.   Well, it's -- yeah, relative to your opinion as to using of

12  horses to go up to a gate and open up the gate and going back

13  to the refuge.

14       What would you expect to see of a horse?

15  A.   Well, isn't -- it's very rough, rocky country.   And it's

16  not a place you would be trotting or loping a horse.   You would

17  mostly be walking.

18       And if you made the full -- say, from this gate

19  here, the full circle up to open up, say, the gate into

20  Bridge Creek, or even to check all of the gates against the

21  school section, which is a fenced federal range unit, would

22  be an area of about six miles.

23       And if you made a -- walked your horse, opened the

24  gates, and checked the gates, and came back down to -- to the

25  gate between the two fields, if you did that in a couple of

Steninger - D - By Mr. Schroeder

1   hours, you would averaging -- well, two miles an hour.  So

2   there would be no reason for a horse to be lathered up doing

3   that.

4           And then you wouldn't -- that -- even -- even the

5   road that's in there, you can go ATV or pickup on it.  But

6   that's a really rough Oregon lava country.  And you could

7   pretty near walk as fast off that road as you could -- you

8   would either have to go horseback or afoot, mostly, when

9   you're off that road.

10  Q.  Mr. Steninger, there's -- now I want to move you to the

11  August 23rd.

12          And in your review of the record, do you understand

13  the Hammonds were observed up in the Hardie summer allotment

14  area in the morning of August 23rd, 2006?

15  A.  Yes.  I saw that in the record.

16  Q.  And relative to what you have reviewed on the actual use

17  report, would you consider it prudent that the Hammonds were up

18  in that area, to continue to -- their move of the livestock

19  into the north field?

20  A.  Yes.  It -- it would be prudent and reasonable for them to

21  go up into that area, to see that -- where the location of the

22  cattle were and how they were progressing up the mountain.

23  Because it would be a natural movement for the cattle to go up

24  the mountain.  To see if there were any cattle left down below,

25  and to check to be sure that -- see any gates or any corners or

Steninger - D - By Mr. Schroeder

1    any places the cattle would be held because they were in a

2    corner, that that gate would be opened.  Check to see that the

3    gates were open.

4          And if you felt all of your cattle had moved out of

5    the lower allotment, then you would go close the gates behind

6    them.

7    Q.  Now, in the area of August 23rd, 2006, in your opinion, if

8    one wanted to go up there to open gates and -- and to access

9    the area to open gates in a different area, what -- what would

10   you say about the use or the lack of use of a horse to do that?

11   A.  As in -- as in a normal prudent, reasonable operation,

12   excluding any emergency going on, the thing would -- would be

13   to go up there in a pickup, and walk to the gates, and see if

14   they're open.

15         If you see that there's a problem and you had to

16   come back with a horse or an ATV, then you would come back

17   and take care of it.

18         And in normal circumstances -- it wouldn't be in

19   a -- a -- an emergency or an urgent situation -- you would be

20   checking on the natural movement of your cattle as they were

21   moving up into the -- to the Hardie summer pasture or field

22   that they were headed for.

23   Q.  Now, in this case, though, we were in -- there was

24   information as to lightning strikes and a fire that ignited on

25   the 22nd, and was continuing to burn on the 22nd of August.

Steninger - D - By Mr. Schroeder

1  And how does that impact their presence in the movement of

2  livestock into the north pasture on August 23rd, 2006?

3  A.  Well, to start with, on -- on August 22nd, when they were

4  moving out of the Mud Creek allotment, there had been a fire

5  that was reported by the B.L.M. to be 2500 acres that was laid

6  down but still burning.  So you had -- you have a significant

7  fire and fire conditions going on in an area where your cattle

8  are.

9       And so you get those cattle -- the fire was -- as I

10  understand it, was down in the lower part of the field --

11  field, so that they moved the cattle up.  And about the end

12  of this road, here, is when you begin to get as -- this last

13  mile, a lot more juniper.

14       This is more open country down in the bottom end.

15  But then you're getting into juniper and more rocks, and the

16  rest of it.  And by late afternoon, they had got the cattle

17  up to where they would be -- what we call mothering up.  The

18  cows would be getting together with their calves, and they

19  would be moving on up, and in the customary fashion that they

20  would go moving up the country, into the -- into the upper

21  allotments.

22       And, of course, there's a fire behind them.  So you

23  would be keeping a special close eye to be sure that your

24  cattle were moving up the mountain.

25       I think they had reason for concern because they

1852

Steninger – D – By Mr. Schroeder

1   could -- they could see that there was additional fires

2   taking place up there.  And they had been notified by the

3   B.L.M. that there were additional fires which were

4   essentially ahead of the cattle.

5         So that would raise you to a pretty high level of

6   alertness that you may have a fire ahead of your cattle and a

7   fire behind them.

8   Q.  To interrupt you, Mr. Steninger, are you talking about that

9   backburn operation that's in the record, that's relative to the

10  Bridge Creek Road?

11  A.  Yes.  Because there was -- B.L.M. had reported to them, the

12  evening of the 22nd, that they were building fires up in the

13  Bridge Creek field, which is their next scheduled field to be

14  going to on their 2006 grazing billing.

15  Q.  And in terms of a prudent operator -- they either got that

16  information via phone on the 22nd or learned of that

17  information on the 23rd of August.  What would that tell a

18  prudent operator you -- he or she needed to do?

19  A.  Be sure and get up -- be sure the gates were open and that

20  there weren't any cattle that might get trapped with a fire

21  that is -- just because the fire was laid down, you've got

22  higher -- high burning conditions and a dangerous situation for

23  the cattle.  You would want to be sure that they were moving.

24  Because, again, from the beginning of the Bridge Creek field to

25  the higher end of the north field is, again, an elevational

Steninger – D – By Mr. Schroeder

1    increase of 14 or 1500 feet.  Therefore, the vegetation would

2    be greener, not as far developed, less apt for a fire to go

3    further up the mountain.  And that's where you would be wanting

4    to get your cattle up as far away as you could from the -- from

5    the fire situation.

