Westlaw.

2015 WL 512898 (U.S.)

Page 1

For Opinion See 135 S.Ct. 1545

Supreme Court of the United States.
Steven Dwight HAMMOND and Dwight Lincoln Hammond, Jr., Petitioners,
v.
UNITED STATES OF AMERICA.
No. 13-1512.
February 9, 2015.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

Brief for the United States in Opposition

Donald B. Verrilli, Jr., Solicitor General, Counsel of Record.Leslie R. Caldwell, Assistant Attorney General.Robert A. Parker, Attorney, Department of Justice, Washington, D.C. 20530-0001, SupremeCtBriefs@usdoj.gov, (202) 514-2217.

*I QUESTIONS PRESENTED

1. Whether imposing five-year mandatory minimum sentences under 18 U.S.C. 844(f)(1) for petitioners' offenses of maliciously damaging or destroying property of the United States by fire would violate the Eighth Amendment.

2. Whether petitioners' oral agreement not to appeal their convictions or sentences gave rise to an implicit bar on the government's appealing the district court's sentence, which was below the statutory minimum specified by 18 U.S.C. 844(f)(1).

*III TABLE OF CONTENTS

Opinion below ... 1

Jurisdiction ... 1

Statement ... 1

Argument ... 9

Conclusion ... 18

TABLE OF AUTHORITIES

Cases:

*Graham v. Florida,* 560 U.S. 48 (2010) ... 10, 11, 14

*Harmelin v. Michigan,* 501 U.S. 957 (1991) ... 10, 12, 13

*Hutto v. Davis,* 454 U.S. 370 (1982) ... 13

*Lockyer v. Andrade,* 538 U.S. 63 (2003) ... 13

*Robinson v. California,* 370 U.S. 660 (1962) ... 12

*Rummel v. Estelle,* 445 U.S. 263 (1980) ... 12, 13

*Solem v. Helm,* 463 U.S. 277 (1983) ... 10

*United States v. Anderson,* 921 F.2d 335 (1st Cir. 1990) ... 15

*United States v. Benchimol,* 471 U.S. 453 (1985) ... 14

*United States v. Blick,* 408 F.3d 162 (4th Cir. 2005) ... 15

*United States v. Broughton-Jones,* 71 F.3d 1143 (4th Cir. 1995) ... 16

*United States v. Burton,* 201 Fed. Appx. 186 (4th Cir. 2006) ... 16

*United States v. Guevara:*

941 F.2d 1299 (4th Cir. 1991), cert. denied, 503 U.S. 977 (1992) ... 8, 15, 17

949 F.2d 706 (4th Cir. 1991) ... 16

*United States v. Hare,* 269 F.3d 859 (7th Cir. 2001) ... 15

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*United States v. Johnston,* 268 U.S. 220 (1925) ... 11

*IV *United States v. Peebles,* 146 Fed. Appx. 630 (4th Cir. 2005) ... 16

*United States v. Russell,* 402 Fed. Appx. 772 (4th Cir. 2010) ... 16

*United States v. Stubbs,* No. 97-4948, 1998 WL 387253 (4th Cir. 1998) ... 17, 18

*Weems v. United States,* 217 U.S. 349 (1910) ... 12

Constitution, statutes and rule:

U.S. Const. Amend. VIII ... 7, 8, 9, 11

18 U.S.C. 844 ... 2

18 U.S.C. 844(f)(1) ... *passim*

Sup. Ct. R. 10 ... 11

*1 OPINION BELOW

The opinion of the court of appeals (Pet. App. 1-11) is reported at 742 F.3d 880.

JURISDICTION

The judgment of the court of appeals was entered on February 7, 2014. A petition for rehearing was denied on March 19, 2014 (Pet. App. 23-24). The petition for a writ of certiorari was filed on June 17, 2014. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

STATEMENT

Following a jury trial in the United States District Court for the District of Oregon, petitioners were convicted of maliciously using fire to damage or destroy federal property, in violation of *2 18 U.S.C. 844(f)(1). Section 844(f)(1) specifies a mandatory minimum sentence of five years of imprisonment for those offenses. The district court, however, sentenced petitioner Dwight Hammond, Jr. (Dwight) to three months of imprisonment for his one count of conviction and sentenced petitioner Steven Hammond (Steven) to concurrent terms of one year and one day of imprisonment for his two Section 844 convictions. The court of appeals vacated the sentences and remanded with instructions to resentence petitioners "in compliance with the law," Pet. App. 11. See *id.* at 1-11.

