1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF OREGON

3     THE HON. MICHAEL R. HOGAN, JUDGE PRESIDING

4

5

6    UNITED STATES OF AMERICA,        )
                                      )
7                    Government,      )
                                      )
8            v.                       )  No. 6:10-cr-60066-HO
                                      )
9    STEVEN DWIGHT HAMMOND and DWIGHT )
     LINCOLN HAMMOND, JR.,            )
10                                    )
                     Defendants.      )
11   _____)

12

13         REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                EUGENE, OREGON

15          TUESDAY, OCTOBER 30, 2012

16               PAGES 1 - 34

17

18

19

20

21              Kristi L. Anderson
                Official Federal Reporter
22              United States Courthouse
                405 East Eighth Avenue
23              Eugene, Oregon 97401
                (541) 431-4112
24              Kristi_Anderson@ord.uscourts.gov

25

GOVERNMENT
EXHIBIT
3
10-CR-60066
CARDELS 800-763-0399

2

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE GOVERNMENT:

 4    UNITED STATES ATTORNEY
      FRANK PAPAGNI, ESQ.
 5    405 East Eighth Avenue
      Eugene, Oregon 97401
 6    (541)465-6771
      frank.papagni@usdoj.gov
 7
      FOR THE DEFENDANT STEVEN DWIGHT HAMMOND:
 8
      LAWRENCE H. MATASAR, ESQ.
 9    LAWRENCE MATASAR, PC
      621 SW Morrison Street
10    Suite 1025
      Portland, OR 97205
11    (503) 222-9830
      Fax: (503) 274-8575
12    Email: larry@pdxlaw.com

13
      FOR THE DEFENDANT DWIGHT LINCOLN HAMMOND, JR.:
14
      MARC D. BLACKMAN, ESQ.
15    RANSOM BLACKMAN, LLP
      1001 SW Fifth Avenue
16    Suite 1400
      Portland, OR 97204
17    (503) 228-0487
      Fax: (503) 227-5984
18    Email: marc@ransomblackman.com