6    Q.  Now, we've mentioned about the 374 cattle that were in that

7    actual use report.

8              Were those cow or cow/calf pairs?

9    A.  Principally cow/calf pairs.  But there could be bulls with

10   them as well.

11   Q.  Okay.  And so when it puts on the actual use report 364

12   cows, if you're talking about the number of animals, it would

13   mean perhaps twice that much?  Would it not?

14   A.  Well, if every cow had a calf, yes.  Because the calf

15   doesn't count.  The cow and the calf only counts as one.

16   Q.  So based upon your education, experience, and background,

17   was this activity by the Hammonds of -- of moving their cattle

18   out of the lower pasture, in light of this fire event, the Mud

19   Creek allotment, and moving them to the north pasture of the

20   Hardie summer a prudent thing to do?

21   A.  Prudent and reasonable.

22   Q.  Now, there was some testimony about a compliance check,

23   Mr. Steninger, by the B.L.M. on August 10th, 2006, finding 50

24   pairs of cattle in the Thompson and cabin pastures of the

25   Hardie summer.

Steninger – D – By Mr. Schroeder

1    Would that fact change your opinion you've already

2  expressed?

3  A.   No.

4  Q.   And why is that?

5  A.   Well, there's no question there was still cattle down in

6  the Mud Creek allotment.  And this is a -- a -- and the

7  movement -- movement of cattle in the actual use report --

8  basically, you can't be moving -- if you kept a record of every

9  head that was going through every gate, it would be a ten-page

10 report.

11   So this shows that the principal movement of the

12 cattle from the Mud Creek allotment to the north field

13 occurred over about a 48-hour period.

14   Some cattle -- and the compliance report that

15 reported the 50 head up there, it didn't specify them in any

16 particular field.  They said it was -- it was in the Hardie

17 summer area.  But there's no question there was still a

18 substantial amount of cattle down in the Mud Creek area.

19   So I -- I -- the fact that there's only 50 -- 50

20 pair -- apparently there wasn't any concern of the B.L.M.,

21 and the compliance report reported that they were there, but

22 they took no trespass action.  And -- and -- and, in fact,

23 had a report a few days later -- I think it was on the 17th

24 of August, same range conservationist, that reported that --

25 that movement was just beginning to occur into the Hardie

1855
                    Steninger - X - By Mr. Papagni

1    summer allotment.  Same guy made both reports.

2           So it was pretty much a natural movement of cattle,

3    as you moved up -- moved up the country.

4           MR. SCHROEDER:  Thank you, Mr. Steninger.  No further

5    questions.

6           MR. BLACKMAN:  Oh, no questions.

7           THE COURT:  Cross.

8                       CROSS-EXAMINATION

9    BY MR. PAPAGNI:

10   Q.  Mr. Steninger, the exhibit you seem to be relying on is the

11   Exhibit No. 1198.

12          MR. PAPAGNI:  If you could put that up, please.

13   Exhibit No. 1198.

14          THE WITNESS:  The actual use report?

15   BY MR. PAPAGNI:

16   Q.  Yes, sir.

17   A.  Yes, sir.

18          MR. PAPAGNI:  That one.  That's fine.

19   BY MR. PAPAGNI:

20   Q.  Who signed that report, Mr. Steninger?

21   A.  It was signed by Steven Hammond on --

22   Q.  Okay.

23   A.  -- the 1st of January 2007.

24   Q.  And pretty much everything you're testifying about the

25   movement of cattle, relies upon the accuracy of that report,

1856

Steninger - X - By Mr. Papagni

1    doesn't it?

2    A.  Well, I -- I mean, I'm relying on it because the Bureau of

     Land Management relied on it when they filled out those

4    remaining columns, in reporting the dates of the movement.

5            And also the -- the transcript of telephone call on

6    the night of the 22nd from Joe Glascock, the range

7    conservationist and resource advisor that had observed the

8    cattle down there on the 22nd.  He was -- and the report from

9    the area manager on either the 24th or 25th, that the move

10   had satisfactorily been made.

11   Q.  Mr. Steninger, have you talked to Joe Glascock?

12   A.  He called me on the telephone, and asked me what I was

13   going to testify about.

14   Q.  Um-hmm.  Mr. Glascock did?

15   A.  Yes.

16   Q.  And when did he do that?

17   A.  Oh, it would have probably been about the middle -- middle

18   to latter part of May.

19   Q.  When did you write a report about this case, sir?  When

20   were you asked to write a report that you're testifying about

21   today?

22   A.  Been -- would have been after that.  After my inspection

23   on -- on the 30th and the 31st of May.

24   Q.  And that's May of 2012?

25   A.  Correct.

1857

Steninger - X - By Mr. Papagni

1    Q.  Okay.  So you spoke to Mr. Glascock?

2    A.  I spoke to Mr. Glascock.  He asked what I was going -- saw

3    that I was on the witness list, and asked what I was going to

4    be testifying about.

5    Q.  Is it Mr. Glascock or a Mr. Shrader?  Do you remember?

6    A.  There was another fella who said he was an assistant or

7    a -- I think it was an assistant special investigator for the

8    issue.

9         Actually, when Glascock -- Glascock called me, he

10   now works for Baric Corporation in Nevada.

11   Q.  Okay.

12   A.  And he -- he called and left a message that he now worked

13   for Baric, and he was working with a fella that I know quite

14   well, by the name of Doug Groves.

15   Q.  Um-hmm.

16   A.  And in the phone conversation, he first indicated to me

17   that -- that Baric Corporation maybe wanted me to do some work.

18   Q.  Okay.

19   A.  When I answered the phone, I could hear someone -- as you

20   know by now, I'm hard-of-hearing.

21        I could hear somebody mumbling in the background.

22   And I said, I'm hard-of-hearing.  You must be on a

23   speakerphone.  Speak up.

24        And that's when the fellow identified he was some

25   kind of an investigator for the B.L.M.