1. Dwight and his son, Steven, own a cattle ranch in Oregon, the land of which is interspersed among tens of thousands of acres of federal land administered by the Bureau of Land Management (BLM). See Pet. 3-4; Gov't C.A. Br. 13 (map). Each petitioner was convicted on a Section 844(f)(1) count for a September 2001 fire, and Steven was additionally convicted on a Section 844(f)(1) count for August 2006 fires. Pet. App. 4; C.A. E.R. 35, 41.

a. In 1999, before the 2001 and 2006 fires at issue, petitioners set fire to their own land. C.A. E.R. 52-54. The fire crossed into and burned about 90 acres of adjacent land owned by the federal government. *Id.* at 54. Shortly thereafter, BLM employees met with petitioners to make clear that petitioners must cooperate with BLM to coordinate and manage controlled burns to avoid damaging public lands, which are used for many purposes other than grazing. Pet. App. 3; C.A. E.R. 54-56; see Gov't C.A. Br. 3-4. BLM warned petitioners that they could be civilly or criminally liable for burning public land without permission. C.A. E.R. 57. Steven had previously vowed "never" to cooperate with BLM, *id.* at 386, and, after 1999, he *3 repeatedly expressed frustration with BLM's grazing and fire restrictions, telling one BLM employee that he had started multiple fires in the area "and you guys never caught me," *id.* at 346. Gov't C.A. Br. 4-5.

b. *The September 2001 fire.* On September 30, 2001, petitioners led an unauthorized hunting expedition on federal land and illegally shot several deer. C.A. E.R. 77, 82, 87-89, 92-96, 239-240. A BLM district manager, who was lawfully hunting in the same area, ran into and spoke with Dwight at about 8 a.m.; witnessed the shooting of several deer

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

about 30 to 45 minutes later; and then briefly saw Steven at the scene before Steven ducked into the brush to hide. *Id.* at 50-51, 79, 92-94, 96-97. As the district manager drove away in his truck with his companions, they saw a group of four men behind them carrying rifles. *Id.* at 95. The district manager told his companions that he was "very uncomfortable with the situation, and [they] needed to leave," which they did. *Id.* at 95-96.

After the district manager departed, Steven handed out boxes of matches and stated that "we [a]re going to light up the whole country on fire." C.A. E.R. 202-203; see Pet. App. 3; see also C.A. E.R. 97-99 (sequence of events). Steven gave one of the boxes of matches to his then 13-year-old nephew, Dusty Hammond, and instructed the boy to walk in the direction along the fence line and to drop the lit matches "until [he] r[a]n out." C.A. E.R. 204-205, 207. Dusty complied, dropping lit matches to the grass along the fence line separating petitioners' land from federal land. *Id.* at 205-206; see *id.* at 287-288. Dusty observed smoke rising from behind him in the direction in which Steven had walked. *Id.* at 206. Dusty later testified that he assumed that the smoke had been *4 caused by "everybody else that walked the other direction." *Ibid.*

The fire quickly raged out of control, trapping Dusty near a creek and forcing others who were camping and hunting in the area to flee. Pet. App. 3; C.A. E.R. 97-100, 158-159, 207. Dusty thought he "was going to get burned up" by the 8-to-10-foot-high flames, but the 13-year-old managed to escape on his own. C.A. E.R. 207. The fire damaged 139 acres of federal land and required that the tract be removed from production for two growing seasons. Pet. App. 3; C.A. E.R. 287-289.

The fire destroyed any evidence of petitioners' illegal deer hunt. C.A. E.R. 248-250. Petitioners then attempted to cover up their arson. When Dusty made it back to the ranch after escaping the fire, Dwight and Steven both ordered him to "keep [his] mouth shut" about what they had done. *Id.* at 210-211. Dusty feared Steven and kept the arson secret for years. *Id.* at 212. Steven also called BLM a few hours after the fire was started, falsely reporting that he planned to do a prescribed burn confined to his own land. *Id.* at 234-235; Gov't C.A. Br. 9. When later questioned by BLM investigators, petitioners denied being involved in the fire. C.A. E.R. 298-301, 331, 336-338.[FN1]

> FN1. Petitioners assert (Pet. 7) that the district court at sentencing "rejected Dusty's version of what had happened." That is incorrect. The court noted that Dusty was young at the time of petitioners' offense conduct but stated that it was "sure he remembered things as best he could." Pet. App. 14. The court made no findings contradicting, much less rejecting, Dusty's testimony.