19

20

21

22

23

24

25
```

1                    TRANSCRIPT OF PROCEEDINGS

2                    TUESDAY, OCTOBER 30, 2012

3          THE CLERK:  Now is the time for 10-60066, United

4  States of America versus Steven Dwight Hammond and Dwight

5  Lincoln Hammond, Jr., time set for sentencing.

6          THE COURT:  Good morning, gentlemen.

7          With regard to our schedule, first, I have read

8  all the materials that have been submitted and -- including

9  all of the letters.  I just read the last one just now.  And

10  what -- there are quite a few issues that we can talk about

11  today.  I am going to take your input, your argument on

12  those, and then I am going to take a break in this

13  sentencing.  I have a couple of civil motions to hear and a

14  break so that I can organize some thoughts on paper.  Much

15  of my reading of this material has been on airplanes the

16  last couple of days, so I want to make sure that I

17  communicate as clearly as I can.

18          So with that in mind, Mr. Papagni, do you have

19  something more you wish to say that's not in your papers?

20          MR. PAPAGNI:  I suspect the last letter you read

21  was the one from Steven Hammond's wife.

22          THE COURT:  It is.

23          MR. PAPAGNI:  That's the one I just read too.  My

24  comments are going to be kind of in the order of the issues

25  so I don't have to spend much time with them.

1          I want the court to know that my cocounsel,

2     Ms. Sgarlata, is not present today because she is very sick

3     with the flu and she's home in bed.  Her role, as the court

4     knows, in this prosecution focused on the damages or loss.

5          THE COURT:  Yes.

6          MR. PAPAGNI:  The paralegal, Ms. Root, is also not

7     present.  She is stuck in Virginia because of Hurricane

8     Sandy.  I relied upon her quite heavily in this case because

9     she was the only member of the original prosecution team who

10    had been involved in this case from the beginning, and her

11    input to me was pretty important.

12          So you are stuck with me today.

13          What I am going to try to do is go through the

14    issues that were raised by the defense lawyers.  I should

15    comment that the defendants have been very ably represented

16    by Mr. Blackman and Mr. Matasar.  They certainly have raised

17    every issue they thought appropriate, and they certainly

18    have made me do my job, as I am supposed to.

19          In the past five days, they have raised some

20    issues that I have to respond to.  First, after speaking

21    with Ms. Zusman in our office, our appellate chief, it's

22    important to point out in this case the government did not

23    waive its right to appeal as they contend.  The Supreme

24    Court in *United States v. Benchimol*, B-E-N-C-H-I-M-O-L, at

25    471 U.S. 453, a 1985 case, which was cited in *United States*

1    *v. Anderson*, 921 F.2d 335, a First Circuit case, 1990, made

2    it clear that the court cannot imply such a waiver in terms

3    of the plea agreement.

4         In fact, the *Anderson* court held that the

5    government could appeal an illegal sentence notwithstanding

6    the fact that it did not expressly reserve its right in a

7    written plea agreement.

8         Moreover, Judge, I have known, in the years I have

9    been an AUSA, that I cannot waive the United States' appeal

10   rights.  That right to waive such rights is with the

11   solicitor general, and that's established by law,

12   28 CFR 0.163 and that was recognized in *U.S. v. Hare*,

13   H-A-R-E, 269 F.3d 859 (7th Cir. 2001).

14        So that's all I have to comment on the

15   government's waiver issue.

16        Second, the suppression costs.  This court has

17   spent a lot of time dealing with that issue as has pretrial.

18   I think Mr. Davis should be complimented for the work he's

19   done in trying to give the court an outline of what the

20   sentencing guidelines are.

21        In the government's sentencing memo we have

22   concurred with Mr. Davis's, I guess you'd call it original

23   calculations.  He has come up with some other ex post facto

24   concerns that the defendants have raised, and I think those

25   can be dealt with by the court.

1          Suffice it to say, the government is comfortable,

2     based upon the testimony of Jeff Rose at trial and the

3     figures he has provided, that what we put forth in our

4     sentencing memo are accurate and reasonable under these

5     circumstances.

6          Mr. Rose is available by phone to testify, but

7     quite frankly, I'd hate to waste the time to do so.  I think

8     defense counsel has heard the testimony, and I think the

9     court knows his thoughts on the matter.

10          The third issue is that the defendants have

11     acknowledged that the jury verdicts were factually and

12     legally sufficient, albeit for different reasons.

13          There can be no doubt in this case, and I think

14     the parties and the court knows that some jurors traveled, I

15     think it was up to 180 miles to attend each day of trial

16     that lasted, I think eight, nine days.  And there's no doubt

17     they worked hard to return their verdicts, both the guilty

18     ones and the not guilty ones.  Indeed, they were hung on

19     some.  That fact weighs heavily in the government's mind as

20     to what should be done today.

21          The government maintains, however, the testimony

22     of the defendant's grandson and nephew, Dusty Hammond,

23     coupled with the corroborating testimony and physical facts,

24     coupled with the reasons that the defendants seem to rely

25     upon in their sentencing memo on Page 5 all together

1    supported the jury's verdicts of guilty on Count 2 and

2    likewise on Count 5 when there was testimony from a non-BLM

3    employee Brett Dunten, coupled by Steven Hammond's admission

4    as far as the fire was concerned.  In short, the guilty

5    verdicts here, Judge, relied, I'd have to say, almost