1858

Steninger - X - By Mr. Papagni

1    Q.   Was that a Mr. Windham?

2    A.   Yes, it was Windham.

3    Q.   Okay.  So did you talk to Mr. Glascock or Mr. Windham, sir?

4    A.   Both of them.  They were on the speakerphone.

5    Q.   Did you ever have a chance to talk to Mr. Glascock about

6    his observations on August 17th, Mr. Steninger?

7    A.   He just told me that he -- he had observed Hammonds setting

8    the fire.

9    Q.   Mr. Glascock did?

10   A.   Mr. Glascock told me that.

11   Q.   And if you could, by courtesy of the bailiff, Exhibit

12   No. 60, please.

13   A.   I didn't hear that.

14   Q.   I'm sorry, sir.

15        Exhibit 60 -- Government Exhibit 60.  I think that's

16   the correct one.

17   A.   Do you want me to hold that up?

18   Q.   I think that works, sir.

19        Do you see on Government's Exhibit -- Exhibit No.

20   60, where it says "cattle"?

21   A.   (Pause, referring.)  I see "cattle" on the circle, yes.

22   Q.   Okay.  And if the cattle that we've been talking about,

23   that you've been testifying about for the last hour, were at

24   that location on August 17th, would that change all of your

25   opinions about what was reasonable and prudent when there's a

Steninger - X - By Mr. Papagni

1    fire burning to the west?

2    A.   No.   Because if there's 50 -- there are 50 cattle in that

3    area, then that wouldn't mean that there were no cattle down

4    where this fire was occurring.

5    Q.   Hmm.   How many cattle were down where the fire was

6    occurring on August 22nd, that you know from talking to someone

7    besides the Hammonds?

8    A.   All I can rely on is the actual use report that said there

9    was 374.   Apparently 50 of them were -- had already moved up

10   the mountain.

11   Q.   And who signed the actual use report, Mr. Steninger?

12   A.   Steven Hammond signed it, and the Bureau accepted it, and

13   calculated the AUMs.

14   Q.   Now, those actual use reports, sir, where was Mr. Steven

15   Hammond on August 23rd?

16   A.   On August 23rd?

17   Q.   Yeah.   Where was Steven Hammond on August 23rd?

18   A.   Well, I wasn't there on August 23rd.   But the -- what I see

19   in the record, he was -- he was up on the -- in the Bridge

20   Creek Road area.

21   Q.   Doing what?

22   A.   Opening or closing gates, getting the cattle moved on up

23   the mountain.

24   Q.   And where was he on August 22nd?

25   A.   He was down in the Mud Creek allotment, pushing the cattle

Steninger - X - By Mr. Papagni

1    up the mountain.

2    Q.  Would have made sense to push the cattle back on the

3    Malheur refuge, where it's green?  There was no fire in front

4    of them?

5    A.  Well, the natural movement of the cattle at that time of

6    the year would be to go up the mountain.

7    Q.  Through the fire?

8    A.  There wasn't any fire ahead of them.

9    Q.  Hmm.  Do you know what a red flag warning is, sir?

10   A.  Pardon?

11   Q.  A red flag warning?

12   A.  Yes.

13   Q.  Do you know if a red flag warning was in effect from about

14   eight o'clock in the morning till --

15   A.  I heard -- I heard it testified to today.

16   Q.  Right.  And there was a fire burning at the time.  Right?

17   A.  Yes.

18   Q.  And did the fire get worse in the afternoon, when the RHs

19   drop and -- and the winds get higher and it's 90 degree

20   temperatures?  Do you know about that?

21   A.  Correct.  And so if you have a fire, even though it was

22   laid down, down in the lower country --

23   Q.  Um-hmm.

24   A.  -- you better be getting away from it.  And if the cattle

25   want to go uphill, then that's a good, safe place to go.

1861

Steninger – X – By Mr. Papagni

1    Q.   And you're going to move them on foot for about six miles?

2    A.   Pardon?

3    Q.   And you move them on foot for about six miles?

4    A.   My understanding is that they moved the cattle up about

5    two-thirds of the way, up to the end of the road I showed on

6    the map.

7    Q.   Um-hmm.

8    A.   And were using horses at that time.

9    Q.   Why wouldn't you move the cattle to the flanks of the fire,

10   sir -- why wouldn't you move the cattle to the flanks of the

11   fire, either to the north or south, as opposed to in front of

12   the moving fire?

13   A.   Well, there were deep canyons on both sides.

14            Bridge Creek to the north and Mud Creek to the

15   south.  And the natural movement of the cattle and the slope

16   of the country were not to be moving to the side, but it

17   would be where -- the natural tendency of the cattle to go

18   would be to move them uphill, into higher country, greener --

19   greener forage, a safer area.

20   Q.   When you talked to Mr. Glascock, how many cattle did he say

21   were in the area, being moved by the Hammonds on the morning of

22   the 22nd?

23   A.   He didn't tell me.

24   Q.   He didn't tell you, did he?

25   A.   (Shakes head.)

1862

Steninger - X - By Mr. Papagni

1    Q.    How many cow/calves did the Hammonds say they were moving

2    on the morning of the 22nd?

3    A.    I didn't ask that because I was relying on the record.

4    Q.    Wouldn't it have been helpful actually ask them what they

5    were doing?

6    A.    Well, it would -- not necessarily.

7    Q.    Oh.

8    A.    There were cattle -- there were cattle in the lower field.

9    Q.    How many cattle --

10                MR. BLACKMAN:  Your Honor, we'll have a matter for the

11   Court at a convenient time.

12                THE COURT:  Yes.

13   BY MR. PAPAGNI:

14   Q.    How many cattle were on the lower field, sir?

15   A.    According to the actual use report, it was 374.

16   Q.    And that's what you relied upon?

17   A.    Yes.

18                MR. PAPAGNI:  Thank you.  Those are all of my

19   questions.

20                THE COURT:  Anything more?

21                MR. BLACKMAN:  Well, your Honor, I think we should

22   have a sidebar about a matter.  I'm apologize for that.