c. *The August 2006 fires.* On August 22, 2006, BLM firefighters were conducting fire-suppression operations on federal land in an effort to prevent the *5 spread of a nearby wildfire. C.A. E.R. 615, 623, 772773, 795-797, 800-804. A firefighter observed three spot fires lined up in a row, which was "not characteristic of what a wildfire would do." *Id.* at 511-512; see *id.* at 481, 487, 491-492. Those fires spread and combined to cover an acre of land. *Id.* at 509. Steven drove up and admitted that he started the fires in order to provide a buffer to protect his property from the wildfire. *Id.* at 663-664, 813; see Pet. App. 3. A BLM supervisor, Lance Okeson, informed Steven that he was prohibited from setting fires on federal land and that Stevens' actions had endangered firefighters. C.A. E.R. 664-665. Steven "got upset" and told Okeson that BLM "better just clear out." *Id.* at 665.

The next morning, two firefighters again observed Steven driving on a road on federal land. C.A. E.R. 523, 528-532. The firefighters proceeded in the direction from which Steven had driven and encountered several suspicious fires. *Id.* at 533-538. Later that day, Okeson observed Dwight in the same area walking away from a freshly lit fire. *Id.* at 670-672. When Dwight reached the road, the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

men locked eyes, and Dwight fled on foot. *Id.* at 672-673. Okeson laid chase; caught up to Dwight; and told Dwight that he knew that Dwight had lit the fire, that people were "all over this mountain," and that Dwight was "going to get someone killed," *id.* at 678. See *id.* at 674-679. Dwight shrugged and initially refused to respond. *Id.* at 679-680. After Okeson attempted to contact a BLM law-enforcement officer on his radio and another BLM employee (Joe Glascock) arrived, Dwight told Okeson that he "d[id]n't have to" make the call and to come that evening to petitioners' ranch to "work this out." *Id.* at 680, 682-683. By the time Okeson and Glascock *6 returned to the road, the fire had spread such that the men were surrounded by fires on both sides of the road. *Id.* at 685. Okeson radioed a fire-suppression aircraft to circle above for safety, while he tried to preserve evidence of the arson and while Glascock, who was concerned for Dwight's safety, left on his four-wheeler to attempt to locate Dwight. *Id.* at 684687, 823-824. Both men were forced to flee to safety. *Id.* at 687, 824-825.

The next day, Glascock met with Steven and discussed the fires. C.A. E.R. 831-833. When Glascock told Steven that his father (Dwight) had been caught coming from the fire, Steven stated that petitioners had "been doing this a long time" and that Glascock "need[ed] to do what [he] c[ould] to make this go away." *Id.* at 833. Steven threatened to frame Glascock if BLM did not drop the issue, warning Glascock that "[i]t could be an ugly situation" and that "if I go down, you're going down with me *** because you started those fires and not me." *Ibid.*

2. a. A federal grand jury charged petitioners with multiple counts of arson, conspiracy to commit arson, and witness tampering. Supp. C.A. E.R. 137-155 (superseding indictment). At trial, the jury advised the district court that it had reached a verdict on several counts but was deadlocked on others. C.A. E.R. 1246, 1257-1258. The district court accepted a partial verdict finding each petitioner guilty on a Section 844(f)(1) count for the 2001 fire and finding Steven guilty on an additional Section 844(f)(1) count for the 2006 fire. Pet. App. 3-4; C.A. E.R. 1256-1258, 12631266. The jury acquitted petitioners of other counts of arson and resumed deliberating on the remaining counts. C.A. E.R. 1257-1258,1266-1267.

*7 While the jury continued deliberating, the parties reached an agreement that they presented orally to the district court. Petitioners agreed to "waive their appeal rights and accept the verdicts as they've been returned thus far by the jury." C.A. E.R. 1268; see Pet. App. 4. In exchange, the government would accept the partial verdict and agreed to recommend that (1) petitioners "remain released pending" sentencing and (2) Steven's sentences run concurrently. C.A. E.R. 1268. The government specifically advised petitioners that the mandatory minimum sentence for their Section 844(f)(1) offenses was five years of imprisonment. *Id.* at 1271. The district court accepted petitioners' waiver of their appeal rights and dismissed the remaining counts of the indictment that were not resolved by the partial verdict. *Id.* at 1270.

b. Over the government's objection, the district court held an expedited sentencing hearing (C.A. E.R. 1-33) without waiting for petitioners' Presentence Reports to be prepared. *Id.* at 20; see *id.* at 18; Pet. App. 13. The district court accepted petitioners' argument that imposing the five-year statutory minimum sentence would constitute cruel and unusual punishment violating the Eighth Amendment and sentenced Dwight to three months and Steven to one year and one day of imprisonment. Pet. App. 16-20.