6    entirely on non-BLM employees.

7        Mindful in Count 2, there was the testimony of

8    some BLM employees.  The court will recall, however, the

9    government did not argue those facts in its closing argument

10   of that testimony.

11       Fourth, the defendants have submitted numerous

12   letters from community members attesting to their high

13   character.  I have read all the letters.  I have no doubt

14   whatsoever to doubt -- or no doubt of their sincerity of the

15   citizens who wrote them.  It is true, and it can't be

16   contested, I have spent a lot of time in Burns, that the

17   Hammonds both -- that you are to sentence both have done

18   wonderful things for their community and those deeds are

19   recognized in these letters.  And his wife's letter has to

20   be the most heartfelt, certainly, the one you just read.

21       But my obligation as a prosecutor is to point out

22   not just one side of the equation.  And that involves Dusty

23   Hammond.  This court has seen the photographs of Dusty

24   Hammond's abuse at the hands of Steven Hammond.  Those

25   aren't addressed.

1    This court has also heard the testimony or at

2    least was aware of how Dusty Hammond was involved and almost

3    burned up in the fire in Count 2.  Those facts aren't

4    addressed in these letters.

5    The court is aware of the testimony of Gordon

6    Choate, a hunting guide, who perhaps like the hunting guide

7    that Steven Hammond interfered with in 1999, had just as

8    much right to public land as any of the Hammonds did.

9    I have to balance that out in evaluating the

10   Hammonds' conduct in this case.  This isn't to distract

11   their good deeds.  They have done wonderful things.  There's

12   no doubt about it.  But they have done things when they have

13   caused problems for citizens using public lands, and they

14   have endangered their own family member that has to be also

15   weighed into the equation.

16   Mr. Steven Hammond has in fact, as the court

17   knows, been convicted of two offenses, one for

18   unsworn falsification.  That was a jury verdict in Harney

19   County.  And he was also found guilty by a U.S. magistrate

20   for interference with public lands in which the magistrate

21   thought a probation sentence was appropriate.  Somewhat

22   unusual, as the court knows, having dealt with CVB cases.

23   But all of these issues now addressed here, Judge,

24   and I am not even going to talk about the 3553(a) issue

25   raised by the defendants, it's pretty clear that that

1    statute doesn't trump the mandatory minimum.

2         The most important issue for this court is what's

3    the appropriate sentence here.

4         I have done this for a few years.  Unfortunately,

5    in this case, maybe some would say tragically, that this

6    case has not been resolved before trial.  I think the

7    parties, the lawyers, I think, tried hard for that, but it

8    seemed that both sides had their heels dug in.  And that's

9    unfortunate, and I think that's tragic.

10        Now the defendants have been found guilty of

11   offenses that Congress has mandated a five-year prison term

12   for.  The defendants have asserted such punishment is

13   unconstitutional under the Eighth Amendment cruel and

14   unusual punishment clause.  I have found no Supreme Court

15   authority or even appellate court authority that says that a

16   mandatory five-year sentence is a cruel and unusual

17   sentence.  I don't think that's a great -- good argument.

18        I have also already addressed the 3553 argument.

19        Perhaps the best argument, Judge, the defendants

20   have in this case is the proportionality of what they did to

21   what their sentence is.  Perhaps that's the most troubling

22   for the court.  It is for the prosecutor who tried the case.

23        Nevertheless, as I told the defendants shortly

24   after, I think it was midnight, in Pendleton and after you

25   accepted their appellate waivers, I said, quote:

1          "I want to make sure the Hammonds understand

2      that under the statute, the government is

3      obligated to recommend a five-year mandatory

4      minimum term of imprisonment.  I think your lawyer

5      has told you that, but I wanted the record to

6      reflect that you gentlemen have been so warned

7      what sentence is going to be -- that I am going to

8      be asking for."

9          I felt obligated to tell them that night because

10  that's what they were facing.  The jury returned verdicts of

11  guilty for offenses with those five-year mandatory minimum

12  sentences.

13          That being said, I have done my job as I see it.

14  I think it is lawful.  I think it is also ethical what I

15  have recommended to the court.

16          The proportionality issue is one, however, that I

17  think our constitution gives to our courts.  Congress has

18  told you what they think the mandatory sentence should be.

19  I have done my job as the prosecutor trying the case and

20  presenting the evidence the best way I could, and now it's

21  the judiciary's job to impose a sentence that it thinks

22  just.  We have made our recommendation of five years as the

23  statute says.

24          Those are all the comments that I intend to make.

25          THE COURT:  Thank you.  For the defense.

1    MR. BLACKMAN:  Your Honor, we have provided the

2    court with an awful lot of information in writing, and with

3    respect to Dwight Hammond, I don't really think there's any

4    material disagreement, for example, about the guideline

5    calculation.  I think there's a point question in terms of

6    whether there was any loss of more than a hundred dollars in

7    connection with the 2001 fire.  I think the court will

8    recall that the testimony from the BLM range con at trial

9    was that the portion of the public land that burned as a

10    result of that fire was improved, not damaged, by the fire,

11    and there were no suppression costs.