23                But I think, under the circumstances of that

24   cross-examination, there are two matters we should raise with

25   the Court before we decide whether to redirect or not.

Colloquy

1       THE COURT:  All right.

2       (The following sidebar was reported.)

3       MR. PAPAGNI:  Yes, sir.

4       THE COURT:  Okay.  Fine.  I know -- go ahead and tell

5  me what your two things are.

6       MR. BLACKMAN:  Well, the first relates to the fact

7  that -- oh, sorry.

8       The first relates to the fact that immediately after

9  Mr. Glascock and Mr. Windham called Mr. Steninger, when they

10  learned he had been identified as a witness, expert for the

11  defense, he contacted Mr. Schroeder, to let him know that

12  he -- this was the first time he had experienced someone from

13  the opposition, in litigation, make an approach to him.  And

14  that Mr. Glascock basically was telling him about this

15  facility -- working at this ranch; which he understood to

16  mean that Glascock was calling him, looking for possibly

17  retaining him.

18       MR. PAPAGNI:  Oh.

19       MR. BLACKMAN:  And that Mr. Windham was in the --

20  working in the background.  Once -- he wanted to know why a

21  grazing man was involved, as the matter doesn't involve

22  grazing.  And this is a communication between the consultant,

23  working for the defense, and the lawyer who retained him.

24       I don't know if Mr. Schroeder wants to go into this,

25  and -- and have Mr. Steninger talk about how unusual it was

Colloquy

1    and why Mr. Glascock was posing as interested in contacting

2    him through the -- through his employer, but in fact having a

3    special agent there.  And if that would deem -- be deemed

4    some kind of waiver of some kind of privilege, which would

5    not be appropriate.

6              This was invited by Mr. Papagni's cross-examination.

7    I believe this was totally improper conduct on the part of

8    the Government and totally improper conduct on the part of

9    Mr. Glascock.  But I don't want us to be in the position

10   where we're somehow opening a door to whatever other

11   communications may have occurred between Mr. Schroeder and

12   Steninger.

13             Then the other issue, which I think you also are

14   anticipating, is the cross-examination about what did the

15   Hammonds tell you; which of course, we attempted not to have

16   the Hammonds communicate with him, Mr. Steninger, precisely

17   because he couldn't rely on that if they aren't going to

18   testify.  We have not yet made a decision whether they're

19   going to testify or not, but having --

20             THE COURT:  I'll take care of that one.

21             MR. PAPAGNI:  Okay.  I agree with that one.

22             The other one that concerns me, the Glascock part --

23   was Mr. Steninger on the case then already, Marc?

24             MR. BLACKMAN:  Oh, yes.  We gave you the name -- I can

25   document when we provided the name.

1865

Steninger – X – By Mr. Blackman

1        MR. PAPAGNI:  No.  I was just wondering.

2        THE COURT:  Yeah, I think you can go into that.

3        MR. PAPAGNI:  Yeah.

4        MR. MATASAR:  Without --

5        MR. PAPAGNI:  I think he can.

6        THE COURT:  And Frank agrees.  Okay.

7        MR. BLACKMAN:  It doesn't open any doors.

8        MR. PAPAGNI:  I'll keep my mouth shut.

9        (Conclusion of sidebar.)

10        MR. BLACKMAN:  Under the circumstances, your Honor --

11        THE COURT:  Just a moment.

12        Members of the jury, there was a question asked in

13   this last portion about whether the witness had talked to

14   Mr. Hammond about certain matters.

15        You're not to consider that question or answer,

16   please.  All right?

17        Go ahead.

18                        CROSS-EXAMINATION

19   BY MR. BLACKMAN:

20   Q.  Okay.  Mr. Steninger, in response to Mr. Papagni's question

21   about ever having spoken to Joe Glascock --

22   A.  Excuse me?

23   Q.  Oh, sorry.  (Moving microphone.)

24        In response to Mr. Papagni's question about whether

25   you ever talked to Joe Glascock, you made reference to the

Steninger - X - By Mr. Blackman

1    fact that you had received a call from Joe Glascock on May

2    24th of this year.  Correct?

3    A.  I didn't say the date, but it was prior to my inspection.

4    Q.  Okay.  And do you recall that it was immediately after

5    receiving that call that you sent an e-mail to Mr. Schroeder to

6    report that you had received that call?

7    A.  Yes.

8    Q.  Okay.  Now, when you received that call, the person who

9    told you he was calling identified himself as Joe Glascock

10   of -- of Baric Mining Company?

11   A.  Correct.

12   Q.  And I think you testified -- but I want to make sure --

13   what did you understand he was calling you for?  How did he

14   identify himself?

15   A.  In the -- it was a phone message left on my office

16   telephone.

17   Q.  I see.

18   A.  Is when he first identified himself to be an employee of

19   Baric Mining Corporation, working with Doug Rose, who was a

20   manager of a ranch for Baric.  And asked that I call back.

21        But -- but the tone of it, he -- at that point,

22   there was no indication -- and I didn't know who Joe Glascock

23   was.  I just thought he was an employee of Baric that wanted

24   to talk to me about Baric business.

25        Then I returned the call.  And it was at that time

Steninger - X - By Mr. Blackman

1   that he and, I believe it was Wisdom or Windham, or

2   something, was -- together, were on the phone.

3   Q.  And so when you returned that call, did you find out that

4   Mr. Glascock was not actually calling you on behalf of the

5   Baric Mining Company?

6   A.  I did.  I found out then.

7   Q.  And what did you find out the reason for his call was?

8   A.  He said that he was -- he had been a range con on the 2006

9   fire, and I am the one that caught Hammond setting fires.  And

10  wanted to know what you want to testify -- what you're going to

11  testify about because we saw your name on the witness list.

12  Q.  Okay.  Now, you've been involved in litigation many times

13  over the years, haven't you?