The district court stated that, in its view, Congress would not have intended Section 844(f)(1)'s five-year mandatory minimum to apply to "th[e] sort of conduct" here. Pet. App. 17. The court stated that Section 844(f)(1)'s mandatory minimum might properly apply if the defendants had "burn[ed] sagebrush in the suburbs of Los Angeles where there are houses up those ravines," but that the court did not "think that's *8 what the Congress in-

tended" "[o]ut in the wilderness here." *Ibid.* The court additionally concluded without elaboration that imposing the statutory minimum sentence would violate the Eighth Amendment because a five-year sentence "is grossly disproportionate to the severity of [petitioners'] offenses," does "not meet any idea I have of justice, proportionality," and "would shock the conscious to me." *Ibid.*

3. The court of appeals vacated and remanded for resentencing. Pet. App. 1-11.

First, the court of appeals rejected petitioners' contention that their agreement with the government barred the government from appealing their sentences and that the government's appeal should therefore be dismissed. Pet. App. 6-9. The court concluded that the government never agreed to waive its right to appeal an illegal sentence and that the parties' agreement was not ambiguous on that point. *Id.* at 6-7. The court noted that petitioners had argued that the agreement's silence on the question should be understood as an "implied waiver" of the government's right to appeal, *id.* at 7 (citing *United States v. Guevara,* 941 F.2d 1299 (4th Cir. 1991), cert. denied, 503 U.S. 977 (1992)), but it refused to imply such a waiver here. *Id.* at 7-8. The court explained that federal courts are not authorized "to remake a plea agreement or imply terms into one" and that it therefore could not properly read a government-appeal waiver into an agreement that was silent on that issue. *Ibid.* (citing cases).

Second, the court of appeals vacated the district court's sentencing judgment. Pet. App. 9-11. The court explained that "[a] minimum sentence mandated by statute is not a suggestion that courts have discretion to disregard." *Id.* at 9. The court acknowledged *9 that in a rare case a term of imprisonment might be so "grossly disproportionate" that it violates the Eighth Amendment, but it rejected petitioners' view that a five-year sentence here would meet that standard. *Id.* at 9-11. "Given the seriousness of arson," the court concluded, "a five-year sentence [would] not [be] grossly disproportionate to the offense." *Id.* at 10. The court explained that Congress could have "justifiably consider[ed] arson, regardless of where it occurs, to be a serious crime" warranting a five-year minimum sentence under Section 844(f)(1) because "[e]ven a fire in a remote area has the potential to spread to more populated areas, threaten local property and residents, or endanger the firefighters called to battle the blaze." *Ibid.* The 2001 fire in this case, the court noted, "which nearly burned a teenager and damaged grazing land, illustrates this very point." *Ibid.* Furthermore, the court observed, the Supreme Court has rejected Eighth Amendment challenges to "far tougher sentences for less serious" or comparable offense conduct. *Id.* at 10-11 (citing cases). The court accordingly vacated petitioners' sentences and remanded with instructions to resentence petitioners "in compliance with the law." *Id.* at 11.

ARGUMENT

Petitioners contend (Pet. 15-36) that imposing Section 844(f)(1)'s minimum five-year sentence for their arson offenses would violate the Eighth Amendment. The court of appeals correctly rejected that contention; petitioners identify no division of authority over the proper standard to apply in assessing such an Eighth Amendment claim; and petitioners' fact-bound challenge to the court of appeals' application of that standard warrants no further review. Petitioners *10 further contend (Pet. 36-39) that review is warranted to resolve a disagreement between the Fourth Circuit and other courts of appeals about whether a plea agreement in which the defendant waives his right to appeal his sentence should also be read to contain an implicit waiver of the government's right to appeal the sentence. The court of appeals' decision is correct and does not implicate a division of authority warranting review. The petition should be denied.