12        So I believe that the base offense level that we

13    are recommending of 6 as opposed to 7 for the more than a

14    hundred dollars is correct.  But again, it's really not

15    material since I don't think it affects where it places

16    Mr. Hammond under the guidelines.

17        The only other two things I really would like the

18    court to consider, if the court is considering, which we

19    certainly trust that you are, that it would in fact be --

20    and I think proportionality is a part of the Eighth

21    Amendment.  If a sentence would be disproportionate to the

22    offense and the offender, at least the extremes as the

23    courts have said, including the Ninth Circuit on at least a

24    couple of occasions, then the proportionality acknowledgment

25    by the government I think demonstrates that imposing a

1   60-month sentence on Dwight Hammond for an offense that

2   under the guidelines would be a maximum six months with

3   the -- probation is basically the recommended sentence as a

4   Zone A offense with a person who is 70 years old and has

5   never been convicted of a crime in his life, who has the

6   kind of respect and appreciation of his community that I

7   don't think anyone is disputing about Mr. Hammond, that that

8   really would shock the conscience, frankly.  I just think it

9   shocks the conscience to think that it would be permissible

10  to condemn this man to 60 months in prison when all those

11  things are undisputed and true.

12          If the court is considering, and, again, I think

13  the government's acknowledging that it's the court's

14  responsibility to consider its constitutional obligations

15  under the Eighth Amendment in fashioning a sentence, then

16  with respect to the 2001 fire, as we say in our memorandum,

17  the facts that support that verdict are the admission that

18  occurred at the time.  There's no dispute that the Hammonds

19  called in to the BLM dispatch and checked to see if a fire

20  could be set that day.

21          It's not disputed that there had been a fire that

22  got off their land two years earlier and they had received a

23  stern warning from the BLM that if fire set on their private

24  land escaped onto the public land again, there would be

25  legal consequences, so they were warned.

1          The evidence as to where ignitions were set on the
2     private land and adjacent to the fence line with the public
3     land permits, certainly the jury's conclusion, that they
4     intended that fire to cross over into the public land.
5          And those facts are sufficient to support the
6     verdict.  And we would urge the court to make those findings
7     as the basis and that it is not sufficiently reliable to
8     conclude that the Dusty Hammond version of that event is
9     more likely than not correct.
10          We have -- I am not going to rehash it all, but
11     his testimony was completely inconsistent with the testimony
12     and the records of the hunting that was done on Section 16
13     in 2001 by Mr. Gustafson, by Mr. Taylor, by the Fish &
14     Wildlife records.
15          So we would urge, if the court is considering
16     looking with favor at our Eighth Amendment argument, that
17     you specifically find those -- that the facts that support
18     that jury verdict are the facts that I have just recited.
19          I don't know if you have any questions that would
20     be of any assistance to you in all the legal stuff we have
21     thrown at you in the last week, but if you have any
22     questions, I would be more than happy to address them.
23          The only other thing I would say, and this is
24     really a practical request, it's if you would in fact find
25     that the nature of this offense was in fact a business

1    regulation offense so that these convictions do not prohibit

2    these men from possessing firearms, which, you know, the

3    only reason they have rifles is because you can't really run

4    a ranch unless you are able to have some opportunity to keep

5    some varmints at bay.  So we would ask for that finding as

6    well.

7            Other than that, I think I have said it all more

8    than once in our memoranda.  But if you have any questions,

9    I would be happy to address them.

10            THE COURT:  Thank you, Mr. Matasar.

11            MR. MATASAR:  Your Honor, just a few things about

12    Steven Hammond.  As far as the fire suppression costs, we

13    provided a memo late yesterday which explains our position

14    on that.  I won't go over that, although I would ask that

15    you make a finding.

16            I agree with what Mr. Blackman said about the

17    basis for the 2001 fire, and so I won't address that but

18    just ask that you make a finding.

19            Steven Hammond has some criminal history issues,

20    which I will just ask the court to make a specific finding.

21    We have argued in the memo about the Fish & Wildlife

22    exception to the -- to one of his convictions.

23            THE COURT:  Had you ever heard of a landowner's

24    permit before this case?

25            MR. MATASAR:  I had not, but obviously you have.

1          THE COURT:  Any of the lawyers ever killed an

2     animal on a landowner's permit?

3          MR. MATASAR:  I have not.

4          THE COURT:  Your judge has.

5          MR. MATASAR:  Yes.  And as I found as I was

6     looking into the landowner permit rules, everybody else

7     knows about them before I did.  So it's quite common, as you

8     know, Your Honor.

9          THE COURT:  It's not common in big cities.

10         MR. MATASAR:  Yes.  It's not.

11         I would say that -- sorry, Your Honor.  I'm

12    resting here.  I hurt my back the other day, so that's why I

13    am resting a bit on the table.

14         THE COURT:  If you need to be seated, go ahead.

15         MR. MATASAR:  No.  I think I can stay. There is --

16    There is -- I think maybe I will.

17         Your Honor, I have known Steven Hammond and Dwight