14  A.  Yes.

15  Q.  Had anything like that ever happened to you?

16  A.  No.

17  Q.  Had anyone ever called, saying they wanted to talk to you

18  about one thing, and then have someone else on the call, not

19  advising you that they were listening in?

20  A.  No.

21  Q.  And it wasn't until you said, I'm a little hard-of-hearing,

22  it sounds like you're on a speakerphone, was the first time

23  that you were advised by Mr. Glascock, or someone else, that a

24  second person was there?

25  A.  Yes.  I could hear someone in the background.  But -- and I

1868

Steninger - ReX - By Mr. Papagni

1  think he identified who his name and position was.  But I asked

2  him to get off the -- or get closer to speakerphone, or get to

3  where I could hear who he was and what they were talking about.

4           MR. BLACKMAN:  That's all.

5           MR. PAPAGNI:  I just have one question, Judge.

6                    RECROSS-EXAMINATION

7  BY MR. PAPAGNI:

8  Q.  Mr. Steninger, I want it clear.

9           Mr. Glascock --

10 A.  Would you get closer to your mic.

11 Q.  I'm sorry, sir.  It's my fault.

12          I want to know who the people -- Mr. Glascock called

13 you and spoke to you?

14 A.  Yes.

15 Q.  I mentioned Mr. Windham.  Could it have been a Mr. Shrader?

16 A.  No, it was Windham.

17 Q.  Okay.  And that's all I need to know.

18          Thank you, sir.

19          THE COURT:  You may step down.  Thank you.

20          Call your next witness.

21          MR. BLACKMAN:  Your Honor, our next witness is

22 Mr. Hogue.

23          He's going to take quite a while, and I really don't

24 want to do that at the end of the day, where --

25          THE COURT:  Here's the thing.  I don't know if we can

Colloquy

1869

1  get some of it in.

2          How long do you think redirect is going to be,

3  Mr. Papagni?

4          MR. PAPAGNI:  I'm going to make it as brief as I can.

5  I don't expect to be longer than 20 or 30 minutes.

6          THE COURT:  All right.  How long do you expect to take

7  with Mr. Hogue?

8          MR. BLACKMAN:  We have tried to hone it down, your

9  Honor.  I think we can get through the direct in under an hour,

10 with the understanding that we may have substantial redirect

11 depending on cross-examination.  Because what I'm hoping -- and

12 I hope you don't mind me discussing this in front of the jury.

13 I am hoping --

14         THE COURT:  Members of the jury -- that's all right.

15 Here's your schedule.  I'm going to release you for the day.

16 In the morning, we're going to take this last bit of evidence.

17 Then I'll give you the Court's instructions on the law.

18         I expect then, after that, we'll start argument on

19 this case before lunch tomorrow.  You'll have the case

20 tomorrow, in time to deliberate tomorrow.

21         That's -- and if -- if the attorneys seem a little

22 pressed by me, don't blame them.  Blame me.  All right?

23         So have a good evening.  We'll see you -- drive

24 careful, for those of you who are driving.  I'll see you

25 tomorrow at 9:00.

Colloquy

1          MR. BLACKMAN:  9:00?

2          THE COURT:  Yes.

3          MR. MATASAR:  Are we going to stay now, your Honor?

4          THE COURT:  Yes.

5          The lawyers -- they want to stay with me for a

6     while.

7          (Laughter.)

8          THE COURT:  So they're going to have the chance to.

9          (Jurors exit.)

10         THE COURT:  Mr. Papagni.

11         MR. PAPAGNI:  Please the Court, we just went -- went

12    through something that I don't think I have experienced in

13    about 21 years.

14         What I have in my hand -- which the defense doesn't

15    have it.  I'll be glad to give them a copy.  Is -- it says,

16    Residence Inn Marriott, Chapel Hill, to Dennis Shrader from

17    Joe Glascock.  And it says, Questions regarding -- from Joe

18    Glascock regarding -- well, from Joe Glascock -- G, regarding

19    questions for Al Steninger or if Steve Hammond takes the

20    stand.

21         When I got these, I looked at them, and I compared

22    them to Mr. Steninger's report.  What I erroneously assumed

23    was it was nothing more than a former range con giving me

24    some good questions, having reviewed Mr. Steninger's report.

25         When Mr. Steninger -- who I have no doubt was

Colloquy

1    telling the truth -- said that he had received a call from

2    Mr. Glascock, then I wanted to know who the investigator was.

3            And Mr. Windham and I have worked closely on this

4    case, and he's just confirmed for me it was him.  But this

5    was faxed to Mr. Shrader and then given to me.

6            THE COURT:  You know I have some concern about his

7    participation here.

8            MR. PAPAGNI:  I understand.  And I also -- this Court

9    also understands that when you ask me a question, you get an

10   answer.

11           THE COURT:  Yes.

12           MR. PAPAGNI:  And I think it's only appropriate for me

13   to give a copy -- I -- I don't see a Bates number on this

14   either.  I want a copy given to defense counsel.

15           I don't think it makes any difference, because I

16   didn't ask all of the questions.  Once I realized the

17   situation, that's when I backed down.

18           And I was under the impression, erroneously, that

19   the Hammonds had spoken to Mr. Steninger.

20           So to defense counsel, you have my apology for that

21   misunderstanding.  That's the reason why I asked that

22   question.

23           I want that to be clear, because I like to fight

24   hard and I like to -- but I like to fight fair.  And I'll

25   have this copy provided to the defense counsel immediately.

Colloquy

1          THE COURT:  You're as good as there is in that regard,

2    Mr. Papagni.

3          I -- I -- you should know, I'll tell you at this

4    time.  As you -- if you try to call Mr. Shrader on redirect

5    [sic], I will not permit it.

6          I'm -- I was offended by him in the meeting,

7    threatening to take someone to the grand jury.  Something he

8    has no authority to do, as we all know.  And that resulted

9    in -- in part in a bad situation.  I haven't decided whether

10   to take action with regard to that concerning one of the

11   counts here.  But it's something I'm -- that's why I've kept

12   it, because I'm not surprised that something else may have

13   come up in that regard.  So that doesn't mean I will, but I'm

14   not going to have any secrets about this either.  All right?