1. "[T]he Eighth Amendment contains a 'narrow proportionality principle' " that " 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " *Graham v. Florida,* 560 U.S. 48, 59-60 (2010) (quoting *Harmelin v. Michigan,* 501 U.S. 957, 997, 1001 (1991) (Kennedy, J., concur-

ring in part and concurring in the judgment)). In determining whether a sentence is grossly disproportionate, "[a] court must begin by comparing the gravity of the offense and the severity of the sentence." *Id.* at 60. This initial, "objective" inquiry requires courts to "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *Solem v. Helm,* 463 U.S. 277, 290 (1983). Only " '[i]n the rare case in which [this] threshold comparison ... leads to an inference of gross disproportionality' " should a court then proceed to "compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions" to determine whether the initial inference of disproportionality is correct. *Graham,* 560 U.S. at 60 (second brackets in original) (quoting *Harmelin,* 501 U.S. at 1005 (Kennedy,*11 J., concurring in part and concurring in the judgment)).

The court of appeals applied the correct standard for evaluating petitioners' Eighth Amendment claim. Pet. App. 9-10 (citing *Graham,* 560 U.S. at 60). And petitioners acknowledge (Pet. 17-18) that the court of appeals' analysis "is consistent with circuit court decisions across the country" and that "no circuit court case" supports petitioners' position. Without disagreement among the courts of appeals, the fact-bound application of the settled legal standard in this case warrants no further review. See, *e.g., United States v. Johnston,* 268 U.S. 220, 227 (1925) ("We do not grant *** certiorari to review evidence and discuss specific facts."); Sup. Ct. R. 10 (review is rarely warranted if "the asserted error consists of *** misapplication of a properly stated rule of law").

Furthermore, the court of appeals' decision is correct. Congress had good reason to "consider arson, regardless of where it occurs, to be a serious crime" warranting a five-year minimum sentence under Section 844(f)(1). Pet. App. 10. That provision applies to arsonists only when they "maliciously" damage or destroy federal property by fire, 18 U.S.C. 844(f)(1), and petitioners have admitted that the jury, *inter alia,* found beyond a reasonable doubt that petitioners specifically "intended" the 2001 fire set on their land "to cross over into the public land," C.A. E.R. 13; see *id.* at 14. The court of appeals explained how the facts of petitioners' crimes "illustrate[]" why Congress would consider such arsons serious enough to warrant a five-year sentence: petitioners maliciously set fires that damaged or destroyed federal property and endangered the safety of others, including firefighters, *12 campers and hunters lawfully using public land, and petitioners' own grandson/nephew. Pet. App. 10. The fires also had the potential to spread further to other areas. See *ibid.* Petitioners went to great lengths to cover up their serious crimes: Steven, for example, submitted a false report with BLM and threatened to frame a BLM employee for arson if the agency did not stop investigating the fires that petitioners set. See pp. 4, 6, *supra.*

This case bears no resemblance to any prior decision of this Court invalidating a non-capital term-of-years sentence on proportionality grounds. See *Weems v. United States,* 217 U.S. 349, 357-358, 364-367, 382 (1910) (invalidating 15-year sentence for falsifying official document under the Philippines Penal Code, which required that, *inter alia,* the prisoner perform "hard and painful labor" and "always carry a chain at the ankle, hanging from the wrists," for at least 12 years) (citation omitted); see also *Rummel v. Estelle,* 445 U.S. 263, 273-275 (1980) (concluding that *Weems* rested on the "triviality" of the offense; the sentence's duration, and the " extraordinary nature" of the "highly unusual" punishment).[FN2] Since *Weems,* the Court has rejected every proportionality challenge to a sentence less than life without parole, including many sentences substantially longer than the five-year sentence at issue here. See, *e.g.,* *13 *Hutto v. Davis,* 454 U.S. 370, 370-371, 374 (1982) (per curiam) (upholding 40-year sentence for possession and distribution of nine ounces of marijuana in case that did not involve a statutory recidivist enhancement);

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Rummel,* 445 U.S. at 264-266, 284-285 (upholding mandatory life sentence under statutory three-strike recidivist enhancement for defendant whose three minor fraud offenses triggering that enhancement involved a total of about $229); see also *Harmelin,* 501 U.S. at 990, 996 (upholding life sentence without parole for possession of 672 grams of cocaine); cf. *Lockyer v. Andrade,* 538 U.S. 63, 66, 77 (2003) (rejecting habeas challenge to 50-years-to-life sentence based on three-strikes recidivist enhancement for defendant who stole nine videotapes worth $150).