18    Hammond for nearly 20 years, and I think you know them now

19    as well.  You know them from the community's letters that

20    you have gotten.  People like 84-year old Ellington Peek who

21    runs the video market, from the Farm Bureau, from people who

22    know his kids at school, from people who know him at school.

23    There are people who were at Crane when Steven Hammond was a

24    student.  You know, from what you have read, people who know

25    him at church; people who know him from his volunteer work

1    in the community.

2         And I have been here enough times in the last four

3    years, Your Honor, on this case and one other case to know

4    that you read the material that we put in front of you.

5         And Earlyna Hammond was going to read her letter.

6    The reason why I gave it to you late was not because we were

7    lazy but because she had planned to read it, but I think she

8    would have had trouble getting through it, and so we

9    provided it to the court this morning.

10         I would ask Your Honor, as Mr. Blackman did, that

11    you go along with our memo.  That you feel -- I believe that

12    under the proportionary principles explained by Mr. Papagni,

13    which are based on the Eighth Amendment, that Mr. Steven

14    Hammond belongs in what the guidelines calls Zone B, which

15    allows for a probationary sentence.  We think the difference

16    and one of the reasons why the proportionality principle is

17    important is the difference between a probationary sentence

18    and the mandatory minimum is so great.

19         As far as the other issues raised by Mr. Papagni,

20    the notice of appeal and such, I will rely on our memo, the

21    Fourth Circuit case, the undecided situation in the

22    Ninth Circuit.

23         So other than that, Your Honor, like Mr. Blackman,

24    we are ready to answer questions from you if you have any

25    either now or after you come back, but we ask you to

1    sentence our clients in the -- along the lines we have

2    suggested in our memorandum.

3            THE COURT:  I do have this question:  We had

4    argument on it, but is -- what indication, if any, do you

5    have more than I have that when this five-year mandatory

6    minimum was put in in the Terrorism Act that this sort of

7    activity is what was anticipated?  Is there anything?

8            MR. MATASAR:  I can only say, Your Honor, that my

9    understanding, from what I included in the memo, was that,

10   you know, this statute is about through fire or explosives.

11   I think the focus of the statute seemed to be the explosive

12   part, the intentional aspect of it.  I indicated all the

13   other sections here, they talk about foreign nationals, they

14   talk about terrorism this and terrorism there.  But I see no

15   indication that this -- that this kind of activity was

16   intended in that statute.

17           MR. BLACKMAN:  And Your Honor, I think the most

18   significant, if you are looking, really, at the legislation,

19   the most significant indication of that is in the definition

20   of federal crime of terrorism, which explicitly does not

21   include the 844(f)(1).

22           THE COURT:  I read that in the memo.

23           MR. BLACKMAN:  So I mean, it does strike us as one

24   of those legislative -- I mean, it's a huge bill.  Sometimes

25   I think the Congress does things that it's not intended, and

1  the best indication that that's not what they intended is

2  that.

3      THE COURT:  All right.  We'll come back at

4  12:30 for the actual sentencing, but I do have these

5  comments:

6      The attorneys in this case are all remarkable.

7  The -- you do your job.  But the argument Mr. Papagni made

8  on proportionality was highly moral.  I appreciate that.

9      And this sort of -- I have been doing this for 39

10  years, and this is my last sentencing.  I will impose a

11  sentence that I believe is defensible under the law but also

12  one that is defensible to my conscience.

13      And this is not about me, although there's a

14  couple of indicatings here that I have a -- just a -- a

15  little comment about.  I didn't -- I was halfway through

16  this before I realized my entire family is here -- I am just

17  taking a moment to get through some of the emotion -- along

18  with loved ones from the court, and I wouldn't have had this

19  opportunity without each of you.  I appreciate it.

20      I love this country.  All of us have

21  responsibilities which can't be defined without our --

22  people talk about rights.  That's only one side of the coin.

23  Years ago I heard Bishop Fulton Sheen.  He gave a wonderful

24  address on that in Washington, D.C.

25      And so we have our role to play in a wonderful

1    legal system, and unlike some of my colleagues who will have

2    people make these sort of comments after they are no longer

3    here, I get to make it today.  I am grateful.

4            We'll come back to your case at 12:30.

5            Thank you.

6            MR. BLACKMAN:  Thank you.

7                        (Recess.)

8            THE COURT:  Thank you.  Be seated.

9            Counsel, anything further?

10           MR. MATASAR:  No, Your Honor.

11           THE COURT:  And Mr. Dwight Hammond and Mr. Steven

12   Hammond, have you read the presentence reports in the case?

13           MR. MATASAR:  There was no formal presentence.

14           THE COURT:  All right.  Have you talked to your

15   lawyers about all the issues we have been talking about here

16   today?

17           DEFENDANT STEVEN HAMMOND:  Yes.

18           DEFENDANT DWIGHT HAMMOND:  Yes.

19           THE COURT:  All right.  If you have a statement

20   that you wish to make, before I impose sentence, now is the

21   time to do that.  All right?  So if either of you do, you

22   decide who speaks first.  I don't really care.

23           DEFENDANT DWIGHT HAMMOND:  I really don't have

24   anything other than what my counsel would fill in.

25           THE COURT:  All right.