15         Did you have some response?

16         MR. BLACKMAN:  Your Honor, I -- Mr. Matasar may know

17   what's going on here, but I don't.

18         MR. MATASAR:  I was going to say the same.

19         I think you -- I think Mr. Papagni may assume we

20   know more than we do, and the Court may assume we know more

21   than we do.  I -- I'm just not understanding.  I am not at

22   all saying Mr. Papagni is doing anything wrong.

23         THE COURT:  Of course you're not.

24         MR. MATASAR:  I can tell -- I can tell he's doing

25   something right, but I don't know what it is.  That's the

Colloquy

 1    problem.

 2            (Laughter.)

 3            THE COURT:  Just accept his -- he plays by the rules,

 4    and so do you fellas.  And, you know, I have -- I don't know

 5    Mr. Schroeder as well, but I like him.  But I have a history

 6    with the three of you, and you have a history with me.  And we

 7    call it straight.  That's all.

 8            He's done what he should do.  And whether it makes

 9    any difference or not, you have that.  You can do with it

10    what you want, frankly.

11            MR. BLACKMAN:  But is it -- you just made reference to

12    some concern about something that I -- at least --

13            THE COURT:  That was in the material I was given about

14    Mr. Shrader.  He made some statement about taking some matters

15    to the grand jury.

16            And if you look at his statement, it includes that.

17            MR. BLACKMAN:  Okay.

18            THE COURT:  And I don't think that's appropriate for

19    him to do that.  And sometimes -- he's been kind of

20    enthusiastic in the past about things.  And so that's -- I'm

21    careful about it.  That's all.

22            MR. BLACKMAN:  I see.

23            THE COURT:  I care that we have a very clean

24    proceeding here.

25            So does Mr. Papagni.  And so do you both.

Colloquy

1        So -- that's because we're all professionals about

2   what we do.  We take it seriously.

3        Okay.  Now, despite all of that, this is the pen my

4   law clerk's been using to make notes (indicating) during this

5   trial.

6        MR. BLACKMAN:  Is that a Pilot, your Honor?

7        THE COURT:  It is the same pen that --

8        MR. BLACKMAN:  Because we noticed that the -- the

9   small carton that we had wasn't full anymore.  So --

10       (Laughter.)

11       MR. BLACKMAN:  But it --

12       THE COURT:  That's certainly misdemeanor category.

13  Here's the missing golf tee (indicating).

14       (Laughter.)

15       MR. BLACKMAN:  All right.

16       THE COURT:  We heard a reference to *Range Magazine*.

17  It's a magazine with a particularly unique take on land use

18  policy in the west, but it has the most beautiful pictures in

19  it.  And wonderful stories about dogs, and things like that,

20  that I like.  I've never paid for a subscription, but some

21  people think I need to be educated on it.

22       MR. MATASAR:  The same, your Honor.  I'm with you.

23  I've been getting it for years myself.  For the same reason.

24  Somebody thinks I should read it.

25       THE COURT:  The only -- we had horses.  Of course, we

Colloquy

1    weren't in bunch grass country.  But of the hundred pair that I

2    was responsible for in high school, my daddy said, You're going

3    to be on shanks' mare when you work the cattle, because I don't

4    want them -- the horses upset.

5            Okay.  Now that we've gone through things -- the

6    serious and the -- and the not serious -- let's look at

7    instructions.

8            Mr. Hammond has not been called.  I would intend to

9    take out -- I know that could still happen.  But I intend to

10   take out the instruction that starts at the bottom of page 8

11   and goes over to page 9 about prior convictions.

12           I want to ask the defense whether you intend --

13   whether you wish to have the jury instructed on necessity and

14   on public authority.

15           (Pause, counsel conferring.)

16           THE COURT:  Everybody gets to make decisions now.

17           MR. BLACKMAN:  I think it -- your Honor, it's

18   really -- I think those two defenses are more particularly

19   applicable to Steven Hammond.  So I'm suggesting to

20   Mr. Matasar --

21           THE COURT:  You can chicken out, if you want,

22   Mr. Matasar.

23           MR. MATASAR:  I can't chicken out.  I think the answer

24   is yes.

25           THE COURT:  Both of them?

Colloquy

1        MR. MATASAR:  Well, let me just have a second to

2   confirm --

3        THE COURT:  It takes an affirmative showing on public

4   authority.

5        MR. MATASAR:  I understand.

6        MR. PAPAGNI:  I thought the Court indicated you wanted

7   something in writing, too, on it before now.

8        MR. MATASAR:  I think now, not, your Honor.

9        THE COURT:  Won't go on either one?

10       MR. MATASAR:  We'll go with the beyond the reasonable

11  doubt, malicious --

12       THE COURT:  Okay.  We'll take those two out.

13       Other input on instructions?

14       MR. PAPAGNI:  On pages -- page 9, I think you just

15  referred to Mr. Steven Hammond regarding Count 7.  And I think

16  it needs to include both defendants.

17       THE COURT:  Hang on just a second.

18       MR. PAPAGNI:  I could be wrong about that.

19       THE COURT:  Page 9.  I must be at a different place

20  than you.

21       MR. PAPAGNI:  The draft I have --

22       THE COURT:  I have a newer draft, however, than you

23  have.

24       MR. BLACKMAN:  Oh.

25       MR. PAPAGNI:  Let me check.

1877

                            Colloquy

1          First of all, I think we could eliminate the word

2    "or explosive."  We're not claiming any explosives in this

3    case.

4          THE COURT:  Want to eliminate "explosives."  Fine.

5          MR. PAPAGNI:  I think that was a part of the statute.

6          And then No. 7, Count 7, I -- at least when I looked

7    last night, it refers only to Mr. Steven Hammond.  And

8    clearly that's the case that involves Mr. Okeson and --

9    Mr. Dwight Hammond.

10         THE WITNESS:  So I think we should include both.

11         I'm looking at your clerk and --

12         THE COURT:  You want both names on Count 7.  Both

13   defendants.