> FN2. The Court in *Robinson v. California,* 370 U.S. 660 (1962), invalidated a conviction for which a 90-day sentence was imposed, but *Robinson* did not apply a proportionality rationale; it held that a State could not constitutionally criminalize the "status" of being a drug addict as distinct from offense conduct involving unlawful activity. *Id.* at 666-667; see *Harmelin,* 501 U.S. at 993 n.14 (plurality opinion) (discussing *Robinson*).

In upholding those sentences, the Court has repeatedly explained that "federal courts should be 'reluctan[t] to review legislatively mandated terms of imprisonment' " and that " 'successful challenges to the proportionality of particular sentences' should be 'exceedingly rare.' " *Davis,* 454 U.S. at 374 (brackets in original) (quoting *Rummel,* 445 U.S. at 272, 274). Although this Court has hypothesized a term-of-years sentence that would be grossly disproportionate to the offense - for example, a lengthy prison term for a minor infraction such as "overtime parking," *Rummel,* 445 U.S. at 274 n.11 - no court has held that a five-year sentence rises to that level, particularly for criminal conduct as serious as that here. See Pet. 17 (conceding as much).[FN3]

> FN3. Petitioners cite (Pet. 29-35) a number of district court and court of appeals decisions in which defendants were convicted of offenses under Section 844(f)(1) in connection with acts of terrorism or the use of explosives, presumably in an effort to show that petitioners' conduct was comparatively less serious. Even if that were true, it would not support petitioners' contention that a five-year sentence for petitioners' arson offenses would be unconstitutional here. Not only does the lack of a threshold inference of disproportionality foreclose such a comparison, see *Graham,* 560 U.S. at 60, nearly all of the decisions that petitioners cite involve sentences significantly longer than five years while the others are distinguishable.

*14 2. Petitioners further contend (Pet. 36-39) that petitioners' express agreement to waive their appellate rights also gave rise to an implicit agreement barring the government from appealing the imposition of an unlawful sentence below the statutory minimum. That contention lacks merit. Petitioners agreed to accept the jury's partial verdict of conviction and to waive their right to appeal and, in exchange, the government dropped the outstanding charges against petitioners and agreed to recommend that petitioners be released pending sentencing and that Steven's sentences be served concurrently. The government complied with those obligations and never agreed to forgo its own right to appeal the imposition of an unlawful sentence.[FN4]

> FN4. Petitioners note (Pet. 38) that defense counsel told the district court that petitioners wanted to "bring this matter to a close" and that "the parties" would therefore "accept the [district court's] judgment as to the sentence that's imposed." C.A. E.R. 1270. But as the court of appeals explained, the statement, with which the government did not concur, "cannot reasonably [be] read" in context "as meaning that no party could take an appeal" from an unlawful sentence. Pet. App. 6-7.

Contrary to petitioners' claim, courts cannot "imply as a matter of law a term" in a plea agreement

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"which the parties themselves did not agree upon." *United States v. Benchimol,* 471 U.S. 453, 456 (1985) (per curiam). Although petitioners' appeal waiver did not *15 involve a promise to plead guilty, petitioners have provided no reason to construe their agreement with the government any differently. Cf. Pet. App. 4 n.1 (construing agreement using provisions applicable to a plea agreement). A defendant may agree to accept conviction and waive his right to appeal in exchange for specific promises by the government. Nothing in logic or plea-agreement law requires that a defendant's appeal waiver must be read to imply a corresponding appeal waiver by the prosecutor. See *id.* at 8; *United States v. Hare,* 269 F.3d 859, 861 (7th Cir. 2001) (rejecting contention that a defendant's appeal waiver must be "matched against a mutual and ' similar' promise" by the government); cf. *United States v. Anderson,* 921 F.2d 335, 337-338 (1st Cir. 1990) (concluding that argument that government waived its right to appeal *sub silentio* by failing to expressly preserve that right in a plea agreement "stands logic on its ear").