1          DEFENDANT STEVEN HAMMOND:  And likewise, I

2   appreciate all the time that's been spent on this.

3          THE COURT:  All right.  There are a number of

4   issues that need findings, and these could be organized a

5   little better than they are.

6          First, the government has objected to me advancing

7   the sentencing to today, and I understand that.

8          The objection is denied.  The last of these events

9   happened in 2006, and I am so familiar with all of the facts

10  here and this situation that it would be not appropriate to

11  burden some other judge with handling the sentencing here.

12          MR. MATASAR:  Your Honor, I am going to be seated,

13  if I may.

14          THE COURT:  Excuse me?

15          MR. MATASAR:  I am going to be seated, if I may.

16          THE COURT:  You may, of course.

17          MR. MATASAR:  I'm sorry, Your Honor.  I just

18  can't --

19          THE COURT:  You can all be seated as far as I am

20  concerned.  That's all right.

21          MR. MATASAR:  Thank you.

22          THE COURT:  Now, whether the government waived its

23  right to appeal is frankly not a matter for me.  That's a

24  question for the Ninth Circuit, and I am not going to make

25  any findings on that.

1          With regard to suppression costs, the 15,000 and

2    change that the government has in their -- I think Page 11

3    of their memo, the argument is there, but the evidence

4    supporting it is not.

5          And frankly, if this would be another situation

6    and the government had a motion to postpone to be able to

7    submit its materials, it probably would be a good motion.

8    We don't have it here.  I am not going to extend this, but

9    nevertheless, I am not going to count that as part of the

10   loss.

11         With regard to the sufficiency of the jury

12   verdicts, they were sufficient.  And what happened here, if

13   you analyze this situation, if you listened to the trial as

14   I did and looked at the pretrial matters, there was a --

15   there were statements that Mr. Steven Hammond had given that

16   indicated he set some fires, and the jury accepted that for

17   what it was.

18         There are other evidence that was significant, and

19   none of us know, in the minds of each juror, what is

20   significant.  That's part of the jury system.  But that was

21   really the key thing that happened here.

22         With regard to character letters and that sort of

23   thing, they were tremendous.  These are people who have been

24   a salt in their community and liked, and I appreciate that.

25         In looking at Dusty Hammond's testimony, he was a

1   youngster when these things happened.  I am sure he

2   remembered things as best he could.  There was, frankly, an

3   incident, apparently it was removal of tattoos, that would

4   have colored any young person's thinking, and if that's what

5   happened, it can't be defended, of course, but that's not

6   what's before the court today.

7          Now, I will take up the matter of the mandatory

8   minimum in a moment.

9          In looking at Dwight Hammond's case, the base

10  offense level here is either -- well, it's either -- the

11  offense level is either a 6 or a 7, and it depends on

12  whether or not I find there was at least a hundred dollars

13  in damages.  Well, the damage was juniper trees and

14  sagebrush, and there might have been a hundred dollars, but

15  it doesn't really matter.  It doesn't affect the guidelines,

16  and I am not sure how much sagebrush a hundred dollars worth

17  is.  But I think this probably will be -- I think mother

18  nature's probably taken care of any injury.  I don't think

19  that's the question.  There would be -- you know, as far as

20  some of these civil matters, there's a civil proceeding

21  going on in Pendleton.  That can take care of that.  There's

22  also administrative proceedings.  There's going to be a

23  fearsome penalty paid by these two gentlemen for the

24  decisions they made and the actions they took.

25          At any rate, I find that Dwight Hammond's

1    guideline level is from 0 to 6 months.

2            With regard to Steven Hammond, there are some

3    interesting findings there because the guidelines talk about

4    using the guideline in effect at the time of an incident, so

5    in this case, the latter one, the 2006 fire.

6            Well, those would be the 2005 guidelines because

7    that's when the -- those are the ones in effect at the time.

8    And the guidelines are pretty clear that that's to happen.

9    And then on the other hand, the Ninth Circuit made itself

10   one of two circuits in the *Ortland* case that said, well,

11   there's an ex post facto constitutionality problem with

12   that.  And therefore, I am going to use the 2000 guidelines,

13   which reflected back to the 2001 fire for that one.  Well,

14   if -- that results in a -- I believe a level 10.

15           And then we look at the criminal history category.

16   The landowner preference violation, there's no question for

17   anyone who is an outdoors person that that has to do with

18   the fish and game matter.  Nevertheless, the allegation was

19   an unsworn falsification, which is -- can apply to lots of

20   things.

21           Well, whether it's a fish and game matter or

22   whether it just overstates the criminal history, I am going

23   to find the criminal history category for Steven Hammond to

24   be a III.

25           And with regard to the sentences, I --

1          MR. MATASAR:  Your Honor, from what you said, it

2    sounded like you would have meant II, if you were

3    considering the overstating.

4          THE COURT:  And that's 10 to 16?  I may have --

5          MR. MATASAR:  Yeah.  A level II -- a 10/II would

6    be 8 to 14.

7          PROBATION OFFICER DAVIS:  If you drop down to II,

8    that's correct.  If it remained at a III, it would be 10 to

9    16.

10          THE COURT:  Okay.

11          PROBATION OFFICER DAVIS:  So if you drop down to