14         MR. PAPAGNI:  That's all I have.

15         THE COURT:  All right.

16         MR. PAPAGNI:  And then I have a comment on the verdict

17   form.

18         THE COURT:  We'll get to that in a second.  I have a

19   few myself.

20         On instructions, gentlemen?

21         I'll make a modification to Count 7.

22         MR. BLACKMAN:  Your Honor, it's odd for us to be doing

23   this before we have done our motions for judgment of acquittal.

24         THE COURT:  Of course.

25         MR. BLACKMAN:  And we do have what we believe to be

Colloquy

1   good motions.  So --

2        THE COURT:  Um-hmm.  I'm -- I'm -- the one issue

3   you're going to raise is amount.  I've got that under

4   consideration already, if you make your motion.  But --

5        MR. BLACKMAN:  There's a second motion, your Honor.

6   We actually have it in writing (indicating), which we can

7   provide to the Court at this time.

8        THE COURT:  All right.

9        MR. BLACKMAN:  And the Government.

10       MR. PAPAGNI:  Thank you.

11       MR. BLACKMAN:  And I would think it would be most

12  efficient to maybe argue it after you've had a chance to read

13  it.

14       THE COURT:  All right.  Well, what I would like you to

15  do, first, is assume that the -- your motions will be denied.

16  Although, I haven't done it.  I haven't even read these.  I

17  just anticipate certain things because I've been listening to

18  the same stuff you have.

19       It's -- except -- so counts may come out, of course.

20  You know, it could be Mr. Papagni will decide he doesn't want

21  to go to the jury on all of the counts.

22       You may ask, if you're not going to have some of

23  them.  But assuming they're all in, do you have some comments

24  on some of the instructions?

25       MR. MATASAR:  Your Honor, I -- I think we can say that

1879

Colloquy

1  while we received the instructions early, I was anticipating

2  that we would be summoned to some sort of instruction

3  conference.

4         THE COURT:  That's where we are right now.

5         MR. MATASAR:  I understand where we are right now.  I

6  was thinking it might be -- I've been at them at seven o'clock

7  in the morning, in the past, and I was thinking it might be

8  tomorrow before -- we are not as ready as we could be on the

9  instructions.  It's just -- that's how it is.  And --

10         THE COURT:  I'll be here at 8:30.  If you have

11  something at that time you want to bring up -- they're,

12  frankly, pretty straightforward.

13         MR. MATASAR:  Yes, I've noticed that.  I've read them.

14         THE COURT:  And then why don't you -- I do want to

15  talk about the verdict form, and have your input on that, if

16  you have it.  Why don't you give that to me at this time.

17         And then you can make your record on your motions

18  for directed verdict.  All right?

19         So, Mr. Papagni?

20         MR. PAPAGNI:  The verdict form, as the Government sees

21  it, is fine.  I noticed the last count is missing.  And --

22         THE COURT:  Yes.

23         MR. PAPAGNI:  -- I think there's probably a reason for

24  that.

25         THE COURT:  Yes.  There's not been any evidence on it.

Colloquy

1    MR. MATASAR:  Count -- so I don't have to make my

2    Count 9 --

3    THE COURT:  You can, if you would like.

4    MR. MATASAR:  No, it doesn't sound like I need to do

5    it.  Great.  All that -- all of that preparation, no, I'm not

6    saying anything about --

7    MR. PAPAGNI:  I thought that was a clue when I got

8    this.

9    THE COURT:  Yes.

10   MR. BLACKMAN:  There may be a more recent verdict

11   form.

12   So the Dwight Hammond --

13   THE COURT:  Just a moment.

14   (Pause, the Court and law clerk conferring.)

15   THE COURT:  I just -- I didn't read the heading very

16   well.  I just have the Dwight Hammond verdict form here.

17   Apparently we have two.

18   So that's --

19   (Pause, the Court and law clerk conferring.)

20   THE COURT:  Yeah, all right.

21   Don't assume anything.  Make your motions.

22   MR. BLACKMAN:  I'm sorry.

23   THE COURT:  Don't assume anything.  Make your motions.

24   MR. MATASAR:  Your Honor, I am just going to rely on

25   the -- we're going to rely on our written motion, first, for

Colloquy

1    the three counts.

2            THE COURT:  Sure.

3            MR. MATASAR:  I just want to say a few words about the

4    last count, the tampering count.  And I'm also going to rely

5    mostly on our trial memo, your Honor.

6            So it's late, and I think you've read it.  I want to

7    urge you to look at it again.  It's No. 125.  It talks about

8    the standards for tampering.  That it's got to be a true

9    threat, and there's got to be both an objective and a

10   subjective --

11           THE COURT:  That's enough on that.

12           Do you have any position on it?

13           MR. PAPAGNI:  No position, your Honor.

14           THE COURT:  The motion is granted on that count.

15           MR. PAPAGNI:  Good job.

16           MR. MATASAR:  I'm the man.

17           MR. BLACKMAN:  And with respect to the depredation

18   counts, your Honor, in addition to the motion we filed in

19   writing, which relates to the fact that the case law says that

20   with respect to damage caused by fire, the Government is

21   required to plead it under Section 844(f), not (h)(1) and 361.

22   And that's the subject matter of the written motion.

23           In addition to that legal basis for the motion on

24   416(a) --

25           THE COURT:  We'll look at that tonight.

Colloquy

1          MR. BLACKMAN:  Yeah.  We don't believe the

2     Government's evidence regarding the so-called damage or

3     depredation meets the standard that is required under the 1361

4     statute because --

5          THE COURT:  Are you referring to the thousand dollar

6     minimum?

7          MR. BLACKMAN:  And that it has to be actual damage to

8     the property, not the cost of repair.