Petitioners base (Pet. 37-38) their appeal-waiver argument on the Fourth Circuit's decision in *United States v. Guevara,* 941 F.2d 1299 (1991), cert. denied, 503 U.S. 977 (1992). *Guevara* stated that construing a plea agreement as permitting the government to appeal the district court's sentence when the defendant has expressly promised to plead guilty and to waive her own right to appeal would be "far too one-sided." *Id.* at 1299. The court determined that such an agreement should be construed as including an "implicit []" government waiver of its right to appeal that parallels the defendant's "explicit[]" waiver. *Id.* at 1299-1300; cf. *United States v. Blick,* 408 F.3d 162, 168 n.5 (4th Cir. 2005) (noting in dicta that *Guevara* "evened the playing field somewhat" by extending *16 such an appeal waiver to the government). *Guevara,* however, cites no authority to support its rule of construction, nor does *Guevara* address the inconsistency between its reasoning and this Court's decision in *Benchimol.* See *United States v. Guevara,* 949 F.2d 706, 707-708 (4th Cir. 1991) (Wilkins, J., dissenting from denial of rehearing en banc) (concluding that panel's decision is foreclosed by *Benchimol*).

The government has not found any Fourth Circuit opinion that has applied *Guevara* to dismiss a government appeal in the more than 20 years since *Guevara* was decided.[FN5] Indeed, subsequent Fourth Circuit decisions appear to have significantly curtailed *Guevara*'s reach. In *United States v. Broughton-Jones,* 71 F.3d 1143 (4th Cir. 1995), the court concluded that a defendant's valid, express, and materially unqualified appeal waiver (*id.* at 1146) did not prohibit the defendant from appealing on the ground that her subsequent sentence was "illegal" because the sentence "exceeded [the district court's] statutory authority," *id.* at 1147. The Fourth Circuit subsequently concluded in a nonprecedential decision that "[t]he *Guevara *17 rule of reciprocity" reflects an interpretive rule of parity that does not prohibit a government appeal if the defendant could have brought a similar appeal. *United States v. Stubbs,* No. 97-4948, 1998 WL 387253, at *2 (4th Cir. 1998) (per curiam) (unpublished) ("Reciprocity *** requires that the government be able to appeal the legality" of a sentence notwithstanding *Guevara,* "just as a defendant would be allowed [to do so] despite a valid waiver of his right to appeal."). And because *Broughton-Jones* permits a defendant to appeal on the ground that his sentence "exceeded the district court's authority," the court of appeals held that the government could similarly appeal a criminal sentence on the ground that the district court "exceed[ed] its authority" in determining its length. *Ibid.* (discussing *Broughton-Jones*).

> FN5. *Guevara*'s practical impact has been limited by changes that have been made to the standard language of government plea agreements used in the Fourth Circuit that expressly preserve the government's right to appeal notwithstanding a defendant's waiver. *Guevara*'s rule of construction thus

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

lacks prospective importance in the only jurisdiction in which it applies. See, *e.g., United States v. Russell,* 402 Fed. Appx. 772, 773 n.* (4th Cir. 2010) (per curiam) (unpublished) (rejecting challenge to government appeal under *Guevara* because plea agreement expressly preserved government's appeal rights); *United States v. Burton,* 201 Fed. Appx. 186, 188 (4th Cir. 2006) (per curiam) (unpublished) (same); *United States v. Peebles,* 146 Fed. Appx. 630, 632 (4th Cir. 2005) (per curiam) (unpublished) (same).

*Guevara*'s rule of construction does not aid petitioners. *Guevara* rests on the view that a guilty-plea agreement that *includes* a defendant's appeal waiver would be "far too one-sided" if it were construed to allow the government to appeal. 941 F.2d at 1299. But unlike Guevara, petitioners did not forgo trial by pleading guilty. Petitioners entered an agreement to waive their appeal only after a jury found them guilty beyond a reasonable doubt and, in exchange, the government dropped remaining unresolved counts and provided other valuable consideration. Such an agreement is not "too one-sided" under *Guevara*. Moreover, even if *Guevara's* reciprocity-based rule of construction might have applied in this case, it would not have prohibited the government from appealing petitioners' sentences on the ground that the district court "exceed[ed] its authority" by imposing a sentence **\*18** below the statutorily required minimum. See *Stubbs,* 1998 WL 387253, at \*2.

In any event, *Guevara* lacks prospective importance in the only jurisdiction in which it applies. See pp. 16-17 & n.5, *supra.* Consequently, this Court's intervention would not be necessary to eliminate any division of authority that might result from *Guevara* even if that decision's reasoning would apply in this case (which it would not).

CONCLUSION

The petition for a writ of certiorari should be denied.

Hammond v. United States of America
2015 WL 512898 (U.S. ) (Appellate Petition, Motion and Filing )

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.