12    II, it would be 8 to 14.

13          THE REPORTER:  You need to turn your mike on.

14          THE COURT:  I am dropping down from -- I

15    apologize -- from a IV to a III.

16          MR. MATASAR:  I think it's from a III to II.  I am

17    not --

18          PROBATION OFFICER DAVIS:  Hold on.  We are talking

19    apples and oranges.  He is talking about the amount of

20    points and you are talking about a category.

21          MR. MATASAR:  Oh, yes.  So --

22          PROBATION OFFICER DAVIS:  So three points puts us

23    in category II.

24          MR. MATASAR:  Okay.  I'm sorry, Your Honor.

25          THE COURT:  And the guideline range there is?

1            PROBATION OFFICER DAVIS:  At a level 10, would be

2    8 to 14.

3            THE COURT:  Thank you.

4            PROBATION OFFICER DAVIS:  You are welcome.

5            THE COURT:  I am not going to say that the

6    firearms are a business -- fit under the business

7    requirement exception.  I understand the problems in running

8    a ranch out there without a firearm.  In fact, I think the

9    other name for a Ruger .223 is a farm gun, and for predators

10   that certainly comes into play, but nevertheless, I am not

11   going to include that.  I am not going to make that finding

12   under that exception.

13           So I find that the guideline range for Steven

14   Hammond is a level 10 with a criminal history category of II

15   for 8 to 14 months.

16           Now, with regard to the mandatory minimum, I don't

17   need to repeat that -- this, but you all know that -- and

18   because you are experienced before me that I think

19   Mr. Lessley told me a short time ago that he and Mr. Papagni

20   came in about the same time to work both sides of these

21   cases, and I have been a -- I have been a pretty faithful

22   observer of the guidelines when they are required to be and

23   their requirements and have been working with sentences for

24   39 years.

25           I remember my first sentence for a petty offense,

1    and I knew what I wanted to do.  I just didn't know how to

2    say it.  And that was a different problem back then.

3         I am not going to apply the mandatory minimum and

4    because, to me, to do so under the Eighth Amendment would

5    result in a sentence which is grossly disproportionate to

6    the severity of the offenses here.

7         And with regard to the Antiterrorism and Effective

8    Death Penalty Act of 1996, this sort of conduct could not

9    have been conduct intended under that statute.

10        When you say, you know, what if you burn sagebrush

11   in the suburbs of Los Angeles where there are houses up

12   those ravines?  Might apply.  Out in the wilderness here, I

13   don't think that's what the Congress intended.  And in

14   addition, it just would not be -- would not meet any idea I

15   have of justice, proportionality.  I am not supposed to use

16   the word "fairness" in criminal law.  I know that I had a

17   criminal law professor a long time ago yell at me for doing

18   that.  And I don't do that.  But this -- it would be a

19   sentence which would shock the conscience to me.

20        So I have considered these guidelines and the

21   sentences in this case.

22        Well, first of all, are there other findings,

23   gentlemen, that you require?

24        MR. PAPAGNI:  Not by the government.

25        MR. MATASAR:  No, Your Honor.

1          MR. BLACKMAN:  No, Your Honor.  Thank you.

2          THE COURT:  With regard to Dwight Hammond, I have

3   given you the guidelines which I am applying, and I have

4   considered the guidelines and the 3553(a) factors, and based

5   on these comments I have made, as to Count 2 -- that's the

6   correct count number, right?

7          THE CLERK:  Yes.

8          THE COURT:  The defendant is committed to the

9   Bureau of Prisons for confinement for a period of three

10  months.

11         Upon release, the defendant shall serve a

12  three-year term of supervised release subject to the

13  standard conditions and the following special conditions:

14         The defendant shall cooperate in the collection of

15  DNA as directed by probation.

16         The defendant shall disclose all assets and

17  liabilities to probation and not transfer, sell, give away,

18  or otherwise convey any asset with a fair market value in

19  excess of $500 without approval of probation.

20         The defendant shall not make application for any

21  loan or credit arrangement or lease without approval of

22  probation.

23         And the defendant shall authorize release of -- to

24  probation a financial information by appropriate means.

25         No fine is ordered.

1          The defendant shall pay a fee assessment in the

2     amount of $200 due immediately in full.

3          Now, Mr. Hammond, you have the right to appeal

4     from this sentence under certain circumstances.   Any notice

5     of appeal must be filed within 14 days of entry of judgment,

6     and that will be no later than tomorrow when that judgment

7     is entered.   If you are unable to pay the costs of an

8     appeal, you may apply for leave to appeal in forma pauperis,

9     and if you request, the clerk will prepare and file a notice

10    of appeal on your behalf.

11          Do you understand, sir?

12          DEFENDANT DWIGHT HAMMOND:   Yes, sir.

13          THE COURT:   Now, with regard to Steven Hammond, I

14    have also considered the guidelines as I have commented this

15    morning and considered the 3553(a) factors.

16          And I have one question for probation here before

17    I do this.

18                    *(Conferred with probation.)*

19          THE COURT:   As to Count 2, the defendant is

20    committed to the Bureau of Prisons for confinement for a

21    period of 12 months and one day.

22          As to Count 5, the defendant is committed to the

23    Bureau of Prisons for confinement for a period of 12 months

24    and one day, said sentence to be served concurrently with