9          It, of course, also raises the issue -- because I

10    think with Krumbo, the thousand dollar threshold would be

11    reached only if you combine the -- I think it was 600

12    dollars -- it might have been 700 dollars -- for the fencing

13    material, and some allocated percentage of the so-called

14    restoration plan, which we don't believe qualifies as damage

15    or depredation.

16         THE COURT:  That's -- that -- that count is the one

17    you have the strongest position on.

18         MR. BLACKMAN:  Well, we believe it's also that in

19    order to make a depredation charge, the Government must prove

20    that the land, or whatever the property they're talking about,

21    is damaged, that it's less valuable after the event than it was

22    before the event.

23         THE COURT:  I understand your argument.

24         MR. BLACKMAN:  And we've made that argument in our

25    trial memo.

1883
Colloquy

1    THE COURT:  Mr. Schroeder had lots of questions about

2    it.

3    MR. BLACKMAN:  Yes.  And I think he made the point,

4    which is, yes, they paid money to do certain things.

5    But they had no evidence that if they hadn't done

6    those things, the property would have been worth any less.

7    THE COURT:  All right.  Well, I'll give Mr. Baker

8    credit for the draft of instructions, and the first question I

9    asked him, Did either side request a definition of depredation?

10    MR. PAPAGNI:  Ms. Sgarlata had a long discussion with

11    me about that.  And I think that unless -- unless he's come up

12    with some Ninth Circuit law we haven't seen, there isn't a

13    whole lot out there.

14    THE COURT:  No, there's not.  It's interesting.

15    MR. PAPAGNI:  And the other part of my argument, just

16    so I make it quick -- we would like to go home -- is I recalled

17    something about they have to intentionally maliciously damage

18    it or attempt to cause that amount of damage.

19    THE COURT:  Yes.

20    MR. PAPAGNI:  I like the word "attempt" a lot in that

21    particular count.

22    THE COURT:  And I'm aware of that opinion.

23    MR. PAPAGNI:  I'm sure.  Thank you.

24    THE COURT:  All right.  I'll give you something on

25    that before you argue.

1884

Colloquy

1    But anything more at this time?

2    MR. PAPAGNI:  Not by the Government, your Honor.

3    Oh, by the way, I want it clear that I've provided

4    those copies I've promised to defense counsel.  I've got

5    three copies.

6    This is Mr. Shrader and Mr. Glascock's -- I said I

7    would do it.  I want to make sure it's on the record.  It's

8    done.

9    THE COURT:  Yes.

10    MR. PAPAGNI:  Thank you, Judge.

11    THE COURT:  Thank you.  We should probably give that a

12    number.

13    MR. PAPAGNI:  If you want me to, your Honor, I'll give

14    it a number.

15    THE COURT:  Just for the record.

16    MR. PAPAGNI:  2 -- what's our next number, Cheryl?

17    MS. ROOT:  268.

18    MR. PAPAGNI:  This is Government's Exhibit 268, and

19    I'll mark it personally.

20    THE COURT:  It won't be received but --

21    MR. BLACKMAN:  It's not -- not for the jury.

22    MR. MATASAR:  No, not --

23    MR. PAPAGNI:  No.  This is not going to the jury.

24    This is the record I am making to make sure I've complied with

25    my obligations.

Colloquy

1       THE COURT:  That's right, and that's why I'm doing it;

2  just so it makes it clear for the record.

3       MR. BLACKMAN:  Your Honor, the other thing I guess we

4  should do to make the record clear, the evidence that came in

5  during the trial about this radio tag -- that we continue to

6  believe was of significance to this case from day 1 -- and the

7  evidence that came in during the trial, through both Mr. Orr

8  and Mr. White and Mr. Bird indicates that, indeed, a key piece

9  of evidence was never taken into evidence, according to

10 Mr. White.  Was apparently coincidentally in a box that was

11 only discovered --

12      THE COURT:  Isn't that a chain-of-custody question?

13      MR. BLACKMAN:  No.  I believe it means that if there

14 had been appropriate handling from day one, that there might

15 have been evidentiary value that has been lost.  And because of

16 the --

17      THE COURT:  This is the same argument you made before

18 trial.  Right?

19      MR. BLACKMAN:  It's -- yes.  But at that time the

20 Government said in its response that the item was inventoried.

21 It was on the inventory.  They attached an inventory to their

22 response to our motion.

23      And, in fact, I will tell you that we thought there

24 was an inventory we had missed.  But then when we looked at

25 the inventory that was actually attached, it was the same

1886

Colloquy

1    inventory which had made no reference to the BK radio tag.

2         But we understood the Government to say that that

3    inventory included the BK radio tag in one of the items that

4    was listed on the inventory.

5         It was only when Mr. White and Mr. Orr testified

6    that it became clear that it never was inventoried.

7         That it never was, quote/unquote, taken into

8    evidence.  We think that materially changes the situation.

9    And that the rules about reckless loss of evidence kick in.

10   And that does entitle us to the dismissal remedy that the

11   cases talk about.

12        THE COURT:  Well, let me make my position on that

13   clear, so that you have your record.

14        I don't think there's any evidence of recklessness.

15   I do not think it was inventoried properly.  I don't think

16   that's -- given the record with regard to a photo, and so on,

17   and its apparent availability, that that is a reason to

18   dismiss.

19        And so that's why I denied your motion before.  I'll

20   consider this reference to that again.  It's denied again.

21        Anything further?

22        MR. PAPAGNI:  Nothing further.

23        THE COURT:  All right.  Thank you.

24        (Court adjourned.)

25

Colloquy

1887

1     --oOo--

2

3   I certify, by signing below, that the foregoing is a correct

4   transcript of the oral proceedings had in the above-entitled

5   matter this 20th day of June, 2012.  A transcript without an

6   original signature or conformed signature is not certified.  I

7   further certify that the transcript fees and format comply with

8   those prescribed by the Court and the Judicial Conference of

9   the United States.

10

            /S/ Amanda M. LeGore

11          _____

12          AMANDA M. LeGORE, RDR, CRR, FCRR, CE

13

14

15

16

17

18

19

20

21

22

23

24

25