25    the sentence imposed in Count 2.

1          The defendant shall cooperate in the collection

2    of --

3          First of all, the defendant shall serve a

4    three-year term of supervised release subject to the

5    standard conditions and the following special conditions:

6          The defendant shall cooperate in the collection of

7    DNA.

8          The defendant shall disclose all assets and

9    liabilities to probation and not transfer or convey any

10   asset with a fair market value in excess of $500 without

11   approval of probation.

12         The defendant shall pay full restitution to the

13   victims identified -- I'm sorry.  I have eliminated that

14   from the sentence.  I'm sorry.

15         The defendant shall not make application for a

16   loan or credit arrangement or enter into a lease agreement

17   without approval of probation.

18         The defendant shall authorize release to probation

19   a financial information by appropriate means.

20         No fine is ordered.

21         The defendant shall pay a fee assessment in the

22   amount of $200 due immediately in full.

23         Mr. Hammond, you have the right to appeal from

24   your sentence under certain circumstances, and a notice of

25   appeal must be filed within 14 days of the entry of

1   judgment.  If you are unable to pay the costs of an appeal,

2   you may apply for leave to appeal in forma pauperis, and if

3   you request, the clerk of court will prepare and file a

4   notice of appeal on your behalf.

5           Do you understand that, sir?

6           DEFENDANT STEVEN HAMMOND:  Yes.

7           THE COURT:  Now, gentlemen, the decisions you made

8   because you couldn't comply with requests from government

9   agencies, whether they were justified in every instance or

10  not, are going to result in grievous losses to you and your

11  families.  And that's how you end up in a place like this.

12          I won't be the judge on any potential supervised

13  release violation.  I will be gravely disappointed if you

14  end up before the court again in that regard.  People have

15  said a lot of nice things about you.  You have a lot to live

16  up to, quite frankly.

17          And I know that for -- you know, it's one thing to

18  have the -- as one letter said, the cowboy code of ethics or

19  the Wyoming code and all that, but we are all a part of one

20  country, and it's a great country.  And even when there are

21  requirements that seem inappropriate, I'm not saying that

22  all of them were; they weren't, we have to learn to live

23  within them or sometimes the consequences are deep.

24          Anything further?

25          MR. BLACKMAN:  Your Honor, just a couple technical

1  things.

2          Number one, would the court authorize voluntary

3  surrender?

4          THE COURT:  Yes.  How long do you request?

5          MR. PAPAGNI:  I think the sentencing was set for

6  December 11th.  I would expect we could set it over until

7  after the first of the year.

8          THE COURT:  All right.

9          MR. BLACKMAN:  If we could have an early January

10 surrender date.

11         THE COURT:  You may.

12         MR. BLACKMAN:  And would you please recommend the

13 Sheridan Camp.

14         THE COURT:  Yes.

15         MR. BLACKMAN:  Then the only other thing, I think

16 you said the fee assessment in Dwight Hammond's case was

17 $200.  I think technically it's 100.

18         THE COURT:  It should be 100.

19         MR. BLACKMAN:  100.

20         THE COURT:  Yeah.  I was using the same form.  I

21 only had one of them, and that's what happened.  It should

22 be 100.

23         MR. MATASAR:  Your Honor, could we confer with the

24 family about perhaps staggering Steven Hammond's turn-in

25 date?  Mr. Dwight Hammond, if he surrenders in January, may

32

1    get out in a few months.

2            THE COURT:  Any objection?

3            MR. PAPAGNI:  No.

4            THE COURT:  All right.  Now, I want you to do it

5    today so that I can -- because I am going to have these

6    judgments prepared today.

7            MR. MATASAR:  I think that makes sense, Your

8    Honor.  We will do it.  We will confer now, and before we

9    leave the courthouse, we will get word to your staff.

10           THE COURT:  That's fine.  All right.  Anything

11   further?

12           MR. PAPAGNI:  I was going to point out what

13   Mr. Blackman did about the assessment.  We caught that one.

14           And of course, the defendants have waived their

15   appeal rights, and I think the court said to the extent they

16   have appeal rights that are limited, that applies, so that's

17   all I have, Judge.

18           THE COURT:  They are.  You have waived most of

19   your appeal rights.

20           The other thing is I find that both defendants

21   have waived the preparation of a presentence report.

22           All right?

23           MR. BLACKMAN:  And Your Honor, we would stipulate

24   that through the trial and all the submissions you had more

25   than sufficient information to proceed to sentencing without

1    a presentence report.

2            MR. MATASAR:  Yes, Your Honor.

3            MR. BLACKMAN:  We stipulate.

4            MR. MATASAR:  For Steven Hammond too.

5            THE COURT:  Thank you.

6            MR. MATASAR:  Thank you, Your Honor.

7            THE COURT:  All right.  We are in recess.  I would

8    like to see just counsel over at the sidebar for a minute.

9            THE CLERK:  Court's in recess.

10           *(The proceedings were concluded this*

11           *30th day of October, 2012.)*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

1          I hereby certify that the foregoing is a true and

2     correct transcript of the oral proceedings had in the

3     above-entitled matter, to the best of my skill and ability,

4     dated this 20th day of November, 2012.

5

6     /s/Kristi L. Anderson
       _____
7     Kristi L. Anderson, Certified Realtime Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25